No. 25-807

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-127

———————————

## EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR PARTIAL STAY PENDING APPEAL
## RELIEF REQUESTED BY FEBRUARY 20, 2025

———————————

BRETT A. SHUMATE
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................1

STATEMENT ..............................................................................................3

ARGUMENT ...............................................................................................7

I.     The States Lack Standing to Challenge Alleged Violations of Individuals' Rights Under the Citizenship Clause. ........................................8

II.    Even if the States Have Standing, the Nationwide Injunction Is Overbroad. ................................................................................... 17

III.   The Remaining Factors Favor a Stay. ............................................ 20

CONCLUSION .......................................................................................... 24

CERTIFICATE OF COMPLIANCE

ADDENDUM

# INTRODUCTION

Defendants-appellants President Donald J. Trump, et al., respectfully move this Court for a partial stay pending appeal of the district court's nationwide preliminary injunction. That injunction restrains the operation of an Executive Order as to every person in the United States at the behest of just two individual plaintiffs and four States. The government does not seek a stay of the injunction with respect to the two individual plaintiffs. But it respectfully requests that this Court stay the district court's improper nationwide injunction pending appeal to the extent it sweeps beyond those individual plaintiffs. *See Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024) (granting a stay of all nonparty relief). Given the importance of the issues presented here and the delays occasioned by the district court's overbroad relief, the government respectfully requests a ruling by February 20, 2025.

The preliminary injunction enjoins nationwide the "enforcement or implementation" of an Executive Order addressing the meaning of the Citizenship Clause of the Fourteenth Amendment. *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025). Under the Citizenship Clause, "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Executive Order explains that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the

United States or whose presence is lawful but temporary. Text, history, and precedent demonstrate that the Executive Order's interpretation of the Citizenship Clause is correct, as the government will explain in its merits brief in this Court.

This motion does not require the Court to address the merits. For the present, the government asks only that this Court stay the preliminary injunction to the extent it sweeps beyond the two individual plaintiffs, whose standing the government does not contest. The district court believed that, because of purported injuries to four plaintiff States, it was appropriate to enjoin the operation of the Executive Order nationwide. That step was plainly unjustified, and a stay is warranted. Citizenship is an *individual* right, and the States have no ability to assert, against the federal government, individual-rights claims of their residents, much less—as the States' theory of relief here implies—individual-rights claims of residents of other States. Well-established limits on *parens patriae* standing and third-party standing dictate this result.

Moreover, the injuries the States themselves claim, such as added expenditures and purported lost revenue, are precisely the sorts of downstream injuries the Supreme Court has rejected as too attenuated to confer Article III standing or are self-inflicted results of States' voluntary spending decisions. Finally, even if the States could overcome these hurdles, precedent from the Supreme Court and this Court makes clear that nationwide relief is patently improper. This

2

Court should therefore stay the order as it applies beyond the two individual

plaintiffs in this case.

## STATEMENT

### A. Background

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll

persons born or naturalized in the United States, and subject to the jurisdiction

thereof, are citizens of the United States and of the State wherein they reside." U.S.

Const. amend. XIV, § 1. Similarly, 8 U.S.C. § 1401(a) makes citizens of any "person

born in the United States, and subject to the jurisdiction thereof."[1]

On January 20, 2025, President Trump issued an Executive Order addressing

what it means to be "subject to the jurisdiction" of the United States. *See* Add. 59-60

§ 1. The Executive Order recognizes that the Constitution and the corresponding

statute extend birthright citizenship to most people born in the United States but they

do not automatically extend the privilege when, at the time of said person's birth: (1)

the mother was unlawfully present and the father was not a citizen or lawful

permanent resident, or (2) the mother's presence was lawful but temporary and the

father was not a citizen or lawful permanent resident. *Id.* The Executive Order also

---

[1] Plaintiffs assert claims under both the Citizenship Clause and this statute. The district court focused on the Citizenship Clause when granting the injunction. *See* Add. 6-10. The reasons States lack standing to bring their constitutional claim also apply to any statutory claim.

3

directs the Executive Branch not to issue documents recognizing U.S. citizenship to persons born in the United States after February 19, 2025 under the conditions described in section 1, and not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. Add. 59-60 § 2.

The Executive Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to "ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and further directs the heads of all federal agencies to issue public guidance by February 19 "regarding this order's implementation with respect to their operations and activities." Add. 61 § 3.

**B. Procedural History**

1. Washington, Arizona, Illinois, and Oregon filed suit the day after the Executive Order issued. *See* Dkt. 1.[2] The States obtained a nationwide temporary restraining order two days later, on January 23. Dkts. 43, 44.

On January 24, three expectant mothers whose children would be affected by the Executive Order filed suit seeking to represent a class of "similarly situated parents and their children" within the State of Washington. Complaint ¶¶ 5, 100, *Aleman v. Trump*, No. 25-cv-163 (W.D. Wash. Jan. 24, 2025), Dkt. 1. The district court

---

[2] Docket citations are to No. 25-cv-127 unless otherwise noted.

4

consolidated the cases. *See* Dkt. 56. One individual withdrew. Add. 17 n.2. The district court construed the two remaining individuals (the "Individual Plaintiffs") to "seek only to enjoin the implementation and enforcement of the [Executive] Order as it relates to themselves." Add. 12 n.9. Because the district court has not yet passed on a class-certification motion, the Individual Plaintiffs are the sole non-State plaintiffs in the case. The government does not seek a stay of the preliminary injunction with respect to the Individual Plaintiffs.

2. On February 6, the district court granted a nationwide preliminary injunction. Add. 1. The court held that not just the Individual Plaintiffs but also the States had Article III standing. The States argued that children born after the effective date of the Executive Order would not qualify for federal financial assistance under programs the States administer, such as Medicaid and the Children's Health Insurance Program (CHIP), and thus the States would lose federal reimbursement dollars for those programs and correspondingly would spend more on state programs that provide care. Add. 36-42, ¶¶ 79-98. In addition, the States contended that they would lose the fee they receive under a contract with the Social Security Administration for each new social security application they process. Add. 42-43, ¶¶ 99-100. Finally, the States contended that they would incur costs adjusting administrative and operational processes to adapt to the new federal policy. Add. 43-45, ¶¶ 101-109.

5

Although the district court did not analyze these alleged injuries in detail, it concluded that the States had alleged an Article III injury based on a "loss of federal funds," "operational disruptions[,] and administrative burdens." Add. 3-4. The court relied on the same alleged injuries in concluding that the States faced irreparable harm from "unrecoverable costs for providing essential medical care and social services" and "administrative costs … to comply with the [Executive] Order." Add. 10.

As to the scope of its injunction, the district court declared that "[t]he extreme nature of the equities"—by which it apparently meant its conclusion that the Executive Order reflects a "constitutional violation[]" that the government "has no legitimate interest in enforcing"—by itself "warrants nationwide relief." Add. 11-12. "In addition," the court reasoned, "a geographically limited injunction would be ineffective" to remedy the States' injuries. Add. 12. "For example, babies born in other states would travel to the Plaintiff States" and "be eligible for services and support that, without nationwide relief, need be funded by the Plaintiff States." *Id.* The district court was further concerned about the "recordkeeping and administrative burden from such an arrangement." Add. 13. Finally, the district court said, it is not "clear what, if any, prejudice the Government would suffer from nationwide relief." *Id.*

The district court entered a preliminary injunction barring "enforcement or implementation of the [Executive] Order on a nationwide basis." *Id.* On February 7,

6

the government moved in district court for a stay pending appeal. As of the filing of this motion, the district court has not ruled on the stay motion.

3. Another district court has enjoined the Executive Order nationwide. *CASA, Inc. v. Trump*, Civ. No. DLB-25-201, 2025 WL 408636, at *17 (D. Md. Feb. 2, 2025). The defendants appealed that injunction and sought a partial stay pending appeal as to its nationwide scope on February 11. A third district court issued a narrower injunction on February 11 that the government also intends to appeal. Preliminary Injunction, *New Hampshire Indonesian Cmty. Support v. Trump*, No. 1:25-cv-38 (D.N.H. Feb. 11, 2025), Dkt. 79.

## ARGUMENT

The government respectfully requests that this Court grant a stay of the nationwide preliminary injunction with respect to all but the two Individual Plaintiffs. The government does not contest that the Individual Plaintiffs have Article III standing, and our merits briefs in this Court will explain why the district court was wrong to enjoin the Executive Order as to them. As to the four plaintiff States and all nonparties nationwide, however, there is no proper basis for equitable relief, and the familiar factors governing the grant of a stay pending appeal—likelihood of success on the merits, irreparable injury, the balance of the equities, and the public interest—strongly counsel in favor of a stay. *See Nken v. Holder*, 556 U.S. 418, 426

7

(2009). At a minimum, this Court should stay the preliminary injunction as to nonparties nationwide.

## I.    The States Lack Standing to Challenge Alleged Violations of Individuals' Rights Under the Citizenship Clause.

The district court properly understood the Individual Plaintiffs to seek only individual—not nationwide—relief. Add. 12 n.9. The district court instead premised the universal sweep of its injunction entirely on the claims of the four States. But the States are not proper parties to this suit, and their purported injuries can provide no valid basis for a nationwide injunction. States cannot directly assert Citizenship Clause claims, which are fundamentally individual-rights claims held by individuals. Nor can the States properly litigate the Citizenship Clause claims of their residents as *parens patriae*. Nor does any other theory of third-party standing plausibly support the States' claims here. Moreover, the States' own alleged injuries rest on speculative and attenuated claims about the downstream effects of federal policy on state expenditures and revenues—precisely the sort of assertions the Supreme Court and courts of appeals have rejected as a basis for Article III standing. At a minimum, these flaws underscore the inappropriateness of the district court's nationwide preliminary injunction, which is unnecessary to remedy any injury to the plaintiff States particularly in light of opposite views expressed by other States who are now encompassed against their will by the district court's injunction.

8

**A.** The States claim that their future residents may be denied the rights or privileges of citizenship by the federal government and that this will indirectly cost the States money. The States, of course, have no Citizenship Clause rights of their own and thus necessarily seek to litigate the constitutional rights of potential future residents. Nor do the States contend that there is any impediment to their residents' ability to bring suits against the federal government asserting rights under that Clause. Nonetheless, the district court permitted the States to litigate Citizenship Clause claims on behalf of their future residents, lest the States incur certain downstream costs.

The Supreme Court has repeatedly held that States cannot bring claims based on the individual rights of their residents. "[I]t is no part of [a State's] duty or power to enforce [its people's] rights in respect of their relations with the Federal Government," *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and thus a "State does not have standing as *parens patriae* to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982). The Supreme Court likewise has refused to countenance States' "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing," *Haaland v. Brackeen*, 599 U.S. 255, 295 n.11 (2023), by asserting derivative injuries from the alleged violations of other individuals' rights.

9

In *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), South Carolina lacked standing to claim that a federal statute violated its citizens' due-process rights because the "States of the Union" have no rights of their own under "the Due Process Clause of the Fifth Amendment" and also could not invoke its citizens' rights "against the Federal Government, the ultimate *parens patriae* of every American citizen." *Id.* at 323-24. Similarly, in *Haaland v. Brackeen*, 599 U.S. 255 (2023), Texas lacked standing to claim that a federal statute violated its citizens' equal-protection rights because Texas "ha[d] no equal protection rights of its own," lacked "standing as *parens patriae* to bring an action against the Federal Government" on behalf of its citizens, and could not "assert third-party standing" to bring such a suit. *Id.* at 294-95 & n.11 (citation omitted). And in *Murthy v. Missouri*, 603 U.S. 43 (2024), Missouri lacked standing to claim that the federal government had violated the Free Speech Clause by censoring the speech of its citizens, as Missouri could not bring a *parens patriae* suit or invoke third-party standing on behalf of residents whose views Missouri was allegedly prevented from hearing. *Id.* at 76.

Ordinary third-party standing principles reinforce the point. A plaintiff generally "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). In other words, a constitutional claim should ordinarily be brought by the person "at whom the constitutional protection is aimed," that is, "the party with the right." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (citation omitted).

10

Crucially, this rule precludes litigating others' claims even when the putative plaintiff "has alleged injury sufficient to meet" Article III requirements. *Warth*, 422 U.S. at 499. In *Kowalski*, for example, the Court addressed a challenge by criminal defense attorneys to a state statute that limited the appointment of appellate counsel for indigent defendants who pleaded guilty. 543 U.S. at 127. The Court assumed that the attorneys had established Article III standing through allegations that the law "has reduced the number of cases in which they could be appointed and paid as assigned appellate counsel" for future "hypothetical indigents." *Id.* at 127, 129 n.2 (citation omitted). But the Court held that notwithstanding that pocketbook injury, the attorneys could not sue to assert their putative clients' constitutional right to have the government pay for their services. *Id.* at 134.

These precedents control here. Just as South Carolina, Texas, and Missouri could not sue the federal government to vindicate individuals' rights under the Due Process, Equal Protection, and Free Speech Clauses, the States here may not sue the federal government to vindicate individuals' asserted rights under the Citizenship Clause. The States "ha[ve] no [citizenship] rights of [their] own," *Brackeen*, 599 U.S. at 294, and indeed they disclaim a *parens patriae* theory of standing, Dkt. 105, at 7. That should have been dispositive. Just as lawyers cannot assert indigent defendants' constitutional rights to government-funded attorneys because those lawyers would lose out on fees, *Kowalski*, 543 U.S. at 134, the plaintiff States here cannot assert the

11

Citizenship Clause rights of future state residents on the theory that those residents' citizenship status may affect States' eligibility for certain federal reimbursements. For this reason alone, the district court erred in ascribing any significance to the States' claims in determining the proper scope of preliminary injunctive relief.

**B.** Although the government raised these points in opposing the preliminary injunction, *see* Dkt. 84, at 11-13, the district court did not address them. It instead concluded that the States have standing solely on the basis of "economic and administrative harms" the States would purportedly suffer through the "loss of federal funds," "'operational disruptions[,] and administrative burdens'" created by the Executive Order. Add. 3-4. But that conclusion was wrong on its own terms. Even apart from the error in allowing the States to raise the individual-rights claims of others, the States have failed to establish Article III standing to sue.

To establish Article III standing, the States must show that they have suffered a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The States' showing of causation "must not be too speculative or too attenuated," an inquiry that includes examining whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

12

The States' claim that the Executive Order will indirectly reduce the federal funding they receive, and thus cause greater expenditures of state funds in other programs, does not satisfy Article III. The Supreme Court recently rejected nearly identical claims in *United States v. Texas*, where two States challenged federal actions that, in their view, increased the number of noncitizens in their States, thereby imposing costs to "supply social services such as healthcare and education to noncitizens." 599 U.S. 670, 674 (2023). The Supreme Court held those costs insufficient to confer standing:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated. In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

*Id.* at 680 n.3 (citations omitted).

That holding was only the most recent in a series of cases rejecting state standing based on downstream effects of federal policy on state revenues or expenditures. The Supreme Court long ago rejected claims that States had standing to challenge federal policy on the theory that it "induc[ed] potential taxpayers to withdraw property" and thereby diminished the State's tax base, explaining that such harms are "purely speculative, and, at most, only remote and indirect." *Florida v.*

13

*Mellon*, 273 U.S. 12, 17-18 (1927).  The courts of appeals have likewise rejected similar claims to standing.  *E.g.*, *Washington v. FDA*, 108 F.4th 1163, 1175-76 (9th Cir. 2024).

