No. 25-807

=====================

**In the
United States Court of Appeals for the Ninth Circuit**

—————————

STATE OF WASHINGTON, *et al.*,
*Plaintiffs-Appellees*,
v.
DONALD J. TRUMP, *et al.*
*Defendants-Appellants.*

—————————

**On Appeal from the United States District Court
for the Western District of Washington**

—————————

**Brief *Amicus Curiae* of
America's Future,
Gun Owners of America,
Gun Owners of California,
Gun Owners Foundation,
Citizens United,
U.S. Constitutional Rights Legal Defense Fund,
Leadership Institute, and
Conservative Legal Defense and Education Fund in Support of Defendants-
Appellants' Emergency Motion for Stay Pending Appeal**

—————————

RICHARD B. SANDERS
  LAND USE AND PROPERTY LAW, PLLC
  6659 Kimball Dr., Ste. B-201
  Gig Harbor, WA 98335
  (253) 853-1806

*Attorneys for Amici Curiae*
February 17, 2025

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia  22180-5615
  (703) 356-5070
*Attorney of Record

=====================

## DISCLOSURE STATEMENT

The *amici curiae* herein, America's Future, Gun Owners of America, Gun Owners of California, Gun Owners Foundation, Citizens United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1, 29(c).

All of these *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them. The *amici curiae* are represented herein by Jeremiah L. Morgan, who is counsel of record, and William J. Olson of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia 22180-5615, and Richard B. Sanders, Land Use and Property Law, PLLC, 6659 Kimball Dr., Ste. B-201, Gig Harbor, Washington 98335.

   s/Jeremiah L. Morgan   
Jeremiah L. Morgan

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT

I.   THE INJUNCTION AGAINST PRESIDENT TRUMP SHOULD BE
     STAYED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PLAINTIFF STATES LACK STANDING TO CHALLENGE THE
     EXECUTIVE ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. THE DISTRICT COURT INCORRECTLY CONCLUDED THAT
     THE PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE
     MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   Plaintiffs' View of Birthright Citizenship Is Unsupported by
          *Wong Kim Ark* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.   Plaintiffs' Reliance on Other Supreme Court Cases Is
          Unpersuasive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.  "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE
     ORIGINAL INTENT OF THE FOURTEENTH AMENDMENT . . . . . . . 14

V.   THE DISTRICT COURT'S CONCLUSION THAT BIRTHRIGHT
     CITIZENSHIP SHOULD BE HANDED OUT IRRESPECTIVE OF
     ALLEGIANCE HAS BIZARRE RESULTS . . . . . . . . . . . . . . . . . . . . . . . 20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

<u>Constitution</u>

Article III, Sect. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Article IV, Sect. 2, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Amendment XIV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 9, 13-17

<u>Cases</u>

*Brown v. Board of Education*, 347 U.S. 483 (1954) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Carlisle v. United States*, 83 U.S. 147 (1872) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Elk v. Wilkins*, 112 U.S. 94, 101 (1884). . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 13

*Franklin v. Massachusetts*, 505 U.S. 788 (1992). . . . . . . . . . . . . . . . . . . . . . . . . 3

*Kendall v. United States*, 37 U.S. 524 (1838) . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Marbury v. Madison,* 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Minor v. Happersett*, 88 U.S. 162 (1874) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Mississippi v. Johnson*, 71 U.S. 475 (1866). . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Plessy v. Ferguson*, 163 U.S. 537 (1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Plyler v. Doe*, 457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

*Scott v. Sandford*, 60 U.S. 393 (1857) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Slaughter-House Cases*, 83 U.S. 36 (1873). . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) . . . . . . . . . . . . . . 6, 9-14, 22

*Van Ness v. Pacard*, 27 U.S. 137 (1829) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

<u>Miscellaneous</u>

H. Ardman, "World War II: German Saboteurs Invade America in 1942,"
*History.net* (June 12, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Raoul Berger, <u>Government by the Judiciary: The Transformation of the
Fourteenth Amendment</u> (Liberty Fund: 1997) . . . . . . . . . . . . . . . . . . . . . . . . 15

Congressional Globe, 39th Cong, 1st Sess, 2890 . . . . . . . . . . . . . . . . . . . . 18, 19

J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*," 22 Chap. L.
Rev. 301 (Spring 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet
Daily News* (Mar. 12, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Edward J. Erler, <u>The Founders on Citizenship and Immigration</u> (Claremont
Inst: 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

