No. 25-807

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATES OF WASHINGTON, ARIZONA, ILLINOIS, and OREGON,

*Plaintiffs-Appellees*,

CHERLY NORALES CASTILLO and ALICIA CHAVARRIA LOPEZ, on behalf
of themselves as individuals and others similarly situated,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Western District of Washington
Case No. 2:25-cv-00127-JCC
The Honorable John C. Coughenour

## PLAINTIFF STATES' RESPONSE TO EMERGENCY MOTION UNDER
## CIRCUIT RULE 27-3 FOR PARTIAL STAY PENDING APPEAL

NICHOLAS W. BROWN
*Attorney General of Washington*

COLLEEN M. MELODY, WSBA 42275
  *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

*(Additional Counsel on Signature Page)*

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................... 1

II.  BACKGROUND AND PROCEDURAL HISTORY ..................... 2

    A.  President Trump Issues the Citizenship Stripping Order .......................... 2

    B.  The District Court Enters a Preliminary Injunction ................................. 3

III.  ARGUMENT ........................................................................... 4

    A.  The Federal Government Will Suffer No Injury from Respecting the 157-Year-Old Guarantee of Birthright Citizenship .................................... 5

    B.  Appellants Are Not Likely to Succeed on the Merits ............................... 7

        1.  The Citizenship Stripping Order Is Blatantly Unlawful ..................... 7

        2.  The States Have Standing to Protect Their Interests ......................... 9

    C.  The States and the Public Interest Will Be Irreparably Harmed if the Injunction Is Stayed ................................................................................ 17

    D.  The Injunction's Scope Is Necessary to Provide Complete Relief .......... 18

IV.  CONCLUSION ....................................................................... 20

## TABLE OF AUTHORITIES

Cases

*Afroyim v. Rusk*,
  387 U.S. 253 (1967) .......................................................6

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ..............................................4

*Betschart v. Oregon*,
  103 F.4th 607 (9th Cir. 2024)............................................18

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023) ............................................. passim

*California v. Azar*,
  911 F.3d 558 (9th Cir. 2018)............................................14

*California v. Trump*,
  963 F.3d 926, (9th Cir. 2020)............................................9

*CASA, Inc. v. Trump*,
  No. 25-cv-00201, 2025 WL 408636 (D. Md. Feb. 2, 2025) .................4

*City & Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018)..........................................11

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
  981 F.3d 742 (9th Cir. 2020)...........................................10

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ...................................................14

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) .................................................. 9, 10

*Doe #1 v. Trump*,
  957 F.3d 1050 (9th Cir. 2020)...................................... 5, 7, 19

*Doe v. Trump*,
  Nos. 25-cv-10135 & 25-cv-10139, 2025 WL 485070 (D. Mass. Feb. 13,
  2025) ................................................................................................................4

*Dred Scott v. Sandford*,
  60 U.S. 393 (1857) ........................................................................................2

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) .................................................................. 7, 19

*E. Bay Sanctuary Covenant v. Trump*,
  932 F.3d 742 (9th Cir. 2018) ..................................................................5, 6

*Haaland v. Brackeen*,
  599 U.S. 255 (2023) ......................................................................................16

*Hecox v. Little*,
  104 F.4th 1061 (9th Cir. 2024) ....................................................................19

*HIAS, Inc. v. Trump*,
  985 F.3d 309 (4th Cir. 2021) .......................................................................19

*Horne v. Flores*,
  557 U.S. 433 (2009) ......................................................................................17

*Idaho v. Coeur d'Alene Tribe*,
  794 F.3d 1039 (9th Cir. 2015) .....................................................................18

*INS v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Labor*,
  510 U.S. 1301 (1993) ......................................................................................6

*Kantor v. Wellesley Galleries, Ltd.*,
  704 F.2d 1088 (9th Cir. 1983) .....................................................................15

*Kowalski v. Tesmer*,
  543 U.S. 125 (2004) ......................................................................................15

*Ledbetter v. Baldwin*,
  479 U.S. 1309 (1986) ....................................................................................18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ...................................................................15

*Mi Familia Vota v. Fontes*,
111 F.4th 976 (9th Cir. 2024)...................................................5

*Murthy v. Missouri*,
603 U.S. 43 (2024) ...................................................................16

*N.H. Indonesian Cmty. Support v. Trump*,
No. 25-cv-00038, 2025 WL 457609 (D.N.H. Feb. 11, 2025)................4

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ...................................................................11

*Nat'l Urb. League v. Ross*,
977 F.3d 698 (9th Cir. 2020) .......................................................5

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024)...........................................................14

*Nken v. Holder*,
556 U.S. 418 (2009) ...............................................................4, 5

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
766 F.2d 228 (6th Cir. 1985).......................................................10