These principles foreclose the States' standing here.  Just as in *Texas*, where it was insufficient for the challenger States to point to expenses stemming from the presence of aliens within their borders, the plaintiff States cannot rely on social services expenditures to challenge the federal government's citizenship determinations.  The Executive Order simply regulates how the federal government will approach certain individuals' citizenship status.  No State has a legally cognizable interest in whether the federal government recognizes the U.S. citizenship of a particular individual.  Any incidental downstream economic benefits or burdens that may flow from the number of citizens residing in a State are insufficient to establish standing.  *See* 108 F.4th at 1174-76 (reasoning that increased state Medicaid costs were the sort of "indirect" fiscal injuries that fell short of Article III); *East Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding that states lack "a significant protectable interest in minimizing their expenditures" from immigration-related policy changes because "such incidental effects are … attenuated and speculative").[3]  To conclude otherwise would imply that every State of the Union has

---

[3] The indirect, downstream nature of the States' claimed harm distinguishes this case from *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), where the challenged federal policy would have directly deprived a state government corporation of ongoing fees that it would have otherwise continued earning under a federal contract.  *See id.* at 2366.

Article III standing to litigate the citizenship status of every person residing within its borders. As the precedents discussed above make clear, that is not the law.

The States likewise cannot rely on "operational disruptions and administrative burdens" that they claim will result from the Executive Order. Add. 4. The order itself does not require the States to change their systems or impose any penalty for failing to do so. Because the States' claimed injuries are not attributable to the federal policy itself, the States' voluntary expenditures in response to federal policy are not sufficient to confer standing. *See Alliance for Hippocratic Med.*, 602 U.S. at 394-95.

Indeed, the States' theory of standing here illustrates the concern that no "limits on state standing" would remain if "any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). That is particularly salient in the immigration context, where, as noted, this Court and the Supreme Court have rejected claims of state standing premised on the economic effects of the presence or absence of noncitizens. *Texas*, 599 U.S. at 680 n.3; *East Bay*, 102 F.4th at 1002. While illegal aliens generally are not eligible for federal benefits, certain "qualified aliens," such as lawful permanent residents, asylees, or refugees, may qualify for federal benefits in certain circumstances (including Medicaid coverage and CHIP). *See, e.g.*, 8 U.S.C. § 1612. On the States' theory, every State would have standing to challenge any change in the federal government's

15

policies for conferring any "qualified alien" status, as the grant or withholding of such status would affect eligibility for federal programs and thus impose "operational disruptions and administrative burdens" on States as they administer those programs.

More generally, the States' theory would confer standing to sue over any federal policy that results in an increase in state expenditures or loss of state revenues. For example, the States' claimed interest in future fees from the Social Security Administration, Dkt. 63, at 8, would, if sufficient to confer standing, imply that the States would equally have standing to challenge any federal action that conceivably lowers the birthrate within their borders (*e.g.*, enhanced immigration enforcement). Neither this Court nor the Supreme Court has ever endorsed such a boundless theory.

Finally, the States' asserted injuries regarding "health, social, and administrative services" are not traceable to the Executive Order, because the Order does not require the States to provide those services. *See* Dkt. 63, at 7. The States have *voluntarily* chosen to provide certain benefits without regard to the recipient's citizenship, and the costs they incur to do so are self-inflicted costs that do not confer standing to sue in federal court. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) ("No State can be heard to complain about damage inflicted by its own hand."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417-18 (2013).

16

## II.     Even if the States Have Standing, the Nationwide Injunction Is Overbroad.

In all events, the district court erred in granting nationwide injunctive relief in a suit brought by four States and two individuals.  Such injunctions exceed "the power of Article III courts," conflict with "longstanding limits on equitable relief," and impose a severe "toll on the federal court system."  *Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring); *see DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in the grant of stay).

Under Article III, "a plaintiff's remedy must be 'limited to the inadequacy that produced his injury.'"  *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (brackets and citation omitted); *see Lewis v. Casey*, 518 U.S. 343, 360 (1996) (narrowing an injunction that improperly granted "a remedy beyond what was necessary to provide relief" to the injured parties).  Similarly, traditional principles of equity require that an injunction be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  Nationwide injunctions flout these principles.  They also circumvent the carefully calibrated rules governing class actions in federal courts—a point particularly salient here, where the district court has not yet acted on plaintiffs' request to certify a class.  *See* Fed. R. Civ. P. 23; Add. 12 n.9.  Nationwide injunctions encourage forum shopping.  *Arizona*, 40 F.4th at 396 (Sutton, J., concurring).  They empower a single district court to pretermit meaningful litigation on the same issue in other courts, thereby preventing further

17

percolation of the issues. *See DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring in the grant of stay). And they operate asymmetrically, granting relief to strangers around the nation if a single plaintiff prevails but not precluding litigation by others if the plaintiff loses. *Cf. United States v. Mendoza*, 464 U.S. 154, 159-60 (1984) (holding that non-mutual collateral estoppel does not apply against the federal government).

The Supreme Court recently reiterated the problems posed by nationwide injunctions in granting a stay in *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024). There, the district court had issued a preliminary injunction prohibiting the defendant from enforcing a state law against parties and nonparties, and the court of appeals denied a stay pending appeal. The Supreme Court stayed the district court's order "except as to" the specific plaintiffs. *Id.* at 921. That stay was premised on five Justices' conclusion that universal injunctions providing relief outside the parties to the case are likely impermissible. *Id.* at 927 (Gorsuch, J., concurring in the grant of stay); *see id.* (emphasizing that "[l]ower courts would be wise to take heed"); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).

The district court here paid lip service to the principle that "injunctive relief must be narrowly tailored" but concluded that "[t]he extreme nature of the equities" "alone" warranted "nationwide relief." Add. 12. That is a non sequitur. Neither the structural separation-of-powers principles embodied in the law of Article III standing, *see Gill*, 585 U.S. at 66, nor the forms of relief traditionally afforded by courts of

18

equity, *see Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999), turn on whether a court views the merits of a controversy as clear or the equities as "extreme." The district court had no warrant to issue a nationwide injunction merely to express its disapproval of the government's legal theory or because the court thought it appropriate that its writ should run more broadly.[4]

The district court also suggested that "a geographically limited injunction would be ineffective" to give the States relief because "babies born in other states would travel to the Plaintiff States" and "would be eligible for services and support that, without nationwide relief, need be funded by the Plaintiff States." Add. 12. That speculative premise is plainly inadequate to support a nationwide injunction. The States have provided no evidence suggesting that such moves are likely to occur, particularly between now and final judgment in this case, when the preliminary injunction would be in effect. This Court has previously reversed nationwide injunctions that lacked record support, *see, e.g.*, *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244-45 (9th Cir. 2018); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018), and the lack of any factual foundation for the district court's speculation about population movements is itself sufficient basis to reject its reasoning here.

---

[4] The district court also misread *Biden v. Nebraska*, as endorsing nationwide relief. Add. 12. The Supreme Court there simply reversed the denial of a preliminary injunction and remanded for further proceedings, without suggesting that a nationwide injunction would be appropriate. *Nebraska*, 143 S. Ct. at 2376.

19

In any event, a narrower injunction that required defendants to treat such moving individuals as eligible for these States' federally funded medical and social programs would fully remedy the States' alleged injuries without requiring nationwide relief.

At a minimum, given the well-documented problems with nationwide relief and the opposition to a preliminary injunction from 18 other States, *see* Dkt. 89-1, the district court should have declined to enter sweeping relief based on such speculative and undocumented possibilities; a court's equitable discretion includes the power to withhold the full measure of relief in light of other considerations. *See Texas v. United States*, 126 F.4th 392, 421 (5th Cir. 2025) (narrowing a nationwide injunction because, in part, "22 states and the District of Columbia" opposed it); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

## III. The Remaining Factors Favor a Stay.

The remaining factors—irreparable harm, the balance of harms, and the public interest—likewise favor the requested partial stay. The States' claims of irreparable injury simply mirror their claims of injury for standing—lost reimbursements or "compliance costs." But as discussed above, *see supra* pp. 12-16, those injuries are not cognizable for standing purposes and thus cannot form the basis of a valid claim of irreparable harm to the States (much less to nonparties nationwide).

20

In any event, even if the States' claim of lost reimbursements were sufficient for standing, they have failed to show that any such injuries occurring between now and final judgment would be irreparable. Plaintiffs have not shown—and the district court did not find—that any purported missed reimbursements for expenditures under Medicaid, CHIP, or the Social Security Enumeration at Birth programs could not be recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs. Courts routinely reject arguments that requiring exhaustion of claims through an administrative process that could result in payment of contested claims constitutes irreparable harm.[5] *See, e.g., Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115-16 (9th Cir. 2003); *Manakee Prof'l Med. Transfer Serv., Inc. v. Shalala*, 71 F.3d 574, 581 (6th Cir. 1995).

The States thus face no prospect of irreparable harm from a stay of the injunction. By contrast, allowing the full scope of the injunction to take effect threatens irreparable injuries to the government and the public, whose interests "merge" in this context. *Nken*, 556 U.S. at 435. An injunction that prevents the President from carrying out his broad authority over and responsibility for immigration matters is "an improper intrusion by a federal court into the workings of

---

[5] The case on which the district court relied illustrates the point: there, the claim was that individuals who no longer received private insurance coverage would impose costs on the States. *California v. Azar*, 911 F.3d at 572. States' inability to seek reimbursement from private insurance providers fundamentally differs from their ability to seek Medicaid reimbursement directly from the federal government.

21

a coordinate branch of the Government." *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). Those harms are particularly manifest given the breadth and timing of the injunction. The injunction applies nationwide to all implementation and enforcement and extends a temporary restraining order that was entered just three days after the Executive Order was issued. The order thus prevents (and has prevented) the Executive Branch as a whole from beginning the process of formulating relevant policies and guidance for implementing the President's Order.[6] The States cannot plausibly claim any injury from those internal operations and delaying advance preparations for the policies of a democratically elected government imposes its own "form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

The injunction is especially harmful as the challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. That immigration policy is designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. 8443 (Jan. 29, 2025); *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025).

---

[6] While another district court has enjoined the Executive Order nationwide, the government has appealed and sought a stay. *See supra* p. 7. A third district court issued a narrower injunction on February 11 that the government plans to appeal.

22

Addressing the Executive Branch's prior misinterpretation of the Citizenship Clause is one component of that broader effort, removing incentives to unlawful immigration and closing exploitable loopholes.

Nor can the plaintiff States plausibly claim to represent the public interest, particularly for an injunction of nationwide scope. As noted, 18 other States filed an amicus brief opposing a preliminary injunction here, *see* Dkt. 89-1, and the district court's order thus imposes an injunction on those non-party States to which they object. The court faulted those States for not proposing "limited relief" in their amicus brief, Add. 13 n.10, but as amici they had no obligation to do so. The court erred in granting nationwide injunctive relief at the behest of just two individuals and four States. *See Labrador*, 144 S. Ct. at 921. This Court should grant a stay pending appeal except as to the Individual Plaintiffs. *See id.*

## CONCLUSION

For the foregoing reasons, this Court should stay the district court's nationwide preliminary injunction except as to the Individual Plaintiffs. At a minimum, this Court should grant a stay as to all nonparties.

Respectfully submitted,

BRETT A. SHUMATE
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

February 2025

24

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Ninth Circuit Rules 32-3 and 27-1(1)(d) because it contains 5,594 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

## CERTIFICATE OF SERVICE

I hereby certify that, on February 12, 2025, I electronically filed the foregoing docketing statement with the Clerk of the Court by using the Appellate Case Management System.  I further certify that the participants in the case are ACMS users and that service will be accomplished by using the ACMS system.

*s/ Derek Weiss*
Derek Weiss

**ADDENDUM**

## TABLE OF CONTENTS

District Court Order (February 6, 2025) (Dkt. 114) ...................................................Add. 1

Consolidated Complaint (February 4, 2025) (Dkt. 106)..........................................Add. 14

    Exhibit A: Executive Order No. 14,160 (Jan. 29, 2025)............................Add. 58

    *Exhibits B through J omitted*

THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  STATE OF WASHINGTON, *et al.*,

10              Plaintiffs,

11     v.

12  DONALD TRUMP, *et al.*,

13              Defendants.

14

CASE NO. C25-0127-JCC

ORDER

15

16    This matter comes before the Court on the Plaintiff States' motion for preliminary

17  injunction (Dkt. No. 63) and the Individual Plaintiffs' supplemental motion for the same (Dkt.

18  No. 74). Having thoroughly considered the parties' briefing and the relevant record, and having

19  heard the parties' oral argument, the Court hereby GRANTS the motions for preliminary

20  injunction (Dkt. Nos. 63, 74) for the reasons explained herein.[1]

21
22
23

24  [1] Because this order grants an interlocutory injunction, the Court must make findings of fact and
    conclusions of law. Fed. R. Civ. P. 52(a)(2). The Court therefore makes such findings and
25  conclusions via this order, which serves as a memorandum of the Court's decision. *See* Fed. R.
    Civ. P. 52(a)(1) (the findings of fact and conclusions of law "may appear in an opinion or a
26  memorandum of decision filed by the court"); *see also FTC v. H.N. Singer, Inc.*, 668 F.2d 1107,
    1109 (9th Cir. 1982) (explicit factual findings are unnecessary); *Riverside Publishing Co. v.*
27  *Mercer Publishing LLC*, 2011 WL 3420421, slip op. at 1 (W.D. Wash. 2011) (same).

ORDER
C25-0127-JCC
PAGE - 1

1    **I.    BACKGROUND**

2              On January 20, 2025, President Trump issued an Executive Order ("Order") entitled

3    "Protecting the Meaning and Value of American Citizenship." (Dkt. No. 12-1.) In it, the

4    President stated that "the privilege of United States citizenship does not automatically extend to

5    persons born in the United States." (*Id.* at 3.) Instead, the President explained that birthright

6    citizenship does not apply to two categories of newborns depending on the status of their parents:

7    (1) those born to a mother who is "unlawfully present" in the United States and whose father is

8    not a United States citizen or lawful permanent resident ("LPR") at the time of birth, and (2)

9    those born to a mother whose presence in the United States is "lawful but temporary" and whose

10   father is not a United States citizen or LPR at the time of birth. (*Id.*) The Order then declares it

11   the policy of the United States not to "issue documents recognizing citizenship, or accept

12   documents issued by State, local, or other governments or authorities purporting to recognize

13   United States citizenship" to the aforementioned categories of persons. (*Id.*) This policy is

14   effective February 19, 2025. (*See id.* at 4.) Nevertheless, the Order further directs the "heads of

15   all executive departments and agencies" to "issue public guidance within 30 days of the date of

16   this order regarding this order's implementation with respect to their operations and activities."

17   (*Id.*)

18             On January 21, 2025, the states of Washington, Arizona, Illinois, and Oregon ("Plaintiff

19   States") filed a complaint against the Government seeking declaratory and injunctive relief. (Dkt.

20   No. 1 at 1.) In it, they argued that the Order violates the Citizenship Clause of the Fourteenth

21   Amendment and the Immigration and Nationality Act (INA), 8 U.S.C. § 1401. (*Id.* at 28–29.)

22   The Plaintiff States then moved for a temporary restraining order to enjoin the Order, in its

23   entirety. (Dkt. No. 10 at 30.) The Court granted the motion on January 23, 2025. (Dkt. No. 43.)