J. Feere, "Birthright Citizenship in the United States: A Global Comparison,"
*Center for Immigration Studies* (Aug. 31, 2010) . . . . . . . . . . . . . . . . . . . . . . 23

D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian
Practice," *This Day* (Aug. 16, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say Trump's
action illegal," *Vanguard* (Jan. 23, 2025) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Office of the Inspector General, "A Review of the FBI's Handling of
Intelligence Information Prior to the September 11 Attacks," (Nov. 2004) . . . . . 23

iv

W. Olson, H. Titus & A. Woll, "Children Born in the United States to Aliens Should Not, by Constitutional Right, Be U.S. Citizens," U.S. Border Control (Jan. 2001; rev'd 2003; rev'd 2005, rev'd 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful lure," *Washington Post* (July 18, 2010) . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human smuggling scheme," (Oct. 30, 2024) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System," (June 9, 2009) . . . . . . . . . . . . . . . 23

19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990 (1995) . . . . . . . . . . . . . 8

## INTEREST OF *AMICI CURIAE*[1]

The interest of the *Amici Curiae* is set out in the motion for leave to file *amicus* brief.

## STATEMENT OF THE CASE

On January 20, 2025, President Trump issued an executive order entitled, "Protecting the Meaning and Value of American Citizenship"[2] ("EO"). The Order contained a narrowly defined directive that federal agencies are not to consider a person born on U.S. soil to be a citizen of the United States when, "at the time of said person's birth," the father "was not a United States citizen or lawful permanent resident..." and:

> "when that person's **mother**" was:
> (1) "**unlawfully present** in the United States" ... or
> (2) ... when [the mother's presence] ... was **lawful but temporary** (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa).... [*Id.* (emphasis added).]

---

[1] *Amici* are filing a motion for leave to file this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

[2] The White House, "Protecting the Meaning and Value of American Citizenship," (Jan. 20, 2025).

1

Washington State joined by other states sought injunctive relief. These *amici* filed an *amicus* brief opposing injunctive relief. On February 6, 2025, the Western District of Washington issued a nationwide preliminary injunction against defendants, apparently including President Trump.

## ARGUMENT

### I. THE INJUNCTION AGAINST PRESIDENT TRUMP SHOULD BE STAYED.

The Plaintiff States named President Trump in his official capacity as the lead defendant. Compl. ¶ 18. Plaintiffs also sued the United States of America, several departments of government, and agency heads, asking the district court to "Temporarily restrain Defendants from implementing or enforcing this Order."

The government's brief raised the impropriety of seeking relief against the President, and the issue was extensively briefed by these *amici*, so the district court acted in the full knowledge of Supreme Court decisions preventing such an injunction. Nevertheless, the district court's injunction applies to all Defendants, including the President, explaining that the government's objection was "procedurally deficient" because it was "buried in a response brief." *See* Order at 5 n.4. Even if the President had been continued as a defendant, the district court

2

had no jurisdiction to enter an injunction against the President — as such jurisdictional defenses can be raised at any time.

In *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992), the Supreme Court explained that, while a district court could enjoin an executive branch official, it could not enjoin the President himself. In striking down an injunction against a President, the Court bluntly stated that "the District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows." *Id*. at 802. Concurring in *Franklin*, Justice Scalia went even further, asserting that "[i]t is a commentary upon the level to which judicial understanding — indeed, even judicial awareness — of the doctrine of separation of powers has fallen, that the District Court entered this order against the President without blinking an eye." *Id*. at 826. Justice Scalia noted that, up until at least 1984, "'[n]o court has ever issued an injunction against the president himself or held him in contempt of court.'" *Id*. at 827.

In 1838, the High Court observed that "[t]he executive power is vested in a President; and as far as his powers are derived from the constitution, he is beyond the reach of any other department, except in the mode prescribed by the constitution through the impeaching power." *Kendall v. United States*, 37 U.S. 524, 610 (1838). The specific issue of an injunction against the President was

3

considered by the U.S. Supreme Court in *Mississippi v. Johnson*, 71 U.S. 475 (1866), involving Mississippi's suit to enjoin President Andrew Johnson from enforcing the Reconstruction Acts. Although leaving open the question of whether the President could be ordered to perform mere ministerial acts, the Court made clear that "this court has no jurisdiction ... to enjoin the President in the performance of his official duties...." *Id.* at 501.