*South Carolina v. Katzenbach*,
383 U.S. 301 (1966) ............................................................ 15, 16

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
402 U.S. 1 (1971) ...................................................................17

*Trump v. Int'l Refugee Assistance Project*,
582 U.S. 571 (2017) ...................................................................19

*United States v. Texas*,
599 U.S. 670 (2023) ............................................................ 10, 13

*United States v. Wong Kim Ark*,
169 U.S. 649 (1898) ...................................................................8

*Warth v. Seldin*,
    422 U.S. 490 (1975) .........................................................................15

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .........................................................5, 6

*Washington v. U.S. Food & Drug Admin.*,
    108 F.4th 1163 (9th Cir. 2024) ....................................................... 9, 12

<u>Constitutional Provisions</u>

U.S. Const. amend. XIV, § 1 ............................................................... 7, 15

U.S. Const. amend. XV, § 1 ...................................................................16

<u>Statutes</u>

8 U.S.C. § 1401 ....................................................................................8

<u>Rules</u>

Fed. R. Civ. P. 17(c)(1)(A) ....................................................................9

<u>Other Authorities</u>

*Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S.*,
    19 Op. O.L.C. 340 (1995)............................................................... 8, 18

# I.    INTRODUCTION

The Executive Branch Appellants claim an exigent need to deny citizenship to children born on American soil. That is not an emergency, and their motion is frivolous. The Executive Order at the heart of this dispute—the Citizenship Stripping Order—contravenes the Fourteenth Amendment's plain text and history, over a century of precedent, an unambiguous federal statute, and longstanding Executive Branch interpretation. Appellants do not even try to argue otherwise. Instead, they make the remarkable assertion that *they* will be irreparably injured if they cannot change the long-established meaning of the Citizenship Clause *now*, while this appeal proceeds. But being enjoined from acting unlawfully does not constitute irreparable harm. That alone requires denial of their motion.

Even if Appellants' other arguments are considered, they come nowhere close to showing a strong likelihood of success. The States have standing to protect their sovereign and pecuniary interests, the latter recently confirmed by *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), where state standing was upheld in a case that is the factual and legal twin of this one. Moreover, Appellants concede the Individual Plaintiffs' standing, so the Court need not assess the States' standing at all. Appellants' "standing" argument is merely a mislabeled attack on the injunction's scope, but the district court acted well within its broad discretion in issuing a nationwide injunction in order to provide complete relief.

The equities and public interest likewise cut decisively in favor of maintaining the injunction. A stay would cause the States to lose jurisdiction over thousands of their residents, forfeit unrecoverable funds from federal contracts, and invest

millions to abruptly change major programs that turn on state residents' citizenship. And, if the Citizenship Stripping Order goes into effect, U.S.-born children *will* be born undocumented, subject to removal or detention, and many left stateless.

Our Constitution and federal laws do not permit such a grave abuse of executive power. The Court should reject the Executive Branch's demand to return our Nation to the days of *Dred Scott v. Sandford*, 60 U.S. 393 (1857), and deny Appellants' motion for a partial stay.

## II.      BACKGROUND AND PROCEDURAL HISTORY

### A.      President Trump Issues the Citizenship Stripping Order

After campaigning on a promise to end birthright citizenship, President Trump issued the Citizenship Stripping Order within hours of taking office. Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025); Supp.Add.003, 161-65.[1] Section 1 declares that U.S. citizenship "does not automatically extend to persons born in the United States" if, at the time of birth, the child's father is not a U.S. citizen or lawful permanent resident and their mother's presence in the United States is (1) unlawful or (2) lawful but temporary. 90 Fed. Reg. at 8449. Section 2 states that it is the "policy of the United States" that no department or agency of the federal government shall issue documents recognizing such persons as U.S. citizens or accept documents issued by State governments recognizing such persons as U.S. citizens. *Id.* Section 3 directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures

---

[1] "Add." and "Supp.Add." refer to Defendants'-Appellants' and Plaintiffs'-Appellees' addenda, respectively. Docket citations are to Case No. 25-cv-127.

to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and mandates that officials cannot "act, or forbear from acting, in any manner inconsistent with this order." *Id.* at 8449-50. The Order also directs that "the heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." *Id.* at 8450.

## B.     The District Court Enters a Preliminary Injunction

The day after President Trump signed the Executive Order, Washington, Arizona, Illinois, and Oregon (the States) filed a Complaint and motion for temporary restraining order, supported by extensive declarations detailing harms to the States, their public programs and fiscs, and their residents. Dkts. 1, 10; Supp.Add.203-375. The district court granted the TRO. Dkt. 43. Soon thereafter, a group of expectant mothers filed a putative class action. The district court consolidated the two cases, Dkt. 56, and the States and Individual Plaintiffs filed a consolidated complaint, Supp.Add.001-119.