24   That same day, the Court set a briefing schedule and preliminary injunction hearing. (Dkt. No.

25

26

27

ORDER
C25-0127-JCC
PAGE - 2

1   44.) The next day, Delmy Franco Aleman, Cherly Norales Castillo, and Alicia Chavarria Lopez[2]

2   ("Individual Plaintiffs") filed suit, lodging similar arguments and seeking similar relief as the

3   Plaintiff States. (*See* Dkt. No. 56 at 2.) The Court consolidated the Individual Plaintiffs' suit with

4   the present action and provided them an opportunity to submit supplemental briefing regarding

5   the preliminary injunction. (*See id*. at 3.) The Plaintiff States' and the Individual Plaintiffs'

6   respective motions for preliminary injunction are now pending before this Court. (*See* Dkt. Nos.

7   63, 74.)

8   **II.   DISCUSSION**

9       **A.   Threshold Matters**

10      Before reaching the criteria for a preliminary injunction, the Government raises two

11  threshold challenges. First, the Government argues that the Plaintiff States' lack standing to

12  bring this lawsuit. (Dkt. No. 84 at 20–26.) Second, the Government contends that both sets of

13  Plaintiffs have failed to assert valid causes of action. (*Id*. at 28–30.) The Court takes each

14  challenge in turn.

15      1.   Standing

16      Though the Court has already concluded that the Plaintiff States have standing, (*see* Dkt.

17  No. 43 at 2), it reaffirms that conclusion here. To establish Article III standing, a plaintiff must

18  demonstrate that they have suffered a concrete "injury in fact" that is traceable to the defendant

19  and likely redressable by judicial relief. *Washington v. U.S. Food & Drug Administration*, 108

20  F.4th 1163, 1172 (9th Cir. 2024) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

21      Here, the Order subjects the Plaintiff States to direct and immediate economic and

22  administrative harms. (Dkt. No. 63 at 12.) That is, the Order would force the Plaintiff States to

23  disqualify many individuals it currently deems citizens, and such disqualification would result in

24

25  [2] All of whom are pregnant noncitizens living in the United States with due dates more than 30
26  days following the Order. *See* C25-0163-JCC, Dkt. No. 1 at 13–15. In a later-filed amended
    consolidated complaint (Dkt. No. 106), the Plaintiffs note that Delmy Franco Aleman has chosen
27  to withdraw from the case. (*Id.* at 3–4 n. 2.)

ORDER
C25-0127-JCC
PAGE - 3

Add. 3

1   the States' significant loss of federal funds for which they are otherwise eligible. (*See id.* at 13.)

2   It would also impose "significant operational disruptions and administrative burdens within state

3   agencies and state-run-healthcare facilities as they try to navigate the chaos and uncertainty the

4   [Order] creates." (*Id.* at 14; *see also* Dkt. Nos. 14 at 12; 15 at 9; 25 at 5; 26 at 4, 6) (documenting

5   burdens on state agencies). This is more than sufficient to satisfy Article III standing. *See Biden*

6   *v. Nebraska*, --- U.S. ---, 143 S. Ct. 2355, 2365–66 (2023) (Missouri had standing to sue the

7   federal government where federal action cancelling student loans would cost Missouri millions

8   "in fees that it otherwise would have earned under its contract with the Department of

9   Education"); *see also City and Cnty. of San Francisco v. United States Citizenship and*

10  *Immigration Servs.*, 944 F.3d 773, 787–88 (9th Cir. 2019) (states had standing to challenge

11  federal government where federal action would have encouraged aliens to disenroll from public

12  benefits, which would have resulted in a reduction in Medicaid reimbursement payments to the

13  States of about $1.01 billion and increased administrative costs).[3]

14                  2.      Cause of Action

15          The Government argues that the Plaintiffs lack a valid cause of action. (Dkt. No. 84 at

16  26–30.) But the Plaintiffs maintain a valid cause of action by nature of the equitable relief they

17  seek in response to the statutory and constitutional violations they allege. Federal courts are

18  courts of equity that are tasked with upholding the rule of law. *Cf. Armstrong v. Exceptional*

19  *Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Indeed, "[t]he ability to sue to enjoin unconstitutional

20  actions by state and federal officers is the creation of courts of equity, and reflects a long history

21  of judicial review of illegal executive action, tracing back to England." *Id.* at 327. "'[I]n a proper

22  case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer.'"

23  _____

24  [3] Finally, though the Government does not challenge standing for the Individual Plaintiffs, (*see generally* Dkt. No 84 at 28), the Court nevertheless confirms that they, too, have standing to

25  bring this lawsuit. They are pregnant noncitizens whose children will be deprived of United States citizenship if the Order goes into effect. (*See* Dkt. Nos. 59 at 2–3, 60 at 2–3, 61 at 2–3)

26  (the Individual Plaintiffs fall into the category of persons for which the Order applies, and their due dates come after the effective date of the Order). As such, their harms are directly traceable

27  to the Order.

ORDER
C25-0127-JCC
PAGE - 4

1   *Id.* (quoting *Carrol v. Safford*, 3 How. 441, 463 (1845)). As such, a party may seek to enjoin acts

2   of a public officer that run counter to statute. *See Sierra Club v. Trump*, 929 F.3d 670, 696 (9th

3   Cir. 2019). Similarly, because a public officer's unconstitutional acts are particularly injurious, a

4   court may provide equitable relief under that principle alone. *See id.* at 694. Different standards

5   apply to suits for damages, of course. *See DeVillier v. Texas*, 601 U.S. 285, 292 (2024). But the

6   Plaintiffs here do not seek damages; they seek declaratory and injunctive relief. (Dkt. No. 106 at

7   42.) Therefore, because they have standing, this Court may review the Order and, if it is illegal

8   under the Constitution or the INA, enjoin its enforcement.[4]

9   **B.    Preliminary Injunction**

10          A preliminary injunction is an extraordinary remedy and is never available as a matter of

11  right. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008). Therefore, the burden is on

12  the moving party to establish that (1) it is likely to succeed on the merits, (2) irreparable harm is

13  likely to occur absent preliminary relief, (3) the balance of equities tips in the movant's favor,

14  and (4) an injunction is in the public interest. *Id.* at 20. Moreover, in the Ninth Circuit, a

15  preliminary injunction may be appropriate where the moving party establishes "'serious

16  questions going to the merits' and a balance of hardships that tips sharply towards the

17  plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable harm and

18  that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

19  1135 (9th Cir. 2011).

20

21

22

23

---

24  [4] The Government also argues in its response brief that the President should be dismissed from
    this case as immune from the injunctive relief the Plaintiffs seek. (Dkt. No. 84 at 58) (citing

25  *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)). Such a request, buried in a response
    brief, is procedurally deficient. *See* LCR 7(b)(1); *see also Kujat v. Harbor Freight Tools USA,*

26  *Inc.*, 2010 WL 3463928, slip op. at 2 (E.D. Mich. 2010) (it is "procedurally improper . . . [to]
    raise in a response brief what is essentially a Rule 12(b)(6) motion"); *Cooper Lighting, LLC v.*

27  *Cordelia Lighting, Inc.*, 2018 WL 11350387, slip op. at 5 (N.D. Ga. 2018) (similar holding).

ORDER
C25-0127-JCC
PAGE - 5

1                    1.      Success on the Merits

2          The Plaintiffs are likely to succeed on their claim that the Order violates the Citizenship

3   Clause of the Fourteenth Amendment (and, in turn, the INA). Indeed, the Court need only look to

4   its text. The Citizenship Clause is clear: "All persons born or naturalized in the United States,

5   and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein

6   they reside." U.S. Const. amend. XIV, § 1, cl. 1. In other words, any individual who is born in

7   the territorial United States or properly naturalized according to federal procedures is a citizen of

8   this country.

9          The Government, for its part, relies on the provision of the Citizenship Clause that

10  conditions citizenship upon being "subject to the jurisdiction" of the United States. (Dkt. No. 84

11  at 31–36.) That is, the Government argues that "children born in the United States of illegal

12  aliens or temporary visitors" are not "subject to the jurisdiction of the United States," and

13  therefore cannot be considered birthright citizens. (*Id*. at 31.) Its logic proceeds as follows. First,

14  the Government contends that a person is "subject to the jurisdiction" of the United States if that

15  person is born "'in the allegiance and under the protection of the country.'" (*Id*. at 33) (citing

16  *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898)). It then explains that such allegiance

17  and protection exist for a person "only if [they are] not subject to the jurisdiction of a foreign

18  power, and the 'nation' has 'consent[ed]' to [that person] becoming part of its own

19  'jurisdiction.'" (*Id*.) (citing *Elk v. Wilkins*, 112 U.S. 94, 101–02 (1884)). The Government further

20  explains that a person owes "allegiance" to the country in which they are "domiciled," and

21  because a child's domicile "'follow[s] the independent domicile of [their] parent,'" so, too, must

22  a child's "allegiance." (*Id*. at 37) (quoting cases). In turn, the Government reasons that because

23  "[t]emporary visitors and unlawfully present aliens" are not "domiciled" here, their children born

24  on our soil must not owe "allegiance" to this country, and therefore are not "subject to [its]

25  jurisdiction" (as that phrase is contemplated by the Citizenship Clause). (*Id*.) But the

26  Government accords more meaning to the phrase "subject to the jurisdiction" than those words

27  or precedent support.

ORDER
C25-0127-JCC
PAGE - 6

Add. 6

1    In interpreting the text of the Constitution, courts are "guided by the principle that '[t]he

2  Constitution was written to be understood by the voters; its words and phrases were used in their

3  normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*,

4  544 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). Here,

5  the Government interprets the phrase "subject to the jurisdiction" beyond its normal and ordinary

6  meaning. For one, the Government insinuates that "subject to the jurisdiction" conditions

7  citizenship upon the *exclusive* jurisdiction of the United States. (*See* Dkt. No. 84 at 33) (stating

8  that allegiance exists only if a person is not subject to the jurisdiction of a foreign power). But

9  the text of the phrase requires no such exclusivity; it requires only that the person born in the

10  United States be subject to it. *See* Michael D. Ramsey, *Originalism and Birthright Citizenship*,

11  109 Geo. L.J. 405, 446 (2020).

12    The Government also contends that whether a person born in the territorial United States

13  is "subject to its jurisdiction" ultimately turns on the legal status of the person's parents and their

14  allegiance to and domicile in this country. But the words "allegiance" and "domicile" do not

15  appear in the Citizenship Clause, or anywhere in the Fourteenth Amendment, and nowhere in the

16  text does it refer to a person's parentage. The Clause merely refers to "jurisdiction," and the

17  word "jurisdiction" is commonly understood in this context to be "a geographic area within

18  which political or judicial authority may be exercised." *Jurisdiction*, Black's Law Dictionary

19  (12th ed. 2024); *see also The Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812) ("The

20  jurisdiction of the nation within its own territory is necessarily exclusive and absolute"). Thus,

21  anyone who answers to the political or judicial authority of the United States is "subject to [its]

22  jurisdiction." That is the plain meaning of the phrase "subject to the jurisdiction," and it

23  unequivocally applies to children born in the territorial United States—regardless of the

24  immigration status of their parents.

25    The Government's interpretation also contravenes longstanding precedent. Indeed, the

26  Supreme Court addressed the meaning of the phrase "subject to the jurisdiction thereof" in the

27  seminal case *Wong Kim Ark*. *See generally* 169 U.S. at 649–705. There, the Supreme Court

ORDER
C25-0127-JCC
PAGE - 7

1   concluded that a child born in California to Chinese nationals, nevertheless acquired United

2   States citizenship at birth under the Fourteenth Amendment. *Id*. at 705. To reach that conclusion,

3   the Supreme Court exhaustively canvassed English common law,[5] early American decisions,[6]

4   and citizenship's meaning to the Fourteenth Amendment's drafters.[7] It also clearly explained that

5   the phrase "subject to the jurisdiction thereof" was an extremely narrow qualification that only

6   excepted three specific classes of person: "children of members of the Indian tribes, . . . children

7   born of alien enemies in hostile occupation, and children of diplomatic representatives of a

8   foreign state." *Id*. at 682.[8] And to further emphasize the narrowness of the qualifications imbued

9

10

---

11   [5] *See, e.g., id.* at 657–58 (citing A.V. Dicey for the proposition that only two types of persons
     born in British dominions were not British: those born to ambassadors and those born to hostile
12   invaders).
     [6] *See, e.g., id.* at 674 (noting that *Lynch v. Clarke*, 1 Sandf. Ch. 583 (1844), "emphatically
13   asserted the citizenship of native-born children of foreign parents").
     [7] *See, e.g., id.* at 698–99. To the extent they are useful, the Senate debates indicate that the
14   Citizenship Clause drafters understood the phrase "subject to the jurisdiction thereof" to apply
     broadly to immigrants and their children. *See* Ramsey, *supra*, at 445–50. Indeed, like the
15   Government here, opponents of the proposed Citizenship Clause worried that it would confer
     citizenship upon children born on U.S. soil to immigrant parents. Cong. Globe, 39th Cong., 1st
16   Sess. 2891 (remarks of Sen. Cowan). Proponents defended the language. *Id.* at 2891 (remarks of
     Sen. Conness), 2893 (Sen. Johnson), 2897 (Sen. Williams). But both sides seemed to agree that
17   the Clause would broadly confer citizenship on these persons. *See* Ramsey, *supra*, at 447–50; *see*
     *also* James Ho, *Birthright Citizenship, the Fourteenth Amendment, and State Authority*, 42 U.
18   Rich. L. Rev. 969, 972 (2008). The opponents lost and the Fourteenth Amendment was ratified,
     with the Citizenship Clause intact.
19   [8] Of course, this exception for Native American children no longer applies. But at the time, in
     deciding *Wong Kim Ark*, the Supreme Court also confronted its decision in *Elk*. In doing so, the
20   *Wong Kim Ark* court clarified that *Elk*'s holding was limited only to be that "an Indian born a
     member of one of the Indian tribes . . . was not a citizen of the United States." 169 U.S. at 680.
21   Congress has since abrogated *Elk* and expanded citizenship to Native American children via
     statute. *See* 8 U.S.C. § 1401(b) (1924).
22   To that effect, the Government's reliance on *Elk*, (*see, e.g.,* Dkt. No. 84 at 15–16, 31, 33–38), as
     well as on Senate debates around Native American citizenship generally, (*id.* at 34–35), are
23   simply unfounded. The questions addressed there were more difficult than the question about
     immigrant parents due to the tribes' "peculiar relation to the national government" as
24   independent sovereigns. *Wong Kim Ark*, 169 U.S. at 682; *see also* Garrett Epps, *The Citizenship*
     *Clause: A "Legislative History"*, 60 Am. U. L. Rev. 331, 357–72 (2010). As noted in *Wong Kim*
25   *Ark*, those special concerns do not directly speak to the question presented here. *See id.* at 680.

ORDER
C25-0127-JCC
PAGE - 8

in the phrase "subject to the jurisdiction thereof," the Supreme Court explicitly clarified that "aliens" were "exempt" from the qualifications because:

> When private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, . . . , it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country.

*Id.* at 685–86. In other words, "aliens" and other individuals who avail themselves of this country for non-diplomatic purposes—whether lawfully or not—are necessarily "subject to the jurisdiction" of the United States. So, too, children born of said "aliens" on United States territory. To construe the phrase otherwise would be "dangerous to society" and delegitimize this country's jurisdiction over the persons who inhabit it. *See id.* (citing *The Schooner Exch.*, 11 U.S. at 136). And thus, according to the Court in *Wong Kim Ark*, so long as a child is born in the territorial United States and does not fall under one of the narrowly tailored exceptions covered by the phrase "subject to the jurisdiction thereof," that child receives citizenship by birth under the Fourteenth Amendment. *Id.* at 693.