Clearly, President Trump's issuance and enforcement of his Executive Order was an act in the performance of his official duties. *See Marbury v. Madison,* 5 U.S. 137, 170 (1803) ("The province of the court is, solely, to decide on the rights of individuals, not to enquire how the executive, or executive officers, perform duties in which they have a discretion. Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court."). *See also Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982).

For his official acts, the President cannot be subjected to the jurisdiction of the judiciary — which is not a superior, but coequal, branch of government. The district court's order exceeded its authority, and to the extent it runs against the President, should be stayed, with instructions to the district court to dismiss the President as a defendant.

4

## II.     PLAINTIFF STATES LACK STANDING TO CHALLENGE THE EXECUTIVE ORDER.

States cannot base their standing on behalf of children born to alien fathers and mothers, as each plaintiff must "assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  States cannot base standing on loss of financial payments to which they would only be entitled if they prevail.  States have no right to demand the federal government extract taxes from Americans to give to states to subsidize the lives of those whose presence here violates the laws of our country.

## III.     THE DISTRICT COURT INCORRECTLY CONCLUDED THAT THE PLAINTIFFS HAVE A LIKELIHOOD OF SUCCESS ON THE MERITS.

The district court grounds its defense of its Preliminary Injunction on false and simplistic assumptions.  First, it simply asserts:  "The Plaintiffs are likely to succeed on their claim that the Order violates the Citizenship Clause....  Indeed, the Court need only look to its text.  The Citizenship Clause is clear ... **any individual who is born in the territorial United States ... is a citizen of this country**."  Order at 6 (emphasis added).  There, the court takes a more radical interpretation of the Fourteenth Amendment than even Plaintiffs, only later in its opinion acknowledging the two exceptions to that rule asserted by Plaintiffs.  *See*

5

Order at 9.  Then the court states that narrow focus must be placed on the child, only later to recognize that there are other overriding factors at work here in acknowledging that to expansively interpret the Fourteenth Amendment to cover those two exceptions "would be 'dangerous to society.'"  Order at 9.

### A. Plaintiffs' View of Birthright Citizenship Is Unsupported by *Wong Kim Ark*.

Plaintiffs claim that their position is identical to a "longstanding common law principle" (Compl. at 8), but that common law is completely inapplicable, as it was developed under the British view of citizenship.  In *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), Justice Gray accurately described the English common law's presumption that everyone born on English soil was a subject of the King for life, whether he wished to be or not.  "By the common law of England, every person born within the dominions of the Crown, no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country, was an English subject." *Wong Kim Ark* at 657.  However, Justice Gray incorrectly assumed the British rule of citizenship that he described also applied in America when it does not.  As Justice Story explained in 1829, "The common law of England is not to be taken in all respects to be that of America.  Our ancestors brought with them its general

6

principles, and claimed it as their birthright. But they brought with them, and adopted only that portion which was applicable to their situation." *Van Ness v. Pacard*, 27 U.S. 137, 145 (1829).

This distinction between British and American citizenship was addressed in an article originally published in January 2001 by a nonprofit organization, U.S. Border Control. As the authors explain, the legal principle of *jus soli* was based on the idea that the king owned the land, and thus anyone born on the land, whether to a citizen or an alien, became by birth a subject of the king, to whom that person now owed allegiance for life, being permanently a subject by accident of birth on the King's land.[3] Constitutional scholar John Eastman explained when that shift occurred. He stated that by declaring their land and persons independent of the King in 1776, the Framers expressly repudiated the notion of being unalterably subjects by birth: "The Declaration of Independence is not just a thorough repudiation of that old feudal idea of 'permanent allegiance' [to the king by accident of birth], but perhaps the most eloquent repudiation of it ever

---

[3] W. Olson, H. Titus & A. Woll, "Children Born in the United States to Aliens Should Not, by Constitutional Right, Be U.S. Citizens," U.S. Border Control (January 2001; rev'd 2003; rev'd 2005, rev'd 2018).

7

written....  The notion that the English common law of *jus soli* therefore continued unabated after the Declaration of Independence could not be more mistaken."[4]

Plaintiffs next rely on a statement submitted to the House Judiciary Committee in 1995 from the Office of Legal Counsel[5] during the Clinton Administration.  *See* Compl. at para 38, 54; Motion for Preliminary Injunction (Dkt. 63) ("PI Mtn") at 13.  Although published together with the official "Opinions of the Office of Legal Counsel," this was not such an Opinion, but rather a statement opposing passage of a House bill.  The statement asserted that to:  "deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be ... unquestionably unconstitutional."  However, it is clear that this statement was based on the same flawed assumption that the British common law of citizenship is identical to the American common law.  That statement relies on a lower court opinion for the proposition it assumes to be true that:  "We find no warrant for the opinion that this great principle of the common law has ever been changed in the United States."  *Id*. at 340.