The States and Individual Plaintiffs both moved for a preliminary injunction. Supp.Add.120-401; Dkt. 74. On February 6, 2025, the district court enjoined Appellants from enforcing or implementing the Citizenship Stripping Order because "[c]itizenship by birth is an unequivocal Constitutional right" that "[t]he President cannot change, limit, or qualify . . . via an executive order." Add.13. Appellants appealed and filed a partial stay motion before the district court, noted for February 28. Dkt. 122. The district court has not ruled on that motion.

There are several cases challenging the Citizenship Stripping Order in other

jurisdictions. Every court to consider it has broadly enjoined the Order's implementation and enforcement. *See Doe v. Trump*, Nos. 25-cv-10135, 25-cv-10139, --- F. Supp. 3d ----, 2025 WL 485070, at *14-16 (D. Mass. Feb. 13, 2025) (issuing nationwide injunction in cases brought by state plaintiffs and private plaintiffs); *N.H. Indonesian Cmty. Support v. Trump*, No. 25-cv-00038, --- F. Supp. 3d ----, 2025 WL 457609, at *6 (D.N.H. Feb. 11, 2025) (enjoining enforcement "in any manner with respect to the plaintiffs, and with respect to any individual or entity in any other matter or instance within the jurisdiction of this court"); *CASA, Inc. v. Trump*, No. 25-cv-00201, --- F. Supp. 3d ----, 2025 WL 408636, at *16-17 (D. Md. Feb. 2, 2025) (issuing nationwide injunction), *appeal filed*, Dkt. 69. Despite seeking partial stays here and in Maryland, Appellants have neither appealed nor sought to stay the injunctions issued by the Massachusetts or New Hampshire district courts.

## III.   ARGUMENT

A stay pending appeal is "'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)). A stay "is not a matter of right, even if irreparable injury might otherwise result." *Nken*, 556 U.S. at 433 (quotation omitted). The Court considers four stay factors: "(1) whether the stay applicant[s] ha[ve] made a strong showing that [they are] likely to succeed on the merits; (2) whether the applicant[s] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quotation omitted). "The burden of demonstrating

that these factors weigh[] in favor of a stay lay with the proponent[,]" and irreparable injury and likelihood of success "'are the most critical' factors." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024) (quoting *Nken*, 556 U.S. at 433-34).

Every *Nken* factor requires denial of Appellants' requested stay.

## A. The Federal Government Will Suffer No Injury from Respecting the 157-Year-Old Guarantee of Birthright Citizenship

Appellants have not shown they will suffer irreparable injury as required to obtain a stay. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). They cannot in good faith contend that they will be irreparably harmed by continuing to respect a foundational constitutional right that has been established—and accepted by all branches of the federal government—for more than a century. The Court should deny Appellants' request outright because "the status quo would be seriously disrupted by an immediate stay[.]" *Nat'l Urb. League v. Ross*, 977 F.3d 698, 701 (9th Cir. 2020); *see Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (denying stay where "the district court's order merely returned the nation temporarily to the position it has occupied for many previous years"); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (denying stay where it "would not preserve the status quo: it would upend it, as the TRO has temporarily restored the law to what it had been for many years").

Appellants do not dispute that they seek to capsize more than a century of settled law. They instead try to conjure harm by invoking the President's supposed "broad authority over and responsibility for immigration matters." Mot. at 21-22. That argument is baseless. This is not a case about "immigration." It is a case about

citizenship rights that the Fourteenth Amendment and federal statute intentionally and explicitly place *beyond* the President's authority to condition or deny. *See Afroyim v. Rusk*, 387 U.S. 253, 263 (1967) (holding that it is "undeniable" that the Citizenship Clause's drafters "wanted to put citizenship beyond the power of any governmental unit to destroy"); *see generally* Supp.Add.135-36, 418-23. Nor do Appellants offer authority remotely holding that the President has the power they claim. The single-Justice opinion they cite, *INS v. Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U.S. 1301, 1304-06 (1993) (O'Connor, J., in chambers), spoke to the President's authority to "take Care that the Laws be faithfully executed" and "supervise the conduct of the Executive Branch." It certainly did not recognize a President's authority to pick and choose which Americans enjoy the right to citizenship. *Id.*

Appellants' argument distills to the claim that the judiciary cannot enjoin the Executive Branch without violating the separation of powers. Mot. at 21-22. But "'claims that [the Government] has suffered an institutional injury by erosion of the separation of powers' do not alone amount to an injury that is 'irreparable,' because the Government may 'pursue and vindicate its interests in the full course of this litigation.'" *E. Bay Sanctuary*, 932 F.3d at 778 (quoting *Washington*, 847 F.3d at 1168). Indeed, if this Court "were to adopt the government's assertion that the irreparable harm standard is satisfied by the fact of executive action alone, no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction. That cannot be so." *Doe #1*, 957 F.3d at 1059. Appellants' irreparable harm claim fails under these controlling precedents.