To the Government's credit, allegiance has at least some importance to citizenship. Indeed, the Supreme Court acknowledged as much in *Wong Kim Ark*. *See id.* ("The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country"). But again, the Government relies too heavily on the *parents'* allegiance, when it ought to focus on the *child's*. In *Wong Kim Ark*, the Supreme Court emphasized time and again that "[b]irth and allegiance go together." *Id.* at 662; *see also id.* at 659 ("allegiance by birth is that which arises from being born within the dominions and under the protection of a particular sovereign"). In other words, so long as a person is born within a territory, then allegiance to that territory is a foregone conclusion. In turn, that a child happens to be born to undocumented parents or parents with temporary status is irrelevant.

ORDER
C25-0127-JCC
PAGE - 9

1    Finally, this Court briefly considers the Government's argument regarding consent. The

2    Government intimates that the phrase "subject to the jurisdiction thereof" requires that the

3    United States "consent" to a person becoming subject to its jurisdiction. (Dkt. No. 84 at 33.) That

4    is, "'[n]o one can become a citizen of a nation without its consent'." (*Id*. at 16) (quoting *Elk*, 112

5    U.S. at 102). And because the United States has not "consented" to the entry of undocumented

6    immigrants, it must follow that the United States has not "consented to making citizens of that

7    person's children." (*Id*.) Once again, the Government seems most preoccupied with the legal

8    status of the parents—so much so that it conflates the position of the child with that of their

9    parents. The fact of the matter is that the United States *has* consented to the citizenship of

10   children born on its territory, through the ratification of the Fourteenth Amendment.

11   Ultimately, the Government's position is unavailing and untenable. It does not have the

12   text or precedent to support its interpretation of the Citizenship Clause. And it rehashes losing

13   arguments from over a century ago. *See, e.g.*, *Wong Kim Ark*, 169 U.S. at 705–32 (Fuller, C.J.,

14   dissenting). Moreover, subsequent precedents have affirmed the exceptionally American grant of

15   citizenship as birthright. *See also Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*,

16   134 F.2d 413 (9th Cir. 1943), *cert denied*, 319 U.S. 753 (1943); *see also Gee v. United States*, 49

17   F. 146, 148 (9th Cir. 1892). We need not till the same ground more than a century later.

18   The Plaintiffs are likely to succeed on the merits.

19        2.    Irreparable Harm

20   The Plaintiff States have also shown that they are likely to suffer irreparable economic

21   harm in the absence of preliminary relief. Economic harm "is irreparable here because the states

22   will not be able to recover money damages." *California v. Azar*, 911 F.3d 558, 581 (9th Cir.

23   2018). The Order will directly impact the Plaintiff States, immediately increasing unrecoverable

24   costs for providing essential medical care and social services to the States's residents and

25   creating substantial administrative costs for state agencies that are forced to comply with the

26   Order. (*See, e.g.*, Dkt. Nos. 14 at 12; 15 at 9; 25 at 5; 26 at 4, 6) (*cf. Ledbetter v. Baldwin*, 479

27

ORDER
C25-0127-JCC
PAGE - 10

1    U.S. 1309, 1310 (1986) ("the State will suffer irreparable harm . . . [and] will bear the

2    administrative costs of changing its system to comply with the District Court's order")).

3           Likewise, the Individual Plaintiffs have made the requisite showing of irreparable harm.

4    "An alleged constitutional infringement will often alone constitute irreparable harm." *Goldie's*

5    *Bookstore, Inc. v. Superior Court of State of Cal.*, 739 F.2d 466, 472 (citing Wright & Miller, 11

6    *Fed. Prac. & Proc.* § 2948 (1973)). The Individual Plaintiffs assert that their unborn children

7    will be denied citizenship and be immediately subject to deportation under the INA, 8 U.S.C.

8    § 1182(a)(6)–(7). (*See, e.g.,* Dkt. Nos. 59 at 3, 60 at 2–3.) This would forcibly separate some of

9    their families. (*See, e.g.,* Dkt. No. 61 at 2–3.) The constitutional infringement and the specter of

10   deportation are sufficiently irreparable for the purposes of a preliminary injunction.

11          Therefore, the Plaintiffs have demonstrated the likelihood of irreparable harm.

12          3.     Balance of Equities and Public Interest

13          Finally, the Court finds that the balance of equities and the public interest strongly weigh

14   in favor of entering a preliminary injunction. These two factors merge when the federal

15   government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). First, constitutional violations

16   weigh heavily in favor of an injunction. *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024).

17   Second, the Government has no legitimate interest in enforcing an Order that is likely

18   unconstitutional and beyond its authority. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d

19   497, 539 (N.D. Cal. 2017). Third, the rule of law is secured by a strong public interest that the

20   laws "enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary*

21   *Covenant v. Trump*, 9 F.3d 742, 779 (9th Cir. 2018) (cleaned up).

22          The balance of equities and the public interest both support the relief sought.

23   **C.     Scope of Injunction**

24          The Plaintiff States ask the Court to enjoin the Order's implementation and enforcement

25

26

27

ORDER
C25-0127-JCC
PAGE - 11

Add. 11

1   on a nationwide basis.[9] (*See* Dkt. No. 63 at 29.) They contend anything less cannot provide

2   complete relief, given the Order's "extraordinary nature," its resulting financial burdens, and the

3   likely "operational chaos" the Order will trigger. (Dkt. Nos. 63 at 29, 105 at 23.) It is axiomatic

4   that injunctive relief must be narrowly tailored. *See, e.g., Nat. Resources Def. Council, Inc. v.*

5   *Winter*, 508 F.3d 885, 886 (9th Cir. 2007). Nevertheless, this "is 'dependent as much on the

6   equities . . . as the substance of the legal issues,' and courts must tailor the scope 'to meet th[ose]

7   exigencies.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (quoting *Azar*, 911 F.3d at

8   584).

9        The extreme nature of the equities, *see supra* Part II.B.3., alone warrants nationwide

10   relief. Moreover, the Court cannot ignore the Supreme Court's discussion regarding President

11   Biden's student loan debt program, as implemented by the Secretary of Education, where

12   according to the Court, the Executive branch "arrogat[ed] to itself power belonging to another

13   [branch]." *Biden*, 143 S. Ct. at 2373. Given the nature of that harm and the scope of that conduct,

14   nationwide relief was warranted. *See id.* at 2376 (reversing the District Court's refusal to issue a

15   nationwide preliminary injunction). The Court fails to see a distinction with the actions at issue

16   here.

17        In addition, as the Plaintiff States note, a geographically limited injunction would be

18   ineffective, as it would not completely relieve them of the Order's financial burden(s). (*See* Dkt.

19   No. 63 at 29.) For example, babies born in other states would travel to the Plaintiff States. Once

20   they do, those persons would be eligible for services and support that, without nationwide relief,

21   need be funded by the Plaintiff States, without federal support (even though that same funding

22   would continue for babies born within the Plaintiff States to parents of comparable immigration

23   status). This is, simply said, perverse and bizarre. As *amicus* 72 State and Local Governments

24

25   [9] The Individual Plaintiffs do not specify the scope of the preliminary injunction they seek. (*See*

26   *generally* Dkt. No. 74.) However, as the Court has not yet ruled on their motion for preliminary
     class certification (Dkt. No. 58), the Court must surmise that these plaintiffs seek only to enjoin

27   the implementation and enforcement of the Order as it relates to themselves.

1   point out, it is also unworkable. (*See* Dkt. No. 69-1 at 17.) The recordkeeping and administrative

2   burden from such an arrangement, (*see id.*),[10] also mandates nationwide relief. Nor is it clear

3   what, if any, prejudice the Government would suffer from nationwide relief. In its brief in

4   opposition, it points to none. (*See* Dkt. No. 84 at 57–59.)

5          For all these reasons, the Court finds that relief must be nationwide. Anything less is

6   ineffectual.

7   **III.    CONCLUSION**

8          Citizenship by birth is an unequivocal Constitutional right. It is one of the precious

9   principles that makes the United States the great nation that it is. The President cannot change,

10  limit, or qualify this Constitutional right via an executive order. The Court GRANTS the

11  Plaintiffs' motions for a nationwide preliminary injunction (Dkt. Nos. 63, 74) and ENJOINS

12  enforcement or implementation of the Order on a nationwide basis.

13

14         DATED this 6th day of February 2025.

15

16

17

18                                             John C. Coughenour
                                               UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26  _____
    [10] *Amicus* 18 Opposing States do not suggest, in the alternative, limited relief. (*See generally*
27  Dkt. No. 89-1.) Nor do other opposing *amici*. (*See generally* Dkt. Nos. 80-2, 86-2.)

    ORDER
    C25-0127-JCC
    PAGE - 13

The Honorable Judge John C. Coughenour

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,

                   Plaintiff States,

and

Cherly NORALES CASTILLO and Alicia
CHAVARRIA LOPEZ, on behalf of
themselves as individuals and on behalf of
others similarly situated,

                   Individual Plaintiffs,

    v.

DONALD TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM in her official
capacity as Secretary of Homeland Security;
U.S. SOCIAL SECURITY
ADMINISTRATION; MICHELLE KING,
in her official capacity as Acting
Commissioner of the Social Security
Administration; U.S. DEPARTMENT OF
STATE; MARCO RUBIO, in his official
capacity as Secretary of State; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY FINK,
in her official capacity as Acting Secretary

NO. 2:25-cv-00127-JCC

CONSOLIDATED COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF—CLASS
ACTION

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    of Health and Human Services; U.S.
     DEPARTMENT OF JUSTICE; JAMES
2    MCHENRY, in his official capacity as
     Acting Attorney General; U.S.
3    DEPARTMENT OF AGRICULTURE;
     GARY WASHINGTON, in his official
4    capacity as Acting Secretary of Agriculture;
     and the UNITED STATES OF AMERICA,
5
                    Defendants.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

Add. 15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.    INTRODUCTION

1.      Plaintiffs bring this action to stop the illegal Executive Order issued by President Donald J. Trump that purports to unilaterally alter the meaning of the Fourteenth Amendment's guarantee of birthright citizenship. The Executive Order directs federal agencies to bar certain persons born in the United States from citizenship and the many benefits to which citizenship entitles them by unlawful executive fiat.

2.      The Executive Order, issued on January 20, 2025, and entitled "Protecting the Meaning and Value of American Citizenship" (Citizenship Stripping Order), is contrary to the plain terms of the Fourteenth Amendment's Citizenship Clause and Section 1401 of the Immigration and Nationality Act (INA).[1] The President has no authority to amend the Constitution or supersede the Citizenship Clause's grant of citizenship to individuals born in the United States. Nor is he empowered by any other constitutional provision or law to determine who shall or shall not be granted U.S. citizenship at birth. The Fourteenth Amendment and federal law automatically confer citizenship upon individuals born in the United States and subject to its jurisdiction.

3.      The States of Washington, Arizona, Illinois, and Oregon (Plaintiff States) bring this action to protect the States—including their public agencies, public programs, public fiscs, and state residents—from the irreparable harm that will result to the States and their residents as a result of the illegal actions of the President and federal government that purport to unilaterally strip U.S. citizens of their citizenship.

4.      Cherly Norales Castillo and Alicia Chavarria Lopez (Individual Plaintiffs) bring this action on behalf of themselves and a class of similarly situated persons to stop the Order's deprivation of citizenship to their unborn children.[2] Individual Plaintiffs are expecting mothers

---

[1] Attached as Ex. A, *also available at* https://www.whitehouse.gov/presidential-actions/2025/01/prote cting-the-meaning-and-value-of-american-citizenship/. The Order was subsequently published in the Federal Register as Exec. Order No. 14,160, 90 Fed. Reg. 18 (Jan. 29, 2025).

[2] Individual Plaintiffs previously filed a separate action challenging the Executive Order, which the Court consolidated with the instant case. *See Franco Aleman v. Trump*, Complaint, No. 2:25-cv-00163 (W.D. Wash. Jan.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 16

who are not U.S. citizens or lawful permanent residents (LPRs) and who have due dates after the implementation date of the Order's prohibition on issuance of citizenship documents. By the terms of the Citizenship Stripping Order—though not by the terms of the Fourteenth Amendment—their children born after the Order's date of implementation will be deprived of U.S. citizenship and be considered without legal status in this country. They seek to represent a class of similarly situated parents and their expected children. These children, although born in the United States and subject to its jurisdiction, will be deprived of U.S. citizenship under the Order.

5.    This deprivation of citizenship strikes at the core of this country's identity as a nation that, following Reconstruction, affirmed that all persons born in the United States are citizens, regardless of race, parentage, creed, or other markers of identity. The Citizenship Stripping Order's attempt to deny citizenship to those born on U.S. soil amounts to "the total destruction of the individual's status in organized society" and "is a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). This is because, as the Supreme Court has recognized time and again, "[c]itizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), whose "value and importance" is "difficult to exaggerate," *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

6.    If the Citizenship Stripping Order is allowed to stand, the Plaintiff States and their residents (including Individual Plaintiffs) will suffer immediate and irreparable harm. Nationally, in 2022 alone, there were approximately 255,000 births of U.S. citizen children to noncitizen mothers without lawful status (undocumented) and approximately 153,000 births to two undocumented parents. In Washington, in 2022 alone, approximately 7,000 U.S. citizen children were born to mothers who lacked legal status and approximately 4,000 U.S. citizen children were born to two parents who lacked legal status. In Arizona, in 2022 alone, there were

---

24, 2025), ECF No. 1. One of the named plaintiffs, Delmy Franco Aleman, has chosen to withdraw from the case following the Court's Consolidation Order, ECF No. 56. Accordingly, she no longer seeks to represent the proposed class.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

2

Add. 17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    approximately 6,000 U.S. citizen children born to mothers who lacked legal status and

2    approximately 3,400 U.S. citizen children born to two parents who lacked legal status. Likewise,

3    in Illinois, in 2022 alone, there were approximately 9,100 U.S. citizen children born to mothers

4    who lacked legal status and approximately 5,200 U.S. citizen children born to two parents who

5    lacked legal status. And in Oregon, in 2022 alone, there were approximately 2,500 U.S. citizen

6    children born to mothers who lacked legal status and approximately 1,500 U.S. citizen children

7    born to two parents who lacked legal status. Using these numbers, likely more than 12,000 babies

8    born in the United States each month who are entitled to citizenship—including more than 1,100

9    babies born each month in the Plaintiff States—will no longer be considered U.S. citizens under

10    the Citizenship Stripping Order and will be left with no immigration status. This estimate is

11    conservative, because it includes only a subset of the newborns that would be stripped of

12    citizenship. The actual number of newborns affected in Plaintiff States is certainly higher.