---

[4] J. Eastman, "The Significance of 'Domicile' in *Wong Kim Ark*," 22 Chap. L. Rev. 301, 308-309 (Spring 2019).

[5] *See* 19 U.S. Op. Off. Legal Counsel 340, 1995 WL 1767990, at *1-2 (1995).

Plaintiffs then assert that "[t]he Supreme Court cemented this longstanding and established understanding of the Citizenship Clause more than 125 years ago" in *Wong Kim Ark*. Compl. para. 36. In essence, Plaintiffs take the position that since "birthright citizenship" has been done for such a long time, it is constitutional, but longevity does not demonstrate constitutionality. In 1896, two years before *Wong Kim Ark*, the Supreme Court decided *Plessy v. Ferguson*, 163 U.S. 537 (1896), by 7 to 1, holding that "separate but equal" did not violate the Fourteenth Amendment, with Justice Gray, the author of *Wong Kim Ark*, in the majority. The *Plessy* decision stood as "good law" for nearly 60 years, before being overturned by *Brown v. Board of Education*, 347 U.S. 483 (1954), by a Court that did not subscribe to Plaintiffs' theory that longevity demonstrates constitutionality.

Plaintiffs claim that their position is supported by the holding of *Wong Kim Ark*, but Plaintiffs fail to admit that case was an outlier that veered sharply away from all the Supreme Court cases decided closer to the time of the ratification of the Fourteenth Amendment. In 1873, just five years after ratification of the Fourteenth Amendment, the Court interpreted the Citizenship Clause:

> That its main purpose was to establish the citizenship of the negro can admit of no doubt. **The phrase, "subject to its jurisdiction" was intended to exclude** from its operation **children of** ministers,

9

consuls, and **citizens or subjects of foreign States born within the United States**. [*Slaughter-House Cases*, 83 U.S. 36, 73 (1873) (emphasis added).]

Two years later, the Court again questioned acquiring citizenship, focusing on British citizenship:

> At **common-law**, ... it was never doubted that all children born in a country of parents who were its citizens became themselves, upon their birth, citizens also. These were natives, or natural-born citizens, as distinguished from aliens or foreigners. **Some authorities go further** and include as citizens children born within the jurisdiction without reference to the citizenship of their parents. **As to this class there have been doubts**.... [*Minor v. Happersett*, 88 U.S. 162, 167-68 (1874) (emphasis added).]

Just 12 years before *Wong Kim Ark*, writing for the Court, Justice Gray again highlighted the critical difference between the children of citizens and the children of aliens owing allegiance to foreign powers. The Court declared:

> [t]he main object of the opening sentence of the Fourteenth Amendment was to settle the question ... as to the citizenship of free negroes ... and to put it beyond doubt that all persons, white or black, and whether formerly slaves or not, born or naturalized in the United States, and **owing no allegiance to any alien power**, should be citizens of the United States.... [*Elk v. Wilkins*, 112 U.S. 94, 101 (1884) (emphasis added).]

Because the Plaintiff in *Elk v. Wilkins* was a member of a Native American tribe to which he owed allegiance, and had never been naturalized, the Court found that he was **not a citizen** despite being born on U.S. soil.

10

Despite some unduly broad dicta, *Wong Kim Ark* did not even address those specific children covered by the Executive Order — those born to a mother either **illegally or temporarily present** in the United States. The question addressed in *Wong Kim Ark* was:

> whether a child born in the United States, of parents of [foreign] descent, who, at the time of his birth, are subjects of [a foreign government], but have a **permanent domicil** and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the [foreign government], becomes at the time of his birth a citizen of the United States. [*Wong Kim Ark* at 653 (emphasis added).]

However, if *Wong Kim Ark* viewed that "subject to the jurisdiction" of the United States simply meant to be present "within the jurisdiction" thereof, equating (i) children born to aliens who owe allegiance to foreign governments to (ii) children of citizens, that decision was in error, an outlier, inconsistent with the Supreme Court's decisions in the *Slaughter-House Cases, Minor,* and *Elk*.