Finally, Appellants demand emergency relief so that they may begin "internal operations" and "advance preparations" to implement the Citizenship Stripping Order. Mot. at 22. But "the public has an interest in ensuring that the '[laws] enacted by [their] representatives are not imperiled by executive fiat.'" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 679, 681 (9th Cir. 2021) (cleaned up) (affirming injunction barring federal government "from taking any action to implement" rule purporting to strip migrants of asylum eligibility). It will cause Appellants no harm whatsoever to refrain from implementing the plainly unlawful Order that has been enjoined four times over—particularly when they have neither appealed nor sought to stay two of those injunctions.

## B.    Appellants Are Not Likely to Succeed on the Merits

Appellants make no effort to defend the Citizenship Stripping Order's legality. They instead challenge the States' standing and the scope of relief. Mot. at 8-20. None of their arguments justifies staying the injunction in any respect.

### 1.    The Citizenship Stripping Order Is Blatantly Unlawful

The Court should not ignore the patent illegality of what Appellants seek to do—deny citizenship to children born on American soil while this appeal proceeds. The Fourteenth Amendment's text guarantees citizenship to all born in the United States and subject to its jurisdiction, regardless of race, ethnicity, alienage, or the immigration status of one's parents. U.S. Const. amend. XIV, § 1; Add.6. The Citizenship Clause's history confirms this understanding. *See* Add.6-7; Supp.Add.135-36, 418-23. Binding precedent confirms this understanding. *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898); Add.7-8. And every branch of

government has long confirmed this understanding. *See* 8 U.S.C. § 1401; *Legis. Denying Citizenship at Birth to Certain Child. Born in the U.S.*, 19 Op. O.L.C. 340, 344 (1995) (U.S. Department of Justice Office of Legal Counsel explaining that "[t]he constitutional guarantee of citizenship to children born in the United States to alien parents has consistently been recognized by courts, including the Supreme Court, and Attorneys General for over a century"); Supp.Add.134-39.

Appellants seek to discard this established understanding of the Citizenship Clause and Immigration and Nationality Act, claiming that undocumented and temporary legal immigrants are not "subject to the jurisdiction" of the United States. The Supreme Court explained in *Wong Kim Ark*, however, that the purpose of that phrase is "to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases . . . recognized [as] exceptions to the fundamental rule of citizenship by birth within the country." 169 U.S. at 682. Those two classes are "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state[.]" *Id.* The Court reached this holding after exhaustively reviewing the Fourteenth Amendment's text, history, and relevant case law. It thus concluded that "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens[.]" *Id.* at 693.

Under *Wong Kim Ark*, the children targeted by the Citizenship Stripping Order are unmistakably "subject to the jurisdiction" of the United States. None fall within

the narrow exceptions for hostile foreign soldiers or diplomats. Every court to consider Appellants' arguments has agreed. *See supra* at 4. Because Appellants have no likelihood of success on the merits, the Court should reject their request for a stay that would allow them to deny citizenship to U.S.-born children.

### 2. The States Have Standing to Protect Their Interests

The States have standing because they have offered undisputed evidence that the Citizenship Stripping Order will directly harm their legally protected interests, causing injury that is actual or imminent, "fairly traceable" to the Order, and redressable by an injunction. *See Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). Appellants' arguments to the contrary are meritless.

**a.** The States have standing to protect their sovereign interests in regulating their residents and enforcing their laws. Appellants do not dispute that under the Order's narrowed view of U.S. citizenship, thousands of state residents would be deemed not subject to the jurisdiction of the United States.[2] *See* Supp.Add.206-08. That will directly injure the States' "'sovereign interest' in the retention of [their] authority" to enforce laws within their borders. *Washington v. U.S. Food & Drug Admin.* (*FDA*), 108 F.4th 1163, 1176 (9th Cir. 2024); *see California v. Trump*, 963 F.3d 926, 936, 938-40 (9th Cir. 2020) (states had standing where federal actions would injure "their sovereign interests in enforcing their environmental laws").[3]

---

[2] Some of these residents will be wards of the States, whose interests the States have a responsibility to protect, and on whose behalf the States may sue. *See* Fed. R. Civ. P. 17(c)(1)(A).