13        7.        The individuals who are stripped of their U.S. citizenship, including the States'

14    residents, Individual Plaintiffs' expected children, and members of the proposed class, will be

15    left without any legal immigration status, vulnerable to removal from this country, and

16    threatened with the loss of "all that makes life worth living." *Bridges v. Wixon*, 326 U.S. 135,

17    147 (1945) (cleaned up). Many will be left stateless—that is, citizens of no country at all. They

18    will be left on the outside of society and forced to remain in the shadows in fear of immigration

19    enforcement actions that could result in their separation from family members and removal from

20    their country of birth. They will lose eligibility for myriad federal benefits programs. They will

21    lose their right to travel freely and re-enter the United States. They will lose their ability to obtain

22    a Social Security number (SSN) and work lawfully. They will lose the opportunity to qualify for

23    many educational opportunities. They will lose their right to vote, serve on juries, and run for

24    most public offices. They will be placed into lifelong positions of instability and insecurity as

25    part of a new underclass in the United States. In short, despite the Constitution's guarantee of

26    their citizenship, Individual Plaintiffs' children and the thousands of newborns who would be

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 18

subject to the Citizenship Stripping Order will lose their ability to fully and fairly be a part of American society as a citizen with all its benefits and privileges.

8.      The Citizenship Stripping Order will also directly injure the Plaintiff States in additional ways. The Plaintiff States will suffer immediate and irreparable harm by losing federal funding or reimbursements to programs that the Plaintiff States administer, such as Medicaid, the Children's Health Insurance Program (CHIP), foster care and adoption assistance programs, and programs to facilitate streamlined issuance of SSNs to eligible babies—among others. By purporting to unilaterally strip citizenship from individuals born in the Plaintiff States based on their parents' citizenship or immigration status, the Plaintiff States will be forced to bear significantly increased costs to operate and fund programs that ensure the health and well-being of their residents. The Plaintiff States will also be required—on no notice and at their considerable burden and expense—to immediately begin modifying their funding and operational structures and administration of programs to account for this change. This will impose significant administrative and operational burdens for multiple of the Plaintiff States' agencies that operate programs for the benefit of their residents.

9.      To prevent the President's and the federal government's unlawful action from harming Plaintiffs, as well as the proposed class that Individual Plaintiffs seek to represent, they ask this Court to invalidate the Citizenship Stripping Order in its entirety and enjoin any actions taken to implement its directives.

## II.    JURISDICTION AND VENUE

10.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). The Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202, 5 U.S.C. § 706, and Federal Rule of Civil Procedure 65.

11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Washington is a resident of this judicial district, the Individual Plaintiffs reside in

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 19

this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred within the Seattle Division of the Western District of Washington, including the harms to UW Medicine at its Montlake and Northwest campuses, as well as at Harborview Medical Center in Seattle.

### III.    PARTIES

### <u>PLAINTIFFS</u>

12.     The State of Washington is a sovereign state of the United States of America.

13.     The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

14.     The State of Arizona is a sovereign state of the United States of America.

15.     The Attorney General of Arizona is the chief legal officer of the State and is authorized to act in federal court on behalf of the State.

16.     The State of Illinois is a sovereign state of the United States of America.

17.     The Attorney General of Illinois is the chief legal officer of the State and is authorized to act in federal court on behalf of the State on matters of public concern. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

18.     The State of Oregon is a sovereign state of the United States of America.

19.     The Attorney General of Oregon is the chief legal officer of the State of Oregon and is authorized to act in federal court on behalf of the State on matters of public concern.

20.     The Plaintiff States are aggrieved and have standing to bring this suit because Defendants' action purporting to strip citizenship from U.S. citizens born and residing in the Plaintiff States, receiving benefits in the Plaintiff States, and receiving government services in the Plaintiff States—including children who are wards of the Plaintiff States and in their custody—harms the Plaintiff States' sovereign, proprietary, and quasi-sovereign interests and will continue to cause injury unless and until enforcement of the Citizenship Stripping Order is permanently enjoined.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 20

21.     Plaintiff Cherly Norales Castillo is a noncitizen from Honduras. She is in removal proceedings and has filed an application for asylum before the immigration court. She is pregnant, and her due date is March 19, 2025.

22.     Plaintiff Alicia Chavarria Lopez is a noncitizen from El Salvador. She has filed an application for asylum before United States Citizenship and Immigration Services (USCIS). She is pregnant, and her due date is July 21, 2025.

## DEFENDANTS

23.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

24.     Defendant Department of Homeland Security (DHS) is a federal cabinet agency responsible for implementing the Citizenship Stripping Order, including by issuing regulations, policies, and guidance consistent with the Order. DHS is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. DHS is comprised of USCIS, U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP). USCIS is responsible for adjudicating immigration benefits applications, as well as certain applications to recognize a person's citizenship. ICE is responsible for, among other things, the detention and removal of unlawfully present noncitizens in the United States and prosecuting removal cases of noncitizens. CBP is responsible for, among other things, operating U.S. ports of entry.

25.     Defendant Kristi Noem is the Secretary of Homeland Security. She is responsible for implementing and enforcing the INA and oversees USCIS, ICE, and CBP. She is sued in her official capacity.

26.     Defendant United States Social Security Administration (SSA) is a federal agency responsible for administering federal retirement, survivors, and disability income programs, as well as the program of supplemental security income for the aged, blind, and disabled. SSA processes applications for and issues Social Security numbers (SSNs) to eligible

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 21

1    applicants. SSA is responsible for implementing the Citizenship Stripping Order, including by

2    ceasing issuance of SSNs to children born in the United States but subject to the Citizenship

3    Stripping Order's interpretation of the Citizenship Clause. SSA is a department of the Executive

4    Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552.

5           27.      Defendant Michelle King is the Acting Commissioner of the SSA. The Office of

6    the Commissioner is directly responsible for all programs administered by the SSA, including

7    the development of policy, administrative and program direction, and program interpretation and

8    evaluation. She is sued in her official capacity.

9           28.      Defendant United States Department of State is responsible for implementing the

10    Citizenship Stripping Order, including by issuing regulations, policies, and guidance consistent

11    with the Order. The State Department is a department of the Executive Branch of the U.S.

12    Government and is an agency within the meaning of 5 U.S.C. § 552. It is authorized by law to

13    grant and issue passports.

14           29.      Defendant Marco Rubio is the Secretary of State. He is responsible for carrying

15    out the President's foreign policies through the State Department and Foreign Service of the

16    United States. He is sued in his official capacity.

17           30.      Defendant United States Department of Health and Human Services (HHS) is a

18    federal cabinet agency responsible for implementing the Citizenship Stripping Order, including

19    through the administration of Medicaid, CHIP, and Title IV-E. HHS is a department of the

20    Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C.

21    § 552. HHS is responsible for implementing the Citizenship Stripping Order in its agency

22    program, operations, and activities.

23           31.      Defendant Dorothy Fink is the Acting Secretary of Health and Human Services.

24    She is responsible for overseeing and administering all HHS programs through the Office of the

25    Secretary and HHS's Operating Divisions. She is sued in her official capacity.

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 22

32.     Defendant United States Department of Justice (DOJ) is a federal cabinet agency responsible for the federal government's legal affairs. The DOJ is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. DOJ is responsible for implementing the Citizenship Stripping Order, including by ensuring agency regulations are consistent with the Order.

33.     Defendant James McHenry is the Acting Attorney General of the United States. He is responsible for overseeing and administering all duties and programs of the DOJ, including overseeing and administering the Executive Office for Immigration Review, which adjudicates the removal proceedings of noncitizens charged with being inadmissible or removable from the United States. He is also responsible for overseeing the Department of Justice's immigration-related prosecutions, such as prosecutions for illegal entry and reentry to the United States. He is sued in his official capacity.

34.     Defendant United States Department of Agriculture (USDA) is a cabinet-level department of the United States. USDA is in charge of administering the Supplemental Nutrition Assistance Program (SNAP), which provides food benefits to eligible low-income families to supplement their grocery budget. USDA is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. USDA is responsible for implementing the Citizenship Stripping Order in its agency operations and activities.

35.     Defendant Gary Washington is the Acting Secretary of Agriculture. He is responsible for overseeing and administering all USDA programs. He is sued in his official capacity.

36.     Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Citizenship Stripping Order.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 23

# IV.    ALLEGATIONS

**A.    The United States Constitution Confers Automatic Citizenship on All Individuals Born in the United States and Subject to the Jurisdiction Thereof**

37.    Section 1 of the Fourteenth Amendment to the United States Constitution states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. This provision is known as the Citizenship Clause. The Citizenship Clause's automatic conferral of citizenship on all individuals born in the United States and subject to its jurisdiction, regardless of the citizenship or immigration status of their parents, is confirmed by the Fourteenth Amendment's text and history, judicial precedent, and longstanding Executive Branch interpretation.

38.    The Citizenship Clause was passed and ratified as part of the Fourteenth Amendment following the Civil War to overturn the Supreme Court's infamous holding in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), where the Supreme Court ruled that Black Americans who were enslaved or were descended from enslaved persons could not be citizens. The Citizenship Clause reaffirmed the longstanding common law principle of *jus soli* as the default rule of citizenship in the United States: All individuals born in the United States and subject to its jurisdiction are citizens. Its operation is automatic. No further action is required for individuals born in the United States to "become" citizens and no additional limitations are imposed.

39.    Unlike the Naturalization Clause, U.S. Const. art. I, § 8, cl. 4, which empowers Congress to set rules for naturalization, the Constitution nowhere empowers the President or Congress to set additional requirements that override or conflict with the Citizenship Clause's plain and broad grant of automatic citizenship to individuals born in the United States.

40.    The Citizenship Clause contains no exceptions based on the citizenship or immigration status of one's parents or their country of origin. Rather, the Citizenship Clause's

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 24

only requirements are that an individual be born "in the United States" and "subject to the jurisdiction thereof[.]" The only individuals who are excluded under the "subject to the jurisdiction thereof" language are the extremely limited number of individuals who are in fact *not* subject to the jurisdiction of the United States at birth—the children of diplomats covered by diplomatic immunity or children born to enemy combatants engaged in war against the United States while on United States soil.[3] Indeed, before the Fourteenth Amendment's adoption, there was explicit legislative debate and clarity that the Citizenship Clause was meant to reach all persons born in the United States, with only the limited exceptions above. *See* Garrett Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. Univ. L. Rev. 331, 355-56 (2010) (detailing congressional debate). By embedding this protection in the Constitution with such clear language, the framers "put citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

41.     The Supreme Court cemented this longstanding and established understanding of the Citizenship Clause more than 125 years ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). There, the Supreme Court held that a child born in the United States to noncitizen parents was entitled to automatic citizenship by birth under the Fourteenth Amendment. In so holding, the Court explained:

> The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color . . . . To hold that the fourteenth amendment of the constitution excludes

---

[3] Another exception recognized by the drafters of the Fourteenth Amendment, children born to Native American tribes with their own sovereign status, are granted U.S. citizenship at birth by a federal statute passed in 1924. *See* 8 U.S.C. § 1401(b) (declaring to be a national and citizen of the United States at birth "a person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe").

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German, or other European parentage, who have always been considered and treated as citizens of the United States.

*Id.* at 693-94.

42.     In addition to *Wong Kim Ark*, the Supreme Court has separately made clear that undocumented immigrants are "subject to the jurisdiction" of the United States. In *Plyler v. Doe*, 457 U.S. 202, 215 (1982), the Supreme Court interpreted the Fourteenth Amendment's Equal Protection Clause—the sentence immediately following the Citizenship Clause—and explained that the term "within its jurisdiction" makes plain that "the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory." The Court concluded:

> That a person's initial entry into a State, or into the United States, was unlawful, and that he may for that reason be expelled, cannot negate the simple fact of his presence within the State's territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State's civil and criminal laws.

*Id.* As the Supreme Court explained, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10. The Supreme Court further confirmed that the phrases "within its jurisdiction" and "subject to the jurisdiction thereof" in the first and second sentences of the Fourteenth Amendment have the same meaning. *Id.*

43.     The Executive Branch has accepted and endorsed this reading and understanding of the Citizenship Clause for more than a century. Indeed, in 1995, the U.S. Justice Department's Office of Legal Counsel (OLC) provided a statement to Congress explaining why proposed legislation that would deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be "unconstitutional on its face" and "unquestionably unconstitutional." 19 Op. O.L.C. 340, 341 (1995). The OLC's statement and

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

11

Add. 26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    opinion recognize that "[t]hroughout this country's history, the fundamental legal principle

2    governing citizenship has been that birth within the territorial limits of the United States confers

3    United States citizenship." *Id.* at 340. As OLC explained: "Congress and the States adopted the

4    Fourteenth Amendment in order to place the right to citizenship based on birth within the

5    jurisdiction of the United States *beyond question*. Any restriction on that right contradicts both

6    the Fourteenth Amendment and the underlying principle that the amendment safeguards." *Id.*

7    (emphasis added). Indeed, OLC explained that "children born in the United States of aliens are

8    subject to the full jurisdiction of the United States[,]" and that "as consistently recognized by

9    courts and Attorneys General for over a century, most notably by the Supreme Court in *United

10   States v. Wong Kim Ark*, there is no question that they possess constitutional citizenship under

11   the Fourteenth Amendment." *Id.* at 342.

12        44.    Congress likewise has reaffirmed through statute the Citizenship Clause's

13   commandment regarding birthright citizenship. The Immigration and Nationality Act states:

14   "The following shall be nationals and citizens of the United States at birth: (a) a person born in

15   the United States, and subject to the jurisdiction thereof[.]" 8 U.S.C. § 1401(a). This language

16   was originally enacted in 1940, well after *Wong Kim Ark*, and taken directly from the Fourteenth

17   Amendment.

18        45.    Federal and state agencies rely on this fundamental and longstanding

19   constitutional grant of birthright citizenship in implementing various federal programs. For

20   example, the U.S. State Department is granted the authority under federal law to issue

21   U.S. passports. 22 U.S.C. § 211a. As explained in the State Department's Foreign Affairs

22   Manual, "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United

23   States acquire U.S. citizenship at birth even if their parents were in the United States illegally at

24   the time of birth."[4] The U.S. State Department's Application for a U.S. Passport confirms that

25

26   _____
     [4] 8 FAM 301.1 (Acquisition By Birth in the United States) (2021), *available at* https://fam.state.gov/
     FAM/08FAM/08FAM030101.html (attached as Ex. B).

---

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

for "Applicants Born in the United States," a U.S. birth certificate alone is sufficient to prove one's citizenship.[5] USCIS likewise confirms in public guidance that "[i]f you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship."[6]

46.     SSA also has long accepted that all children born in the United States are citizens. Under current public guidance, SSA states that "[t]he easiest way to get a Social Security number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital."[7] With respect to citizenship, SSA explains that for children born in the United States, the child's U.S. birth certificate is proof of U.S. citizenship.[8] SSA's guidance is consistent with federal regulations, which establish that "[g]enerally, an applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate or other evidence . . . that shows a U.S. place of birth." 20 C.F.R. § 422.107(d). Indeed, for newborn babies, SSA utilizes what is called "Enumeration at Birth." Under that program, SSA enters into agreements with states to streamline the process for obtaining SSNs. Where a parent requests an SSN as part of an official birth registration process, the state vital statistics office electronically transmits the request to SSA along with the child's name, date and place of birth, sex, mother's maiden name, father's name, address of the mother, and birth certificate number. 20 C.F.R. § 422.103(c)(2). That information alone is used to establish the age, identity, and U.S. citizenship of the newborn child. *Id.* States receive payment from the federal government under this program for each record transmitted to the SSA for purposes of issuing an SSN—approximately $4.19 per SSN that is issued. Currently,

---

[5] U.S. Dep't of State, *Application for a U.S. Passport*, DS-11 04-2022, 2 (expiration date April 30, 2025) (attached as Ex. C).
[6] U.S. Citizenship & Immigr. Servs*., A4--I am a U.S. citizen…How do I get proof of my U.S. citizenship?*, M-560B, 1 (October 2013) *available at* https://www.uscis.gov/sites/default/files/document/guides/A4en.pdf (attached as Ex. D).
[7] Soc. Sec. Admin., *Social Security Numbers for Children*, Pub. No. 05-10023, 1 (Jan. 2024), *available at* https://www.ssa.gov/pubs/EN-05-10023.pdf (attached as Ex. E).
[8] *Id.* at 2-3.

CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CLASS ACTION – No. 2:25-cv-00127-JCC
13
Add. 28
ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Washington receives approximately $440,000 per year for administering this process and transmitting birth data for newborn babies in Washington to SSA. Arizona, likewise, has received approximately $874,000 for FY 2024 and more than $935,000 for FY 2025 through the Enumeration at Birth program, and is expected to receive more than $1 million in FY 2026. Oregon received approximately $158,000 in 2023 and $129,000 through the first three quarters of 2024 through the program. Illinois likewise participates in this program and receives federal funds for each record transmitted.

47.    State law also relies on the basic constitutional principle that a person born in the territorial United States is an American citizen. For example, Arizona has unique and complicated proof of citizenship requirements for voter registration. Birth certificates play an important role in this process. One of the documents that qualifies as "satisfactory evidence of citizenship" for voter registration in Arizona is "the applicant's birth certificate that verifies citizenship to the satisfaction of the county recorder." Ariz. Rev. Stat. § 16-166(F)(2). Another document that qualifies as "satisfactory evidence of citizenship" for voter registration in Arizona is a "driver license" number, if the driver license indicates that the applicant previously submitted proof of citizenship to the Arizona Department of Transportation or equivalent agency of another state. Ariz. Rev. Stat. § 16-166(F)(1). Applicants often use their birth certificate to meet this requirement.

48.    If a U.S. birth certificate were to stop being sufficient for proof of citizenship, voter registration in Arizona would become substantially more difficult and time-consuming. This is because election officials in Arizona would face a dilemma each time a prospective voter submits a birth certificate or driver license number. Under current registration procedures, the assumption is that these kinds of documents prove U.S. citizenship and nothing further is required. Without this assumption, a new and more complex set of procedures would need to be developed to try to identify which birth certificates and driver license numbers qualify as proof of U.S. citizenship.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 29

**B.**     **The President Acted Without Legal Authority in Purporting to Strip Individuals of Their U.S. Citizenship**

49.     President Trump's public statements make clear that he wishes to end birthright citizenship purely as a policy tactic to purportedly deter immigration to the United States. Despite a president's broad powers to set immigration policy, the Citizenship Stripping Order falls far outside the legal bounds of the president's authority.

50.     During his most recent campaign for President, for example, then-candidate Trump made clear that an Executive Order would issue "[o]n Day One" to "stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens."[9] As he explained, the goal is for this Executive Order to "eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S. to return home."[10] He explained that the Executive Order would do this by instructing agencies not to issue passports, Social Security numbers, and otherwise have the federal government treat those children as noncitizens.

51.     After the 2024 election, President-Elect Trump continued to state that birthright citizenship should be ended. In December 2024, for example, President-Elect Trump again promised an Executive Order "directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen."[11]

52.     The Citizenship Stripping Order, issued January 20, 2025, is the promised Executive Order. It declares that U.S. citizenship "does not automatically extend to persons born in the United States" if (1) the individual's mother is "unlawfully present in the United States"

---

[9] Trump Vance 2025, *Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism* (May 30, 2023), https://www.donaldjtrump.com/agenda47/agenda47-day-one-executive-order-ending-citizenship-for-children-of-illegals-and-outlawing-birth-tourism (attached as Ex. F).

[10] *Id.*

[11] Tarini Parti & Michelle Hackman, *Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs*, Wall Street Journal (Dec. 8, 2024), https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291 (attached as Ex. G).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 30

and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." The Citizenship Stripping Order affects at least hundreds of thousands of newborns in the United States, including those who are born to two undocumented parents.

53.     Section 2 of the Order states that, effective in 30 days, it is the "policy of the United States" that no department or agency of the federal government "shall issue documents recognizing U.S. citizenship" to persons within those categories or "accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship." Section 3 of the Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." The Order further directs that "the heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities."

54.     The Citizenship Stripping Order thus attempts to redefine the Fourteenth Amendment and restrict *jus soli*—or birthright citizenship—in the United States. If implemented, the Fourteenth Amendment's text would mean one thing for certain people, and the opposite for the same class of persons born mere days apart.

55.     Its language underscores its arbitrary nature, particularly by failing to define who is considered "unlawfully present" or who has "temporary status." The INA contains many "non-immigrant" and other forms of status that do not provide or guarantee a pathway to lawful permanent residence. Many noncitizen parents-to-be covered by the Order include people who

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

16

Add. 31

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

have lived in this country for decades and built their lives here. This includes people who have no status, as well as those who have or are seeking other forms of lawful status (including asylum and other humanitarian forms of relief provided by the INA).

56.    The Constitution does not empower the President to set rules regarding citizenship at birth.

57.    The Constitution does not empower the President to condition citizenship at birth on the citizenship or immigration status of one's parents.

58.    The Constitution does not empower the President to unilaterally amend the Fourteenth Amendment.

59.    The Constitution does not empower the President to grant or deny citizenship to individuals born in the United States.

60.    The Constitution and federal law confer automatic citizenship to individuals born in the United States and subject to its jurisdiction. The Constitution removes control over the grant of birthright citizenship from the category of legitimate policy options the President and Congress may exercise to address immigration policy issues. As the Office of Legal Counsel explained when discussing the unconstitutionality of such proposals: "In short, the text and legislative history of the citizenship clause as well as consistent judicial interpretation make clear that the amendment's purpose was to remove the right of citizenship by birth from transitory political pressures." 19 Op. O.L.C. at 347.

**C.    United States Citizens Are Entitled to All Rights and Benefits of Citizenship as Defined by Law**

61.    U.S. citizens are entitled to a broad array of rights and benefits as a result of their citizenship. U.S. citizenship is a "priceless treasure." *Fedorenko v. United States*, 449 U.S. 490, 507 (1981). Not only does citizenship provide a sense of belonging, but it carries with it immense privileges and benefits—all of which the President claims to wipe away at the stroke of a pen.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    Withholding citizenship or stripping individuals of their citizenship will result in an immediate

2    and irreparable harm to those individuals and to the Plaintiff States.

3        62.    Among other rights, citizens are "entitled as of birth to the full protection of the

4    United States, to the absolute right to enter its borders, and to full participation in the political

5    process." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001).

6        63.    The implication of these rights is equally important: U.S. citizens cannot be

7    detained by immigration authorities, removed from this country, separated from their families,

8    or deprived of their friends and communities. *See, e.g.*, 18 U.S.C. § 4001 (preventing the U.S.

9    government from detaining U.S. citizen absent authorization by Congress); 8 U.S.C.

10    § 1229a(a)(1) (removal proceedings are to "decid[e] the inadmissibility or deportability of

11    [a noncitizen]"). Such rights to belong and remain are among the most fundamental and valuable

12    rights that the Constitution protects.

13        64.    U.S. citizens are entitled to obtain a U.S. passport and may travel abroad for an

14    unlimited period of time and with unlimited frequency without risk of being denied re-entry to

15    the United States. Such travel may be needed to visit family, receive healthcare, travel for work

16    or pleasure, or for many other reasons.

17        65.    Individuals over 18 years of age who are U.S. citizens are eligible to vote in

18    federal, state, and local elections. U.S. Const. amend. XXVI; Wash. Const. art. VI, § 1;

19    Ariz. Const. art. VII, § 2; Or. Const. art. II, § 2; Ill. Const. art III, § 1. The right to vote is a

20    fundamental political right.

21        66.    Individuals over 18 years of age who are U.S. citizens are eligible to serve on

22    federal and state juries. 28 U.S.C. § 1865(b)(1); Wash. Rev. Code § 2.36.070; Ariz. Rev. Stat.

23    § 21-201(1); Or. Rev. Stat. Ann. § 10.030(2); 705 ILCS 305/2(a).

24        67.    Individuals who are U.S. citizens may petition for immigration status for family

25    members including spouses, children, parents, and siblings. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i),

26    1153(a).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

18

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 33

1    68.    Individuals who are natural born U.S. citizens are eligible for election to the

2    offices of President and Vice President of the United States. U.S. Const. art. II, § 1; U.S. Const.

3    amend. XII.

4    69.    Individuals who are U.S. citizens are eligible for election to the United States

5    House of Representatives and the United States Senate, and to certain state offices.

6    U.S. Const. art I, §§ 2-3; Wash. Const. art. II, § 7, art. III, § 25; Ariz. Const. art. IV pt. 2 § 2,

7    art. V § 2; Or. Const. art. V, § 2, art. IV, § 8; Or. Rev. Stat. Ann. § 204.016(1); Ill. Const. art. V,

8    § 3, art. IV § 2.

9    70.    Individuals who are U.S. citizens or nationals are eligible for appointment to

10   competitive service federal jobs. Exec. Order No. 11,935, 5 C.F.R. § 7.3(b) (Sept. 3, 1976).

11   71.    Depending on immigration or citizenship status, residents of Plaintiff States may

12   also be eligible to participate in a number of federal and state programs that ensure the health

13   and welfare of individuals, families, and communities. Those include programs administered by

14   the Plaintiff States and funded by federal and state dollars. These programs provide healthcare

15   coverage for newborns and children, foster care and custodial services for children in need, and

16   other forms of social and economic assistance to those in need.

17   72.    Longer term, a child stripped of birthright citizenship who remains

18   undocumented will face the effects of a lack of legal status over their lifespan. While U.S.

19   citizens of sufficient age are authorized to work in the United States, only noncitizens granted

20   particular immigration statuses are or can be authorized to work. *See* 8 C.F.R. § 274a.12.

21   A noncitizen who is unlawfully present is ineligible for employment authorization, affecting

22   their lifetime earning potential and job opportunities. Undocumented individuals are not eligible

23   for federal student financial aid, affecting their educational opportunities. Research also shows

24   that undocumented individuals are more likely to report greater depression, social isolation,

25   longer hospital stays, and higher levels of stress.

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 34

73.     A person without legal immigration status is not generally eligible to be issued a social security number. *See* 20 C.F.R. § 422.107. This creates cascading barriers to basic needs and milestones, such as accessing traditional mortgages or banking services, as well as eligibility for federal housing programs, among other things. Likewise, undocumented individuals are not eligible for a REAL ID Act compliant driver's license or identification card, which will be required for all air travel, including domestic flights, as of May 7, 2025. 6 C.F.R. §§ 37.5(b), 37.11(g).

**D.      Plaintiff States Will Be Irreparably Injured by Defendants' Citizenship Stripping Order**

74.     The Plaintiff States will be immediately and irreparably injured by Defendants' Citizenship Stripping Order separate and apart from the grievous harms its residents will suffer as a result of the Order.

75.     As noted above, in Washington in 2022 alone, approximately 7,000 U.S. citizen children were born to mothers who lacked legal status and approximately 4,000 U.S. citizen children were born to two parents who lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

76.     In Arizona in 2022 alone, approximately 6,000 U.S. citizen children were born to mothers who lacked legal status and approximately 3,400 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

77.     In Illinois in 2022 alone, approximately 9,100 U.S. citizen children were born to mothers who lacked legal status and approximately 5,200 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

20

Add. 35

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  number of children affected by the Citizenship Stripping Order, and the full number of children
2  affected will be greater.

3  78.    In Oregon in 2022 alone, approximately 2,500 U.S. citizen children were born to
4  mothers who lacked legal status and approximately 1,500 U.S. citizen children were born to two
5  parents who were noncitizens and lacked legal status. This is a conservative estimate of the
6  number of children affected by the Citizenship Stripping Order, and the full number of children
7  affected will be greater.

8  79.    The Plaintiff States administer numerous programs for the benefit of their
9  residents, including for newborns and young children, some of whom are wards of the Plaintiff
10  States who are entitled to care by statute. Some of these programs are funded in part by federal
11  dollars, with federal funding frequently tied to the citizenship and immigration status of the
12  individuals served. As detailed below, stripping individuals of their citizenship and leaving them
13  without a qualifying immigration status will render them ineligible to receive federally funded
14  benefits, leaving them to rely on state-only funded benefits and services that the Plaintiff States
15  must provide, and causing direct, immediate, and measurable financial harm to Plaintiff States.

16  80.    The Medicaid and CHIP health insurance programs were created by federal law
17  and are jointly funded by the federal and state governments. Medicaid provides health insurance
18  for individuals, including children, whose household incomes fall below certain eligibility
19  thresholds that vary slightly by state. CHIP is a program through which health insurance
20  coverage is provided for children whose household incomes exceed the eligibility thresholds for
21  Medicaid but fall below a separate threshold. The federal government pays states a percentage
22  of program expenditures for individuals enrolled in Medicaid and CHIP. This percentage varies
23  by program, state, covered population, and service, but generally ranges between 50% and 90%
24  of the total expenditure.

25  81.    Only individuals who are U.S. citizens or have a qualifying immigration status
26  are eligible for Medicaid and CHIP except for certain emergency medical services that must be

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 36

provided and can be covered under Medicaid where the individual is otherwise qualified but for their immigration or citizenship status. 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406. In all Plaintiff States, children who would be eligible for Medicaid or CHIP but for the fact that they are not U.S. citizens or qualifying noncitizens are eligible for certain health insurance or emergency services that are funded entirely by the State. The Citizenship Stripping Order will therefore result in newborn children who would otherwise be eligible for federally funded Medicaid or CHIP instead being enrolled in entirely state-funded health care programs or provided entirely state-funded healthcare services, transferring the cost for their health care to the States and causing a direct loss of federal funding. And for some Plaintiff States, those State-funded services may be underfunded or restricted to emergency care only, resulting in newborns and children not receiving regular or preventative care and ultimately leading to more expensive emergency care in the long term.

82.    One example is Washington's programs for ensuring healthcare coverage for its most vulnerable residents. The Washington State Health Care Authority (HCA) is the designated single state agency responsible for administering Washington's Medicaid program and CHIP. In Washington, Medicaid is called Apple Health. Coverage programs for children are provided under the name Apple Health for Kids and serve all kids regardless of immigration status up to 317% of the Federal Poverty Limit (FPL). Between 215% and 317% of the FPL, for children who are citizens or qualified and authorized immigrants, the funding for this coverage comes through CHIP, and households pay a minimal premium for children's coverage. Below that range, for children who are citizens or qualified and authorized immigrants, funding for coverage is provided through Medicaid. Under federal law, HCA must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. For those children who would be eligible but for their lack of citizenship or a qualifying immigration status, the State provides coverage through what is called the Children's Health Plan (CHP).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 37

1    83.    As of December 2024, HCA administers federally-backed Medicaid and CHIP

2    funded coverage for more than 860,000 children in Washington. HCA estimates that coverage

3    on a per-child basis costs approximately $2,844 per year on average for physical health care

4    coverage alone. For this coverage, Washington expended approximately $2.37 billion with

5    approximately $1.3 billion coming from the federal government under Medicaid and CHIP. With

6    respect to the division of funding in Washington, health coverage provided through CHIP

7    generally receives a 65% federal match rate as opposed to Medicaid's 50% federal match rate.