Plaintiffs argue that the Immigration and Nationality Act ("INA") reaffirms *Wong Kim Ark* and Plaintiffs' expansive reading of that case. Compl. at 11. While the INA was enacted after *Wong Kim Ark*, the INA did not incorporate that case, and certainly did not equate "the Citizenship Clause's commandment" with its mistaken reading of *Wong Kim Ark*, rather than the Clause itself. As Plaintiffs concede, the language of the INA, "subject to the jurisdiction thereof" was "taken

11

directly from the Fourteenth Amendment." Thus, it could be said to incorporate that Amendment, but not Plaintiffs' mistaken reading of *Wong Kim Ark*.

In their motion for a temporary restraining order, Plaintiffs' hyperbole reaches new heights. Plaintiffs claim that "President Trump and the federal government now seek to impose a modern version of *Dred Scott*." TRO Mtn. at 1. *Dred Scott*, of course, stood for the proposition that if a person's ancestors were brought to U.S. soil as slaves against their will, no matter how many generations passed, their descendants born here could never be citizens. The challenged Order, on the other hand, says that a father and mother who are citizens of other countries, who currently owe their allegiance to a foreign government, do not magically create an American Citizen by the mother being in the United States illegally or temporarily. The two situations are different in every respect.

**B.    Plaintiffs' Reliance on Other Supreme Court Cases Is Unpersuasive.**

Although the district court did not address them all, Plaintiffs cited several other Supreme Court cases they incorrectly assert undercut the legality of the challenged Order. Plaintiffs cited to *dicta* in *Plyler v. Doe*, 457 U.S. 202 (1982). Motion for Preliminary Injunction (Dkt. 63) at 10-12. *Plyler* involved a Texas statute denying state funds for public education for children of illegal immigrants.

Writing for a bare 5-4 majority, Justice Brennan's opinion for the Court stated that "[i]n appellants' view, persons who have entered the United States illegally are not 'within the jurisdiction' of a State even if they are present within a State's boundaries and subject to its laws. Neither our cases nor the logic of the Fourteenth Amendment supports that constricting construction of the phrase 'within its jurisdiction.'" *Id*. at 211. As shown in an accompanying footnote, for this proposition, the Court relied on Justice Gray's *dicta* in *Wong Kim Ark* that:

> it was "impossible to construe the words 'subject to the jurisdiction thereof,' in the opening sentence [of the Fourteenth Amendment], as less comprehensive than the words 'within its jurisdiction,' in the concluding sentence of the same section; or to hold that persons 'within the jurisdiction' of one of the States of the Union are not 'subject to the jurisdiction of the United States.'" [*Id*. at 211, n.10.]

Justice Gray utterly ignored the legislative history of the Citizenship Clause, in which numerous Senators, including the author of the Clause, expressly differentiated the meaning of the phrases "within the jurisdiction" and "subject to the jurisdiction" within the Clause, in order to reach the opinion in his dicta. *See* Section IV, *infra*.

If Justice Gray's *dicta* from *Wong Kim Ark* had been the case's holding, it would have effectively overturned other cases, including Justice Gray's own opinion in *Elk*, that were decided closer to the ratification of the Fourteenth

13

Amendment, and he had to ignore the plain statements in the legislative history. In addition, neither the dicta in *Wong Kim Ark* nor that in *Plyler* controls the outcome here. Rather, the text and history of the Citizenship Clause control, and these utterly fail to support Plaintiffs' novel proposition that children of diplomats and occupying forces are the only exceptions to its claimed right of birthright citizenship. For that matter, nothing in *Plyler* would exclude even children born to occupying forces from citizenship. The error in *Plyler*'s dicta simply follows from the error in *Wong Kim Ark*'s dicta upon which it rests. Neither undercuts the legality of the Executive Order.

## IV. "BIRTHRIGHT CITIZENSHIP" VIOLATES THE TEXT AND THE ORIGINAL INTENT OF THE FOURTEENTH AMENDMENT.

The district court opinion is based on an erroneous understanding of the Citizenship Clause. Following the Civil War, Congress took action to overrule *Scott v. Sandford*, 60 U.S. 393 (1857), which held that slaves and their descendants, even as freedmen, were excluded from U.S. citizenship. Congress first moved to override *Dred Scott* by enacting the **Civil Rights Act of 1866**, which provided that "all persons born in the United States and **not subject to any foreign power**, excluding Indians not taxed, are hereby declared to be **citizens** of the United States." 14 *Stat*. 27 (emphasis added).