[3] For these reasons, Judge Sorokin in the District of Massachusetts recognized that the plaintiff states there likely had sovereign standing. *Doe*, 2025 WL 485070, at *5 n.7. Indeed, the defendants "essentially conceded at the motion hearing that the State plaintiffs would have standing under these theories." *Id.*

Nor is it disputed that the States' constitutions and laws rely on the settled meaning of "United States citizen," and as a result, application of those laws is suddenly "endangered and rendered uncertain." *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985) (state has standing when federal government's position endangers enforcement of state law); *see* Supp.Add.131, 410-11. This threat to the States' sovereign interests confers standing.

**b.** The States separately have standing to protect their pecuniary interests, because the Order will defund public programs such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-E foster care, and the Social Security Administration (SSA) Enumeration at Birth program. "Monetary costs are of course an injury[,]" *United States v. Texas*, 599 U.S. 670, 676 (2023), and such losses are "sufficiently concrete and imminent injury to satisfy Article III," *New York*, 588 U.S. at 767. Indeed, the Supreme Court recently confirmed that where the federal government's action causes a direct reduction in the number of individuals a state entity serves—and therefore a loss of fees the state would otherwise receive—the loss is unquestionably sufficient for standing. *Nebraska*, 143 S. Ct. at 2365-66; *see also New York*, 588 U.S. at 767 (states had standing where inclusion of citizenship question on the census would cause states to "lose out on federal funds that are distributed on the basis of state population"); *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020) (states had standing based on reduction in federal payments due to decreased enrollment in public benefits); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (counties had standing from lost funds promised under federal law).

The district court held that the Citizenship Stripping Order "subjects the Plaintiff States to *direct and immediate* economic and administrative harms" sufficient to confer standing. Add.3 (emphasis added). That conclusion is drawn from an unrebutted record, and the district court's harm findings are reviewed for clear error. *See* Add.3-4; *New York*, 588 U.S. at 753-54. Specifically, thousands of babies born each year will be subject to the Order. Supp.Add.206-08. Denied citizenship, they will immediately become ineligible for federally backed healthcare coverage and social services programs the States administer pursuant to federal law, including Medicaid, CHIP, and Title IV-E. Add.3-4; *see* Supp.Add.251-54, 258, 260-61, 356-57, 359-360.

As a direct result, the States will lose contracted reimbursements for administering services that they would otherwise receive. Add.3-4; *see* Supp.Add.251-54 (estimating likely loss to Washington of nearly $7 million per year if approximately 4,000 children become ineligible for Medicaid/CHIP); Supp.Add.380 (detailing Oregon's millions of lost Title IV-E dollars if children made ineligible); Supp.Add.359-60 (estimating Arizona's expected loss of more than $320 million in healthcare funding over the first 18 years of life for the first cohort subject to the Order). *See also NFIB v. Sebelius*, 567 U.S. 519, 576-77 (2012) (Medicaid funding is "much in the nature of a contract"). Appellants' reliance on *FDA* is thus misplaced; Idaho's asserted harm to its Medicaid system "depend[ed] on an attenuated chain of healthcare decisions by independent actors" that only indirectly affected state revenue. 108 F.4th at 1174. Here, the States' harms are direct. Add.3-4.

The States will also lose administrative fees they otherwise would receive under SSA's Enumeration at Birth program. Pursuant to existing contracts with SSA, the States' vital statistics agencies collect newborn birth data, format it, and transmit it to the SSA to facilitate the assignment of SSNs. Supp.Add.268-70. This is how most SSNs are assigned today. Supp.Add.269. SSA pays the States approximately $4-5 for each SSN assigned, totaling hundreds of thousands of dollars per year. Supp.Add.268-70, 353, 366-67, 372-73. The loss of revenue will begin immediately if SSA ceases issuing SSNs to children subject to the Order. *Id.* (Washington, Illinois, and Oregon each expect losses of between $7,230 to $38,129 per year due to decrease in the number of newborns assigned SSNs). This is the *exact* type of financial loss—a going-forward reduction in "administrative fee[s]" that the States "otherwise would have earned under [their] contract[s]" with SSA—that confers standing. *Nebraska*, 143 S. Ct. at 2366. Appellants bury *Nebraska* in a footnote, but there is no daylight between *Nebraska* and this case. The standing analysis is open-and-shut in the States' favor.

Finally, the States' agencies will suffer additional immediate harms due to the sudden and substantial administrative and operational burdens created by the Order. Federal law requires the States to verify the eligibility of residents they serve through programs like Medicaid, CHIP, and Title IV-E foster care. Supp.Add.249-51, 263-64, 358, 381, 391. If the Order's new interpretation of citizenship takes effect, State agencies that currently rely on a child's place of birth, birth certificate, or SSN to automatically determine eligibility for federal programs will be required to create new systems to determine the citizenship of *every* child they serve. Agencies will

also be forced to update policies, training, and guidance to operationalize these new systems. Add.3-4; *see* Supp.Add.252, 254 (necessary system changes for Washington's Healthcare Authority would require 7-8 FTEs and take two to three years); Supp.Add.358 (cost of implementing necessary changes to Arizona's Medicaid eligibility systems range from $2.3-4.4 million); *see also* Supp.Add.263-64, 365, 367, 381, 391-93. These harms confer standing because they flow directly from the denial of citizenship to children the States serve.