8    84.    If deemed ineligible because they are no longer U.S. citizens, children enrolled

9    in CHIP who do not meet the income eligibility guidelines for Medicaid would be left without

10   health coverage unless Washington provides it using only state funding—even for emergency

11   medical care that hospitals (including State-operated hospitals) are required by federal law to

12   provide. *See, e.g.*, 42 U.S.C. § 1395dd. The result would be that federal law would *require* State-

13   providers, like UW Medicine's Harborview hospital, to provide emergency and other care, but

14   *withhold* federal contribution for that care at the normal CHIP rates. Washington would provide

15   coverage to these individuals using State-only funds, and therefore be required to spend

16   substantial funds it otherwise should receive from the federal government through the CHIP

17   program.

18   85.    The CHIP program also enables certain healthcare services to be provided to

19   children prior to birth in the form of prenatal care for their mother, regardless of the mother's status.

20   Under CHIP, a child is defined as "an individual under the age of 19 including the period from

21   conception to birth." 42 C.F.R. § 457.10. In Washington, children are eligible at conception for

22   prenatal care through CHIP. This prenatal care coverage is provided regardless of the immigration

23   status of the mother because the child is assumed to be a U.S. citizen. In State FY 2025, Washington

24   expects to receive $161.5 million in federal CHIP funding to provide prenatal health care to children

25   born in Washington to mothers ineligible for Medicaid and CHIP.

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

23

Add. 38

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1        86.    Certain children born whose health care would have been covered through

2    Medicaid or CHIP as U.S. citizens will become ineligible for those programs because they are

3    no longer deemed U.S. citizens or qualifying noncitizens under the Citizenship Stripping Order.

4    This poses an immediate risk to HCA's federal funding stream used to provide healthcare

5    coverage to vulnerable Washington newborns and children. In state fiscal year 2022, for

6    example, there were more than 4,000 children born to unauthorized and non-qualifying mothers

7    whose labor and delivery was covered by Emergency Medicaid. Those children, by being born

8    in the United States and deemed citizens, were eligible for federally-backed coverage. If this

9    number of children became ineligible due to a loss of citizenship and moved to the State-funded

10   CHP coverage, however, that will result in a loss of $6.9 million in federal reimbursements to

11   Washington and a corresponding increase to State expenditures of the same amount, based on

12   the current expenditures for the complete physical and behavioral health package of benefits.

13       87.    In Arizona, in 2024 there were 4,519 births paid for by the Federal Emergency

14   Services Program (FES births). For each of these births, the parent's household income fell under

15   133% of the Federal Poverty Level and the parent would have been eligible for Title XIX

16   (Medicaid) if they were U.S. citizens or "lawfully residing." However, because these children

17   were born in the United States, the children were eligible for Medicaid and qualified for

18   Arizona's Medicaid program, the Arizona Health Care Cost Containment System (AHCCCS),

19   but they would not be eligible if birthright citizenship were removed. If each of these children

20   became ineligible for AHCCCS until 18, using FFY 2026 figures for FMAP of 64.34% (federal

21   match) and capitation rates, then this would likely cost the State $39,400 in federal revenue per

22   child used to pay $61,300 in total capitation payments over the first 18 years of that child's life.

23       88.    In addition, based on current data, AHCCCS estimates that approximately 3,126

24   births each year are for children whose family income are low enough to make them eligible for

25   Title XXI (KidsCare) under birthright citizenship, but who would not be eligible if birthright

26

CONSOLIDATED COMPLAINT FOR                    24              ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                                           Civil Rights Division
RELIEF – CLASS ACTION –                                           800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                     Add. 39                   Seattle, WA 98104-3188
                                                                        (206) 464-7744

1  citizenship were removed. And given the scope of the Order, the number of children affected

2  will likely be higher.

3      89.     Removing birthright citizenship from the above 7,645 (4,519 + 3,126) children

4  would reduce federal revenues to Arizona by $321,844,600 used to pay $468,638,500 in total

5  capitation payments over the first 18 years of the children's lives. This amount is only for the

6  first "cohort" of children and only through their first 18 years of life. Each year additional

7  children would be born, adding to the lost revenue.

8      90.     In Illinois, the Department of Healthcare and Family Services (HFS) is

9  responsible for administering Illinois's Medicaid program and CHIP. HFS currently administers

10 federally-backed Medicaid and CHIP funded coverage for over 1 million children in Illinois.

11 Some of those children—children whose health care would have been covered through Medicaid

12 or CHIP as U.S. citizens—will become ineligible for those programs because they are no longer

13 deemed U.S. citizens or qualifying noncitizens under the Citizenship Stripping Order. That

14 threatens the federal funds that HFS uses to provide healthcare coverage to vulnerable Illinois

15 newborns and children and risks transferring the cost for their health care to Illinois.

16     91.     Similarly, Plaintiff States' child welfare systems are funded in part through an

17 annual appropriation based on an open-ended formula grant entitlement operated by the

18 Defendant HHS' federal Foster Care Program, known as "Title IV-E." For example, in Federal

19 Fiscal Year 2024, Washington received approximately $219 million in federal Title IV-E

20 funding.

21     92.     The Title IV-E grant amount is awarded to partially reimburse the States'

22 expenditures on allowable uses of funds for the direct costs of supporting eligible children in

23 foster care. The States receive no Title IV-E funding for the costs to care for foster children who

24 do not meet Title IV-E eligibility. Children who are neither citizens nor qualifying noncitizens,

25 which will include children who would be natural-born U.S. citizens but for the Citizenship

26 Stripping Order, are not covered by Title IV-E. 8 U.S.C. §§ 1611(a), (c)(1)(A).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

25

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 40

93.    Plaintiff States also receive federal funding under Title IV-E for certain program administrative costs based in part on the number of children eligible for Title IV-E. Washington's Department of Children, Youth, and Families (DCYF) receives reimbursements for foster care maintenance, adoption support, guardianship support, and associated legal, administrative, and training costs. Therefore, any decrease in the number of foster children who are Title IV-E eligible will reduce federal funding to States for foster care and related programs. As a result of the Citizenship Stripping Order, fewer children will be eligible for welfare and support services and Plaintiff States will suffer a negative financial impact to their child welfare programs.

94.    Washington's DCYF foster care services provide support for children and families when they may be most vulnerable and ensures that children have the tools they need to succeed. In Washington, those services will often be provided for a long period of time—the median length of stay for a child in out-of-home care is nearly two years. If that child is ineligible for Title IV-E because they are not a citizen, DCYF cannot receive federal reimbursements for any of the services they provide to that child. And any decrease in Title IV-E funding means that DCYF will have fewer resources to help all of the children it serves, including children whose citizenship status is unaffected by the Citizenship Stripping Order.

95.    Arizona's Department of Child Services (DCS) also relies on Title IV-E funding and operates on a limited budget appropriated by the State Legislature. The Citizenship Stripping Order will cause DCS to lose material amounts of federal funding that it would use for foster care maintenance payments for those children, as well as reimbursement for administrative expenses associated with their care.

96.    Illinois Department of Child and Family Services (DCFS) also relies on Title IV-E funding. The guaranteed reduction in Title IV-E funding—as well as other federal reimbursements—that will result from the Citizenship Stripping Order will have a meaningful effect and strain on DCFS's ability to fulfill its statutory mandate to provide care to the wards in its custody.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

26

Add. 41

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

97.     The loss of federal funding and reimbursement will have other significant and negative ripple effects on the Plaintiff States. For example, in Arizona, DCS prioritizes kinship placements for the children within its custody. In kinship placements, children are placed in the homes of relatives or individuals with a significant relationship to the children. Placements with relatives and kin provides children with more stability by maintaining connections to neighborhood, community, faith, family, tribe, school and friends. A family's willingness and ability to accept a kinship placement is often dependent on the family's ability to receive financial and resource assistance from DCS. If fewer children are considered U.S. citizens and therefore are ineligible for these vouchers and resources, DCS will not be able to provide the same assistance to support relative and kinship placements, and the number of these placements will decrease. That will harm these already vulnerable children. It will also increase costs for DCS, which will have to place those same children in group homes, which are significantly more expensive.

98.     Because the benefit is to the child, not the caregiver, an increase of children without legal status in DCS care will also impact community foster homes. Community foster homes may not be willing to take placement of a child if they are not able to receive benefits like childcare assistance. Many communities foster caregivers work outside of the home and rely on childcare assistance to pay for care while they work.

99.     Plaintiff States will also suffer a direct and immediate loss of federal reimbursements that they receive for every SSN that is assigned to a child born in their state through the Enumerated at Birth (EAB) program. Pursuant to this program, Plaintiff States are under contract with the SSA to collect and transmit to SSA certain birth information on behalf of parents who wish to obtain an SSN for their newborn child. For their services under this program, the States receive a payment from SSA of approximately $4.19 per assigned SSN. These funds are used to support general administrative expenses for state agencies beyond the cost of transmitting SSN applications to SSA.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

27

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 42

100.     As noted above, each year, the Citizenship Stripping Order is likely to impact—at a bare minimum—at least 4,000 children born in Washington; 3,400 children born in Arizona; 5,200 children born in Illinois; and 1,500 children born in Oregon. Those children will therefore be ineligible for SSNs, which in turn will cause the Plaintiff States to suffer an immediate decrease in the number of SSNs assigned and payments received through the EAB program. For example, withholding issuance of approximately 4,000 SSNs through the EAB process will cause Washington to lose approximately $16,000 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to these children. Withholding issuance of approximately 3,400 SSNs through the EAB program will cause Arizona to lose approximately $14,000 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to certain children. Withholding issuance of approximately 5,200 SSNs through the EAB process will cause Illinois to lose approximately $21,000 per year at a minimum. And withholding issuance of approximately 1,500 SSNs through the EAB process will cause Oregon to lose approximately $6,200 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to certain children.

101.     As noted above, the Citizenship Stripping Order will also harm Arizona's ability to implement its voter registration laws aimed at ensuring that only citizens register to vote.

102.     The Citizenship Stripping Order will immediately begin to upend administrative and operational processes within the Plaintiff States. States must immediately alter their systems for verifying which children they serve are eligible for federal reimbursement programs like Medicaid, CHIP, and Title IV-E; operationalize those altered systems; and plan for the fiscal impact of losing substantial federal funding that the Plaintiff States rely on receiving to support a range of programs.

103.     In Washington, for example, agencies rely on birthright citizenship in their internal processes to determine eligibility for federal programs. This includes Washington's HCA, which administers Washington's Medicaid and CHIP programs. The Citizenship Stripping

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

28

Add. 43

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Order will require HCA to develop updated training and guidance for staff, partners, and health care providers across Washington about which children are citizens and therefore eligible for Medicaid and CHIP. HCA anticipates this will take at least seven to eight full-time employees around two to three years to make these changes. These updates may then require training for up to 2,000 staff, on top of coordination with external community partners. Similarly, the Citizenship Stripping Order requires health care providers like UW Medicine to immediately update their understanding of how to assess coverage to assist patients and parents in understanding and navigating applications for coverage, when those parents may have a due date in just a few weeks.

104.    Washington's DCYF likewise relies on birthright citizenship to determine which services it may receive reimbursement for. Federal law requires DCYF to verify citizenship status of children it serves as a part of determining Title IV-E eligibility. Currently, the primary method of citizenship verification is through birth certificates issued by other state agencies. DCYF relies on those birth certificates to determine whether children are eligible for Title IV-E, and DCYF's services for children may begin as soon as they are born. The Citizenship Stripping Order requires DCYF to amend its processes, trainings, and materials to make any Title IV-E eligibility determinations. That will take staff time that would have been spent on other projects to better serve children and families in Washington.

105.    Washington's DOH also faces uncertainty and substantial administrative burdens under the Citizenship Stripping Order. DOH cannot modify State's newborn registration process immediately. Instead, doing so will require substantial operational time, manpower resources, and technological resources from DOH and healthcare facilities in Washington. Indeed, because more than 80,000 babies are born every year in Washington, DOH anticipates that any required updates to the birth registration process or birth certificates in Washington will impose serious burdens on DOH that it is not currently equipped to handle, as DOH has no way of determining the immigration status or citizenship of every newborn (or their parents).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

29

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 44

106.     Similarly, in Arizona, the State's Medicaid program, AHCCCS, is jointly funded by the federal and state governments for individuals and families who qualify based on income level. AHCCCS does not currently rely on a Social Security Number or parental immigration status to determine eligibility. Newborns are automatically approved for benefits through an automated process when a mother living in Arizona on AHCCCS gives birth. Citizenship is considered automatically verified if the child's birth is verified through this method since they are born in the United States. If this methodology no longer applied, AHCCCS would need to update its eligibility policy and update three systems it uses: HEAPlus, PMMIS and AHCCCS Online. This would take approximately 12 months to implement the change. Based on the complexity of the potential update, the expense to change HEAplus would be approximately $1 million to $2.5 million and would take about 12 months to develop. In addition, it would cost $1.3 million to 1.9 million to update PMMIS and AHCCCS Online.

107.     The Illinois Department of Public Health (IDPH) will also face substantive administrative burdens under the Citizenship Stripping Order in order to modify its newborn registration process immediately. IDPH would need to create systems for state-run healthcare facilities to use to verify parents' immigration statuses for purposes of issuing birth certificates and applying for a newborn's SSN. This would require training and hiring of staff and would potentially cause delays in the registration and issuance of a newborn's birth certificate.

108.     In Oregon, the sudden need to collect proof of citizenship information from parents at the birth of a child will cause the state to incur the expense of training its employees and staff at Oregon hospitals on new protocols.

109.     In sum, the Citizenship Stripping Order, if allowed to stand, will work direct and substantial injuries to Washington, Arizona, Illinois, and Oregon, in addition to their residents.

**E.     Individual Plaintiffs**

         a) <u>Cherly Norales Castillo</u>

110.     Plaintiff Cherly Norales Castillo is a noncitizen from Honduras.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

30

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 45

111.   She has lived in the United States since 2023, and currently resides in Seattle, Washington.

112.   Ms. Norales lives with her partner and her four-year-old son.

113.   Ms. Norales and her son have a pending asylum application before the immigration court.

114.   In 2023, they fled a violent and abusive situation in Honduras to seek protection in the United States.

115.   Ms. Norales learned she is pregnant with her second child in or around July 2024.

116.   Her expected due date is March 19, 2025.

117.   When Ms. Norales learned of President Trump's Executive Order on birthright citizenship in January 2025, she became fearful for her unborn child, as neither she nor the child's father are citizens or LPRs.

118.   Ms. Norales fears for the safety and security of her family if her unborn child does not receive citizenship by birthright. She does not want her unborn child to ever face removal to Honduras, a country she had to flee due to abuse and violence. It is important to Ms. Norales that her family remain unified and safe in this country.

119.   Ms. Norales also desires that her soon-to-be-born child have access to an education, work authorization, and the many other benefits of U.S. citizenship. She fears the many obstacles her child will face if the child lacks citizenship.

   b) Alicia Chavarria Lopez

120.   Plaintiff Alicia Chavarria Lopez is a noncitizen from El Salvador.

121.   She has lived in the United States since 2016, and currently resides in Bothell, Washington.

122.   Ms. Chavarria lives with her partner and their five-year-old child.

123.   Ms. Chavarria has a pending asylum application before USCIS.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

31

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 46

124.    In 2016, she fled a violent and abusive situation in El Salvador to seek protection in the United States.

125.    Ms. Chavarria learned she is pregnant with her second child in or around October or November 2024.

126.    Her anticipated due date is July 21, 2025.

127.    When Ms. Chavarria learned of President Trump's Executive Order on birthright citizenship in January 2025, she became fearful for her unborn child, as neither she nor the child's father are citizens or LPRs.