14

Due to concerns that the Supreme Court might rule the Civil Rights Act unconstitutional or that a subsequent Congress might repeal the Act, Congress initiated the process required to amend the Constitution. *See* Raoul Berger, Government by the Judiciary: The Transformation of the Fourteenth Amendment (Liberty Fund: 1997) at 48. The resulting Fourteenth Amendment included this language:

> Section 1. All persons born or naturalized in the United States, and **subject to the jurisdiction thereof**, are citizens of the United States and of the State wherein they reside.... No State shall ... deny to any person **within its jurisdiction** the equal protection of the law. [Emphasis added.]

The language "**subject to the jurisdiction thereof**" in the Fourteenth Amendment, as demonstrated *infra*, was understood as conveying the same meaning as the language "**and not subject to any foreign power**" as used in the Civil Rights Act of 1866. Most countries claim as citizens those children born to parents who are their citizens. Consequently, even if born on American soil, those children are **subjects of a foreign power** and thus **not subject to the jurisdiction of the United States**. That being the case, children born in the United States of parents who are not U.S. citizens have no lawful claim of citizenship simply because they are born in U.S. territory.

15

The Declaration of Independence not only freed the new country from the notion that persons born in America were British citizens with allegiance to England, it demonstrated the solemn, binding, and covenantal action undertaken on behalf of the people, which was later confirmed by the People's ratification of the Constitution which begins "We the People."

> We, therefore, the Representatives of the united States of America, in General Congress, Assembled, **appealing to the Supreme Judge of the world for the rectitude of our intentions**, do, in the Name, and by Authority of the good People of these Colonies, solemnly publish and declare, That these United Colonies are, and of Right ought to be **Free and Independent States**; that they are **Absolved from all Allegiance to the British Crown**, and that all political connection between them and the State of Great Britain, is and ought to be totally dissolved…. [Declaration of Independence (emphasis added).]

The Declaration of Independence declared that Americans were shifting from their previous "**allegiance to the British Crown**" to allegiance to the new nation formed of "**Free and Independent States**." Likewise, the ratification history of the Fourteenth Amendment, discussed *infra*, that "**subject to the jurisdiction**" entails an obligation of allegiance to the United States and not simply an obligation of obedience to the laws of the United States. The **obligation of allegiance** signified in the Citizenship Clause is different in kind from the obligation of every person in the territory of the United States to obey the laws of

16

the land.  Citizens subject to the jurisdiction of the United States are entitled to corresponding privileges and immunities of citizenship.  Constitution, Article IV, Sect. 2, cl. 1.  On the other hand, all persons who "come within its jurisdiction" have a duty to obey the law, together with a corresponding right to the equal protection of the law.  The meaning of the phrase "subject to the jurisdiction" as used in the Fourteenth Amendment context is very different from the meaning of "within its jurisdiction."

The record of Congress's deliberations on the Fourteenth Amendment identifies the limited objective for which the Citizenship Clause was adopted — to reverse *Dred Scott* and to ensure that the citizenship of freedmen was recognized on the same basis as other Americans born in the United States.  The purpose was not to change the law regarding citizenship, but rather to affirm its proper understanding.  The deliberations specifically addressed the issue of children born in the United States to non-citizens and assumed that they did not qualify as natural born citizens.  It was understood by the Amendment's Framers that the best evidence that a person will bear true faith and allegiance to America is birth in the United States to American parents.

Senator Jacob Howard of Michigan, who authored the Citizenship Clause, explained its meaning:

17

> This … is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. **This will not, of course, include persons born in the United States who are foreigners, aliens**, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. [Congressional Globe, 39th Cong, 1st Sess, 2890 (emphasis added).]

Senator Howard also explained what he meant by use of the term "jurisdiction":

> "jurisdiction" as here employed, ought to be construed so as to imply a **full and complete jurisdiction** on the part of the United States ... that is to say, the **same jurisdiction in extent and quality** as applies to every citizen of the United States now. [*Id*. at 2895 (emphasis added).]

Senator Lyman Trumbull of Illinois, Chairman of the Senate Judiciary Committee,

concurred with Senator Howard regarding his characterization of the meaning of

"jurisdiction":

> That means "subject to the complete jurisdiction thereof".... **Not owing allegiance to anybody else**. That is what it means.... It cannot be said of any [person] who owes allegiance, partial allegiance if you please, to some other Government that he is "subject to the jurisdiction of the United States…."
> It is only those persons who are completely within our jurisdiction, who are subject to our laws, that we think of making citizens; and there can be no objection to the proposition that such persons should be citizens. [*Id*. at 2893 (emphasis added).]