Without rebutting this record, Appellants seek support from a footnote in *United States v. Texas*, 599 U.S. at 680 n.3. In *Texas*, the Supreme Court held that the states' injuries in the form of downstream costs to incarcerate and provide social services to non-citizens were not redressable because the judiciary could not interfere in the exercise of Article II prosecutorial discretion regarding whom to arrest and deport. *Id.* at 677-80. The Court did not disturb the district court's conclusion that the states suffered cognizable injuries, and no one "dispute[d] that even one dollar's worth of harm is traditionally enough to 'qualify as concrete injur[y] under Article III.'" *Id.* at 688 (Gorsuch, J., concurring) (citation omitted). Indeed, the *Texas* Court stressed that its holding was "narrow" and limited to redressability concerns stemming from prosecutorial discretion. *Id.* at 683-85. This Court has subsequently confirmed as much. *Nebraska v. Su*, 121 F.4th 1, 13 n.5 (9th Cir. 2024). The States' financial harms here are redressable through an injunction, and *Texas* casts no doubt on the States' standing.[4]

---

[4] As recognized in a separate decision enjoining the Citizenship Stripping Order, the federal government's "discussion of *Texas* in their papers verges on misleading." *Doe*, 2025 WL 485070, at *5 n.8.

**c.** Appellants also assert in passing that the States' injuries are self-inflicted because the States could simply stop providing services to residents. Mot. at 16. This Court has squarely rejected that limitless argument. *See California v. Azar*, 911 F.3d 558, 573-74 (9th Cir. 2018) (rejecting argument that state plaintiffs' economic injuries are "self-inflicted" because "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation"). *Clapper v. Amnesty International USA*, 568 U.S. 398, 417-18 (2013), does not change this result. *Clapper* held that the plaintiffs' voluntary action did not confer standing because it was in response to speculative fears about government surveillance activities and thus not traceable to the challenged statute. *Id.* The Court's "too many links in the chain" holding does not support Appellants' suggestion that plaintiffs can suffer cognizable harm only when a federal law or directive compels their action.

**d.** With precedent against them, Appellants make a bolder claim, arguing that the States can *never* have standing to assert Citizenship Clause claims. Mot. 9-12. The Fourteenth Amendment's text and history show otherwise.

The Citizenship Clause renders individuals born in the United States "citizens of the United States *and of the State wherein they reside*." U.S. Const. amend. XIV, § 1 (emphasis added). This text squarely implicates the states, and the history of the Citizenship Clause is in accord. In ratifying the Fourteenth Amendment, the states agreed to nationalize and constitutionalize the baseline rule of birthright citizenship. *See, e.g.*, *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983) (recognizing that the Fourteenth Amendment "broadened the national scope of the

Government under the Constitution by causing citizenship of the United States to be paramount and dominant instead of being subordinate and derivative [of state citizenship]") (citation omitted). Because the Citizenship Clause directly binds them, the States have a concrete "stake in the outcome of the controversy[.]" *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quotation omitted).[5]

Appellants' cited cases stand at most for the principle that states cannot generally bring *parens patriae* claims against the federal government. *See* Mot. at 9-10. But the States are not bringing *parens patriae* claims here, and the law is clear that state standing may exist against the federal government where the state is protecting its own interests and is not proceeding as *parens patriae*. For example, in *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), which Appellants cite, the Court explained "at the outset" that South Carolina would lack standing to challenge the Voting Rights Act if it brought suit as "the parent of its citizens." But the Court did not dismiss the lawsuit—it evaluated the state's Fifteenth Amendment claims on the merits. *Id.* at 325-37. It did so even though the Fifteenth Amendment speaks to "[t]he right of citizens of the United States to vote" and does not expressly assign rights to the states. U.S. Const. amend. XV, § 1. Even so, the challenged federal action affected South Carolina—it "temporarily barred [the state] from

---

[5] Appellants' quoted passage from *Warth* was not part of the Article III analysis but rather a "limitation[]" that is "essentially [a] matter[] of judicial self-governance[.]" 422 U.S. at 500. Since *Warth*, the Supreme Court has clarified that so-called "prudential standing" is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014) (cleaned up). Appellants' reliance on *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004), fails for the same reason; that case discussed the prudential rule in *Warth* while assuming Article III standing.

enforcing the [literacy test] portion of its voting laws." *Katzenbach*, 383 U.S. at 319. Accordingly, South Carolina had standing. *Id.* at 334-37.