128.    Ms. Chavarria's family is one of mixed immigration status. She is seeking asylum, and her five-year-old child is a U.S. citizen.

129.    Ms. Chavarria fears that the Citizenship Stripping Order puts her family at risk of separation, and that her expected child may become a target for immigration enforcement. She does not want her unborn child to live in fear of removal to El Salvador, a country Ms. Chavarria had to flee for her own safety.

130.    Ms. Chavarria desires that her soon-to-be-born child have access to education, work opportunities, and the many other benefits of U.S. citizenship—the same benefits that are available to her other child who was born in this country. She fears the many obstacles her child will face if the child lacks citizenship.

**F.    The Effect of the Executive Order on the Plaintiff States' Residents, Individual Plaintiffs, and Proposed Class Members**

131.    The Citizenship Stripping Order will have widespread and destructive effects on the lives of the Plaintiff States' residents, Individual Plaintiffs, and proposed class members, which includes the Individual Plaintiffs' expected children.

132.    Without the protections of citizenship, the Plaintiff States' residents, Individual Plaintiffs, and proposed class members face the risk of family separation, as DHS could take away and remove resident and proposed class member children at any moment. This is not

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

32

Add. 47

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   speculative. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) (enjoining policy

2   implemented by first Trump administration to deter immigration by separating parents and their

3   children).

4       133.    Some children subject to the Citizenship Stripping Order may also become

5   stateless. A U.S.-born child deemed to be a noncitizen may not be recognized as a citizen under

6   the laws of their parents' country or countries of origin. Even if legally possible, practical barriers

7   may prevent these children from being recognized as citizens of any other country, especially

8   where those countries offer no consular services in the United States (and thus no means to obtain

9   a passport and verify citizenship). This is true for some large immigrant populations in the United

10  States, like Venezuelans.[12]

11      134.    The Order also deprives the Plaintiff States' residents, Individual Plaintiffs'

12  expected children, and the other proposed class member children of the ability to obtain social

13  security numbers and work lawfully once they are of lawful age. Without social security

14  numbers, the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed

15  class member children will be unable to provide for themselves or their families (including,

16  eventually, the Individual Plaintiffs and class member parents themselves). *Gonzalez Rosario v.*

17  *U.S. Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1162 (W.D. Wash. 2018) (recognizing

18  a "negative impact on human welfare" when asylum seekers "are unable to financially support

19  themselves or their loved ones").

20      135.    In addition, and among other things, the Citizenship Stripping Order denies the

21  Plaintiff States' residents, Individual Plaintiffs' expected children, and the other proposed class

22  member children (once they become adults) the right to vote in federal elections, serve on federal

23  juries, serve in many elected offices, and work in various federal jobs.

24

25      [12] U.S. Dep't of State, *International Travel, Learn About Your Destination, Venezuela* https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/

26  Venezuela.html (last updated Oct. 30, 2024) ("The Venezuelan embassy and consulates in the United States are not open.") (attached as Ex. H).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

33

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 48

136.     The Order will further deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of access to higher education, as they will not qualify for federal financial aid to higher education, limiting their ability to develop their full potential.

137.     The Citizenship Stripping Order will also deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of access to other critical public benefits. For example, as undocumented persons, children subject to the Order will not qualify for federally funded SNAP benefits. *See* 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4. While Washington State provides supplemental, state-funded programs for many noncitizens, not all noncitizens (and thus not all class member children) would be covered. *See, e.g.*, Wash. Admin. Code § 388-424-0030 (addressing how immigration status affects eligibility for state-funded food assistance programs); Wash. Admin. Code § 388-424-0001 (identifying qualifying immigration statuses for state-funded food assistance programs).

138.     The Order will deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of any immigration status. The INA and its implementing regulations do not provide any status to, and in fact do not contemplate, persons born in the United States who are not U.S. citizens, except for those born to foreign diplomatic officers. *See* 8 C.F.R. § 101.3(a); *see also* 8 U.S.C. §1401(a). Indeed, most persons born in the U.S. who are subject to the Order will have no other path to gain lawful status in this country.

139.     Finally, the Citizenship Stripping Order is a source of immense stress, anxiety, and concern for some of the Plaintiff States' residents, Individual Plaintiffs, and proposed class members. They are understandably apprehensive and distressed about the prospect that their families may be separated, rendered ineligible for benefits, and subject to many other harms.

## V.    CLASS ACTION ALLEGATIONS

140.     Individual Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). A class

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

34

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 49

action is proper because this action involves questions of law and fact common to the class, the

class is so numerous that joinder of all members is impractical, Individual Plaintiffs' claims are

typical of the claims of the class and will fairly and adequately protect the interests of the class.

Defendants have acted on grounds that apply generally to the class, so that injunctive and

declaratory relief and relief under the APA are appropriate with respect to the class as a whole.

141.    Individual Plaintiffs seek to represent the following class:

> All pregnant persons residing in Washington State who will give birth in
> the United States on or after February 19, 2025, where neither parent of
> the expected child is a U.S. citizen or lawful permanent resident at the
> time of the child's birth; and,
>
> all children residing in Washington State who are born in the United
> States on or after February 19, 2025, where neither of their parents is a
> U.S. citizen or lawful permanent resident at the time of the child's birth.

142.    The proposed class meets the numerosity requirements of Federal Rule of Civil

Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. The

precise number of class members will be determined by how Defendants define and implement

the key terms of the Citizenship Stripping Order. However, in 2021, Washington State estimated

that there were over 300,000 undocumented noncitizens in the state.[13] Even a conservative

estimate thus suggests that thousands of people, and perhaps many more, will be born this year

alone in the state that will now be considered noncitizens.[14] Additionally, as described above, in

2022 there were approximately 4,000 births in Washington State to parents who were

undocumented.

---

[13] *See* Wei Yen, *Washington state's immigrant population: 2010-21*, Office of Financial Management, 2 (May 2023), *available at* https://ofm.wa.gov/sites/default/files/public/dataresearch/researchbriefs/brief110.pdf (attached as Ex. I).

[14] Washington State Dep't of Health, *All Births Dashboard*, https://doh.wa.gov/data-and-statistical-reports/washington-tracking-network-wtn/county-all-births-dashboard (last accessed Jan. 23, 2025) (reflecting a fertility rate of 53.5 births per 1,000 women aged 15–44 in 2022 in Washington) (attached as Ex. J).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

35

Add. 50

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

143.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are all subject or will be subject to the Citizenship Stripping Order divesting them or their soon-to-be or future children of U.S. citizenship. The lawsuit raises questions of law common to members of the proposed class, including whether the Order violates the Fourteenth Amendment.

144.    The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Individual Plaintiffs are typical of the class. Individual Plaintiffs and the proposed class share the same legal claims, which assert the same claim under the Fourteenth Amendment, federal law, and the APA. All involve families where a child will be born in the United States where neither parent is a U.S. citizen or lawful permanent resident.

145.    The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Individual Plaintiffs seek the same final relief as the other members of the class—namely, an injunction that enjoins the President and federal agencies and personnel from enforcing the Order, a declaration clarifying the citizenship status of the children born in the United States targeted by the Citizenship Stripping Order, and appropriate relief under the APA. Individual Plaintiffs will fairly and adequately protect the interests of the proposed class members because they seek relief on behalf of the class as a whole and have no interest antagonistic to other class members.

146.    Individual Plaintiffs are represented by competent counsel with extensive experience in complex class actions and immigration law.

147.    The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class, thereby making final injunctive, declaratory, and APA relief appropriate.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

36

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## VI.  FIRST CAUSE OF ACTION
### (Fourteenth Amendment – Citizenship Clause)

148.  Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

149.  The Fourteenth Amendment declares: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

150.  Section 1 of the Citizenship Stripping Order declares that U.S. citizenship does not automatically extend to individuals born in the United States when (1) the individual's mother is "unlawfully present in the United States" and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."

151.  Section 2 of the Citizenship Stripping Order states that Defendants will not issue documents recognizing U.S. citizenship to those individuals, nor accept documents issued by State, local, or other governments recognizing U.S. citizenship of those individuals.

152.  Section 3 of the Citizenship Stripping Order requires Defendants to "take all appropriate measures to ensure" that Defendant agencies do not recognize the citizenship of certain U.S. citizens.

153.  The Citizenship Stripping Order expressly violates the Fourteenth Amendment's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

154.  The President has no authority to override or ignore the Fourteenth Amendment's Citizenship Clause or otherwise amend the Constitution, and therefore lacks authority to strip individuals of their right to citizenship.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

37

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 52

155.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

156.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

## VII.    SECOND CAUSE OF ACTION
### (Immigration and Nationality Act – 8 U.S.C. § 1401)

157.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

158.    Section 1401 of the Immigration and Nationality Act states that "a person born in the United States, and subject to the jurisdiction thereof" shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(a).

159.    Section 1 of the Citizenship Stripping Order declares that U.S. citizenship does not automatically extend to individuals born in the United States when (1) the individual's mother is "unlawfully present in the United States" and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."

160.    Section 2 of the Citizenship Stripping Order states that Defendants will not issue documents recognizing U.S. citizenship to those individuals, nor accept documents issued by State, local, or other governments recognizing U.S. citizenship of those individuals.

161.    Section 3 of the Citizenship Stripping Order requires Defendants to "take all appropriate measures to ensure" that Defendant agencies do not recognize the citizenship of certain U.S. citizens.

162.    The Citizenship Stripping Order expressly violates Section 1401's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CLASS ACTION – No. 2:25-cv-00127-JCC     38     ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 53

1     163.    The President has no authority to override Section 1401's statutory guarantee of

2    citizenship, and therefore lacks any authority to unilaterally strip individuals of their right to

3    citizenship.

4     164.    The Citizenship Stripping Order will cause harm to Washington, Arizona,

5    Illinois, Oregon, and the residents of each Plaintiff State.

6     165.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and

7    proposed class members.

## VIII.   THIRD CAUSE OF ACTION
### (Administrative Procedure Act – 5 U.S.C. § 706)

166.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

167.    The actions of Defendants that are required or permitted by the Citizenship Stripping Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the Fourteenth Amendment to the U.S. Constitution, in violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

168.    The actions of Defendants that are required or permitted by the Citizenship Stripping Order, as set forth above, violate 8 U.S.C. § 1401 *et seq.*, and are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

169.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

170.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

171.    Accordingly, Plaintiffs request that the Court set aside any and all agency action that implements the Citizenship Stripping Order.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

39

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 54

1
## IX.  PRAYER FOR RELIEF

2       WHEREFORE, Plaintiffs pray that the Court:

3       a.      Declare that the Citizenship Stripping Order is contrary to the Constitution and

4  laws of the United States;

5       b.      Certify the case as a class action as proposed by Individual Plaintiffs herein and

6  in the previously filed motion for class certification, ECF No. 58;

7       c.      Preliminarily and permanently enjoin Defendants from implementing or

8  enforcing the Citizenship Stripping Order, pending further orders from this Court;

9       d.      Declare that Individual Plaintiffs' children born on or after the implementation

10  date of the Citizenship Stripping Order and others similarly situated are U.S. citizens,

11  notwithstanding the terms of the Order;

12      e.      Award Individual Plaintiffs costs and reasonable attorney fees under the

13  Equal Access to Justice Act, 28 U.S.C. § 2412; and

14      f.      Award such additional relief as the interests of justice may require.

15

16      DATED this 4th day of February 2025.

17                                      NICHOLAS W. BROWN
                                        Attorney General
18
                                        s/ Lane M. Polozola
19                                      COLLEEN M. MELODY, WSBA #42275
                                        Civil Rights Division Chief
20                                      LANE POLOZOLA, WSBA #50138
                                        DANIEL J. JEON, WSBA #58087
21                                      ALYSON DIMMITT GNAM, WSBA #48143
                                        Assistant Attorneys General
22                                      Wing Luke Civil Rights Division
                                        Office of the Washington State Attorney General
23                                      800 Fifth Avenue, Suite 2000
                                        Seattle, WA 98104-3188
24                                      (206) 464-7744
                                        colleen.melody@atg.wa.gov
25                                      lane.polozola@atg.wa.gov
                                        daniel.jeon@atg.wa.gov
26                                      alyson.dimmittgnam@atg.wa.gov

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

40

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 55

1

2    *Attorneys for Plaintiff State of Washington*

3    KRIS MAYES
     *Attorney General of Arizona*

4    *s/ Joshua Bendor*
     Joshua D. Bendor (AZ No. 031908)*

5    Luci D. Davis (AZ No. 035347)*
     Gabriela Monico Nunez (AZ No. 039652)*

6    Office of the Arizona Attorney General
     Firm State Bar No. 14000

7    2005 N. Central Ave.
     Phoenix, AZ 85004

8    (602) 542-3333
     Joshua.Bendor@azag.gov

9    Luci.Davis@azag.gov
     Gabriela.MonicoNunez@azag.gov

10   ACL@azag.gov

11   *Pro hac vice*
     *Attorneys for Plaintiff State of Arizona*

12

13   KWAME RAOUL
     *Attorney General, State of Illinois*

14   *s/ Rebekah Newman*
     REBEKAH NEWMAN, ARDC #6327372*

15   Assistant Attorney General
     Special Litigation Bureau

16   Office of the Illinois Attorney General
     115 South LaSalle St., Floor 35

17   Chicago, IL 60603
     Tel. (773) 590-6961

18   rebekah.newman@ilag.gov

19   *Pro hac vice*
     *Attorneys for Plaintiff State of Illinois*

20

21   DAN RAYFIELD
     *Attorney General, State of Oregon*

22   */s/ Carla A. Scott*
     CARLA A. SCOTT, WSBA #39947

23   THOMAS H. CASTELLI, OSB #226448*
     Senior Assistant Attorneys General

24   Oregon Department of Justice
     100 SW Market Street

25   Portland, OR 97201
     (971) 673-1880

26   Carla.A.Scott@doj.oregon.gov

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

41

Add. 56

Thomas.Castelli@doj.oregon.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Oregon*

NORTHWEST IMMIGRANT
RIGHTS PROJECT

s/ Matt Adams
Matt Adams, WSBA #28287
matt@nwirp.org

s/ Leila Kang
Leila Kang, WSBA #48048
leila@nwirp.org

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid, WSBA #46987
glenda@nwirp.org

s/ Aaron Korthuis
Aaron Korthuis, WSBA #53974
aaron@nwirp.org

NORTHWEST IMMIGRANT
RIGHTS PROJECT
614 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

*Attorneys for Individual Plaintiffs and Proposed*
*Class Members*

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

42

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Add. 57

# EXHIBIT A



PRESIDENTIAL ACTIONS

# PROTECTING THE MEANING AND VALUE OF AMERICAN CITIZENSHIP

EXECUTIVE ORDER

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  The privilege of United States citizenship is a priceless and profound gift.  The Fourteenth Amendment states:  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which

Add. 59

misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race. But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States.  The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof."  Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text. Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States:  (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Sec. 2.  Policy.  (a)  It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons:  (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the

person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b)  Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c)  Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

Sec. 3.  Enforcement.  (a)  The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b)  The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

Sec. 4.  Definitions.  As used in this order:

(a)  "Mother" means the immediate female biological progenitor.

(b)  "Father" means the immediate male biological progenitor.

Sec. 5.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against

the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

   January 20, 2025.

News

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW

Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Add. 62

Privacy