Senator George Williams of Oregon concurred:

18

> In one sense, all persons born within the geographical limits of the United States, are subject to the jurisdiction of the United States, but they are not subject to the jurisdiction of the United States in every sense.... I understand the words here, "subject to the jurisdiction of the United States," to mean fully and completely subject to the jurisdiction of the United States. [*Id*. at 2897 (emphasis added).]

Senator Edgar Cowan of Pennsylvania specifically expressed concern that the amendment should not be interpreted to grant citizenship to Chinese immigrant workers in California and went on to discuss the rights of travelers in the United States from foreign nations:

> If a **traveler** comes here from Ethiopia, from Australia, or from Great Britain, he is entitled to a certain extent, to the protection of the laws. You cannot murder him with impunity. It is murder to kill him, the same as it is to kill another man. You cannot commit an assault and battery on him, I apprehend. He has a right to the protection of the laws; but he is **not a citizen** in the ordinary acceptation of the word. [*Id*. at 2890 (emphasis added).]

Before the debate on Senator Howard's proposal to add the qualifying phrase "subject to the jurisdiction thereof," Senator Saulsbury concisely stated the Senate's object with regard to this amendment, and in so doing, removed all doubt as to the limited purpose of the amendment as drafted.

> I do not presume that any one will pretend to disguise the fact that the object of this first section is simply to declare that negroes shall be citizens of the United States. [*Id.* at 2897.]

19

## V.  THE DISTRICT COURT'S CONCLUSION THAT BIRTHRIGHT CITIZENSHIP SHOULD BE HANDED OUT IRRESPECTIVE OF ALLEGIANCE HAS BIZARRE RESULTS.

The district court's preliminary injunction entirely missed one of the most important aspects of Citizenship — the **allegiance** that a person owes to his own country, sometimes described as loyalty or fidelity to the nation.  Most countries recognize citizenship based on the principle of *jus sanguinis* — that a child acquires the citizenship of the child's natural parents.  *See* Edward J. Erler, The Founders on Citizenship and Immigration (Claremont Inst: 2007) at 28-29.  Thus, children born anywhere in the world to citizens of most other countries acquire the citizenship of their parents at birth.  Under Plaintiffs' notion of birthright citizenship — a term of recent origin that cannot be sourced to the Declaration, Constitution, or statute — almost all such children automatically would be citizens of multiple countries.  To which country do these children owe their allegiance?

The United States has long required naturalized citizens to disavow allegiance to all foreign sovereigns, but not so with those covered by Plaintiffs' assertion of birthright citizenship.  Because most children born in the United States to parents with foreign citizenship are recognized as foreign nationals under international law, they are not any more "subject to the jurisdiction" of the United

States than are the children of diplomats, Native Americans, or foreign invaders, who Plaintiffs concede cannot benefit from citizenship by birth alone.

The importance of allegiance is most acutely felt during time of war when the obligations of citizenship are most consequential. An American citizen is "subject to the jurisdiction" of the United States and may be drafted into the military even if outside the country. Citizens who take up arms against the United States may be prosecuted for treason. *See* U.S. Constitution Article III, Sect. 3. Non-citizens who take up arms against the United States are prisoners of war if captured, and they are not subject to prosecution simply for waging war against the United States. A person who is a citizen of two different countries that are at war will be placed in an untenable position. The problems that arise with dual citizenship were acutely felt by U.S. citizens who were impressed into service with the British navy leading up to the War of 1812.

Neither of the two categories of children born to aliens in the United States that are addressed by the Executive Order can be expected to demonstrate no allegiance to our nation. First, those children born of parents who are not legally in the United States cannot be expected to be nurtured in the values of American citizenship by parents who entered the country illegally — being here not "subject to" but rather "in defiance of" our nation's laws. Second are those children of

21

parents, birth tourists, who travel to the United States for the purpose of giving birth and thereby obtaining cheap and easy citizenship for their children.  They too are unlikely to have any allegiance nurture their children in values of American citizenship.

Only those persons who can be expected to have a "**permanent allegiance**" to our country can become citizens, because based on that permanent allegiance, the country then owes to its citizens a reciprocal duty of protection.  No such relationship exists with the two classes of persons addressed by the EO:

> By **allegiance** is meant the obligation of **fidelity and obedience** which the individual owes to the government under which he lives, or to his sovereign in return for the protection he receives.  It may be an absolute and permanent obligation, or it may be a qualified and temporary one.  The citizen or subject owes an **absolute and permanent allegiance** to his government or sovereign, or at least until, by some open and distinct act, he renounces it and becomes a citizen or subject of another government or another sovereign.  The alien, whilst domiciled in the country, owes a **local and temporary allegiance**, which continues during the period of his residence. [*Carlisle v. United States*, 83 U.S. 147, 154 (1872) (emphasis added).]