Likewise, the Court's analysis in *Haaland v. Brackeen*, 599 U.S. 255 (2023), confirms that a state has standing to bring constitutional claims against the federal government if it makes an adequate showing of financial harm. In *Brackeen*, Texas brought an equal protection challenge to the Indian Child Welfare Act. *Id.* at 294-95. The Court held that Texas could not "assert equal protection claims on behalf of its citizens" as "*parens patriae.*" *Id.* (citation omitted). But the Court separately considered whether Texas had "alleged costs" that were "fairly traceable" to the challenged statute. *Id.* at 296. Although Texas failed to make that showing, the financial-harm analysis would have been irrelevant if states *never* have standing to bring constitutional equal protection claims against the federal government. Under the Court's analysis, while *parens patriae* claims are off limits if states do not identify a harm to their own interests, claims based on a "direct pocketbook injury" are fair game. *Id.*[6] Because they have demonstrated sovereign and pecuniary injuries that will result from the Order, the States have standing.

**e.** In addition to being wrong, Appellants' standing challenge is irrelevant. They concede that the Individual Plaintiffs have standing, so this Court need not analyze the States' standing at all. *See Nebraska*, 143 S. Ct. at 2365 ("If at least one plaintiff has standing, the suit may proceed."); *Horne v. Flores*, 557 U.S. 433, 446 (2009) ("Because the superintendent clearly has standing to challenge the lower

---

[6] The paragraph Appellants cite from *Murthy v. Missouri*, 603 U.S. 43, 76 (2024), reflects this point.

courts' decisions, we need not consider whether the Legislators also have standing to do so."). In fact, in *Horne* the Supreme Court rejected the argument that relief must be limited to the only plaintiff the Court found to have standing. 557 U.S. at 446 n.2. Once any plaintiff has standing, the only question becomes the proper scope of relief, which is reviewed for abuse of discretion. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers . . . is broad, for breadth and flexibility are inherent in equitable remedies."). As detailed below, the scope of the district court's injunction here is eminently reasonable.

## C. The States and the Public Interest Will Be Irreparably Harmed if the Injunction Is Stayed

The States presented extensive and unrebutted evidence of the harms they and their residents face under the Citizenship Stripping Order. *See* Supp.Add.140-49, 424-25. The district court correctly recognized those harms and that the "balance of equities and the public interest strongly weigh in favor of entering a preliminary injunction." Add.11. Appellants' response is to suggest that operational chaos and immediate financial losses "are not cognizable" because there might be some way for the States to recover certain lost reimbursements. Mot. at 20-21. They are wrong.

As explained, the States' harms flow directly from the unilateral reclassification of *thousands* of individuals as non-citizens. Appellants nowhere contend with the fact that irreparable harm results when money damages are not recoverable against sovereign defendants like the federal government. *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). They cite two irrelevant

cases involving discrete Medicare reimbursement disputes raised by end-providers but offer nothing showing that states can pursue damages in response to federal action deeming thousands of residents categorically *ineligible* for the federal programs at issue in this case. Nor do Appellants rebut the overwhelming evidence that the States will have to expend significant resources to update and modify systems used to verify citizenship *now*. That loss is plainly irreparable. *Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986) (harm is irreparable when "[t]he State will bear the administrative costs of changing its system to comply" and is unlikely to recover those costs in litigation).

Ultimately, the Citizenship Stripping Order attempts to return our Nation to a reprehensible chapter of American history when *Dred Scott* excluded Black Americans from citizenship—an exclusionary view of citizenship soundly rejected by the people and their representatives through the Fourteenth Amendment. *See* 19 Op. O.L.C. at 349 ("From our experience with *Dred Scott*, we had learned that our country should never again trust to judges or politicians the power to deprive from a class born on our soil the right of citizenship."). The grave deprivation of rights at stake belies any public interest in the Order because "public interest concerns are implicated when a constitutional right has been violated[.]" *Betschart v. Oregon*, 103 F.4th 607, 625 (9th Cir. 2024) (quotations omitted).

## D.  The Injunction's Scope Is Necessary to Provide Complete Relief

Finally, Appellants protest that the district court issued a nationwide injunction. Mot. at 17-20. They rely on general statements about broad injunctions being disfavored, but do not dispute that the district court has considerable discretion

to fashion an injunction, including on a nationwide basis, in order to provide the States with complete relief. The district court did not abuse its discretion here.