If *Wong Kim Ark* is read to support the district court's preliminary injunction, it contravenes common sense and our sense of justice.  According to the district court's theory, under *Wong Kim Ark*, a person born in the United States of alien parents is constitutionally entitled to American citizenship, whereas a

22

person born outside the United States to American citizens is entitled to such

citizenship only by statute.  Why should there be an irrebuttable legal presumption

of allegiance in the former case, but not in the latter?

Under the Plaintiffs' theory of the case and the district court's preliminary

injunction, children of the 9/11 hijackers, WWII German saboteurs, human

traffickers, and imprisoned enemy combatants born on U.S. territory would be

entitled to citizenship.[6]  Birth tourism from Turkey, China, Nigeria, and Mexico

has received considerable attention.[7]  The problems associated with the theory of

birthright citizenship are exacerbated by statutes that facilitate immigration of

lawfully naturalized citizens, known as "chain migration."

---

[6] *See, e.g.*, Office of the Inspector General, "A Review of the FBI's Handling of Intelligence Information Prior to the September 11 Attacks," ch. 5 (Nov. 2004); H. Ardman, "World War II: German Saboteurs Invade America in 1942," *History.net* (June 12, 2006); U.S. Department of Justice, "Two sent to prison for roles in cartel-linked human smuggling scheme," (Oct. 30, 2024); U.S. Department of Justice, "Fact Sheet: Prosecuting and Detaining Terror Suspects in the U.S. Criminal Justice System," (June 9, 2009).

[7] *See, e.g.*, J. Feere, "Birthright Citizenship in the United States: A Global Comparison," *Center for Immigration Studies* (Aug. 31, 2010); I. Egrikavuk, "Birth tourism in U.S. on the rise for Turkish parents," *Hurriyet Daily News* (Mar. 12, 2010); K. Richburg, "For many pregnant Chinese, a U.S. passport for baby remains a powerful lure," *Washington Post* (July 18, 2010); D. Iriekpen, "Citizenship Rights: American Agitations Threaten a Nigerian Practice," *This Day* (Aug. 16, 2010); N. Nnorom, "Birthright citizenship: Nigerians in diaspora kick, say Trump's action illegal," *Vanguard* (Jan. 23, 2025).

Plaintiffs' advocacy for automatic citizenship for children born to illegal aliens and birth tourists may further the policy objectives of globalists and the United Nations, which call for open migration,[8] but it defies common sense and undermines the nation-state and the concept of borders.

## CONCLUSION

For the foregoing reasons, the district court's February 6, 2025 Preliminary Injunction should be stayed pending appeal.

Respectfully submitted,

RICHARD B. SANDERS
  LAND USE AND PROPERTY LAW, PLLC
  6659 Kimball Dr., Ste. B-201
  Gig Harbor, WA 98335
  (253) 853-1806

February 17, 2025
*Attorney of Record

  /s/ Jeremiah L. Morgan
JEREMIAH L. MORGAN*
WILLIAM J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia 22180-5615
  (703) 356-5070
*Attorneys for Amici Curiae*

---

[8] *See* UN's Global Compact for Safe, Orderly and Regular Migration (GMC), but even that compact is voluntary, and states that it "respects states' sovereign right to determine who enters and stays in their territory…."

24

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

IT IS HEREBY CERTIFIED:

1.      That the foregoing Brief *Amicus Curiae* of America's Future, *et al*. in Support of Defendants-Appellants' Motion for Stay Pending Appeal complies with the limitation set forth by Circuit Rule 27-1(1)(d), because this brief contains 5,547, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point Times News Roman.

/s/ Jeremiah L. Morgan

_____
Jeremiah L. Morgan
Attorney for *Amici Curiae*

Dated:  February 17, 2025

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of America's Future, *et al.*, in Support of Defendants-Appellants' Motion for Stay Pending Appeal was made, this 17th day of February 2025, by the Court's Appellate Case Management System upon the attorneys for the parties.

/s/ Jeremiah L. Morgan

_____

Jeremiah L. Morgan
Attorney for *Amici Curiae*