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project* (*IRAP*), 582 U.S. 571, 579 (2017). Equitable relief "is acceptable where it is 'necessary to give prevailing parties the relief to which they are entitled[,]'" *E. Bay Sanctuary Covenant*, 993 F.3d at 680 (citation omitted), and "there is 'no general requirement that an injunction affect only the parties in the suit[,]'" *Hecox v. Little*, 104 F.4th 1061, 1090 (9th Cir. 2024) (citation omitted). Courts have thus allowed nationwide injunctions where necessary to provide complete relief. *See IRAP*, 582 U.S. at 579, 582 (allowing nationwide injunction against enforcement of Executive Order section that exceeded presidential authority); *Doe #1*, 957 F.3d at 1069 (declining to stay nationwide injunction and explaining that "there is no bar" against such an injunction "when it is appropriate"). Indeed, they are warranted where, as here, the fact that individuals move between states exposes plaintiffs to irreparable harm. *See E. Bay Sanctuary Covenant*, 993 F.3d at 680-81 (affirming nationwide injunction where plaintiff organizations would lose clients under a more-limited injunction); *HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (affirming nationwide injunction for organizations that "place[d] refugees throughout the country").

Consistent with these cases, the district court enjoined the Order on a nationwide basis in order to provide the States complete relief. Add.12-13. That makes perfect sense. If the States' pregnant residents happen to give birth in another

state, or if individuals born in non-plaintiff states move to the States, the States will suffer the *same* irreparable injuries to their sovereign and pecuniary interests that they would without any injunction at all. The States will be required to overhaul their systems to verify eligibility for Medicaid, CHIP, and Title IV-E programs because they must verify citizenship for *every* child they serve. *See* Supp.Add.249-54, 263-64, 358, 365, 367, 381-82, 391-93. And because people move, the States will serve children born in other states who will not be eligible for federally backed programs if stripped of their citizenship, resulting in financial loss. *See* Supp.Add.249-51, 263-64, 358, 381, 391. The district court was correct that "relief must be nationwide," because "[a]nything less is ineffectual." Add.13.

Finally, the Supreme Court has acknowledged nationwide relief is necessary when "one branch of government [has] arrogat[ed] to itself power belonging to another." *Nebraska*, 143 S. Ct. at 2373 (reversing refusal to issue injunction). The Citizenship Stripping Order's attempt to do precisely that—to unilaterally amend the Fourteenth Amendment and discard a federal statute—necessitates an injunction that preserves the guarantee of birthright citizenship as it has long existed: A uniform right that applies nationwide and is beyond the power of the President to destroy.

## IV. CONCLUSION

The Court should deny Appellants' motion.

RESPECTFULLY SUBMITTED this 18th day of February 2025.

NICHOLAS W. BROWN
  *Attorney General of Washington*

*s/ Lane Polozola*
COLLEEN M. MELODY, WSBA 42275
  *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
  *Assistant Attorneys General*
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
noah.purcell@atg.wa.gov
cristina.sepe@atg.wa.gov
marsha.chien@atg.wa.gov
*Attorneys for State of Washington*

KRIS MAYES
  *Attorney General of Arizona*
JOSHUA D. BENDOR, AZ No. 031908
  *Solicitor General*

LUCI D. DAVIS, AZ No. 035347
  *Senior Litigation Counsel*
Arizona Attorney General's Office
Firm State Bar No. 14000
2005 N. Central Ave.
Phoenix, AZ 85004
Telephone: (602) 542-3333
Joshua.Bendor@azag.gov
Luci.Davis@azag.gov
*Attorneys for State of Arizona*


KWAME RAOUL
  *Attorney General of Illinois*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
Illinois Attorney General's Office
115 South LaSalle St.
Chicago, IL 60603
Telephone: (312) 814-5526
Jane.Notz@ilag.gov
Alex.Hemmer@ilag.gov
*Attorneys for State of Illinois*


DAN RAYFIELD
  *Attorney General of Oregon*
BENJAMIN GUTMAN
  *Solicitor General*
MICHAEL A. CASPER #062000
  *Senior Assistant Attorney General*
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 378-4402
Michael.Casper@doj.oregon.gov
*Attorneys for State of Oregon*

## CERTIFICATE OF COMPLIANCE

This Response to Emergency Motion Under Circuit Rule 27-3 for Partial Stay Pending Appeal complies with the type-volume limitation of Ninth Circuit Rules 27-1(1)(d) and 32-3 because it contains 5,589 words. This Response also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word in New Times Roman 14-point font, a proportionally spaced typeface.

*s/ Lane Polozola*
LANE POLOZOLA

## CERTIFICATE OF SERVICE

I hereby certify that, on February 18, 2025, I electronically filed the foregoing documents with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users, and that service will be accomplished by using the ACMS system.

*s/ Lane Polozola*
LANE POLOZOLA