No. 25-807

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATES OF WASHINGTON, ARIZONA, ILLINOIS, and OREGON,

*Plaintiffs-Appellees*,

CHERLY NORALES CASTILLO and ALICIA CHAVARRIA LOPEZ, on behalf of themselves as individuals and others similarly situated,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as President of the United States, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Western District of Washington
Case No. 2:25-cv-00127-JCC
The Honorable John C. Coughenour

## PLAINTIFF STATES' SUPPLEMENTAL ADDENDUM TO RESPONSE TO EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR PARTIAL STAY PENDING APPEAL

NICHOLAS W. BROWN
*Attorney General of Washington*

COLLEEN M. MELODY, WSBA 42275
  *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200

*(Additional Counsel on Signature Page)*

## SUPPLEMENTAL ADDENDUM

| Document Title | Filing Date | District Court Dkt. No. | Page Range |
|---|---|---|---|
| Consolidated Complaint for Declaratory and Injunctive Relief and Exhibits | 02/04/2025 | Dkt. 106 | Supp.Add.001-119 |
| Plaintiff States' Motion for Preliminary Injunction | 01/27/2025 | Dkt. 63 | Supp.Add.120-151 |
| Index of Declarations in Support of Plaintiff States' Motion for Preliminary Injunction | 01/27/2025 | Dkt. 64 | Supp.Add.152-156 |
| Declaration of Lane Polozola | 01/21/2025 | Dkt. 12 | Supp.Add.157-160 |
| Exhibit 1 to Polozola Declaration – Executive Order, *Protecting the Meaning and Value of American Citizenship* | 01/21/2025 | Dkt. 12-1 | Supp.Add.161-166 |
| Exhibit 2 to Polozola Declaration – *Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism* | 01/21/2025 | Dkt. 12-2 | Supp.Add.167-175 |
| Exhibit 3 to Polozola Declaration – *Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs* | 01/21/2025 | Dkt. 12-3 | Supp.Add.176-182 |

| Document Title | Filing Date | District Court Dkt. No. | Page Range |
|---|---|---|---|
| Exhibit 4 to Polozola Declaration – U.S. State Department's Foreign Affairs Manual, 8 FAM 301.1 | 01/21/2025 | Dkt. 12-4 | Supp.Add.183-192 |
| Exhibit 5 to Polozola Declaration – U.S. Department of State's Application for a U.S. Passport, Form DS-11 04-2022 | 01/21/2025 | Dkt. 12-5 | Supp.Add.193-199 |
| Exhibit 6 to Polozola Declaration – *I am a U.S. citizen: How do I get proof of my U.S. Citizenship?* | 01/21/2025 | Dkt. 12-6 | Supp.Add.200-202 |
| Declaration of Dr. Shelley Lapkoff | 01/21/2025 | Dkt. 13 | Supp.Add.203-209 |
| Exhibit A to Lapkoff Declaration – Curriculum Vitae | 01/21/2025 | Dkt. 13-1 | Supp.Add.210-216 |
| Exhibit B to Lapkoff Declaration – *Births to Unauthorized Immigrants in the States of Washington, Arizona, Illinois, and Oregon* | 01/21/2025 | Dkt. 13-2 | Supp.Add.217-242 |
| Declaration of Dr. Charissa Fotinos | 01/21/2025 | Dkt. 14 | Supp.Add.243-255 |

2

| Document Title | Filing Date | District Court Dkt. No. | Page Range |
|---|---|---|---|
| Declaration of Jenny Heddin | 01/21/2025 | Dkt. 15 | Supp.Add.256-265 |
| Declaration of Katherine Hutchinson | 01/21/2025 | Dkt. 16 | Supp.Add.266-272 |
| Declaration of Brian Reed | 01/21/2025 | Dkt. 17 | Supp.Add.273-276 |
| Declaration of Tom K. Wong | 01/21/2025 | Dkt. 18 | Supp.Add.277-286 |
| Exhibit A to Wong Declaration – Curriculum Vitae | 01/21/2025 | Dkt. 18-1 | Supp.Add.287-296 |
| Declaration of David C. Baluarte | 01/21/2025 | Dkt. 19 | Supp.Add.297-305 |
| Declaration of Dr. Caitlin Patler | 01/21/2025 | Dkt. 20 | Supp.Add.306-318 |
| Exhibit A to Patler Declaration – Curriculum Vitae | 01/21/2025 | Dkt. 20-1 | Supp.Add.319-332 |
| Exhibit B to Patler Declaration – List of References Cited | 01/21/2025 | Dkt. 20-2 | Supp.Add.333-337 |
| Declaration of Sarah K. Peterson | 01/21/2025 | Dkt. 21 | Supp.Add.338-344 |
| Declaration of Magaly Solis Chavez | 01/21/2025 | Dkt. 22 | Supp.Add.345-349 |
| Declaration of Krystal Colburn | 01/21/2025 | Dkt. 24 | Supp.Add.350-353 |

| Document Title | Filing Date | District Court Dkt. No. | Page Range |
|---|---|---|---|
| Declaration of Jeffrey Tegen | 01/25/2025 | Dkt. 25 | Supp.Add.354-361 |
| Declaration of Nadine O'Leary | 01/21/2025 | Dkt. 26 | Supp.Add.362-368 |
| Declaration of Jennifer A. Woodward | 01/21/2025 | Dkt. 27 | Supp.Add.369-375 |
| Declaration of Aprille Flint-Gerner | 01/27/2025 | Dkt. 65 | Supp.Add.376-383 |
| Declaration of Heidi E. Mueller | 01/27/2025 | Dkt. 66 | Supp.Add.384-393 |
| Declaration of Mozhdeh Oskouian | 01/27/2025 | Dkt. 67 | Supp.Add.394-401 |
| Reply in Support of Plaintiff States' Motion for Preliminary Injunction | 02/04/2025 | Dkt. 105 | Supp.Add.402-429 |

RESPECTFULLY SUBMITTED this 18th day of February 2025.

NICHOLAS W. BROWN
*Attorney General of Washington*

*s/ Lane Polozola*
COLLEEN M. MELODY, WSBA 42275
*Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
*Assistant Attorneys General*
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000

4

Seattle, WA 98104-3188
(206) 464-7744
colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
noah.purcell@atg.wa.gov
cristina.sepe@atg.wa.gov
marsha.chien@atg.wa.gov
*Attorneys for State of Washington*

KRIS MAYES
  *Attorney General of Arizona*

JOSHUA D. BENDOR, AZ No. 031908
  *Solicitor General*
LUCI D. DAVIS, AZ No. 035347
  *Senior Litigation Counsel*
Arizona Attorney General's Office
Firm State Bar No. 14000
2005 N. Central Ave.
Phoenix, AZ 85004
Telephone: (602) 542-3333
Joshua.Bendor@azag.gov
Luci.Davis@azag.gov
*Attorneys for State of Arizona*

5

KWAME RAOUL
  *Attorney General of Illinois*

JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
Illinois Attorney General's Office
115 South LaSalle St.
Chicago, IL 60603
Telephone: (312) 814-5526
Jane.Notz@ilag.gov
Alex.Hemmer@ilag.gov
*Attorneys for State of Illinois*


DAN RAYFIELD
  *Attorney General of Oregon*

BENJAMIN GUTMAN
  *Solicitor General*
MICHAEL A. CASPER #062000
  *Senior Assistant Attorney General*
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: (503) 378-4402
Michael.Casper@doj.oregon.gov
*Attorneys for State of Oregon*

The Honorable Judge John C. Coughenour

1

2

3

4

5

6

7

8        **UNITED STATES DISTRICT COURT**
         **WESTERN DISTRICT OF WASHINGTON**
9                      **AT SEATTLE**

10   STATE OF WASHINGTON; STATE OF          NO. 2:25-cv-00127-JCC
     ARIZONA; STATE OF ILLINOIS; and
11   STATE OF OREGON,                       CONSOLIDATED COMPLAINT
                                            FOR DECLARATORY AND
12                   Plaintiff States,      INJUNCTIVE RELIEF—CLASS
                                            ACTION
13   and

14   Cherly NORALES CASTILLO and Alicia
     CHAVARRIA LOPEZ, on behalf of
15   themselves as individuals and on behalf of
     others similarly situated,
16

17                   Individual Plaintiffs,

18        v.

19   DONALD TRUMP, in his official capacity
     as President of the United States; U.S.
20   DEPARTMENT OF HOMELAND
     SECURITY; KRISTI NOEM in her official
21   capacity as Secretary of Homeland Security;
     U.S. SOCIAL SECURITY
22   ADMINISTRATION; MICHELLE KING,
     in her official capacity as Acting
23   Commissioner of the Social Security
     Administration; U.S. DEPARTMENT OF
24   STATE; MARCO RUBIO, in his official
     capacity as Secretary of State; U.S.
25   DEPARTMENT OF HEALTH AND
     HUMAN SERVICES; DOROTHY FINK,
26   in her official capacity as Acting Secretary

CONSOLIDATED COMPLAINT FOR                    ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                              Civil Rights Division
RELIEF – CLASS ACTION –                              800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                                  Seattle, WA 98104-3188
                                                          (206) 464-7744

1    of Health and Human Services; U.S.
     DEPARTMENT OF JUSTICE; JAMES
2    MCHENRY, in his official capacity as
     Acting Attorney General; U.S.
3    DEPARTMENT OF AGRICULTURE;
     GARY WASHINGTON, in his official
4    capacity as Acting Secretary of Agriculture;
     and the UNITED STATES OF AMERICA,
5

6            Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

# I.     INTRODUCTION

1.      Plaintiffs bring this action to stop the illegal Executive Order issued by President Donald J. Trump that purports to unilaterally alter the meaning of the Fourteenth Amendment's guarantee of birthright citizenship. The Executive Order directs federal agencies to bar certain persons born in the United States from citizenship and the many benefits to which citizenship entitles them by unlawful executive fiat.

2.      The Executive Order, issued on January 20, 2025, and entitled "Protecting the Meaning and Value of American Citizenship" (Citizenship Stripping Order), is contrary to the plain terms of the Fourteenth Amendment's Citizenship Clause and Section 1401 of the Immigration and Nationality Act (INA). [1] The President has no authority to amend the Constitution or supersede the Citizenship Clause's grant of citizenship to individuals born in the United States. Nor is he empowered by any other constitutional provision or law to determine who shall or shall not be granted U.S. citizenship at birth. The Fourteenth Amendment and federal law automatically confer citizenship upon individuals born in the United States and subject to its jurisdiction.

3.      The States of Washington, Arizona, Illinois, and Oregon (Plaintiff States) bring this action to protect the States—including their public agencies, public programs, public fiscs, and state residents—from the irreparable harm that will result to the States and their residents as a result of the illegal actions of the President and federal government that purport to unilaterally strip U.S. citizens of their citizenship.

4.      Cherly Norales Castillo and Alicia Chavarria Lopez (Individual Plaintiffs) bring this action on behalf of themselves and a class of similarly situated persons to stop the Order's deprivation of citizenship to their unborn children. [2] Individual Plaintiffs are expecting mothers

---

[1] Attached as Ex. A, *also available at* https://www.whitehouse.gov/presidential-actions/2025/01/prote cting-the-meaning-and-value-of-american-citizenship/. The Order was subsequently published in the Federal Register as Exec. Order No. 14,160, 90 Fed. Reg. 18 (Jan. 29, 2025).

[2] Individual Plaintiffs previously filed a separate action challenging the Executive Order, which the Court consolidated with the instant case. *See Franco Aleman v. Trump*, Complaint, No. 2:25-cv-00163 (W.D. Wash. Jan.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.003

who are not U.S. citizens or lawful permanent residents (LPRs) and who have due dates after the implementation date of the Order's prohibition on issuance of citizenship documents. By the terms of the Citizenship Stripping Order—though not by the terms of the Fourteenth Amendment—their children born after the Order's date of implementation will be deprived of U.S. citizenship and be considered without legal status in this country. They seek to represent a class of similarly situated parents and their expected children. These children, although born in the United States and subject to its jurisdiction, will be deprived of U.S. citizenship under the Order.

5.      This deprivation of citizenship strikes at the core of this country's identity as a nation that, following Reconstruction, affirmed that all persons born in the United States are citizens, regardless of race, parentage, creed, or other markers of identity. The Citizenship Stripping Order's attempt to deny citizenship to those born on U.S. soil amounts to "the total destruction of the individual's status in organized society" and "is a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). This is because, as the Supreme Court has recognized time and again, "[c]itizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), whose "value and importance" is "difficult to exaggerate," *Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

6.      If the Citizenship Stripping Order is allowed to stand, the Plaintiff States and their residents (including Individual Plaintiffs) will suffer immediate and irreparable harm. Nationally, in 2022 alone, there were approximately 255,000 births of U.S. citizen children to noncitizen mothers without lawful status (undocumented) and approximately 153,000 births to two undocumented parents. In Washington, in 2022 alone, approximately 7,000 U.S. citizen children were born to mothers who lacked legal status and approximately 4,000 U.S. citizen children were born to two parents who lacked legal status. In Arizona, in 2022 alone, there were

---

24, 2025), ECF No. 1. One of the named plaintiffs, Delmy Franco Aleman, has chosen to withdraw from the case following the Court's Consolidation Order, ECF No. 56. Accordingly, she no longer seeks to represent the proposed class.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Supp.Add.004

approximately 6,000 U.S. citizen children born to mothers who lacked legal status and approximately 3,400 U.S. citizen children born to two parents who lacked legal status. Likewise, in Illinois, in 2022 alone, there were approximately 9,100 U.S. citizen children born to mothers who lacked legal status and approximately 5,200 U.S. citizen children born to two parents who lacked legal status. And in Oregon, in 2022 alone, there were approximately 2,500 U.S. citizen children born to mothers who lacked legal status and approximately 1,500 U.S. citizen children born to two parents who lacked legal status. Using these numbers, likely more than 12,000 babies born in the United States each month who are entitled to citizenship—including more than 1,100 babies born each month in the Plaintiff States—will no longer be considered U.S. citizens under the Citizenship Stripping Order and will be left with no immigration status. This estimate is conservative, because it includes only a subset of the newborns that would be stripped of citizenship. The actual number of newborns affected in Plaintiff States is certainly higher.

7.      The individuals who are stripped of their U.S. citizenship, including the States' residents, Individual Plaintiffs' expected children, and members of the proposed class, will be left without any legal immigration status, vulnerable to removal from this country, and threatened with the loss of "all that makes life worth living." *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (cleaned up). Many will be left stateless—that is, citizens of no country at all. They will be left on the outside of society and forced to remain in the shadows in fear of immigration enforcement actions that could result in their separation from family members and removal from their country of birth. They will lose eligibility for myriad federal benefits programs. They will lose their right to travel freely and re-enter the United States. They will lose their ability to obtain a Social Security number (SSN) and work lawfully. They will lose the opportunity to qualify for many educational opportunities. They will lose their right to vote, serve on juries, and run for most public offices. They will be placed into lifelong positions of instability and insecurity as part of a new underclass in the United States. In short, despite the Constitution's guarantee of their citizenship, Individual Plaintiffs' children and the thousands of newborns who would be

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Supp.Add.005

1   subject to the Citizenship Stripping Order will lose their ability to fully and fairly be a part of

2   American society as a citizen with all its benefits and privileges.

3       8.      The Citizenship Stripping Order will also directly injure the Plaintiff States in

4   additional ways. The Plaintiff States will suffer immediate and irreparable harm by losing federal

5   funding or reimbursements to programs that the Plaintiff States administer, such as Medicaid,

6   the Children's Health Insurance Program (CHIP), foster care and adoption assistance programs,

7   and programs to facilitate streamlined issuance of SSNs to eligible babies—among others. By

8   purporting to unilaterally strip citizenship from individuals born in the Plaintiff States based on

9   their parents' citizenship or immigration status, the Plaintiff States will be forced to bear

10  significantly increased costs to operate and fund programs that ensure the health and well-being

11  of their residents. The Plaintiff States will also be required—on no notice and at their

12  considerable burden and expense—to immediately begin modifying their funding and

13  operational structures and administration of programs to account for this change. This will

14  impose significant administrative and operational burdens for multiple of the Plaintiff States'

15  agencies that operate programs for the benefit of their residents.

16      9.      To prevent the President's and the federal government's unlawful action from

17  harming Plaintiffs, as well as the proposed class that Individual Plaintiffs seek to represent, they

18  ask this Court to invalidate the Citizenship Stripping Order in its entirety and enjoin any actions

19  taken to implement its directives.

## II.    JURISDICTION AND VENUE

21      10.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(a)(2). The

22  Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a)

23  and 2202, 5 U.S.C. § 706, and Federal Rule of Civil Procedure 65.

24      11.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and

25  1391(e)(1). Defendants are United States agencies or officers sued in their official capacities.

26  The State of Washington is a resident of this judicial district, the Individual Plaintiffs reside in

CONSOLIDATED COMPLAINT FOR           4           ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                                   Civil Rights Division
RELIEF – CLASS ACTION –                                   800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                                        Seattle, WA 98104-3188
                                                                 (206) 464-7744

**Supp.Add.006**

1   this judicial district, and a substantial part of the events or omissions giving rise to this Complaint

2   occurred within the Seattle Division of the Western District of Washington, including the harms

3   to UW Medicine at its Montlake and Northwest campuses, as well as at Harborview Medical

4   Center in Seattle.

5                                    **III.    PARTIES**

6                                    <u>**PLAINTIFFS**</u>

7        12.    The State of Washington is a sovereign state of the United States of America.

8        13.    The Attorney General of Washington is the chief legal adviser to the State and is

9   authorized to act in federal court on behalf of the State on matters of public concern.

10       14.    The State of Arizona is a sovereign state of the United States of America.

11       15.    The Attorney General of Arizona is the chief legal officer of the State and is

12  authorized to act in federal court on behalf of the State.

13       16.    The State of Illinois is a sovereign state of the United States of America.

14       17.    The Attorney General of Illinois is the chief legal officer of the State and is

15  authorized to act in federal court on behalf of the State on matters of public concern.

16  *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

17       18.    The State of Oregon is a sovereign state of the United States of America.

18       19.    The Attorney General of Oregon is the chief legal officer of the State of Oregon

19  and is authorized to act in federal court on behalf of the State on matters of public concern.

20       20.    The Plaintiff States are aggrieved and have standing to bring this suit because

21  Defendants' action purporting to strip citizenship from U.S. citizens born and residing in the

22  Plaintiff States, receiving benefits in the Plaintiff States, and receiving government services in

23  the Plaintiff States—including children who are wards of the Plaintiff States and in their

24  custody—harms the Plaintiff States' sovereign, proprietary, and quasi-sovereign interests and

25  will continue to cause injury unless and until enforcement of the Citizenship Stripping Order is

26  permanently enjoined.

CONSOLIDATED COMPLAINT FOR                     5                  ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                                                   Civil Rights Division
RELIEF – CLASS ACTION –                                                    800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                                                        Seattle, WA 98104-3188
                                                                                (206) 464-7744

**Supp.Add.007**

21.     Plaintiff Cherly Norales Castillo is a noncitizen from Honduras. She is in removal proceedings and has filed an application for asylum before the immigration court. She is pregnant, and her due date is March 19, 2025.

22.     Plaintiff Alicia Chavarria Lopez is a noncitizen from El Salvador. She has filed an application for asylum before United States Citizenship and Immigration Services (USCIS). She is pregnant, and her due date is July 21, 2025.

## DEFENDANTS

23.     Defendant Donald Trump is the President of the United States. He is sued in his official capacity.

24.     Defendant Department of Homeland Security (DHS) is a federal cabinet agency responsible for implementing the Citizenship Stripping Order, including by issuing regulations, policies, and guidance consistent with the Order. DHS is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. DHS is comprised of USCIS, U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP). USCIS is responsible for adjudicating immigration benefits applications, as well as certain applications to recognize a person's citizenship. ICE is responsible for, among other things, the detention and removal of unlawfully present noncitizens in the United States and prosecuting removal cases of noncitizens. CBP is responsible for, among other things, operating U.S. ports of entry.

25.     Defendant Kristi Noem is the Secretary of Homeland Security. She is responsible for implementing and enforcing the INA and oversees USCIS, ICE, and CBP. She is sued in her official capacity.

26.     Defendant United States Social Security Administration (SSA) is a federal agency responsible for administering federal retirement, survivors, and disability income programs, as well as the program of supplemental security income for the aged, blind, and disabled. SSA processes applications for and issues Social Security numbers (SSNs) to eligible

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.008

applicants. SSA is responsible for implementing the Citizenship Stripping Order, including by ceasing issuance of SSNs to children born in the United States but subject to the Citizenship Stripping Order's interpretation of the Citizenship Clause. SSA is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552.

27.    Defendant Michelle King is the Acting Commissioner of the SSA. The Office of the Commissioner is directly responsible for all programs administered by the SSA, including the development of policy, administrative and program direction, and program interpretation and evaluation. She is sued in her official capacity.

28.    Defendant United States Department of State is responsible for implementing the Citizenship Stripping Order, including by issuing regulations, policies, and guidance consistent with the Order. The State Department is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. It is authorized by law to grant and issue passports.

29.    Defendant Marco Rubio is the Secretary of State. He is responsible for carrying out the President's foreign policies through the State Department and Foreign Service of the United States. He is sued in his official capacity.

30.    Defendant United States Department of Health and Human Services (HHS) is a federal cabinet agency responsible for implementing the Citizenship Stripping Order, including through the administration of Medicaid, CHIP, and Title IV-E. HHS is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. HHS is responsible for implementing the Citizenship Stripping Order in its agency program, operations, and activities.

31.    Defendant Dorothy Fink is the Acting Secretary of Health and Human Services. She is responsible for overseeing and administering all HHS programs through the Office of the Secretary and HHS's Operating Divisions. She is sued in her official capacity.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.009

32.    Defendant United States Department of Justice (DOJ) is a federal cabinet agency responsible for the federal government's legal affairs. The DOJ is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. DOJ is responsible for implementing the Citizenship Stripping Order, including by ensuring agency regulations are consistent with the Order.

33.    Defendant James McHenry is the Acting Attorney General of the United States. He is responsible for overseeing and administering all duties and programs of the DOJ, including overseeing and administering the Executive Office for Immigration Review, which adjudicates the removal proceedings of noncitizens charged with being inadmissible or removable from the United States. He is also responsible for overseeing the Department of Justice's immigration-related prosecutions, such as prosecutions for illegal entry and reentry to the United States. He is sued in his official capacity.

34.    Defendant United States Department of Agriculture (USDA) is a cabinet-level department of the United States. USDA is in charge of administering the Supplemental Nutrition Assistance Program (SNAP), which provides food benefits to eligible low-income families to supplement their grocery budget. USDA is a department of the Executive Branch of the U.S. Government and is an agency within the meaning of 5 U.S.C. § 552. USDA is responsible for implementing the Citizenship Stripping Order in its agency operations and activities.

35.    Defendant Gary Washington is the Acting Secretary of Agriculture. He is responsible for overseeing and administering all USDA programs. He is sued in his official capacity.

36.    Defendant the United States of America includes all government agencies and departments responsible for the implementation, modification, and execution of the Citizenship Stripping Order.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.010

# IV.    ALLEGATIONS

**A.    The United States Constitution Confers Automatic Citizenship on All Individuals Born in the United States and Subject to the Jurisdiction Thereof**

37.    Section 1 of the Fourteenth Amendment to the United States Constitution states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. This provision is known as the Citizenship Clause. The Citizenship Clause's automatic conferral of citizenship on all individuals born in the United States and subject to its jurisdiction, regardless of the citizenship or immigration status of their parents, is confirmed by the Fourteenth Amendment's text and history, judicial precedent, and longstanding Executive Branch interpretation.

38.    The Citizenship Clause was passed and ratified as part of the Fourteenth Amendment following the Civil War to overturn the Supreme Court's infamous holding in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), where the Supreme Court ruled that Black Americans who were enslaved or were descended from enslaved persons could not be citizens. The Citizenship Clause reaffirmed the longstanding common law principle of *jus soli* as the default rule of citizenship in the United States: All individuals born in the United States and subject to its jurisdiction are citizens. Its operation is automatic. No further action is required for individuals born in the United States to "become" citizens and no additional limitations are imposed.

39.    Unlike the Naturalization Clause, U.S. Const. art. I, § 8, cl. 4, which empowers Congress to set rules for naturalization, the Constitution nowhere empowers the President or Congress to set additional requirements that override or conflict with the Citizenship Clause's plain and broad grant of automatic citizenship to individuals born in the United States.

40.    The Citizenship Clause contains no exceptions based on the citizenship or immigration status of one's parents or their country of origin. Rather, the Citizenship Clause's

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
**Supp.Add.011**

1   only requirements are that an individual be born "in the United States" and "subject to the

2   jurisdiction thereof[.]" The only individuals who are excluded under the "subject to the

3   jurisdiction thereof" language are the extremely limited number of individuals who are in fact

4   *not* subject to the jurisdiction of the United States at birth—the children of diplomats covered by

5   diplomatic immunity or children born to enemy combatants engaged in war against the United

6   States while on United States soil.[3] Indeed, before the Fourteenth Amendment's adoption, there

7   was explicit legislative debate and clarity that the Citizenship Clause was meant to reach all

8   persons born in the United States, with only the limited exceptions above. *See* Garrett Epps, *The*

9   *Citizenship Clause: A "Legislative History,"* 60 Am. Univ. L. Rev. 331, 355-56 (2010) (detailing

10  congressional debate). By embedding this protection in the Constitution with such clear

11  language, the framers "put citizenship beyond the power of any governmental unit to destroy."

12  *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

13         41.    The Supreme Court cemented this longstanding and established understanding of

14  the Citizenship Clause more than 125 years ago in *United States v. Wong Kim Ark*, 169 U.S. 649

15  (1898). There, the Supreme Court held that a child born in the United States to noncitizen parents

16  was entitled to automatic citizenship by birth under the Fourteenth Amendment. In so holding,

17  the Court explained:

18         The fourteenth amendment affirms the ancient and fundamental rule of citizenship
19         by birth within the territory, in the allegiance and under the protection of the
           country, including all children here born of resident aliens, with the exceptions or
20         qualifications (as old as the rule itself) of children of foreign sovereigns or their
           ministers, or born on foreign public ships, or of enemies within and during a hostile
21         occupation of part of our territory, and with the single additional exception of
           children of members of the Indian tribes owing direct allegiance to their several
22         tribes. The amendment, in clear words and in manifest intent, includes the children
           born within the territory of the United States of all other persons, of whatever race
23         or color . . . . To hold that the fourteenth amendment of the constitution excludes

24  _____

25         [3] Another exception recognized by the drafters of the Fourteenth Amendment, children born to Native
    American tribes with their own sovereign status, are granted U.S. citizenship at birth by a federal statute passed in
26  1924. *See* 8 U.S.C. § 1401(b) (declaring to be a national and citizen of the United States at birth "a person born in
    the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe").

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC                    10                    ATTORNEY GENERAL OF WASHINGTON
                                                                        Civil Rights Division
                                                                     800 Fifth Avenue, Suite 2000
                                                                      Seattle, WA 98104-3188
                                                                          (206) 464-7744

Supp.Add.012

from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons of English, Scotch, Irish, German, or other European parentage, who have always been considered and treated as citizens of the United States.

*Id.* at 693-94.

42.     In addition to *Wong Kim Ark*, the Supreme Court has separately made clear that undocumented immigrants are "subject to the jurisdiction" of the United States. In *Plyler v. Doe*, 457 U.S. 202, 215 (1982), the Supreme Court interpreted the Fourteenth Amendment's Equal Protection Clause—the sentence immediately following the Citizenship Clause—and explained that the term "within its jurisdiction" makes plain that "the Fourteenth Amendment extends to anyone, citizen or stranger, who *is* subject to the laws of a State, and reaches into every corner of a State's territory." The Court concluded:

> That a person's initial entry into a State, or into the United States, was unlawful, and that he may for that reason be expelled, cannot negate the simple fact of his presence within the State's territorial perimeter. Given such presence, he is subject to the full range of obligations imposed by the State's civil and criminal laws.

*Id.* As the Supreme Court explained, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10. The Supreme Court further confirmed that the phrases "within its jurisdiction" and "subject to the jurisdiction thereof" in the first and second sentences of the Fourteenth Amendment have the same meaning. *Id.*

43.     The Executive Branch has accepted and endorsed this reading and understanding of the Citizenship Clause for more than a century. Indeed, in 1995, the U.S. Justice Department's Office of Legal Counsel (OLC) provided a statement to Congress explaining why proposed legislation that would deny citizenship to certain children born in the United States based on their parents' immigration or citizenship status would be "unconstitutional on its face" and "unquestionably unconstitutional." 19 Op. O.L.C. 340, 341 (1995). The OLC's statement and

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    opinion recognize that "[t]hroughout this country's history, the fundamental legal principle

2    governing citizenship has been that birth within the territorial limits of the United States confers

3    United States citizenship." *Id.* at 340. As OLC explained: "Congress and the States adopted the

4    Fourteenth Amendment in order to place the right to citizenship based on birth within the

5    jurisdiction of the United States *beyond question*. Any restriction on that right contradicts both

6    the Fourteenth Amendment and the underlying principle that the amendment safeguards." *Id.*

7    (emphasis added). Indeed, OLC explained that "children born in the United States of aliens are

8    subject to the full jurisdiction of the United States[,]" and that "as consistently recognized by

9    courts and Attorneys General for over a century, most notably by the Supreme Court in *United*

10   *States v. Wong Kim Ark*, there is no question that they possess constitutional citizenship under

11   the Fourteenth Amendment." *Id.* at 342.

12        44.    Congress likewise has reaffirmed through statute the Citizenship Clause's

13   commandment regarding birthright citizenship. The Immigration and Nationality Act states:

14   "The following shall be nationals and citizens of the United States at birth: (a) a person born in

15   the United States, and subject to the jurisdiction thereof[.]" 8 U.S.C. § 1401(a). This language

16   was originally enacted in 1940, well after *Wong Kim Ark*, and taken directly from the Fourteenth

17   Amendment.

18        45.    Federal and state agencies rely on this fundamental and longstanding

19   constitutional grant of birthright citizenship in implementing various federal programs. For

20   example, the U.S. State Department is granted the authority under federal law to issue

21   U.S. passports. 22 U.S.C. § 211a. As explained in the State Department's Foreign Affairs

22   Manual, "[a]ll children born in and subject, at the time of birth, to the jurisdiction of the United

23   States acquire U.S. citizenship at birth even if their parents were in the United States illegally at

24   the time of birth."[4] The U.S. State Department's Application for a U.S. Passport confirms that

25

26        [4] 8 FAM 301.1 (Acquisition By Birth in the United States) (2021), *available at* https://fam.state.gov/
     FAM/08FAM/08FAM030101.html (attached as Ex. B).

CONSOLIDATED COMPLAINT FOR           12          ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                              Civil Rights Division
RELIEF – CLASS ACTION –                               800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                                   Seattle, WA 98104-3188
                                                          (206) 464-7744

**Supp.Add.014**

for "Applicants Born in the United States," a U.S. birth certificate alone is sufficient to prove one's citizenship.[5] USCIS likewise confirms in public guidance that "[i]f you were born in the United States, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship."[6]

46.     SSA also has long accepted that all children born in the United States are citizens. Under current public guidance, SSA states that "[t]he easiest way to get a Social Security number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital."[7] With respect to citizenship, SSA explains that for children born in the United States, the child's U.S. birth certificate is proof of U.S. citizenship.[8] SSA's guidance is consistent with federal regulations, which establish that "[g]enerally, an applicant for an original or replacement social security number card may prove that he or she is a U.S. citizen by birth by submitting a birth certificate or other evidence . . . that shows a U.S. place of birth." 20 C.F.R. § 422.107(d). Indeed, for newborn babies, SSA utilizes what is called "Enumeration at Birth." Under that program, SSA enters into agreements with states to streamline the process for obtaining SSNs. Where a parent requests an SSN as part of an official birth registration process, the state vital statistics office electronically transmits the request to SSA along with the child's name, date and place of birth, sex, mother's maiden name, father's name, address of the mother, and birth certificate number. 20 C.F.R. § 422.103(c)(2). That information alone is used to establish the age, identity, and U.S. citizenship of the newborn child. *Id.* States receive payment from the federal government under this program for each record transmitted to the SSA for purposes of issuing an SSN—approximately $4.19 per SSN that is issued. Currently,

---

[5] U.S. Dep't of State, *Application for a U.S. Passport*, DS-11 04-2022, 2 (expiration date April 30, 2025) (attached as Ex. C).

[6] U.S. Citizenship & Immigr. Servs., *A4--I am a U.S. citizen…How do I get proof of my U.S. citizenship?*, M-560B, 1 (October 2013) *available at* https://www.uscis.gov/sites/default/files/document/guides/A4en.pdf (attached as Ex. D).

[7] Soc. Sec. Admin., *Social Security Numbers for Children*, Pub. No. 05-10023, 1 (Jan. 2024), *available at* https://www.ssa.gov/pubs/EN-05-10023.pdf (attached as Ex. E).

[8] *Id.* at 2-3.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.015

1    Washington receives approximately $440,000 per year for administering this process and

2    transmitting birth data for newborn babies in Washington to SSA. Arizona, likewise, has

3    received approximately $874,000 for FY 2024 and more than $935,000 for FY 2025 through the

4    Enumeration at Birth program, and is expected to receive more than $1 million in FY 2026.

5    Oregon received approximately $158,000 in 2023 and $129,000 through the first three quarters

6    of 2024 through the program. Illinois likewise participates in this program and receives federal

7    funds for each record transmitted.

8         47.    State law also relies on the basic constitutional principle that a person born in the

9    territorial United States is an American citizen. For example, Arizona has unique and

10   complicated proof of citizenship requirements for voter registration. Birth certificates play an

11   important role in this process. One of the documents that qualifies as "satisfactory evidence of

12   citizenship" for voter registration in Arizona is "the applicant's birth certificate that verifies

13   citizenship to the satisfaction of the county recorder." Ariz. Rev. Stat. § 16-166(F)(2). Another

14   document that qualifies as "satisfactory evidence of citizenship" for voter registration in Arizona

15   is a "driver license" number, if the driver license indicates that the applicant previously submitted

16   proof of citizenship to the Arizona Department of Transportation or equivalent agency of another

17   state. Ariz. Rev. Stat. § 16-166(F)(1). Applicants often use their birth certificate to meet this

18   requirement.

19        48.    If a U.S. birth certificate were to stop being sufficient for proof of citizenship,

20   voter registration in Arizona would become substantially more difficult and time-consuming.

21   This is because election officials in Arizona would face a dilemma each time a prospective voter

22   submits a birth certificate or driver license number. Under current registration procedures, the

23   assumption is that these kinds of documents prove U.S. citizenship and nothing further is

24   required. Without this assumption, a new and more complex set of procedures would need to be

25   developed to try to identify which birth certificates and driver license numbers qualify as proof

26   of U.S. citizenship.

CONSOLIDATED COMPLAINT FOR                14         ATTORNEY GENERAL OF WASHINGTON
DECLARATORY AND INJUNCTIVE                                  Civil Rights Division
RELIEF – CLASS ACTION –                                   800 Fifth Avenue, Suite 2000
No. 2:25-cv-00127-JCC                                       Seattle, WA 98104-3188
                                                              (206) 464-7744

**B.      The President Acted Without Legal Authority in Purporting to Strip Individuals of Their U.S. Citizenship**

49.      President Trump's public statements make clear that he wishes to end birthright citizenship purely as a policy tactic to purportedly deter immigration to the United States. Despite a president's broad powers to set immigration policy, the Citizenship Stripping Order falls far outside the legal bounds of the president's authority.

50.      During his most recent campaign for President, for example, then-candidate Trump made clear that an Executive Order would issue "[o]n Day One" to "stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens."[9] As he explained, the goal is for this Executive Order to "eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S. to return home."[10] He explained that the Executive Order would do this by instructing agencies not to issue passports, Social Security numbers, and otherwise have the federal government treat those children as noncitizens.

51.      After the 2024 election, President-Elect Trump continued to state that birthright citizenship should be ended. In December 2024, for example, President-Elect Trump again promised an Executive Order "directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen."[11]

52.      The Citizenship Stripping Order, issued January 20, 2025, is the promised Executive Order. It declares that U.S. citizenship "does not automatically extend to persons born in the United States" if (1) the individual's mother is "unlawfully present in the United States"

---

[9] Trump Vance 2025, *Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism* (May 30, 2023), https://www.donaldjtrump.com/agenda47/agenda47-day-one-executive-order-ending-citizenship-for-children-of-illegals-and-outlawing-birth-tourism (attached as Ex. F).
[10] *Id.*
[11] Tarini Parti & Michelle Hackman, *Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs*, Wall Street Journal (Dec. 8, 2024), https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291 (attached as Ex. G).

CONSOLIDATED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF – CLASS ACTION – No. 2:25-cv-00127-JCC      15      ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Supp.Add.017

and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." The Citizenship Stripping Order affects at least hundreds of thousands of newborns in the United States, including those who are born to two undocumented parents.

53.    Section 2 of the Order states that, effective in 30 days, it is the "policy of the United States" that no department or agency of the federal government "shall issue documents recognizing U.S. citizenship" to persons within those categories or "accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship." Section 3 of the Order directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." The Order further directs that "the heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities."

54.    The Citizenship Stripping Order thus attempts to redefine the Fourteenth Amendment and restrict *jus soli*—or birthright citizenship—in the United States. If implemented, the Fourteenth Amendment's text would mean one thing for certain people, and the opposite for the same class of persons born mere days apart.

55.    Its language underscores its arbitrary nature, particularly by failing to define who is considered "unlawfully present" or who has "temporary status." The INA contains many "non-immigrant" and other forms of status that do not provide or guarantee a pathway to lawful permanent residence. Many noncitizen parents-to-be covered by the Order include people who

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Supp.Add.018

have lived in this country for decades and built their lives here. This includes people who have no status, as well as those who have or are seeking other forms of lawful status (including asylum and other humanitarian forms of relief provided by the INA).

56.     The Constitution does not empower the President to set rules regarding citizenship at birth.

57.     The Constitution does not empower the President to condition citizenship at birth on the citizenship or immigration status of one's parents.

58.     The Constitution does not empower the President to unilaterally amend the Fourteenth Amendment.

59.     The Constitution does not empower the President to grant or deny citizenship to individuals born in the United States.

60.     The Constitution and federal law confer automatic citizenship to individuals born in the United States and subject to its jurisdiction. The Constitution removes control over the grant of birthright citizenship from the category of legitimate policy options the President and Congress may exercise to address immigration policy issues. As the Office of Legal Counsel explained when discussing the unconstitutionality of such proposals: "In short, the text and legislative history of the citizenship clause as well as consistent judicial interpretation make clear that the amendment's purpose was to remove the right of citizenship by birth from transitory political pressures." 19 Op. O.L.C. at 347.

**C.     United States Citizens Are Entitled to All Rights and Benefits of Citizenship as Defined by Law**

61.     U.S. citizens are entitled to a broad array of rights and benefits as a result of their citizenship. U.S. citizenship is a "priceless treasure." *Fedorenko v. United States*, 449 U.S. 490, 507 (1981). Not only does citizenship provide a sense of belonging, but it carries with it immense privileges and benefits—all of which the President claims to wipe away at the stroke of a pen.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.019**

Withholding citizenship or stripping individuals of their citizenship will result in an immediate and irreparable harm to those individuals and to the Plaintiff States.

62.     Among other rights, citizens are "entitled as of birth to the full protection of the United States, to the absolute right to enter its borders, and to full participation in the political process." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001).

63.     The implication of these rights is equally important: U.S. citizens cannot be detained by immigration authorities, removed from this country, separated from their families, or deprived of their friends and communities. *See, e.g.*, 18 U.S.C. § 4001 (preventing the U.S. government from detaining U.S. citizen absent authorization by Congress); 8 U.S.C. § 1229a(a)(1) (removal proceedings are to "decid[e] the inadmissibility or deportability of [a noncitizen]"). Such rights to belong and remain are among the most fundamental and valuable rights that the Constitution protects.

64.     U.S. citizens are entitled to obtain a U.S. passport and may travel abroad for an unlimited period of time and with unlimited frequency without risk of being denied re-entry to the United States. Such travel may be needed to visit family, receive healthcare, travel for work or pleasure, or for many other reasons.

65.     Individuals over 18 years of age who are U.S. citizens are eligible to vote in federal, state, and local elections. U.S. Const. amend. XXVI; Wash. Const. art. VI, § 1; Ariz. Const. art. VII, § 2; Or. Const. art. II, § 2; Ill. Const. art III, § 1. The right to vote is a fundamental political right.

66.     Individuals over 18 years of age who are U.S. citizens are eligible to serve on federal and state juries. 28 U.S.C. § 1865(b)(1); Wash. Rev. Code § 2.36.070; Ariz. Rev. Stat. § 21-201(1); Or. Rev. Stat. Ann. § 10.030(2); 705 ILCS 305/2(a).

67.     Individuals who are U.S. citizens may petition for immigration status for family members including spouses, children, parents, and siblings. *See* 8 U.S.C. §§ 1151(b)(2)(A)(i), 1153(a).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

18

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.020

68. Individuals who are natural born U.S. citizens are eligible for election to the offices of President and Vice President of the United States. U.S. Const. art. II, § 1; U.S. Const. amend. XII.

69. Individuals who are U.S. citizens are eligible for election to the United States House of Representatives and the United States Senate, and to certain state offices. U.S. Const. art I, §§ 2-3; Wash. Const. art. II, § 7, art. III, § 25; Ariz. Const. art. IV pt. 2 § 2, art. V § 2; Or. Const. art. V, § 2, art. IV, § 8; Or. Rev. Stat. Ann. § 204.016(1); Ill. Const. art. V, § 3, art. IV § 2.

70. Individuals who are U.S. citizens or nationals are eligible for appointment to competitive service federal jobs. Exec. Order No. 11,935, 5 C.F.R. § 7.3(b) (Sept. 3, 1976).

71. Depending on immigration or citizenship status, residents of Plaintiff States may also be eligible to participate in a number of federal and state programs that ensure the health and welfare of individuals, families, and communities. Those include programs administered by the Plaintiff States and funded by federal and state dollars. These programs provide healthcare coverage for newborns and children, foster care and custodial services for children in need, and other forms of social and economic assistance to those in need.

72. Longer term, a child stripped of birthright citizenship who remains undocumented will face the effects of a lack of legal status over their lifespan. While U.S. citizens of sufficient age are authorized to work in the United States, only noncitizens granted particular immigration statuses are or can be authorized to work. *See* 8 C.F.R. § 274a.12. A noncitizen who is unlawfully present is ineligible for employment authorization, affecting their lifetime earning potential and job opportunities. Undocumented individuals are not eligible for federal student financial aid, affecting their educational opportunities. Research also shows that undocumented individuals are more likely to report greater depression, social isolation, longer hospital stays, and higher levels of stress.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.021

73.     A person without legal immigration status is not generally eligible to be issued a social security number. *See* 20 C.F.R. § 422.107. This creates cascading barriers to basic needs and milestones, such as accessing traditional mortgages or banking services, as well as eligibility for federal housing programs, among other things. Likewise, undocumented individuals are not eligible for a REAL ID Act compliant driver's license or identification card, which will be required for all air travel, including domestic flights, as of May 7, 2025. 6 C.F.R. §§ 37.5(b), 37.11(g).

**D.     Plaintiff States Will Be Irreparably Injured by Defendants' Citizenship Stripping Order**

74.     The Plaintiff States will be immediately and irreparably injured by Defendants' Citizenship Stripping Order separate and apart from the grievous harms its residents will suffer as a result of the Order.

75.     As noted above, in Washington in 2022 alone, approximately 7,000 U.S. citizen children were born to mothers who lacked legal status and approximately 4,000 U.S. citizen children were born to two parents who lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

76.     In Arizona in 2022 alone, approximately 6,000 U.S. citizen children were born to mothers who lacked legal status and approximately 3,400 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the number of children affected by the Citizenship Stripping Order, and the full number of children affected will be greater.

77.     In Illinois in 2022 alone, approximately 9,100 U.S. citizen children were born to mothers who lacked legal status and approximately 5,200 U.S. citizen children were born to two parents who were noncitizens and lacked legal status. This is a conservative estimate of the

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.022

1  number of children affected by the Citizenship Stripping Order, and the full number of children

2  affected will be greater.

3        78.    In Oregon in 2022 alone, approximately 2,500 U.S. citizen children were born to

4  mothers who lacked legal status and approximately 1,500 U.S. citizen children were born to two

5  parents who were noncitizens and lacked legal status. This is a conservative estimate of the

6  number of children affected by the Citizenship Stripping Order, and the full number of children

7  affected will be greater.

8        79.    The Plaintiff States administer numerous programs for the benefit of their

9  residents, including for newborns and young children, some of whom are wards of the Plaintiff

10  States who are entitled to care by statute. Some of these programs are funded in part by federal

11  dollars, with federal funding frequently tied to the citizenship and immigration status of the

12  individuals served. As detailed below, stripping individuals of their citizenship and leaving them

13  without a qualifying immigration status will render them ineligible to receive federally funded

14  benefits, leaving them to rely on state-only funded benefits and services that the Plaintiff States

15  must provide, and causing direct, immediate, and measurable financial harm to Plaintiff States.

16        80.    The Medicaid and CHIP health insurance programs were created by federal law

17  and are jointly funded by the federal and state governments. Medicaid provides health insurance

18  for individuals, including children, whose household incomes fall below certain eligibility

19  thresholds that vary slightly by state. CHIP is a program through which health insurance

20  coverage is provided for children whose household incomes exceed the eligibility thresholds for

21  Medicaid but fall below a separate threshold. The federal government pays states a percentage

22  of program expenditures for individuals enrolled in Medicaid and CHIP. This percentage varies

23  by program, state, covered population, and service, but generally ranges between 50% and 90%

24  of the total expenditure.

25        81.    Only individuals who are U.S. citizens or have a qualifying immigration status

26  are eligible for Medicaid and CHIP except for certain emergency medical services that must be

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.023

provided and can be covered under Medicaid where the individual is otherwise qualified but for their immigration or citizenship status. 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406. In all Plaintiff States, children who would be eligible for Medicaid or CHIP but for the fact that they are not U.S. citizens or qualifying noncitizens are eligible for certain health insurance or emergency services that are funded entirely by the State. The Citizenship Stripping Order will therefore result in newborn children who would otherwise be eligible for federally funded Medicaid or CHIP instead being enrolled in entirely state-funded health care programs or provided entirely state-funded healthcare services, transferring the cost for their health care to the States and causing a direct loss of federal funding. And for some Plaintiff States, those State-funded services may be underfunded or restricted to emergency care only, resulting in newborns and children not receiving regular or preventative care and ultimately leading to more expensive emergency care in the long term.

82.    One example is Washington's programs for ensuring healthcare coverage for its most vulnerable residents. The Washington State Health Care Authority (HCA) is the designated single state agency responsible for administering Washington's Medicaid program and CHIP. In Washington, Medicaid is called Apple Health. Coverage programs for children are provided under the name Apple Health for Kids and serve all kids regardless of immigration status up to 317% of the Federal Poverty Limit (FPL). Between 215% and 317% of the FPL, for children who are citizens or qualified and authorized immigrants, the funding for this coverage comes through CHIP, and households pay a minimal premium for children's coverage. Below that range, for children who are citizens or qualified and authorized immigrants, funding for coverage is provided through Medicaid. Under federal law, HCA must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. For those children who would be eligible but for their lack of citizenship or a qualifying immigration status, the State provides coverage through what is called the Children's Health Plan (CHP).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.024**

83.     As of December 2024, HCA administers federally-backed Medicaid and CHIP funded coverage for more than 860,000 children in Washington. HCA estimates that coverage on a per-child basis costs approximately $2,844 per year on average for physical health care coverage alone. For this coverage, Washington expended approximately $2.37 billion with approximately $1.3 billion coming from the federal government under Medicaid and CHIP. With respect to the division of funding in Washington, health coverage provided through CHIP generally receives a 65% federal match rate as opposed to Medicaid's 50% federal match rate.

84.     If deemed ineligible because they are no longer U.S. citizens, children enrolled in CHIP who do not meet the income eligibility guidelines for Medicaid would be left without health coverage unless Washington provides it using only state funding—even for emergency medical care that hospitals (including State-operated hospitals) are required by federal law to provide. *See, e.g.*, 42 U.S.C. § 1395dd. The result would be that federal law would *require* State-providers, like UW Medicine's Harborview hospital, to provide emergency and other care, but *withhold* federal contribution for that care at the normal CHIP rates. Washington would provide coverage to these individuals using State-only funds, and therefore be required to spend substantial funds it otherwise should receive from the federal government through the CHIP program.

85.     The CHIP program also enables certain healthcare services to be provided to children prior to birth in the form of prenatal care for their mother, regardless of the mother's status. Under CHIP, a child is defined as "an individual under the age of 19 including the period from conception to birth." 42 C.F.R. § 457.10. In Washington, children are eligible at conception for prenatal care through CHIP. This prenatal care coverage is provided regardless of the immigration status of the mother because the child is assumed to be a U.S. citizen. In State FY 2025, Washington expects to receive $161.5 million in federal CHIP funding to provide prenatal health care to children born in Washington to mothers ineligible for Medicaid and CHIP.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

23

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.025**

86.     Certain children born whose health care would have been covered through Medicaid or CHIP as U.S. citizens will become ineligible for those programs because they are no longer deemed U.S. citizens or qualifying noncitizens under the Citizenship Stripping Order. This poses an immediate risk to HCA's federal funding stream used to provide healthcare coverage to vulnerable Washington newborns and children. In state fiscal year 2022, for example, there were more than 4,000 children born to unauthorized and non-qualifying mothers whose labor and delivery was covered by Emergency Medicaid. Those children, by being born in the United States and deemed citizens, were eligible for federally-backed coverage. If this number of children became ineligible due to a loss of citizenship and moved to the State-funded CHP coverage, however, that will result in a loss of $6.9 million in federal reimbursements to Washington and a corresponding increase to State expenditures of the same amount, based on the current expenditures for the complete physical and behavioral health package of benefits.

87.     In Arizona, in 2024 there were 4,519 births paid for by the Federal Emergency Services Program (FES births). For each of these births, the parent's household income fell under 133% of the Federal Poverty Level and the parent would have been eligible for Title XIX (Medicaid) if they were U.S. citizens or "lawfully residing." However, because these children were born in the United States, the children were eligible for Medicaid and qualified for Arizona's Medicaid program, the Arizona Health Care Cost Containment System (AHCCCS), but they would not be eligible if birthright citizenship were removed. If each of these children became ineligible for AHCCCS until 18, using FFY 2026 figures for FMAP of 64.34% (federal match) and capitation rates, then this would likely cost the State $39,400 in federal revenue per child used to pay $61,300 in total capitation payments over the first 18 years of that child's life.

88.     In addition, based on current data, AHCCCS estimates that approximately 3,126 births each year are for children whose family income are low enough to make them eligible for Title XXI (KidsCare) under birthright citizenship, but who would not be eligible if birthright

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

24

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.026

1  citizenship were removed. And given the scope of the Order, the number of children affected

2  will likely be higher.

3       89.    Removing birthright citizenship from the above 7,645 (4,519 + 3,126) children

4  would reduce federal revenues to Arizona by $321,844,600 used to pay $468,638,500 in total

5  capitation payments over the first 18 years of the children's lives. This amount is only for the

6  first "cohort" of children and only through their first 18 years of life. Each year additional

7  children would be born, adding to the lost revenue.

8       90.    In Illinois, the Department of Healthcare and Family Services (HFS) is

9  responsible for administering Illinois's Medicaid program and CHIP. HFS currently administers

10  federally-backed Medicaid and CHIP funded coverage for over 1 million children in Illinois.

11  Some of those children—children whose health care would have been covered through Medicaid

12  or CHIP as U.S. citizens—will become ineligible for those programs because they are no longer

13  deemed U.S. citizens or qualifying noncitizens under the Citizenship Stripping Order. That

14  threatens the federal funds that HFS uses to provide healthcare coverage to vulnerable Illinois

15  newborns and children and risks transferring the cost for their health care to Illinois.

16       91.    Similarly, Plaintiff States' child welfare systems are funded in part through an

17  annual appropriation based on an open-ended formula grant entitlement operated by the

18  Defendant HHS' federal Foster Care Program, known as "Title IV-E." For example, in Federal

19  Fiscal Year 2024, Washington received approximately $219 million in federal Title IV-E

20  funding.

21       92.    The Title IV-E grant amount is awarded to partially reimburse the States'

22  expenditures on allowable uses of funds for the direct costs of supporting eligible children in

23  foster care. The States receive no Title IV-E funding for the costs to care for foster children who

24  do not meet Title IV-E eligibility. Children who are neither citizens nor qualifying noncitizens,

25  which will include children who would be natural-born U.S. citizens but for the Citizenship

26  Stripping Order, are not covered by Title IV-E. 8 U.S.C. §§ 1611(a), (c)(1)(A).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

25

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.027

93.     Plaintiff States also receive federal funding under Title IV-E for certain program administrative costs based in part on the number of children eligible for Title IV-E. Washington's Department of Children, Youth, and Families (DCYF) receives reimbursements for foster care maintenance, adoption support, guardianship support, and associated legal, administrative, and training costs. Therefore, any decrease in the number of foster children who are Title IV-E eligible will reduce federal funding to States for foster care and related programs. As a result of the Citizenship Stripping Order, fewer children will be eligible for welfare and support services and Plaintiff States will suffer a negative financial impact to their child welfare programs.

94.     Washington's DCYF foster care services provide support for children and families when they may be most vulnerable and ensures that children have the tools they need to succeed. In Washington, those services will often be provided for a long period of time—the median length of stay for a child in out-of-home care is nearly two years. If that child is ineligible for Title IV-E because they are not a citizen, DCYF cannot receive federal reimbursements for any of the services they provide to that child. And any decrease in Title IV-E funding means that DCYF will have fewer resources to help all of the children it serves, including children whose citizenship status is unaffected by the Citizenship Stripping Order.

95.     Arizona's Department of Child Services (DCS) also relies on Title IV-E funding and operates on a limited budget appropriated by the State Legislature. The Citizenship Stripping Order will cause DCS to lose material amounts of federal funding that it would use for foster care maintenance payments for those children, as well as reimbursement for administrative expenses associated with their care.

96.     Illinois Department of Child and Family Services (DCFS) also relies on Title IV-E funding. The guaranteed reduction in Title IV-E funding—as well as other federal reimbursements—that will result from the Citizenship Stripping Order will have a meaningful effect and strain on DCFS's ability to fulfill its statutory mandate to provide care to the wards in its custody.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.028

97.     The loss of federal funding and reimbursement will have other significant and negative ripple effects on the Plaintiff States. For example, in Arizona, DCS prioritizes kinship placements for the children within its custody. In kinship placements, children are placed in the homes of relatives or individuals with a significant relationship to the children. Placements with relatives and kin provides children with more stability by maintaining connections to neighborhood, community, faith, family, tribe, school and friends. A family's willingness and ability to accept a kinship placement is often dependent on the family's ability to receive financial and resource assistance from DCS. If fewer children are considered U.S. citizens and therefore are ineligible for these vouchers and resources, DCS will not be able to provide the same assistance to support relative and kinship placements, and the number of these placements will decrease. That will harm these already vulnerable children. It will also increase costs for DCS, which will have to place those same children in group homes, which are significantly more expensive.

98.     Because the benefit is to the child, not the caregiver, an increase of children without legal status in DCS care will also impact community foster homes. Community foster homes may not be willing to take placement of a child if they are not able to receive benefits like childcare assistance. Many communities foster caregivers work outside of the home and rely on childcare assistance to pay for care while they work.

99.     Plaintiff States will also suffer a direct and immediate loss of federal reimbursements that they receive for every SSN that is assigned to a child born in their state through the Enumerated at Birth (EAB) program. Pursuant to this program, Plaintiff States are under contract with the SSA to collect and transmit to SSA certain birth information on behalf of parents who wish to obtain an SSN for their newborn child. For their services under this program, the States receive a payment from SSA of approximately $4.19 per assigned SSN. These funds are used to support general administrative expenses for state agencies beyond the cost of transmitting SSN applications to SSA.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

27

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.029

100.    As noted above, each year, the Citizenship Stripping Order is likely to impact—at a bare minimum—at least 4,000 children born in Washington; 3,400 children born in Arizona; 5,200 children born in Illinois; and 1,500 children born in Oregon. Those children will therefore be ineligible for SSNs, which in turn will cause the Plaintiff States to suffer an immediate decrease in the number of SSNs assigned and payments received through the EAB program. For example, withholding issuance of approximately 4,000 SSNs through the EAB process will cause Washington to lose approximately $16,000 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to these children. Withholding issuance of approximately 3,400 SSNs through the EAB program will cause Arizona to lose approximately $14,000 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to certain children. Withholding issuance of approximately 5,200 SSNs through the EAB process will cause Illinois to lose approximately $21,000 per year at a minimum. And withholding issuance of approximately 1,500 SSNs through the EAB process will cause Oregon to lose approximately $6,200 per year at a minimum, because of the Citizenship Stripping Order's direction to SSA to stop issuing SSNs to certain children.

101.    As noted above, the Citizenship Stripping Order will also harm Arizona's ability to implement its voter registration laws aimed at ensuring that only citizens register to vote.

102.    The Citizenship Stripping Order will immediately begin to upend administrative and operational processes within the Plaintiff States. States must immediately alter their systems for verifying which children they serve are eligible for federal reimbursement programs like Medicaid, CHIP, and Title IV-E; operationalize those altered systems; and plan for the fiscal impact of losing substantial federal funding that the Plaintiff States rely on receiving to support a range of programs.

103.    In Washington, for example, agencies rely on birthright citizenship in their internal processes to determine eligibility for federal programs. This includes Washington's HCA, which administers Washington's Medicaid and CHIP programs. The Citizenship Stripping

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

28

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.030

Order will require HCA to develop updated training and guidance for staff, partners, and health care providers across Washington about which children are citizens and therefore eligible for Medicaid and CHIP. HCA anticipates this will take at least seven to eight full-time employees around two to three years to make these changes. These updates may then require training for up to 2,000 staff, on top of coordination with external community partners. Similarly, the Citizenship Stripping Order requires health care providers like UW Medicine to immediately update their understanding of how to assess coverage to assist patients and parents in understanding and navigating applications for coverage, when those parents may have a due date in just a few weeks.

104.    Washington's DCYF likewise relies on birthright citizenship to determine which services it may receive reimbursement for. Federal law requires DCYF to verify citizenship status of children it serves as a part of determining Title IV-E eligibility. Currently, the primary method of citizenship verification is through birth certificates issued by other state agencies. DCYF relies on those birth certificates to determine whether children are eligible for Title IV-E, and DCYF's services for children may begin as soon as they are born. The Citizenship Stripping Order requires DCYF to amend its processes, trainings, and materials to make any Title IV-E eligibility determinations. That will take staff time that would have been spent on other projects to better serve children and families in Washington.

105.    Washington's DOH also faces uncertainty and substantial administrative burdens under the Citizenship Stripping Order. DOH cannot modify State's newborn registration process immediately. Instead, doing so will require substantial operational time, manpower resources, and technological resources from DOH and healthcare facilities in Washington. Indeed, because more than 80,000 babies are born every year in Washington, DOH anticipates that any required updates to the birth registration process or birth certificates in Washington will impose serious burdens on DOH that it is not currently equipped to handle, as DOH has no way of determining the immigration status or citizenship of every newborn (or their parents).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

29

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.031

106.    Similarly, in Arizona, the State's Medicaid program, AHCCCS, is jointly funded by the federal and state governments for individuals and families who qualify based on income level. AHCCCS does not currently rely on a Social Security Number or parental immigration status to determine eligibility. Newborns are automatically approved for benefits through an automated process when a mother living in Arizona on AHCCCS gives birth. Citizenship is considered automatically verified if the child's birth is verified through this method since they are born in the United States. If this methodology no longer applied, AHCCCS would need to update its eligibility policy and update three systems it uses: HEAPlus, PMMIS and AHCCCS Online. This would take approximately 12 months to implement the change. Based on the complexity of the potential update, the expense to change HEAplus would be approximately $1 million to $2.5 million and would take about 12 months to develop. In addition, it would cost $1.3 million to 1.9 million to update PMMIS and AHCCCS Online.

107.    The Illinois Department of Public Health (IDPH) will also face substantive administrative burdens under the Citizenship Stripping Order in order to modify its newborn registration process immediately. IDPH would need to create systems for state-run healthcare facilities to use to verify parents' immigration statuses for purposes of issuing birth certificates and applying for a newborn's SSN. This would require training and hiring of staff and would potentially cause delays in the registration and issuance of a newborn's birth certificate.

108.    In Oregon, the sudden need to collect proof of citizenship information from parents at the birth of a child will cause the state to incur the expense of training its employees and staff at Oregon hospitals on new protocols.

109.    In sum, the Citizenship Stripping Order, if allowed to stand, will work direct and substantial injuries to Washington, Arizona, Illinois, and Oregon, in addition to their residents.

**E.    Individual Plaintiffs**

a) <u>Cherly Norales Castillo</u>

110.    Plaintiff Cherly Norales Castillo is a noncitizen from Honduras.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

30

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.032**

111. She has lived in the United States since 2023, and currently resides in Seattle, Washington.

112. Ms. Norales lives with her partner and her four-year-old son.

113. Ms. Norales and her son have a pending asylum application before the immigration court.

114. In 2023, they fled a violent and abusive situation in Honduras to seek protection in the United States.

115. Ms. Norales learned she is pregnant with her second child in or around July 2024.

116. Her expected due date is March 19, 2025.

117. When Ms. Norales learned of President Trump's Executive Order on birthright citizenship in January 2025, she became fearful for her unborn child, as neither she nor the child's father are citizens or LPRs.

118. Ms. Norales fears for the safety and security of her family if her unborn child does not receive citizenship by birthright. She does not want her unborn child to ever face removal to Honduras, a country she had to flee due to abuse and violence. It is important to Ms. Norales that her family remain unified and safe in this country.

119. Ms. Norales also desires that her soon-to-be-born child have access to an education, work authorization, and the many other benefits of U.S. citizenship. She fears the many obstacles her child will face if the child lacks citizenship.

b) Alicia Chavarria Lopez

120. Plaintiff Alicia Chavarria Lopez is a noncitizen from El Salvador.

121. She has lived in the United States since 2016, and currently resides in Bothell, Washington.

122. Ms. Chavarria lives with her partner and their five-year-old child.

123. Ms. Chavarria has a pending asylum application before USCIS.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

31

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.033

124.     In 2016, she fled a violent and abusive situation in El Salvador to seek protection in the United States.

125.     Ms. Chavarria learned she is pregnant with her second child in or around October or November 2024.

126.     Her anticipated due date is July 21, 2025.

127.     When Ms. Chavarria learned of President Trump's Executive Order on birthright citizenship in January 2025, she became fearful for her unborn child, as neither she nor the child's father are citizens or LPRs.

128.     Ms. Chavarria's family is one of mixed immigration status. She is seeking asylum, and her five-year-old child is a U.S. citizen.

129.     Ms. Chavarria fears that the Citizenship Stripping Order puts her family at risk of separation, and that her expected child may become a target for immigration enforcement. She does not want her unborn child to live in fear of removal to El Salvador, a country Ms. Chavarria had to flee for her own safety.

130.     Ms. Chavarria desires that her soon-to-be-born child have access to education, work opportunities, and the many other benefits of U.S. citizenship—the same benefits that are available to her other child who was born in this country. She fears the many obstacles her child will face if the child lacks citizenship.

**F.     The Effect of the Executive Order on the Plaintiff States' Residents, Individual Plaintiffs, and Proposed Class Members**

131.     The Citizenship Stripping Order will have widespread and destructive effects on the lives of the Plaintiff States' residents, Individual Plaintiffs, and proposed class members, which includes the Individual Plaintiffs' expected children.

132.     Without the protections of citizenship, the Plaintiff States' residents, Individual Plaintiffs, and proposed class members face the risk of family separation, as DHS could take away and remove resident and proposed class member children at any moment. This is not

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

32

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.034**

1  speculative. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018) (enjoining policy

2  implemented by first Trump administration to deter immigration by separating parents and their

3  children).

4       133.    Some children subject to the Citizenship Stripping Order may also become

5  stateless. A U.S.-born child deemed to be a noncitizen may not be recognized as a citizen under

6  the laws of their parents' country or countries of origin. Even if legally possible, practical barriers

7  may prevent these children from being recognized as citizens of any other country, especially

8  where those countries offer no consular services in the United States (and thus no means to obtain

9  a passport and verify citizenship). This is true for some large immigrant populations in the United

10  States, like Venezuelans.[12]

11       134.    The Order also deprives the Plaintiff States' residents, Individual Plaintiffs'

12  expected children, and the other proposed class member children of the ability to obtain social

13  security numbers and work lawfully once they are of lawful age. Without social security

14  numbers, the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed

15  class member children will be unable to provide for themselves or their families (including,

16  eventually, the Individual Plaintiffs and class member parents themselves). *Gonzalez Rosario v.*

17  *U.S. Citizenship & Immigr. Servs.*, 365 F. Supp. 3d 1156, 1162 (W.D. Wash. 2018) (recognizing

18  a "negative impact on human welfare" when asylum seekers "are unable to financially support

19  themselves or their loved ones").

20       135.    In addition, and among other things, the Citizenship Stripping Order denies the

21  Plaintiff States' residents, Individual Plaintiffs' expected children, and the other proposed class

22  member children (once they become adults) the right to vote in federal elections, serve on federal

23  juries, serve in many elected offices, and work in various federal jobs.

24

25      [12] U.S. Dep't of State, *International Travel, Learn About Your Destination, Venezuela*
https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/

26  Venezuela.html (last updated Oct. 30, 2024) ("The Venezuelan embassy and consulates in the United States are not open.") (attached as Ex. H).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

33

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.035**

136.    The Order will further deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of access to higher education, as they will not qualify for federal financial aid to higher education, limiting their ability to develop their full potential.

137.    The Citizenship Stripping Order will also deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of access to other critical public benefits. For example, as undocumented persons, children subject to the Order will not qualify for federally funded SNAP benefits. *See* 7 U.S.C. § 2015(f); 7 C.F.R. § 273.4. While Washington State provides supplemental, state-funded programs for many noncitizens, not all noncitizens (and thus not all class member children) would be covered. *See, e.g.*, Wash. Admin. Code § 388-424-0030 (addressing how immigration status affects eligibility for state-funded food assistance programs); Wash. Admin. Code § 388-424-0001 (identifying qualifying immigration statuses for state-funded food assistance programs).

138.    The Order will deprive the Plaintiff States' residents, Individual Plaintiffs' children, and the other proposed class member children of any immigration status. The INA and its implementing regulations do not provide any status to, and in fact do not contemplate, persons born in the United States who are not U.S. citizens, except for those born to foreign diplomatic officers. *See* 8 C.F.R. § 101.3(a); *see also* 8 U.S.C. §1401(a). Indeed, most persons born in the U.S. who are subject to the Order will have no other path to gain lawful status in this country.

139.    Finally, the Citizenship Stripping Order is a source of immense stress, anxiety, and concern for some of the Plaintiff States' residents, Individual Plaintiffs, and proposed class members. They are understandably apprehensive and distressed about the prospect that their families may be separated, rendered ineligible for benefits, and subject to many other harms.

## V.    CLASS ACTION ALLEGATIONS

140.    Individual Plaintiffs bring this action on behalf of themselves and all others who are similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2). A class

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

34

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.036

1  action is proper because this action involves questions of law and fact common to the class, the

2  class is so numerous that joinder of all members is impractical, Individual Plaintiffs' claims are

3  typical of the claims of the class and will fairly and adequately protect the interests of the class.

4  Defendants have acted on grounds that apply generally to the class, so that injunctive and

5  declaratory relief and relief under the APA are appropriate with respect to the class as a whole.

6       141.    Individual Plaintiffs seek to represent the following class:

7
    All pregnant persons residing in Washington State who will give birth in
8      the United States on or after February 19, 2025, where neither parent of
    the expected child is a U.S. citizen or lawful permanent resident at the
9      time of the child's birth; and,

10      all children residing in Washington State who are born in the United
    States on or after February 19, 2025, where neither of their parents is a
11      U.S. citizen or lawful permanent resident at the time of the child's birth.

12

13       142.    The proposed class meets the numerosity requirements of Federal Rule of Civil

14  Procedure 23(a)(1). The class is so numerous that joinder of all members is impracticable. The

15  precise number of class members will be determined by how Defendants define and implement

16  the key terms of the Citizenship Stripping Order. However, in 2021, Washington State estimated

17  that there were over 300,000 undocumented noncitizens in the state.[13] Even a conservative

18  estimate thus suggests that thousands of people, and perhaps many more, will be born this year

19  alone in the state that will now be considered noncitizens.[14] Additionally, as described above, in

20  2022 there were approximately 4,000 births in Washington State to parents who were

21  undocumented.

22

23

24      [13] *See* Wei Yen, *Washington state's immigrant population: 2010-21*, Office of Financial Management, 2
(May 2023), *available at* https://ofm.wa.gov/sites/default/files/public/dataresearch/researchbriefs/brief110.pdf

25  (attached as Ex. I).
    [14] Washington State Dep't of Health, *All Births Dashboard*, https://doh.wa.gov/data-and-statistical-

26  reports/washington-tracking-network-wtn/county-all-births-dashboard (last accessed Jan. 23, 2025) (reflecting a
fertility rate of 53.5 births per 1,000 women aged 15–44 in 2022 in Washington) (attached as Ex. J).

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

35

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Supp.Add.037

143.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). The members of the class are all subject or will be subject to the Citizenship Stripping Order divesting them or their soon-to-be or future children of U.S. citizenship. The lawsuit raises questions of law common to members of the proposed class, including whether the Order violates the Fourteenth Amendment.

144.    The proposed class meets the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because the claims of the representative Individual Plaintiffs are typical of the class. Individual Plaintiffs and the proposed class share the same legal claims, which assert the same claim under the Fourteenth Amendment, federal law, and the APA. All involve families where a child will be born in the United States where neither parent is a U.S. citizen or lawful permanent resident.

145.    The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). The representative Individual Plaintiffs seek the same final relief as the other members of the class—namely, an injunction that enjoins the President and federal agencies and personnel from enforcing the Order, a declaration clarifying the citizenship status of the children born in the United States targeted by the Citizenship Stripping Order, and appropriate relief under the APA. Individual Plaintiffs will fairly and adequately protect the interests of the proposed class members because they seek relief on behalf of the class as a whole and have no interest antagonistic to other class members.

146.    Individual Plaintiffs are represented by competent counsel with extensive experience in complex class actions and immigration law.

147.    The proposed class also satisfies Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class, thereby making final injunctive, declaratory, and APA relief appropriate.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

36

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.038

## VI.    FIRST CAUSE OF ACTION
### (Fourteenth Amendment – Citizenship Clause)

148.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

149.    The Fourteenth Amendment declares: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."

150.    Section 1 of the Citizenship Stripping Order declares that U.S. citizenship does not automatically extend to individuals born in the United States when (1) the individual's mother is "unlawfully present in the United States" and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."

151.    Section 2 of the Citizenship Stripping Order states that Defendants will not issue documents recognizing U.S. citizenship to those individuals, nor accept documents issued by State, local, or other governments recognizing U.S. citizenship of those individuals.

152.    Section 3 of the Citizenship Stripping Order requires Defendants to "take all appropriate measures to ensure" that Defendant agencies do not recognize the citizenship of certain U.S. citizens.

153.    The Citizenship Stripping Order expressly violates the Fourteenth Amendment's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

154.    The President has no authority to override or ignore the Fourteenth Amendment's Citizenship Clause or otherwise amend the Constitution, and therefore lacks authority to strip individuals of their right to citizenship.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

37

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.039

155.   The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

156.   The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

## VII.   SECOND CAUSE OF ACTION
### (Immigration and Nationality Act – 8 U.S.C. § 1401)

157.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

158.   Section 1401 of the Immigration and Nationality Act states that "a person born in the United States, and subject to the jurisdiction thereof" "shall be [a] national[] and citizen[] of the United States at birth." 8 U.S.C. § 1401(a).

159.   Section 1 of the Citizenship Stripping Order declares that U.S. citizenship does not automatically extend to individuals born in the United States when (1) the individual's mother is "unlawfully present in the United States" and the father "was not a citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth."

160.   Section 2 of the Citizenship Stripping Order states that Defendants will not issue documents recognizing U.S. citizenship to those individuals, nor accept documents issued by State, local, or other governments recognizing U.S. citizenship of those individuals.

161.   Section 3 of the Citizenship Stripping Order requires Defendants to "take all appropriate measures to ensure" that Defendant agencies do not recognize the citizenship of certain U.S. citizens.

162.   The Citizenship Stripping Order expressly violates Section 1401's guarantee of birthright citizenship to all individuals born in the United States and subject to the jurisdiction thereof.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

38

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.040

163.    The President has no authority to override Section 1401's statutory guarantee of citizenship, and therefore lacks any authority to unilaterally strip individuals of their right to citizenship.

164.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

165.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

## VIII.   THIRD CAUSE OF ACTION
### (Administrative Procedure Act – 5 U.S.C. § 706)

166.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-139.

167.    The actions of Defendants that are required or permitted by the Citizenship Stripping Order, as set forth above, are contrary to constitutional right, power, privilege, or immunity, including rights protected by the Fourteenth Amendment to the U.S. Constitution, in violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(B).

168.    The actions of Defendants that are required or permitted by the Citizenship Stripping Order, as set forth above, violate 8 U.S.C. § 1401 *et seq*., and are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(C).

169.    The Citizenship Stripping Order will cause harm to Washington, Arizona, Illinois, Oregon, and the residents of each Plaintiff State.

170.    The Citizenship Stripping Order will cause harm to the Individual Plaintiffs and proposed class members.

171.    Accordingly, Plaintiffs request that the Court set aside any and all agency action that implements the Citizenship Stripping Order.

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

39

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.041

## IX.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.     Declare that the Citizenship Stripping Order is contrary to the Constitution and laws of the United States;

b.     Certify the case as a class action as proposed by Individual Plaintiffs herein and in the previously filed motion for class certification, ECF No. 58;

c.     Preliminarily and permanently enjoin Defendants from implementing or enforcing the Citizenship Stripping Order, pending further orders from this Court;

d.     Declare that Individual Plaintiffs' children born on or after the implementation date of the Citizenship Stripping Order and others similarly situated are U.S. citizens, notwithstanding the terms of the Order;

e.     Award Individual Plaintiffs costs and reasonable attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.     Award such additional relief as the interests of justice may require.

DATED this 4th day of February 2025.

NICHOLAS W. BROWN
Attorney General

*s/ Lane M. Polozola*
COLLEEN M. MELODY, WSBA #42275
Civil Rights Division Chief
LANE POLOZOLA, WSBA #50138
DANIEL J. JEON, WSBA #58087
ALYSON DIMMITT GNAM, WSBA #48143
Assistant Attorneys General
Wing Luke Civil Rights Division
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

40

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

*Attorneys for Plaintiff State of Washington*

2

KRIS MAYES
*Attorney General of Arizona*

3

4

*s/ Joshua Bendor*
Joshua D. Bendor (AZ No. 031908)*

5

Luci D. Davis (AZ No. 035347)*
Gabriela Monico Nunez (AZ No. 039652)*

6

Office of the Arizona Attorney General
Firm State Bar No. 14000

7

2005 N. Central Ave.
Phoenix, AZ 85004

8

(602) 542-3333
Joshua.Bendor@azag.gov

9

Luci.Davis@azag.gov
Gabriela.MonicoNunez@azag.gov

10

ACL@azag.gov

11

*Pro hac vice
*Attorneys for Plaintiff State of Arizona*

12

13

KWAME RAOUL
*Attorney General, State of Illinois*

14

*s/ Rebekah Newman*
REBEKAH NEWMAN, ARDC #6327372*

15

Assistant Attorney General
Special Litigation Bureau

16

Office of the Illinois Attorney General
115 South LaSalle St., Floor 35

17

Chicago, IL 60603
Tel. (773) 590-6961

18

rebekah.newman@ilag.gov

19

*Pro hac vice
*Attorneys for Plaintiff State of Illinois*

20

21

DAN RAYFIELD
*Attorney General, State of Oregon*

22

*/s/ Carla A. Scott*
CARLA A. SCOTT, WSBA #39947

23

THOMAS H. CASTELLI, OSB #226448*
Senior Assistant Attorneys General

24

Oregon Department of Justice
100 SW Market Street

25

Portland, OR 97201
(971) 673-1880

26

Carla.A.Scott@doj.oregon.gov

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

41

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
**Supp.Add.043**

1    Thomas.Castelli@doj.oregon.gov

2    *Pro hac vice*
     *Attorneys for Plaintiff State of Oregon*
3
     NORTHWEST IMMIGRANT
4    RIGHTS PROJECT

5    *s/ Matt Adams*
     Matt Adams, WSBA #28287
6    matt@nwirp.org

7    *s/ Leila Kang*
     Leila Kang, WSBA #48048
8    leila@nwirp.org

9    *s/ Glenda M. Aldana Madrid*
     Glenda M. Aldana Madrid, WSBA #46987
10   glenda@nwirp.org

11   *s/ Aaron Korthuis*
     Aaron Korthuis, WSBA #53974
12   aaron@nwirp.org

13   NORTHWEST IMMIGRANT
     RIGHTS PROJECT
14   614 Second Avenue, Suite 400
     Seattle, WA 98104
15   (206) 957-8611

16   *Attorneys for Individual Plaintiffs and Proposed*
     *Class Members*
17

18

19

20

21

22

23

24

25

26

CONSOLIDATED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF – CLASS ACTION –
No. 2:25-cv-00127-JCC

42

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.044

# EXHIBIT A

Menu                                                          Search



PRESIDENTIAL ACTIONS

# PROTECTING THE MEANING AND VALUE OF AMERICAN CITIZENSHIP

EXECUTIVE ORDER

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  The privilege of United States citizenship is a priceless and profound gift.  The Fourteenth Amendment states:  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which

misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race. But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States.  The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof."  Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text. Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States:  (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Sec. 2.  Policy.  (a)  It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons:  (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the

person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b)  Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c)  Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

Sec. 3.  Enforcement.  (a)  The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b)  The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

Sec. 4.  Definitions.  As used in this order:

(a)  "Mother" means the immediate female biological progenitor.

(b)  "Father" means the immediate male biological progenitor.

Sec. 5.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against

the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

   January 20, 2025.

News

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW
Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

Supp.Add.050

# EXHIBIT B

UNCLASSIFIED (U)

# 8 FAM 300
# U.S. CITIZENSHIP AND NATIONALITY

# 8 FAM 301
# U.S. CITIZENSHIP

## 8 FAM 301.1
## ACQUISITION BY BIRTH IN THE UNITED STATES

*(CT:CITZ-50;  01-21-2021)*
*(Office of Origin:  CA/PPT/S/A)*

## 8 FAM 301.1-1  INTRODUCTION

*(CT:CITZ-50;  01-21-2021)*

a. U.S. citizenship may be acquired either at birth or through naturalization subsequent to birth.  U.S. laws governing the acquisition of citizenship at birth embody two legal principles:

    (1) Jus soli (the law of the soil) - a rule of common law under which the place of a person's birth determines citizenship.  In addition to common law, this principle is embodied in the 14th Amendment to the U.S. Constitution and the various U.S. citizenship and nationality statutes; and

    (2) Jus sanguinis (the law of the bloodline) - a concept of Roman or civil law under which a person's citizenship is determined by the citizenship of one or both parents.  This rule, frequently called "citizenship by descent" or "derivative citizenship", is not embodied in the U.S. Constitution, but such citizenship is granted through statute.  As U.S. laws have changed, the requirements for conferring and retaining derivative citizenship have also changed.

b. National vs. citizen:  While most people and countries use the terms "citizenship" and "nationality" interchangeably, U.S. law differentiates between the two.  Under current law all U.S. citizens are also U.S. nationals, but not all

U.S. nationals are U.S. citizens.  The term "national of the United States", as defined by statute (INA 101 (a)(22) (8 U.S.C. 1101(a)(22)) includes all citizens of the United States, and other persons who owe allegiance to the United States but who have not been granted the privilege of citizenship:

(1) Nationals of the United States who are not citizens owe allegiance to the United States and are entitled to the consular protection of the United States when abroad, and to U.S. documentation, such as U.S. passports with appropriate endorsements.  They are not entitled to voting representation in Congress and, under most state laws, are not entitled to vote in Federal, State, or local elections except in their place of birth.  (See 7 FAM 012 and 7 FAM 1300 Appendix B Endorsement 09.);

(2) Historically, Congress, through statutes, granted U.S. non-citizen nationality to persons born or inhabiting territory acquired by the United States through conquest or treaty.  At one time or other natives and certain other residents of Puerto Rico, the U.S. Virgin Islands, the Philippines, Guam, and the Panama Canal Zone **were** U.S. non-citizen nationals.  (See 7 FAM 1120 and 7 FAM 1100 Appendix P.);

(3) Under current law, only persons born in American Samoa and Swains Island are U.S. non-citizen nationals (INA 101(a)(29) (8 U.S.C. 1101(a)(29) and INA 308(1) (8 U.S.C. 1408)).  (See 7 FAM 1125.); and

(4) See 7 FAM 1126 regarding the citizenship/nationality status of persons born on the Commonwealth of the Northern Mariana Islands (CNMI).

c. Naturalization – Acquisition of U.S. Citizenship Subsequent to Birth:  Naturalization is "the conferring of nationality of a State upon a person after birth, by any means whatsoever" (INA 101(a)(23) (8 U.S.C. 1101(a)(23)) or conferring of citizenship upon a person (see INA 310, 8 U.S.C. 1421 and INA 311, 8 U.S.C. 1422).  Naturalization can be granted automatically or pursuant to an application.  (See 7 FAM 1140.)

d. "Subject to the Jurisdiction of the United States":  All children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth:

(1) The U.S. Supreme Court examined at length the theories and legal precedents on which the U.S. citizenship laws are based in U.S. v. Wong Kim Ark, 169 U.S. 649 (1898).  In particular, the Court discussed the types of persons who are subject to U.S. jurisdiction.  The Court affirmed that a child born in the United States to Chinese parents acquired U.S. citizenship even though the parents were, at the time, racially ineligible for naturalization;

(2) The Court also concluded that:  "The 14th Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on

foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes.  The Amendment, in clear words and in manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States."  Pursuant to this ruling:

(a)  Acquisition of U.S. citizenship generally is not affected by the fact that the parents may be in the United States temporarily or illegally; and that; and

(b)  A child born in an immigration detention center physically located in the United States is considered to have been born in the United States and be subject to its jurisdiction.  This is so even if the child's parents have not been legally admitted to the United States and, for immigration purposes, may be viewed as not being in the United States.

# 8 FAM 301.1-2  WHAT IS BIRTH "IN THE UNITED STATES"?

*(CT:CITZ-45;   12-09-2020)*

a. INA 101(a)(38) (8 U.S.C. 1101 (a)(38)) provides that "the term 'United States,' when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States."

b. On November 3, 1986, Public Law 94-241, "approving the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America", (Section 506(c)),took effect.  From that point on, the Northern Mariana Islands have been treated as part of the United States for the purposes of INA 301 (8 U.S.C. 1401) and INA 308 (8 U.S.C. 1408) (see 8 FAM 302.1)

c. The Nationality Act of 1940 (NA), Section 101(d) (54 Statutes at Large 1172) (effective January 13, 1941 until December 23, 1952) provided that "the term 'United States' when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, and the Virgin Islands of the United States."  The 1940 Act did not include Guam or the Northern Mariana Islands as coming within the definition of "United States."

> See the text of the 1940 Act on the Intranet, Acquisition of Citizenship, Legal and Regulatory Documents.

d. Prior to January 13, 1941, there was no statutory definition of "the United States" for citizenship purposes.  The phrase "in the United States" as used in Section 1993 of the Revised Statues of 1878 clearly includes states that have been admitted to the Union (see 8 FAM 102.2).

e. INA 304 (8 U.S.C. 1404) and INA 305 (8 U.S.C. 1405) provide a basis for citizenship of persons born in Alaska and Hawaii, respectively, while they were territories of the United States.

# 8 FAM 301.1-3  NOT INCLUDED IN THE MEANING OF "IN THE UNITED STATES"

*(CT:CITZ-1;   06-27-2018)*

a. Birth on U.S. Registered Vessel On High Seas or in the Exclusive Economic Zone:  A U.S.-registered or documented ship on the high seas or in the exclusive economic zone is not considered to be part of the United States. Under the law of the sea, an Exclusive Economic Zone (EEZ) is a maritime zone over which a State has special rights over the exploration and use of natural resources.  The EEZ extends up to 200 nautical miles from the coastal baseline.  A child born on such a vessel does not acquire U.S. citizenship by reason of the place of birth (Lam Mow v. Nagle, 24 F.2d 316 (9th Cir., 1928)).

> **NOTE**:  This concept of allotting nations EEZs to give better control of maritime affairs outside territorial limits gained acceptance in the late 20th century and was given binding international recognition by the United Nations Convention on the Law of the Sea (UNCLOS) in 1982.
>
> Part V, Article 55 of the Convention states:
>
> Specific legal regime of the EEZ:
>
> The EEZ is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this convention.

b. A U.S.-registered aircraft outside U.S. airspace is not considered to be part of U.S. territory.  A child born on such an aircraft outside U.S. airspace does not acquire U.S. citizenship by reason of the place of birth.

> **NOTE**:  The United States of America is not a party to the U.N. Convention on Reduction of Statelessness (1961).  Article 3 of the Convention does not apply to the United States.  Article 3 provides
>
> > "For the purpose of determining the obligations of Contracting States under this Convention, birth on a ship or in an aircraft shall be deemed to have taken place in the territory of the State whose flag the ship flies or in the territory of the State in which the aircraft is registered, as the case may be."
>
> This is a frequently asked question.

c. Birth on U.S. military base outside of the United States or birth on U.S. embassy or consulate premises abroad:

  (1)  Despite widespread popular belief, U.S. military installations abroad and U.S. diplomatic or consular facilities abroad are not part of the United

States within the meaning of the 14th Amendment.  A child born on the premises of such a facility is not born in the United States and does not acquire U.S. citizenship by reason of birth;

(2)  The status of diplomatic and consular premises arises from the rules of law relating to immunity from the prescriptive and enforcement jurisdiction of the receiving State; the premises are not part of the territory of the United States of America.  (See Restatement (Third) of Foreign Relations Law, Vol. 1, Sec. 466, Comment a and c (1987).  See also, Persinger v. Iran, 729 F.2d 835 (D.C. Cir. 1984).

d. Birth on foreign ships in foreign government non-commercial service:

(1)  A child born on a foreign merchant ship or privately owned vessel in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.  (See U.S. v. Wong Kim Ark.); and

(2)  Foreign warships, naval auxiliaries, and other vessels or aircraft owned or operated by a State and used for governmental non-commercial service are not subject to jurisdiction of the United States.  Persons born on such vessels while in U.S. internal waters (or, of course, anywhere else) do not acquire U.S. citizenship by virtue of place of birth.

e. Alien enemies during hostile occupation:

(1)  If part of the United States were occupied by foreign armed forces against the wishes of the United States, children born to enemy aliens in the occupied areas would not be subject to U.S. jurisdiction and would not acquire U.S. citizenship at birth; and

(2)  Children born to persons other than enemy aliens in an area temporarily occupied by hostile forces would acquire U.S. citizenship at birth because sovereignty would not have been transferred to the other country.  (See U.S. v. Wong Kim Ark.)

# 8 FAM 301.1-4  BIRTH IN U.S. INTERNAL WATERS AND TERRITORIAL SEA

*(CT:CITZ-50;  01-21-2021)*

a. Persons born on ships located within U.S. internal waters (except as provided in 8 FAM 301.1-3) are considered to have been born in the United States.  Such persons will acquire U.S. citizenship at birth if they are subject to the jurisdiction of the United States.  Internal waters include the ports, harbors, bays, and other enclosed areas of the sea along the U.S. coast.  As noted above, a child born on a foreign merchant ship or privately owned vessel in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.  (See U.S. v. Wong Kim Ark.)

b. Twelve Nautical Mile Limit:  The territorial sea of the United States was formerly three nautical miles.  (See, e.g., Cunard S.S. Co. v Mellon, 262 U.S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894 (1923).)  However, the three-mile rule

was changed by a Presidential Proclamation in 1988, implementing the territorial-sea provision of the 1982 U.N. Convention on the Law of the Sea. (Presidential Proclamation 5928, signed December 27, 1988, published at 54 Federal Register 777, January 9, 1989.)  As decreed by that Proclamation, the territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.  (The Proclamation also stated that the jurisdiction of the United States extends to the airspace over the territorial sea.)  (See Gordon, Immigration Law and Procedure, Part 8 Nationality and Citizenship, 92.03(2)(b) territorial limits.)

c.  FAM guidance up until 1995 (7 FAM 1116.1-2  In U.S. Waters TL:CON-64; 11-30-95) advised that persons born within the 3-mile limit of the U.S. territorial sea were born "within the United States" and could be documented as U.S. citizens if they were also born subject to U.S. jurisdiction.  Some commentators took this view as well, such as Gordon.  Analysis of this issue undertaken in 1994-1995 revealed, however, that there is a substantial legal question whether persons born outside the internal waters of the United States but within the territorial sea are in fact born "within the United States" for purposes of the 14th Amendment and the INA.

d. Cases involving persons born outside the internal waters but within the U.S. territorial sea, must be referred to AskPPTAdjudication@state.gov for coordination with L/CA, L/OES, and other appropriate offices within the United States government.

*NOTE: This is not a public-facing e-mail address and public inquiries will not be replied to.*

# 8 FAM 301.1-5  WHAT IS BIRTH IN U.S. AIRSPACE?

*(CT:CITZ-45;  12-09-2020)*

a. Under international law, the limits of a country's sovereign airspace correspond with the extent of its territorial sea.  The outer limit of the territorial sea of the United States is 12 nautical miles from the coastline.  Airspace above the land territory, internal waters, and territorial sea is considered to be part of the United States (Presidential Proclamation 5928, signed December 27, 1988, published at 54 Federal Register 777, January 9, 1989).

b. Comments on the applicability of the 14th Amendment to vessels and planes, are found in Gordon, Immigration Law and Procedure, Part 8, Nationality and Citizenship, Chapter 92, 92.03 (New York:  Matthew Bender, 2007).  This volume states:

"The rules applicable to vessels obviously apply equally to airplanes.  Thus a child born on a plane in the United States or flying over its territory would acquire United States citizenship at birth."

c.  Under the 1944 Convention on International Civil Aviation, articles 17–21, all aircraft have the nationality of the State in which they are registered, and may not have multiple nationalities.  For births, the nationality law of the aircraft's "nationality" may be applicable, and for births that occur in flight while the aircraft is not within the territory or airspace of any State, it is the only applicable law that may be pertinent regarding acquisition of citizenship by place of birth.  However, if the aircraft is in, or flying over the territory of another State, that State may also have concurrent jurisdiction.

d.  Cases of citizenship of persons born on planes in airspace above the United States land territory or internal waters may be adjudicated by passport specialists at domestic passport agencies and centers or consular officers at posts abroad in accordance with 8 FAM 301.1-6.

e.  Cases of persons born on planes in airspace outside the 12 nautical mile limit would be adjudicated as a birth abroad under INA 301 (8 U.S.C. 1401) or INA 309 (8 U.S.C. 1409) as made applicable by INA 301(g).

f.  Cases of persons born on a plane in airspace above the U.S. territorial sea (12 nautical mile limit) must be referred to AskPPTAdjudication@state.gov for consultation with L/CA.

# 8 FAM 301.1-6  DOCUMENTING BIRTH IN U.S. WATERS AND U.S. AIRSPACE

*(CT:CITZ-1;   06-27-2018)*

a. Proof of birth in U.S. internal waters or U.S. airspace consists of a U.S. birth certificate certified by the issuing authority in the U.S. jurisdiction.

b. There is no U.S. Federal law governing the report of such births.

c.  Generally speaking, U.S. Customs and Border Protection (CBP) would require some documentation of the birth, generally an excerpt of the ship's/aircraft's medical log or master/captain's log, reflecting the time, latitude, and longitude when the birth occurred.

d. For ships/aircraft in-bound for the United States, the parents would then be responsible for reporting the birth to the civil authorities in the U.S. jurisdiction where the vessel put into port.  (See the Centers for Disease Control and Prevention (CDC) publication "Where to Write for Birth Certificates.")

(1)  The parents will have to contact the state vital records office to determine the exact procedures for report such a birth;

(2)  Parents should obtain a certified copy of the ship's medical log, airplane's log, or other statement from the attending physician or other attendant and attempt to obtain information on how to contact attendants in the future should further questions arise;

(3) If the mother and child were immediately taken to a U.S. hospital, authorities there may be of assistance in facilitating contact with the appropriate state authorities; and

(4) It is unlikely that the vital records office in the parents' state of residence will issue such a birth certificate.  Parents may be redirected to the vital records office in the state where the ship first put into port after the birth of the child.

# 8 FAM 301.1-7  NATIVE AMERICANS AND ESKIMOS

*(CT:CITZ-1;   06-27-2018)*

a. Before U.S. v. Wong Kim Ark, the only occasion on which the Supreme Court had considered the meaning of the 14th Amendment's phrase "subject to the jurisdiction" of the United States was in Elk v. Wilkins, 112 U.S. 94 (1884).  That case hinged on whether a Native American who severed ties with the tribe and lived among whites was a U.S. citizen and entitled to vote.  The Court held that the plaintiff had been born subject to tribal rather than U.S. jurisdiction and could not become a U.S. citizen merely by leaving the tribe and moving within the jurisdiction of the United States.  The Court stated that:  "The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal through treaties or acts of Congress.  They were never deemed citizens of the United States except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens upon application for naturalization."

b. The Act of June 2, 1924 was the first comprehensive law relating to the citizenship of Native Americans.  It provided:  That all non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States:  Provided, That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property.

c. Section 201(b) NA, effective January 13, 1941, declared that persons born in the United States to members of an Indian, Eskimo, Aleutian, or other aboriginal tribe were nationals and citizens of the United States at birth.

d. INA 301(b) (8 U.S.C. 1401(b)) (formerly INA 301(a)(2)), in effect from December 24, 1952, restates this provision.

# 8 FAM 301.1-8  FOUNDLINGS

*(CT:CITZ-1;  06-27-2018)*

a. Under INA 301(f) (8 U.S.C. 1401(f)) (formerly Section 301(a)(6)) INA), a child of unknown parents is conclusively presumed to be a U.S. citizen if found in the United States when under 5 years of age, unless foreign birth is established before the child reaches age 21.

b. Under Section 201(f) of the Nationality Act of 1940, a child of unknown parents, found in the United States, was presumed to have been a U.S. citizen at birth until shown not to have been born in the United States no matter at what age this might have been demonstrated.

**UNCLASSIFIED (U)**

# EXHIBIT C

OMB Control No. 1405-0004
Expiration Date: 04-30-2025
Estimated Burden: 85 Minutes

# APPLICATION FOR A U.S. PASSPORT

**Please read all instructions first and type or print in black ink to complete this form.**
For information or questions, visit travel.state.gov or contact the National Passport Information Center (NPIC) at
1-877-487-2778  (TDD/TTY: 1-888-874-7793) or NPIC@state.gov.

## SECTION A. ELIGIBILITY TO USE THIS FORM

This form is used to apply for a U.S. passport book and/or card **in person** at an acceptance facility, a passport agency (by appointment only), or a U.S. embassy, consulate, or consular agency (if abroad). The U.S. passport is a travel document attesting to one's identity and issued to U.S. citizens or non-citizen U.S. nationals. To be eligible to use this form you must **apply in person** if at least one of the following is true:

✓ I am applying for my first U.S. passport
✓ I am under age 16

✓ My previous U.S. passport was either: a) issued under age 16;
b) issued more than 15 years ago; c) lost, stolen, or damaged

**If none of the above statements apply to you, then you may be eligible to apply using form DS-82 or DS-5504 depending on your circumstances. Visit travel.state.gov for more information.**

- **Notice to Applicants Under Age 16:** You must appear in person to apply for a U.S. passport with your parent(s) or legal guardian(s). See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants Ages 16 and 17:** At least one of your parent(s) or legal guardian(s) must know that you are applying for a U.S. passport. See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants for No-Fee Regular, Service, Official, or Diplomatic Passports:** You may use this application if you meet all provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency and forwarded to you.

## SECTION B. STEPS TO APPLY FOR A U.S. PASSPORT

1. Complete this form (Do not sign until requested to do so by an authorized agent).
2. Attach one color photograph 2x2 inches in size and supporting documents (See Section D of these instructions).
3. Schedule appointment to apply in person by visiting our website or calling NPIC (see contact info at the top page).
4. Arrive for appointment and present completed form and attachments to the authorized agent who will administer the oath, witness you signing your form, and collect your passport fee.
5. Track application status online at Passportstatus.state.gov.
6. Receive new passport and original supporting documents (that you submitted with your application).

## SECTION C. HOW TO COMPLETE THIS FORM

Please see the instructions below for items on the form that are not self-explanatory. The numbers match the numbered items of the form.

1. **Name (Last, First, Middle)**: Enter the name to appear in the passport. The name to appear in the passport should be consistent with your proof of citizenship and identification. If you have changed your name and are not eligible to use a DS-82 or DS-5504, you must use this form. Visit travel.state.gov/namechange for more information.

2. **Date of Birth**: Use the following format: Month, Date, and Year (MM/DD/YYYY).

3. **Gender**: The gender markers used are "M" (male), "F" (female) and "X" (unspecified or another gender identity). The gender marker that you check on this form will appear in your passport regardless of the gender marker(s) on your previous passport and/or your supporting evidence of citizenship and identity. If changing your gender marker from what was printed on your previous passport, select "Yes" in this field on Application Page 1. If no gender marker is selected, we may print the gender as listed on your supporting evidence or contact you for more information. **Please Note**: We cannot guarantee that other countries you visit or travel through will recognize the gender marker on your passport. Visit travel.state.gov/gender for more information.

4. **Place of Birth**: Enter the name of the city and state if in the U.S. or city and country as presently known.

5. **Social Security Number**: You must provide a Social Security number (SSN), if you have been issued one, in accordance with Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f). If you do not have a Social Security number, you must enter zeros in this field and submit a statement, signed, and dated, that includes the phrase, ("*I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:  I have never been issued a Social Security Number by the Social Security Administration.*" If you reside abroad, you must also provide the name of the foreign country where you reside. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury which will use it in connection with debt collection and check against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses. If you fail to provide the information, we may deny your application and the Internal Revenue Service (IRS) may enforce a penalty. Refer all questions on this matter to the nearest IRS office.

| | |
|---|---|
| 6. **Email:** By providing your email you are consenting to us communicating with you by email about your application. | 7. **Primary Contact Phone Number:** If providing a mobile/cell phone number you are consenting to receive calls and/or text messaging about your application. |

8. **Mailing Address Line 1 and 2 "In Care Of"**: For line 1 enter applicant's Street/RFD #, *or* P.O. Box *or* URB. For line 2, if you do not live at the address listed in this field, put the name of the person who lives at this address and mark it "In Care Of". **If the applicant is a minor child, you must include the "In Care Of" name of the parent or adult registered to receive mail at this address.**

9. **List all other names you have used:** Enter all legal names previously used to include maiden name, name changes, and previous married names. You can enter up to two names one in item A and one in item B. If only your last name has changed just enter your last name. If you need more space to write additional names, please use a separate sheet of paper and attach it to this form.

⚠ **Blue Section Application Page 1 - Identifying Documents and Signature Blocks: Skip this section and complete Application Page 2. Do not sign this form until requested to do so by the authorized agent who will administer the oath to you.**

U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

| SECTION D. ATTACHMENTS TO SUBMIT WITH THIS FORM |
|---|
| Once you have completed Application Pages 1 and 2, attach the supporting documents as outlined in this section. |

1. **PROOF OF U.S. CITIZENSHIP** Information can be found on travel.state.gov/citizenship.

### Applicants Born in the United States

Your evidence will be returned to you if it is not damaged, altered, or forged. Submit an original or certified copy and a photocopy of the front and back if there is printed information on the back, of one of the following documents:

- U.S. Birth Certificate that meets all the following requirements:
  - o Issued by the city, county, or state of birth
  - o Lists your full name, birthdate, and birthplace
  - o Lists your parent(s)' full names
  - o Lists date filed with registrar's office (must be within one year of birth)
  - o Shows registrar's signature and the seal of the issuing authority
- Fully valid, undamaged U.S. passport (may be expired)
- Consular Report of Birth Abroad or Certification of Birth Abroad
- Certificate of Naturalization or Citizenship

- Secondary documents may be submitted if the U.S. birth certificate was filed more than one year after your birth **or** if no birth record exists. For no birth record on file, submit a registrar's letter to that effect. For both scenarios, submit a combination of the evidence listed below, with your first and last name, birthdate and/or birthplace, the seal or other certification of the office (if customary), and the signature of the issuing official.
  - o A hospital birth record
  - o An early baptismal or circumcision certificate
  - o Early census, school, medical, or family Bible records
  - o Insurance files or published birth announcements (such as a newspaper article)
  - o Notarized affidavits (or DS-10, Birth Affidavit) of older blood relatives having knowledge of your birth may be submitted in addition to some of the records listed above.

### Applicants Born Outside the United States

If we determine that you are a U.S. citizen, your lawful permanent resident card submitted with this application will be forwarded to U.S. Citizenship and Immigration Services.

- Claiming Citizenship through Naturalization of One or Both Parent(s), submit all the following:
  - o Your parent(s) Certificate(s) of Naturalization
  - o Your parents' marriage certificate and/or evidence that you were in the legal and physical custody of your U.S. citizen parent, if applicable
  - o Your foreign birth certificate (and official translation if the document is not in English)
  - o Your evidence of admission to the United States for legal permanent residence and proof you subsequently resided in the United States

- Claiming Citizenship through Birth Abroad to At Least One U.S. Citizen Parent, submit all the following:
  - o Your Consular Report of Birth Abroad (Form FS-240), Certification of Birth (Form DS-1350 or FS-545), or your foreign birth certificate (and official translation if the document is not in English)
  - o Your parent's proof of U.S. citizenship
  - o Your parents' marriage certificate
  - o Affidavit showing all your U.S. citizen parents' periods and places of residence and physical presence before your birth (DS-5507)

- Claiming Citizenship Through Adoption by a U.S. Citizen Parent(s), if your birthdate is on or after October 5, 1978, submit evidence of all the following:
  - o Your permanent residence status
  - o Your full and final adoption
  - o You were in the legal and physical custody of your U.S. citizen parent(s)
  - o You have resided in the United States

2. **PROOF OF IDENTITY** Information can be found at travel.state.gov/identification.

Present your original identification and submit a front and back photocopy with this form. It must show a photograph that is a good likeness of you. Examples include:

- Driver's license (not temporary or learner's permit)
- Previous or current U.S. passport book/card
- Military identification
- Federal, state, or city government employee identification
- Certificate of Naturalization or Citizenship

3. **A RECENT COLOR PHOTOGRAPH** See the full list of photo requirements on travel.state.gov/photos.

Attach one photo, 2x2 inches in size. U.S. passport photo requirements may differ from photo requirements of other countries. To avoid processing delays, be sure your photo meets all the following requirements (Refer to the photo template on Application Page 1):

- Taken less than six months ago
- Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
- Head must face the camera directly with full face in view
- No eyeglasses and head covering and no uniforms*
- Printed on matte or glossy photo quality paper
- Use a plain white or off-white background

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery). Photos are to be taken in clothing normally worn on a daily basis. You cannot wear a uniform, clothing that looks like a uniform, or camouflage attire.

# APPLICATION FOR A U.S. PASSPORT

**4. PROOF OF PARENTAL RELATIONSHIP** *(FOR APPLICANTS UNDER AGE 16)*

Parents/guardians must appear in person with the child and submit the following:

- Evidence of the child's relationship to parents/guardian(s) (Example: a birth certificate or Consular Report of Birth Abroad listing the names of the parent(s)/guardian(s) and child)
- Original parental/guardian government-issued photo identification and a photocopy of the front and back (to satisfy proof of identity)

If only one parent/guardian can appear in person with the child, you must also submit one of the following:

- The second parent's notarized written statement or DS-3053 (including the child's full name and date of birth) consenting to the passport issuance for the child. The notarized statement <u>cannot</u> be more than three months old, <u>must</u> be signed and notarized on the same day, and <u>must</u> come with a front and back photocopy of the second parent's government-issued photo identification.
- The second parent's death certificate (if second parent is deceased)
- Evidence of sole authority to apply (Example: a court order granting sole legal custody or a birth certificate listing only one parent)
- A written statement (made under penalty of perjury) or DS-5525 explaining, in detail, why the second parent cannot be reached

***OR***

**PROOF OF PARENTAL AWARENESS** *(FOR APPLICANTS AGES 16 AND 17)*

We may request the consent of one legal parent/legal guardian to issue a U.S. passport to you. In many cases, the passport authorizing officer may be able to ascertain parental awareness of the application by virtue of the parent's presence when the minor submits the application or a signed note from the parent or proof the parent is paying the application fees. However, the passport authorizing officer retains discretion to request the legal parent's/legal guardian's notarized statement of consent to issuance (e.g., on Form DS-3053).

**5. FEES**    Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56) and are collected at the time you apply for the passport service. By law, the passport fees are **non-refundable**. Visit travel.state.gov/passportfees for current fees and how fees are used and processed. Payment methods are as follows:

| Applicant Applying in the United States<br>At Acceptance Facility | Applicant Applying at a Passport Agency or<br>Outside the United States |
|---|---|
| • Passport fees must be made by check (personal, certified, cashier's, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State."<br><br>• The execution fee **must be paid separately** and made payable to the acceptance facility in the form that they accept. | • We accept checks (personal, certified, cashier's, travelers); major credit cards (Visa, Master Card, American Express, Discover); money orders (U.S. Postal, international, currency exchange); or exact cash (no change provided). Make all fees payable to the "U.S. Department of State."<br><br>• <u>If applying outside the United States</u>: Please see the website of your embassy, consulate, or consular agency for acceptable payment methods. |

**Other Services Requiring Additional Fee** (Visit travel.state.gov for more details)**:**

- **Expedite Service:** Only available for passports mailed in the United States and Canada.
- **1-2 Day Delivery:** Only available for passport book (and not passport card) mailings in the United States.
- **Verification of a previous U.S. Passport or Consular Report of Birth Abroad:** Upon your request, we verify previously issued U.S. passport or Consular Report of Birth Abroad if you are unable to submit evidence of U.S. citizenship.
- **Special Issuance Passports:** If you apply for a no-fee regular, service, official, or diplomatic passport at a designated acceptance facility, you must pay the execution fee. No other fees are charged when you apply.

## SECTION E. HOW TO SUBMIT THIS FORM

Submitting your form depends on your location and how soon you need your passport.

- **Applicant Located Inside the United States:** For the latest information regarding processing times, scheduling appointments, and nearest designated acceptance facilities visit travel.state.gov or contact NPIC.

- **Applicant Located Outside the United States:** In most countries, you must apply in person at a U.S. embassy or consulate for all passport services. Each U.S. embassy and consulate has different procedures for submitting and processing your application. Visit travel.state.gov to check the U.S. embassy or consulate webpage for more information.

## SECTION F. RECEIVING YOUR PASSPORT AND SUPPORTING DOCUMENTS

- **Difference Between U.S. Passport Book and Card:** The book is valid for international travel by air, land, and sea. The card is not valid for international air travel, only for entry at land border crossings and seaports of entry when traveling from Canada, Mexico, Bermuda, and the Caribbean. The maximum number of letters provided for your given name (first and middle) on the card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 of Application Page 1.
- **Separate mailings:** You may receive your newly issued U.S. passport book and/or card and your citizenship evidence <u>in two separate mailings</u>. If you are applying for both a book and card, <u>you may receive three separate mailings</u>: one with your returned evidence, one with your newly issued book, and one with your newly issued card. **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.
- **Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.
- **Shipping and Delivery Changes:** If your mailing address changes prior to receipt of your new passport, please contact NPIC. **NOTE:** We will not mail a U.S. passport to a private address outside the United States or Canada.
- **Passport Corrections, Non-Receipt/Undeliverable Passports, and Lost/Stolen Passport:** For more information visit travel.state.gov or contact NPIC.

U.S. Department of State

# APPLICATION FOR A U.S. PASSPORT

## WARNING

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

## ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a statutory "sex tourism" crime, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

## PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211 a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:**  We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:**  This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. Your Social Security number will be provided to the U.S. Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section.  More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:**  Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application. Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law on Instruction Page 1 (Section C) to this form.

## PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 85 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199.

**For more information about your application status, online tools, current fees, and processing times, please visit <u>travel.state.gov</u>.**

DS-11 04-2022

Instruction Page 4 of 4

**Supp.Add.065**

OMB Control No. 1405-0004
Expiration Date: 04/30/2025
Estimated Burden: 85 Minutes

# APPLICATION FOR A U.S. PASSPORT

*Use __black ink__ only. If you make an error, complete a new form. Do not correct.*

## Select document(s) for which you are submitting fees:

☐ U.S. Passport Book     ☐ U.S. Passport Card     ☐ Both
The U.S. passport card is **not** valid for international air travel. See Instruction Page 3
☐ Regular Book (Standard)     ☐ Large Book (Non-Standard)
The large book is for frequent international travelers who need more visa pages.

**1. Name** Last

☐ D   ☐ O   ☐ S   ☐ NFR
End. #                    Exp.

First                                        Middle

**2. Date of Birth** *(mm/dd/yyyy)*     **3. Gender (Read Instruction Page 1)**   **4. Place of Birth** *(City & State if in the U.S. or City & Country as it is presently known.)*

M  F  X  Changing gender marker?
☐ ☐ ☐        Yes ☐

**5. Social Security Number**     **6. Email** *(See application status at passportstatus.state.gov)*     **7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** Street/RFD#, P.O. Box, or URB

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" of the parent. Example: In Care Of - Jane Doe)*

**City**                          **State**     **Zip Code**     **Country,** *(if outside the United States)*

**9. List all other names you have used.** *(Examples: Birth Name, Maiden, Previous Marriage, Legal Name Change.  Attach additional  pages if needed.)*

A.                                          B.

## STOP! CONTINUE TO PAGE 2 ➜
## DO NOT SIGN APPLICATION UNTIL REQUESTED TO DO SO BY AUTHORIZED AGENT

STAPLE — FROM 1" TO 1 3/8" — STAPLE
2" X 2"        2" X 2"
STAPLE                STAPLE
Attach a color photograph
taken within the last six months

**Identifying Documents -Applicant or Mother/Father/Parent/Legal Guardian on Second Signature Line (if identifying minor)**
☐ Driver's License   ☐ State Issued ID Card   ☐ Passport   ☐ Military   ☐ Other
Name
Issue Date *(mm/dd/yyyy)*          Exp. Date *(mm/dd/yyyy)*          State of Issuance
ID No                                    Country of Issuance

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Third Signature Line (if identifying minor)**
☐ Driver's License   ☐ State Issued ID Card   ☐ Passport   ☐ Military   ☐ Other
Name
Issue Date *(mm/dd/yyyy)*          Exp. Date *(mm/dd/yyyy)*          State of Issuance
ID No                                    Country of Issuance

☐ Acceptance Agent     ☐ (Vice) Consul USA
☐ Passport Staff Agent

(Seal)

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph attached to this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

Signature of person authorized to accept applications

*By signing this form, I certify that I have provided the verbal oath and witnessed the applicant's/legal guardian's signature.*

Date

x
**Applicant's Legal Signature - age 16 and older**

Agent ID Number

x
**Mother/Father/Parent/Legal Guardian's Signature** (if identifying minor)

Print Facility Name/Location

Facility ID Number

x
**Mother/Father/Parent/Legal Guardian's Signature** (if identifying minor)

Name of courier company *(if applicable)*

For Issuing Office Only ➜ Bk ____ Card ____ EF ____ Postage ____ Execution ____ Other ____

DS 11 C 03 2022 1

DS-11 04-2022

**Name of Applicant** *(Last, First, & Middle)*

**Date of Birth** *(mm/dd/yyyy)*

**10. Parental Information**

Mother/Father/Parent - First & Middle Name *(at Parent's Birth)*

Last Name *(at Parent's Birth)*

Date of Birth *(mm/dd/yyyy)*

Place of Birth *(City & State if in the U.S. or City & Country as it is presently known)*

Gender
☐ M
☐ F
☐ X

U.S. Citizen?
☐ Yes
☐ No

Mother/Father/Parent - First & Middle Name *(at Parent's Birth)*

Last Name *(at Parent's Birth)*

Date of Birth *(mm/dd/yyyy)*

Place of Birth *(City & State if in the U.S. or City & Country as it is presently known)*

Gender
☐ M
☐ F
☐ X

U.S. Citizen?
☐ Yes
☐ No

**11. Have you ever been married?**  ☐ Yes  ☐ No  *If yes, complete the remaining items in #11.*

Full Name of Current Spouse or Most Recent Spouse *(Last, First & Middle)*

Date of Birth *(mm/dd/yyyy)*

Place of Birth

U.S. Citizen?
☐ Yes  ☐ No

Date of Marriage *(mm/dd/yyyy)*

Have you ever been widowed or divorced?
☐ Yes  ☐ No

Widow/Divorce Date *(mm/dd/yyyy)*

**12. Additional Contact Phone Number**
☐ Home  ☐ Work  ☐ Cell

**13. Occupation** *(if age 16 or older)*

**14. Employer or School** *(if applicable)*

**15. Height**

**16. Hair Color**

**17. Eye Color**

**18. Travel Plans** *(If no travel plans, please write "none")*

Departure Date *(mm/dd/yyyy)*

Return Date *(mm/dd/yyyy)*

Countries to be Visited

**19. Permanent Address** *(Complete if P.O. Box is listed under Mailing Address **or** if residence is different from Mailing Address. **Do not list a P.O. Box.**)*

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**20. Your Emergency Contact (** *Provide the information of a person not traveling with you to be contacted in the event of an emergency.)*

Name

Address: Street/RFD # or P.O. Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship

**21. Have you ever applied for or been issued a U.S. Passport Book or Passport Card?**  ☐ Yes  ☐ No  *If yes, complete the remaining items in #21.*

Name as printed on your most recent passport book

Most recent passport book number

Most recent passport book issue date *(mm/dd/yyyy)*

Status of your most recent passport book: ☐ Submitting with application  ☐ Stolen  ☐ Lost  ☐ In my possession *(if expired)*

Name as printed on your most recent passport card

Most recent passport card number

Most recent passport card issue date *(mm/dd/yyyy)*

Status of your most recent passport card: ☐ Submitting with application  ☐ Stolen  ☐ Lost  ☐ In my possession *(if expired)*

## PLEASE DO NOT WRITE BELOW THIS LINE - FOR ISSUING OFFICE ONLY

Name as it appears on citizenship evidence _____

☐ Birth Certificate   SR   CR   City   Filed:                    Issued:                    ☐ Sole Parent

☐ Nat. / Citz. Cert.  USCIS  USDC  Date/Place Acquired:         A#

☐ Report of Birth     Filed/Place:

☐ Passport  C/R  S/R  See #21  #/DOI:

☐ Other:

☐ Attached:

☐ P/C of Citz  ☐ P/C of ID  ☐ DS-71  ☐ DS-3053  ☐ DS-64  ☐ DS-5520  ☐ DS-5525  ☐ PAW  ☐ NPIC  ☐ IRL  ☐ Citz W/S

DS 11 C 03 2022 2

# EXHIBIT D



# I am a U.S. citizen

# A4

## How do I get proof of my U.S. citizenship?



U.S. Citizenship and Immigration Services

**If you were born in the United States**, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship.[1]

**If you were born outside the United States, but one or both of your parents were U.S. citizens when you were born**, you may still be a U.S. citizen. This is called citizenship through derivation. There are usually additional specific requirements, and sometimes citizenship can be through a combination of a parent and grandparent.

### What documents are usually accepted as proof of U.S. citizenship?

The most common documents that establish U.S. citizenship are:

- **Birth Certificate,** issued by a U.S. State (if the person was born in the United States), or by the U.S. Department of State (if the person was born abroad to U.S. citizen parents who registered the child's birth and U.S. citizenship with the U.S. Embassy or consulate);

- **U.S. Passport,** issued by the U.S. Department of State;

- **Certificate of Citizenship,** issued to a person born outside the United States who derived or acquired U.S. citizenship through a U.S. citizen parent; or

- **Naturalization Certificate,** issued to a person who became a U.S. citizen after 18 years of age through the naturalization process.

### I was born in the United States. Where can I get a copy of my birth certificate?

Check with the Department of Health (Vital Records) in the U.S. State in which you were born. For more information, visit the National Center for Health Statistics web page at **www.cdc.gov/nchs/births.htm**.

[1]An exception to this rule exists regarding children born in the United States to foreign diplomats.

### I am a U.S. citizen. My child will be born abroad or recently was born abroad. How do I register his or her birth and U.S. citizenship?

Please contact the U.S. Department of State or the U.S. Embassy or consulate in the country where your child will be born for more information about eligibility requirements and how to register your child's U.S. citizenship.

### I was born overseas. My birth and U.S. citizenship were registered with the U.S. Embassy or consulate. I need a copy of the evidence of my citizenship. Whom should I contact?

Contact the U.S. Department of State. For more information, please see their Web site at **www.state.gov**.

### I was born overseas. I believe I was a U.S. citizen at birth because one or both my parents were U.S. citizens when I was born. But my birth and citizenship were not registered with the U.S. Embassy when I was born. Can I apply to have my citizenship recognized?

Whether or not someone born outside the United States to a U.S. citizen parent is a U.S. citizen depends on the law in effect when the person was born. These laws have changed over the years, but usually require a combination of the parent being a U.S. citizen when the child was born, and the parent having lived in the United States or its possessions for a specific period of time. Derivative citizenship can be quite complex and may require careful legal analysis.

### I was born overseas. One of my parents was a U.S. citizen but never lived in the United States. One of my grandparents was also a U.S. citizen. Could I have derived U.S. citizenship?

If your parent was a U.S. citizen when you were born but had not lived in the United States for the required amount of time before your birth, but one of your grandparents was also a U.S. citizen and had already met the residence requirements, then you may still

A4—I am a U.S. citizen…How do I get proof of my U.S. citizenship?
M-560B (October 2013) N

1

Supp.Add.069

have derived U.S. citizenship. The provisions of immigration law that govern derivative citizenship are quite precise and circumstances in individual cases can be complex. For specific information on how the law applies, please check our Web site at **www.uscis.gov**, or the U.S. Department of State Web site at **www.state.gov,** or call USCIS Customer Service at **1-800-375-5283**.

### I was born overseas. After I was born, my parent(s) became naturalized U.S. citizens. Could I have derived U.S. citizenship?

If **one** of your parents naturalized after February 27, 2001, and you were a permanent resident and under 18 years old at the time, then you may have automatically acquired U.S. citizenship. Before that date, you may have automatically acquired U.S. citizenship if you were a permanent resident and under 18 years old when **both** parents naturalized, or if you had only **one** parent when that parent naturalized.

However, if your parent(s) naturalized after you were 18, then you will need to apply for naturalization on your own after you have been a permanent resident for at least 5 years.

### How do I apply to have my citizenship recognized?

You have two options:

- You can apply to the U.S. Department of State for a U.S. passport. A passport is evidence of citizenship and also serves as a travel document if you need to travel. For information about applying for a U.S. passport, see the U.S. Department of State Web site at **www.state.gov**.
- If you are already in the United States, you also have the option of applying to USCIS using **Form N-600**, Application for Certificate of Citizenship. However, you may find applying for a passport to be more convenient because it also serves as a travel document and could be a faster process.

### How do I replace a lost, stolen, or destroyed Naturalization Certificate or Certificate of Citizenship?

To apply to replace your Naturalization Certificate or Certificate of Citizenship issued by USCIS or by the U.S. Immigration and Naturalization Service, file a **Form N-565**, Application for Replacement Naturalization Citizenship Document. Filing instructions and forms are available on our Web site at **www.uscis.gov**.

## Key Information

| Key USCIS forms referenced in this guide | Form # |
|---|---|
| Application for Certificate of Citizenship | N-600 |
| Application for Replacement Naturalization Citizenship Document | N-565 |

| Other U.S. Government Services–Click or Call | | |
|---|---|---|
| General Information | www.usa.gov | 1-800-333-4636 |
| New Immigrants | www.welcometoUSA.gov | |
| U.S. Dept. of State | www.state.gov | 1-202-647-6575 |
| National Center for Health Statistics | www.cdc.gov | 1-800-311-3435 |
| | www.cdc.gov/nchs /birth.htm | |

For more copies of this guide, or information about other customer guides, please visit **www.uscis.gov/howdoi**.

You can also visit **www.uscis.gov** to download forms, e-file some applications, check the status of an application, and more. It's a great place to start!

If you don't have Internet access at home or at work, try your local library.

If you cannot find what you need, please call **Customer Service at: 1-800-375-5283** *Hearing Impaired TDD Customer Service: 1-800-767-1833*

**Disclaimer:** *This guide provides basic information to help you become generally familiar with our rules and procedures. For more information, or the law and regulations, please visit our Web site. Immigration law can be complex, and it is impossible to describe every aspect of every process. You may wish to be represented by a licensed attorney or by a nonprofit agency accredited by the Board of Immigration Appeals.*

A4—I am a U.S. citizen…How do I get proof of my U.S. citizenship?
M-560B (October 2013) N

2

**Supp.Add.070**

# EXHIBIT E

0127-JCC   Document 106   Filed 02/04/25



Securing today
and tomorrow

# Social Security Numbers for Children



The easiest way to get a Social Security number (SSN) for your newborn is to apply when you provide information for your baby's birth certificate in the hospital.

If you wait to apply for a number at a Social Security office, there may be delays while we verify your child's birth certificate.

## Why should I get a Social Security number for my child?

You need an SSN to claim your child as a dependent on your income tax return. Your child may also need a number if you plan to:

- Open a bank account for the child.
- Buy savings bonds for the child.
- Get medical coverage for the child.
- Apply for government services for the child.

## Must my child have a Social Security number?

Getting an SSN for your newborn is voluntary, but may be necessary to obtain important services, such as those listed above, for your child. Therefore, getting a number when your child is born is a good idea.

**How do I apply?**

**At the hospital:** When you complete the application for your baby's birth certificate, you will be asked whether you want to apply for an SSN for your baby.

**1**

If you say "yes," you will be asked to provide both parents' SSNs. If you don't know both parents' SSNs, you still can apply for your child's SSN.

**At a Social Security office:** If you wait to apply for your child's number, you can use our online Social Security Number and Card application available at *www.ssa.gov/number-card*. You will start the application online and complete the process in a local Social Security office or card center. If you are not able to apply online, you can fill out and print our Application for a Social Security Card (Form SS-5), available at *www.ssa.gov/forms/ss-5.pdf*.

No matter where you apply, you will need to:

- Show us original documents proving your child's:
  —U.S. citizenship.
  —Age.
  —Identity.
- Show us documents proving your identity and your relationship to your child.

Anyone age 12 or older who requests an original SSN must appear in person for an interview. This applies even if a parent or guardian will sign the application on the child's behalf.

### Citizenship

We can accept only certain documents as proof of U.S. citizenship. These include a:

**2**

- U.S. birth certificate.
- U.S. consular report of birth.
- U.S. passport (valid and unexpired).
- Certificate of Naturalization or Certificate of Citizenship.

Noncitizens should see *Social Security Numbers for Noncitizens* (Publication No. 05-10096) for more information.

### Age

If your child was born in the United States, you need to present your child's birth certificate. If your child does not have a birth certificate, we may be able to accept a:

- Religious record made before the age of 5 showing the date of birth.
- U.S. hospital record of birth.
- U.S. passport or passport card.

If your child was born outside the United States, you need to present your child's foreign birth certificate. You may already have it or can get a copy within 10 business days. If you can't get it, we may be able to accept your child's:

- Certificate of Birth Abroad (FS-545).
- Certificate of Report of Birth (DS-1350).
- Consular Report of Birth Abroad (FS-240).
- Certificate of Naturalization.
- Passport.

**3**

### Identity

**Your child:** We can accept only certain documents as proof of your child's identity. An acceptable document must be current (not expired) and show your child's name, identifying information, and, preferably, a recent photograph. We generally can accept a non-photo identity document if it has enough information to identify the child. Information may include the child's name and age, date of birth, or parents' names. We prefer to see the child's unexpired U.S. passport. If that document isn't available, we may accept the child's:

- Unexpired valid state-issued nondriver identification card.
- Adoption decree.
- Certified copy of medical record (doctor, clinic, or hospital).
- Religious record.
- Certified school record showing your child's name and your child's age or date of birth (must be for the current or prior year).
- School identification card showing your child's name and either a photograph of your child, your child's age, or date of birth (**must be for the current or prior year**).

**You:** If you're a U.S. citizen, we will ask to see your U.S. driver's license, state-issued nondriver identification card, or U.S. passport as proof of your identity. If you don't have these specific

**4**

documents, we'll ask to see other documents that may be available, such as:

- Unexpired U.S. passport or passport card.
- Certificate of U.S. Citizenship.
- Certificate of Naturalization.
- School identification card showing your name and either your photograph, age, or date of birth (**must be for the current or prior year**).
- Health insurance card (not a Medicare card) showing your name and either your photograph, or age, or date of birth.
- U.S. military identification card.
- Employee identification card showing your name and either your photograph or date of birth.
- Life insurance policy.

*All documents must be either originals or copies certified by the issuing agency. We can't accept photocopies or notarized copies of documents*. We may use 1 document for 2 purposes. For example, we may use your child's passport as proof of both citizenship and identity. Or, we may use your child's birth certificate as proof of age and citizenship. *However, you must provide at least 2 separate documents*.

**5**            *(over)*

We'll mail your child's number and card as soon as we have all of your child's information and have verified your child's documents.

## What if my child is adopted?

We can assign your adopted child an SSN before the adoption is complete, but you may want to wait until the adoption is finalized. Then, you can apply for the number using your child's new name, with your name as parent. You may want to claim your child for tax purposes while the adoption is still pending. If so, contact the Internal Revenue Service for Form W-7A, *Application for Taxpayer Identification Number for Pending U.S. Adoptions*.

## What does it cost?

There's no charge for issuing an SSN and card. If someone contacts you and wants to charge you for getting a number or card, please remember that these Social Security services are free. You can report anyone attempting to charge you by calling our Office of the Inspector General hotline at **1-800-269-0271 (TTY 1-866-501-2101 deaf or hard of hearing)** from 10:00 a.m. to 4:00 p.m. Eastern Time or visit ***https://oig.ssa.gov***.

**6**

## What if I lose the card?

You can replace your Social Security card if it's lost or stolen. You're limited to 3 replacement cards in a year and 10 during your lifetime. Legal name changes and other exceptions don't count toward these limits. For example, changes in noncitizen status that require card updates may not count toward these limits. Also, you may not be affected by these limits if you can prove you need the card to prevent a significant hardship.

Your child's Social Security card is an important document. We recommend you keep it in a safe place. **Do not carry it with you**.

## Social Security number misuse

If you think someone is using your child's SSN fraudulently, you should file a complaint with the Federal Trade Commission via:

- Internet — ***www.identitytheft.gov***.
- Telephone — **1-877-IDTHEFT** (**1-877-438-4338**).
- TTY — **1-866-653-4261**.

It's against the law to:

- Use someone else's SSN.
- Give false information when applying for a number.
- Alter, buy, or sell Social Security cards.

**7**

## Contacting Us

The most convenient way to do business with us is to visit **www.ssa.gov** to get information and use our online services. There are several things you can do online: apply for benefits; start or complete your request for an original or replacement Social Security card; get useful information; find publications; and get answers to frequently asked questions.

When you open a personal *my* Social Security account, you have more capabilities. You can review your *Social Security Statement*, verify your earnings, and get estimates of future benefits. You can also print a benefit verification letter, change your direct deposit information (Social Security beneficiaries only), and get a replacement SSA-1099/1042S. Access to your personal *my* Social Security account may be limited for users outside the United States.

If you don't have access to the internet, we offer many automated services by telephone, 24 hours a day, 7 days a week, so you may not need to speak with a representative.

If you need to speak with someone, call us toll-free at **1-800-772-1213** or at our TTY number, **1-800-325-0778**, if you're deaf or hard of hearing. A member of our staff can answer your call from 8 a.m. to 7 p.m., Monday through Friday. We provide free interpreter services

**8**

0127-JCC   Document 106    Filed 02/04/25

upon request. For quicker access to a representative, try calling early in the day (between 8 a.m. and 10 a.m. local time) or later in the day. **We are less busy later in the week (Wednesday to Friday) and later in the month.**

**Social Security Administration**
Publication No. 05-10023
January 2024 (Recycle prior editions)
Social Security Numbers for Children
Produced and published at U.S. taxpayer expense

# EXHIBIT F



PLATFORM   NEWS   EVENTS

GET INVOLVED

TRUMP FORCE 47

PROTECT THE VOTE

CONTRIBUTE

SHOP

BACK TO VIDEOS

# Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism

**May 30, 2023**

 



Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals a…

**Mar-a-Lago, FL—** In a new Agenda47 video, President Donald J. Trump announced his plan to sign an executive order on Day One to end automatic citizenship for

children of illegal aliens.

"As part of my plan to secure the border, on Day One of my new term in office, I will sign an executive order making clear to federal agencies that under the correct interpretation of the law, going forward, the future children of illegal aliens will not receive automatic U.S. citizenship," President Trump said.

"My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries."

**PRESIDENT TRUMP'S PLAN TO DISCOURAGE ILLEGAL IMMIGRATION BY ENDING AUTOMATIC CITIZENSHIP FOR THE CHILDREN OF ILLEGAL ALIENS AND OUTLAWING BIRTH TOURISM**

**A DAY-ONE EXECUTIVE ORDER TO SHUT OFF A MAGNET FOR ILLEGAL IMMIGRATION:**

- On Day One, President Trump will sign an Executive Order to stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens.

- It will explain the clear meaning of the 14th Amendment, that U.S. Citizenship extends only to those both born in AND "subject to the jurisdiction" of the United States.

- It will make clear that going forward, the children of illegal aliens will not be granted automatic citizenship, and should not be issued passports, Social Security numbers, or be eligible for certain taxpayer funded welfare benefits.

- It will direct federal agencies to require that at least one parent be a U.S. citizen or lawful permanent resident for their future children to become automatic U.S. citizens.

- This Executive Order ending automatic citizenship for the children of illegal aliens will eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S. to return home.

- The Executive Order will also stop "**Birth Tourism**."

- Through "Birth Tourism," **tens of thousands** of foreign nationals fraudulently enter the U.S. each year during the final weeks of their pregnancies for the sole purpose of obtaining U.S. citizenship for their child.

- Under the current erroneous interpretation, the children of these foreign nationals are then eligible to **receive** a host of government benefits reserved for U.S. citizens, including a myriad of welfare programs and taxpayer funded healthcare, as well as chain migration and the right to vote.

- The Executive Order is part of a larger strategy to fully secure the Southern Border starting on Day One. It will remove a major incentive for illegal aliens and other foreign nationals to come to and remain in the United States in violation of our laws and National sovereignty.

- The announcement of today's Executive Order follows a historical slate of hundreds of executive actions, proclamations, and presidential memorandums on border security and immigration that President Trump implemented while in office to remake the immigration system in the United States for the interest of the American people, including:

- Executive Order Implementing the Travel Ban and Pausing Refugee Admissions

- Executive Order on Border Security and Immigration Enforcement

- Presidential Memorandum on the Extreme Vetting of Foreign Nationals

- Presidential Memorandum to Create a National Vetting Center

- Executive Order to Unleash Interior Immigration Enforcement

- Executive Order to Block Federal Grants to Sanctuary Cities

- Presidential Memorandum Ordering DHS to Train National Guard Troops to Assist with Border Enforcement

- Presidential Memorandum to End "catch and release" at the Border

- Presidential Proclamation Suspending Entry Across Southern Border Outside Ports of Entry to Bar Asylum Access

- Executive Order requiring the U.S. Government to Prioritize the Hiring of U.S. Workers in the Administration of all Immigration Programs

- Executive Order on Aligning Federal Contracting and Hiring Practices with the Interests of American Workers

- Presidential Proclamation Suspending Chain Migration, Visa Lottery, and All Non-Essential Foreign Workers

- Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- Presidential Memorandum to Cut Off Immigrant Access to the Welfare State

**PRESIDENT TRUMP'S EXECUTIVE ORDER WILL FINALLY ENSURE THAT THE FEDERAL GOVERNMENT NO LONGER ADHERES TO A PATENTLY INCORRECT INTERPRETATION OF THE 14TH AMENDMENT:**

- Constitutional scholars have shown for decades that granting automatic citizenship to the children of illegal aliens born in the United States is based on a patently incorrect interpretation of the 14th Amendment.

- The **14th Amendment** extends federal citizenship to "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof."

- The purpose of the 14th Amendment had nothing to do with the citizenship of immigrants, let alone the citizenship of the children of illegal aliens. Its purpose was to extend citizenship to people newly freed from slavery, whose status was left in question after the infamous case **Dred Scott v. Sandford**.

- The framers of the 14th Amendment made **clear** that "persons born in the United States who are foreigners, aliens [or] who belong to the families of ambassadors or foreign ministers" are not "subject to the jurisdiction" of the U.S.

- For years, open-borders proponents have deliberately misinterpreted "subject to the jurisdiction" in the 14th Amendment to mean merely subject to American law, which is the case for anyone physically present in the United States.

- This twisting of the amendment's meaning and intent has caused America to become one of the few countries in the world to extend citizenship to the children of illegal aliens even if both parents are not citizens nor even legally present in the United States, thus diluting the privileges that Americans are entitled to.

## BIDEN'S OPEN BORDER POLICY IS A NATIONAL SECURITY, ECONOMIC, AND HUMANITARIAN DISASTER:

- A record number of illegal aliens crossed the southern border in both 2021 and 2022. In the official numbers alone, there have been over 6.6 million **illegal crossings** since Biden took office—but the true numbers are much higher.

- Biden has deliberately made his border disaster worse by abolishing Title 42 this month, allowing for an additional **400,000** illegal aliens from all corners of the globe to pour across our border each month.

- This invasion is wasting our resources, lowering our citizens' wages, poisoning our communities with lethal drugs, and threatening our national security.

- Illegal immigration **reduces** American workers' wages by $99 to $118 billion each year, with the burden falling most heavily on low-wage workers.

- Thousands of pounds of deadly drugs are pouring across our borders, poisoning over 100,000 of our citizens each year. Fueled in large part by Biden's border disaster, fentanyl poisoning has become the leading cause of death for Americans between the ages of 18 and 45.

- Nearly 100 known or suspected terrorists were **arrested** at the border last year— more than three times the total for the previous five years combined. Border arrests of illegal alien murderers **increased** by over 1,900% and arrests of illegal alien drug traffickers increased by 480% since 2020.

- Biden's open border policy has also created a humanitarian crisis, with migrant deaths reaching a record **high** last year and human smuggling arrests **up** 82% since

# EXHIBIT G

**Supp.Add.088**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291

POLITICS | POLICY

# Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs

Many constitutional scholars and civil-rights groups have said a change can't be done through executive action

*By* *Tarini Parti* [Follow] *and* *Michelle Hackman* [Follow]

*Updated* Dec. 8, 2024 9:16 pm ET



People riding the ferry to Ellis Island for a naturalization ceremony pass the Statue of Liberty. PHOTO: ALEX KENT/AFP/GETTY IMAGES

WASHINGTON—President-elect Donald Trump's transition team is drafting several versions of his long-promised executive order to curtail automatic citizenship for anyone born in the U.S., according to people familiar with the matter, as his aides prepare for an expanded legal fight.

Trump, who has railed against so-called birthright citizenship for years, said during his first term that he was planning an executive order that would outright ban it. Such an order was never signed, but the issue remained a focus of Trump's immigration proposals during his re-election campaign. He has said he would tackle the issue in an executive order on day one of his second term.

Weeks before he takes office, Trump's transition team is now considering how far to push the scope of such an order, knowing it would almost immediately be challenged in court, according to a transition official and others familiar with the matter. The eventual order is expected to focus on changing the requirements for documents issued by federal agencies that verify citizenship, such as a passport.

Through an executive order or the agency rule-making process, Trump is also expected to take steps to deter what Trump allies call "birth tourism," in which pregnant women travel to the U.S. to have children, who receive the benefit of citizenship. One option on the table is to tighten the criteria to qualify for a tourist visa, according to people familiar with the Trump team's thinking. Tourist visas are most often issued for a period of 10 years, though the tourist can't stay in the U.S. on each visit for longer than six months.



President-elect Donald Trump has said he would tackle birthright citizenship in an executive order on day one of his second term. PHOTO: OLIVIER TOURON/AFP/GETTY IMAGES

Karoline Leavitt, a spokeswoman for the Trump transition, said the president-elect "will use every lever of power to deliver on his promises, and fix our broken immigration system once and for all."

Some on the right have backed Trump's plans and argued that birthright citizenship is a misinterpretation of the 14th amendment, which dates back to the 19th century and in part granted full citizenship to former slaves. They have also criticized birth tourism. Companies in China have attracted attention in recent years for advertising such services, and airlines in Asia even started turning away some pregnant passengers they suspected of traveling to give birth.

"Because you happen to be in this country when your child is born, is not a reason for that child to be a U.S. citizen. It's just silly, and the reliance on it in law is utterly misplaced," said Ken Cuccinelli, a senior fellow at the Center for Renewing America, a pro-Trump think tank, who previously served as deputy secretary of Homeland Security.

Many constitutional scholars and civil-rights groups have said a change to birthright citizenship can't be done through executive action and would require amending the Constitution—a rare and difficult process. The most recent amendment was ratified in 1992, more than 200 years after it was first proposed.

Trump on the campaign trail this year offered more details on what executive action related to birthright citizenship could include compared with his first term, a change that some backers took as an indication that he is more willing to act on the issue.

Trump said he would sign a "day one" executive order directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen. It would also stop agencies from issuing passports, Social Security numbers and other welfare benefits to children who don't meet the new requirement for citizenship, the president-elect's campaign had said.

"My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries," Trump said in a campaign video.

But the requirement that at least one parent be a U.S. citizen or legal permanent resident would also affect children born to parents who immigrated legally

through visas, excluding them from automatic citizenship.

"The new piece of it is them talking publicly about the mechanism they might try to use to operationalize this unconstitutional plan," said Omar Jadwat, director of the American Civil Liberties Union's Immigrants' Rights Project. "They just can't do that consistent with the constitution."



Portrait of Wong Kim Ark, whose case affirmed birthright citizenship. PHOTO: NATIONAL ARCHIVES/GETTY IMAGES

"Litigation is definitely going to follow," he added.

The Supreme Court affirmed birthright citizenship in its 1898 ruling in U.S. v. Wong Kim Ark. But critics of automatic citizenship argue Trump's proposed citizenship restrictions would be different from that case, which involved a child born to Chinese parents who were legal permanent residents in the U.S.

Trump's allies say a legal fight that makes its way to the Supreme Court is the point of the executive order.

"Force the issue and see what happens," said Mark Krikorian, executive director for the Center for Immigration Studies, a group favoring immigration restrictions that was close to Trump's first administration. Even with the court's conservative majority, Krikorian isn't optimistic about Trump's chances.

"I think they'll probably uphold the current interpretation of the 14th Amendment," he said. "They're going to want to start that court fight as soon as possible to see if they can see it through to the end before the administration ends," he said.

Write to Tarini Parti at tarini.parti@wsj.com and Michelle Hackman at michelle.hackman@wsj.com

# EXHIBIT H

# Venezuela International Travel Information

U.S. Embassy Colombia
Calle 24 Bis No. 48-50
Bogotá, D.C. Colombia
Telephone: +(57)(1) 275-2000
Emergency: +(57)(1) 275-2000
Fax: No fax
Online: https://co.usembassy.gov/services/contact-acs-form/
Website

The U.S. Department of State urges U.S. citizens not to travel to Venezuela, and recommends that U.S. citizens in Venezuela leave immediately. More information is in our Venezuela Travel Advisory.

The U.S. Embassy in Caracas suspended operations on March 11, 2019. It cannot provide consular services to U.S. citizens in Venezuela. The U.S. Embassy in Colombia assists U.S. citizens in Venezuela when possible.

If you are a U.S. citizen in Venezuela in need of assistance, or are concerned about a U.S. citizen in Venezuela, please contact us in one of the following ways:

- Contact us online at https://co.usembassy.gov/services/contact-acs-form/ or

- Call us at +1-888-407-4747 (from the U.S. & Canada) or +1-202-501-4444 (from overseas).

The U.S. Department of State strongly urges U.S. citizens not to travel to Venezuela. Detentions of U.S. citizens at formal or informal border crossings into Venezuela are common.

To enter Venezuela, you must have:

- A valid U.S. passport in good condition with at least six months of validity, and
- A valid Venezuelan visa. Visas are not available upon arrival.

**Visas:** The Venezuelan embassy and consulates in the United States are not open. For information about visa services, contact the Venezuelan Embassy in Mexico at +52 55 5203 4233. You must have the proper visa and appropriate accreditation before traveling to Venezuela. If not, you face refusal of admission, expulsion, or detention.

Immigration officials often require proof of accommodation while in Venezuela, adequate means of support, and an onward departure itinerary. Use only official crossing points when entering Venezuela. You must obtain an entry stamp upon entry.

If you reside in Venezuela as a non-citizen, you must obtain legitimate Venezuelan residency documentation and renew your residency visa well in advance of expiration. Do not use intermediaries to purchase resident visas and/or work permits.

**Traveling with Children:** Venezuela's child protection law mandates that minors (under 18) of any nationality who are traveling alone, with only one parent, or with a third party, must present extensive, specific, and notarized documentation granting permission for travel. Consult the nearest Venezuelan embassy or consulate for further information.

Supp.Add.094

**Dual Nationality:** Venezuelan law requires Venezuelan citizens to enter and depart Venezuela using Venezuelan passports. If you hold dual U.S. and Venezuelan nationality, you must plan to travel between the United States and Venezuela with valid U.S. and Venezuelan passports. Dual-national minors are only allowed to depart Venezuela with both parents present or with a legal authorization signed by the absent parent in a family court.

**Immunizations:** Visit the CDC Traveler website for vaccination information, including Yellow Fever vaccination requirements. Carry your International Certificate of Vaccination (or yellow card) with you upon arrival or departure. Travel to Venezuela no longer requires evidence of COVID-19 vaccination.

**HIV/AIDS:** The U.S. Department of State is unaware of any HIV/AIDS entry restrictions for visitors to or foreign residents of Venezuela. Be aware that HIV/AIDS medications, like other medications, are often not available in Venezuela.

Find further information on dual nationality, prevention of international child abduction, and customs regulations on our websites.

Terrorism:  Terrorist groups and those inspired by such organizations are intent on attacking U.S. citizens abroad. Terrorists are increasingly using less sophisticated methods of attack – including knives, firearms, and vehicles – to more effectively target crowds. Frequently, their aim is focused on unprotected or vulnerable targets, such as:

- High-profile public events (sporting contests, political rallies, demonstrations, holiday events, celebratory gatherings, etc.)
- Hotels, clubs, and restaurants frequented by tourists
- Places of worship
- Schools
- Parks
- Shopping malls and markets
- Public transportation systems (including subways, buses, trains, and scheduled commercial flights)

Terrorist groups such as the Revolutionary Armed Forces of Colombia – People's Army (FARC-EP), Segunda Marquetalia, and the Colombian-origin National Liberation Army (ELN) have expanded in Venezuela in recent years. We are aware of reports of cooperation between FARC dissidents and the ELN in the areas of road/border checkpoints, forced displacement of communities, and narcotics trafficking.

For more information, see our Terrorism page.

**Crime:**  Violent crime is pervasive throughout Venezuela. Venezuela has one of the highest homicide rates in the world, and kidnappings are a serious concern.

If you are in Venezuela:

- Be alert of your surroundings at all times and take personal security precautions to avoid becoming a victim of crime.
- Maintain a low profile.
- Travel in groups of five or more, and
- Provide family or friends with your itineraries prior to departure.
- Avoid police activity. Corruption within the police forces is a concern, and criminals may be posing as police officers or National Guard members. National Guard members may target

**Supp.Add.095**

U.S. citizens, especially at remote land border crossings, for bribery, extortion, or detention, possibly in collusion with criminal organizations.

Criminal gangs operate openly and with little repercussion, often setting up fake police checkpoints. Armed robberies, including with grenades and assault rifles, take place throughout the country, including in tourist areas and institutions such as banks and ATMs, national parks, shopping malls, public transportation stations, and universities.

**Drugs:**  Do not attempt to bring any narcotics or controlled substances into Venezuela, or substances that may be confused with illegal drugs.

- Do not accept packages from anyone.
- Always keep your luggage with you.
- U.S. citizens have been actively recruited as narcotics couriers or "drug mules." Arrestees can expect extended jail terms under extremely difficult prison conditions.

**Transportation:**

- Do not use any taxis hailed on the street. Use only radio-dispatched taxis from taxi services, hotels, restaurants, and airline staff. Some taxi drivers in Caracas are known to overcharge, rob, injure, and even kidnap passengers.
- Do not use public transportation such as city buses and the metro (subway) in Caracas.
- If you drive, be aware of attacks in tunnels and avoid obstacles in the road.

**Maiquetía International Airport:**  Only travel to and from Maiquetía International Airport near Caracas in daylight hours. Kidnappings, robberies at gunpoint, thefts, and muggings are common. Individuals wearing seemingly official uniforms and displaying airport or police credentials have been involved in crimes inside the airport, including extortion and robberies.

- Do not pack valuable items or documents in checked luggage.
- Make advance plans for transportation from the airport to your hotel or destination using a trusted party or dispatch taxi service.

**ATMs:**  Most ATMs do not accept U.S. debit or credit cards, and malfunctions are common. Many ATMs do not have cash. Criminals target ATM users for robberies. ATM data is often hacked and used to make unauthorized withdrawals.

- Use only ATMs located in well-lit, public places.

**Demonstrations** occur occasionally.  They may take place in response to political or economic issues, on politically significant holidays, and during international events.

- Demonstrations can be unpredictable; avoid areas around protests and demonstrations.
- Past demonstrations have turned violent.
- Check local media for updates and traffic advisories.

**International Financial Scams:**  See the [Department of State](#) and the [FBI](#) pages for additional information.

Internet romance and financial scams are prevalent in Venezuela.  Scams are often initiated through Internet postings/profiles or by unsolicited emails and letters.  Scammers almost always pose as U.S. citizens who have no one else to turn to for help.  Common scams include:

- Romance/online dating

Supp.Add.096

Venezuela International Travel Information                    https://travel.state.gov/content/travel/en/international-travel/Internationa...

(104 of 436), Page 104 of 436    Case: 25-807, 02/18/2025, DktEntry: 32.1, Page 104 of 436
                Case 2:25-cv-00127-JCC    Document 106    Filed 02/04/25    Page 97 of 119

- Money transfers
- Grandparent/relative targeting

**Victims of Crime:** The U.S. Embassy in Caracas suspended operations on March 11, 2019, and therefore cannot provide consular services to U.S. citizens in Venezuela. The U.S. Embassy in Colombia assists U.S. citizens in Venezuela when possible.

- U.S. citizen victims of crime are encouraged to contact the U.S. Embassy in Bogota.
- Report crimes to the local police and contact the U.S. Embassy in Bogota by completing our online form at https://co.usembassy.gov/services/contact-acs-form/ or dialing +57 (1) 275-2000 or +57 (1) 275-4021 after hours. Remember that local authorities are responsible for investigating and prosecuting crime. Note that emergency numbers may not function in Venezuela and travelers should be prepared to make direct contact with the nearest police station to reach emergency service personnel.

See our webpage on help for U.S. victims of crimes overseas.

We can:

- Help you find appropriate medical care
- Contact relatives or friends with your written consent
- Provide general information regarding local law enforcement investigations
- Provide a list of local attorneys
- Provide our information on victim's compensation programs in the United States
- Help you find accommodation and arrange flights home
- If you are able to travel to a U.S. Embassy, we can replace a stolen or lost passport and provide an emergency loan for repatriation to the United States and/or limited medical support in cases of destitution

**Domestic Violence:** U.S. citizen victims of domestic violence are encouraged to contact the U.S. Embassy in Bogota for assistance.

**Colombian Border:** The area within 50-miles of the entire Venezuela and Colombian border is extremely dangerous. U.S. citizens near the border are at risk of detention by authorities. U.S. citizens must obtain a visa to enter Venezuela legally. Visas are not available upon arrival. U.S. citizens attempting to enter Venezuela without a visa have been charged with terrorism and other serious crimes and detained for long periods. Maduro authorities do not notify the U.S. government of the detention of U.S. citizens and the U.S. government is not granted access to those citizens. Additionally, cross-border violence, kidnapping, drug trafficking, and smuggling are common. Some kidnapping victims are released after ransom payments, while others are murdered.

- Do not attempt to cross the land border.

**Tourism:** Tourists participate in activities at their own risk. Emergency response and subsequent appropriate medical treatment does not meet U.S. standards. Serious medical issues require costly medical evacuation complicated by restrictions on air travel to and from Venezuela. Air evacuations to the United States from Venezuela may not be possible.

- U.S. citizens are encouraged to purchase medical evacuation insurance. See our webpage for more information on insurance providers for overseas coverage.

**Criminal Penalties:** You are subject to local laws. If you violate local laws, even unknowingly, you may be expelled, arrested, or imprisoned. Individuals establishing a business or practicing a

**Supp.Add.097**

profession that requires additional permits or licensing should seek information from the competent local authorities prior to practicing or operating a business. Application of local laws can at times be arbitrary and/or politically motivated.

In Venezuela, it is illegal to take pictures of sensitive buildings, including the presidential palace, military bases, government buildings, and airports.

Drug trafficking is a serious problem in Venezuela and treated as such by Venezuelan authorities. Convicted traffickers receive lengthy prison sentences.

Furthermore, some laws are also prosecutable in the United States, regardless of local law. For examples, see our website on crimes against minors abroad and the Department of Justice website.

**Arrest Notification:** If you are arrested or detained, attempt to have someone notify the U.S. Embassy in Bogota immediately. See our webpage for further information.

Please note that the U.S. Department of State may not be informed of your detention, particularly if you also hold Venezuelan citizenship. Due to the suspension of operations of the U.S. Embassy in Caracas, consular visits to detained U.S. citizens are not possible. There have been instances of U.S. citizens in recent years who have been detained without being afforded due process or fair trial guarantees, or as a pretext for an illegitimate purpose, often due to their U.S. citizenship. U.S. citizens in Venezuela are at risk of wrongful detention. See our Travel Advisory for Venezuela for additional information.

**Currency and Exchange:** Venezuela has started to allow dollarized commercial transactions and shopping, but policies and availability are subject to change. Some local businesses accept U.S. credit cards and electronic transfers through certain online vendors. "Black market" currency exchanges – often offering significantly favorable exchange rates – are technically prohibited under Venezuelan foreign exchange controls. Violators may be detained by Venezuelan authorities and face criminal penalties.

**Wire Transfers:** Wire transfers cannot be used reliably as a source of emergency funds, and receipt of funds is generally restricted to Venezuelan citizens and residents.

**Counterfeit and Pirated Goods:** Although counterfeit and pirated goods are prevalent in many countries, they may still be illegal according to local laws. You may also pay fines or forfeit the items if you attempt to bring them back to the United States. See the U.S. Department of Justice website for more information.

**Faith-Based Travelers:** See the following webpages for details:

- Faith-Based Travel Information
- International Religious Freedom Report – see country reports
- Human Rights Report – see country reports
- Hajj Fact Sheet for Travelers
- Best Practices for Volunteering Abroad

**LGB Travelers:** There are no legal restrictions on same-sex sexual relations or the organization of LGB events in Venezuela.

See our LGB Travel Information page and section 6 of our Human Rights report for further details.

**Travelers with Disabilities:** The law in Venezuela prohibits discrimination against persons with physical and mental disabilities, but the law is not enforced. Social acceptance of persons with

**Supp.Add.098**

disabilities in public is not as prevalent as in the United States. Expect accessibility to be limited in public transportation, lodging, communication/information, and general infrastructure. Accessibility is more prevalent in the capital city of Caracas than in the rest of the country.

The availability of rental, repair, and replacement parts for aids/equipment/devices as well as service providers, such as sign language interpreters or personal assistants, is limited.

**Students:**  See our Students Abroad page and FBI travel tips.

**Women Travelers:** See our travel tips for Women Travelers.

Travel to Venezuela no longer requires evidence of COVID-19 vaccination.For emergency services in Venezuela, dial 171. Emergency numbers may not function, and travelers should be prepared to make direct contact with the nearest police station to reach emergency services personnel.

Ambulance services are:

- not widely available, depending on the individual's health insurance, training, and availability of emergency responders may be below U.S. standards.
- unreliable in most areas.
- not equipped with state-of-the-art medical equipment.

Injured or seriously ill travelers may prefer to take a taxi or private vehicle to the nearest major hospital rather than wait for an ambulance.

Direct emergency medical evacuation flights between the United States and Venezuela are notpossible.

**We do not pay medical bills.**  Be aware that U.S. Medicare/Medicaid does not apply overseas. Most hospitals and doctors overseas do not accept U.S. health insurance.

**Medical Insurance:**  Most care providers overseas only accept cash payments. See our webpage for more information on insurance providers for overseas coverage. Visit the U.S. Centers for Disease Control and Prevention for more information on types of insurance you should consider before you travel overseas.

- Make sure your health insurance plan provides coverage overseas. We strongly recommend supplemental insurance to cover medical evacuation.
- Always carry your prescription medication in original packaging, along with your doctor's prescription.
- Before travelling to Venezuela with prescription medications, travelers should research current Customs and Immigration restrictions in place at Venezuelan ports of entry.

**Vaccinations:**  You must be up to date on all vaccinations recommended by the U.S. Centers for Disease Control and Prevention. A Yellow Fever vaccination is required if coming from or transiting for more than 12 hours through Brazil.

- Confirm you have all vaccinations recommended by the U.S. Centers for Disease Control and Prevention.
- Carry your International Certificate of Vaccination (or yellow card) with you upon arrival.

**Health Facilities in General:**

- Do not depend on health care facilities in Venezuela for medical care. Serious medical issues

**Supp.Add.099**

require costly medical evacuation complicated by restrictions on air travel to and from Venezuela. Direct air evacuations to the United States are not possible.

- Public medical clinics lack basic resources and supplies, including soap and water. In recent years, hospital infrastructure has deteriorated significantly, and medical staff are in short supply. Patients frequently must supply their own water, medication, and medical instruments to receive care.
- Adequate private health facilities are available in Caracas and other major cities, but health care in rural areas is well below U.S. standards.  Many private hospitals and clinics may be overcrowded and may experience shortages of public utilities such as electricity and running water.
- Some private hospitals and doctors require cash payment "up front" prior to service or admission. Credit card payment and online transfers are sometimes available. If you cannot provide an up-front payment, you may be referred to a public institution.
- Medical staff may speak little to no English.
- Generally, in public hospitals only minimal staff is available overnight. Consider hiring a private nurse or having family spend the night with the patient, especially a minor child.
- Patients may be required to bear costs for transfer to or between hospitals.
- Psychological and psychiatric services are limited, even in the larger cities.

## Medical Tourism and Elective Surgery:

- U.S. citizens have suffered serious complications or died during or after having cosmetic or other elective surgery overseas.
- Visit the U.S. Centers for Disease Control and Prevention website for information on medical tourism, the risks of medical tourism, and what you can do to prepare before traveling to Venezuela.
- We strongly recommend supplemental insurance to cover medical evacuation in the event of unforeseen medical complications.
- Your legal options in case of malpractice are very limited in Venezuela.

## Pharmaceuticals:

- Some medical supplies are unavailable in Venezuela, and you should not expect to find all necessary medications in Venezuela. Travelers should carry over the counter and prescription drugs sufficient to cover the entire duration of their trips.
- Exercise caution when purchasing medication overseas.  Pharmaceuticals, both over the counter and requiring prescription in the United States, are often readily available for purchase with little controls.  Counterfeit medication is common and may prove to be ineffective, the wrong strength, or contain dangerous ingredients.  Medication should be purchased in consultation with a medical professional and from reputable establishments.
- U.S. Customs and Border Protection and the Food and Drug Administration are responsible for rules governing the transport of medication back to the United States.  Medication purchased abroad must meet their requirements to be legally brought back into the United States.  Medication should be for personal use and must be approved for usage in the United States.  Please visit the U.S. Customs and Border Protection and the Food and Drug Administration websites for more information.

## Assisted Reproductive Technology and Surrogacy :

- There is no legal framework for foreigners or same-sex couples to pursue surrogacy in Venezuela. According to Venezuelan law, the birth mother of a child born in Venezuela is the legal mother. Surrogacy agreements between foreign or same sex intending parents and gestational mothers are not enforced by Venezuelan courts.

**Supp.Add.100**

- If you decide to pursue parenthood in Venezuela via assisted reproductive technology (ART) with a gestational mother, be prepared for long and unexpected delays in documenting your child's citizenship. Be aware that individuals who attempt to circumvent local law risk criminal prosecution.
- If you are considering traveling to Venezuela to have a child through use of assisted reproductive technology (ART) or surrogacy, please see our <u>ART and Surrogacy Abroad page</u>.

## Water Quality:

- Tap water is not potable, even in major cities. Bottled water and beverages are generally safe, although you should be aware that many restaurants and hotels serve tap water unless bottled water is specifically requested.  Be aware that ice for drinks may be made using tap water.
- Expect frequent shortages in running water.
- Gastrointestinal illnesses such as severe diarrhea are common throughout the country.

## Adventure Travel :

- Visit the U.S. Centers for Disease Control and Prevention website for more information about <u>Adventure Travel</u>.

## General Health:

The following diseases are prevalent:

- <u>COVID-19</u>
- <u>Dengue</u>
- <u>Zika</u>
- <u>Chikungunya</u>
- <u>Chagas Disease (Trypanosomiasis)</u>
- <u>Measles (Rubeloa)</u>
- <u>Malaria</u>
- <u>Leishmaniasis</u>
- <u>Schistosomiasis (Bilharzia)</u>
- <u>Travelers' Diarrhea</u>

The Ministry of Health has announced they will start an epidemiological plan at airports for those travelers coming from countries where there is a confirmation of Mpox outbreak: "To enter the country, they must report their health status and personal data in the epidemiological surveillance form, for medical follow-up".

- Use the U.S. Centers for Disease Control and Prevention recommended mosquito repellents and sleep under insecticide-impregnated mosquito nets. Chemoprophylaxis is recommended for all travelers even for short stays.
- Visit the U.S. Centers for Disease Control and Prevention website for more information about <u>Resources for Travelers</u> regarding specific issues in Venezuela.

## Road Conditions and Safety:

- Avoid driving in Venezuela. If you do drive, drive defensively, as most drivers do not obey rules.
- Do not drive at night outside major cities. Police and national guard checkpoints are mandatory, and criminals often set up fake checkpoints during nighttime to rob or kidnap victims.

- Road damage is not clearly marked.
- Traffic jams are common within Caracas during most of the day and are frequently exploited by criminals. Armed motorcycle gangs operate in traffic jams. Comply with demands as victims may be killed for not complying.
- Do not use buses due to high levels of criminal activity.
- Venezuela experiences shortages in gasoline, and you should plan accordingly, especially when travelling to distant or rural areas. Be aware that the quality of gasoline is not the same as in the United States and may cause vehicle damage, requiring repairs and/or frequent maintenance.

**Traffic Laws:**

- Child car seats and seatbelts are not required and are seldom available in rental cars and taxis.
- Some Caracas municipalities have outlawed the use of handheld cell phones while driving.
- Stops at National Guard and local police checkpoints are mandatory. Follow all National Guard instructions and be prepared to show vehicle and insurance papers and passports. Vehicles may be searched.

**Public Transportation:** Subways, buses, trains, and other means of public transport in Venezuela do not have the same safety standards as in the United States.

 See our Road Safety page for more information.

**Aviation Safety Oversight:** The U.S. Federal Aviation Administration (FAA) has assessed that Venezuela's Civil Aviation Authority is not in compliance with International Civil Aviation Organization (ICAO) aviation safety standards for oversight of Venezuela's air carrier operations. Further information may be found on the FAA's safety assessment page.

The U.S. Department of Transportation issued an order suspending all nonstop flights between the United States and Venezuela. The Department of Homeland Security concluded that conditions in Venezuela threaten the safety and security of passengers, aircraft, and crew traveling to or from that country.

Due to risks to civil aviation operating within or in the vicinity of Venezuela, the Federal Aviation Administration (FAA) has issued a Notice to Air Missions (NOTAM) and/or a Special Federal Aviation Regulation (SFAR). For more information, U.S. citizens should consult the Federal Aviation Administration's Prohibitions, Restrictions, and Notices. Emergency medical evacuation flights between the United States and Venezuela may not be possible.

**Maritime Travel:**

Mariners should not travel to Venezuela. If transiting near Venezuelan maritime boundaries, check for U.S. maritime advisories and alerts. Information may also be posted to the U.S. Coast Guard homeport website, and the NGA broadcast warnings website.

We reiterate that the U.S. Department of State urges citizens not to travel to Venezuela or to attempt to enter Venezuela without a visa.

Incidents of piracy off the coast of Venezuela remain a concern. Yachters should note that anchoring offshore is not considered safe. Marinas, including those in Puerto la Cruz and Margarita Island (Porlamar), provide only minimal security, and you should exercise a heightened level of caution in Venezuelan waters.

# EXHIBIT I

**OFM Health Care Research Center**

Research brief No. 110

# Washington state's immigrant population: 2010-21

*By Wei Yen, Ph.D.*                                                          *May 2023*

## Introduction

This brief presents changes in Washington's immigrant population from 2010 to 2021. We grouped the state's population in four categories: U.S.-born citizens, naturalized citizens, legal immigrants and undocumented immigrants. Our data source is the Census Bureau's American Community Survey (ACS) 1-year Public Use Microdata Sample files. Before we analyzed the ACS data, we applied an adjustment to the data to account for the underreport of Medicaid population in the ACS beginning in 2014.[1] Estimates for 2020 are not available due to data quality issues that year in the ACS because of national data collection challenges during COVID-19.[2]

## Our main findings

- *Immigrant population has increased by 29% in Washington during 2010-21, with a larger increase in the immigrant group of naturalized citizens (37%). In 2021, the total immigrant population was 1,149,000.*

- *Shares of females in each immigrant population group remained about the same across the years, although the shares varied among the groups, between 40% and 60%.*

- *While the share of adults 18-64 declined in the U.S.-born citizen group to 58%, it remained the same in the immigrant groups (around 75% for naturalized citizen group and legal immigrant group, and 90% for the undocumented immigrant group).*

- *The share of individuals with Hispanic origin had a gradual but steady increase in the U.S.-born citizen group (8% to 12%). However, the undocumented immigrant group share declined from 54% to 39%.*

- *The shares of non-Hispanic white population declined in the U.S.-born citizen group (80% to 72%)[3] and the legal immigrant group (32% to 23%).*

- *The shares of non-Hispanic Asians or Pacific Islanders increased in the legal*

---

[1] For more information on our adjustment to the ACS, see
https://ofm.wa.gov/sites/default/files/public/legacy/healthcare/healthcoverage/pdf/undercount_medicaid.pdf.
[2] For more information about data issues in the 2020 American Community Survey, see
https://ofm.wa.gov/sites/default/files/public/dataresearch/researchbriefs/brief106.pdf.
[3] There is a strong reason to believe that large decline from 75.3% in 2019 to 71.5% in 2021 is mostly due to change in the survey question adopted in 2021 ACS. See more details in the section "Non-Hispanic white."

**Supp.Add.104**

*immigrant group (27% to 36%) and the undocumented immigrant group (27% to 43%).*

- *In the adult population age 18-64, all groups except the legal immigrant group had increased shares with a 4-year college degree or higher. The undocumented immigrant group had the largest change (22% to 47%).*

- *For all groups, shares of adults 18-64 who were employed increased to the highest point in 2019 (above 70%) and then declined in 2021.*

- *Shares of adults 18-64 in low-income families (less than 200% of the federal poverty level) declined in all groups, particularly in the undocumented immigrant group in which the share dropped by half (56% to 28%).*

## Immigrant population in 2010-21

Washington's total population increased by 15% from 2010 to 2021 (7.7 million). At the same time, U.S.-born citizen population increased by 13% and the immigrant population increased by 29%. Within the immigrant population, the naturalized citizen group had the largest increase, with 37%, while the legal immigrant group and the undocumented immigrant group increased by 20% and 23%.

U.S.-born citizens accounted for 86.7% of the total population in 2010 and 85.1% in 2021. The share of naturalized citizens increased slightly from 6.1% to 7.3%. The share of legal immigrants remained unchanged essentially, at about 3.6%. The share of undocumented immigrants also remained unchanged, at about 3.8%.

Table 1. Washington population (in thousands) by immigration status: 2010-21

| Immigration status | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2010-2021 change (%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State total population | 6,744 | 6,830 | 6,897 | 6,971 | 7,062 | 7,170 | 7,288 | 7,406 | 7,536 | 7,615 | | 7,739 | 14.7% |
| U.S.-born citizen | 5,850 | 5,912 | 5,985 | 6,027 | 6,132 | 6,191 | 6,269 | 6,339 | 6,426 | 6,483 | | 6,589 | 12.6% |
| Immigrant | 894 | 918 | 912 | 944 | 930 | 979 | 1,019 | 1,067 | 1,110 | 1,132 | | 1,149 | 28.5% |
| Naturalized citizen | 411 | 414 | 428 | 439 | 429 | 464 | 483 | 515 | 542 | 532 | | 563 | 37.0% |
| Legal immigrant | 236 | 237 | 227 | 232 | 240 | 262 | 287 | 288 | 279 | 293 | | 283 | 20.0% |
| Undocumented immigrant | 247 | 268 | 257 | 274 | 261 | 254 | 249 | 264 | 289 | 307 | | 304 | 22.6% |

Figure 1. Percentage of total population by immigration status, 2010-21: Washington



**Supp.Add.105**

## Changes in demographic characteristics, 2010-21

### Sex

There were no statistically significant changes in the share of females within any of the immigrant population groups from 2010 to 2021. However, across the groups, *differences* in the shares of females persisted. For example, while the share of females in the U.S.-born citizen group has been slightly below 50%, the share in the naturalized citizen group and legal immigrant groups has been higher, in the mid-50% and the share has been lower in the undocumented immigrant group, in the mid-40%.

Figure 2. Percentage of female in population groups by immigration status, 2010-21: Washington



### Children under 18

From 2010 to 2021, the share of children under 18 declined in the U.S.-born citizen, naturalized citizen and legal immigrant groups. In the undocumented immigrant group, the change in the share was not significant. There were, however, considerable differences across these four groups in their shares of children under 18.

The U.S.-born citizen group had the highest share, above 25%. The share was lowest in the naturalized citizen group, below 5% in all years except 2010. In the legal immigrant group, the share dropped from approximately 20% to about 11%. Finally, the share in the undocumented immigrant group remained between 5% and 10% at all times.

**Supp.Add.106**

Figure 3. Percentage of children under 18 in population groups by immigration status, 2010-21: Washington



## Adults 18-64

The only group that had a significant change from 2010 to 2021 in the share of adults 18-64 was the U.S.-born citizen group.

When the four groups' shares are ranked, the U.S.-born citizen group had the lowest share, at or slightly below 60%. The undocumented immigrant group had the highest share, around 90%. For the naturalized citizen group and the legal immigrant group, their shares were similar, between 70% and 80%.

Figure 4. Percentage of adults 18-64 in population groups by immigration status, 2010-21: Washington



**Supp.Add.107**

## Adults 65 and older

Washington's population has been aging over the past decade due to Baby Boomers entering the retirement age. This phenomenon manifested itself in the share of adults 65 and older in the U.S.-born citizens. This group's increased from 12.5% in 2010 to 16.6% in 2021. In all three immigrant groups, although the share was higher in 2021 than in 2010, the change was not statistically significant. Notable differences existed in the shares when we compared the four groups. The naturalized citizen group had the highest share, about 20%, followed by the U.S.-born citizen group (around 15%), the legal immigrant group (around 10%) and the undocumented immigrant group (around 2.5%).

Figure 5. Percentage of adults 65 and older in population groups by immigration status, 2010-21: Washington



## Hispanic origin

Two groups, the U.S.-born citizen group and the undocumented immigrant group, had opposite trends in their shares of people with Hispanic origin. The share in the U.S.-born citizen group rose steadily while the share in the undocumented immigrant group had an overall decline. The shares in the other two groups, naturalized citizen group and legal immigrant group, show little change over time. Despite the steady increase, the share (around 10%) in the U.S.- born citizen was the lowest when we compared all four groups. And despite the declining trend from mid-50% to approximately 40% in the undocumented immigrant group, its share remained the highest. The second highest share, between 30% and 35%, belonged to the legal immigrant group. The naturalized citizen group had the third highest share, around 15%. Note that in the U.S.-born citizen group, the average annual change from

**Supp.Add.108**

2010 to 2019 was an increase of approximately a quarter of a percent (0.24%). However, from 2019 to 2021, the average annual change was an increase of slightly over half of a percent (0.55%), more than twice the change in previous years.

This change from 2019 to 2021 is partially due to a change first implemented in 2020 in how the U.S. Census Bureau asked race/ethnicity questions in the American Community Survey.[4]

Figure 6. Percentage of people of Hispanic origin in population groups by immigration status, 2010-21: Washington



### Non-Hispanic white

Changes in the shares of non-Hispanic white persons are notable in the U.S.-born citizen group and the legal immigrant group, with declines in both groups. Changes in the other two groups were not statistically significant. The change from 75.3% in 2019 to 71.5% in 2021 among U.S.-born citizens was particularly large for this group. However, this large change is mostly the result of the change in how the race questions were asked in the American

Community Survey.[5] If we apply the average annual decline from 2010 to 2019 to the 2020 and 2021 ACS for Washington, we should expect the non-Hispanic white share in the U.S.-born citizen group to be approximately 74.4%. (This is true if we assume the ACS race/ethnicity questions did not change). In other words, it is reasonable to attribute a nearly 3 percentage point decline (74.4%-71.5%) in this group's share to the change based on how the race/ethnicity questions were asked in the ACS.

---

[4] For the change in the race/ethnicity questions, see https://www.census.gov/newsroom/blogs/random-samplings/2021/08/improvements-to-2020-census-race-hispanic-origin-question-designs.html.
[5] See the previous note for details about the change in the race/ethnicity questions in the ACS.

Supp.Add.109

Across the four groups, there was a large variation in the share of non-Hispanic white people. The U.S.-born citizen group had the highest share. The naturalized citizen group and the legal immigrant group had the second highest shares. These two groups had shares ranging between 20% and 35% and there was no statistical difference between these two groups in any single year. The undocumented immigrant group had the lowest share, between 11% and 15%.

Figure 7. Percentage of non-Hispanic white in population groups by immigration status, 2010-21: Washington



### Non-Hispanic Asian and Pacific Islander

The share of non-Hispanic Asians/Pacific Islanders in the U.S.-born citizen group had a gradual and steady increase during 2010-21. However, the average annual increase in 2019-21 appeared to be much larger than any previous year-to-year increase. The larger increases in 2019-21 may be caused by the change in the ACS questions on race/ethnicity.

In the naturalized citizen group, there was no apparent change. In the legal immigrant group, there was an increase in 2013 and the share afterwards remained at the increased level. In the undocumented immigrant group, the increase started in 2014 and continued to increase through 2021.

When compared across the four groups, the share of non-Hispanic Asian/Pacific Islander people was the highest in the naturalized citizen group (more than 40%) and the lowest in the U.S.-born citizen group (below 5%). In the remaining two groups, their shares appear to be similar (between high 20% to mid-30%), except that the share in the undocumented immigrant group appeared to have a faster increase in recent years than the share in the legal immigrant group.

**Supp.Add.110**

Figure 8. Percentage of non-Hispanic Asian or Pacific Islander people in population groups by immigration status, 2010-21: Washington



**Supp.Add.111**

## Changes in socio-economic characteristics of adults 18-64 from 2010 to 2021

### Education

The share of adults 18-64 years with a four-year college degree or higher increased in three of the four groups. The one with inconclusive trend was the legal immigrant group.

The highest share of the four groups was in the naturalized citizen group and it increased from 33% in 2010 to 43% in 2021. The undocumented immigrant group, for most of the years, had the lowest share.

However, in the last few years, this group's share had a rather fast increase, so much that it was tied statistically with the highest share in the naturalized citizen group by 2021. Over time, this group's share increased from 22% to 47%. The share in the legal immigrant group hovered around 30%, which placed the group's share between the second lowest and the lowest. The U.S.-born citizen group had a gradual yet steady increase in its share (from below 30% to 35%) and its rank among the four groups changed from the second highest to the third highest.

Figure 9. Percentage of adults aged 18-64 with a 4-year college degree or higher in population groups by immigration status, 2010-21: Washington



### Employment

The share of adults 18-64 years who were employed in each group showed an upward trend from 2010 to 2019 and then a decline from 2019 to 2021. The decline from 2019 to 2021 can be attributed to the COVID-19 pandemic because many businesses were

recovering in 2021. For all four groups, the share of the employed was at or above 60%. However, the share in the naturalized citizen group, between 75% and 80%, was consistently the highest in all years, except in 2021. The group with the lowest share at all

Supp.Add.112

times was the legal immigrant group, with a share between 60% and 75%. The share of the U.S.-born citizen group had a narrow range, between 70% and 75%, with a ranking of the second highest early on and the third highest in the last few years. The group with the second highest share in the last few years was the undocumented immigrant group. Its share increased from 65% in 2010 to its highest point of 78% in 2019 and then dropped slightly to 76% in 2021.

Figure 10. Percentage of adults aged 18-64 who were employed in population groups by immigration status, 2010-21: Washington



## Low income (family income below 200 percent of the federal poverty level)

The share of adults 18-64 with low income dropped in all four groups from 2010 to 2021. In the legal immigrant group and the undocumented immigrant group, there was a slight increase from 2019 to 2021, but the increase was not statistically significant for either group. The shares in the U.S.-born citizen group and the naturalized citizen group were quite similar, dropping from high 20% to about 20%. Their shares were much lower than the shares in the other two groups, especially in earlier years. The undocumented immigrant group had the highest share in earlier years, at about 50%. However, in the last two years, its share dropped to a level similar to that of the legal immigrant group, below 30%.

**Supp.Add.113**

Figure 11. Percentage with low family income (less than 200% of federal poverty level), adults aged 18-64 by immigration status, 2010-21: Washington



## Evolving demographic and socio-economic characteristics of the undocumented immigrants

Changes in the demographic and socio-economic characteristics of the undocumented immigrants are worth mention. In many cases, this group's changes were the most dramatic change during 2010-21. In the early years of this period, the undocumented immigrants were nearly all in the age range of 18-64, mostly male, individuals of Hispanic origin, non-white, and non-Asian/Pacific Islander. For those in the age range of 18-64, few had a 4-year college degree and beyond and most were in low-income, though the majority of them were employed.

By the end of this period, although undocumented immigrants continued to be nearly all in the 18-64 age range, mostly male and non-white, most of them were now no longer of Hispanic origin. For those

in the age range of 18-64, their share of having a 4-year college degree and beyond was approaching 50% and was the highest of all groups in 2021. The proportion with low-income dropped by half, the largest decline of all groups. Their share of being employed increased further and it was tied with the highest share.

We did not attempt to determine the cause(s) for the changes in the characteristics of the undocumented immigrant population because doing so requires data we do not have and also requires a more complex analysis. However, the higher employment share, the dramatic increase in the share holding a 4-year college degree and beyond, and the dramatic decrease in the share of low-income people appear to suggest that current undocumented immigrants were more likely to be here on expired temporary documents (e.g., student visa and temporary work visa) than in earlier years.

**Supp.Add.114**

# Data source and notes

## Data source

The original data source for this research brief is the US Census Bureau's American Community Survey (ACS) 1-year Public Use Microdata Sample files for 2010 to 2019 and 2021. The Health Care Research Center at the Office of Financial Management adjusted the ACS sample weights to correct the undercount of Medicaid enrollment found in ACS beginning in 2014.[6] This adjustment may have resulted in minor changes in estimates besides counts of Medicaid enrollment. We based estimates reported in this brief for 2014-20 and 2021 on the adjusted ACS data.

## Immigrant status

This brief classifies Washington's population into four groups according to their immigration statuses: U.S.-born citizen, naturalized citizen, legal immigrant and undocumented immigrant. U.S.-born citizen and naturalized citizen are determined by the citizenship and nativity data fields in the ACS. If a person is a citizen and was born native, that person is classified as U.S.-born citizen. A citizen reported to be a foreign-born is classified as a naturalized citizen. The remainder of the population are non-citizens. The ACS does not have direct data fields that can be used to classify a non-citizen as either legal immigrant or undocumented immigrant. To help make

that distinction, we applied an algorithm published in the journal of Labor Economics by George Jo. Borjas to the ACS data.[7] The Borjas algorithm uses existing information in federal surveys such as the Current Population Survey and the ACS to impute a non-citizen's legal status. Such information includes their arrival in U.S. before 1980, participation in public assistance programs, employment in government positions, veteran or person currently in armed forces, etc. Surveys may have sampling and response errors that may result in under-report of non-citizens, probably more so of undocumented immigrants. Estimates of the non-citizen populations in this brief may contain those errors. In addition, there may be an over-report of naturalized citizens in this brief since people born outside the U.S. but to parents who are U.S. citizens are classified as "naturalized citizens" in the brief's analysis.

## Missing income

The ACS data include a small number of records that have no income information. We excluded those records when we calculated the percentage of population in low income.

## Statistical difference between estimates

The difference between two estimates is considered statistically significant if their 95% confidence intervals of the two estimates do not overlap.

---

[6] See footnote 1.
[7] Borjas, GJ. The Labor supply of undocumented immigrants. Labor Economics 46(2017):1-13.

**Supp.Add.115**

# Appendixes

Table A1. Total population by immigration status (in percentage), Washington, 2010-19 and 2021

| Immigration status | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 | '18 | '19 | '20 | '21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| U.S.-born citizen | 86.7 | 86.6 | 86.8 | 86.5 | 86.8 | 86.3 | 86.0 | 85.6 | 85.3 | 85.1 | | 85.1 |
| Naturalized citizen | 6.1 | 6.1 | 6.2 | 6.3 | 6.1 | 6.5 | 6.6 | 7.0 | 7.2 | 7.0 | | 7.3 |
| Legal immigrant | 3.5 | 3.5 | 3.3 | 3.3 | 3.4 | 3.6 | 3.9 | 3.9 | 3.7 | 3.9 | | 3.7 |
| Undocumented immigrant | 3.7 | 3.9 | 3.7 | 3.9 | 3.7 | 3.5 | 3.4 | 3.6 | 3.8 | 4.0 | | 3.9 |
| Total population | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | | 100 |

Table A2. Demographic characteristics by Immigration status (in percentage), total population, Washington, 2010-19 and 2021

| Characteristic | Immigration Status | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 | '18 | '19 | '20 | '21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Female | U.S.-born citizen | 49.8 | 49.8 | 49.9 | 49.8 | 49.7 | 49.8 | 49.7 | 49.7 | 49.7 | 49.7 | | 49.3 |
| | Naturalized citizen | 55.9 | 54.7 | 55.1 | 55.8 | 55.1 | 55.1 | 54.5 | 55.6 | 54.8 | 54.4 | | 54.4 |
| | Legal immigrant | 56.8 | 56.4 | 54.5 | 54.7 | 54.7 | 53.9 | 55.0 | 53.4 | 52.6 | 55.2 | | 52.8 |
| | Undocumented immigrant | 43.6 | 44.3 | 44.7 | 42.5 | 43.6 | 43.4 | 45.4 | 44.2 | 45.4 | 42.7 | | 44.8 |
| Age 0-17 | U.S.-born citizen | 27.1 | 26.8 | 26.7 | 26.6 | 26.5 | 26.4 | 26.2 | 26.2 | 26.0 | 26.0 | | 25.6 |
| | Naturalized citizen | 6.4 | 4.8 | 4.8 | 4.7 | 4.4 | 3.8 | 4.1 | 4.1 | 3.9 | 2.8 | | 3.4 |
| | Legal immigrant | 19.5 | 16.5 | 14.4 | 15.9 | 14.3 | 12.8 | 15.1 | 14.3 | 13.3 | 11.3 | | 11.4 |
| | Undocumented immigrant | 8.9 | 8.7 | 8.1 | 6.1 | 7.4 | 7.0 | 5.6 | 6.9 | 7.3 | 8.7 | | 9.1 |
| Age 18-64 | U.S.-born citizen | 60.5 | 60.5 | 60.1 | 59.5 | 59.3 | 59.0 | 58.8 | 58.6 | 58.2 | 57.8 | | 57.8 |
| | Naturalized citizen | 74.1 | 75.7 | 76.5 | 75.8 | 75.4 | 76.0 | 74.1 | 74.4 | 74.0 | 74.4 | | 75.4 |
| | Legal immigrant | 71.6 | 72.8 | 73.3 | 72.1 | 74.3 | 76.0 | 75.4 | 74.0 | 77.3 | 78.7 | | 76.6 |
| | Undocumented immigrant | 89.6 | 89.7 | 90.0 | 92.7 | 89.9 | 90.5 | 92.2 | 90.4 | 90.8 | 89.3 | | 88.5 |
| Age 65 and older | U.S.-born citizen | 12.5 | 12.7 | 13.3 | 13.8 | 14.2 | 14.6 | 15.0 | 15.2 | 15.7 | 16.2 | | 16.6 |
| | Naturalized citizen | 19.5 | 19.5 | 18.7 | 19.5 | 20.2 | 20.2 | 21.8 | 21.5 | 22.1 | 22.8 | | 21.2 |
| | Legal immigrant | 8.9 | 10.7 | 12.3 | 12.0 | 11.5 | 11.2 | 9.5 | 11.6 | 9.4 | 10.1 | | 12.0 |
| | Undocumented immigrant | 1.5 | 1.6 | 1.9 | 1.2 | 2.6 | 2.5 | 2.2 | 2.7 | 1.9 | 2.0 | | 2.3 |
| Hispanic | U.S.-born citizen | 8.3 | 8.7 | 8.7 | 9.2 | 9.5 | 9.6 | 9.7 | 10.1 | 10.2 | 10.5 | | 11.6 |
| | Naturalized citizen | 14.5 | 14.5 | 15.1 | 14.4 | 14.5 | 15.7 | 15.5 | 15.2 | 17.0 | 16.6 | | 14.3 |
| | Legal immigrant | 33.3 | 31.0 | 34.2 | 29.3 | 34.8 | 35.0 | 34.8 | 34.6 | 31.9 | 32.1 | | 34.0 |
| | Undocumented immigrant | 54.4 | 52.0 | 55.3 | 54.1 | 49.7 | 49.7 | 49.5 | 45.8 | 45.3 | 41.0 | | 39.4 |
| Non-Hispanic white | U.S.-born citizen | 79.5 | 79.1 | 78.4 | 78.1 | 77.2 | 77.0 | 76.8 | 76.1 | 75.7 | 75.3 | | 71.5 |
| | Naturalized citizen | 30.9 | 30.0 | 32.1 | 30.3 | 29.8 | 29.5 | 28.4 | 29.9 | 27.3 | 27.1 | | 27.7 |
| | Legal immigrant | 31.6 | 33.2 | 28.1 | 28.9 | 24.3 | 25.8 | 25.2 | 23.2 | 24.0 | 21.2 | | 22.8 |
| | Undocumented immigrant | 15.4 | 12.9 | 14.1 | 13.2 | 14.6 | 11.6 | 11.9 | 11.8 | 10.8 | 12.9 | | 14.1 |
| Non-Hispanic Asian and Pacific Islander | U.S.-born citizen | 3.3 | 3.3 | 3.5 | 3.5 | 3.6 | 3.5 | 3.8 | 3.8 | 4.0 | 4.0 | | 4.3 |
| | Naturalized citizen | 47.3 | 46.8 | 45.3 | 47.3 | 49.1 | 46.3 | 46.2 | 46.1 | 45.7 | 46.9 | | 46.9 |
| | Legal immigrant | 26.8 | 28.7 | 28.6 | 35.2 | 31.8 | 33.6 | 29.9 | 34.0 | 33.4 | 32.9 | | 35.6 |
| | Undocumented immigrant | 27.4 | 30.2 | 26.7 | 27.5 | 32.1 | 36.2 | 34.8 | 37.0 | 39.0 | 40.4 | | 42.7 |

**Supp.Add.116**

Table A3. Education, employment and income by immigration status (in percentage): adults 18-64, 2010-19 and 2021

| Characteristic | Immigration status | '10 | '11 | '12 | '13 | '14 | '15 | '16 | '17 | '18 | '19 | '20 | '21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-year college education or higher | U.S.-born citizen | 28.8 | 29.1 | 29.1 | 29.9 | 30.1 | 30.3 | 31.6 | 32.0 | 32.7 | 32.8 | | 34.7 |
| | Naturalized citizen | 33.4 | 33.5 | 34.7 | 34.2 | 36.8 | 37.4 | 39.1 | 37.5 | 40.4 | 41.0 | | 43.1 |
| | Legal immigrant | 27.5 | 27.3 | 28.1 | 31.7 | 25.3 | 29.1 | 31.2 | 31.4 | 34.1 | 32.4 | | 32.9 |
| | Undocumented immigrant | 22.0 | 22.6 | 21.8 | 25.5 | 27.1 | 30.7 | 30.7 | 37.0 | 37.5 | 40.9 | | 46.6 |
| Employed | U.S.-born citizen | 69.0 | 69.0 | 70.3 | 70.4 | 70.1 | 71.1 | 72.0 | 73.7 | 74.1 | 74.3 | | 71.7 |
| | Naturalized citizen | 74.9 | 75.6 | 75.0 | 74.5 | 78.2 | 76.9 | 77.2 | 78.3 | 78.0 | 80.3 | | 75.8 |
| | Legal immigrant | 61.6 | 61.4 | 61.5 | 64.1 | 59.3 | 65.6 | 63.5 | 65.0 | 68.0 | 74.0 | | 65.1 |
| | Undocumented immigrant | 64.9 | 66.8 | 70.5 | 71.0 | 72.8 | 71.1 | 73.1 | 73.1 | 74.5 | 77.6 | | 76.1 |
| Low-income (below 200% of FPL) | U.S.-born citizen | 24.3 | 25.7 | 26.2 | 26.6 | 26.0 | 25.2 | 23.3 | 22.0 | 21.6 | 20.6 | | 19.9 |
| | Naturalized citizen | 25.2 | 28.3 | 25.6 | 27.6 | 23.8 | 26.5 | 22.3 | 19.7 | 20.8 | 19.3 | | 19.2 |
| | Legal immigrant | 41.7 | 40.8 | 41.3 | 41.4 | 47.8 | 42.4 | 39.9 | 34.4 | 35.6 | 29.6 | | 31.0 |
| | Undocumented immigrant | 56.2 | 55.8 | 51.4 | 51.7 | 47.1 | 43.5 | 41.5 | 40.2 | 33.3 | 26.5 | | 27.8 |

**Supp.Add.117**

# EXHIBIT J



Washington
State
Department
of Health

# All Births Dashboard - County

| Top 50 Baby Names to WA Residents | General Fertility Rate by County | General Fertility Rate by Maternal Race and County | Crude Birth Rate by County | Crude Birth Rate by Infant Sex and County | Age Specific Birth Rate by County |

**General Fertility Rate: Total # of Births to Women of All Ages per 1,000 women aged 15-44 years (WA Residents only)**
Data are available in this tab for years 2011-2022 at the State and County levels. Please use the slider to select a year. The last tab titled "Download Data Table" allows you to select the data you would like to download for analysis.

Map (Select a Year)

2022



| Geography | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 20 |
|---|---|---|---|---|---|---|---|---|
| State Total | 53.5 | 54.7 | 54.6 | 56.7 | 58.5 | 60.6 | 63.7 | 63 |
| Adams | 79.5 | 92.0 | 84.3 | 99.6 | 100.8 | 104.0 | 100.1 | 93 |
| Asotin | 59.2 | 61.0 | 59.2 | 60.9 | 72.2 | 51.6 | 6.8 | 5 |
| Benton | 61.8 | 64.0 | 63.7 | 66.3 | 68.3 | 70.0 | 75.8 | 73 |
| Chelan | 55.9 | 57.8 | 57.9 | 64.9 | 63.4 | 64.0 | 69.5 | 71 |
| Clallam | 46.9 | 56.9 | 57.3 | 55.9 | 57.6 | 64.2 | 63.5 | 64 |
| Clark | 55.4 | 57.0 | 55.6 | 59.3 | 59.3 | 59.3 | 60.8 | 56 |
| Columbia | 61.5 | 48.4 | 53.7 | 50.2 | 58.2 | 60.3 | 65.3 | 56 |
| Cowlitz | 64.0 | 61.7 | 64.7 | 65.3 | 65.7 | 69.4 | 66.4 | 62 |
| Douglas | 65.5 | 65.3 | 61.5 | 64.5 | 66.2 | 77.1 | 71.3 | 76 |
| Ferry | 63.2 | 73.4 | 67.1 | 72.6 | 65.9 | 72.4 | 80.1 | 53 |
| Franklin | 69.1 | 70.4 | 73.8 | 78.1 | 79.4 | 84.9 | 89.3 | 90 |
| Garfield | 87.7 | 81.5 | 56.4 | 68.8 | 78.8 | 89.7 | | 33 |

General Fertility Rate per 1,000 women (aged 15-44)

© 2025 Mapbox © OpenStreetMap    30.09    87.69



Line Graph (Select Geographies)

(Multiple values)

**Geography**
- King
- Pierce
- Snohomish
- Thurston

**State Reference**
- State Total

NR = Not Reliable. Rates are not reliable due to counts less than 17. ** = Suppression. Rates are suppressed when counts are between 1-9.
For more information, please click on the landing page: https://doh.wa.gov/data-and-statistical-reports/washington-tracking-network-wtn/birth-outcomes-data
Citation: Washington State Department of Health, Center for Health Statistics, Birth Certificate Data, 2000–2022. Due to the current lack of Small Area Data Estimates from Office of Financial Management (OFM), the population data used to calculate rates in this dashboard come from the



The Honorable Judge John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,

                Plaintiffs,

    v.

DONALD TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
capacity as Secretary of Homeland Security;
U.S. SOCIAL SECURITY
ADMINISTRATION; MICHELLE KING,
in her official capacity as Acting
Commissioner of the Social Security
Administration; U.S. DEPARTMENT OF
STATE; MARCO RUBIO, in his official
capacity as Secretary of State; U.S.
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY FINK,
in her official capacity as Acting Secretary
of Health and Human Services; U.S.
DEPARTMENT OF JUSTICE; JAMES
MCHENRY, in his official capacity as
Acting Attorney General; U.S.
DEPARTMENT OF AGRICULTURE;
GARY WASHINGTON, in his official
capacity as Acting Secretary of Agriculture;
and the UNITED STATES OF AMERICA,

                Defendants.

NO. 2:25-cv-00127-JCC

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR:
FEBRUARY 6, 2025

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.120**

## **TABLE OF CONTENTS**

I.     INTRODUCTION....................................................................................... 1

II.    BACKGROUND........................................................................................ 3

       A.    President Trump Issues the Citizenship Stripping Order on Day One of His
             Presidency........................................................................................ 3

       B.    The Citizenship Stripping Order Will Immediately Disrupt Plaintiff States'
             Programs and Upset the Lives of Hundreds of Thousands of Families.................. 3

III.   ARGUMENT .............................................................................................. 5

       A.    The Plaintiff States Have Standing to Challenge the Citizenship Stripping
             Order ................................................................................................ 6

       B.    The Plaintiff States' Claims Are Likely to Succeed on the Merits Because
             Birthright Citizenship Is a Cornerstone of American Constitutional and
             Statutory Law That Is Beyond Serious Dispute....................................... 9

             1.     Birthright Citizenship Is Enshrined in the Constitution .................... 9

             2.     Birthright Citizenship Is Protected Under the INA .......................... 14

       C.    The Citizenship Stripping Order Will Immediately and Irreparably Harm the
             Plaintiff States................................................................................. 15

       D.    The Equities and Public Interest Weigh Strongly in the Plaintiff States' Favor ..... 19

       E.    A Nationwide Injunction Barring Implementation of the Citizenship Stripping
             Order Is Needed to Provide Complete Relief ........................................ 23

IV.    CONCLUSION ......................................................................................... 24

PLAINTIFF STATES' MOTION FOR            i            ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                         Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                                  800 Fifth Avenue, Suite 2000
                                                                Seattle, WA  98104
                                                                  (206) 464-7744

                                                              **Supp.Add.121**

# TABLE OF AUTHORITIES

### Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
  458 U.S. 592 (1982) ............................................................................................ 6

*Aptheker v. Sec'y of State,*
  378 U.S. 500 (1964) .......................................................................................... 20

*Ariz. Democratic Party v. Hobbs,*
  976 F.3d 1081 (9th Cir. 2020) .......................................................................... 19

*Betschart v. Oregon,*
  103 F.4th 607 (9th Cir. 2024) ........................................................................... 20

*Biden v. Nebraska,*
  --- U.S. ---, 143 S. Ct. 2355 (2023) ............................................................. 7, 23

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) .......................................................................................... 14

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018) ............................................................................ 15

*Chin v. United States,*
  43 App. D.C. 38 (D.C. App. Ct. 1915) ............................................................ 13

*City & Cnty. of San Francisco v. U.S. Citizen & Immigr. Servs.,*
  981 F.3d 742 (9th Cir. 2020) ....................................................................... 7, 19

*Davis v. Packard,*
  33 U.S. 312 (1834) .............................................................................................. 6

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ............................................................................................ 6

*Diamond v. Charles,*
  476 U.S. 54 (1986) .............................................................................................. 6

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ............................................................................................ 9

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020) .......................................................................... 23

*Doe v. Trump,*
  288 F. Supp. 3d 1045 (W.D. Wash. 2017) ...................................................... 19

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

ii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.122

*Dred Scott v. Sandford*,
  60 U.S. 393 (1857)................................................................................................ 1, 19

*Fedorenko v. United States*,
  449 U.S. 490 (1981)...................................................................................................... 3

*Gee v. United States*,
  49 F. 146 (9th Cir. 1892)............................................................................................. 13

*George v. McDonough*,
  596 U.S. 740 (2022)..................................................................................................... 15

*Idaho v. Coeur d'Alene Tribe*,
  794 F.3d 1039 (9th Cir. 2015)..................................................................................... 16

*INS v. Rios-Pineda*,
  471 U.S. 444 (1985)..................................................................................................... 12

*Ledbetter v. Baldwin*,
  479 U.S. 1309 (1986)................................................................................................... 16

*Moy Suey v. United States*,
  147 F. 697 (7th Cir. 1906)........................................................................................... 13

*Perkins v. Elg*,
  307 U.S. 325 (1939)..................................................................................................... 12

*Plyler v. Doe*,
  457 U.S. 202 (1982)......................................................................................... 10, 11, 12

*Regan v. King*,
  49 F. Supp. 222 (N.D. Cal. 1942)............................................................................... 13

*Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017)........................................................................ 22

*Schooner Exch. v. McFaddon*,
  11 U.S. 116 (1812)......................................................................................................... 6

*Trop v. Dulles*,
  356 U.S. 86 (1958)....................................................................................................... 20

*United States v. Texas*,
  599 U.S. 670 (2023)....................................................................................................... 6

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898)......................................................................................... 11, 12, 13

*Washington v. U.S. Food & Drug Admin.*,
  108 F.4th 1163 (9th Cir. 2024)...................................................................................... 6

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

iii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.123

*Winter v. Nat. Res. Def. Council, Inc.*,
      555 U.S. 7 (2008)...................................................................................................... 5

*Wolford v. Lopez*,
      116 F.4th 959 (9th Cir. 2024). .............................................................................. 19

## Constitutional Provisions

U.S. Const. amend. XIV, § 1 ................................................................................... 9

U.S. Const. amend. XXVI ...................................................................................... 20

U.S. Const. art. I, §§ 2-3......................................................................................... 20

U.S. Const. art. II, § 1 ............................................................................................ 20

## Statutes

8 U.S.C. § 1401(a) .................................................................................................. 14

8 U.S.C. § 1611(a) .................................................................................................. 16

8 U.S.C. § 1611(c)(1)(B) ........................................................................................ 16

22 U.S.C. § 211(a) .................................................................................................. 14

28 U.S.C. § 1865(b)(1) ........................................................................................... 20

42 U.S.C. §1395dd(b) ............................................................................................ 17

42 U.S.C. §1396b(v)............................................................................................... 16

## Regulations

6 C.F.R. § 37.5 ........................................................................................................ 21

6 C.F.R. § 37.11(g) ................................................................................................. 21

8 C.F.R. § 274a.12 .................................................................................................. 21

22 C.F.R. § 51.2 ...................................................................................................... 21

34 C.F.R. § 668.33(a) ............................................................................................. 21

42 C.F.R. § 435.406 ................................................................................................ 16

42 C.F.R. § 440.255(c) ........................................................................................... 17

PLAINTIFF STATES' MOTION FOR                    iv              ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                                         Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                                                  800 Fifth Avenue, Suite 2000
                                                                                  Seattle, WA  98104
                                                                                     (206) 464-7744

Supp.Add.124

1

## Other Authorities

2
Gabriel J. Chin & Paul Finkelman,
3     *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal*
    *Immigration Regulation,*
4     54 U.C. Davis L. Rev. 2215 (2021) ..................................................................... 11

5
Garrett Epps,
    *The Citizenship Clause: A "Legislative History,"*
6     60 Am. Univ. L. Rev. 331 (2010) ........................................................................ 11

7
*To Revise and Codify the Nationality Laws of United States into a Comprehensive*
    *Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R.*
8     *6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess. (1940) .............................. 15

9
James C. Ho,
    *Birthright Citizenship, The Fourteenth Amendment, and State Authority*,
10     42 U. Rich. L. Rev. 969 (2008) ........................................................................... 10

11
James C. Ho,
    *Defining "American" Birthright Citizenship and the Original Understanding of the*
12     *14th Amendment,*
    9 Green Bag 367, 369 (2006) .............................................................................. 10

13
*Legislation Denying Citizenship at Birth to Certain Children Born in the United States*,
14     19 Op. O.L.C. 340 (1995) ........................................................................ 13, 19, 23

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF STATES' MOTION FOR       v       ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                 Civil Rights Division
CASE NO. 2:25-CV-00127-JCC             800 Fifth Avenue, Suite 2000
                                          Seattle, WA 98104
                                          (206) 464-7744

Supp.Add.125

# I. INTRODUCTION

The Fourteenth Amendment's Citizenship Clause emerged out of one of our Nation's darkest chapters and embodies one of its most solemn promises. It was passed and ratified following the Civil War to overturn the Supreme Court's infamous holding in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), which denied citizenship to an entire class of persons—descendants of enslaved people. The Citizenship Clause repudiated *Dred Scott* and reaffirmed the common law principle of *jus soli*, under which all individuals born in the United States and subject to its jurisdiction are citizens. Its operation is automatic and its scope broad. It provides our Nation a bright-line and nearly universal rule under which citizenship cannot be conditioned on one's race, ethnicity, alienage, or the immigration status of one's parents. And since its adoption, the Supreme Court, Congress, and the Executive Branch have continuously affirmed its foundational principle that birth in the United States confers citizenship, with all its benefits and privileges.

President Trump and the federal government now seek to impose a modern version of *Dred Scott*. But nothing in the Constitution grants the President, federal agencies, or anyone else authority to impose conditions on the grant of citizenship to individuals born in the United States. The President's Executive Order of January 20, 2025—the Citizenship Stripping Order—declares that children born to parents who are undocumented or who have lawful, but temporary, status lack citizenship and directs federal agencies to deprive those individuals of their rights. It is flatly contrary to the Fourteenth Amendment's text and history, century-old Supreme Court precedent, longstanding Executive Branch interpretation, and the Immigration and Nationality Act (INA). The Plaintiff States are therefore exceedingly likely to succeed on the merits of their claims.

Absent an injunction, the Citizenship Stripping Order will cause substantial and irreparable harm to the Plaintiff States and their residents. More than 150,000 newborn children who are born each year in the United States will be denied citizenship under the Citizenship

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.126

Stripping Order because their parents are undocumented; more than 1,100 such children are born in the Plaintiff States each month. These numbers represent only a conservative baseline because the Order also attempts to deny citizenship to children born to parents with lawful, temporary status. If implemented, the Citizenship Stripping Order will cause the Plaintiff States to lose substantial federal funds that are conditioned on their residents' citizenship and to incur immediate, substantial, and unbudgeted expenditures to implement the massive changes required to state programs and systems, none of which the Plaintiff States can recoup through this case or otherwise.

The Plaintiff States will also suffer irreparable harm because thousands of children will be born within their borders but denied full participation and opportunity in American society and the Plaintiff States' communities. Children born in the Plaintiff States will be rendered undocumented, subject to removal or detention, and many left stateless. They will be denied their right to travel freely and re-enter the United States, including the Plaintiff States. They will lose their ability to obtain a Social Security number (SSN) and work lawfully in the Plaintiff States as they grow up. They will be denied their right to vote, serve on juries, and run for certain offices. And they will be placed into positions of instability and insecurity as part of a new, Presidentially-created underclass in the United States.

In issuing the Temporary Restraining Order currently in place, the Court rightfully recognized the blatant unlawfulness of the Citizenship Stripping Order and the grave harms it will cause. ECF No. 43. A preliminary injunction is imperative to protect the Plaintiff States and their public agencies, public programs, public fiscs, and state residents against the egregiously illegal actions of the President and federal government. The Court should preliminarily enjoin the implementation and enforcement of the Citizenship Stripping Order.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.127

## II.    BACKGROUND

### A.    President Trump Issues the Citizenship Stripping Order on Day One of His Presidency

On January 20, 2025, President Trump issued an Executive Order entitled "Protecting the Meaning and Value of American Citizenship." ECF No. 1 ¶ 2; Declaration of Lane Polozola, Ex. 1. Section 1 of the Order declares that U.S. citizenship "does not automatically extend to persons born in the United States" if (1) the individual's mother was "unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth"; or (2) the "person's mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Polozola Decl., Ex. 1. Section 2 states that it is the "policy of the United States" that no department or agency of the federal government shall issue documents recognizing such persons as U.S. citizens or accept documents issued by State governments recognizing such persons as U.S. citizens. *Id.* This specific provision is effective for births occurring on or after February 19, 2025. *Id.* Section 3 directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and mandates that officials cannot "act, or forbear from acting, in any manner inconsistent with this order." *Id.* Finally, the Order directs that "the heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." *Id.*

### B.    The Citizenship Stripping Order Will Immediately Disrupt Plaintiff States' Programs and Upset the Lives of Hundreds of Thousands of Families

Citizenship confers the "right to full and equal status in our national community, a right conferring benefits of inestimable value upon those who possess it." *Fedorenko v. United States*, 449 U.S. 490, 522 (1981) (Blackmun, J., concurring). At the highest level, "citizenship confers

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.128**

legal, political, and social membership in the United States, thus creating paths to mobility." Declaration of Caitlin Patler ¶ 9. It guarantees the opportunity to participate and belong in society—to live free from fear of deportation, vote, serve on a jury, and travel. ECF No. 1 ¶¶ 55-63; *see* Declaration of Mozhdeh Oskouian ¶¶ 5-9; Declaration of David Baluarte ¶¶ 12-15. It further provides the opportunity to achieve economic, health, and educational potential through the right to work legally and through eligibility for social supports, such as federally backed healthcare benefits, cash and food assistance during vulnerable times, and federal student financial aid. ECF No. 1 ¶¶ 64-65, 71-90; Patler Decl. ¶¶ 10-13, 16-22; Declaration of Tom Wong ¶¶ 11-14; Declaration of Sarah Peterson ¶¶ 5, 8-10.

By purporting to revoke birthright citizenship, the Citizenship Stripping Order seeks to immediately deny these rights and benefits to more than 150,000 children born each year in the United States, condemning most to a life without authorized immigration status and some to statelessness. ECF No. 1 ¶ 3; Declaration of Shelley Lapkoff ¶¶ 10, 16; Baluarte Decl. ¶¶ 8-10; Oskouian Decl. ¶¶ 5-10. Instead of the right to full participation and belonging in their home country—the United States—these children will be forced to live "in the shadow," under the constant risk of deportation and unable to obtain work authorization as they grow up, interrupting their "ability to count on the promise of the future." Patler Decl. ¶¶ 20-21; *see also* ECF No. 1 ¶¶ 56, 64-65; Oskouian Decl. ¶¶ 5, 9-10, 12; Baluarte Decl. ¶¶ 12-15.

"Denying birthright citizenship to children born in the U.S. to undocumented parents will create a permanent underclass of people who are excluded from U.S. citizenship and are thus not able to realize their full potential." Wong Decl. ¶ 9. Indeed, the consequences will be severe and long-lasting to the Plaintiff States and their communities, of which the children born under the Order are a part. Undocumented students are less likely to complete high school or enroll in higher education and will earn less at almost every stage of the lifetimes than their citizen counterparts. ECF No. 1 ¶ 64; Patler Decl. ¶¶ 10-12; Wong Decl. ¶¶ 11-12, 14. They will be more likely than their citizen peers to experience disease, depression, anxiety, and social

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.129**

1  isolation. ECF No. 1 ¶ 64; Patler Decl. ¶¶ 18-19, 22. Stated differently, "[b]irthright citizenship

2  is a cornerstone of the U.S. identity as a nation of immigrants, promoting social cohesion,

3  opportunity, and mobility. Ending birthright citizenship would erode those principles and divide

4  our national community, creating and reinforcing vast inequality for generations to come." Patler

5  Decl. ¶ 27.

6        The Citizenship Stripping Order will directly injure the Plaintiff States in other ways,

7  too, including by directly reducing their federal funding through programs that the Plaintiff

8  States administer, such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-

9  E foster care and adoption assistance programs, and programs to facilitate streamlined issuance

10  of SSNs to eligible babies—among others. ECF No. 1 ¶¶ 71-92; *see* Declaration of Charissa

11  Fotinos ¶¶ 21-28; Declaration of Jenny Heddin ¶¶ 11-21; Declaration of Katherine Hutchinson

12  ¶¶ 9-13; Declaration of Jeffrey Tegen ¶¶ 8-17, 21-26; Declaration of Krystal Colburn ¶¶ 12-15;

13  Declaration of Nadine O'Leary ¶¶ 19-22; Declaration of Jennifer Woodward ¶ 13; Declaration

14  of Aprille Flint-Gerner ¶¶ 12-16; Declaration of Heidi Mueller ¶¶ 16-30. In addition to these

15  direct and substantial financial losses, the Plaintiff States will also be required to immediately

16  begin modifying the funding, operational structure, and administration of large, statewide

17  programs to account for this change. ECF No. 1 ¶¶ 93-101; Fotinos Decl. ¶¶ 21-25, 28; Heddin

18  Decl. ¶¶ 18-21; Hutchinson Decl. ¶¶ 14-18; Tegen Decl. ¶¶ 18-20; O'Leary Decl. ¶¶ 7-13, 23;

19  Woodward Decl. ¶¶ 14-18; Flint-Gerner Decl. ¶¶ 16-18; Mueller Decl. ¶¶ 31-39.

20  ## III.    ARGUMENT

21        A preliminary injunction is warranted where the moving party establishes that (1) it is

22  likely to succeed on the merits; (2) irreparable harm is likely absent preliminary relief; (3) the

23  balance of equities tips in the movant's favor; and (4) an injunction is in the public interest.

24  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All factors strongly favor the

25  Plaintiff States here. The Court should enter a nationwide preliminary injunction to prevent the

26  cascade of irreparable and immediate harm that will follow if the Order is implemented.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.130

**A.      The Plaintiff States Have Standing to Challenge the Citizenship Stripping Order**

The Plaintiff States have standing to obtain an injunction because the Citizenship Stripping Order harms both their sovereign and pecuniary interests. The Plaintiff States' sovereign interests involve "the exercise of sovereign power over individuals and entities within the relevant jurisdiction." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). "[T]his involves the power to create and enforce a legal code, both civil and criminal." *Id.*; *see also Diamond v. Charles*, 476 U.S. 54, 65 (1986) (the power to enforce a legal code "is one of the quintessential functions of a State," and gives the State a "direct stake . . . in defending the standards embodied in that code") (cleaned up). "This interest is sufficient to convey standing to . . . challenge a federal [law] that preempts or nullifies state law." *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024).

Here, the Citizenship Stripping Order proclaims that thousands of the Plaintiff States' residents are not subject to the jurisdiction of the United States. While that assertion is based on a frivolous interpretation of the Fourteenth Amendment, *see infra* § III.B, if not enjoined the Order would render these residents the legal equivalents of "foreign ministers" who enjoy immunity from "national or municipal law." *Schooner Exch. v. McFaddon*, 11 U.S. 116, 138, 147 (1812); *see also Davis v. Packard*, 33 U.S. 312, 324 (1834) (affirming dismissal of civil suit against diplomat whose status "exempted him from being sued in [New York] state court"). Because the Plaintiff States have a "'sovereign interest' in the retention of [their] authority" to regulate individuals within their borders, they have standing to challenge the present attempt to gut it. *Washington*, 108 F.4th at 1176 (quoting *Snapp*, 458 U.S. at 601).

Next, the Plaintiff States may seek redress for the direct and immediate economic and administrative harms the Citizenship Stripping Order will impose. As the Supreme Court has recognized, "[m]onetary costs are of course an injury[,]" *United States v. Texas*, 599 U.S. 670, 676 (2023), and such losses constitute "sufficiently concrete and imminent injury to satisfy Article III," *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019). Indeed, where the federal

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.131**

government's action causes a direct reduction in the number of individuals a state entity serves—and therefore a loss of revenue—the loss is unquestionably sufficient for standing. *Biden v. Nebraska*, --- U.S. ---, 143 S. Ct. 2355, 2365-66 (2023) (holding Missouri had standing to challenge federal action cancelling student loans because state entity serviced loans under contract with the federal government and the state alleged the challenged action would cost it millions in fees "it otherwise would have earned under its contract"). The Ninth Circuit has likewise confirmed that states have standing to challenge unlawful federal action that will directly reduce the number of individuals eligible for federally backed programs like Medicaid. *City & Cnty. of San Francisco v. U.S. Citizen & Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020).

The Plaintiff States provide health, social, and administrative services to their residents and will, as a result of the Order, lose substantial federal funds they currently receive. Thousands of babies born each year will be impacted. At a minimum, there will be approximately 4,000 in Washington, 5,200 in Illinois, 3,400 in Arizona, and 1,500 in Oregon. ECF No. 1 ¶ 3; Lapkoff Decl. ¶¶ 11-16. If denied citizenship, these children will no longer be eligible for programs the Plaintiff States administer pursuant to federal law, including Medicaid, CHIP, and foster care and adoption assistance programs. ECF No. 1 ¶¶ 94-100; Fotinos Decl. ¶¶ 21-28; Heddin Decl. ¶¶ 6, 11-13; Tegen Decl. ¶¶ 8-17, 23-25; Flint-Gerner Decl. ¶ 6; Mueller Decl. ¶¶ 16-30. The result is that the Plaintiff States will necessarily lose federal reimbursement dollars for services provided through these programs. *See* Fotinos Decl. ¶¶ 21-28 (Washington's Health Care Authority (HCA) estimating likely loss of nearly $7 million per year if approximately 4,000 children become ineligible for Medicaid or CHIP coverage); Tegen Decl. ¶¶ 23-25 (Arizona Health Care Cost Containment System (AHCCCS) estimating expected reduction in federal revenue to the state for medical care for children of $321,844,600 over the first 18 years of life for the first cohort subject to the Order); Flint-Gerner Decl. ¶¶ 12-14 (Oregon Department of Human Services (ODHS) estimating that "even 45 fewer children being eligible for Title IV-E"

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.132**

1    would reduce "Oregon's reimbursement by $3.4 million" and "even just eight fewer eligible

2    children per year equates to $596,850.49 in lost federal funding"); Heddin Decl. ¶¶ 11-19

3    (detailing how each loss of an eligible child will negatively impact Washington's foster care

4    reimbursements under Title IV-E); Mueller Decl. ¶¶ 16-30 (same). These losses will further

5    injure the Plaintiff States by harming children who are wards in their custody. *See* ECF No. 1

6    ¶¶ 89-90.

7          The Plaintiff States will likewise suffer direct losses of federal reimbursements under the

8    Social Security Administration's (SSA) longstanding Enumeration at Birth program. ECF No. 1

9    ¶¶ 91-92; Hutchinson Decl. ¶¶ 9-13 (detailing expected loss of $16,000 per year to Washington's

10   Department of Health (DOH) due to decrease in the number of newborns assigned SSNs at birth);

11   Colburn Decl. ¶¶ 12-15 (revocation of birthright citizenship to children born in Arizona will

12   result in reduced EAB funding to the state); O'Leary Decl. ¶¶ 19-22 (estimating loss to Illinois

13   of $21,788 to $38,129); Woodward Decl. ¶¶ 12-13 (estimating loss to Oregon of more than

14   $7,230 per year).

15         If no preliminary injunction issues, the Plaintiff States also will suffer immediate and

16   significant operational disruptions and administrative burdens within state agencies and state-

17   run-healthcare facilities as they try to navigate the chaos and uncertainty the Citizenship

18   Stripping Order creates. ECF No. 1 ¶¶ 93-101; *see* Declaration of Brian Reed ¶ 7 (detailing

19   disruptions to "services UW Medicine provides to newborns in the neonatal intensive care unit

20   (NICU)"); Fotinos Decl. ¶¶ 25-28 (detailing HCA's need to develop extensive training and

21   guidance in response to a denial of birthright citizenship to children born in the United States,

22   which it estimates will require 7-8 FTEs and take two to three years to complete); Hutchinson

23   Decl. ¶¶ 14-18 (detailing Washington DOH's likely need to devote "substantial operational time,

24   manpower resources, and technological resources" to change Washington's vital records

25   system); Heddin Decl. ¶¶ 20-21 (Washington's child-welfare agency will need to divert staff

26   resources from existing projects in order to amend and update processes related to Title IV-E

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1   eligibility determinations and training); Tegen Decl. ¶¶ 18-20 (estimating it will cost $2.3-4.4

2   million and require 12 months to update Arizona's three systems to determine eligibility for

3   Medicaid coverage); O'Leary Decl. ¶¶ 13, 23 (state-run healthcare facilities would incur new

4   administrative costs to implement new systems for registration of newborns); Flint-Gerner Decl.

5   ¶¶ 17-18 (identifying the "significant and costly administrative burden on [Oregon]" of

6   developing a new system to determine the citizenship of children entering foster care system);

7   Mueller Decl. ¶¶ 31-39 (discussing the "immediate and detrimental effect on the operations and

8   finances" of Illinois child welfare system). These harms and more are detailed below, and there

9   is no doubt that they confer standing upon the Plaintiff States to challenge the Citizenship

10  Stripping Order.

11  **B.    The Plaintiff States' Claims Are Likely to Succeed on the Merits Because Birthright
12       Citizenship Is a Cornerstone of American Constitutional and Statutory Law That
         Is Beyond Serious Dispute**

13          The Plaintiff States will succeed on the merits because the Citizenship Stripping Order

14  unlawfully attempts to rob individuals born in the United States of their constitutionally

15  conferred and statutorily protected citizenship. A wall of Supreme Court, Ninth Circuit, and

16  Executive Branch authorities, as well as the INA, make clear that children born in the United

17  States in the coming weeks are citizens—just like all children born in the United States for more

18  than 150 years. The Court recognized this in issuing a TRO and should do so again by issuing a

19  preliminary injunction.

20          **1.      Birthright Citizenship Is Enshrined in the Constitution**

21          The meaning of the Fourteenth Amendment begins with the text. As the Supreme Court

22  has explained, "[t]he Constitution was written to be understood by the voters; its words and

23  phrases were used in their normal and ordinary as distinguished from technical meaning."

24  *District of Columbia v. Heller*, 554 U.S. 570, 576 (2008). The text is expressly broad: "*All*

25  *persons* born or naturalized in the United States, and subject to the jurisdiction thereof, are

26  citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1

PLAINTIFF STATES' MOTION FOR              9              ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                          Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                                    800 Fifth Avenue, Suite 2000
                                                                 Seattle, WA  98104
                                                                   (206) 464-7744

Supp.Add.134

1    (emphasis added). The Citizenship Clause contains no exceptions based on the citizenship,

2    immigration status, or country of origin of one's parents. Rather, its only requirements are that

3    an individual be born "in the United States" and "subject to the jurisdiction thereof."

4          The only U.S.-born individuals excluded are those who are *not* subject to the jurisdiction

5    of United States' law at birth—the children of diplomats covered by diplomatic immunity and

6    children born to foreign armies at war against the United States on U.S. soil. Not excepted are

7    children born in the United States, even if their parents are undocumented or here lawfully but

8    on a temporary basis. They must comply with U.S. law; so too must their parents. Undocumented

9    immigrants pay taxes, must register for the Selective Service, and must otherwise follow—and

10   are protected by—federal and state law just like anyone else within the United States' territorial

11   sweep. *See Plyler v. Doe*, 457 U.S. 202, 211 (1982) ("That a person's initial entry into a State,

12   or into the United States, was unlawful . . . cannot negate the simple fact of his presence within

13   the State's territorial perimeter. Given such presence, he is subject to the full range of obligations

14   imposed by the State's civil and criminal laws."). Indeed, it is absurd to suggest that

15   undocumented immigrants are somehow not subject to the jurisdiction of the United States. They

16   may be arrested and deported precisely *because* they are subject to the jurisdiction of the United

17   States.

18         The history of the Citizenship Clause confirms this longstanding, well-recognized

19   meaning of its plain language. Birthright citizenship stems from English common law's principle

20   of *jus soli*—citizenship determined by birthplace. James C. Ho, *Defining "American" Birthright*

21   *Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367, 369

22   (2006). In response to *Dred Scott* and the Civil War, Congress and the States adopted the

23   Fourteenth Amendment to reaffirm birthright citizenship as the law and "guarantee citizenship

24   to virtually everyone born in the United States," with only narrow exceptions. James C. Ho,

25   *Birthright Citizenship, The Fourteenth Amendment, and State Authority*, 42 U. Rich. L. Rev.

26   969, 971 (2008); *see also* Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade*

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.135

1  *Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215,

2  2227 (2021) ("Congress had indeed identified a category of people who were not allowed to be

3  here, and who could be deported under federal law if found in the United States. Nevertheless,

4  through the Fourteenth Amendment, Congress made the children of illegally imported slaves

5  and free blacks U.S. citizens if born in the United States."); Ho, *Defining "American" Birthright*

6  *Citizenship, supra* at 369-72 (detailing ratification debate and concluding that "[t]ext and history

7  confirm that the Citizenship Clause reaches all persons who are subject to U.S. jurisdiction and

8  laws, regardless of race or alienage"); Garrett Epps, *The Citizenship Clause: A "Legislative*

9  *History*,*"* 60 Am. Univ. L. Rev. 331, 352-59 (2010) (detailing ratification debate); *see also*

10  *Plyler*, 457 U.S. at 214 ("Although the congressional debate concerning § 1 of the Fourteenth

11  Amendment was limited, that debate clearly confirms the understanding that the phrase 'within

12  its jurisdiction' was intended in a broad sense.").

13      This understanding of the Citizenship Clause is cemented by controlling U.S. Supreme

14  Court precedent which, more than 125 years ago, confirmed that the Fourteenth Amendment

15  guarantees citizenship to the children of immigrants born in the United States. *United States v.*

16  *Wong Kim Ark*, 169 U.S. 649, 704 (1898). As the Supreme Court explained: "Every citizen or

17  subject of another country, while domiciled here, is within the allegiance and the protection, and

18  consequently *subject to the jurisdiction*, of the United States." *Id.* at 693 (emphasis added).

19  Consequently, the Court held that a child born in San Francisco to Chinese citizens, who could

20  not themselves become citizens, was an American citizen. *Id.* at 704. In reaching this conclusion,

21  the Court reasoned that the Fourteenth Amendment "affirms the ancient and fundamental rule of

22  citizenship by birth within the territory, in the allegiance and under the protection of the country,

23  including all children here *born of resident aliens*." *Id.* at 693 (emphasis added). The Court noted

24  that the only exclusions involved individuals who were not, in fact, subject to U.S. jurisdiction:

25  "children born of alien enemies in hostile occupation, and children of diplomatic representatives

26  of a foreign state[]—both of which . . . had been recognized exceptions to the fundamental rule

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.136**

1   of citizenship by birth within the country."[1] *Id.* at 682. In language that remains apt, the Court

2   explained that the Citizenship Clause "is throughout affirmative and declaratory, intended to

3   allay doubts and to settle controversies which had arisen, and not to impose any new restrictions

4   upon citizenship." *Id.* at 688.

5       In addition to *Wong Kim Ark*, the Supreme Court has separately made clear that

6   undocumented immigrants are "subject to the jurisdiction" of the United States. In *Plyler v. Doe*,

7   the Court interpreted the Equal Protection Clause and explained that the term "within its

8   jurisdiction" makes plain that "the Fourteenth Amendment extends to anyone, citizen or stranger,

9   who *is* subject to the laws of a State, and reaches into every corner of a State's territory." 457

10  U.S. at 215. As the Court explained, "no plausible distinction with respect to Fourteenth

11  Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United

12  States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10. The Court

13  expressly confirmed that the phrases "within its jurisdiction" and "subject to the jurisdiction

14  thereof" in the first and second sentences of the Fourteenth Amendment have the same meaning.

15  *Id.*

16      These are merely the most notable examples of the judiciary's steadfast protection of the

17  Fourteenth Amendment's birthright-citizenship guarantee. The Supreme Court, the Ninth

18  Circuit, and other courts have repeatedly confirmed that individuals born in this country are

19  citizens subject to its jurisdiction regardless of their parents' status or country of origin. *See*, *e.g.*,

20  *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing that child of two undocumented

21  immigrants "was a citizen of this country" by virtue of being "born in the United States");

22  *Perkins v. Elg*, 307 U.S. 325, 328 (1939) ("[A] child born here of alien parentage becomes a

23  citizen of the United States."). Indeed, during World War II, the Ninth Circuit affirmed a district

24  court's rejection of an attempt to strike from voter rolls 2,600 people of Japanese descent who

25
26      [1] Although the original understanding of the Fourteenth Amendment was that children born to tribal
    members are not subject to the United States' jurisdiction at birth, it is well established under a federal statute passed
    in 1924 that such children *are* granted U.S. citizenship at birth. *See* 8 U.S.C. § 1401(b).

PLAINTIFF STATES' MOTION FOR            12        ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                      Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                               800 Fifth Avenue, Suite 2000
                                                            Seattle, WA 98104
                                                              (206) 464-7744

were born in the United States. *Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*, 134 F.2d 413 (9th Cir. 1943), *cert. denied*, 319 U.S. 753 (1943). As the district court explained, it was "unnecessary to discuss the arguments of counsel" challenging those individuals' citizenship because it was "settled" that a child born "within the United States" is a U.S. citizen. *Id.* Even before *Wong Kim Ark*, the Ninth Circuit confirmed the same. *Gee v. United States*, 49 F. 146, 148 (9th Cir. 1892) (Chinese exclusion laws "are inapplicable to a person born in this country, and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens").[2]

The Executive Branch, too, has long endorsed this understanding of the Citizenship Clause. When the U.S. Department of Justice's Office of Legal Counsel (OLC) was asked in 1995 to assess the constitutionality of a bill that would deny citizenship to children unless a parent was a citizen or permanent resident alien, OLC concluded that the "legislation is unquestionably unconstitutional." *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 341 (1995). As OLC recognized, "Congress and the States adopted the Fourteenth Amendment in order to place the right to citizenship based on birth within the jurisdiction of the United States beyond question." *Id.* at 340. The phrase "subject to the jurisdiction thereof," OLC explained, "was meant to reflect the existing common law exception for discrete sets of persons who were deemed subject to a foreign sovereign and immune from U.S. laws," such as "foreign diplomats." *Id.* at 342. OLC concluded: "Apart from these extremely limited exceptions, there can be no question that children born in the United States of aliens are subject to the full jurisdiction of the United States." *Id.* Thus, "as consistently recognized by courts and Attorneys General for over a century, most notably by the Supreme

---

[2] *Accord Chin v. United States*, 43 App. D.C. 38, 42 (D.C. App. Ct. 1915) ("If it be true that Chin Wah was born of Chinese parents domiciled in California, and not employed in any diplomatic or official capacity, he became at his birth a citizen of the United States."); *Moy Suey v. United States*, 147 F. 697, 698 (7th Cir. 1906) ("Nativity gives citizenship, and is a right under the Constitution. It is a right that congress would be without constitutional power to curtail or give away.").

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC                    13                    ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.138**

1    Court in *United States v. Wong Kim Ark*, there is no question that they possess constitutional

2    citizenship under the Fourteenth Amendment." *Id.*

3        The Executive Branch has accepted this foundational understanding and built daily

4    government functions around the Citizenship Clause's plain meaning. For example, the U.S.

5    Department of State is granted the authority under federal law to issue U.S. passports. 22 U.S.C.

6    § 211a. As explained in the State Department's Foreign Affairs Manual, "[a]ll children born in

7    and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship

8    at birth even if their parents were in the United States illegally at the time of birth[.]" Polozola

9    Decl., Ex. 4. The State Department's Application for a U.S. Passport confirms that for

10   "Applicants Born in the United States" a U.S. birth certificate alone is sufficient to prove one's

11   citizenship. *Id.*, Ex. 5. And U.S. Citizenship and Immigration Services (USCIS) likewise

12   confirms in public guidance that "[i]f you were born in the United States, you do not need to

13   apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were

14   born is proof of your citizenship." *Id.*, Ex. 6.

15       In short, with the stroke of a pen, the Citizenship Stripping Order seeks to overrule 150

16   years of consensus as to the Citizenship Clause's established meaning. But the Constitution does

17   not confer upon the President the authority to deny birthright citizenship to children born on

18   American soil. The Citizenship Stripping Order is unconstitutional, and the Plaintiff States are

19   overwhelmingly likely to succeed on the merits of their Fourteenth Amendment claim.

20       **2.    Birthright Citizenship Is Protected Under the INA**

21       The Plaintiff States are equally likely to prevail on their claim under the INA. That statute

22   faithfully tracks the Citizenship Clause's language, stating: "The following shall be nationals

23   and citizens of the United States at birth:[] a person born in the United States, and subject to the

24   jurisdiction thereof[.]" 8 U.S.C. § 1401(a). Like any statute, it must be "interpret[ed] . . . in

25   accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v.*

26   *Clayton Cnty.*, 590 U.S. 644, 654 (2020). There is no doubt that the INA incorporates the

PLAINTIFF STATES' MOTION FOR                     14          ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                       Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                                   800 Fifth Avenue, Suite 2000
                                                            Seattle, WA  98104
                                                            (206) 464-7744

**Supp.Add.139**

Citizenship Clause's broad grant of birthright citizenship. It uses identical language and the legislative history confirms that it codified the Fourteenth Amendment's protections.[3] *See To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., at 38 (1940) (Section 201 language regarding citizenship at birth "is taken of course from the fourteenth amendment to the Constitution"); *Nationality Laws of the United States*, 76th Cong. 1st Sess., at 418 ("It accords with the provision in the fourteenth amendment to the Constitution[.]").[4]

As a result, the INA incorporates the same bright-line and near-universal grant of birthright citizenship as the Citizenship Clause itself. *See George v. McDonough*, 596 U.S. 740, 746 (2022) ("Where Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it.") (cleaned up). Like the Citizenship Clause and Supreme Court precedent interpreting it, the INA cannot be displaced by executive fiat. The Plaintiff States are highly likely to succeed in showing that the Citizenship Stripping Order violates the INA.

## C. The Citizenship Stripping Order Will Immediately and Irreparably Harm the Plaintiff States

If not enjoined, the Citizenship Stripping Order will immediately and irreparably harm the Plaintiff States by injuring their sovereign interests and forcibly shifting unrecoverable financial costs and substantial administrative and operational burdens onto the Plaintiff States. Economic harm "is irreparable" when a state "will not be able to recover money damages," *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), including when money damages are not recoverable due to the sovereignty of the defendant, *Idaho v. Coeur d'Alene Tribe*, 794 F.3d

---

[3] 8 U.S.C. § 1401 was first enacted as Section 201 of the Nationality Act of 1940 and reenacted as Section 301 of the Immigration and Nationality Act of 1952. *See* H.R. Rep. No. 82-1365 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 1653, 1734 ("The bill carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth."); *id.* at 1675-78 (1952 House Report discussing the Citizenship Clause as interpreted by *Wong Kim Ark*).

[4] Available at: https://babel.hathitrust.org/cgi/pt?id=mdp.39015019148942&seq=1.

---

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

15

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
**Supp.Add.140**

1   1039, 1046 (9th Cir. 2015). And when "[t]he State will bear the administrative costs of changing

2   its system to comply" and is unlikely to recover those costs in litigation, the harm is irreparable.

3   *Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986).

4          Under the new regime the Citizenship Stripping Order attempts to erect, the Plaintiff

5   States will suffer irreparable and immediate harm to their public health programs. Medicaid and

6   CHIP, created by federal law, support the Plaintiff States' provision of low-cost health insurance

7   to individuals whose family incomes fall below eligibility thresholds and who are U.S. citizens

8   or "qualified aliens." 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406.

9   The programs are administered by States but funded in part by the federal government. *See*

10  Fotinos Decl. ¶¶ 4-7, 10-16. And under federal law, agencies like Washington's HCA must

11  provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or

12  qualifying immigration status is verified and who are otherwise eligible. *Id.* ¶ 17. To provide

13  legally mandated care, ensure that children within their jurisdiction have access to

14  comprehensive health insurance, and further the public health, certain states like Washington

15  also provide state-funded health insurance to undocumented children who otherwise are eligible

16  for Medicaid or CHIP. *Id.* ¶¶ 4-5, 11-16, 23-24.

17         Washington's Medicaid and CHIP programs rely on significant federal funding to

18  operate—including federal reimbursements of between 50 and 65 percent of expenditures for

19  coverage provided to eligible children. *Id.* ¶¶ 6, 14, 24, 26. In 2022, HCA administered coverage

20  for more than 4,000 children who, as citizens, were eligible for Medicaid or CHIP despite being

21  born to undocumented or non-qualifying mothers. *Id.* ¶ 27. If those children were not citizens at

22  birth, they would be ineligible for Medicaid or CHIP and the cost of their care would shift to

23  Washington's state-funded CHP health coverage for children, resulting in an increase to State

24  expenditures of $6.9 million. *Id.* ¶¶ 26-27. The Citizenship Stripping Order will impact at least

25  that many newborn children in Washington each year. Lapkoff Decl. ¶ 11.

26

PLAINTIFF STATES' MOTION FOR                16              ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                            Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                                     800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104
                                                                      (206) 464-7744

Supp.Add.141

1    Nor can this harm be waved away as self-inflicted. These programs are established and

2    operated pursuant to federal law that dictates services states *must* provide. State providers like

3    UW Medicine's Harborview hospital are required by federal law to provide emergency care.

4    Fotinos Decl. ¶ 26; *see* 42 U.S.C. § 1395dd(b); 42 C.F.R. § 440.255(c). For children who would

5    be eligible for CHIP but for their status, the State will necessarily lose the 65 percent federal

6    reimbursement for emergency care that is provided. Fotinos Decl. ¶ 26. Other Plaintiff States

7    will similarly lose federal Medicaid and CHIP funding for babies stripped of citizenship. *See*

8    Tegen Decl. ¶¶ 23-25 (estimating that removal of birthright citizenship would reduce federal

9    revenue to Arizona for medical care provided to children by $321,844,600 over the first 18 years

10   of life for the first cohort subject to the Order).

11   The Citizenship Stripping Order will likewise cause the direct loss of federal

12   reimbursements for services provided in state foster care systems. For example, Washington

13   State's Department of Children, Youth, and Families (DCYF), like other Plaintiff States' child

14   welfare agencies, receives federal Title IV-E funding for the administration of its foster care

15   program, including programs to support permanent placements and other critical functions.

16   Heddin Decl. ¶¶ 4-10; Flint-Gerner Decl. ¶¶ 4-11 (Oregon); Mueller Decl. ¶¶ 16-30 (Illinois).

17   State reliance on Title IV-E is substantial: In federal financial year 2024, Washington received

18   $219 million in Title IV-E reimbursements. Heddin Decl. ¶ 17. Under the Citizenship Stripping

19   Order, children born to undocumented parents will no longer be eligible under Title IV-E; the

20   Plaintiff States will thus bear the full cost of serving children in their foster care systems. Heddin

21   Decl. ¶¶ 11-18; *see also* Flint-Gerner Decl. ¶ 14 (estimating Oregon will lose $569,850 if even

22   eight children become ineligible and $3.4 million if even 45 children become ineligible under

23   Title IV-E); Mueller Decl. ¶¶ 16-30 (detailing likely loss to Illinois of "significant share of

24   federal funds under Title IV-E").

25   The Plaintiff States will also face an immediate reduction in payments from SSA for

26   administration of the Enumeration at Birth program. Hutchinson Decl. ¶ 13; Colburn Decl.

PLAINTIFF STATES' MOTION FOR          17          ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                               Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                         800 Fifth Avenue, Suite 2000
                                                      Seattle, WA  98104
                                                        (206) 464-7744
                                                      **Supp.Add.142**

¶¶ 12-15; O'Leary Decl. ¶¶ 19-22; Woodward Decl. ¶¶ 12-13. Pursuant to contracts with SSA, Plaintiff States' vital statistics agencies, like Washington's DOH, collect newborn birth data, format it, and transmit it to the SSA to facilitate the assignment of SSNs to newborn babies. Hutchinson Decl. ¶¶ 7-13. This is how almost all SSNs are assigned in the United States today. *Id.* ¶ 10. In exchange, the SSA pays the State $4.19 for each SSN assigned through this process, for a total of nearly $440,000 per year. *Id.* ¶ 12; *see* O'Leary Decl. ¶ 19 (Illinois receives $4.19 per SSN, for a total of just under $500,000 in FY 2025); Woodward Decl. ¶ 12 (Oregon receives $4.82 per SSN, for a total of $158,381 in 2023); Colburn Decl. ¶ 12 (Arizona received $936,469.38 for FY2025 through the EAB process). The loss of revenue will begin occurring immediately if the Citizenship Stripping Order goes into effect and SSA ceases issuing SSNs to children whose citizenship the federal government no longer recognizes.

Finally, the Plaintiff States' agencies will suffer additional immediate harms due to the sudden and substantial new administrative and operational burdens created by the Order. The Plaintiff States are required under federal law to verify the eligibility of the residents they serve through programs like Medicaid and CHIP. Fotinos Decl. ¶¶ 17-20; Tegen Decl. ¶ 18. Likewise, the Plaintiff States must confirm citizenship or a qualifying immigration status of children in foster care to receive reimbursements under Title IV-E. Heddin Decl. ¶ 20; Flint-Gerner Decl. ¶ 17; Mueller Decl. ¶ 31. State agencies that previously relied on a child's place of birth, birth certificate, or SSN to automatically determine eligibility for federal programs will now be required to create new systems to affirmatively determine the citizenship or immigration status of *every* child born in their states to ascertain whether they are entitled to federally backed services, as well as update policies, training, and guidance to operationalize these new systems. *See* Fotinos Decl. ¶¶ 25, 28 (necessary system changes for HCA would require 7-8 FTEs and take two to three years); Tegen Decl. ¶¶ 18-20 (cost of implementing necessary changes to AHCCCS eligibility systems range from $2.3-4.4 million); *see also* Heddin Decl. ¶¶ 20-21; O'Leary Decl. ¶¶ 13, 23; Flint-Gerner Decl. ¶¶ 16-18; Mueller Decl. ¶¶ 31-39.

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

18

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.143**

1    In sum, the Plaintiff States will be forced to bear the costs of reforming their systems for

2    the administration of several programs due to the Citizenship Stripping Order. They will lose

3    millions of dollars in federal reimbursements and be forced to expend significant resources

4    addressing the "chaotic" change the Citizenship Stripping Order requires. Hutchinson Decl. ¶ 16.

5    These types of financial, operational, and administrative burdens, which cannot be avoided, are

6    precisely the types of irreparable harm that warrant an injunction. *See, e.g.*, *City & Cnty. of San*

7    *Francisco*, 981 F.3d at 762 (affirming injunction where states showed "they likely are bearing

8    and will continue to bear heavy financial costs because of withdrawal of immigrants from federal

9    assistance programs and consequent dependence on state and local programs"); *Ariz. Democratic*

10    *Party v. Hobbs*, 976 F.3d 1081, 1084-86 (9th Cir. 2020) (entering emergency stay where sudden

11    election-law change would "send[] the State scrambling to implement and to administer a new

12    procedure" in less than two months); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1083 (W.D. Wash.

13    2017) ("Throughout the time it will take [plaintiff organizations] to adequately build programs

14    to service other populations, the organizations will suffer irreparable harm.").

15    **D.    The Equities and Public Interest Weigh Strongly in the Plaintiff States' Favor**

16    The equities and public interest, which merge when the government is a party, could not

17    tip more sharply in favor of the Plaintiff States. *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir.

18    2024). The Citizenship Stripping Order attempts to return our Nation to a reprehensible chapter

19    of American history when *Dred Scott* excluded Black Americans from citizenship—a view of

20    citizenship soundly rejected by the people and their representatives through the Fourteenth

21    Amendment. *See* 19 Op. O.L.C. at 349 ("From our experience with *Dred Scott*, we had learned

22    that our country should never again trust to judges or politicians the power to deprive from a

23    class born on our soil the right of citizenship."). The Court should not allow a return to a regime

24    where Americans born on United States soil are excluded from our citizenry based on their class,

25    race, status, or any other characteristic. This grave deprivation of rights belies any public interest

26    in the Order because "public interest concerns are implicated when a constitutional right has

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

19

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.144**

1    been violated, . . . all citizens have a stake in upholding the Constitution." *Betschart v. Oregon*,

2    103 F.4th 607, 625 (9th Cir. 2024) (quotations omitted).

3        The harms to Plaintiff States and their residents are not abstract. The Citizenship

4    Stripping Order deprives children born in the Plaintiff States of a foundational right enabling full

5    participation in our democracy, as citizens may exercise their fundamental right to vote in

6    federal, state, or local elections. U.S. Const. amend. XVI; ECF No. 1 ¶ 57 (citing state

7    constitutions). They may serve on federal and state juries. 28 U.S.C. § 1865(b)(1); ECF No. 1

8    ¶ 58 (citing state statutes). They may become the President, Vice President, or a member of

9    Congress, and hold offices in the Plaintiff States. U.S. Const. art. II, § 1; U.S. Const. art I, §§ 2-

10   3; ECF No. 1 ¶ 61 (citing state laws). Children subject to the Citizenship Stripping Order will be

11   denied each of these rights and benefits they would have had if they were born earlier.

12       The vast majority of those subject to the Order will be condemned to the additional harm

13   of living with undocumented legal status. Most of the babies denied citizenship will be left with

14   no legal immigration status and no prospects for legalization. Oskouian Decl. ¶¶ 5-10. Children

15   left without legal status "will be at immediate risk of removal from the United States," including

16   "being at risk of being arrested and detained" during removal proceedings. *Id.* ¶ 9. Others will

17   likely become stateless, "left in legal limbo" with "no home country to return to voluntarily or

18   otherwise." Baluarte Decl. ¶¶ 8-15. Statelessness would assign these children "a fate of ever-

19   increasing fear and distress." *Trop v. Dulles*, 356 U.S. 86, 102 (1958).

20       The harms of living in the United States without legal status are profound. One such harm

21   is the deprivation of one's fundamental right to travel: "Travel abroad, like travel within the

22   country . . . may be as close to the heart of the individual as the choice of what he eats, or wears,

23   or reads. Freedom of movement is basic in our scheme of values." *Aptheker v. Sec'y of State*,

24   378 U.S. 500, 505-506 (1964) (cleaned up). The Order deprives individuals of their right to travel

25   by denying eligibility to obtain a passport, 22 C.F.R. § 51.2, bars them from re-entry to the

26

PLAINTIFF STATES' MOTION FOR                    20                    ATTORNEY GENERAL OF WASHINGTON
PRELIMINARY INJUNCTION                                                     Civil Rights Division
CASE NO. 2:25-CV-00127-JCC                                            800 Fifth Avenue, Suite 2000
                                                                           Seattle, WA  98104
                                                                             (206) 464-7744

Supp.Add.145

1  United States, Oskouian Decl. ¶ 7, and makes them ineligible for identification needed for certain

2  domestic travel. *Id.* ¶ 11; 6 C.F.R. §§ 37.11(g), 37.5.

3      Depriving children born and residing in the Plaintiff States of citizenship will further

4  harm their economic, educational, and mental health outcomes, depriving the Plaintiff States of

5  the human capital and economic contribution that results from the full social and economic

6  integration of youth into society. Without legal status, individuals have worse educational

7  outcomes: One study found that undocumented immigrant youth had more than double the

8  probability of high school non-completion, relative to U.S. citizens. Patler Decl. ¶ 10; *see also*

9  Wong Decl. ¶¶ 11-12 (finding 17.9% difference in unauthorized immigrants ages 18-24 with

10  high school diploma compared to citizens). There are multiple causes of the disparity in

11  education outcomes for undocumented students, including ineligibility for federal student

12  financial aid. 34 C.F.R. § 668.33(a); *see also* Patler Decl. ¶ 13 (institutional characteristics,

13  knowledge of future barriers, and feelings of despair and hopelessness also affect educational

14  trajectories). In addition, the impacts on earning potential and mobility of undocumented status

15  are stark. Children left without lawful status due to the Order will not be eligible for employment

16  authorization. *See* 8 C.F.R. § 274a.12; Oskouian Decl. ¶ 12; Baluarte Decl. ¶ 14. While citizens

17  and undocumented immigrants are both employed at similar rates, U.S. citizens earn

18  significantly more annual total income. Wong Decl. ¶¶ 13-14; Patler Decl. ¶ 10 n.1.

19      "[I]mmigrant legal status is also a fundamental determinant of health." Patler Decl. ¶ 17.

20  Children growing up undocumented experience "profound" health harms, "particularly with

21  regard to mental health and emotional wellbeing." *Id.* ¶ 19. Barriers to health care, isolation and

22  stigma, exclusion from normal rites of passage in American life, and fear of deportation

23  contribute to undocumented individuals experiencing anxiety, chronic sadness, depression, and

24  hopelessness, as well as poorer physical health. *Id.* ¶¶ 17-22. Furthermore, denial of critical cash

25  and food assistance to children who would have been eligible but for the Order will deprive them

26  of access to sufficient and healthy food and to shelter, warm clothing, and safety, "causing a

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.146

1 negative impact on children's health and risking increasing rates of child hunger." Peterson Decl.

2 ¶¶ 7-10. An increase in the number of uninsured children will also exacerbate the harm to public

3 health. *Id.* ¶¶ 13-14; Fotinos Decl. ¶ 24 (loss of federal eligibility for health coverage will "likely

4 result in a significant number of children who may go uninsured and receive only emergency

5 care when absolutely necessary, leading to worse health outcomes").

6       The Citizenship Stripping Order will additionally harm communities and civic life in the

7 Plaintiff States. Threats to citizenship status trigger fear and cause young people to "distance

8 themselves from their family, culture, and language[,]" and "[w]ithout lawful status, [young

9 people] . . . cannot experience full belonging in U.S. culture and communities." Declaration of

10 Magaly Solis Chavez ¶ 12. That is because "citizenship confers legal, political, and social

11 membership in the United States," and is a "central determinant of immigrants' integration and

12 mobility." Patler Decl. ¶¶ 9. "[D]enying citizenship to children born to undocumented parent(s)

13 would be catastrophically harmful for children's development, wellbeing, and mobility. These

14 harms would extend beyond the millions of impacted children themselves, impacting schools,

15 neighborhoods, communities and, indeed, our nation as a whole." *Id.* ¶ 27. The Citizenship

16 Stripping Order will create a permanent underclass of people excluded from American society,

17 impeding community integration, self-sufficiency, and a thriving democracy. *See* Baluarte Decl.

18 ¶ 15; Wong Decl. ¶ 8; Patler Decl. ¶¶ 9, 27; Peterson Decl. ¶¶ 7, 10; Solis Chavez Decl. ¶¶ 7-12;

19 Oskouian Decl. ¶ 14.

20       Finally, the federal government has *no* legitimate public interest in enforcing the

21 unlawful Citizenship Stripping Order. An executive order's "facially unconstitutional directives

22 and its coercive effects weigh heavily against leaving it in place." *Santa Clara v. Trump*, 250 F.

23 Supp. 3d 497, 539 (N.D. Cal. 2017). The only justification offered is that the Citizenship

24 Stripping Order may deter unlawful immigration, a hypothetical rationale and political

25 motivation that can never justify an unlawful deprivation of constitutional rights. Indeed, the

26 entire point of the Citizenship Clause was to *remove* the weaponization of citizenship status as a

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

22

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.147**

1  policy tool. *See* 19 Op. O.L.C. at 347. The government has lawful means to effect immigration

2  policy. The Citizenship Stripping Order is not one of them.

3  **E.    A Nationwide Injunction Barring Implementation of the Citizenship Stripping Order Is Needed to Provide Complete Relief**

4

5        A nationwide injunction is necessary due to the extraordinary nature of the Citizenship

6  Stripping Order and the impossibility of fashioning an injunction of lesser scope that would

7  provide complete relief to the Plaintiff States. As the Ninth Circuit has explained, "[t]he scope

8  of an injunction is 'dependent as much on the equities of a given case as the substance of the

9  legal issues it presents,' and courts must tailor the scope 'to meet the exigencies of the particular

10 case.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (quoting *Azar*, 911 F.3d at 584).

11 Here, American citizenship cannot be made to hinge on the state in which a child is born without

12 causing the Plaintiff States the harms detailed herein. If an injunction is limited in geographic

13 scope, the Plaintiff States would suffer the same harms insofar as babies born in non-party states

14 (who would otherwise have been citizens) travel or move to the Plaintiff States and obtain

15 healthcare and foster care services at the Plaintiff States' expense. Expecting parents would be

16 restricted from travel—essentially trapped in the Plaintiff States—rather than risk their baby's

17 birth as a non-citizen in a different state. State-based citizenship would also be unworkable at

18 airports and other international ports of entry, which are controlled by federal authorities and

19 require uniform rules.

20       In addition to these practical realities, the Supreme Court has acknowledged nationwide

21 relief is necessary when "one branch of government [has] arrogated to itself power belonging to

22 another." *Biden*, 143 S. Ct. at 2373 (reversing district court's refusal to issue preliminary

23 injunction). The Citizenship Stripping Order's attempt to do precisely that—to unilaterally

24 amend the Fourteenth Amendment and discard a federal statute—necessitates an injunction that

25 preserves the status quo birthright citizenship guarantee as it has long existed: A uniform rule

26

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

23

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.148**

1 | that draws no lines based upon the citizenship or immigration status of one's parents or the
2 | location of one's birth within the United States.

3 | **IV.    CONCLUSION**

4 | Plaintiff States request that the Court issue a preliminary injunction barring the
5 | Citizenship Stripping Order's enforcement or implementation.

6 | DATED this 27th day of January 2025.

7 |
8 | NICHOLAS W. BROWN
Attorney General

9 | *s/ Lane M. Polozola*
COLLEEN M. MELODY, WSBA #42275
10 | Civil Rights Division Chief
LANE POLOZOLA, WSBA #50138
11 | DANIEL J. JEON, WSBA #58087
ALYSON DIMMITT GNAM, WSBA #48143
12 | Assistant Attorneys General
Wing Luke Civil Rights Division
13 | Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
14 | Seattle, WA 98104-3188
(206) 464-7744
15 | colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
16 | daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

17 | *Attorneys for Plaintiff State of Washington*

18 | I certify that this memorandum contains 8395
words, in compliance with the Local Civil Rules.
19 |
20 | KRIS MAYES
*Attorney General of Arizona*

21 | *s/ Joshua Bendor*
Joshua D. Bendor (AZ No. 031908)*
22 | Luci D. Davis (AZ No. 035347)*
Gabriela Monico Nunez (AZ No. 039652)*
23 | Office of the Arizona Attorney General
Firm State Bar No. 14000
24 | 2005 N. Central Ave.
Phoenix, AZ 85004
25 | (602) 542-3333
Joshua.Bendor@azag.gov
26 | Luci.Davis@azag.gov

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

24

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.149**

Gabriela.MonicoNunez@azag.gov
ACL@azag.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Arizona*

KWAME RAOUL
*Attorney General, State of Illinois*

s/ Rebekah Newman
REBEKAH NEWMAN, ARDC #6327372*
Assistant Attorney General
Special Litigation Bureau
Office of the Illinois Attorney General
115 South LaSalle St., Floor 35
Chicago, IL 60603
Tel. (773) 590-6961
rebekah.newman@ilag.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Illinois*

DAN RAYFIELD
*Attorney General, State of Oregon*

/s/ Carla A. Scott
CARLA A. SCOTT, WSBA #39947
THOMAS H. CASTELLI, OSB #226448*
Senior Assistant Attorneys General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Carla.A.Scott@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Oregon*

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

25

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.150**

1

**CERTIFICATE OF SERVICE**

2

3    I hereby certify that the foregoing document was electronically filed with the United

State District Court using the CM/ECF system. I certify that all participants in the case are

4

registered CM/ECF users and that service will be accomplished by the CM/ECF system.

5

6

Dated this 27th day of January 2025 in Seattle, Washington.

7

8                                                      *s/ Tiffany Jennings*
                                                       Tiffany Jennings
9                                                      Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-CV-00127-JCC

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.151**



1                                   The Honorable Judge John C. Coughenour

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**
          **WESTERN DISTRICT OF WASHINGTON**
9                       **AT SEATTLE**

STATE OF WASHINGTON; STATE OF     NO. 2:25-cv-00127-JCC
10 ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,
11                        INDEX OF DECLARATIONS IN
           Plaintiffs,         SUPPORT OF PLAINTIFF
12                        STATES' MOTION FOR
    v.                          PRELIMINARY INJUNCTION
13

14 DONALD TRUMP, in his official capacity
as President of the United States; U.S.
15 DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM, in her official
16 capacity as Secretary of Homeland Security;
U.S. SOCIAL SECURITY
17 ADMINISTRATION; MICHELLE KING,
in her official capacity as Acting
18 Commissioner of the Social Security
Administration; U.S. DEPARTMENT OF
19 STATE; MARCO RUBIO, in his official
capacity as Secretary of State; U.S.
20 DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DOROTHY FINK,
21 in her official capacity as Acting Secretary
of Health and Human Services; U.S.
22 DEPARTMENT OF JUSTICE; JAMES
MCHENRY, in his official capacity as
23 Acting Attorney General; U.S.
DEPARTMENT OF AGRICULTURE;
24 GARY WASHINGTON, in his official
capacity as Acting Secretary of Agriculture;
25 and the UNITED STATES OF AMERICA,

              Defendants.
26

---

INDEX OF DECLARATIONS ISO             ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF STATES' MOTION FOR              Civil Rights Division
PRELIMINARY INJUNCTION                800 Fifth Avenue, Suite 2000
CASE NO. 2:25-cv-00127-JCC               Seattle, WA  98104
                                  (206) 464-7744

**Declarations in Support of Plaintiff States' Motion for Preliminary Injunction**

| ECF No. | Name | Title |
|---------|------|-------|
| 12 | Lane Polozola | Managing Assistant Attorney General<br>Wing Luke Civil Rights Division<br>Washington State Office of the Attorney General |
| 13 | Dr. Shelley Lapkoff | Senior Demographer<br>National Demographics Corporation |
| 14 | Dr. Charissa Fotinos | State Medicaid Director<br>Washington State Health Care Authority |
| 15 | Jenny Heddin | Deputy Secretary—Chief of Staff<br>Washington State Department of Children,<br>Youth and Families |
| 16 | Katherine Hutchinson | State Registrar and Office Director<br>Center for Health Statistics<br>Washington Department of Health |
| 17 | Brian Reed | Service Line Administrator of Women's and<br>Children's Services<br>UW Medicine |
| 18 | Dr. Tom K. Wong | Associate Professor<br>University of California, San Diego (UCSD) |
| 19 | David C. Baluarte | Professor of Law and Senior Associate Dean for<br>Academic Affairs<br>CUNY School of Law |
| 20 | Dr. Caitlin Patler | Associate Professor of Public Policy<br>Goldman School of Public Policy<br>University of California, Berkeley |

INDEX OF DECLARATIONS ISO
PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-cv-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.153

| ECF No. | Name | Title |
|---------|------|-------|
| 21 | Sarah K. Peterson | Director of Washington's Office of Refugee and Immigrant Assistance Economic Services Administration Washington Department of Social and Health Services |
| 22 | Magaly Solis Chavez | Executive Director La Casa Hogar |
| 24 | Krystal Colburn | Chief Reporting Officer and Assistant State Registrar Arizona Department of Health Services |
| 25 | Jeffrey Tegen | Assistant Director Division of Business and Finance Arizona Health Care Cost Containment System Administration |
| 26 | Nadine O'Leary | Deputy State Registrar Division of Vital Records Illinois Department of Public Health |
| 27 | Jennifer A. Woodward | State Registrar Oregon Health Authority |
| 65 | Aprille Flint-Gerner | Director Child Welfare Division Oregon Department of Human Services |
| 66 | Heidi E. Mueller | Director Illinois Department of Children and Family Services |
| 67 | Mozhdeh Oskouian | Deputy Director Northwest Immigrant Rights Project (NWIRP) |

INDEX OF DECLARATIONS ISO
PLAINTIFF STATES' MOTION FOR
PRELIMINARY INJUNCTION
CASE NO. 2:25-cv-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.154

1    DATED this 27th day of January 2025.

2                                                                NICHOLAS W. BROWN
                                                                Attorney General
3

4                                                                *s/ Lane M. Polozola*
                                                                COLLEEN M. MELODY, WSBA #42275
5                                                                Civil Rights Division Chief
                                                                LANE POLOZOLA, WSBA #50138
6                                                                DANIEL J. JEON, WSBA #58087
                                                                ALYSON DIMMITT GNAM, WSBA #48143
7                                                                Assistant Attorneys General
                                                                Wing Luke Civil Rights Division
8                                                                Office of the Washington State Attorney General
                                                                800 Fifth Avenue, Suite 2000
9                                                                Seattle, WA 98104-3188
                                                                (206) 464-7744
10                                                               colleen.melody@atg.wa.gov
                                                                lane.polozola@atg.wa.gov
11                                                               daniel.jeon@atg.wa.gov
                                                                alyson.dimmittgnam@atg.wa.gov
12
                                                                *Attorneys for Plaintiff State of Washington*
13
                                                                KRIS MAYES
14                                                               *Attorney General of Arizona*

15                                                               *s/ Joshua Bendor*
                                                                Joshua D. Bendor (AZ No. 031908)*
16                                                               Luci D. Davis (AZ No. 035347)*
                                                                Gabriela Monico Nunez (AZ No. 039652)*
17                                                               Office of the Arizona Attorney General
                                                                Firm State Bar No. 14000
18                                                               2005 N. Central Ave.
                                                                Phoenix, AZ 85004
19                                                               (602) 542-3333
                                                                Joshua.Bendor@azag.gov
20                                                               Luci.Davis@azag.gov
                                                                Gabriela.MonicoNunez@azag.gov
21                                                               ACL@azag.gov

22                                                               *Pro hac vice*
                                                                *Attorneys for Plaintiff State of Arizona*
23
                                                                KWAME RAOUL
24                                                               *Attorney General, State of Illinois*

25                                                               *s/ Rebekah Newman*
                                                                REBEKAH NEWMAN, ARDC #6327372*
26                                                               Assistant Attorney General
                                                                Special Litigation Bureau

INDEX OF DECLARATIONS ISO                    3                   ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF STATES' MOTION FOR                                     Civil Rights Division
PRELIMINARY INJUNCTION                                          800 Fifth Avenue, Suite 2000
CASE NO. 2:25-cv-00127-JCC                                       Seattle, WA 98104
                                                                (206) 464-7744

**Supp.Add.155**

1   Office of the Illinois Attorney General
    115 South LaSalle St., Floor 35
2   Chicago, IL 60603
    Tel. (773) 590-6961
3   rebekah.newman@ilag.gov

4   *Pro hac vice
    Attorneys for Plaintiff State of Illinois
5
    DAN RAYFIELD
6   Attorney General, State of Oregon

7   /s/ Carla A. Scott
    CARLA A. SCOTT, WSBA #39947
8   THOMAS H. CASTELLI, OSB #226448*
    Senior Assistant Attorneys General
9   Oregon Department of Justice
    100 SW Market Street
10  Portland, OR 97201
    (971) 673-1880
11  Carla.A.Scott@doj.oregon.gov
    Thomas.Castelli@doj.oregon.gov
12
    *Pro hac vice
13  Attorneys for Plaintiff State of Oregon

14

15

16

17

18

19

20

21

22

23

24

25

26

INDEX OF DECLARATIONS ISO                         4                    ATTORNEY GENERAL OF WASHINGTON
PLAINTIFF STATES' MOTION FOR                                                      Civil Rights Division
PRELIMINARY INJUNCTION                                                        800 Fifth Avenue, Suite 2000
CASE NO. 2:25-cv-00127-JCC                                                        Seattle, WA 98104
                                                                                   (206) 464-7744

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,

                Plaintiffs,

    v.

DONALD TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF HOMELAND
SECURITY; BENJAMINE HUFFMAN, in
his official capacity as Acting Secretary of
Homeland Security; U.S. SOCIAL
SECURITY ADMINISTRATION;
MICHELLE KING, in her official capacity
as Acting Commissioner of the Social
Security Administration; U.S.
DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
of State; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
DOROTHY FINK, in her official capacity
as Acting Secretary of Health and Human
Services; U.S. DEPARTMENT OF
JUSTICE; JAMES MCHENRY, in his
official capacity as Acting Attorney
General; U.S. DEPARTMENT OF
AGRICULTURE; GARY WASHINGTON,
in his official capacity as Acting Secretary
of Agriculture; and the UNITED STATES
OF AMERICA,

                Defendants.

NO. 2:25-cv-00127

DECLARATION OF LANE
POLOZOLA IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTARAINING
ORDER

DECLARATION OF LANE POLOZOLA
CASE NO. 2:25-cv-00127

1

Supp.Add.157

I, Lane Polozola, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.      I am a Managing Assistant Attorney General with the Wing Luke Civil Rights Division of the Washington State Office of the Attorney General. I am one of the attorneys representing Plaintiff State of Washington in the above-captioned matter.

3.      The Plaintiff States in this matter filed this lawsuit today, January 21, 2025, and file their Motion for a Temporary Restraining Order concurrently herewith. The Motion seeks a Temporary Restraining Order to enjoin the President's Executive Order of January 20, 2025, entitled "Protecting the Meaning and Value of American Citizenship."

4.      Pursuant to Federal Rule of Civil Procedure 65(b) and Western District of Washington LCR 65(b)(1), counsel for the State of Washington called the office of the United States Attorney for the Western District of Washington in advance of filing at 9:30am on January 21, 2025, to notify the office of the Plaintiffs' intention to file the Complaint and Motion for a Temporary Restraining Order in the near term, and to note it for same-day hearing once filed. Washington's counsel spoke with Joe Fonseca with the United States Attorneys' Office, Western District of Washington. Counsel for Washington also emailed the United States Attorney for the Western District of Washington and the Chief of the Civil Division, at 9:32am on January 21, 2025, to notify the office of Plaintiff States' intention to file the Complaint and Motion for a Temporary Restraining Order in the near term. The Civil Chief let the State know that Brad Rosenberg with the Civil Division's Federal Programs Branch would be the State's contact for the case, and the State committed to send copies of the motion for Temporary Restraining Order and all supporting papers via email once filed.

5.      Attached hereto as **Exhibit 1** is a true and correct copy of the President Trump's Executive Order, signed January 20, 2025, entitled "Protecting the Meaning and Value of American Citizenship."

DECLARATION OF LANE POLOZOLA
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.158

6.      Attached hereto as **Exhibit 2** is a true and correct copy of the *Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism*, DonaldJTrump.com, dated May 30, 2023. This webpage was last accessed on January 21, 2025, at https://www.donaldjtrump.com/agenda47/agenda47-day-one-executive-order-ending-citizenship-for-children-of-illegals-and-outlawing-birth-tourism.

7.      Attached hereto as **Exhibit 3** is a true and correct copy of an article by Tarini Parti and Michelle Hackman published in The Wall Street Journal, entitled, *Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs* (Dec. 8, 2024). This article was last accessed on January 21, 2025, at https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291.

8.      Attached hereto as **Exhibit 4** is a true and correct copy of the State Department's Foreign Affairs Manual, 8FAM 301.1. This document was accessed on January 21, 2025, at https://fam.state.gov/FAM/08FAM/08FAM030101.html.

9.      Attached hereto as **Exhibit 5** is a true and correct copy of the U.S. Department of State's Application for A U.S. Passport Form, DS-11 04-2022 copy. This document was last accessed on January 21, 2025, at https://eforms.state.gov/Forms/ds11_pdf.pdf.

10.      Attached hereto as **Exhibit 6** is a true and correct copy of *I am a U.S. citizen: How do I get proof of my U.S. citizenship?*, U.S. Citizenship and Immigration Services, M-560B (October 2013) N copy. This document was last accessed on January 21, 2025, at https://www.uscis.gov/sites/default/files/document/guides/A4en.pdf.

///

///

///

///

DECLARATION OF LANE POLOZOLA                    3                    ATTORNEY GENERAL OF WASHINGTON
CASE NO. 2:25-cv-00127                                                                  Civil Rights Division
                                                                                        800 Fifth Avenue, Suite 2000
                                                                                        Seattle, WA  98104
                                                                                        (206) 464-7744

**Supp.Add.159**

1       I declare under penalty of perjury under the laws of the State of Washington and the

2  United States of America that the foregoing is true and correct.

3       DATED and SIGNED this 20th day of January 2025, at Seattle, Washington.

 

                      *s/ Lane Polozola*
                      LANE POLOZOLA, WSBA #50138
                      Assistant Attorney General

DECLARATION OF LANE POLOZOLA
CASE NO. 2:25-cv-00127

4

# POLOZOLA DECLARATION

# EXHIBIT 1

Menu Search



PRESIDENTIAL ACTIONS

# PROTECTING THE MEANING AND VALUE OF AMERICAN CITIZENSHIP

EXECUTIVE ORDER

January 20, 2025

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered:

Section 1.  Purpose.  The privilege of United States citizenship is a priceless and profound gift.  The Fourteenth Amendment states:  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  That provision rightly repudiated the Supreme Court of the United States's shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which

misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race. But the Fourteenth Amendment has never been interpreted to extend citizenship universally to everyone born within the United States.  The Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not "subject to the jurisdiction thereof."  Consistent with this understanding, the Congress has further specified through legislation that "a person born in the United States, and subject to the jurisdiction thereof" is a national and citizen of the United States at birth, 8 U.S.C. 1401, generally mirroring the Fourteenth Amendment's text. Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States:  (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Sec. 2.  Policy.  (a)  It is the policy of the United States that no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons:  (1) when that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the

Supp.Add.163

person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

(b)  Subsection (a) of this section shall apply only to persons who are born within the United States after 30 days from the date of this order.

(c)  Nothing in this order shall be construed to affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship.

Sec. 3.  Enforcement.  (a)  The Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security shall take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order.

(b)  The heads of all executive departments and agencies shall issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities.

Sec. 4.  Definitions.  As used in this order:

(a)  "Mother" means the immediate female biological progenitor.

(b)  "Father" means the immediate male biological progenitor.

Sec. 5.  General Provisions.  (a)  Nothing in this order shall be construed to impair or otherwise affect:

(i)  the authority granted by law to an executive department or agency, or the head thereof; or

(ii)  the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b)  This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c)  This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against

the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,

January 20, 2025.

News

Administration

Issues

**THE WHITE HOUSE**

1600 Pennsylvania Ave NW

Washington, DC 20500

THE WHITE HOUSE

WH.GOV

Copyright

Privacy

Supp.Add.166

**POLOZOLA DECLARATION**

**EXHIBIT 2**

**TEXT TRUMP TO 88022!**



PLATFORM    NEWS    EVENTS

GET INVOLVED

TRUMP FORCE 47

PROTECT THE VOTE

CONTRIBUTE

SHOP

BACK TO VIDEOS

# Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals and Outlawing Birth Tourism

**May 30, 2023**

 



Agenda47: Day One Executive Order Ending Citizenship for Children of Illegals a…

**Mar-a-Lago, FL—** In a new Agenda47 video, President Donald J. Trump announced his plan to sign an executive order on Day One to end automatic citizenship for

children of illegal aliens.

"As part of my plan to secure the border, on Day One of my new term in office, I will sign an executive order making clear to federal agencies that under the correct interpretation of the law, going forward, the future children of illegal aliens will not receive automatic U.S. citizenship," President Trump said.

"My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries."

**PRESIDENT TRUMP'S PLAN TO DISCOURAGE ILLEGAL IMMIGRATION BY ENDING AUTOMATIC CITIZENSHIP FOR THE CHILDREN OF ILLEGAL ALIENS AND OUTLAWING BIRTH TOURISM**

**A DAY-ONE EXECUTIVE ORDER TO SHUT OFF A MAGNET FOR ILLEGAL IMMIGRATION:**

- On Day One, President Trump will sign an Executive Order to stop federal agencies from granting automatic U.S. citizenship to the children of illegal aliens.

- It will explain the clear meaning of the 14th Amendment, that U.S. Citizenship extends only to those both born in AND "subject to the jurisdiction" of the United States.

- It will make clear that going forward, the children of illegal aliens will not be granted automatic citizenship, and should not be issued passports, Social Security numbers, or be eligible for certain taxpayer funded welfare benefits.

- It will direct federal agencies to require that at least one parent be a U.S. citizen or lawful permanent resident for their future children to become automatic U.S. citizens.

- This Executive Order ending automatic citizenship for the children of illegal aliens will eliminate a major incentive for illegal immigration, discourage future waves of illegal immigration to exploit this misapplication of citizenship, and encourage illegal aliens in the U.S. to return home.

- The Executive Order will also stop "**Birth Tourism**."

- Through "Birth Tourism," **tens of thousands** of foreign nationals fraudulently enter the U.S. each year during the final weeks of their pregnancies for the sole purpose of obtaining U.S. citizenship for their child.

- Under the current erroneous interpretation, the children of these foreign nationals are then eligible to **receive** a host of government benefits reserved for U.S. citizens, including a myriad of welfare programs and taxpayer funded healthcare, as well as chain migration and the right to vote.

- The Executive Order is part of a larger strategy to fully secure the Southern Border starting on Day One. It will remove a major incentive for illegal aliens and other foreign nationals to come to and remain in the United States in violation of our laws and National sovereignty.

- The announcement of today's Executive Order follows a historical slate of hundreds of executive actions, proclamations, and presidential memorandums on border security and immigration that President Trump implemented while in office to remake the immigration system in the United States for the interest of the American people, including:

- Executive Order Implementing the Travel Ban and Pausing Refugee Admissions

- Executive Order on Border Security and Immigration Enforcement

- Presidential Memorandum on the Extreme Vetting of Foreign Nationals

- Presidential Memorandum to Create a National Vetting Center

- Executive Order to Unleash Interior Immigration Enforcement

- Executive Order to Block Federal Grants to Sanctuary Cities

- Presidential Memorandum Ordering DHS to Train National Guard Troops to Assist with Border Enforcement

- Presidential Memorandum to End "catch and release" at the Border

- Presidential Proclamation Suspending Entry Across Southern Border Outside Ports of Entry to Bar Asylum Access

- Executive Order requiring the U.S. Government to Prioritize the Hiring of U.S. Workers in the Administration of all Immigration Programs

- Executive Order on Aligning Federal Contracting and Hiring Practices with the Interests of American Workers

- Presidential Proclamation Suspending Chain Migration, Visa Lottery, and All Non-Essential Foreign Workers

- Presidential Proclamation on Suspension of Entry of Immigrants Who Will Financially Burden the United States Healthcare System

- Presidential Memorandum to Cut Off Immigrant Access to the Welfare State

**PRESIDENT TRUMP'S EXECUTIVE ORDER WILL FINALLY ENSURE THAT THE FEDERAL GOVERNMENT NO LONGER ADHERES TO A PATENTLY INCORRECT INTERPRETATION OF THE 14TH AMENDMENT:**

- Constitutional scholars have shown for decades that granting automatic citizenship to the children of illegal aliens born in the United States is based on a patently incorrect interpretation of the 14th Amendment.

- The **14th Amendment** extends federal citizenship to "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof."

- The purpose of the 14th Amendment had nothing to do with the citizenship of immigrants, let alone the citizenship of the children of illegal aliens. Its purpose was to extend citizenship to people newly freed from slavery, whose status was left in question after the infamous case **Dred Scott v. Sandford**.

- The framers of the 14th Amendment made **clear** that "persons born in the United States who are foreigners, aliens [or] who belong to the families of ambassadors or foreign ministers" are not "subject to the jurisdiction" of the U.S.

- For years, open-borders proponents have deliberately misinterpreted "subject to the jurisdiction" in the 14th Amendment to mean merely subject to American law, which is the case for anyone physically present in the United States.

- This twisting of the amendment's meaning and intent has caused America to become one of the few countries in the world to extend citizenship to the children of illegal aliens even if both parents are not citizens nor even legally present in the United States, thus diluting the privileges that Americans are entitled to.

**BIDEN'S OPEN BORDER POLICY IS A NATIONAL SECURITY, ECONOMIC, AND HUMANITARIAN DISASTER:**

- A record number of illegal aliens crossed the southern border in both 2021 and 2022. In the official numbers alone, there have been over 6.6 million **illegal crossings** since Biden took office—but the true numbers are much higher.

- Biden has deliberately made his border disaster worse by abolishing Title 42 this month, allowing for an additional **400,000** illegal aliens from all corners of the globe to pour across our border each month.

- This invasion is wasting our resources, lowering our citizens' wages, poisoning our communities with lethal drugs, and threatening our national security.

- Illegal immigration **reduces** American workers' wages by $99 to $118 billion each year, with the burden falling most heavily on low-wage workers.

- Thousands of pounds of deadly drugs are pouring across our borders, poisoning over 100,000 of our citizens each year. Fueled in large part by Biden's border disaster, fentanyl poisoning has become the leading cause of death for Americans between the ages of 18 and 45.

- Nearly 100 known or suspected terrorists were **arrested** at the border last year— more than three times the total for the previous five years combined. Border arrests of illegal alien murderers **increased** by over 1,900% and arrests of illegal alien drug traffickers increased by 480% since 2020.

- Biden's open border policy has also created a humanitarian crisis, with migrant deaths reaching a record **high** last year and human smuggling arrests **up** 82% since

2014.

## TRANSCRIPT

Joe Biden has launched an illegal foreign invasion of our country allowing a record number of illegal aliens to storm across our borders. From all over the world, they came. Under Biden's current policies even though these millions of illegal border crossers have entered the country unlawfully, all of their future children will become automatic U.S. citizens. Can you imagine?

They'll be eligible for welfare, taxpayer-funded healthcare, the right to vote, chain migration, and countless other government benefits, many of which will also profit the illegal alien parents. This policy is a reward for breaking the laws of the United States and is obviously a magnet, helping draw the flood of illegals across our borders.

They come by the millions and millions and millions. They come from mental institutions, they come from jails-- prisoners, some of the toughest, meanest people you'll ever see. The United States is among the only countries in the world that says that even if neither parent is a citizen nor even lawfully in the country, their future children are automatic citizens the moment the parents trespass onto our soil. As has been laid out by many scholars, this current policy is based on a historical myth, and a willful misinterpretation of the law by the open borders advocates. There aren't that many of them around.

It's an amazing. Who wants this? Who wants to have prisoners coming into our country? Who wants to have people who are very sick coming into our country? People from mental institutions coming into our country? And come they will, they're coming by the thousands, by the tens of thousands.

As part of my plan to secure the border on Day One of my new term in office, I will sign an executive order making clear to federal agencies that under the correct interpretation of the law, going forward, the future children of illegal aliens will not receive automatic U.S. citizenship. It's things like this that bring millions of people to our country, and they enter our country illegally. My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries.

They must go back. Nobody could afford this. Nobody could do this. And even morally it's so wrong. My order will also end their unfair practice known as birth tourism, where hundreds of thousands of people from all over the planet squat in hotels for their last few weeks of pregnancy to illegitimately and illegally obtain US citizenship for the child, often to later exploit chain migration to jump the line and get green cards for themselves and their family members.

It's a practice that's so horrible, and so egregious, but we let it go forward. At least one parent will have to be a citizen or a legal resident in order to qualify. We will secure our borders and we will restore our sovereignty. Starting on Day One, our country will be great again. Our country will be a country again. We'll have borders, we'll have proper education, and we'll put America First.

Thank you.



## Join Our Movement

## Follow Us

ENTER YOUR EMAIL                              ZIP

Paid for by Never Surrender, Inc.
Not authorized by any candidate
or candidate authorized's
committee.

Privacy Policy      Terms & Conditions      Press      Careers      Powered by Nucleus

The appearance of U.S. Department of Defense personnel or other visual information does not imply or constitute
DoD endorsement.

# POLOZOLA DECLARATION

# EXHIBIT 3

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/politics/policy/trump-birthright-citizenship-executive-order-battle-0900a291

POLITICS | POLICY

# Trump Prepares for Legal Fight Over His 'Birthright Citizenship' Curbs

Many constitutional scholars and civil-rights groups have said a change can't be done through executive action

By *Tarini Parti* Follow *and* *Michelle Hackman* Follow

*Updated* Dec. 8, 2024 9:16 pm ET



People riding the ferry to Ellis Island for a naturalization ceremony pass the Statue of Liberty. PHOTO: ALEX KENT/AFP/GETTY IMAGES

WASHINGTON—President-elect Donald Trump's transition team is drafting several versions of his long-promised executive order to curtail automatic citizenship for anyone born in the U.S., according to people familiar with the matter, as his aides prepare for an expanded legal fight.

Trump, who has railed against so-called birthright citizenship for years, said during his first term that he was planning an executive order that would outright ban it. Such an order was never signed, but the issue remained a focus of Trump's immigration proposals during his re-election campaign. He has said he would tackle the issue in an executive order on day one of his second term.

Weeks before he takes office, Trump's transition team is now considering how far to push the scope of such an order, knowing it would almost immediately be challenged in court, according to a transition official and others familiar with the matter. The eventual order is expected to focus on changing the requirements for documents issued by federal agencies that verify citizenship, such as a passport.

Through an executive order or the agency rule-making process, Trump is also expected to take steps to deter what Trump allies call "birth tourism," in which pregnant women travel to the U.S. to have children, who receive the benefit of citizenship. One option on the table is to tighten the criteria to qualify for a tourist visa, according to people familiar with the Trump team's thinking. Tourist visas are most often issued for a period of 10 years, though the tourist can't stay in the U.S. on each visit for longer than six months.



President-elect Donald Trump has said he would tackle birthright citizenship in an executive order on day one of his second term. PHOTO: OLIVIER TOURON/AFP/GETTY IMAGES

Karoline Leavitt, a spokeswoman for the Trump transition, said the president-elect "will use every lever of power to deliver on his promises, and fix our broken immigration system once and for all."

Some on the right have backed Trump's plans and argued that birthright citizenship is a misinterpretation of the 14th amendment, which dates back to the 19th century and in part granted full citizenship to former slaves. They have also criticized birth tourism. Companies in China have attracted attention in recent years for advertising such services, and airlines in Asia even started turning away some pregnant passengers they suspected of traveling to give birth.

"Because you happen to be in this country when your child is born, is not a reason for that child to be a U.S. citizen. It's just silly, and the reliance on it in law is utterly misplaced," said Ken Cuccinelli, a senior fellow at the Center for Renewing America, a pro-Trump think tank, who previously served as deputy secretary of Homeland Security.

Many constitutional scholars and civil-rights groups have said a change to birthright citizenship can't be done through executive action and would require amending the Constitution—a rare and difficult process. The most recent amendment was ratified in 1992, more than 200 years after it was first proposed.

Trump on the campaign trail this year offered more details on what executive action related to birthright citizenship could include compared with his first term, a change that some backers took as an indication that he is more willing to act on the issue.

Trump said he would sign a "day one" executive order directing federal agencies to require a child to have at least one parent be either a U.S. citizen or legal permanent resident to automatically become a U.S. citizen. It would also stop agencies from issuing passports, Social Security numbers and other welfare benefits to children who don't meet the new requirement for citizenship, the president-elect's campaign had said.

"My policy will choke off a major incentive for continued illegal immigration, deter more migrants from coming, and encourage many of the aliens Joe Biden has unlawfully let into our country to go back to their home countries," Trump said in a campaign video.

But the requirement that at least one parent be a U.S. citizen or legal permanent resident would also affect children born to parents who immigrated legally

through visas, excluding them from automatic citizenship.

"The new piece of it is them talking publicly about the mechanism they might try to use to operationalize this unconstitutional plan," said Omar Jadwat, director of the American Civil Liberties Union's Immigrants' Rights Project. "They just can't do that consistent with the constitution."



Portrait of Wong Kim Ark, whose case affirmed birthright citizenship. PHOTO: NATIONAL ARCHIVES/GETTY IMAGES

"Litigation is definitely going to follow," he added.

The Supreme Court affirmed birthright citizenship in its 1898 ruling in U.S. v. Wong Kim Ark. But critics of automatic citizenship argue Trump's proposed citizenship restrictions would be different from that case, which involved a child born to Chinese parents who were legal permanent residents in the U.S.

Trump's allies say a legal fight that makes its way to the Supreme Court is the point of the executive order.

"Force the issue and see what happens," said Mark Krikorian, executive director for the Center for Immigration Studies, a group favoring immigration restrictions that was close to Trump's first administration. Even with the court's conservative majority, Krikorian isn't optimistic about Trump's chances.

"I think they'll probably uphold the current interpretation of the 14th Amendment," he said. "They're going to want to start that court fight as soon as possible to see if they can see it through to the end before the administration ends," he said.

Write to Tarini Parti at tarini.parti@wsj.com and Michelle Hackman at michelle.hackman@wsj.com

*Appeared in the December 9, 2024, print edition as 'Trump Set to Target 'Birthright' Citizens'.*

## Videos



02:31

**WSJ Opinion: Hits and Misses of the Week**

**WSJ Opinion: The Wildfires Reckoning Arrives**

**WSJ Opinion: Biden Goes Out Kicking**

---

## Buy Side from WSJ

Buy Side is independent of The Wall Street Journal newsroom.



**GIFT GUIDES**

**26 Thoughtful Valentine's Day Gifts**



**BANKING**

**How to Choose the Best High-Yield Savings Account for You**



**BANKING**

**Here Are Today's Best CD Rates**



BANKING

### These Savings Accounts Pay Over 4% and Still Let You Write Checks



BANKING

### The Best Savings Accounts Pay More than 5%—12 Times the National Average



PERSONAL LOANS

### Best Debt Consolidation Loans

---

## Real Estate Insights

Content provided by ♦ realtor.com



**Sean Hannity and Ainsley Earhardt are Engaged—See Inside Long-Distance Romance**



**Richard Gere Spends First Holiday in Spain After Quitting U.S. for Good**



**Ivanka Trump Says She Moved to $24M Miami Mansion To Protect Kids From 'Darkness' of Politics**



**Michelle Obama Confirms She Will Skip Inauguration as She Vanishes From Public Life**



**Melania Trump Hits Out at the Obamas Over 'Challenging' White House Move**



**Miami Beach Wants To Be the Next 'Blue Zone'—How Will It Get There?**

# POLOZOLA DECLARATION

# EXHIBIT 4

UNCLASSIFIED (U)

# 8 FAM 300
# U.S. CITIZENSHIP AND NATIONALITY

## 8 FAM 301
## U.S. CITIZENSHIP

### 8 FAM 301.1
### ACQUISITION BY BIRTH IN THE UNITED STATES

*(CT:CITZ-50;   01-21-2021)*
*(Office of Origin:   CA/PPT/S/A)*

## 8 FAM 301.1-1  INTRODUCTION

*(CT:CITZ-50;   01-21-2021)*

a. U.S. citizenship may be acquired either at birth or through naturalization subsequent to birth.  U.S. laws governing the acquisition of citizenship at birth embody two legal principles:

   (1) Jus soli (the law of the soil) - a rule of common law under which the place of a person's birth determines citizenship.  In addition to common law, this principle is embodied in the 14th Amendment to the U.S. Constitution and the various U.S. citizenship and nationality statutes; and

   (2) Jus sanguinis (the law of the bloodline) - a concept of Roman or civil law under which a person's citizenship is determined by the citizenship of one or both parents.  This rule, frequently called "citizenship by descent" or "derivative citizenship", is not embodied in the U.S. Constitution, but such citizenship is granted through statute.  As U.S. laws have changed, the requirements for conferring and retaining derivative citizenship have also changed.

b. National vs. citizen:  While most people and countries use the terms "citizenship" and "nationality" interchangeably, U.S. law differentiates between the two.  Under current law all U.S. citizens are also U.S. nationals, but not all

U.S. nationals are U.S. citizens.  The term "national of the United States", as defined by statute (INA 101 (a)(22) (8 U.S.C. 1101(a)(22)) includes all citizens of the United States, and other persons who owe allegiance to the United States but who have not been granted the privilege of citizenship:

(1) Nationals of the United States who are not citizens owe allegiance to the United States and are entitled to the consular protection of the United States when abroad, and to U.S. documentation, such as U.S. passports with appropriate endorsements.  They are not entitled to voting representation in Congress and, under most state laws, are not entitled to vote in Federal, State, or local elections except in their place of birth.  (See 7 FAM 012 and 7 FAM 1300 Appendix B Endorsement 09.);

(2) Historically, Congress, through statutes, granted U.S. non-citizen nationality to persons born or inhabiting territory acquired by the United States through conquest or treaty.  At one time or other natives and certain other residents of Puerto Rico, the U.S. Virgin Islands, the Philippines, Guam, and the Panama Canal Zone **were** U.S. non-citizen nationals.  (See 7 FAM 1120 and 7 FAM 1100 Appendix P.);

(3) Under current law, only persons born in American Samoa and Swains Island are U.S. non-citizen nationals (INA 101(a)(29) (8 U.S.C. 1101(a)(29) and INA 308(1) (8 U.S.C. 1408)).  (See 7 FAM 1125.); and

(4) See 7 FAM 1126 regarding the citizenship/nationality status of persons born on the Commonwealth of the Northern Mariana Islands (CNMI).

c. Naturalization – Acquisition of U.S. Citizenship Subsequent to Birth:  Naturalization is "the conferring of nationality of a State upon a person after birth, by any means whatsoever" (INA 101(a)(23) (8 U.S.C. 1101(a)(23)) or conferring of citizenship upon a person (see INA 310, 8 U.S.C. 1421 and INA 311, 8 U.S.C. 1422).  Naturalization can be granted automatically or pursuant to an application.  (See 7 FAM 1140.)

d. "Subject to the Jurisdiction of the United States":  All children born in and subject, at the time of birth, to the jurisdiction of the United States acquire U.S. citizenship at birth even if their parents were in the United States illegally at the time of birth:

(1) The U.S. Supreme Court examined at length the theories and legal precedents on which the U.S. citizenship laws are based in U.S. v. Wong Kim Ark, 169 U.S. 649 (1898).  In particular, the Court discussed the types of persons who are subject to U.S. jurisdiction.  The Court affirmed that a child born in the United States to Chinese parents acquired U.S. citizenship even though the parents were, at the time, racially ineligible for naturalization;

(2) The Court also concluded that:  "The 14th Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on

foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes.  The Amendment, in clear words and in manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States."  Pursuant to this ruling:

(a)  Acquisition of U.S. citizenship generally is not affected by the fact that the parents may be in the United States temporarily or illegally; and that; and

(b)  A child born in an immigration detention center physically located in the United States is considered to have been born in the United States and be subject to its jurisdiction.  This is so even if the child's parents have not been legally admitted to the United States and, for immigration purposes, may be viewed as not being in the United States.

# 8 FAM 301.1-2  WHAT IS BIRTH "IN THE UNITED STATES"?

*(CT:CITZ-45;   12-09-2020)*

a. INA 101(a)(38) (8 U.S.C. 1101 (a)(38)) provides that "the term 'United States,' when used in a geographical sense, means the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States."

b. On November 3, 1986, Public Law 94-241, "approving the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America", (Section 506(c)),took effect.  From that point on, the Northern Mariana Islands have been treated as part of the United States for the purposes of INA 301 (8 U.S.C. 1401) and INA 308 (8 U.S.C. 1408) (see 8 FAM 302.1)

c. The Nationality Act of 1940 (NA), Section 101(d) (54 Statutes at Large 1172) (effective January 13, 1941 until December 23, 1952) provided that "the term 'United States' when used in a geographical sense means the continental United States, Alaska, Hawaii, Puerto Rico, and the Virgin Islands of the United States."  The 1940 Act did not include Guam or the Northern Mariana Islands as coming within the definition of "United States."

> See the text of the 1940 Act on the Intranet, Acquisition of Citizenship, Legal and Regulatory Documents.

d. Prior to January 13, 1941, there was no statutory definition of "the United States" for citizenship purposes.  The phrase "in the United States" as used in Section 1993 of the Revised Statues of 1878 clearly includes states that have been admitted to the Union (see 8 FAM 102.2).

e. INA 304 (8 U.S.C. 1404) and INA 305 (8 U.S.C. 1405) provide a basis for citizenship of persons born in Alaska and Hawaii, respectively, while they were territories of the United States.

# 8 FAM 301.1-3  NOT INCLUDED IN THE MEANING OF "IN THE UNITED STATES"

*(CT:CITZ-1;   06-27-2018)*

a. Birth on U.S. Registered Vessel On High Seas or in the Exclusive Economic Zone:  A U.S.-registered or documented ship on the high seas or in the exclusive economic zone is not considered to be part of the United States.  Under the law of the sea, an Exclusive Economic Zone (EEZ) is a maritime zone over which a State has special rights over the exploration and use of natural resources.  The EEZ extends up to 200 nautical miles from the coastal baseline.  A child born on such a vessel does not acquire U.S. citizenship by reason of the place of birth (Lam Mow v. Nagle, 24 F.2d 316 (9th Cir., 1928)).

> **NOTE**:  This concept of allotting nations EEZs to give better control of maritime affairs outside territorial limits gained acceptance in the late 20th century and was given binding international recognition by the United Nations Convention on the Law of the Sea (UNCLOS) in 1982.
>
> Part V, Article 55 of the Convention states:
>
> Specific legal regime of the EEZ:
>
> The EEZ is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this convention.

b. A U.S.-registered aircraft outside U.S. airspace is not considered to be part of U.S. territory.  A child born on such an aircraft outside U.S. airspace does not acquire U.S. citizenship by reason of the place of birth.

> **NOTE**:  The United States of America is not a party to the U.N. Convention on Reduction of Statelessness (1961).  Article 3 of the Convention does not apply to the United States.  Article 3 provides
>
> "For the purpose of determining the obligations of Contracting States under this Convention, birth on a ship or in an aircraft shall be deemed to have taken place in the territory of the State whose flag the ship flies or in the territory of the State in which the aircraft is registered, as the case may be."
>
> This is a frequently asked question.

c. Birth on U.S. military base outside of the United States or birth on U.S. embassy or consulate premises abroad:

   (1) Despite widespread popular belief, U.S. military installations abroad and U.S. diplomatic or consular facilities abroad are not part of the United

States within the meaning of the 14th Amendment.  A child born on the premises of such a facility is not born in the United States and does not acquire U.S. citizenship by reason of birth;

(2) The status of diplomatic and consular premises arises from the rules of law relating to immunity from the prescriptive and enforcement jurisdiction of the receiving State; the premises are not part of the territory of the United States of America.  (See Restatement (Third) of Foreign Relations Law, Vol. 1, Sec. 466, Comment a and c (1987).  See also, Persinger v. Iran, 729 F.2d 835 (D.C. Cir. 1984).

d. Birth on foreign ships in foreign government non-commercial service:

(1) A child born on a foreign merchant ship or privately owned vessel in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.  (See U.S. v. Wong Kim Ark.); and

(2) Foreign warships, naval auxiliaries, and other vessels or aircraft owned or operated by a State and used for governmental non-commercial service are not subject to jurisdiction of the United States.  Persons born on such vessels while in U.S. internal waters (or, of course, anywhere else) do not acquire U.S. citizenship by virtue of place of birth.

e. Alien enemies during hostile occupation:

(1) If part of the United States were occupied by foreign armed forces against the wishes of the United States, children born to enemy aliens in the occupied areas would not be subject to U.S. jurisdiction and would not acquire U.S. citizenship at birth; and

(2) Children born to persons other than enemy aliens in an area temporarily occupied by hostile forces would acquire U.S. citizenship at birth because sovereignty would not have been transferred to the other country.  (See U.S. v. Wong Kim Ark.)

# 8 FAM 301.1-4  BIRTH IN U.S. INTERNAL WATERS AND TERRITORIAL SEA

*(CT:CITZ-50;  01-21-2021)*

a. Persons born on ships located within U.S. internal waters (except as provided in 8 FAM 301.1-3) are considered to have been born in the United States.  Such persons will acquire U.S. citizenship at birth if they are subject to the jurisdiction of the United States.  Internal waters include the ports, harbors, bays, and other enclosed areas of the sea along the U.S. coast.  As noted above, a child born on a foreign merchant ship or privately owned vessel in U.S. internal waters is considered as having been born subject to the jurisdiction of the United States.  (See U.S. v. Wong Kim Ark.)

b. Twelve Nautical Mile Limit:  The territorial sea of the United States was formerly three nautical miles.  (See, e.g., Cunard S.S. Co. v Mellon, 262 U.S. 100, 122, 43 S. Ct. 504, 67 L. Ed. 894 (1923).)  However, the three-mile rule

was changed by a Presidential Proclamation in 1988, implementing the territorial-sea provision of the 1982 U.N. Convention on the Law of the Sea. (Presidential Proclamation 5928, signed December 27, 1988, published at 54 Federal Register 777, January 9, 1989.)  As decreed by that Proclamation, the territorial sea of the United States henceforth extends to 12 nautical miles from the baselines of the United States determined in accordance with international law.  (The Proclamation also stated that the jurisdiction of the United States extends to the airspace over the territorial sea.)  (See Gordon, Immigration Law and Procedure, Part 8 Nationality and Citizenship, 92.03(2)(b) territorial limits.)

c.  FAM guidance up until 1995 ([7 FAM 1116.1-2](#)  In U.S. Waters TL:CON-64; 11-30-95) advised that persons born within the 3-mile limit of the U.S. territorial sea were born "within the United States" and could be documented as U.S. citizens if they were also born subject to U.S. jurisdiction.  Some commentators took this view as well, such as Gordon.  Analysis of this issue undertaken in 1994-1995 revealed, however, that there is a substantial legal question whether persons born outside the internal waters of the United States but within the territorial sea are in fact born "within the United States" for purposes of the 14th Amendment and the INA.

d.  Cases involving persons born outside the internal waters but within the U.S. territorial sea, must be referred to AskPPTAdjudication@state.gov for coordination with L/CA, L/OES, and other appropriate offices within the United States government.

> *NOTE:  This is not a public-facing e-mail address and public inquiries will not be replied to.*

# 8 FAM 301.1-5  WHAT IS BIRTH IN U.S. AIRSPACE?

*(CT:CITZ-45;  12-09-2020)*

a. Under international law, the limits of a country's sovereign airspace correspond with the extent of its territorial sea.  The outer limit of the territorial sea of the United States is 12 nautical miles from the coastline.  Airspace above the land territory, internal waters, and territorial sea is considered to be part of the United States (Presidential Proclamation 5928, signed December 27, 1988, published at 54 Federal Register 777, January 9, 1989).

b. Comments on the applicability of the 14th Amendment to vessels and planes, are found in Gordon, Immigration Law and Procedure, Part 8, Nationality and Citizenship, Chapter 92, 92.03 (New York:  Matthew Bender, 2007).  This volume states:

> "The rules applicable to vessels obviously apply equally to airplanes.  Thus a child born on a plane in the United States or flying over its territory would acquire United States citizenship at birth."

c.  Under the 1944 Convention on International Civil Aviation, articles 17–21, all aircraft have the nationality of the State in which they are registered, and may not have multiple nationalities.  For births, the nationality law of the aircraft's "nationality" may be applicable, and for births that occur in flight while the aircraft is not within the territory or airspace of any State, it is the only applicable law that may be pertinent regarding acquisition of citizenship by place of birth.  However, if the aircraft is in, or flying over the territory of another State, that State may also have concurrent jurisdiction.

d.  Cases of citizenship of persons born on planes in airspace above the United States land territory or internal waters may be adjudicated by passport specialists at domestic passport agencies and centers or consular officers at posts abroad in accordance with 8 FAM 301.1-6.

e.  Cases of persons born on planes in airspace outside the 12 nautical mile limit would be adjudicated as a birth abroad under INA 301 (8 U.S.C. 1401) or INA 309 (8 U.S.C. 1409) as made applicable by INA 301(g).

f.  Cases of persons born on a plane in airspace above the U.S. territorial sea (12 nautical mile limit) must be referred to AskPPTAdjudication@state.gov for consultation with L/CA.

# 8 FAM 301.1-6  DOCUMENTING BIRTH IN U.S. WATERS AND U.S. AIRSPACE

*(CT:CITZ-1;   06-27-2018)*

a. Proof of birth in U.S. internal waters or U.S. airspace consists of a U.S. birth certificate certified by the issuing authority in the U.S. jurisdiction.

b. There is no U.S. Federal law governing the report of such births.

c.  Generally speaking, U.S. Customs and Border Protection (CBP) would require some documentation of the birth, generally an excerpt of the ship's/aircraft's medical log or master/captain's log, reflecting the time, latitude, and longitude when the birth occurred.

d. For ships/aircraft in-bound for the United States, the parents would then be responsible for reporting the birth to the civil authorities in the U.S. jurisdiction where the vessel put into port.  (See the Centers for Disease Control and Prevention (CDC) publication "Where to Write for Birth Certificates.")

   (1)  The parents will have to contact the state vital records office to determine the exact procedures for report such a birth;

   (2)  Parents should obtain a certified copy of the ship's medical log, airplane's log, or other statement from the attending physician or other attendant and attempt to obtain information on how to contact attendants in the future should further questions arise;

(3) If the mother and child were immediately taken to a U.S. hospital, authorities there may be of assistance in facilitating contact with the appropriate state authorities; and

(4) It is unlikely that the vital records office in the parents' state of residence will issue such a birth certificate. Parents may be redirected to the vital records office in the state where the ship first put into port after the birth of the child.

# 8 FAM 301.1-7  NATIVE AMERICANS AND ESKIMOS

*(CT:CITZ-1;   06-27-2018)*

a. Before U.S. v. Wong Kim Ark, the only occasion on which the Supreme Court had considered the meaning of the 14th Amendment's phrase "subject to the jurisdiction" of the United States was in Elk v. Wilkins, 112 U.S. 94 (1884). That case hinged on whether a Native American who severed ties with the tribe and lived among whites was a U.S. citizen and entitled to vote. The Court held that the plaintiff had been born subject to tribal rather than U.S. jurisdiction and could not become a U.S. citizen merely by leaving the tribe and moving within the jurisdiction of the United States. The Court stated that: "The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal through treaties or acts of Congress. They were never deemed citizens of the United States except under explicit provisions of treaty or statute to that effect, either declaring a certain tribe, or such members of it as chose to remain behind on the removal of the tribe westward, to be citizens, or authorizing individuals of particular tribes to become citizens upon application for naturalization."

b. The Act of June 2, 1924 was the first comprehensive law relating to the citizenship of Native Americans. It provided: That all non-citizen Indians born within the territorial limits of the United States be, and they are hereby, declared to be citizens of the United States: Provided, That the granting of such citizenship shall not in any manner impair or otherwise affect the right of any Indian to tribal or other property.

c. Section 201(b) NA, effective January 13, 1941, declared that persons born in the United States to members of an Indian, Eskimo, Aleutian, or other aboriginal tribe were nationals and citizens of the United States at birth.

d. INA 301(b) (8 U.S.C. 1401(b)) (formerly INA 301(a)(2)), in effect from December 24, 1952, restates this provision.

# 8 FAM 301.1-8  FOUNDLINGS

*(CT:CITZ-1;  06-27-2018)*

a. Under INA 301(f) (8 U.S.C. 1401(f)) (formerly Section 301(a)(6)) INA), a child of unknown parents is conclusively presumed to be a U.S. citizen if found in the United States when under 5 years of age, unless foreign birth is established before the child reaches age 21.

b. Under Section 201(f) of the Nationality Act of 1940, a child of unknown parents, found in the United States, was presumed to have been a U.S. citizen at birth until shown not to have been born in the United States no matter at what age this might have been demonstrated.

**UNCLASSIFIED (U)**

# POLOZOLA DECLARATION

# EXHIBIT 4

# APPLICATION FOR A U.S. PASSPORT

OMB Control No. 1405-0004
Expiration Date: 04-30-2025
Estimated Burden: 85 Minutes

**Please read all instructions first and type or print in black ink to complete this form.**
For information or questions, visit travel.state.gov or contact the National Passport Information Center (NPIC) at
1-877-487-2778  (TDD/TTY: 1-888-874-7793) or NPIC@state.gov**.**

## SECTION A. ELIGIBILITY TO USE THIS FORM

This form is used to apply for a U.S. passport book and/or card **in person** at an acceptance facility, a passport agency (by appointment only), or a U.S. embassy, consulate, or consular agency (if abroad). The U.S. passport is a travel document attesting to one's identity and issued to U.S. citizens or non-citizen U.S. nationals. To be eligible to use this form you must **apply in person** if at least one of the following is true:

✓  I am applying for my first U.S. passport
✓  I am under age 16
✓  My previous U.S. passport was either: a) issued under age 16;
b) issued more than 15 years ago; c) lost, stolen, or damaged

**If none of the above statements apply to you, then you may be eligible to apply using form DS-82 or DS-5504 depending on your circumstances. Visit travel.state.gov for more information.**

- **Notice to Applicants Under Age 16:** You must appear in person to apply for a U.S. passport with your parent(s) or legal guardian(s). See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants Ages 16 and 17:** At least one of your parent(s) or legal guardian(s) must know that you are applying for a U.S. passport. See Section D of these instructions or travel.state.gov for more details.
- **Notice to Applicants for No-Fee Regular, Service, Official, or Diplomatic Passports:** You may use this application if you meet all provisions listed; however, you must consult your sponsoring agency for instructions on proper routing procedures before forwarding this application. Your completed passport will be released to your sponsoring agency and forwarded to you.

## SECTION B. STEPS TO APPLY FOR A U.S. PASSPORT

1. Complete this form (Do not sign until requested to do so by an authorized agent).
2. Attach one color photograph 2x2 inches in size and supporting documents (See Section D of these instructions).
3. Schedule appointment to apply in person by visiting our website or calling NPIC (see contact info at the top page).
4. Arrive for appointment and present completed form and attachments to the authorized agent who will administer the oath, witness you signing your form, and collect your passport fee.
5. Track application status online at Passportstatus.state.gov.
6. Receive new passport and original supporting documents (that you submitted with your application).

## SECTION C. HOW TO COMPLETE THIS FORM

Please see the instructions below for items on the form that are not self-explanatory. The numbers match the numbered items of the form.

1. **Name (Last, First, Middle)**: Enter the name to appear in the passport. The name to appear in the passport should be consistent with your proof of citizenship and identification. If you have changed your name and are not eligible to use a DS-82 or DS-5504, you must use this form. Visit travel.state.gov/namechange for more information.

2. **Date of Birth**: Use the following format: Month, Date, and Year (MM/DD/YYYY).

3. **Gender**: The gender markers used are "M" (male), "F" (female) and "X" (unspecified or another gender identity). The gender marker that you check on this form will appear in your passport regardless of the gender marker(s) on your previous passport and/or your supporting evidence of citizenship and identity. If changing your gender marker from what was printed on your previous passport, select "Yes" in this field on Application Page 1. If no gender marker is selected, we may print the gender as listed on your supporting evidence of citizenship or contact you for more information. **Please Note:** We cannot guarantee that other countries you visit or travel through will recognize the gender marker on your passport. Visit travel.state.gov/gender for more information.

4. **Place of Birth**: Enter the name of the city and state if in the U.S. or city and country as presently known.

5. **Social Security Number**: You must provide a Social Security number (SSN), if you have been issued one, in accordance with Section 6039E of the Internal Revenue Code (26 U.S.C. 6039E) and 22 U.S.C 2714a(f). If you do not have a Social Security number, you must enter zeros in this field and submit a statement, signed, and dated, that includes the phrase, "*I declare under penalty of perjury under the laws of the United States of America that the following is true and correct:  I have never been issued a Social Security Number by the Social Security Administration.*" If you reside abroad, you must also provide the name of the foreign country where you reside. The U.S. Department of State must provide your SSN and foreign residence information to the U.S. Department of the Treasury which will use it in connection with debt collection and check against lists of persons ineligible or potentially ineligible to receive a U.S. passport, among other authorized uses. If you fail to provide the information, we may deny your application and the Internal Revenue Service (IRS) may enforce a penalty. Refer all questions on this matter to the nearest IRS office.

| | |
|---|---|
| 6. **Email:** By providing your email you are consenting to us communicating with you by email about your application. | 7. **Primary Contact Phone Number:** If providing a mobile/cell phone number you are consenting to receive calls and/or text messaging about your application. |

8. **Mailing Address Line 1 and 2 "In Care Of"**: For line 1 enter applicant's Street/RFD #, *or* P.O. Box *or* URB. For line 2, if you do not live at the address listed in this field, put the name of the person who lives at this address and mark it "In Care Of". **If the applicant is a minor child, you must include the "In Care Of" name of the parent or adult registered to receive mail at this address.**

9. **List all other names you have used:** Enter all legal names previously used to include maiden name, name changes, and previous married names. You can enter up to two names one in item A and one in item B. If only your last name has changed just enter your last name. If you need more space to write additional names, please use a separate sheet of paper and attach it to this form.

⚠ **Blue Section Application Page 1 - Identifying Documents and Signature Blocks: Skip this section and complete Application Page 2. Do not sign this form until requested to do so by the authorized agent who will administer the oath to you.**

# APPLICATION FOR A U.S. PASSPORT

## SECTION D. ATTACHMENTS TO SUBMIT WITH THIS FORM
Once you have completed Application Pages 1 and 2, attach the supporting documents as outlined in this section.

1.  **PROOF OF U.S. CITIZENSHIP** Information can be found on travel.state.gov/citizenship.

### Applicants Born in the United States

Your evidence will be returned to you if it is not damaged, altered, or forged. Submit an original or certified copy and a photocopy of the front and back if there is printed information on the back, of one of the following documents:

*   U.S. Birth Certificate that meets all the following requirements:
    *   Issued by the city, county, or state of birth
    *   Lists your full name, birthdate, and birthplace
    *   Lists your parent(s)' full names
    *   Lists date filed with registrar's office (must be within one year of birth)
    *   Shows registrar's signature and the seal of the issuing authority
*   Fully valid, undamaged U.S. passport (may be expired)
*   Consular Report of Birth Abroad or Certification of Birth Abroad
*   Certificate of Naturalization or Citizenship

*   Secondary documents may be submitted if the U.S. birth certificate was filed more than one year after your birth **or** if no birth record exists. For no birth record on file, submit a registrar's letter to that effect. For both scenarios, submit a combination of the evidence listed below, with your first and last name, birthdate and/or birthplace, the seal or other certification of the office (if customary), and the signature of the issuing official.
    *   A hospital birth record
    *   An early baptismal or circumcision certificate
    *   Early census, school, medical, or family Bible records
    *   Insurance files or published birth announcements (such as a newspaper article)
    *   Notarized affidavits (or DS-10, Birth Affidavit) of older blood relatives having knowledge of your birth may be submitted in addition to some of the records listed above.

### Applicants Born Outside the United States

If we determine that you are a U.S. citizen, your lawful permanent resident card submitted with this application will be forwarded to U.S. Citizenship and Immigration Services.

*   Claiming Citizenship through Naturalization of One or Both Parent(s), submit all the following:
    *   Your parent(s) Certificate(s) of Naturalization
    *   Your parents' marriage/certificate and/or evidence that you were in the legal and physical custody of your U.S. citizen parent, if applicable
    *   Your foreign birth certificate (and official translation if the document is not in English)
    *   Your evidence of admission to the United States for legal permanent residence and proof you subsequently resided in the United States

*   Claiming Citizenship through Birth Abroad to At Least One U.S. Citizen Parent, submit all the following:
    *   Your Consular Report of Birth Abroad (Form FS-240), Certification of Birth (Form DS-1350 or FS-545), or your foreign birth certificate (and official translation if the document is not in English)
    *   Your parent's proof of U.S. citizenship
    *   Your parents' marriage certificate
    *   Affidavit showing all your U.S. citizen parents' periods and places of residence and physical presence before your birth (DS-5507)

*   Claiming Citizenship Through Adoption by a U.S. Citizen Parent(s), *if your birthdate is on or after October 5, 1978*, submit evidence of all the following:
    *   Your permanent residence status
    *   Your full and final adoption
    *   You were in the legal and physical custody of your U.S. citizen parent(s)
    *   You have resided in the United States

2.  **PROOF OF IDENTITY** Information can be found at travel.state.gov/identification.

Present your original identification and submit a front and back photocopy with this form. It must show a photograph that is a good likeness of you. Examples include:

*   Driver's license (not temporary or learner's permit)
*   Previous or current U.S. passport book/card
*   Military identification
*   Federal, state, or city government employee identification
*   Certificate of Naturalization or Citizenship

3.  **A RECENT COLOR PHOTOGRAPH** See the full list of photo requirements on travel.state.gov/photos.

Attach one photo, 2x2 inches in size. U.S. passport photo requirements may differ from photo requirements of other countries. To avoid processing delays, be sure your photo meets all the following requirements (Refer to the photo template on Application Page 1):

*   Taken less than six months ago
*   Head must be 1-1 3/8 inches from the bottom of the chin to the top of the head
*   Head must face the camera directly with full face in view
*   No eyeglasses and head covering and no uniforms*
*   Printed on matte or glossy photo quality paper
*   Use a plain white or off-white background

*Head coverings are not acceptable unless you submit a signed statement verifying that it is part of recognized, traditional religious attire that is customarily or required to be worn continuously in public or a signed doctor's statement verifying its daily use for medical purposes. Glasses or other eyewear are not acceptable unless you submit a signed statement from a doctor explaining why you cannot remove them (e.g., during the recovery period from eye surgery). Photos are to be taken in clothing normally worn on a daily basis. You cannot wear a uniform, clothing that looks like a uniform, or camouflage attire.

# APPLICATION FOR A U.S. PASSPORT

**4. PROOF OF PARENTAL RELATIONSHIP** *(FOR APPLICANTS UNDER AGE 16)*

Parents/guardians must appear in person with the child and submit the following:

- Evidence of the child's relationship to parents/guardian(s) (Example: a birth certificate or Consular Report of Birth Abroad listing the names of the parent(s)/guardian(s) and child)
- Original parental/guardian government-issued photo identification and a photocopy of the front and back (to satisfy proof of identity)

If only one parent/guardian can appear in person with the child, you must also submit one of the following:

- The second parent's notarized written statement or DS-3053 (including the child's full name and date of birth) consenting to the passport issuance for the child. The notarized statement <u>cannot</u> be more than three months old, <u>must</u> be signed and notarized on the same day, and <u>must</u> come with a front and back photocopy of the second parent's government-issued photo identification.
- The second parent's death certificate (if second parent is deceased)
- Evidence of sole authority to apply (Example: a court order granting sole legal custody or a birth certificate listing only one parent)
- A written statement (made under penalty of perjury) or DS-5525 explaining, in detail, why the second parent cannot be reached

*OR*

**PROOF OF PARENTAL AWARENESS** *(FOR APPLICANTS AGES 16 AND 17)*

We may request the consent of one legal parent/legal guardian to issue a U.S. passport to you. In many cases, the passport authorizing officer may be able to ascertain parental awareness of the application by virtue of the parent's presence when the minor submits the application or a signed note from the parent or proof the parent is paying the application fees. However, the passport authorizing officer retains discretion to request the legal parent's/legal guardian's notarized statement of consent to issuance (e.g., on Form DS-3053).

**5. FEES**   Passport service fees are established by law and regulation (see 22 U.S.C. 214, 22 C.F.R. 22.1, and 22 C.F.R. 51.50-56) and are collected at the time you apply for the passport service. By law, the passport fees are **non-refundable**. Visit travel.state.gov/ passportfees for current fees and how fees are used and processed. Payment methods are as follows:

| Applicant Applying in the United States At Acceptance Facility | Applicant Applying at a Passport Agency or Outside the United States |
|---|---|
| • Passport fees must be made by check (personal, certified, cashier's, travelers) or money order (U.S. Postal, international, currency exchange) with the applicant's full name and date of birth printed on the front and payable to "U.S. Department of State."<br>• The execution fee **must be paid separately** and made payable to the acceptance facility in the form that they accept. | • We accept checks (personal, certified, cashier's, travelers); major credit cards (Visa, Master Card, American Express, Discover); money orders (U.S. Postal, international, currency exchange); or exact cash (no change provided). Make all fees payable to the "U.S. Department of State."<br>• <u>If applying outside the United States</u>: Please see the website of your embassy, consulate, or consular agency for acceptable payment methods. |

**Other Services Requiring Additional Fee** (Visit travel.state.gov for more details)**:**

- **Expedite Service:** Only available for passports mailed in the United States and Canada.
- **1-2 Day Delivery:** Only available for passport book (and not passport card) mailings in the United States.
- **Verification of a previous U.S. Passport or Consular Report of Birth Abroad:** Upon your request, we verify previously issued U.S. passport or Consular Report of Birth Abroad if you are unable to submit evidence of U.S. citizenship.
- **Special Issuance Passports:** If you apply for a no-fee regular, service, official, or diplomatic passport at a designated acceptance facility, you must pay the execution fee. No other fees are charged when you apply.

## SECTION E. HOW TO SUBMIT THIS FORM

Submitting your form depends on your location and how soon you need your passport.

- **Applicant Located Inside the United States:** For the latest information regarding processing times, scheduling appointments, and nearest designated acceptance facilities visit travel.state.gov or contact NPIC.

- **Applicant Located Outside the United States:** In most countries, you must apply in person at a U.S. embassy or consulate for all passport services. Each U.S. embassy and consulate has different procedures for submitting and processing your application. Visit travel.state.gov to check the U.S. embassy or consulate webpage for more information.

## SECTION F. RECEIVING YOUR PASSPORT AND SUPPORTING DOCUMENTS

- **Difference Between U.S. Passport Book and Card:** The book is valid for international travel by air, land, and sea. The card is not valid for international air travel, only for entry at land border crossings and seaports of entry when traveling from Canada, Mexico, Bermuda, and the Caribbean. The maximum number of letters provided for your given name (first and middle) on the card is 24 characters. If both your given names are more than 24 characters, you must shorten one of your given names you list on item #1 of Application Page 1.
- **Separate mailings:** You may receive your newly issued U.S. passport book and/or card and your citizenship evidence <u>in two separate mailings</u>. If you are applying for both a book and card, <u>you may receive three separate mailings</u>: one with your returned evidence, one with your newly issued book, and one with your newly issued card. **All documentary evidence that is not damaged, altered, or forged will be returned to you.** Photocopies will not be returned.
- **Passport numbers:** Each newly issued passport book or card will have a different passport number than your previous one.
- **Shipping and Delivery Changes:** If your mailing address changes prior to receipt of your new passport, please contact NPIC. **NOTE:** We will not mail a U.S. passport to a private address outside the United States or Canada.
- **Passport Corrections, Non-Receipt/Undeliverable Passports, and Lost/Stolen Passport:** For more information visit travel.state.gov or contact NPIC.

**Supp.Add.196**

# APPLICATION FOR A U.S. PASSPORT

## WARNING

False statements made knowingly and willfully in passport applications, including affidavits or other documents submitted to support this application, are punishable by fine and/or imprisonment under U.S. law including the provisions of 18 U.S.C. 1001, 18 U.S.C. 1542, and/or 18 U.S.C. 1621. Alteration or mutilation of a passport issued pursuant to this application is punishable by fine and/or imprisonment under the provisions of 18 U.S.C. 1543. The use of a passport in violation of the restrictions contained herein or of passport regulations is punishable by fine and/or imprisonment under 18 U.S.C. 1544. All statements and documents are subject to verification.

**Failure to provide information requested on this form, including your Social Security number, may result in significant processing delays and/or the denial of your application.**

## ACTS OR CONDITIONS

If any of the below-mentioned acts or conditions have been performed by or apply to the applicant, a supplementary explanatory statement under oath (or affirmation) by the applicant should be attached and made a part of this application.

*I have not been convicted of a federal or state drug offense or convicted of a statutory "sex tourism" crime, and I am not the subject of an outstanding federal, state, or local warrant of arrest for a felony; a criminal court order forbidding my departure from the United States; or a subpoena received from the United States in a matter involving federal prosecution for, or grand jury investigation of, a felony.*

## PRIVACY ACT STATEMENT

**AUTHORITIES:** Collection of this information is authorized by 22 U.S.C. 211 a et seq.; 8 U.S.C. 1104; 26 U.S.C. 6039E, 22 U.S.C. 2714a(f), Section 236 of the Admiral James W. Nance and Meg Donovan Foreign Relations Authorization Act, Fiscal Years 2000 and 2001; Executive Order 11295 (August 5, 1966); and 22 C.F.R. parts 50 and 51.

**PURPOSE:** We are requesting this information in order to determine your eligibility to be issued a U.S. passport. Your Social Security number is used to verify your identity.

**ROUTINE USES:** This information may be disclosed to another domestic government agency, a private contractor, a foreign government agency, or to a private person or private employer in accordance with certain approved routine uses. These routine uses include, but are not limited to, law enforcement activities, employment verification, fraud prevention, border security, counterterrorism, litigation activities, and activities that meet the Secretary of State's responsibility to protect U.S. citizens and non-citizen nationals abroad. Your Social Security number will be provided to the U.S. Department of the Treasury and may be used in connection with debt collection, among other purposes authorized and generally described in this section. More information on the routine uses for the system can be found in System of Records Notices State-05, Overseas Citizen Services Records and Other Overseas Records and State-26, Passport Records.

**DISCLOSURE:** Providing information on this form is voluntary. Be advised, however, that failure to provide the information requested on this form may cause delays in processing your U.S. passport application and/or could also result in the refusal or denial of your application. Failure to provide your Social Security number may result in the denial of your application (consistent with 22 U.S.C. 2714a(f)) and may subject you to penalty enforced by the Internal Revenue Service, as described in the Federal Tax Law on Instruction Page 1 (Section C) to this form.

## PAPERWORK REDUCTION ACT STATEMENT

Public reporting burden for this collection of information is estimated to average 85 minutes per response, including the time required for searching existing data sources, gathering the necessary data, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: Passport Forms Officer, U.S. Department of State, Bureau of Consular Affairs, Passport Services, Office of Program Management and Operational Support, 44132 Mercure Cir, PO Box 1199, Sterling, Virginia 20166-1199.

**For more information about your application status, online tools, current fees, and processing times, please visit <u>travel.state.gov</u>.**

Supp.Add.197

OMB Control No. 1405-0004
Expiration Date: 04/30/2025
Estimated Burden: 85 Minutes

# APPLICATION FOR A U.S. PASSPORT

*Use black ink only. If you make an error, complete a new form. Do not correct.*

**Select document(s) for which you are submitting fees:**

☐ U.S. Passport Book    ☐ U.S. Passport Card    ☐ Both

The U.S. passport card is **not** valid for international air travel. See Instruction Page 3

☐ Regular Book (Standard)    ☐ Large Book (Non-Standard)

The large book is for frequent international travelers who need more visa pages.

**1. Name** Last

☐ D  ☐ O  ☐ S  ☐ NFR

End. #          Exp.

First                          Middle

**2. Date of Birth** *(mm/dd/yyyy)*

**3. Gender (Read Instruction Page 1)**  M ☐  F ☐  X ☐  Changing gender marker? Yes ☐

**4. Place of Birth** *(City & State if in the U.S. or City & Country as it is presently known.)*

**5. Social Security Number**

**6. Email** *(See application status at passportstatus.state.gov)*

**7. Primary Contact Phone Number**

**8. Mailing Address Line 1:** Street/RFD#, P.O. Box, or URB

**Address Line 2:** *(Include Apartment, Suite, etc. If applicant is a child, write "In Care Of" of the parent. Example: In Care Of - Jane Doe)*

**City**          **State**    **Zip Code**    **Country,** *(if outside the United States)*

**9. List all other names you have used.** *(Examples: Birth Name, Maiden, Previous Marriage, Legal Name Change.  Attach additional  pages if needed.)*

A.                          B.

## STOP! CONTINUE TO PAGE 2 ➔
### DO NOT SIGN APPLICATION UNTIL REQUESTED TO DO SO BY AUTHORIZED AGENT

STAPLE          STAPLE

FROM 1" TO 1 3/8"

2" X 2"          2" X 2"

STAPLE          STAPLE

Attach a color photograph taken within the last six months

☐ Acceptance Agent    ☐ (Vice) Consul USA

☐ Passport Staff Agent

(Seal)

Signature of person authorized to accept applications

*By signing this form, I certify that I have provided the verbal oath and witnessed the applicant's/legal guardian's signature.*

Print Facility Name/Location

Name of courier company *(if applicable)*

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Second Signature Line (if identifying minor)**

☐ Driver's License  ☐ State Issued ID Card  ☐ Passport  ☐ Military  ☐ Other

Name

Issue Date *(mm/dd/yyyy)*          Exp. Date *(mm/dd/yyyy)*          State of Issuance

ID No          Country of Issuance

**Identifying Documents - Applicant or Mother/Father/Parent/Legal Guardian on Third Signature Line (if identifying minor)**

☐ Driver's License  ☐ State Issued ID Card  ☐ Passport  ☐ Military  ☐ Other

Name

Issue Date *(mm/dd/yyyy)*          Exp. Date *(mm/dd/yyyy)*          State of Issuance

ID No          Country of Issuance

I declare under penalty of perjury all of the following: 1) I am a citizen or non-citizen national of the United States and have not performed any of the acts listed under "Acts or Conditions" on page 4 of the instructions of this application (unless explanatory statement is attached); 2) the statements made on the application are true and correct; 3) I have not knowingly and willfully made false statements or included false documents in support of this application; 4) the photograph attached to this application is a genuine, current photograph of me; and 5) I have read and understood the warning on page 4 of the instructions to the application form.

Date

Agent ID Number

Facility ID Number

x _____
**Applicant's Legal Signature - age 16 and older**

x _____
**Mother/Father/Parent/Legal Guardian's Signature** (if identifying minor)

x _____
**Mother/Father/Parent/Legal Guardian's Signature** (if identifying minor)

For Issuing Office Only ─➔ Bk ____ Card ____ EF ____ Postage ____ Execution ____ Other ____

DS 11 C 03 2022 1

DS-11 04-2022

**Name of Applicant** *(Last, First, & Middle)*

**Date of Birth** *(mm/dd/yyyy)*

**10. Parental Information**

Mother/Father/Parent - First & Middle Name *(at Parent's Birth)*

Last Name *(at Parent's Birth)*

Date of Birth *(mm/dd/yyyy)*

Place of Birth *(City & State if in the U.S. or City & Country as it is presently known)*

Gender
☐ M
☐ F
☐ X

U.S. Citizen?
☐ Yes
☐ No

Mother/Father/Parent - First & Middle Name *(at Parent's Birth)*

Last Name *(at Parent's Birth)*

Date of Birth *(mm/dd/yyyy)*

Place of Birth *(City & State if in the U.S. or City & Country as it is presently known)*

Gender
☐ M
☐ F
☐ X

U.S. Citizen?
☐ Yes
☐ No

**11. Have you ever been married?** ☐ Yes ☐ No *If yes, complete the remaining items in #11.*

Full Name of Current Spouse or Most Recent Spouse *(Last, First & Middle)*

Date of Birth *(mm/dd/yyyy)*

Place of Birth

U.S. Citizen?
☐ Yes ☐ No

Date of Marriage *(mm/dd/yyyy)*

Have you ever been widowed or divorced? ☐ Yes ☐ No

Widow/Divorce Date *(mm/dd/yyyy)*

**12. Additional Contact Phone Number**
☐ Home ☐ Cell
☐ Work

**13. Occupation** *(if age 16 or older)*

**14. Employer or School** *(if applicable)*

**15. Height**

**16. Hair Color**

**17. Eye Color**

**18. Travel Plans** *(If no travel plans, please write "none")*
Departure Date *(mm/dd/yyyy)*   Return Date *(mm/dd/yyyy)*

Countries to be Visited

**19. Permanent Address** *(Complete if P.O. Box is listed under Mailing Address or if residence is different from Mailing Address.* **Do not list a P.O. Box.***)*

Street/RFD # or URB

Apartment/Unit

City

State

Zip Code

**20. Your Emergency Contact** *(Provide the information of a person not traveling with you to be contacted in the event of an emergency.)*

Name

Address: Street/RFD # or P.O. Box

Apartment/Unit

City

State

Zip Code

Phone Number

Relationship

**21. Have you ever applied for or been issued a U.S. Passport Book or Passport Card?** ☐ Yes ☐ No *If yes, complete the remaining items in #21.*

Name as printed on your most recent passport book

Most recent passport book number

Most recent passport book issue date *(mm/dd/yyyy)*

Status of your most recent passport book: ☐ Submitting with application ☐ Stolen ☐ Lost ☐ In my possession *(if expired)*

Name as printed on your most recent passport card

Most recent passport card number

Most recent passport card issue date *(mm/dd/yyyy)*

Status of your most recent passport card: ☐ Submitting with application ☐ Stolen ☐ Lost ☐ In my possession *(if expired)*

## PLEASE DO NOT WRITE BELOW THIS LINE - FOR ISSUING OFFICE ONLY

Name as it appears on citizenship evidence _____

☐ Birth Certificate  SR  CR  City  Filed:  Issued:  ☐ Sole Parent

☐ Nat. / Citz. Cert.  USCIS  USDC  Date/Place Acquired:  A#

☐ Report of Birth  Filed/Place:

☐ Passport  C/R  S/R  See #21  #/DOI:

☐ Other:

☐ Attached:

☐ P/C of Citz  ☐ P/C of ID  ☐ DS-71  ☐ DS-3053  ☐ DS-64  ☐ DS-5520  ☐ DS-5525  ☐ PAW  ☐ NPIC  ☐ IRL  ☐ Citz W/S

DS 11 C 03 2022 2

DS-11 04-2022

Clear Form

# POLOZOLA DECLARATION

# EXHIBIT 6

Supp.Add.200



# I am a U.S. citizen

**A4**

## How do I get proof of my U.S. citizenship?



U.S. Citizenship and Immigration Services

---

**If you were born in the United States**, you do not need to apply to USCIS for any evidence of citizenship. Your birth certificate issued where you were born is proof of your citizenship.[1]

**If you were born outside the United States, but one or both of your parents were U.S. citizens when you were born**, you may still be a U.S. citizen. This is called citizenship through derivation. There are usually additional specific requirements, and sometimes citizenship can be through a combination of a parent and grandparent.

### What documents are usually accepted as proof of U.S. citizenship?

The most common documents that establish U.S. citizenship are:

- **Birth Certificate,** issued by a U.S. State (if the person was born in the United States), or by the U.S. Department of State (if the person was born abroad to U.S. citizen parents who registered the child's birth and U.S. citizenship with the U.S. Embassy or consulate);

- **U.S. Passport,** issued by the U.S. Department of State;

- **Certificate of Citizenship,** issued to a person born outside the United States who derived or acquired U.S. citizenship through a U.S. citizen parent; or

- **Naturalization Certificate,** issued to a person who became a U.S. citizen after 18 years of age through the naturalization process.

### I was born in the United States. Where can I get a copy of my birth certificate?

Check with the Department of Health (Vital Records) in the U.S. State in which you were born. For more information, visit the National Center for Health Statistics web page at **www.cdc.gov/nchs/births.htm**.

---

[1]An exception to this rule exists regarding children born in the United States to foreign diplomats.

---

### I am a U.S. citizen. My child will be born abroad or recently was born abroad. How do I register his or her birth and U.S. citizenship?

Please contact the U.S. Department of State or the U.S. Embassy or consulate in the country where your child will be born for more information about eligibility requirements and how to register your child's U.S. citizenship.

### I was born overseas. My birth and U.S. citizenship were registered with the U.S. Embassy or consulate. I need a copy of the evidence of my citizenship. Whom should I contact?

Contact the U.S. Department of State. For more information, please see their Web site at **www.state.gov**.

### I was born overseas. I believe I was a U.S. citizen at birth because one or both my parents were U.S. citizens when I was born. But my birth and citizenship were not registered with the U.S. Embassy when I was born. Can I apply to have my citizenship recognized?

Whether or not someone born outside the United States to a U.S. citizen parent is a U.S. citizen depends on the law in effect when the person was born. These laws have changed over the years, but usually require a combination of the parent being a U.S. citizen when the child was born, and the parent having lived in the United States or its possessions for a specific period of time. Derivative citizenship can be quite complex and may require careful legal analysis.

### I was born overseas. One of my parents was a U.S. citizen but never lived in the United States. One of my grandparents was also a U.S. citizen. Could I have derived U.S. citizenship?

If your parent was a U.S. citizen when you were born but had not lived in the United States for the required amount of time before your birth, but one of your grandparents was also a U.S. citizen and had already met the residence requirements, then you may still

---

A4—I am a U.S. citizen…How do I get proof of my U.S. citizenship?
M-560B (October 2013) N

1

**Supp.Add.201**

have derived U.S. citizenship. The provisions of immigration law that govern derivative citizenship are quite precise and circumstances in individual cases can be complex. For specific information on how the law applies, please check our Web site at **www.uscis.gov**, or the U.S. Department of State Web site at **www.state.gov,** or call USCIS Customer Service at **1-800-375-5283**.

### I was born overseas. After I was born, my parent(s) became naturalized U.S. citizens. Could I have derived U.S. citizenship?

If **one** of your parents naturalized after February 27, 2001, and you were a permanent resident and under 18 years old at the time, then you may have automatically acquired U.S. citizenship. Before that date, you may have automatically acquired U.S. citizenship if you were a permanent resident and under 18 years old when **both** parents naturalized, or if you had only **one** parent when that parent naturalized.

However, if your parent(s) naturalized after you were 18, then you will need to apply for naturalization on your own after you have been a permanent resident for at least 5 years.

### How do I apply to have my citizenship recognized?

You have two options:

- You can apply to the U.S. Department of State for a U.S. passport. A passport is evidence of citizenship and also serves as a travel document if you need to travel. For information about applying for a U.S. passport, see the U.S. Department of State Web site at **www.state.gov**.
- If you are already in the United States, you also have the option of applying to USCIS using **Form N-600**, Application for Certificate of Citizenship. However, you may find applying for a passport to be more convenient because it also serves as a travel document and could be a faster process.

### How do I replace a lost, stolen, or destroyed Naturalization Certificate or Certificate of Citizenship?

To apply to replace your Naturalization Certificate or Certificate of Citizenship issued by USCIS or by the U.S. Immigration and Naturalization Service, file a **Form N-565**, Application for Replacement Naturalization Citizenship Document. Filing instructions and forms are available on our Web site at **www.uscis.gov**.

## Key Information

| Key USCIS forms referenced in this guide | Form # |
|---|---|
| Application for Certificate of Citizenship | N-600 |
| Application for Replacement Naturalization Citizenship Document | N-565 |

| Other U.S. Government Services–Click or Call | | |
|---|---|---|
| General Information | www.usa.gov | 1-800-333-4636 |
| New Immigrants | www.welcometoUSA.gov | |
| U.S. Dept. of State | www.state.gov | 1-202-647-6575 |
| National Center for Health Statistics | www.cdc.gov | 1-800-311-3435 |
| | www.cdc.gov/nchs /birth.htm | |

For more copies of this guide, or information about other customer guides, please visit **www.uscis.gov/howdoi**.

You can also visit **www.uscis.gov** to download forms, e-file some applications, check the status of an application, and more. It's a great place to start!

If you don't have Internet access at home or work, try your local library.

If you cannot find what you need, please call **Customer Service at: 1-800-375-5283**
*Hearing Impaired TDD Customer Service: 1-800-767-1833*

**Disclaimer:** *This guide provides basic information to help you become generally familiar with our rules and procedures. For more information, or the law and regulations, please visit our Web site. Immigration law can be complex, and it is impossible to describe every aspect of every process. You may wish to be represented by a licensed attorney or by a nonprofit agency accredited by the Board of Immigration Appeals.*

A4—I am a U.S. citizen…How do I get proof of my U.S. citizenship?
M-560B (October 2013) N

2

Supp.Add.202

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9    STATE OF WASHINGTON; STATE OF                  NO. 2:25-cv-00127
     ARIZONA; STATE OF ILLINOIS; and
10   STATE OF OREGON,

                                                    DECLARATION OF
11                          Plaintiffs,             DR. SHELLEY LAPKOFF

12         v.

13   DONALD TRUMP, in his official capacity
     as President of the United States; U.S.
14   DEPARTMENT OF HOMELAND
     SECURITY; BENJAMINE HUFFMAN, in
15   his official capacity as Acting Secretary of
     Homeland Security; U.S. SOCIAL
16   SECURITY ADMINISTRATION;
     MICHELLE KING, in her official capacity
17   as Acting Commissioner of the Social
     Security Administration; U.S.
18   DEPARTMENT OF STATE; MARCO
     RUBIO, in his official capacity as Secretary
19   of State; U.S. DEPARTMENT OF
     HEALTH AND HUMAN SERVICES;
20   DOROTHY FINK, in her official capacity
     as Acting Secretary of Health and Human
21   Services; U.S. DEPARTMENT OF
     JUSTICE; JAMES MCHENRY, in his
22   official capacity as Acting Attorney
     General; U.S. DEPARTMENT OF
23   AGRICULTURE; GARY WASHINGTON,
     in his official capacity as Acting Secretary
24   of Agriculture; and the UNITED STATES
     OF AMERICA,
25
                            Defendants.
26

DECLARATION OF                            1              ATTORNEY GENERAL OF WASHINGTON
DR. SHELLEY LAPKOFF                                              Civil Rights Division
CASE NO. 2:25-cv-00127                                        800 Fifth Avenue, Suite 2000
                                                                 Seattle, WA  98104
                                                                  (206) 464-7744

**Supp.Add.203**

I, Shelley Lapkoff, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge. If called to testify as a witness, I could and would testify competently to the matters set forth below.

2.    I am a Senior Demographer at National Demographics Corporation (NDC), which I joined in 2023. Founded in 1979, NDC is a firm dedicated to providing research and analysis services on demographic, districting, and redistricting issues to a variety of governmental and non-governmental clients. At NDC, as I have for more than 30 years, I specialize in conducting demographic and political redistricting analyses. Within the field of demography, my area of expertise is applied demography, which includes the analysis of client and third-party data, such as Census Bureau counts and estimates, data from state, federal and local governments, and data from other research organizations.

3.    Prior to joining NDC, I earned a Ph.D. in Demography in 1988 and an M.A. in Economics from the University of California, Berkeley in 1984. I received a B.A. with Honors in Economics from the University of Maryland, College Park, in 1976. While in graduate school, I founded my own demographic consulting firm, Lapkoff Demographic Research (LDR), in 1985, which provided consulting services and demographic analyses to government and non-governmental clients. In 1992, LDR subsequently became Lapkoff & Gobalet Demographic Research, Inc. (LDGR). And just recently, in 2023, LDGR merged with NDC. Additionally, I have taught Applied Demography and presented seminars in the U.C. Berkeley Demography Department. I have also been active in the Population Association of America (PAA) and have been Chair of the PAA Committee on Applied Demography.

4.    I served as one of the principals of LDGR from its inception until joining NDC. As President of LGDR and as a Senior Demographer with NDC, I have conducted and overseen many demographic research projects. As a consultant and practitioner of applied demographics, I help diverse types of clients. The work includes developing new methods (including

DECLARATION OF
DR. SHELLEY LAPKOFF
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.204

mathematical models) to forecast population and housing occupancy; assembling and analyzing demographic data; evaluating demographic trends; preparing written reports on the findings; and making presentations on a variety of matters.

5.    At LGDR and now NDC, I have worked with more than 20 school districts, including the large San Francisco and Oakland Unified School Districts, many cities, special districts, and county boards of supervisors. National-level clients have included non-profits (Girl Scouts of the United States, United Way Worldwide) and the U.S. Department of Justice. These projects have often used client and third-party data, such as Census Bureau American Community Survey data, data from state and federal government (especially birth data from the National Center for Health Statistics), and from research organizations like Pew Research Center.

6.    I have worked with dozens of clients providing political redistricting services after the 1990, 2000, 2010, and 2020 decennial Censuses. These types of demographic and redistricting analyses have required expert use of Census data, including the American Community Survey, and Geographic Information Systems (GIS) software.

7.    Over the years, I have served as an expert witness in several cases that involved demographic analyses, including issues such as racial and disability discrimination cases, housing discrimination against households with children cases, evaluations of school desegregation plans, political redistricting that conforms to civil rights legislation and court decisions, and developer fee justifications for school districts, among others.

8.    Attached as **Exhibit A** is a copy of my curriculum vitae listing my full experience, prior publications, and list of cases where I have submitted a declaration or participated as a consultant.

9.    NDC was retained by the State of Washington to determine the possible impact of a revocation of birthright citizenship in Washington and other states. NDC was asked to estimate the annual number of births to women who are unauthorized immigrants in Washington

DECLARATION OF
DR. SHELLEY LAPKOFF
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.205**

1    and other states, and if possible, the number of births in which both the mother and father were

2    unauthorized immigrants. Under my direction and supervision, NDC prepared the analysis and

3    report attached as **Exhibit B,** which reflects NDC's estimate of the number of such births

4    nationally and in Washington, Arizona, Illinois, and Oregon. The report details NDC's estimates,

5    the methodology used, and the data sources and additional materials consulted and relied upon.

6    It explains in detail the analysis and calculations for Washington and provides in Appendices C-

7    F the calculations for our nationwide estimates, as well as the estimates for Arizona, Illinois, and

8    Oregon based on the same methodology and data sources.

9         10.    **Nationwide.** As explained in our report, we estimate that in 2022, there were

10   255,000 births to unauthorized mothers in the United States. We further estimate that there were

11   approximately 153,000 births in which both parents were unauthorized. Our nationwide

12   calculations are detailed in Appendix C.

13        11.    **Washington.** With respect to Washington, as explained in our report, we estimate

14   that in 2022, the last year for which complete data are available, there were approximately 7,000

15   births to unauthorized mothers in Washington. That represents 30 percent of births to all foreign-

16   born mothers and eight percent of all births to Washington residents. We further estimate that

17   there were approximately 4,000 births in which both parents were unauthorized, representing 17

18   percent of births to all foreign-born mothers, and five percent of all births to Washington

19   residents. In conducting our analysis, we reviewed data from a variety of independent sources as

20   well as official federal and state government databases in an effort to best estimate using reliable

21   sources the number of births to unauthorized mothers and parents. Our methodology, data

22   sources, and full analysis are explained further in our attached report.

23        12.    NDC has also performed the same analysis for the number of births in Arizona,

24   Illinois, and Oregon. Our analysis for these states used the same methodology and data sources

25   as the Washington calculations.

26

DECLARATION OF
DR. SHELLEY LAPKOFF
CASE NO. 2:25-cv-00127

4

13. **Arizona.** As shown in Appendix D to our report, we estimate that in 2022, the last year for which complete data are available, there were approximately 6,000 births to unauthorized mothers in Arizona. We further estimate that there were approximately 3,400 births in which both parents were unauthorized. In conducting our analysis, we reviewed data from a variety of independent sources as well as official federal and state government databases in an effort to best estimate using reliable sources the number of births to unauthorized mothers and parents in Arizona.

14. **Illinois.** Likewise, as shown in Appendix E, we estimate that in 2022, the last year for which complete data are available, there were approximately 9,100 births to unauthorized mothers in Illinois. We further estimate that there were approximately 5,200 births in which both parents were unauthorized. In conducting our analysis, we reviewed data as with other states, including data from a variety of independent sources as well as official federal and state government databases in an effort to best estimate using reliable sources the number of births to unauthorized mothers and parents in Illinois.

15. **Oregon.** We conducted the same analysis for Oregon. As shown in Appendix F, we estimate that in 2022, the last year for which complete data are available, there were approximately 2,500 births to unauthorized mothers in Oregon. We further estimate that there were approximately 1,500 births in which both parents were unauthorized. For our Oregon calculation, like other states, we reviewed data from a variety of independent sources as well as official federal and state government databases in an effort to best estimate using reliable sources the number of births to unauthorized mothers and parents in Oregon.

16. I have reviewed President Trump's Executive Order, "Protecting the Meaning and Value of American Citizenship," which states that birthright citizenship does not extend to children who are born to (1) a mother who is unlawfully present in the United States and a father who is a not a citizen or lawful permanent resident at the time of said person's birth; or (2) a mother lawfully present but here on a temporary basis and a father who is not a citizen or lawful

DECLARATION OF
DR. SHELLEY LAPKOFF
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.207**

1    permanent resident at the time of said person's birth. The analysis described here and in NDC's

2    report addresses only a subset of children likely covered by the Executive Order. At this time,

3    we do not have an estimate of the number of births from immigrants lawfully present in the

4    United States but here on a "temporary basis," which the Executive Order does not define. The

5    birth estimates provided above and in NDC's report are therefore lower than the full number of

6    children that would be affected by the Executive Order. In other words, our estimates reflect

7    only a conservative baseline of the number of children born in the United States and Washington,

8    Arizona, Illinois, and Oregon, who will be denied citizenship under the Executive Order.

9

10   ///

11   ///

12   ///

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF
DR. SHELLEY LAPKOFF
CASE NO. 2:25-cv-00127

6

**Supp.Add.208**

1       I declare under penalty of perjury under the laws of the State of Washington and the

2   United States of America that the foregoing is true and correct.

3       DATED and SIGNED this 20th day of January 2025, at Oakland, California.

                      _____

                      DR. SHELLEY LAPKOFF

DECLARATION OF
DR. SHELLEY LAPKOFF
CASE NO. 2:25-cv-00127

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.209

# LAPKOFF DECLARATION

# EXHIBIT A

# Curriculum Vitae for Shelley Lapkoff

**Shelley Lapkoff, Ph.D.**
**Demographer**
National Demographics Corporation/Lapkoff & Gobalet Demographic Research, Inc.
SLapkoff@NDCResearch.com

Senior Demographer at National Demographics Corporation since 2023. President and Principal, Lapkoff & Gobalet Demographic Research, Inc., since 1992, and founder and owner of Lapkoff Demographic Research before that.  In 2023, National Demographics Corporation and Lapkoff & Gobalet Demographic Research, Inc. merged.

Lecturer, *University of California, Berkeley,* Demography Department, 1995 and 2001.

**Education and Honors**

Ph.D.    Demography, *University of California, Berkeley*, 1988

M.A.    Economics, *University of California, Berkeley*

A.B.    Economics, With Honors, *University of Maryland*

Guest Lecturer, Business School, University of California, Berkeley

NICHHD Training Grant, University of California, Berkeley, 1984-86

University of California Graduate Fellowship, 1982-84


**Professional Experience**

Dr. Lapkoff has provided demographic services to school districts since 1985.  In 1989 she founded Lapkoff Demographic Research, and since 1992 she has been the President and a Principal of Lapkoff & Gobalet Demographic Research, Inc.  In 2023, she became Senior Demographer at National Demographics Corporation.

She has provided consulting and research services to public K-12 school districts throughout the San Francisco Bay Area and California, as well as to community colleges, cities, voting jurisdictions, the Department of Housing and Urban Development, and the Department of Justice.  She has provided expert testimony in several court cases involving political redistricting, school desegregation, developer fee challenges, and housing discrimination.  Dr. Lapkoff is recognized as a national leader in the field of school district demography, and she is a past Chair of the Applied Demography Committee of the Population Association of America.

1

**Papers and Professional Presentations**

*Political Districting*

"Who Must Elect by District in California? A Demographer's Perspective on Methods for Assessing Racially Polarized Voting," with Shelley Lapkoff.  Chapter 18 in *Emerging Techniques in Applied Demography,* Hoque, M. Nazrul, Potter, Lloyd B. (Eds.), 2015.

"How much is enough and how much is too much?  Measuring Hispanic political strength for redistricting purposes," with Jeanne Gobalet, 2012 Population Association of America Annual Meeting.

"Voting Rights Act Issues in Political Redistricting," with Jeanne Gobalet, 1993 Population Association of America Annual Meeting.

Invited Speaker, "Demographers and the Legal System," International Conference on Applied Demography, Bowling Green University, 1992.

"Changing from At-large to District Election of Trustees in Two California Community College Districts: A Study of Contrasts," with Jeanne G. Gobalet, *Applied Demography*, August 1991.


*School and Child Demography*

"Who Attends Private Schools?" with Magali Barbieri and Jeanne Gobalet, 2014 Applied Demography Conference, San Antonio, TX.

"Measuring Variations in Private School Enrollment Rates Using ACS Estimates," with Magali Barbieri and Jeanne Gobalet, 2014 American Community Survey Users Conference, Washington, DC.

"Five Trends for Schools," Educational Leadership, March 2007, Volume 64, No. 6, Association for Supervision and Curriculum Development (with Rose Maria Li).

"Studies in Applied Demography," Session Organizer at the 2006 Population Association of America Annual Meeting.

"California's Changing Demographics: How New Population Trends Can Affect Your District," 2004 California School Boards Association Annual Meeting.

Panelist, "School Demography" session, 2004 Southern Demographic Association Annual Meeting.

"Where Have All the Children Gone?" Poster, 2004 Population Association of America Annual Meeting.

"Using Child-Adult Ratios for Estimating Census Tract Populations," 1996 Population Association of America Annual Meeting.

"How to Figure Kids," *American Demographics*, January 1994.

"Neighborhood Life Cycles," 1994 Population Association of America Annual Meeting.

"Enrollment Projections for School Districts," *Applied Demography*, Spring 1993.

"Projecting Births in a California School District," 1993 Population Association of America Annual Meeting.

"School District Demography," Session Organizer and Chair, 1994 Population Association of America Annual Meeting.

"School District Demography," Roundtable Luncheon Organizer, 1992 Population Association of America Annual Meeting.

2

"National Demographic Trends," presentation to the National Association of Business Economists, 1990.

"Demographic Trends and Long-range Enrollment Forecasting," presentation at the Redwood Leadership Institute, Sonoma County, California, 1990.

"Projections of Student Enrollment in the Pleasanton Unified School District," 1989 Population Association of America Annual Meeting.

### General Demography

"Forecast of Emeritus Faculty/Staff Households on a University Campus," with Jeanne Gobalet, 2000 Population Association of America Annual Meeting.

"Communicating Results:  Practical Approaches Suited to Decision-Oriented Audiences," Panelist.  2000 Population Association of America Annual Meeting.

"Fiscal Impacts of Demographic Change: Focus on California," Session Organizer and Chair. 1995 Population Association of America Annual Meeting.

Discussant for "Evaluating the Accuracy of Population Estimates and Projections," 1992 Population Association of America Annual Meeting.

"Intergenerational Flows of Time and Goods: Consequences of Slowing Population Growth," with Ronald Lee, *Journal of Political Economy*, March 1988.

"A Research Note on Keyfitz' 'The Demographics of Unfunded Pension'," *European Journal of Population*, July 1991.

"Pay-as-you-go Retirement Systems in Nonstable Populations," Working Paper, U.C. Berkeley Demography Group, 1985.

"Assessing Long-run Migration Policy as a Solution to the Old Age Dependency Problem," paper presented at the 1985 Population Association of America Annual Meeting

3

## Cases in which Dr. Lapkoff provided expert testimony

*Smith et al. v. City of Oakland, Case No. 4:19-cv-05398-JST, 2023.* I was retained by Plaintiffs' counsel to provide demographic analyses of the numbers of Oakland's rental units and shares of renters with an ambulatory disability. Plaintiffs alleged that the city's current rent program was disproportionately affecting households that contain a member with an ambulatory disability. Specifically, I was asked to: estimate the number and share of Oakland's renter households that include at least one member with an ambulatory disability; estimate the number and share of Oakland renter households with at least one member who uses a wheeled mobility device (a wheelchair or scooter), as well as those that include at least one member who uses mobility devices more generally (wheelchairs, scooters, walkers, crutches, or canes); estimate the number of existing Oakland rental units that were subject to state or federal accessible design and construction requirements when built; and consider the effect that adding various numbers of accessible units to Oakland's rent control program would have on the opportunity for people with ambulatory disabilities to rent an accessible covered unit, and thereby gain protections against rising rent. I believe there has been no ruling on this case yet.

*United States v. Mid-America Apartment Communities, Inc., et al., 2013-18.* The U.S. Department of Justice sued a national apartment management company for designing and constructing large apartment buildings that allegedly discriminated against those with a disability. Dr. Lapkoff was retained to evaluate the potential impact of the defendants' alleged discrimination, by region. Using Census surveys and analyzing Mid-America Apartment Communities' building data, Dr. Lapkoff estimated that 9.5 percent of households potentially renting units in Mid-America units would be expected to contain a person with a vision or ambulatory disability, a rate that is likely to rise in the future. The Justice Department obtained $11.3 million settlement of disability-based housing discrimination from Defendant.

*United States of America ex rel., Curtis Lockey and Craig MacKenzie v. City of Dallas, Texas and Housing Authority of City of Dallas, Texas, 2012.* I was retained by legal counsel for the Dallas Housing Authority (DHA) to evaluate claims that the actions of the DHA promoted racial segregation. My analysis of Census data, DHA data, and U.S. Department of Housing and Urban Development (HUD) data, showed that neighborhoods containing much of the public housing became minority-concentrated after the developments were built; that renovations were made to all the older housing projects under DHA control; that over the decades, DHA had provided a variety of housing options for persons receiving housing assistance; and that DHA is now part of an innovative program to encourage voucher holders to lease units in integrated neighborhoods. In short, I provided a broader context than Plaintiff's expert and showed the intention, efforts, and results of DHA's proactive measures to promote racial integration. DHA's Motion to Dismiss was accepted by the court.

*Redwood Christian School v. Alameda County, California, 2006-2007.* The County of Alameda denied a conditional use permit submitted by Redwood Christian School, which wanted to build a new facility. The School's enrollments declined. When the application

4

was denied, the School sued the County for damages, arguing that its enrollment decline would not have occurred if the building permit had been granted. I provided expert testimony that the decline was not associated with denial of the building permit. The court found for the County.

*United States of America, vs. Donald Sterling et al., 2006-2009.* The lawsuit, filed by the Justice Department in August 2006, alleged that the defendants, Donald T. Sterling, his wife Rochelle Sterling, and the Sterling Family Trust, engaged in discriminatory rental practices on the basis of race, national origin, and familial status (having children under 18) at various apartment buildings that they own and manage in Los Angeles. Among other things, the suit alleged that the defendants discriminated against non-Korean tenants and prospective tenants at buildings the defendants owned in the Koreatown area of Los Angeles. LGDR was hired by the Department of Justice to investigate these claims. We had access to all tenant records in the Koreatown buildings. Using both time series and cross-sectional analyses of the tenant records, as well as an analysis of Census data, we found a disproportionate decline in the number of Hispanic and African American renters. Sterling was required to make the largest monetary payment ever required by the U.S. Department of Justice, at the time, in the settlement of a case alleging housing discrimination in the rental of apartments.

*Thompson v. HUD, 2002-2005. MJG-95-309.* The U.S. Department of Housing and Urban Development (HUD) and the City of Baltimore were sued by the ACLU over the siting of public housing. The U.S. Department of Justice hired me to investigate Baltimore neighborhoods' demographic characteristics at the time public housing was built and used Census data to reconstruct the housing mix in Baltimore's neighborhoods from 1940 to the present. My analysis showed that in many cases, the neighborhood ethnic mix changed after public housing was sited. I also reviewed the various changes in HUD policies regarding the delivery of public housing ranging from large housing developments to Section 8 vouchers and projects, and then to smaller developments and scattered sites. There were many experts in this case, and I was the one most quoted by the judge – I believe that this was because I worked hard to make sure that my report was impartial.

*Project Sentinel v. Herman Christensen, Jr., 1994-95*. Project Sentinel, a nonprofit corporation, sued an apartment owner for discriminating against children under its occupancy standards. I analyzed unpublished Census data on residential patterns of children and provided an expert deposition. The case was settled out of court.

*Ridgeview Builders, Inc., v. Pittsburg Unified School District, 1991.*
Ridgeview Builders sued the Pittsburg Unified School over imposition of fees on residential development. Dr. Lapkoff was an expert witness for the school district. Her report discussed the development's impact on school enrollments and analyzed the school district's report that justified the fees when they were imposed. The court upheld the district's imposition of fees.

*Michelle Porter, et al., v. Davis Realty Company, et al., 1983*. In this fair housing case, Michelle Porter (an African American) sued the Davis Realty Company for housing

5

discrimination. While still in graduate school, I provided expert testimony for the plaintiff that indicated that the real estate agent had directed Ms. Porter to African American neighborhoods. Plaintiff won the highest damages award for housing discrimination ever received up to that time.

*Shappell Industries, Inc., v. Milpitas Unified School District, 1989-1990.*
Shappell Industries sued the school district over imposition of developer fees. Dr. Lapkoff provided an expert declaration discussing flaws in the District's fee justification. Shappell Industries won in trial court; however, the decision was overturned in appellate court, which found that Dr. Lapkoff's expert declaration was inadmissible due to timing.

6

# LAPKOFF DECLARATION

# EXHIBIT B

# Births to Unauthorized Immigrants in the States of Washington, Arizona, Illinois, and Oregon

Prepared by National Demographics Corporation, January 18, 2025

## Executive Summary

National Demographics Corporation (NDC) was asked to estimate the annual number of births in Washington and other states to women who are unauthorized immigrants, and if possible, the number of births in which both the mother and father were unauthorized immigrants.

For 2022, the year for which the most recent set of data are available, we estimate that:

1. There were approximately 7,000 births to unauthorized mothers in Washington, representing 30 percent of births to all foreign-born mothers and eight percent of all births to the state's residents.

2. There were approximately 4,000 births in Washington in which both parents were unauthorized, representing 17 percent of births to all foreign-born mothers, and five percent of all births to the state's residents.

While these estimates do not perfectly predict the number of unauthorized births in 2025, they currently provide the best approximation of the likely magnitude of unauthorized births in 2025.

The starting point for these estimates is an analysis by the Center for Immigration Studies (CIS) for the year 2014. We considered two factors to update the 2014 estimate: 1) The trend in births to all foreign-born mothers; and 2) The trend in the unauthorized total population. For estimating the number of births in which *both* parents were unauthorized immigrants, we used survey results about married couples from the Migration Policy Institute (MPI). Additionally, we used other sources to make alternative estimates to confirm the primary estimates provided.

We also have estimated the corresponding number of births nationally and for the states of Arizona, Illinois, and Oregon, as set forth in the Appendices to this report.

## CIS-Estimated Births to Unauthorized Mothers in 2014

For Washington, CIS estimated 6,554 births to unauthorized mothers in 2014, representing 7.3 percent of the state's total births (Table 1) and 30 percent of the state's births to foreign-born mothers. To our knowledge, the CIS report is the only published estimate of the number of births to unauthorized immigrant mothers by state.

Pew Research Center (Pew) estimated births to unauthorized immigrants for the entire United States, but not by state. Their analysis showed approximately 275,000 total births to unauthorized

1

immigrants in the U.S. in 2014, representing about 7.0 percent of all births (Passel and Cohn, 2016). CIS' comparable estimate for the U.S. is 297,073 births, or 7.5 percent of all births in 2014.

**Table 1. Washington Estimated 2014 Births, by Mother's Nativity and Immigration Status**

| Mother | Births | Percent |
|---|---|---|
| Unauthorized Foreign-Born | 6,554 | 7.3% |
| Authorized Foreign-Born | 15,217 | 17.0% |
| Native Born | 67,975 | 75.7% |
| Total | 89,746 | 100% |

Source: Camarota, Ziegler, and Richwine, Center for Immigration Studies (2018)

The methodology used by CIS is reasonable. Their 2014 estimates were based on data from the Census Bureau's 2012-2016 American Community Survey (ACS), for which 2014 is the middle year. The authors used a variation of the residual method to estimate the size of the unauthorized immigrant population from the ACS. This method of estimation is commonly used by researchers, including those at the Pew Research Center and the Center for Migration Studies (CMS). To determine which foreign-born ACS respondents may be unauthorized immigrants, CIS first eliminated those who are least likely to be unauthorized. The resulting subset of respondents was then weighted based on known characteristics of unauthorized immigrants (such as age, gender, region, and country of origin) as reported by the Department of Homeland Security (DHS).

## Updating the CIS Estimate for 2022

Since the publication of their 2014 estimates, CIS has not released subsequent estimates. Our calculations update those 2014 estimates using more recent data on births to foreign-born mothers and an analysis of the share of the foreign-born population that is unauthorized.

We considered multiple methodologies to estimate the number of births to unauthorized mothers for more recent years. We chose the methodology detailed below because it is the most reliable method based on the available data. Because CIS did not publish the specific fields and calculations used in their 2014 estimates, there is no way to reliably recreate their methodology with more recent ACS data without engaging in guesswork. We instead updated their data based on 2014 to 2022 population trends.

In this report, we build on the CIS 2014 birth count and consider two additional factors to estimate how the number of births changed over time:

1. **Change in the number of births to foreign-born mothers**. While data are not available on the number of births to unauthorized women, there are reliable data on the number of births to all foreign-born women. If the number of births to foreign-born mothers increased

2

from 2014 to 2022, we would expect the number of births to unauthorized foreign-born mothers to also increase, all else equal.

2. **Change in the unauthorized share of the foreign-born population.** To evaluate whether the trend in the number of births to unauthorized mothers is expected to mirror the trend in the number of births to foreign-born mothers, we considered whether the total population of the foreign born changed in the same way as the total population of the unauthorized population. The simplest way to do so is to calculate the share of the foreign-born population that is unauthorized and how that share has changed over time.

Each of these factors is discussed in detail below.

Secondarily, we use two different methods to estimate the share of unauthorized mothers with unauthorized partners. These methods are also discussed below.

## Change in the Number of Births to Foreign-Born Mothers

While official data on the number of births to *unauthorized* foreign-born mothers are not available, state-level data are readily available for *all* foreign-born mothers. A standard U.S. birth certificate includes the birthplace of the mother. The most reliable data on mothers' immigrant status is available from the National Center for Health Statistics (NCHS), which collects data from every state. According to the NCHS data, between 2014 and 2022, the number of births to foreign-born women increased by 6.1 percent. All else equal, we would expect births to unauthorized women to also increase by 6.1 percent during that period.

Table 2. Births to Washington's Foreign-Born Mothers

| Year | NCHS Births to Foreign-Born |
|:---:|:---:|
| 2014 | 22,187 |
| 2022 | 23,547 |
| Difference | 1,360 |
| Percent Change | 6.1% |

## Change in the Unauthorized Share of the Foreign-Born Population

As shown in Table 2 above, the number of births to foreign-born mothers increased by 6.1 percent over the nine-year period from 2014 to 2022. Unauthorized mothers are a subset of all foreign-born mothers. However, the unauthorized population may have a different birth trend than all foreign-born mothers. To evaluate that possibility, we consider one additional factor.

3

As mentioned above, data are not available on the growth in the number of births to unauthorized mothers. But estimates of the *total population* of the foreign-born and estimates of the unauthorized *total population* are readily available. These data allow us to compare how similar the population trends are between the unauthorized population and the overall foreign-born population.

Table 3 shows how the foreign-born population changed between 2014 and 2022, while Table 4 shows how the unauthorized population changed during the same period. As Table 3 shows, between 2014 and 2022, the foreign-born population grew by 24 percent.

**Table 3. Estimates of Washington's Foreign-Born Population**

|  | 2012-2016 ACS | 2022 ACS | Change |
|---|---|---|---|
| **Foreign-Born Population** | 957,185 | 1,188,392 | 24% |

Source: Census Bureau 2012-2016 5-Year ACS dataset and 2022 1-Year ACS dataset

Although the ACS does not directly estimate the *unauthorized* total population, three organizations provide estimates of that count—the Pew Research Center, the U.S. Department of Homeland Security (DHS), and the Center for Migration Studies (CMS). They estimate the unauthorized population changed by a rate between 21 and 30 percent from 2014 to 2022, as shown in Table 4. Averaging the three estimates yields an estimated 25 percent growth rate for the unauthorized population over that period.

**Table 4. Estimates of Washington's Unauthorized Population**

|  | 2014 | 2022 | Change |
|---|---|---|---|
| **DHS** | 280,000 | 340,000 | 21% |
| **Pew** | 250,000 | 325,000 | 30% |
| **CMS** | 234,100 | 290,648 | 24% |
| **Average of Change Estimates for 2014-2022** | | | 25% |

Sources: DHS estimates from Baker (2017) and Baker and Warren (2024)
Pew estimates from Passel and Krogstad (2024)
CMS estimates from CMS (2022) and Warren (2024)

Thus, the total foreign-born population grew by 24 percent while we estimate that the unauthorized population grew by an estimated 25 percent. Since the unauthorized population has a (slightly) higher growth rate than the overall foreign-born population, we assume that the number of births follow similar trends.

Using the same data from Tables 3 and 4, we calculate the unauthorized population as a share of the total foreign-born population. For Washington, there is only a slight difference in the unauthorized share of the foreign-born population – 26.6 percent in 2014 and 26.8 percent in 2022. It is such a

4

small difference that it is tempting not to adjust for the slight difference in the trend between the unauthorized and all foreign-born populations. But for completeness, we include the adjustment in this report. Detailed calculations are shown in Table 5. The percentage change in the unauthorized share of the foreign-born population is 0.8 percent, or less than one percent, from 2014 to 2022. This percentage change, shown in column D, is used to generate a multiplier, shown in column E, to adjust our final estimate of births to unauthorized mothers in 2022.

**Table 5. Estimates of Washington's Unauthorized Share of the Foreign-Born Population**

| Source | (A) Unauthorized Share of Foreign-Born, 2014 | (B) Unauthorized Share of Foreign-Born, 2022 | ( C ) Change in Share, 2014 to 2022 (B-A) | (D) Percent Change in Share (C/A) | ( E ) Adjustment for Calculations (1-D) |
|---|---|---|---|---|---|
| DHS | 29.3% | 28.6% | -0.6% | -2.2% | 97.8% |
| Pew | 26.1% | 27.3% | 1.2% | 4.7% | 104.7% |
| CMS | 24.5% | 24.5% | 0.0% | 0.0% | 100.0% |
| **Average** | **26.6%** | **26.8%** | **0.2%** | **0.8%** | **100.8%** |

## NDC's Estimate of Births to Unauthorized Mothers

Based on the above analysis, we make two updates to the CIS 2014 estimate of births to unauthorized mothers:

1. First, we adjust the number of births to reflect the change in the number of births to foreign-born mothers between 2014 and 2022.

2. Next, we adjust the number of births to reflect the change in the unauthorized share of the total foreign-born population from 2014 to 2022.

As shown in Table 6, we estimate 7,014 births to unauthorized mothers in 2022. This takes into account the overall change in births to foreign-born women between 2014 and 2022, as well as the change in the unauthorized population share during that period.

5

Table 6. Calculating Births to Unauthorized Washington Mothers in 2022

| Statistic | 2014 Births | Change in Foreign-Born Births, 2014-2022 | Adjustment for Change in Unauthorized Share, 2014-2022 | 2022 Births |
|---|---|---|---|---|
| Estimate | 6,554 | 6.1% | 100.8% | 7,014 |

Rounding 7,014 to reflect the imprecision in the data sources, we arrive at an estimate of 7,000 births to unauthorized mothers in 2022 in Washington.

Using the same methodology described above, we calculated the number of 2022 births nationwide to women who are unauthorized. We estimate there are 255,000 births in the U.S. to women who are unauthorized. See Appendix C for corresponding tables culminating in this result.

## Estimating Births to Two Unauthorized Parents

One question we were asked to investigate is how many births in Washington to unauthorized immigrant mothers are likely to also have *unauthorized immigrant fathers*. In general, there is much less information collected about fathers. Information about fathers is optional on may state's birth certificates. We found no published estimates of births to unauthorized mothers that also report the father's legal status.

However, we found one source of data on married couples and their unauthorized status. The Migration Policy Institute (MPI, 2019) estimated that 57 percent of unauthorized residents who are married have an unauthorized spouse.[1]  As that is the best available estimate, we calculate that 57 percent of children born to unauthorized mothers also have unauthorized fathers. The other 43% of the births to unauthorized mothers occur in mixed-status relationships, with an unauthorized mother and a legal resident or U.S. citizen father.

Available data on the marital status of women giving birth lend credence to this approach.  Using data from the ACS, we see that 78 percent of all women (native and foreign-born) who reported giving birth in 2022 were married.  Notably, an even higher percentage of foreign-born mothers (82 percent) are married. This supports the use of MPI's marriage data as a proxy for the immigration status of fathers when estimating births to unauthorized foreign-born mothers.

---

[1] MPI's estimates are based on a methodology that imputes unauthorized status using U.S. Census Bureau 2015-19 American Community Survey (ACS) and 2008 Survey of Income and Program Participation (SIPP) data, weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

6

Using this approach, NDC estimates about 4,000 births in Washington in 2022 in which neither parent was an authorized immigrant or U.S. citizen, as shown in Table 7. The corresponding national figure is 153,000 births in which both parents are unauthorized.

**Table 7. Calculating Births to Unauthorized Washington Parents in 2022**

| NDC estimate of births to unauthorized mothers | Estimated share with unauthorized father | Estimated births with unauthorized mother and father |
|---|---|---|
| 7,014 | 57.4% | 4,029 |

**Alternative Authorized-Spouse Percentage**

It is possible that couples with children differ from all married couples, or that unmarried mothers are even more likely to have an unauthorized spouse than married women. Extrapolating from a variety of secondary sources, NDC estimates that approximately 80 percent of births to unauthorized mothers may have an unauthorized father. See Appendix A for detailed calculations.

Using the 80 percent figure would increase the estimated number of births in which both parents were unauthorized immigrants to about 5,700 births annually. This suggests that the 57 percent figure from the MPI survey is conservative.

## Summary

NDC reviewed data from a variety of independent sources as well as official federal and state government databases in a search for counts of the unauthorized population and the number of births to unauthorized mothers each year. As described in detail above, our best estimate uses the following data sources:

- National Center for Health Statistics (NCHS) counts of births per year to foreign-born mothers;

- The United States Census Bureau American Community Survey (ACS) estimates of the foreign-born population;

- The Center for Immigration Studies (CIS) estimate of the number of births to unauthorized mothers in 2014;

- The Pew Research Center, Department of Homeland Security (DHS), and Center for Migration Studies (CMS) estimates of the total unauthorized population; and,

- Migration Policy Institute (MPI) estimates of the marital status of unauthorized immigrants.

7

Our best estimate from these data is that in Washington in 2022, there were approximately 7,000 babies born to unauthorized mothers, of whom approximately 4,000 also have an unauthorized father.

## Additional States

We used the same methodology to review additional states and the nation as a whole. Rather than repeating the discussion of methodology for each one, we simply include the corresponding tables and conclusion for each state in an attached appendix.

8

# References

Baker, B. and Warren, R. (2024, April). *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018 - January 2022.* Office of Homeland Security Statistics, U.S. Department of Homeland Security. https://ohss.dhs.gov/sites/default/files/2024-06/2024_0418_ohss_estimates-of-the-unauthorized-immigrant-population-residing-in-the-united-states-january-2018%25E2%2580%2593january-2022.pdf

Camarota, S., Ziegler, K., and Richwine, J. (2018). *Births to Legal and Illegal Immigrants in the U.S.: A look at health insurance coverage among new mothers by legal status at the state and local level.* Center for Immigration Studies. https://cis.org/Report/Births-Legal-and-Illegal-Immigrants-US

Center for Migration Studies (CMS). (2022). *Democratizing Data Initiative: Undocumented Immigrants in the United States, by State, Sex, and Year, 2010-2019* [Data set]. https://www.cmsny.org/data-undocumented-state-sex-2010-to-2019

Migration Policy Institute (MPI). (2019). *Profile of the Unauthorized Population: Washington* [Data set]. https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/WA

Migration Policy Institute (MPI). (2022). *State Immigration Data Profile: Washington* [Data set]. https://www.migrationpolicy.org/data/state-profiles/state/demographics/WA

Passel, J.S. and Cohn, D. (2016, October 26). *Number of babies born to unauthorized immigrants in U.S. continues to decline.* Pew Research Center. https://www.pewresearch.org/short-reads/2016/10/26/number-of-babies-born-to-unauthorized-immigrants-in-u-s-continues-to-decline/

Passel, J.S. and Krogstad, J.M. (2024, July 22). *What we know about unauthorized immigrants living in the U.S.* Pew Research Center. https://www.pewresearch.org/short-reads/2024/07/22/what-we-know-about-unauthorized-immigrants-living-in-the-us/

Warren, R. (2024). After a Decade of Decline, the US Undocumented Population Increased by 650,000 in 2022. *Journal on Migration and Human Security* 12(2): 85-95. https://doi.org/10.1177/23315024241226624

9

## Appendix A: Alternative Calculations on the Legal Status of Fathers

Some of the children born to unauthorized mothers have authorized fathers (either citizen or otherwise authorized). To our knowledge, no one has surveyed or estimated the number or percent of births to unauthorized mothers that also have an unauthorized father. In the report above, we estimate this figure at 57 percent from a survey of married couples.

An alternative approach described here is to consider the composition of households with at least one unauthorized member. The percentage of unauthorized adults in such households is used to estimate the probability that an unauthorized mother would have an unauthorized partner. For example, if all households were 100 percent filled with unauthorized members, an unauthorized mother would have a 100 percent probability of being in partnership with an unauthorized man. If roughly half the members of the household were unauthorized, she would have a roughly 50 percent probability of being in partnership with an unauthorized man.

Data estimates are available on the number of authorized and unauthorized people in households that contain at least one unauthorized person. However, these data include children. In our calculations below, we subtract children from both the authorized and unauthorized populations to obtain a count of adults living in households with at least one unauthorized person. As Table A-1 shows, 81 percent of adults in households that contain at least one unauthorized member are unauthorized.

**Table A-1. Composition of Washington Households with at Least One Unauthorized Member**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Total Population | 340,000 | 230,000 | 570,000 | 60% |
| Children | 42,532 | 160,000 | 202,532 | 21% |
| Adults | 297,468 | 70,000 | 367,468 | 81% |

Sources: Connor (2024) run; Capp, Fix, and Zong (2016); DHS.

We need to make one small mathematical adjustment to the 81 percent figure in Table A-1 to obtain the probability that an unauthorized mother would have an unauthorized partner. The 81 percent figure includes the mothers themselves who are, by definition, unauthorized. We need to subtract these women from both the numerator and denominator so they are not in the probability calculation. Table A-2 shows these calculations assuming there are 7,000 unauthorized mothers – our estimate for 2022. This changes the percent unauthorized from 81.0 percent to 80.6 percent.

10

**Supp.Add.227**

**Table A-2. Probability Calculation**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Adults | 297,468 | 70,000 | 367,468 | 81.0% |
| Unauthorized Mothers | 7,000 | 0 | 7,000 | 100% |
| Adults Excluding Mothers | 290,468 | 70,000 | 360,468 | 80.6% |

Table A-3 shows the estimated number of births in which both parents are unauthorized. With 7,000 mothers and 80.6 probability of being in partnership with an unauthorized man, we calculate 5.641 births in which both parents are unauthorized.

**Table A-3. Alternative Estimate of Both Parents being Unauthorized in Washington**

| | Unauthorized Population |
|---|---|
| 2022 Births to Unauthorized Mothers | 7,000 |
| Probability of the Father Being Unauthorized | 80.6% |
| 2022 Births with Both Parents Unauthorized | 5,641 |

## Conclusion

Just as our original estimate methodology looked only at married couples, for this methodology we make the assumption that the mother and father live together, as we have no data to adjust the numbers to account for situations where the mother and father do not live together.

We estimate that approximately 5,700 is an alternative estimate for the number of births where neither the mother nor the father is authorized.

## References

Capps, R., Fix, M., and Zong, J. (2016, January). *A Profile of U.S. Children with Unauthorized Immigrant Parents*. Migration Policy Institute Fact Sheet. https://www.migrationpolicy.org/research/profile-us-children-unauthorized-immigrant-parents

Connor, P. (2024, January 18). *Immigration reform can keep millions of mixed-status families together. Fwd.us*

Supp.Add.228

# Appendix B:  Sources of Data on Immigrants

For this report, NDC collected data from academic studies, government agencies, and independent organizations. Each source is described in detail below.

**Government Agencies**

Data from official government sources is regarded as authoritative and reliable.

- **National Center for Health Statistics (NCHS)**
  NCHS serves as the principal health statistics agency in the United States and operates under the umbrella of the Centers for Disease Control and Prevention (CDC). NCHS collects birth data from all 50 states and the District of Columbia through the Vital Statistics System, which includes birth certificates filed with state health departments. The NCHS uses standardized forms and methods for collecting birth data, ensuring consistency and comparability across States and over time.

- **American Community Survey (ACS)**
  The American Community Survey (ACS) is an ongoing survey conducted by the U.S. Census Bureau that collects detailed demographic, social, economic, and housing information about the U.S. population. The ACS employs a scientifically designed sampling method that ensures the data collected is representative of the entire U.S. population. Each year, about 3.5 million households participate in the survey, providing a broad and diverse data set. By collecting data annually, the ACS is particularly useful for tracking changes in demographic trends over time.

- **Office of Immigration Statistics (OIS)**
  The Office of Immigration Statistics is housed within the Department of Homeland Security (DHS), the federal agency responsible for immigration enforcement. The OIS often collaborates with academic institutions to enhance the quality and utility of its data. This collaboration can involve peer review processes that further validate findings.

**Independent Organizations**

These organizations are widely regarded as authorities on immigration and their research is cited frequently in legal proceedings and policy debates.

- **Center for Immigration Studies (CIS)**
  Founded in 1985, CIS is a nonprofit research organization that focuses on immigration policy issues, often advocating for reduced immigration levels in the United States. Critics of CIS often argue that it has a political agenda that promotes anti-immigration views.

  **Dr. Steven Camarota, Director of Research, Center for Immigration Studies**
  Dr. Camarota holds a Ph.D. in American Government from the University of Virginia. He is currently the Director of Research at the Center for Immigration Studies, where he has

12

authored numerous reports analyzing U.S. Census Bureau data as it relates to issues of immigration and citizenship.

Dr. Camarota's research has been cited in high profile cases, including *Arizona v. United States (2012)*. He has experience testifying before congressional committees[2] and providing expert testimony in legal proceedings.[3]

- **Pew Research Center**
  Founded in 2004, the Pew Research Center is a nonpartisan, nonprofit research organization based in Washington, D.C., known for its data-driven studies on a broad range of topics, including demographics and immigration. The Center does not take policy positions or advocate for specific policies.

  **Dr. Jeffrey S. Passel, Senior Demographer, Pew Research Center**
  Dr. Passel is widely recognized for his demographic expertise and as one of the nation's premier experts on immigration. He developed demographic methods for estimating the unauthorized immigrant population that are widely used by scholars in many fields. As a senior demographer at the Pew Research Center, he authored and contributed to significant reports on the size and characteristics of the undocumented immigrant population, which are frequently cited in legal and academic discussions. Dr. Passel previously held positions at the Urban Institute and the U.S. Census Bureau. He holds a Ph.D. from Johns Hopkins University.

  Dr. Passel has testified before congressional committees and federal agencies.[4] His research has been cited in high profile cases including *Arizona v. United States (2012)*. Dr. Passel has also provided expert testimony in court cases over the past four decades.[5]

- **Migration Policy Institute (MPI)**
  Founded in 2001, MPI is a nonpartisan research organization based in Washington, D.C., on the study of migration and immigration policy in the United States and globally. The institute conducts in-depth research, produces reports, and provides analysis on a wide range of immigration-related topics, including legal and illegal immigration. The institute employs a team of experienced researchers, demographers, and policy analysts who produce high-quality, rigorous studies.

  **Dr. Randy Capps, Director of Research for U.S. Programs, Migration Policy Institute**

---

[2] *The Fiscal Costs of the President's Executive Actions on Immigration*, Hearing Before the H. Comm. on Oversight & Gov't Reform, 113th Cong. (Mar. 17, 2015).

[3] *Fish v. Kobach*. 309 F.Supp.3d 1048 (2018).

[4] *Issues Facing Hispanics in the Federal Workplace, Meeting of the Equal Employment Opportunities Commission.* (October 23, 2008).

[5] *Cuomo v. Baldrige*, 674 F. Supp. 1089 (1987).

13

Dr. Capps is a prominent researcher and demographer known for his work on immigration and migration policy for the Migration Policy Institute. He has provided research cited in legal proceedings.[6] Dr. Capps holds a Ph.D. from the University of California, Berkeley.

- **Center for Migration Studies (CMS)**
  Founded in 1964 and affiliated with the Catholic Church, CMS is a nonprofit research organization based in New York City that focuses on issues related to immigration. The Center collaborates with academic institutions and researchers, which adds to its credibility. Many of its staff and affiliated researchers are respected scholars in the field of migration studies.

  **Dr. Robert Warren, Senior Visiting Fellow, Center for Migration Studies**
  Dr. Warren served as a demographer for 34 years with the United States Census Bureau and the former Immigration and Naturalization Service (INS). He is now a Senior Visiting Fellow at the Center for Migration Studies of New York.

  Dr. Warren has authored and coauthored numerous reports focusing on the size and characteristics of the undocumented immigrant population in the U.S. His work is often referenced in policy debates and legal proceedings. Dr. Warren's contributions to immigration research have made him a respected authority in the field. He holds a Ph.D. from Columbia University.

- **FWD.us**
  FWD.us is a nonprofit organization founded in 2013 by a group of technology leaders, including Mark Zuckerberg (Meta Platforms and Facebook), Reid Hoffman (LinkedIn), and others, with the aim of advocating policies that benefit the tech industry, including immigration reform that makes it easier for skilled workers to enter and remain in the U.S.

  **Dr. Phillip Connor, Senior Demographer, FWD.us**
  Formerly a researcher at the Pew Research Center, Dr. Connor now serves as Senior Demographer for FWD.us. He holds a Ph.D. from Princeton University and has published peer-reviewed studies on immigration.

---

[6] *Rodriguez v. Finan*, Civil Action No.: 2:15-CV-2317-BHH (2016).

14

# Appendix C:  United States

We estimate the United States in 2022 saw 255,000 births to unauthorized mothers, of which we estimate 153,000 also had unauthorized fathers. Our calculations are shown in the following tables:

**Table 1. Estimated 2014 U.S. Births, by Mother's Nativity**

| Mother's Nativity | Births | Percent |
|---|---|---|
| Unauthorized Foreign-born | 297,073 | 7.5% |
| Authorized Foreign-born | 493,509 | 12.4% |
| Native Born | 3,180,564 | 80.1% |
| Total | 3,971,146 | 100% |

Source: Camarota, Ziegler, and Richwine, Center for Immigration Studies (2018)

**Table 2. Births to Foreign-Born Mothers in the U.S.**

| Year | NCHS Births to Foreign-Born |
|---|---|
| 2014 | 872,256 |
| 2022 | 832,728 |
| Difference | -39,528 |
| Percent Change | -4.5% |

**Table 3. Estimates of U.S. Foreign-Born Population**

| | 2012-2016 ACS | 2022 ACS | Change |
|---|---|---|---|
| Foreign-Born Total Population | 42,194,354 | 46,182,177 | 9.5% |

Source: Census Bureau 2012-2016 5-Year ACS dataset and 2022 1-Year ACS dataset

**Table 4. Estimates of the U.S. Unauthorized Population**

| | 2014 | 2022 | Change |
|---|---|---|---|
| DHS | 11,460,000 | 10,990,000 | -4.1% |
| Pew | 11,100,000 | 11,000,000 | -0.9% |
| CMS | 10,912,300 | 10,939,004 | 0.2% |
| Average of Change Estimates for 2014-2022 | | | -1.6% |

Sources: DHS estimates from Baker and Warren (2024).

Pew estimates from Passel and Krogstad (2024).

CMS estimates from CMS (2022) and Warren (2024).

15

**Table 5. Estimates of U.S.'s Unauthorized Population Compared to Foreign-Born Population**

| Source | (A) Unauthorized Share of Foreign-Born, 2014 | (B) Unauthorized Share of Foreign-Born, 2022 | ( C ) Change in Share, 2014 to 2022 (B-A) | (D) Percent Change in Share (C/A) | ( E ) Adjustment for Calculations (1-D) |
|---|---|---|---|---|---|
| DHS | 27.2% | 23.8% | -3.4% | -12.4% | 87.6% |
| Pew | 26.3% | 23.8% | -2.5% | -9.5% | 90.5% |
| CMS | 25.9% | 23.7% | -2.2% | -8.4% | 91.6% |
| **Average** | **26.4%** | **23.8%** | **-2.7%** | **-10.1%** | **89.9%** |

**Table 6. Calculating U.S. Births to Unauthorized Mothers in 2022**

| Statistic | 2014 Births | Change in Foreign-Born Births, 2014-2022 | Adjustment for Change in Unauthorized Share, 2014-2022 | 2022 Births |
|---|---|---|---|---|
| **Estimate** | 297,073 | -4.5% | 89.9% | 255,012 |

**Table 7. Calculating U.S. Births to Unauthorized Parents in 2022**

| NDC estimate of births to unauthorized mothers | Estimated share with unauthorized father | Estimated births with unauthorized mother and father |
|---|---|---|
| 255,012 | 60.0% | 153,007 |

16

**Table A-1: Composition of U.S. Households with at Least One Unauthorized Member**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Total Population | 10,990,000 | 10,160,000 | 21,150,000 | 52% |
| Children | 1,454,051 | 5,470,000 | 6,924,051 | 21% |
| Adults | 9,535,949 | 4,690,000 | 14,225,949 | 67.0% |

**Table A-2: Probability Calculation**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Adults | 9,535,949 | 4,690,000 | 14,225,949 | 67.0% |
| Unauthorized Mothers | 255,000 | 0 | 255,000 | 100% |
| Adults Excluding Mothers | 9,280,949 | 4,690,000 | 13,970,949 | 66.4% |

**Table A-3: Alternative Estimate of Both Parents being Unauthorized in the U.S.**

| | Unauthorized Population |
|---|---|
| 2022 Births to Unauthorized Mothers | 255,000 |
| Probability of the Father Being Unauthorized | 66.4% |
| 2022 Births with Both Parents Unauthorized | 169,397 |

17

Supp.Add.234

## Appendix D: Arizona

We estimate Arizona in 2022 saw 6,000 births to unauthorized mothers, of which we estimate 3,400 also had unauthorized fathers. Our calculations are shown in the following tables:

**Table 1. Estimated 2014 Arizona Births, by Mother's Nativity**

| Mother's Nativity | Births | Percent |
|---|---|---|
| Unauthorized Foreign-born | 9,430 | 10.9% |
| Authorized Foreign-born | 8,233 | 9.5% |
| Native Born | 68,612 | 79.5% |
| Total | 86,275 | 100% |

Source: Camarota, Ziegler, and Richwine, Center for Immigration Studies (2018)

**Table 2. Births to Foreign-Born Mothers in Arizona**

| Year | NCHS Births to Foreign-Born |
|---|---|
| 2014 | 18,909 |
| 2022 | 15,521 |
| Difference | -3,388 |
| Percent Change | **-17.9%** |

**Table 3. Estimate of Arizona's Foreign-Born Total Population**

| | 2012-2016 ACS | 2022 ACS | Change |
|---|---|---|---|
| Foreign-Born Total Population | 901,548 | 962,688 | 6.8% |

Source: Census Bureau 2012-2016 5-Year ACS dataset and 2022 1-Year ACS dataset

**Table 4. Estimates of Arizona's Unauthorized Foreign-Born Total Population**

| | 2014 | 2022 | Change |
|---|---|---|---|
| DHS | 350,000 | 290,000 | -17.1% |
| Pew | 325,000 | 250,000 | -23.1% |
| CMS | 277,000 | 248,976 | -10.1% |
| Average of Change Estimates for 2014-2022 | | | **-16.8%** |

Sources: DHS estimates from Baker (2017) and Baker and Warren (2024).

Pew estimates from Passel and Krogstad (2024).

CMS estimates from CMS (2022) and Warren (2024).

18

Supp.Add.235

**Table 5. Estimates of Arizona's Unauthorized Population Compared to Foreign-Born Population**

| Source | (A) Unauthorized Share of Foreign-Born, 2014 | (B) Unauthorized Share of Foreign-Born, 2022 | (C) Change in Share, 2014 to 2022 (B-A) | (D) Percent Change in Share (C/A) | (E) Adjustment for Calculations (1-D) |
|---|---|---|---|---|---|
| DHS | 38.8% | 30.1% | -8.7% | -22.4% | 77.6% |
| Pew | 36.0% | 26.0% | -10.1% | -28.0% | 72.0% |
| CMS | 30.7% | 25.9% | -4.9% | -15.8% | 84.2% |
| **Average** | **35.2%** | **27.3%** | **-7.9%** | **-22.1%** | **77.9%** |

**Table 6. Calculating Arizona Births to Unauthorized Mothers in 2022**

| Statistic | 2014 Births | Change in Foreign-Born Births, 2014-2022 | Adjustment for Change in Unauthorized Share, 2014-2022 | 2022 Births |
|---|---|---|---|---|
| **Estimate** | 9,430 | -17.9% | 77.9% | 6,033 |

**Table 7. Calculating Arizona Births to Unauthorized Parents in 2022**

| NDC estimate of births to unauthorized mothers | Estimated share with unauthorized father | Estimated births with unauthorized mother and father |
|---|---|---|
| 6,033 | 56.5% | 3,410 |

19

**Table A-1: Composition of Arizona Households with at Least One Unauthorized Member**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Total Population | 290,000 | 220,000 | 510,000 | 57% |
| Children | 37,215 | 140,000 | 177,215 | 21% |
| Adults | 252,785 | 80,000 | 332,785 | 76.0% |

**Table A-2: Probability Calculation**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Adults | 252,785 | 80,000 | 332,785 | 76.0% |
| Unauthorized Mothers | 6,000 | 0 | 6,000 | 100% |
| Adults Excluding Mothers | 246,785 | 80,000 | 326,785 | 75.5% |

**Table A-3: Alternative Estimate of Both Parents being Unauthorized in Arizona**

| | Unauthorized Population |
|---|---|
| 2022 Births to Unauthorized Mothers | 6,000 |
| Probability of the Father Being Unauthorized | 75.5% |
| 2022 Births with Both Parents Unauthorized | 4,531 |

20

## Appendix E:  Illinois

We estimate Arizona in 2022 saw 9,100 births to unauthorized mothers, of which we estimate 5,200 also had unauthorized fathers. Our calculations are shown in the following tables:

**Table 1. Estimated 2014 Illinois Births, by Mother's Nativity**

| Mother's Nativity | Births | Percent |
|---|---|---|
| Unauthorized Foreign-born | 13,774 | 8.8% |
| Authorized Foreign-born | 18,380 | 11.7% |
| Native Born | 124,500 | 79.5% |
| Total | 156,654 | 100% |

Source: Camarota, Ziegler, and Richwine, Center for Immigration Studies (2018)

**Table 2. Births to Foreign-Born Mothers in Illinois**

| Year | NCHS Births to Foreign-Born |
|---|---|
| 2014 | 35,386 |
| 2022 | 27,041 |
| Difference | -8,345 |
| Percent Change | **-23.6%** |

**Table 3. Estimate of Illinois's Foreign-Born Total Population**

| | 2012-2016 ACS | 2022 ACS | Change |
|---|---|---|---|
| Foreign-Born Total Population | 1,791,568 | 1,810,100 | 1.0% |

Source: Census Bureau 2012-2016 5-Year ACS dataset and 2022 1-Year ACS dataset

**Table 4. Estimates of Illinois's Unauthorized Foreign-Born Total Population**

| | 2014 | 2022 | Change |
|---|---|---|---|
| DHS | 530,000 | 420,000 | -20.8% |
| Pew | 450,000 | 400,000 | -11.1% |
| CMS | 454,600 | 429,361 | -5.6% |
| Average of Change Estimates for 2014-2022 | | | -12.5% |

Sources: DHS estimates from Baker (2017) and Baker and Warren (2024).

Pew estimates from Passel and Krogstad (2024).

CMS estimates from CMS (2022) and Warren (2024).

21

Table 5. Estimates of Illinois's Unauthorized Population Compared to Foreign-Born Population

| Source | (A) Unauthorized Share of Foreign-Born, 2014 | (B) Unauthorized Share of Foreign-Born, 2022 | ( C ) Change in Share, 2014 to 2022 (B-A) | (D) Percent Change in Share (C/A) | ( E ) Adjustment for Calculations (1-D) |
|---|---|---|---|---|---|
| DHS | 29.6% | 23.2% | -6.4% | -21.6% | 78.4% |
| Pew | 25.1% | 22.1% | -3.0% | -12.0% | 88.0% |
| CMS | 25.4% | 23.7% | -1.7% | -6.5% | 93.5% |
| Average | 26.7% | 23.0% | -3.7% | -13.4% | 86.6% |

Table 6. Calculating Illinois Births to Unauthorized Mothers in 2022

| Statistic | 2014 Births | Change in Foreign-Born Births, 2014-2022 | Adjustment for Change in Unauthorized Share, 2014-2022 | 2022 Births |
|---|---|---|---|---|
| Estimate | 13,774 | -23.6% | 86.6% | 9,119 |

Table 7. Calculating Illinois Births to Unauthorized Parents in 2022

| NDC estimate of births to unauthorized mothers | Estimated share with unauthorized father | Estimated births with unauthorized mother and father |
|---|---|---|
| 9,119 | 57.1% | 5,211 |

22

Supp.Add.239

**Table A-1: Composition of Illinois Households with at Least One Unauthorized Member**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Total Population | 420,000 | 460,000 | 880,000 | 48% |
| Children | 61,139 | 230,000 | 291,139 | 21% |
| Adults | 358,861 | 230,000 | 588,861 | 60.9% |

**Table A-2: Probability Calculation**

| Source | Unauthorized Population | Authorized Population | Total Population | Percent Unauthorized |
|---|---|---|---|---|
| Adults | 358,861 | 230,000 | 588,861 | 60.9% |
| Unauthorized Mothers | 9,100 | 0 | 9,100 | 100% |
| Adults Excluding Mothers | 349,761 | 230,000 | 579,761 | 60.3% |

**Table A-3:  Alternative Estimate of Both Parents being Unauthorized in Illinois**

| | Unauthorized Population |
|---|---|
| 2022 Births to Unauthorized Mothers | 9,100 |
| Probability of the Father Being Unauthorized | 60.3% |
| 2022 Births with Both Parents Unauthorized | 5,490 |

23

**Supp.Add.240**

## Appendix F:  Oregon

We estimate Oregon in 2022 saw 2,500 births to unauthorized mothers, of which we estimate 1,500 also had unauthorized fathers. Our calculations are shown in the following tables:

**Table 1. Estimated 2014 Oregon Births, by Mother's Nativity**

| Mother's Nativity | Births | Percent |
|---|---|---|
| Unauthorized Foreign-born | 3,416 | 7.8% |
| Authorized Foreign-born | 4,933 | 11.2% |
| Native Born | 35,677 | 81.0% |
| Total | 44,026 | 100% |

Source: Camarota, Ziegler, and Richwine, Center for Immigration Studies (2018)

**Table 2. Births to Foreign-Born Mothers in Oregon**

| Year | NCHS Births to Foreign-Born |
|---|---|
| 2014 | 8,517 |
| 2022 | 7,140 |
| Difference | -1,377 |
| Percent Change | -16.2% |

**Table 3. Estimate of Oregon's Foreign-Born Total Population**

|  | 2012-2016 ACS | 2022 ACS | Change |
|---|---|---|---|
| Foreign-Born Total Population | 390,613 | 420,943 | 7.8% |

Source: Census Bureau 2012-2016 5-Year ACS dataset and 2022 1-Year ACS dataset

**Table 4. Estimates of Oregon's Unauthorized Foreign-Born Total Population**

|  | 2014 | 2022 | Change |
|---|---|---|---|
| DHS | NA | NA | NA |
| Pew | 130,000 | 120,000 | -7.7% |
| CMS | 121,200 | 116,395 | -4.0% |
| Average of Change Estimates for 2014-2022 | | | -5.8% |

Sources: DHS estimates from Baker (2017) and Baker and Warren (2024).

Pew estimates from Passel and Krogstad (2024).

CMS estimates from CMS (2022) and Warren (2024).

24

**Table 5. Estimates of Oregon's Unauthorized Population Compared to Foreign-Born Population**

| Source | (A) Unauthorized Share of Foreign-Born, 2014 | (B) Unauthorized Share of Foreign-Born, 2022 | ( C ) Change in Share, 2014 to 2022 (B-A) | (D) Percent Change in Share (C/A) | ( E ) Adjustment for Calculations (1-D) |
|---|---|---|---|---|---|
| DHS | NA | NA | NA | NA | NA |
| Pew | 33.3% | 28.5% | -4.8% | -14.3% | 85.7% |
| CMS | 31.0% | 27.7% | -3.4% | -10.9% | 89.1% |
| Average | 32.2% | 28.1% | -4.1% | -12.6% | 87.4% |

**Table 6. Calculating Oregon Births to Unauthorized Mothers in 2022**

| Statistic | 2014 Births | Change in Foreign-Born Births, 2014-2022 | Adjustment for Change in Unauthorized Share, 2014-2022 | 2022 Births |
|---|---|---|---|---|
| Estimate | 3,416 | -16.2% | 87.4% | 2,502 |

**Table 7. Calculating Oregon Births to Unauthorized Parents in 2022**

| NDC estimate of births to unauthorized mothers | Estimated share with unauthorized father | Estimated births with unauthorized mother and father |
|---|---|---|
| 2,502 | 61.2% | 1,532 |

Note: data are not available for the alternative calculations of births when both parents are unauthorized.

25

Supp.Add.242

1

2

3

4

5

6

7 **UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8 **AT SEATTLE**

9 STATE OF WASHINGTON; STATE OF          NO. 2:25-cv-00127
ARIZONA; STATE OF ILLINOIS; and
10 STATE OF OREGON,

11                        Plaintiffs,          DECLARATION OF
DR. CHARISSA FOTINOS
12     v.

13 DONALD TRUMP, in his official capacity
as President of the United States; U.S.
14 DEPARTMENT OF HOMELAND
SECURITY; BENJAMINE HUFFMAN, in
15 his official capacity as Acting Secretary of
Homeland Security; U.S. SOCIAL
16 SECURITY ADMINISTRATION;
MICHELLE KING, in her official capacity
17 as Acting Commissioner of the Social
Security Administration; U.S.
18 DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary
19 of State; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
20 DOROTHY FINK, in her official capacity
as Acting Secretary of Health and Human
21 Services; U.S. DEPARTMENT OF
JUSTICE; JAMES MCHENRY, in his
22 official capacity as Acting Attorney
General; U.S. DEPARTMENT OF
23 AGRICULTURE; GARY WASHINGTON,
in his official capacity as Acting Secretary
24 of Agriculture; and the UNITED STATES
OF AMERICA,
25
                       Defendants.
26

DECLARATION OF                        1          ATTORNEY GENERAL OF WASHINGTON
DR. CHARISSA FOTINOS                              Civil Rights Division
CASE NO. 2:25-cv-00127                          800 Fifth Avenue, Suite 2000
                                                Seattle, WA  98104-3188
                                                (206) 464-7744

**Supp.Add.243**

I, Dr. Charissa Fotinos, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.    I am the State Medicaid Director for the Washington State Health Care Authority (HCA). I have been employed with HCA since October 1, 2013 and held this position since 2022.  As State Medicaid Director, I am responsible for executive level oversight and administration of the Washington Apple Health (Medicaid) program, which provides more than two million Washington residents with integrated physical and behavioral health services. In this role I oversee Medicaid and the Children's Health Insurance Program (CHIP) in Washington, which are programs governed by federal rules and supported by federal funding, but administered by the State.  I have also served, since 2022, as HCA's Behavioral Health Medical Director.

3.    Before beginning my role as State Medicaid Director in 2022, I served in the same role in an acting capacity beginning in 2021. I have served as the Deputy Chief Medical Officer since 2013. Prior to joining HCA, I served as Chief Medical Officer for Public Health-Seattle & King County for 10 years and have served as a physician faculty member at the Providence Family Medicine Residency Program. By way of formal training and medical practice, I am board certified by the American Board of Family Medicine in Family Medicine and by the American Board of Preventive Medicine in Addiction Medicine. I hold a Master of Science in evidence-based health care from Oxford University, Kellogg College, in England, and an M.D. from the University of Colorado Health Sciences Center.

4.    HCA is the designated single state agency responsible for administering Washington's Medicaid program and Children's Health Insurance Program (CHIP), federal programs regulated by the U.S. Department of Health and Human Services. Medicaid and CHIP are jointly funded by both state and federal dollars, though at different rates, as explained below. HCA also administers some state funded health care programs, including the Children's Health

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.244

Program (CHP) and the recently launched Apple Health Expansion (which in July 2024 began providing coverage for individuals 19 and older who do not qualify for other Apple Health (Medicaid) programs due to immigration status).

5.      As explained below, Washington Apple Health is an umbrella term or "brand name" for all Washington State medical assistance programs, including Medicaid. HCA is Washington's Medicaid authority, its behavioral health authority, and functions as the largest purchaser of health coverage in Washington. It is a leader in ensuring Washington residents have access to services and interventions that support health, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Washington. HCA purchases health care for nearly 2.8 million people through Apple Health (Medicaid) and other programs. Apple Health programs serve approximately 1.9 million individuals per month in Washington.

6.      Medicaid is the federally matched medical aid program under Title XIX of the Social Security Act (and Title XXI of the Social Security Act for the Children's Health Insurance Plan) that covers the Alternative Benefit Package (ABP), Categorically Needy (CN) and Medically Needy (MN) programs. The program is a state and federal partnership with states funding a portion of the program (as noted, usually up to 50 precent). In Washington, as noted, Medicaid is provided under the name Apple Health. It provides coverage for a broad array of services, including preventative care and other health care services.

7.      The table below illustrates the state fiscal year 2025 forecasted expenditure dollars in the thousands for the physical health, non-behavioral health services, side of HCA's programs. Funds are broken out by federal (GFF) and state (GFS) expenditures. Medicaid[1] includes funds associated with all Title XIX eligibility groups. CHIP[2] includes children covered under Title XXI. State only[3] programs in Washington include Medical Care Services (MCS), Children's Health Plan (CHP), post-partum coverage for non-citizen pregnant women and the Apple Health Expansion (AHE), among others. States, including Washington, use federal

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.245

Medicaid funds for the Alien Emergency Medical (AEM) program, which is also known as Emergency Medicaid.

| FY 2025 HCA PH Forecasted Expenditures ($s in Thousands) | | | |
|---|---|---|---|
| | **GFF** | **GFS** | **Total** |
| *Medicaid* | 6,427,949 | 3,222,626 | 9,650,575 |
| *CHIP (Children)* | 105,594 | 55,974 | 161,569 |
| *AEM* | 31,828 | 20,527 | 52,355 |
| *Non-Citizen Pregnant Women through post-partum* | 31,799 | 50,369 | 82,168 |
| *CHP* | 4,553 | 55,514 | 60,067 |
| *MCS* | 181 | 18,593 | 18,774 |
| *AHE (includes AEM for AHE clients)* | 31,738 | 102,775 | 134,514 |
| *Total* | 6,633,644 | 3,526,378 | 10,160,022 |

8.     Within the Information Technology Innovation and Customer Experience Administration at HCA, roughly 350 state staff are responsible for determining eligibility for Apple Health programs, providing customer service, and managing eligibility policy for the majority of state and federally-backed Apple Health programs serving approximately 1.9 million Washingtonians. In addition to providing direct access to the programs, this administration is responsible for coordinating with the Department of Social and Health Services (DSHS) for administering Supplemental Security Income (SSI)-related and Long-Term Services and Supports Medicaid programs for the aged, blind or disabled populations.

9.     Medicaid eligibility is comprised of three income methodologies: Modified Adjusted Gross Income (MAGI) methodology, non-MAGI methodology, and deemed eligibility

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    (SSI recipients or Foster Care/Adoption support coverage). Programs under MAGI rules include

2    coverage for adults aged 19-64, pregnant women, families, and children. Programs under non-

3    MAGI rules include aged, blind or disabled populations. Deemed eligibility means that a person

4    is granted coverage based on their categorical relationship to the program. For example, a person

5    receiving SSI automatically receives full scope Medicaid coverage. All programs have the same

6    level of coverage. With our community, state, and national partners, HCA is committed to

7    providing evidence-based, cost-effective services that support the health and well-being of

8    individuals, families, and communities in Washington State.

9        10.    Federal Medicaid rules direct states to look at income and residency rules first

10   and then determine whether someone is a citizen or has a satisfactory immigration status to

11   determine eligibility. Individuals who are undocumented and do not have a lawful, qualifying

12   immigration status, are not eligible for federal Medicaid or other benefits. The limited exception

13   involves the federal program for undocumented or non-qualified individuals to receive

14   emergency medical care coverage if they are otherwise eligible for Medicaid. This is also known

15   as Emergency Medicaid. In Washington, this is available through the limited Alien Emergency

16   Medical (AEM) program. This program covers emergency health care for a limited set of

17   qualifying emergent medical conditions. Individuals must be categorically relatable to an

18   existing Medicaid program—in other words, they must meet the income or other requirements—

19   but not be eligible for a program solely due to immigration status requirements. As part of the

20   Medicaid program, this is a joint federal and state funded program and is available to non-

21   pregnant individuals with emergent medical conditions, including labor and delivery for

22   pregnant clients, breast and cervical cancer, dialysis treatment and some long-term care services.

23   When individuals who are undocumented or non-qualified receive emergency coverage under

24   AEM, the federal matching rate is 50 percent, meaning that federal funds cover 50 percent of the

25   cost and state funds cover 50 percent of the cost.

26

DECLARATION OF                                          5                    ATTORNEY GENERAL OF WASHINGTON
DR. CHARISSA FOTINOS                                                                 Civil Rights Division
CASE NO. 2:25-cv-00127                                                           800 Fifth Avenue, Suite 2000
                                                                                  Seattle, WA 98104-3188
                                                                                      (206) 464-7744

Supp.Add.247

11.     Coverage programs for children are also provided under the name Apple Health for Kids. From a public-facing standpoint, Washington's Apple Health covers all kids regardless of immigration status up to 317 percent of the Federal Poverty Limit (FPL). Funding for the coverage, though, depends on a child's eligibility for different programs.

12.     Below 215 percent of the FPL, for children who are citizens or qualified and authorized immigrants, the funding for this coverage is through Medicaid.

13.     Between 215 and 317 percent of the FPL, for children who are citizens or qualified and authorized immigrants, the funding for this coverage comes through CHIP, and households pay a minimal premium for kids coverage. CHIP is a federally matched health coverage program that expands coverage to children above the Medicaid cutoff. Washington's CHIP offers comprehensive healthcare coverage to children through age 18, who reside in households with incomes between 215 percent and 317 percent of the FPL, whereas Medicaid covers eligible children below that range.

14.     While provided in Washington under the name Apple Health, coverage provided under the CHIP program operates separately from Medicaid on the funding side. Historically, CHIP federal match has been 65 percent. It was increased as high as 88 percent for a period of time in recent years, but now is at 65 percent. This means that coverage provided to eligible children under the CHIP funding structure results in federal funds covering a higher portion of the expenses. Children who would have been eligible for Washington's CHIP-funded coverage programs had they met immigration status requirements can receive coverage through the state-funded Apple Health for Kids (CHP).

15.     Apple Health also covers all pregnant women regardless of immigration status with income at or below 215 percent of the FPL. This is possible because their unborn children are deemed covered at conception, so even though the mother may not have a legal immigration status, the child will be born a U.S. citizen and is therefore eligible under CHIP from conception through birth. After the child is born, the child (as a U.S. citizen) can remain covered under

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.248

Medicaid while the mother is no longer covered under the federal program. Historically, Washington's annual federal CHIP award totals about $250 million. That funding, combined with the appropriate state funds, can be used for many purposes including prenatal health care for immigrants who might not qualify for Medicaid.

16.     As of December 2024, HCA administers Medicaid and CHIP funded coverage for more than 860,000 children in Washington. HCA estimates that coverage on a per-child basis costs approximately $2,844 per year on average for physical health care coverage. For this coverage, Washington expended approximately $2.37 billion with approximately $1.3 billion coming from the federal government under Medicaid and CHIP. With respect to the state-only funded CHP, there were approximately 30,000 children covered. Additionally, the State expended approximately $60 million with approximately $4.5 million from the federal government under Medicaid as part of AEM (for emergency medical services).

17.     Under federal law, HCA must provide Medicaid and CHIP coverage to citizens and qualified noncitizens whose citizenship or qualifying immigration status is verified and who are otherwise eligible. Applications for coverage are processed either through the Washington Healthplanfinder (administered by the Health Benefit Exchange) where eligibility is based on a MAGI determination or through the Department of Social and Health Services (DSHS) for other eligible individuals. Citizenship or eligibility status is one eligibility factor that HCA must verify for Apple Health (Medicaid and CHIP) coverage. There are multiple ways that HCA verifies citizenship or immigration status to determine eligibility.

18.     Generally speaking, for MAGI-based coverage, HCA first uses an individual's Social Security Number (SSN) along with the individual's name and date of birth to automatically check the SSN with the Social Security Administration (SSA) in order to confirm identity and citizenship through what is called the "federal hub." For individuals who declare to be lawfully present and have a SSN, HCA uses the SSN, name, and date of birth to confirm an individual's status with the Department of Homeland Security. For individuals who have an SSN

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127                 7                 ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.249

and declare to be a citizen, but for whom citizenship cannot be automatically verified, HCA will request verification from the individual of their citizenship. And when an individual is applying for Classic Apple Health/non-MAGI through DSHS, SSN and citizenship are automatically verified through an interface with the SSA.

19.    In instances where citizenship is not or cannot be verified by those automatic means (such as where an individual claims to be a citizen or have a qualifying status but HCA cannot verify it through the automatic process because the individual lacks an SSN), an individual can be approved for Medicaid/CHIP coverage based on their attestation and given a reasonable opportunity to provide verification. On that issue, a declaration of citizenship or satisfactory immigration status may be provided in writing, and under penalty of perjury by an adult member of the household, an authorized representative, or someone acting for the applicant. States must provide otherwise eligible individuals with a "reasonable opportunity period" to verify their satisfactory immigration status. Individuals making a declaration of a satisfactory citizenship or immigration status are furnished at least 90 days of coverage in order to resolve any unverified issues. If an individual's status is found to be unsatisfactory before the 90 days, their eligibility is determined and their coverage closed. If at the end of the 90 days, the individual still has not resolved their status, they can have an additional 90 days to continue working towards resolution. This is a manual process in which HCA works to verify an individual's citizenship or status on a case-by-case basis. It is administratively burdensome for both the individual and for HCA staff.

20.    HCA's Application for Health Care Coverage is the form individuals can use to apply for Apple Health and is thus one way HCA can determine whether the individual is eligible for free or low-cost health care coverage through Apple Health (Medicaid), Apple Health for Kids and Apple Health for Kids with Premiums (also known as CHIP), or other state-funded programs. As part of that application, individuals must submit their (or if applying for their child, their child's) Social Security Number (SSN), date of birth, immigration information if

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.250

applicable, and income information. As the application explains, HCA uses SSNs and other immigration document numbers to determine eligibility.

21.     I understand that the President has issued an Executive Order that will deny birthright citizenship to children born in Washington depending on their parents' citizenship or immigration status. The federal government's policy of ending birthright citizenship for children born in the United States based on their parent(s)' non-citizen/immigration status will have a variety of widespread impacts on Washington's medical benefits programs, including a decrease in receipt of proper medical care for children born in Washington and increased operational and administrative costs for Washington.

22.     In addition to impacts on those subject to this new policy will have a direct impact on HCA's administration of its healthcare programs and the amount of federal funding Washington receives to reimburse medical expenses for children in Washington.

23.     Washington has made tremendous strides in reducing the number of uninsured individuals. Many immigrants are direct beneficiaries of this progress. In 2007, Washington became one of the first states to adopt a local policy to cover all kids with income up to 312 percent of the federal poverty level regardless of immigration status. Washington has continued to improve and broaden coverage options for children residing in Washington and worked to streamline the application process and make public-facing materials easy to understand for parents seeking coverage for themselves and their children. This is possible using both state and federal Medicaid and CHIP dollars as appropriate. Evidence shows that uninsured individuals suffer significant negative health impacts and the economic impacts of an increase in the uninsured rate could be severe.

24.     Washington's current Medicaid and health benefits programs are structured around the significant reimbursements from the federal government, and any loss of funding would have serious consequences for HCA and those individuals it serves. The federal government action of taking away birthright citizenship from children born in Washington will

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.251

result in babies being born as non-citizens with no legal status. That will result in direct loss of federal reimbursements to the State for coverage provided to those children because eligibility for federally matched programs such as Medicaid and CHIP depend on the individual's eligibility under federal law, which necessarily depends on their citizenship or immigration status. In particular, federally matched coverage to many children that would have been provided under Medicaid or CHIP will very likely be lost, since those programs are not available to unauthorized individuals aside from Emergency Medicaid/AEM coverage. This will necessarily result in a shift to the State of funding responsibility for this group of children, which poses a direct threat to the ability of the State to provide meaningful healthcare to all in need without interruption. It will also likely result in a significant number of children who may go uninsured and receive only emergency care when absolutely necessary, leading to worse health outcomes as they grow up and more expensive care through emergency procedures. Indeed, if infants or children go insured, they are not likely to be immunized, which puts them, their families, and the communities at higher risk of infectious disease.

25.     Additionally, there will be substantial uncertainty and administrative burdens for HCA in providing coverage to pregnant women and their unborn children. As noted above, Washington is able to provide coverage to all pregnant women, regardless citizenship status, for prenatal care under the CHIP program because the unborn children are covered under CHIP. If the children are no longer to be citizens at birth, HCA will be left in limbo to determine whether coverage to those vulnerable pregnant women will be able to be covered, and if so, under what program. This is likely to pose a significant barrier to HCA providing streamlined coverage to women in need. In particular, HCA will need to do additional outreach to families, make systems changes and dedicate additional employee time to support understanding families' ongoing eligibility based on their child's citizenship at birth. This will put HCA and hospitals in a difficult and complex situation, requiring us to dedicate additional resources to understanding new or

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.252

1  unclear eligibility requirements and complicating providers' ability to be paid for services

2  provided.

3      26.    The removal of birthright citizenship is also like to cause coverage lapses, or at a

4  minimum, result in direct shifts to the State with respect to the cost of funding healthcare

5  coverage for children who would have otherwise been eligible for Medicaid and/or CHIP. These

6  are not impacts that can be avoided. For example, with respect to emergency care, the State and

7  its providers will be required to absorb costs that would normally be recoverable through federal

8  reimbursements under Medicaid and CHIP. Hospitals must provide emergency medical care

9  under federal law, including EMTALA and the relevant Emergency Medicaid provisions. They

10  cannot turn patients away as a general rule. Such emergency services, if provided to a child

11  otherwise eligible for Medicaid but for their immigration status, will still be covered in part by

12  the federal government at the 50 percent match rate for Medicaid. However, if a child is a citizen

13  and covered under CHIP, such services would be covered and reimbursed at the 65 percent match

14  rate. If that same child is deemed a non-citizen at birth (and thus is ineligible for CHIP), the State

15  will be left to pay for that care. Indeed, Washington's state-funded Children's Health Program

16  (CHP) would provide coverage, as is required under state law. As a result, for each child that

17  would be eligible for CHIP but for their new non-citizen status, the State will lose the 65 percent

18  federal reimbursement for any emergency care provided—solely because the child, now as a

19  non-citizen, would not be eligible for CHIP.

20      27.    This poses an immediate risk to HCA's federal funding stream used to provide

21  healthcare coverage to vulnerable Washington newborns and children. In state fiscal year 2022,

22  there were 4,367 children born to unauthorized and non-qualifying mothers whose labor and

23  delivery was covered by AEM (Emergency Medicaid). Those children, by being born in the

24  United States and deemed citizens, were eligible for Medicaid or CHIP programs. If this number

25  of children became ineligible due to a loss of citizenship and moved to the State-funded CHP

26  coverage, that would result in a loss of $6.9 million in federal reimbursements to Washington

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.253

and a corresponding increase to State expenditures of the same amount, based on the current expenditures for the complete physical and behavioral health package of benefits. Additionally, the state would no longer be able to use the CHIP to pay for pre-natal services/expenses for the non-citizen mother. Those services would presumably shift to state-only funded coverage. Maintaining pre-natal care and services is important for health outcomes for both the mother and child/fetus. Those costs associated with this pre-natal care shifting to a state-only program is not included here.

28.     In order to respond and update its practices in light of the federal government's new policy, HCA will also need to develop updated comprehensive training for staff, partners, and healthcare providers. For example, HCA will likely need to update its training and guidance around which children are citizens and therefore eligible for Medicaid and CHIP programs, and which must be funneled into state-only programs. This is a significant burden. This will likely require the work of several members of the eligibility policy team (at least 7-8 FTEs) because it would require changes touching several areas of internal expertise. Based on my team's estimation, this would likely take around two to three years to complete given the need to modify internal policies, public guidance, and formal rules; update training; and coordinate with state agencies like DSHS. We estimate that it may require training for up to 2,000 staff and will require coordination with staff in administrative hearings, communications, and for our external community partners. It may also require additional legislative solutions at the state level. Ultimately, this is counterintuitive, puts the health of children at risk, creates unfunded care mandates for already overburdened hospital systems and unwinds all the progress that has been achieved to ensure that all Washingtonians have access to affordable care.

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.254

1       I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3       DATED and SIGNED this 21st day of January 2025, at Olympia, Washington.

4

5                             _____

6                             CHARISSA FOTINOS, MD, MSC
                                 Medicaid and Behavioral Health Medical Director

7                             Washington State Health Care Authority

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF
DR. CHARISSA FOTINOS
CASE NO. 2:25-cv-00127

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.255

1

2

4

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127 |
| Plaintiffs, | DECLARATION OF JENNY HEDDIN |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE, GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JENNY HEDDIN
CASE NO. 2:25-cv-00127

**Supp.Add.256**

I, Jenny Heddin, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.     I am the Deputy Secretary—Chief of Staff for the Washington State Department of Children, Youth, and Families (DCYF). I served as the Finance Director for Children's Administration from 2013 until the creation of DCYF in 2018. I also served as the Chief Financial Officer for DCYF from its creation until serving as DCYF's Director of Strategic Initiatives and Collaboration. I became DCYF's Chief of Staff on October 6, 2023. In these various roles, I oversaw administration of the Title IV-E grant, financial activities for child welfare including foster care and now programmatic functions including foster care. I hold a master's degree in Public Administration and have worked for Washington for 20 years.

3.     DCYF is a cabinet-level agency focused on the well-being of children. Its vision is to ensure that Washington state's children and youth grow up safe and healthy—thriving physically, emotionally, and academically, nurtured by family and community. DCYF is the lead agency for child welfare services that support children and families to build resilience and health, and to improve educational outcomes. It partners with state and local agencies, tribes, and other organizations in communities across the state of Washington. It focuses on supporting children and families at their most vulnerable points, giving them the tools they need to succeed. According to brain science, laying a strong foundation early in life critically impacts healthy development. And addressing trauma, especially at critical transition points in the lives of youth, helps ensure successful transition into adulthood. To truly give all children the great start in school and life they deserve, DCYF was created to be a comprehensive agency exclusively dedicated to the social, emotional, and physical well-being of children, youth and families—an agency that prioritizes early learning, prevention, and early intervention at critical points along the age continuum from birth through adolescence.

DECLARATION OF JENNY HEDDIN
CASE NO. 2:25-cv-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.257**

4.     DCYF administers Washington's child welfare system which is funded in part through an annual appropriation based on an open-ended formula grant entitlement operated by the U.S. Department of Health and Human Services (HHS) Federal Foster Care Program under Title IV, Subpart E of the Social Security Act (Title IV-E).

5.     Title IV-E reimburses DCYF for a portion of the maintenance, administrative, and legal costs associated with caring for children placed in foster care. The state provides foster care services to children who are in danger of imminent physical harm from abuse or neglect, have been abused or neglected, are abandoned, or who have no parent capable of providing adequate care so that the children are in circumstances that endanger their psychological or physical development. It provides Title IV-E reimbursable services to achieve permanency for the children through family reunification, adoption, guardianship, or another approved living arrangement. Title IV-E also partially reimburses expenses associated with permanent placement of children through guardianship or adoption.

6.     While the state provides care for all children in foster care within its jurisdiction, it is only reimbursed through Title IV-E for expenses associated with children who meet Title IV-E eligibility requirements, including being United States citizens or qualifying non-citizens. DCYF receives federal reimbursements for many of the expenses associated with the care of dependent children eligible for Title IV-E. Services provided to individuals who are undocumented or who do not have a qualifying immigration status, are not eligible for federal Title IV-E reimbursement. Those individuals are also not entitled to other federally funded benefits such as Medicaid. DCYF is also entitled to reimbursements for many types of administrative and legal costs incurred in serving Title IV-E children.

7.     Title IV-E's "Adoption Assistance Program" is designed to facilitate the timely permanence for children whose special needs or circumstances would otherwise make them difficult to place. Under federal law, DCYF receives Title IV-E funding for the administrative functions of the Adoption Assistance Program, including portion of a monthly stipend paid to

**Supp.Add.258**

the adoptive parents to assist with the cost of caring for the child. In addition, Title IV-E also provides for reimbursement for a onetime payment towards the cost of the adoption of a Title IV-E eligible child. The maximum amount a family can receive in Washington is $1500. Title IV-E reimburses the state for a portion of any ongoing legal and administrative expenses including the determination and redetermination of eligibility; fair hearings and appeals; rate setting; and other costs directly related only to the administration of the adoption assistance program. It also includes the administration of any grievance procedures; negotiation and review of adoption agreements; post-placement management of subsidy payments; recruitment of adoptive homes; placement of the child in the adoptive home; case reviews conducted during a specific preadoptive placement for children who are legally free for adoption; case management and supervision prior to a final decree of adoption; a proportionate share of related agency overhead; referral to services; development of the case plan; home studies, and a proportionate share of the development and use of adoption exchanges.

8.     Title IV-E's "Guardianship Assistance Program," like the Adoption Assistance Program, assists with the expense of achieving permanency for the dependent child. When a child is placed with a qualifying relative, the agency can receive partial reimbursement for related expenses and the monthly stipend provided to the relative guardian to assist with the cost of caring for the child, as well as for the same kind of legal and administrative services as provided for under the Adoption Assistance Program.

9.     Title IV-E's "Foster Care Program," provides partial reimbursement for the regular costs of supervising and providing foster care services to children, including eligible youth up to their twenty-first birthday.  This includes payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement. In the case of institutional care, it also includes the administration of

DECLARATION OF JENNY HEDDIN          3          ATTORNEY GENERAL OF WASHINGTON
CASE NO. 2:25-cv-00127                                    Civil Rights Division
                                                          800 Fifth Avenue, Suite 2000
                                                          Seattle, WA  98104-3188
                                                          (206) 464-7744
                                              Supp.Add.259

1  providing all the services detailed above. The state can also claim reimbursement for part of the

2  cost establishing eligibility, training of staff and foster parents, and ongoing case management

4  so long as the child remains eligible and requires services.

4      10.    Under the "Foster Care Program," the state can also claim reimbursement for part

5  of the cost of providing legal representation to the child and the parents throughout the

6  dependency process, including any permanency proceedings. In Washington, the Office of Civil

7  Legal Aid is the agency that administers the Children's Representation Program. This program's

8  mission is to underwrite and oversee the delivery of effective standards-based, trauma-informed,

9  and culturally-competent attorney representation for children subject to dependency and

10  termination of parental rights proceedings in Washington State. The Office of Public Defense is

11  the agency that administers the parents' representation program by contracting with attorneys in

12  all thirty-nine counties in Washington to represent indigent parents, custodians, and legal

13  guardians involved in child dependency and termination of parental rights proceedings. The

14  available reimbursement under Title IV-E is used, in part, to fund these programs.

15      11.    The amount of federal funds that Washington is entitled to under Title IV-E

16  depends on the number of Title IV-E eligible children and the type of services they receive.

17  Among the criteria for eligibility is the requirement that the child be a United States citizen or

18  eligible non-citizen. The amount Washington receives is partly based on Washington's

19  "penetration rate," which is then used to determine the amount Washington will be reimbursed

20  for providing services. The penetration rate describes the proportion of Title IV-E eligible

21  children in foster care in relation to the total number of children in foster care, pursuant to the

22  definition of foster care in 45 CFR 1355.20. Certain reimbursable program administration costs

23  are determined using a formula that is calculated on the number of hours spent in reimbursable

24  activities multiplied by the penetration rate percentage. The fewer children that are eligible for

25  Title IV-E, the lower the penetration rate.  The lower the penetration rate, the lower the potential

26  reimbursement to the state and the greater the cost to the state.

DECLARATION OF JENNY HEDDIN                4            ATTORNEY GENERAL OF WASHINGTON
CASE NO. 2:25-cv-00127                                          Civil Rights Division
                                                             800 Fifth Avenue, Suite 2000
                                                             Seattle, WA  98104-3188
                                                                 (206) 464-7744

12.     Title IV-E also partially reimburses Washington for the cost of direct care for Title IV-E eligible children placed with fully licensed foster caregivers who receive a payment for the children placed in their care. Again, the exclusion of a child from the pool of reimbursable expenses reduces the amount that Washinton is reimbursed, leaving the state to bear the full cost of caring for the child.

13.     Title IV-E also partially reimburses the state for a percentage of the legal and administrative services afforded to children and families involved in dependency, adoption and guardianship proceedings. Legal services include legal representation of the child, the appointment and services of Guardians ad Litem, one time court costs and fees associated with adoption and guardianship. Covered administrative services include case studies, recruitment of foster parents, referral to services, case management, data collection, data storage, and a proportionate share of agency overhead. The reimbursement formulas for these services are also calculated based on the expenses associated with total number of Title IV-E eligible children and a reduction in the total number of eligible children shifts the costs for those children entirely to the State.

14.     Notably, in order for Washington to be eligible for the payments under the Foster Care Maintenance Program and the Adoption Assistance Program, Title IV-E requires that DCYF make reasonable efforts to finalize children's permanent plans and that children in foster care have case plans in which DCYF files a petition to terminate the parental rights of the children's parents when children have been in foster care for fifteen of the most recent twenty-two months, unless an exception applies. Many caregivers are only able to adopt children in foster care or serve as their legal guardians because of the financial support provided to defray the costs associated with the adoption proceeding and through the ongoing monthly assistance payment for these high needs children. Washington receives federal money through Title IV-E's Adoption Support Program and Guardianship Support Program to provide this assistance, which contributes to children timely achieving permanency. The exclusion of a child from the pool of

DECLARATION OF JENNY HEDDIN
CASE NO. 2:25-cv-00127     5     ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Supp.Add.261

children who are eligible for reimbursement of permanency expenses and assistance payments puts Washington in a no-win situation: it must either suffer the reduced amount that Washington is reimbursed and thereby increase its financial responsibility for children's permanency assistance programs, or avoid the increase in state financial responsibility of permanency assistance by maintaining children in foster care and delaying their permanency, which will also carry financial consequences because the State is not fulfilling Title IV-E's mandate that it make reasonable efforts to finalize children's permanency plans and file petitions to terminate the parental rights of the children's parents when children have been in foster care for the requisite period of time. Moreover, not only is extending children's length of stay in foster care damaging to children, but it will still increase the costs to the state if there is a reduction in the pool of Title IV-E eligible children.

15.     Because the penetration rate depends on the number of children eligible for Title IV-E funding, each decrease in the number of children eligible for Title IV-E funding negatively affects the total amount of federal funding that Washington receives under Title IV-E for foster care maintenance, adoption support, and guardianship support, and associated legal, administrative, and training costs. In November 2024, Washington had a penetration rate of 58.6 percent for children in traditional foster care.

16.     The median length of stay for a child in out-of-home care that is longer than seven days is nearly two years—727 days. If a child is ineligible for Title IV-E because they are not a citizen, DCYF cannot receive federal reimbursements for any of the services provided to that child.

17.     In federal fiscal year 2024, DCYF received approximately $219 million in reimbursable Title IV-E expenses serving eligible children. This includes about $160 million in reimbursements for foster care expenditures, $55 million in adoption support reimbursements, and $4 million in guardianship support reimbursements, all including administrative costs. And many of those who enter DCYF's care are infants and newborns. In 2022, 2,087 children under

DECLARATION OF JENNY HEDDIN                6
CASE NO. 2:25-cv-00127

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.262

the age of 1 entered DCYF's services for out-of-home care. Of those, 1,039 were newborns. In 2023, 1,481 under the age of 1 entered DCYF's services for out-of-home care, and 701 were newborns.

18.    I understand that the President has issued an Executive Order directing that individuals born to two unauthorized non-citizen parents are not to be deemed United States citizens. The federal government's policy of ending birthright citizenship for children born in the United States based on their parent(s)' non-citizen/immigration status will have program wide negative impacts on DCYF's administration of childcare subsidies for families, and foster care, adoption assistance guardianship assistance and extended foster care programs and associated legal, administrative, and training functions.

19.    The state laws and regulations that govern DCYF's Child Welfare Programs were specifically crafted to comply with the requirements for Title IV-E in anticipation that the financial partnership between the State and Federal government would maximize resources available to ensure that children and families residing in the state have the opportunity to thrive in safe, healthy environments. The federal government's stripping of birthright citizenship from children will result in babies being born in Washington as non-citizens, rendering the cost of their care non-reimbursable under Title IV-E. Washington will continue to provide services to those children, but any resulting reduction in the reimbursement rate will reduce the resources available to serve the entire population of children in foster care, including children who are U.S. citizens. Washington will continue to have administrative, legal, and training costs associated with the children no longer eligible for Title IV-E. Without reimbursement, the resources available to provide for those services for the entire population of children in foster care will be reduced as well.

20.    DCYF is required by federal law to verify the citizenship status of all children receiving foster care support under Title IV-E, in order to determine the child's eligibility. DCYF's service to children may begin as soon as they are born, so those determinations must be

DECLARATION OF JENNY HEDDIN
CASE NO. 2:25-cv-00127                    7                    ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.263

made with respect to newborns. Currently, the primary method of citizenship verification is through birth certificates issued by other state agencies. DCYF relies on those birth certificates to determine whether children are eligible under Title IV-E.

21.    If DCYF is no longer able to rely on birth certificates to make eligibility determinations, it will need to amend its processes related to Title IV-E eligibility determinations. It will also require DCYF to update or amend existing trainings regarding eligibility determinations to account for the change in birthright citizenship. These necessary process changes will demand staff time that would have been spent on other projects to better serve the children and families of Washington.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

DECLARATION OF JENNY HEDDIN
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1        I declare under penalty of perjury under the laws of the State of Washington and the

2   United States of America that the foregoing is true and correct.

4        DATED and SIGNED this 20th day of January 2025, at Olympia, Washington.

4

5                           _____

6                           JENNY HEDDIN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF JENNY HEDDIN           9
CASE NO. 2:25-CV-00127

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.265

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127 |
| Plaintiffs, | DECLARATION OF KATHERINE HUTCHINSON |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF
KATHERINE HUTCHINSON
CASE NO. 2:25-cv-00127

1

**Supp.Add.266**

1    I, Katherine Hutchinson, declare as follows:

2        1.    I am over the age of 18 and have personal knowledge of the matters herein.

3        2.    I am the State Registrar and Office Director at the Washington Department of

4    Health's (DOH) Center for Health Statistics. I have held this position for 2.5 years, and have

5    been with DOH since 2008. As State Registrar, I oversee Washington's system of vital

6    statistics, including the registration of vital events, such as births, and the issuance of vital

7    records, including birth certificates. I am also familiar with DOH's relationship with the U.S.

8    Social Security Administration, and DOH's role in SSA's "Enumeration at Birth" program for

9    issuance of Social Security Numbers (SSNs) to babies born in Washington.

10        3.    DOH's mission is to protect and improve the health of all people in Washington

11    state. In carrying out that mission, it administers programs and provides services that touch the

12    lives of all Washingtonians and visitors to the State. DOH regulates healthcare facilities and

13    oversees the Center for Health Statistics, among other things. As the office of the State

14    Registrar, the Center is responsible for the registration, preservation, amendment, and release

15    of official state records of all births, deaths, fetal deaths, marriages and divorces that occur in

16    Washington. It also participates in the U.S. Social Security Administration's Enumeration at

17    Birth program, enabling parents to request issuance of an SSN at or shortly after the time a

18    baby is born, as part of completing the standard birth filing forms in Washington.

19        4.    One primary function of the DOH is to oversee registration and release of birth

20    certificates. As background, the U.S. Department of Health and Human Services, National

21    Center for Health Statistics (NCHS) develops standard form certificates for vital events, which

22    it recommends that the States adopt to maintain nationwide uniformity in the system of vital

23    statistics. Washington has adopted the U.S. standard form birth certificate, with few

24    modifications. *See* Wash. Admin. Code § 246-491.

25        5.    The Washington form to register a birth and obtain a birth certificate is called

26    the Washington State Birth Filing Form and is completed upon the birth of a newborn child.

DECLARATION OF                                    2                 ATTORNEY GENERAL OF WASHINGTON
KATHERINE HUTCHINSON                                                       Civil Rights Division
CASE NO. 2:25-cv-00127                                               800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA  98104-3188
                                                                           (206) 464-7744

**Supp.Add.267**

1    Generally speaking, it requires entry of information about the child and birthplace, information

2    about the mother and father, and information for hospital use only. The form asks for

3    information about the parents, including place of birth and their SSN if they have one, though

4    they are not required to include that information. The form does not contain fields for

5    immigration or citizenship status of a baby's parents. Thus, Washington birth certificates do

6    not collect parental immigration or citizenship status information.

7        6.    Neither does Washington's form to register a birth contain any field for

8    immigration or citizenship status of the baby. Babies born in Washington have always been

9    considered U.S. citizens, and Washington birth certificates have always been proof of U.S.

10    citizenship sufficient to obtain a U.S. passport or SSN. Thus, Washington birth certificates

11    contain no information or representation about a baby's immigration or citizenship status.

12        7.    As part of the Birth Filing Form, parents are asked whether they wish to get an

13    SSN for their children. They select either a "Yes" or "No" box when completing the form.

14        8.    After the newborn's parents complete the Birth Filing Form, the hospital sends

15    the information electronically to DOH through an electronic birth system called WHALES

16    (Washington Health and Life Event System). DOH and the local public health jurisdiction then

17    use that information to creates and register a birth certificate with the State.

18        9.    The option to request issuance of an SSN at the time of birth is an option on

19    Washington's Birth Filing Form because Washington participates in the U.S. Social Security

20    Administration's Enumeration at Birth program. The EAB program is a process by which

21    babies born in the United States may obtain an SSN based on the submission of information

22    from the State's vital statistics agency (like DOH in Washington) rather than a separate

23    application to the SSA and identity/citizenship confirmation process.

24        10.    The Birth Filing Form asks for the parents' SSNs. Parents born outside the

25    United States can apply for and receive an SSN for their child born in the United States without

26    including their own SSNs. Currently, because children born in the United States are U.S.

DECLARATION OF                           3         ATTORNEY GENERAL OF WASHINGTON
KATHERINE HUTCHINSON                                       Civil Rights Division
CASE NO. 2:25-cv-00127                               800 Fifth Avenue, Suite 2000
                                                      Seattle, WA  98104-3188
                                                          (206) 464-7744

Supp.Add.268

1   citizens, they are eligible for SSNs regardless of their parents' immigration status. The EAB

2   process facilitates a streamlined application and issuance of SSNs to U.S. Citizen babies born

3   in Washington. To DOH's knowledge, based on its agreement with the SSA, more than 98

4   percent of parents in the United States voluntarily request an SSN for their newborns through

5   the EAB program.

6       11.    After a healthcare facility receives a completed Birth Filing Form indicating

7   that an SSN is sought for a newborn child, it sends the required information to DOH, and DOH

8   in turn sends the required birth record information to the SSA in the prescribed format for the

9   purpose of SSA issuing an SSN to the newborn child. The information sent must include the

10  child's name, date of birth, place of birth, sex, mother's maiden name, father's name if listed

11  on the birth registration document, the mother's address, the birth certificate number, and the

12  parents' SSNs if available.

13      12.    In exchange for administering this program and formatting and transmitting

14  certain data to the SSA, DOH receives federal funding from the SSA. Through a contract in

15  place with the SSA, the State currently receives $4.19 per SSN assigned through the EAB

16  process, up to nearly $440,000 per year. Under the agreement, DOH only sends EAB records

17  and information to the SSA for enumeration of infants born within the past 12 months, and it

18  receives payment only for records received for births in the current month and the prior two

19  months. Further, the number of records processed and available for reimbursement is reduced

20  by the number of births that are assigned an SSN in SSA Field Offices after the parent has

21  applied for EAB at the hospital. In other words, DOH is only reimbursed for those SSNs

22  assigned through EAB.  The annual payment received through the EAB program is

23  approximately 7 percent of the Center's annual budget, and DOH uses those funds to support

24  the payment of administrative and operational costs for the Center.

25      13.    If children born in Washington become ineligible for SSNs because they are no

26  longer citizens, DOH will lose federal funds because there will be a decrease in the number of

DECLARATION OF                          4              ATTORNEY GENERAL OF WASHINGTON
KATHERINE HUTCHINSON                                    Civil Rights Division
CASE NO. 2:25-cv-00127                               800 Fifth Avenue, Suite 2000
                                                       Seattle, WA  98104-3188
                                                          (206) 464-7744
                                                                              Supp.Add.269

SSN applications sent through the EAB process. For example, if there is an annual decrease of approximately 4,000 newborn children eligible for SSNs in Washington and the SSA declines to issue SSNs for those children, DOH stands to lose approximately $16,000 per year. Based on my experience, I anticipate that DOH would in fact see an even larger decrease in the number of children eligible to obtain an SSN because data quality may decrease, making it hard to provide enough information to SSA to get an SSN assigned.

14.    DOH also anticipates additional negative impacts based on the loss of birthright citizenship to newborns in Washington. If it were no longer the case that all children born in the United States are U.S. citizens at birth and the newborn registration process had to be amended to provide for verification of the parents' citizenship or immigration status, Washington's vital records system would have no immediate way to reflect this significant change. It would instead require substantial operational time, manpower resources, and technological resources from the Center and healthcare facilities in Washington to respond to the change. Indeed, the Center endeavors to avoid deviation from the national standard in order to preserve interoperability of data systems. Modifying required birth certificate information would require significant system changes for the Center and additional rulemaking by DOH.

15.    Historically, the National Center for Health Statistics within the U.S. Centers for Disease Control and Prevention (NCHS) has reviewed and revised U.S. standard vital form certificates every 10-15 years only, by way of a years-long collaborative process with state vital records officers and public health experts. Even if NCHS were to develop and promulgate a new U.S. standard birth certificate that included fields for immigration or citizenship information, adoption of a new form by DOH would additionally require notice-and-comment rulemaking, which cannot occur overnight. *See* Wash. Admin. Code § 246-491-149(1).

16.    It would be chaotic if a change to U.S. citizenship at birth were implemented without sufficient time to prepare. A change of such scale would place significant new burdens on DOH and the Center in particular. DOH would need to determine what changes are required

DECLARATION OF
KATHERINE HUTCHINSON
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.270

1    to birth certificates and what new information may need to be collected. Once determined,

2    DOH would need to work with NCHS to promulgate a new U.S. standard birth certificate for

3    Washington's adoption. DOH then would have to promulgate a new rule to effectuate the

4    changes.

5        17.    Meanwhile, approximately 80,000 babies are born every year in Washington.

6    That is an average of more than 200 babies per day. It is unclear what would be required or

7    requested of DOH in connection with the registration of births that were to occur prior to the

8    implementation of updated birth certificates, since birth certificates are proof of U.S.

9    citizenship. DOH is not currently equipped to handle those new burdens; for example, it is hard

10   to know how we would go about determining the immigration status or citizenship of every

11   newborn (or their parents) when their immigration status is unclear to us, and whose job it

12   would be to make that determination. Most births are assisted births, and hospitals and

13   midwives are the ones who collect and transmit birth registration information to DOH.

14   Furthermore, all information we receive is self-reported, we have no way to verify it, and we

15   do not receive information concerning the parents' immigration or citizenship status.

16       18.    Furthermore, implementing any changes to the Washington birth

17   certificate—an electronic system comprised of distinct end-user interfaces for medical

18   providers to input data for transmission to DOH, on the one hand, and files DOH can transmit

19   to the SSA, for example, on the other—would require substantial, unbudgeted expenditures by

20   DOH.

21   //

22   //

23   //

24   //

25   //

26   //

DECLARATION OF
KATHERINE HUTCHINSON
CASE NO. 2:25-cv-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3    DATED and SIGNED this 20th day of January 2025 at Tumwater, WA.

4

5    _____

6    Katherine Hutchinson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                                  7
KATHERINE HUTCHINSON
CASE NO. 2:25-cv-00127

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.272

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

8

9  STATE OF WASHINGTON; STATE OF
   ARIZONA; STATE OF ILLINOIS; and
10 STATE OF OREGON,

11                              Plaintiffs,

12       v.

13 DONALD TRUMP, in his official capacity
   as President of the United States; U.S.
14 DEPARTMENT OF HOMELAND
   SECURITY; BENJAMINE HUFFMAN, in
15 his official capacity as Acting Secretary of
   Homeland Security; U.S. SOCIAL
16 SECURITY ADMINISTRATION;
   MICHELLE KING, in her official capacity
17 as Acting Commissioner of the Social
   Security Administration; U.S.
18 DEPARTMENT OF STATE; MARCO
   RUBIO, in his official capacity as Secretary
19 of State; U.S. DEPARTMENT OF
   HEALTH AND HUMAN SERVICES;
20 DOROTHY FINK, in her official capacity
   as Acting Secretary of Health and Human
21 Services; U.S. DEPARTMENT OF
   JUSTICE; JAMES MCHENRY, in his
22 official capacity as Acting Attorney
   General; U.S. DEPARTMENT OF
23 AGRICULTURE; GARY WASHINGTON,
   in his official capacity as Acting Secretary
24 of Agriculture; and the UNITED STATES
   OF AMERICA,

25
                             Defendants.
26

NO. 2:25-cv-00127

DECLARATION OF
BRIAN REED

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.273**

I, Brian Reed, declare as follows:

1.    I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.    I am the Service Line Administrator of Women's and Children's Services for UW Medicine. In this role, I oversee strategy, planning, and operations for the provision of women's and children's services across the UW Medicine hospitals and clinics in the greater Seattle area. My Responsibilities include overseeing daily operations, engaging in strategic planning, and ensuring financial stewardship of the programs. I hold a bachelor's degree in Recreation Therapy from Eastern Washington University and a master's degree in Health Administration from the University of Washington. I have accumulated over 10 years of experience in Women's health and possesses 15 years of experience in the healthcare industry.

3.    UW Medicine operates UW Medical Center, at its Montlake and Northwest campuses, along with Harborview Medical Center, the only Level 1 Trauma Center in Washington, Alaska, Montana, and Idaho.  All three of these facilities care for pregnant mothers and newborns. In 2024, UW Medicine helped deliver 4307 babies and served 890 newborns in its neonatal intensive care units (NICU). Doctors employed and trained by UW Medicine also work at Seattle Children's Hospital to provide pediatric care.

4.    I understand that the President of the United States has issued an Executive Order directing that individuals born in the United States to two unauthorized non-citizen parents are not to be deemed United States citizens. The federal government's policy of ending birthright citizenship for children born in the United States based on their parent(s)' non-citizen/immigration status will have a variety of impacts on UW Medicine, including an increase in the operational and administrative costs for UW Medicine's hospital sites.

5.    When families do not have insurance coverage for their children born or treated at UW Medicine facilities, UW Medicine tries to work with the family to assess whether the child is eligible for publicly funded forms of health insurance, including federally funded

DECLARATION OF BRIAN REED
CASE NO. 2:25-cv-00127

2

1    Medicaid and Children's Health Insurance Program (CHIP), and state-funded programs,

2    including the Children's Health Plan (CHP).  The UW admissions team meets with new patients

3    to review their insurance benefits. If the patient has no insurance coverage, then the admissions

4    team contacts UW Medicine's financial counselors. Those financial counselors work with the

5    patients to complete an intake appointment, where the counselors will screen patients for

6    insurance options. And if it appears that the child is eligible for a form of public health insurance

7    coverage, UW Medicine's staff assists the family with submitting applications for this coverage.

8          6.       The current UW Medicine process for screening newborns for health insurance

9    coverage relies on the fact that babies born in a Washington hospital site are citizens and are

10   eligible for federally funded Medicaid and CHIP.  Because UW Medicine can no longer rely on

11   newborns being citizens, it will have to build a new pathway in its eligibility screening process

12   to assist the parents of non-citizen newborns in applying for the appropriate public benefits

13   programs. This will also require UW Medicine to revise internal and patient facing materials to

14   account for the loss of birthright citizenship.  This work will involve significant staff time and

15   other administrative resources.

16         7.       The disruption to UW Medicine's process for screening newborns for public

17   insurance coverage will most significantly impact the services UW Medicine provides to

18   newborns in the neonatal intensive care unit (NICU). Children in the NICU require around-the-

19   clock care, and many of them are brought to the NICU immediately or shortly after being born

20   in one of UW's hospital sites. Over 95% of admissions to UW Medicine NICUs are from the

21   UWMC High-Risk Perinatal Program, one of the highest risk obstetric services in the nation.  In

22   addition, UW Medicine has special expertise in managing the most fragile growth-restricted and

23   premature fetuses and newborns. The change in eligibility for coverage for newborns, and

24   changes in assisting patients in navigating and applying for public coverage, will add additional

25   burdens on UW Medicine staff who are focused on providing top notch care to newborns.

26

DECLARATION OF BRIAN REED                    3          ATTORNEY GENERAL OF WASHINGTON
CASE NO. 2:25-cv-00127                                              Civil Rights Division
                                                                  800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104
                                                                      (206) 464-7744

1    I declare under penalty of perjury under the laws of the State of Washington and the

2  United States of America that the foregoing is true and correct.

3    DATED and SIGNED this 20th day of January 2025 at Seattle, Washington.

4

5    *Brian R Reed*

    BRIAN REED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF BRIAN REED                4          ATTORNEY GENERAL OF WASHINGTON
CASE NO. 2:25-cv-00127                                         Civil Rights Division
                                                              800 Fifth Avenue, Suite 2000
                                                                 Seattle, WA  98104
                                                                  (206) 464-7744

**Supp.Add.276**

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8                                    **AT SEATTLE**

9   STATE OF WASHINGTON; STATE OF          NO. 2:25-cv-00127
    ARIZONA; STATE OF ILLINOIS; and
10  STATE OF OREGON,
                                           DECLARATION OF
11                      Plaintiffs,        TOM K WONG

12        v.

13  DONALD TRUMP, in his official capacity
    as President of the United States; U.S.
14  DEPARTMENT OF HOMELAND
    SECURITY; BENJAMINE HUFFMAN, in
15  his official capacity as Acting Secretary of
    Homeland Security; U.S. SOCIAL
16  SECURITY ADMINISTRATION;
    MICHELLE KING, in her official capacity
17  as Acting Commissioner of the Social
    Security Administration; U.S.
18  DEPARTMENT OF STATE; MARCO
    RUBIO, in his official capacity as Secretary
19  of State; U.S. DEPARTMENT OF
    HEALTH AND HUMAN SERVICES;
20  DOROTHY FINK, in her official capacity
    as Acting Secretary of Health and Human
21  Services; U.S. DEPARTMENT OF
    JUSTICE; JAMES MCHENRY, in his
22  official capacity as Acting Attorney
    General; U.S. DEPARTMENT OF
23  AGRICULTURE; GARY WASHINGTON,
    in his official capacity as Acting Secretary
24  of Agriculture; and the UNITED STATES
    OF AMERICA,
25
                        Defendants.
26

**Supp.Add.277**

I, Tom K. Wong, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge. If called to testify as a witness, I could and would testify competently to the matters set forth below.

2.     I am a tenured Associate Professor at the University of California, San Diego (UCSD). I work in the Political Science Department, which U.S. News & World Report consistently ranks as one of the top ten political science departments nationally. I first joined the Department at UCSD in 2012, and became an Associate Professor with tenure in 2016. At UCSD, I am the Director of the U.S. Immigration Policy Center (USIPC), which I founded in 2018, and the Director of the Human Rights and Migration Studies Program Minor.

3.     Prior to this, I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I co-led on the immigration portfolio, during the 2015-2016 academic year. I received a Ph.D. in Political Science from the University of California, Riverside in 2011.

4.     I am an expert on U.S. immigration policy. I have written two peer-reviewed books and dozens of peer-reviewed journal articles, book chapters, and reports on this subject. My most recent article represents one of the first randomized survey experiments done on a sample of undocumented immigrants that sheds light on how local cooperation with federal immigration enforcement officials affects the day-to-day behaviors of unauthorized immigrants.

5.     In my work, I regularly estimate the size and the characteristics of the unauthorized immigrant population using U.S. Census American Community Survey (ACS) microdata. This work has been used in my academic publications, reports that I have written for think tanks, white papers written for Congressional offices, and in sworn testimony that I have given to the Senate Judiciary Committee on immigration-related matters. Substantively, this work involves comparing outcomes between U.S. citizens and those without legal status, which is the core of the analysis I present below.

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.278

6.      I have attached a true and complete copy of my curriculum vitae as **Exhibit A** to this Declaration, which includes a list of all of my publications over the past ten years.

7.      I have been retained by the State of Washington to analyze data related to possible impacts of denying birthright citizenship to certain children born in the United States. I share my opinions below of how the denial of birthright citizenship will impact children who are born non-citizens, the methodology and analysis I conducted to reach those opinions, and the data used to demonstrate differences across multiple social and economic indicators to compare outcomes for U.S. citizens versus non-citizens.

8.      I understand that the federal government has taken action to deny birthright citizenship to certain children born to undocumented parents. In my opinion, denying birthright citizenship to children born in the U.S., but who have undocumented parents, will create a permanent underclass of people whose societal and economic integration will be severely impaired throughout the course of their entire lifetimes. One way to evaluate this impact is to compare outcomes between U.S. citizens and those who live in the U.S. without legal status. Indeed, the status quo gives U.S. citizenship to children born in the U.S., but who have undocumented parents. Denying birthright citizenship to these children would make them unauthorized immigrants just like their parents.

9.      In the analysis below, I use the Warren (2014) method[1] to estimate likely unauthorized immigrants in the 2023 American Community Survey (ACS) microdata one-year file.[2] I then compare outcomes between U.S. citizens and those who live in the U.S. without legal status across a range of indicators of societal and economic integration. The data show clear patterns, wherein unauthorized immigrants do worse when compared to U.S. citizens across these indicators of societal and economic integration. This confirms the conclusion that denying birthright citizenship to children born in the U.S. to undocumented parents will create a

---

[1] Warren, Robert. "Democratizing data about unauthorized residents in the United States: Estimates and public-use data, 2010 to 2013." *Journal on Migration and Human Security* 2, no. 4 (2014): 305-328.
[2] This represents the most recently available ACS microdata.

DECLARATION OF                                    3                          ATTORNEY GENERAL OF WASHINGTON
DR. TOM. K. WONG                                                                         Civil Rights Division
CASE NO. 2:25-cv-00127                                                               800 Fifth Avenue, Suite 2000
                                                                                              Seattle, WA  98104
                                                                                                (206) 464-7744

**Supp.Add.279**

1   permanent underclass of people who are excluded from U.S. citizenship and are thus not able to

2   realize their full potential. Not only would this newly created underclass of people stand to lose,

3   but American society and the economy would also be harmed from their lack of societal and

4   economic integration.

5   **Indicators of Societal and Economic Integration**

6        10.     Living in the U.S. without legal status means having to live with the constant fear

7   of deportation and the absence of work authorization. But living "in the shadows," as

8   unauthorized immigrants do, affects societal and economic integration in numerous other ways.

9   One indicator of societal integration is whether a person is in school. Another indicator of

10  societal integration is educational attainment. These two indicators speak to human capital,

11  wherein more people who are in school and more educational attainment mean more human

12  capital accrues to society. Indicators of economic integration are whether a person is employed,

13  income, and poverty. These three indicators speak to economic contributions, wherein higher

14  employment, higher income, and lower poverty, mean higher economic contributions. I discuss

15  each indicator and differences between U.S. citizens and unauthorized immigrants below.

16       11.     **School.** Regarding whether a person is in school, the data show clearly that U.S.

17  citizens are significantly more likely to be in school when compared to likely unauthorized

18  immigrants. For example, for U.S. citizens between the ages of eighteen and twenty-four, 48.2

19  percent are in school. For likely unauthorized immigrants between the ages of eighteen and

20  twenty-four, only 26.4 percent are in school. This 21.8 percent difference is highly statistically

21  significant. As Table 1 shows, not only are U.S. citizens significantly more likely to be in school

22  when compared to likely unauthorized immigrants, but this pattern holds across all age groups.

23

24

25

26

DECLARATION OF                                                     4
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.280**

**Table 1**

| Age Group | % In School – U.S. Citizen | % In School – Likely Unauthorized Immigrant | Difference |
|---|---|---|---|
| **18-24** | 48.2% | 26.4% | +21.8% |
| **25-34** | 10.2% | 4.6% | +5.6% |
| **35-44** | 5.1% | 2.3% | +2.8% |
| **45-54** | 3.0% | 1.6% | +1.4% |
| **55-64** | 1.5% | 1.0% | +0.5% |
| **65+** | 0.7% | 0.5% | +0.2% |

12.    **Educational Attainment.** In terms of educational attainment, I analyze differences between U.S. citizens and likely unauthorized immigrants when it comes to whether a person has a high-school diploma. The data show clearly that U.S. citizens are significantly more likely to have a high-school diploma when compared to likely unauthorized immigrants. For example, for U.S. citizens between the ages of eighteen and twenty-four, 77.5 percent have a high-school diploma. For likely unauthorized immigrants between the ages of eighteen and twenty-four, only 59.6 percent have a high-school diploma. This 17.9 percent difference is highly statistically significant. As Table 2 shows, not only are U.S. citizens significantly more likely to have a high-school diploma when compared to likely unauthorized immigrants, but this pattern also holds across all age groups. In fact, the gap between the percentage of U.S citizens who have a high-school diploma and the percentage of likely unauthorized immigrants who have a high-school diploma is widest at the sixty-five an older age group. More specifically, for U.S. citizens who are sixty-five or older, 73.7 percent have a high-school diploma. For likely

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.281**

unauthorized immigrants who are sixty-five or older, only 29.7 percent have a high-school diploma. This 44.0 percent difference is highly statistically significant.

**Table 2**

| Age Group | % High-School Diploma – U.S. Citizen | % High-School Diploma – Likely Unauthorized Immigrant | Difference |
|---|---|---|---|
| 18-24 | 77.5% | 59.6% | +17.9% |
| 25-34 | 81.3% | 55.0% | +26.3% |
| 35-44 | 76.5% | 43.7% | +32.8% |
| 45-54 | 75.6% | 38.0% | +37.6% |
| 55-64 | 75.8% | 38.9% | +36.9% |
| 65+ | 73.7% | 29.7% | +44.0% |

13.     **Employment.** When it comes to employment, employment rates are largely similar when comparing U.S. citizens to likely unauthorized immigrants. Table 3 shows employment rates for those who are in the labor force for U.S. citizens and likely unauthorized immigrants by age group.

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.282

**Table 3**

| Age Group | % Employed – U.S. Citizen | % Employed – Likely Unauthorized Immigrant | Difference |
|-----------|--------------------------|-------------------------------------------|------------|
| 18-24 | 91.1% | 92.2% | -1.1% |
| 25-34 | 95.7% | 96.6% | -0.9% |
| 35-44 | 96.5% | 96.8% | -0.3% |
| 45-54 | 97.0% | 96.9% | +0.1% |
| 55-64 | 97.3% | 96.5% | +0.8% |
| 65+ | 97.3% | 96.6% | +0.7% |

14.    **Annual Total Income.** Despite similar employment rates, income varies significantly between U.S. citizens and likely unauthorized immigrants, which demonstrates the gap in earning potential for unauthorized workers. This makes vivid the "undocumented penalty" that comes with living in the U.S. without legal status. Regarding annual total income, the data show clearly that U.S. citizens earn significantly more annual total income when compared to likely unauthorized immigrants. For example, for U.S. citizens between the ages of eighteen and twenty-four, average annual total income is $24,899.43. For likely unauthorized immigrants between the ages of eighteen and twenty-four, average annual total income is $23,857.68. This $1,041.75 difference is highly statistically significant. Despite annual total income being higher for likely unauthorized immigrants between the ages of twenty-five and thirty-four when compared to U.S. citizens between the ages of twenty-five and thirty-four, the income disadvantage for unauthorized immigrants grows and becomes more significant over time. For U.S. citizens between the ages of thirty-five and forty-four, average annual total income is $69,623.08. For likely unauthorized immigrants between the ages of thirty-five and forty-four, average annual total income is $63,236.55. This $6,386.53 difference is highly statistically

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

significant. Between the ages of forty-five and fifty-four, the income disadvantage for unauthorized immigrants is at its widest. For U.S. citizens between the ages of forty-five and fifty-four, average annual total income is $75,845.63. For likely unauthorized immigrants between the ages of forty-five and fifty-four, average annual total income is $52,534.81. This $23,310.82 difference is highly statistically significant. As Table 4 shows, the income disadvantage for unauthorized immigrants persists for the rest of their working lifetimes. Altogether, from the ages of eighteen to sixty-four, U.S. citizens will earn an estimated $455,717.35 more in annual total income, which translates into a 19.5 percent difference, when compared to likely unauthorized immigrants.

**Table 4**

| Age Group | Annual Total Income – U.S. Citizen | Annual Total Income – Likely Unauthorized Immigrant | Difference |
|---|---|---|---|
| **18-24** | $24,899.43 | $23,857.68 | +$1,041.75 |
| **25-34** | $50,902.85 | $55,784.47 | -$4,881.62 |
| **35-44** | $69,623.08 | $63,236.55 | +$6,386.53 |
| **45-54** | $75,845.63 | $52,534.81 | +$23,310.82 |
| **55-64** | $65,276.56 | $45,249.78 | +$20,026.78 |
| **65+** | $48,638.26 | $29,591.35 | +$19,046.91 |

15.     **Poverty.** Lastly, the data show clearly that poverty is more pronounced among likely unauthorized immigrants when compared to U.S. citizens. For example, whereas 15.6 percent of U.S. citizens between the ages of eighteen and twenty-four live at or below the federal poverty line, the commensurate percentage for likely unauthorized immigrants between the ages

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.284**

of eighteen and twenty-four is 18.0 percent. This 2.4 percent difference is highly statistically significant. As Table 5 shows, the poverty disadvantage for unauthorized immigrants persists across all age groups except for likely unauthorized immigrants between the ages of fifty-five and sixty-four. As Table 5 also shows, the poverty disadvantage for unauthorized immigrants is widest for unauthorized immigrants sixty-five years and older. Whereas 10.4 percent of U.S. citizens sixty-five years and older live at or below the federal poverty line, the commensurate percentage for likely unauthorized immigrants sixty-five years and older is 15.9 percent. This 5.4 percent difference is highly statistically significant.

**Table 5**

| Age Group | % Poverty – U.S. Citizen | % Poverty – Likely Unauthorized Immigrant | Difference |
|-----------|--------------------------|-------------------------------------------|------------|
| 18-24 | 15.6% | 18.0% | -2.4% |
| 25-34 | 8.5% | 9.9% | -1.4% |
| 35-44 | 8.1% | 10.5% | -2.4% |
| 45-54 | 7.3% | 8.2% | -0.9% |
| 55-64 | 9.5% | 7.7% | +1.8% |
| 65+ | 10.4% | 15.9% | -5.5% |

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Supp.Add.285

1    I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3    DATED and SIGNED this 21st day of January 2025, at San Diego, California.

4

5    _____

6    DR. TOM K. WONG

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF
DR. TOM. K. WONG
CASE NO. 2:25-cv-00127

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.286**

**WONG DECLARATION**

**EXHIBIT A**

Wong: CV (1/2024)

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Cell: (951) 907-9989

## APPOINTMENTS

| | |
|---|---|
| 2019 - | **DIRECTOR, U.S. IMMIGRATION POLICY CENTER (USIPC)**<br>University of California, San Diego |
| 2018 - 2021 | **APPOINTED MEMBER (GUBERNATORIAL APPOINTMENT)**<br>**STATE OF CALIFORNIA CENSUS COMPLETE COUNT COMMITTEE** |
| 2017 - | **ASSOCIATE PROFESSOR (W/TENURE), POLITICAL SCIENCE**<br>University of California, San Diego |
| 2016 | **ADVISOR, IMMIGRATION PORTFOLIO**<br>**WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS** |
| 2016 - | **SENIOR FELLOW**<br>**CENTER FOR AMERICAN PROGRESS** |
| 2013 - | **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**<br>**CO-DIRECTOR, HUMAN RIGHTS AND MIGRATION PROGRAM MINOR**<br>University of California, San Diego |
| 2012 - 2017 | **ASSISTANT PROFESSOR, POLITICAL SCIENCE**<br>University of California, San Diego |

## EDUCATION

| | |
|---|---|
| 2011 | **PH.D. IN POLITICAL SCIENCE**<br>University of California, Riverside |
| 2005 | **B.A. IN POLITICAL SCIENCE**<br>University of California, Riverside<br>*Magna Cum Laude* |

## BOOKS

(2) Tom K. Wong. 2017. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity.* Oxford University Press.
NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control.* Stanford University Press.

i

Supp.Add.288

Wong: CV (1/2024)

## JOURNAL ARTICLES

(11) Tom K. Wong and Karina Shklyan. 2024. "The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants," *Journal of Race, Ethnicity, and Politics.* [Research Design: TKW; Analysis: TKW; Literature Review: TKW, KS]

(10) Tom K. Wong, Andrea Silva, and Karina Shklyan. 2022. "The Effect of Intergovernmental Policy Conflict on Immigrants' Behavior: Evidence from a Survey Experiment in California," *Publius* vol. 52 no. 1: 107-132. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, AS, KS]

(9) Tom K. Wong, S. Deborah Kang, Carolina Valdivia, Josefina Espino, Michelle Gonzalez, and Elia Peralta. 2021. "How Interior Immigration Enforcement Affects Trust in Law Enforcement," *Perspectives on Politics* vol. 19 no. 2: 357-370. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, SDK, CV, JE, MG, EP]

(8) Justin Gest, Ian M. Keysil, and Tom K. Wong. 2019. "Protecting and Benchmarking Migrants' Rights: An Analysis of the Global Compact for Safe, Orderly and Regular Migration," *International Migration* https://doi.org/10.1111/imig.12635 [Equal contributions from all authors]

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. 2018. "The Political Incorporation of Undocumented Youth," *Social Problems* vol. 66 no. 3: 356-372. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, AG, CV]

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, HK]

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, AG] C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, DW, JMA, MMM] NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269. [Equal contributions from all authors]

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.

Wong: CV (1/2024)

## POLICY REPORTS

(23) Tom K. Wong. 2024. *Expanded Legal Pathways to Enter the U.S. Reduce Irregular Migration.* Washington D.C.: Center for American Progress.

(22) Tom K. Wong. 2023. *Lives in Danger: Seeking Asylum Against the Backdrop of Increased Border Enforcement.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego.

(21) Tom K. Wong, Maya Lu, and Lily Amirjavadi. 2022. *New American Voters 2022: Harnessing the Power of Naturalized Citizens.* Chicago, IL and La Jolla, CA: National Partnership for New Americans (NPNA) and U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW, ML, LA; Literature Review: TKW]

(20) Tom K. Wong, et al. 2022. *Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(19) Tom K. Wong, et al. 2020. *Do TPS Designations Increase Irregular Migration to the United States?* Washington, D.C.: Center for American Progress.

(18) Tom K. Wong, et al. 2020. *Nepali TPS Holders Make Significant Contributions to America.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(17) Tom K. Wong et al. 2020. *Amid Changes to the DACA Program and COVID-19, DACA Recipients are Fired Up and Civically Engaged.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(16) Tom K. Wong. 2020. *COVID-19 and the Remaking of U.S. Immigration Policy? Empirically Evaluating the Myth of Immigration and Disease.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego

(15) Tom K. Wong et al. 2019. *DACA Recipients' Livelihoods, Families, and Sense of Security Are at Stake This November.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(14) Tom K. Wong and Vanessa Ceceña. 2019. *Seeking Asylum: Part 2.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW]

(13) Tom K. Wong, Sebastian Bonilla, and Anna Coleman. 2019. *Seeking Asylum: Part 1.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW]

(12) Tom K. Wong, Jeremiah Cha, and Erika Villareal-Garcia. 2019. *The Impact of Changes to the Public Charge Rule on Undocumented Immigrants Living in the U.S.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, JC]

(11) Tom K. Wong, et al. 2019. *Deterrence, Displacement, and Death: The Impact of the Border Wall on Undocumented Immigration.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(10) Tom K. Wong, et al. 2019. *Fractured Federalism: How Dissonant Immigration Enforcement Policies Affect Undocumented Immigrants.* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(9) Tom K. Wong, et al. 2019. *How Interior Immigration Enforcement Affects Trust in Law Enforcement* La Jolla, CA: U.S. Immigration Policy Center (USIPC) at UC San Diego. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(8) Tom K. Wong. 2018. *Do Family Separation and Detention Deter Immigration?* Washington, D.C.: Center for American Progress.

(7) Tom K. Wong et al. 2018. *Amid Legal and Political Uncertainty DACA Remains More Important Than Ever.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(6) Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(5) Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy.* Washington, D.C.: Center for American Progress.

(4) Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(3) Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact.* Washington, D.C.: Center for American Progress. [Research Design: TKW; Analysis: TKW; Literature Review: TKW, et al.]

(2) Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border.* Washington, D.C.: Center for American Progress.

(1) Tom K. Wong. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA).* Washington, D.C.: Center for American Progress.

## BOOK CHAPTERS

(5) James Hollifield and Tom K. Wong. 2022. "The Politics of International Migration." In *Migration Theory: Talking Across Disciplines* (4th edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.

## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

(Book Project) DACA: Undocumented Youth and the Politics of Immigrant Illegality
  This project leverages nearly a decade of surveying DACA recipients about their economic,
  societal, and civic integration. These surveys span the Obama, Trump, and Biden administrations, and
  include both the periods before and after the rescission of DACA. NPR, CNN, Washington Post, New York
  Times, NBC News, CNBC, Atlantic, Vox, Forbes, 538, Politifact, WNYC, C-Span, Associated Press

(Book Project) The Impact of Immigration Enforcement on Undocumented Immigrants.
  This project draws from a first-of-its-kind probability-based survey of undocumented immigrants. This
  project includes several survey experiments that uncover how the day-to-day behaviors of undocumented
  immigrants, as well as the trust that they have in public institutions, is affected by differential levels of local
  law enforcement cooperation with federal immigration enforcement officials. Washington Post, NPR, KPBS,
  USA Today, City Lab, Chicago Tribune, Factcheck.org

(Book Project) Tom K. Wong. "Immigration, White Nationalism, and the Great Replacement Theory: Who Believes,
  Why do They Believe, and What Can be Done."
  The Great Replacement Theory is a conspiracy theory subscribed to be White nationalists that states that
  immigration is being used to replace the native-born White population in the U.S. with people of color (i.e.,
  "White genocide"). Previously relegated to the fringes of American society,
  the Great Replacement Theory has emerged as a serious threat to pluralistic values, as recent mass shootings
  wherein shooters have left manifestos espousing the Great Replacement Theory have made clear. News
  media and other polling suggest that as many as one-third of Republicans (Washington Post) or one-half of
  native-born White Americans (SPLC) believe in some variant of the Great Replacement Theory. This book
  project examines the determinants of belief in the Great Replacement Theory, explores why individuals
  believe that immigration is being weaponized to replace native-born Whites, the extent to which those who
  believe are willing to resort to political violence, and what can be done to stop this.

## RESEARCH GRANTS (AS FACULTY MEMBER)

- $800,000, Coulter Foundation, "U.S. Immigration Policy Center," 2021-2024
- $150,000, Private Donor, "U.S. Immigration Policy Center," 2021-2023
- $820,000, Multiple Funders, "U.S. Immigration Policy Center," 2019-2021
- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016
- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the U.S. Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, U.S. Department of Homeland Security (DACA), 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS — (LAST UPDATED 6/2018)

2018 |  "Surveying Undocumented Immigrants." UC Berkeley, June 12, 2018.

"The Integration of DACA Recipients." Scripps College, May 3, 2018.

"The Impact of the Trump Administration's Immigration Policies on Undocumented Immigrants: Evidence from Survey Experiments." Race, Ethnicity, and Politics Workshop, Northwestern University, April 13, 2018.

"Immigrant Political Incorporation." UC Migration Conference, UCSD, March 2, 2018.

"The Future of DACA." Columbia University, February 22, 2018.

"Immigration and DACA in the Age of Uncertainty, Middlebury College, February 20, 2018.

2017 |  "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

Wong: CV (1/2024)

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

**2016 |**  "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

**2015 |**  "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

2014 | "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

2013 | "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

## PROFESSIONAL ACTIVITIES

- Reviewer: *American Journal of Political Science, American Political Science Review, American Politics Research, American Sociological Review, British Journal of Political Science, Citizenship Studies, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Peace Research, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Migration Studies, National*

*Science Foundation, Oxford University Press, Perspectives on Politics, Politics, Groups, and Identities, Political Research Quarterly, Proceedings of the National Academies of Sciences, Russell Sage Foundation, Social Identities, Social Problems*

- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-2018
- Advisory Board, Integrated Voter Engagement study, 2016
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Co-Chair, 2018
- Editorial Board, *Journal of Ethnic and Migration Studies* (JEMS), 2024-2028
- Editorial Board, *Journal of Migration and Human Security* (JMHS), 2014-present
- Editorial Board, *Politics, Groups, and Identities* (PGI), 2016-present
- Editorial Board, *Polity*, 2016-present
- Editorial Search Committee, *Perspectives on Politics* Editor-in-Chief search committee, 2022-2023
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-2018
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016

## PUBLIC SCHOLARSHIP

Wong is one of the country's top experts on immigration politics and policy. Wong and his work have been covered by The *New York Times*, The *Los Angeles Times*, The *Washington Post*, NPR and major media outlets across the country in hundreds of articles. A sample can be found here: https://usipc.ucsd.edu/media/index.html

1

2

3

4

5

6

7

8

9

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127 |
| Plaintiffs, | DECLARATION OF DAVID C. BALUARTE |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.297

(305 of 436), Page 305 of 436
Case: 25-807, 02/18/2025, DktEntry: 32.1, Page 305 of 436
Case 2:25-cv-00127-JCC    Document 19    Filed 01/21/25    Page 2 of 9

I, David C. Baluarte, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2.     I am a Professor of Law and the Senior Associate Dean for Academic Affairs at CUNY School of Law in New York. My professional and scholarly focus is and has long been on immigration, refugee, and statelessness protection, and international human rights issues.

3.     Prior to joining CUNY School of Law in 2024, I held numerous academic positions at Washington and Lee University School of Law in Lexington, Virginia, from 2013 to 2023. As a Clinical Professor of Law, I founded the Immigrant Rights Clinic and designed a clinical curriculum in which students represented immigrants in federal removal proceedings and state court custody matters. In addition to the Immigrant Rights Clinic, I taught classes on Immigration Law, Transnational Law, Refugee Protection and Human Rights, and Civil Litigation. Prior to my time at Washington and Lee University School of Law, I also was a Practitioner-in-Residence in the International Human Rights Law Clinic at American University Washington College of Law, where I co-taught a year-long clinic seminar and supervised students in their representation of individuals and communities in international human rights litigation and advocacy, as well as their representation of asylum seekers. I also taught a class on Asylum and Refugee Law in that position. In this role, I also conducted multiple funded projects, including a project to establish a pilot clinic for stateless persons in the United States (funded through the United Nations High Commissioner for Refugees) and a cross-clinical partnership focused on protecting and promoting nationality rights in the Bahamas.

4.     I have researched and published extensively on issues related to immigration, refugee, and statelessness in particular. For example, in 2017, I published an article in the Yale Human Rights and Development Law Journal on issues related to statelessness, entitled *The Risk of Statelessness: Reasserting a Rule for the Protection of the Right to Nationality*, 19 Yale Hum. Rts. & Dev. L.J. 47 (2017). Before that, in 2015, I published an article in the Georgetown

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.298**

Immigration Law Journal entitled *Life after Limbo: Stateless Persons in the United States and the Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 351 (2015). In addition to those law review articles (and numerous others), I have also published multiple short journal articles and reports on issues related to statelessness and other immigration, refugee, and human rights issues. For example, in 2020, I published an article in the Brown Journal of World Affairs entitled *Protecting Stateless Refugees in the United States*. In 2012, I authored a report entitled *Citizens of Nowhere*, which was co-published by the United Nations High Commissioner for Refugees (UNHCR) and the Open Society Justice Initiative. That report was the first comprehensive review of U.S. jurisprudence relating to statelessness.

5.    As a scholar focused on statelessness issues, I have also served as an expert consultant in numerous roundtable matters, advised on a variety of legal issues related to statelessness, and engaged with civil society on these issues. I have also delivered numerous speaking engagements on statelessness issues in multiple academic and civil society convenings. I was a founding Steering Committee Member of the American Network on Nationality and Statelessness and am currently an Advisory Council Member with the Institute on Statelessness and Inclusion.

6.    The term "stateless" refers to individuals and populations who are "not considered as a national by any State under the operations of its law." That definition comes from the 1954 Convention Relating to the Status of Stateless Persons and has acquired customary international law status. In essence, stateless individuals are citizens or nationals of no country. They include individuals who are not recognized as a national under the laws of any country or certain individuals outside the county of their presumptive nationality who are denied the protection, assistance, or recognition by that country. An expert meeting on statelessness issues in 2010 offered a useful and recognized functional definition of statelessness, stating that an individual is stateless "if all states to which he or she has a factual link fail to consider the person as a national." Polly J. Price, *Stateless in the United States: Current Reality and a Future*

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.299**

1    *Prediction*, 46 Vanderbilt J. Transnat'l L. 443, 451 (2021) (discussing the 2010 Expert Meeting

2    on the Concept of Stateless Persons at Prato, Italy). The State Department's Bureau of

3    Population, Refugees, and Migration likewise recognizes this understanding of what it means to

4    be stateless, explaining that "[a] stateless person is someone who, under national laws, does not

5    enjoy citizenship – the legal bond between a government and an individual – in any country."[1]

6    As I have written previously, "to be stateless is to have no nationality, which the U.S. Supreme

7    Court has called 'a fate of ever increasing fear and distress' that is 'deplored by the international

8    community of democracies.'" *Life after Limbo: Stateless Persons in the United States and the*

9    *Role of International Protection in Achieving a Legal Solution*, 29 Geo. Imm. L.J. 351, 352

10    (2015).

11        7.     Worldwide, the United Nations Commissioner for Refugees has found that there

12    are at least 4.4 million stateless people and recognizes that the actual number is believed to be

13    substantially higher due to the fact that many countries do not report statelessness data. In the

14    United States, the Center for Migration Studies, which is recognized as having conducted the

15    most rigorous analysis to date on the issue, estimates that as of 2020, there were approximately

16    218,000 U.S. residents, spread across all 50 states, that are potentially stateless or at risk of

17    becoming stateless.[2] Numerous causes are recognized as driving statelessness in the United

18    States and elsewhere, including gaps in nationality laws (including laws restricting acquisition

19    of citizenship, laws restricting the right of women to pass on their nationality to their children,

20    and laws relating to children born out of wedlock and during transit), discrimination against

21    minorities, lack of birth registration and birth certificates, birth to stateless parents, political

22    changes and transfers of territory, and other administrative oversights and procedural problems

23    (such as destruction of official records).

24

25

26          [1] Available at: https://www.state.gov/other-policy-issues/statelessness/.
      [2] Available at: https://cmsny.org/wp-content/uploads/2020/01/StatelessnessReportFinal.pdf

DECLARATION OF                                    4                    ATTORNEY GENERAL OF WASHINGTON
DAVID C. BALUARTE                                                              Civil Rights Division
CASE NO. 2:25-cv-00127                                                    800 Fifth Avenue, Suite 2000
                                                                                Seattle, WA  98104
                                                                                  (206) 464-7744

**Supp.Add.300**

8.　　While there are likely more than 200,000 individuals in the United States who are potentially stateless or at risk of being stateless today, that number is generally limited to one generation. The reason is that under the existing rule of birthright citizenship in the U.S., children born in the United States are citizens regardless of their parents' citizenship, status, or country of origin. In other words, the United States currently has a relatively minor statelessness problem when compared with other countries around the world, in large part because of the longstanding and brightline rule of birthright citizenship. If the established rule of birthright citizenship in the United States were to change to exclude children born to undocumented mothers or parents, however, the number of stateless children would increase dramatically.

9.　　This likely outcome of modifications to the Fourteenth Amendment's birthright citizenship rule in the United States has been discussed at length in the academic literature on statelessness issues. One key article that details the mechanisms by which the number stateless individuals would increase if there were a change to the United States' established rule of birthright citizenship is Professor Polly Price's *Stateless in the United States: Current Reality and a Future Prediction*, 46 Vanderbilt J. Transnat'l L. 443 (2021). As Professor Price explains, "[s]tatelessness, already present in the United States, would be increased by these restrictions [on birthright citizenship]" for two reasons: "(1) statelessness already exists in the Western Hemisphere, from which many, if not most, unauthorized migrants come to the United States, and (2) new restrictions will extend statelessness to second or subsequent generations, as well as create statelessness for some children even when the parent has a recognized nationality." *Id.* at 446. In terms of the number of individuals who might be rendered stateless under a change to the U.S. birthright citizenship rules, one study estimated that a prospective denial of birthright citizenship to children born to unauthorized immigrants would create in the United States a population of up to 13.5 million native-born, but stateless, children by 2050. *See* Margaret Stock,

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.301

*The Cost to Americans and America of Ending Birthright Citizenship*, National Foundation for American Policy (March 2012).[3]

10. In my view, there are three ways that the number of stateless individuals in the United States would multiply at an exponential rate should the established birthright citizenship rule be limited. The first is that there are already individuals who are stateless in the United States today. If those individuals have children who are not U.S. citizens and do not automatically acquire another nationality through their parents' country of origin, those children too will become stateless. This is essentially the creation of a second generation of stateless individuals. Second, the number of stateless individuals would be increased because some parents, due to the laws of their country of origin, may be nationals of that country but are prohibited from transmitting citizenship to their children born abroad (i.e., in the United States). This is essentially the creation of a new generation of stateless individuals in the United States. And third, there are individuals who are nationals of other countries that nonetheless reside here in the United States. Under a reasonable interpretation of their country of origin's nationality laws, they may be able to pass that citizenship to their children, but despite a credible claim, their country of origin may refuse to recognize a claim to citizenship for numerous reasons (such as record keeping issues, political issues or disagreements with the United States, or discrimination against certain racial, ethnic, or religious groups of which the individual is a member).

11. The impacts are not purely hypothetical. As I have explained in prior work, whatever the exact size of the stateless population, birthright citizenship limits the size of the population put into the legal limbo that is being statelessness in the United States. Indeed, the Fourteenth Amendment's birthright citizenship rule has provided a guarantee that statelessness cannot be reproduced in the United States. One example is Kuwaiti Bidoons (a group that lacks a nationality in their homeland), who fled the first Gulf War to the United States and can count on U.S. citizenship for their children who are born here. Those children would otherwise be

[3] Available at: https://nfap.com/pdf/NFAPPolicyBrief.BirthrightCitizenship.March2012.pdf.

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

1  stateless. As noted above, due to country-specific nationality laws, nationals of some countries

2  cannot transmit their own nationality to children who are born abroad. But if those children are

3  born in the United States, they automatically gain American citizenship. The Bahamas presents

4  another example of this phenomenon in the Western hemisphere: Bahamian women are not

5  permitted to pass their nationality to children born abroad. And in Haiti and some other Western

6  hemisphere countries, crumbling birth-registration systems make it difficult to substantiate

7  nationality claims for children who are born abroad. Other noted profiles of individuals who are

8  stateless or likely stateless in the United States have been recognized in the literature, including

9  in the 2020 CMS Report, which provides an extensive description of such groups in the United

10  States. Taking these cases into consideration, the potential problem of statelessness in the United

11  States would be substantially larger if the current birthright citizenship rule is changed or limited.

12       12.     The harm of individuals becoming stateless is significant to the individual and to

13  the United States as a whole. For an individual, U.S. immigration law does not explicitly

14  recognize statelessness, nor does it provide humanitarian protection to relieve stateless persons

15  of their suffering. Stateless individuals are instead treated like other unauthorized migrants in

16  the United States. This means that a limitation on birthright citizenship in the United States will

17  have the effect of immediately increasing the population of undocumented individuals here, and

18  in fact will create a permanent growing class of undocumented individuals. And because of their

19  stateless status, these individuals do not have a home country to return to voluntarily or

20  otherwise. They must simply remain in the United States with no citizenship or status at all.

21       13.     The personal harm is substantial to these individuals—many of whom will be

22  children if birthright citizenship is denied to them. Some stateless individuals may be able to

23  apply for and obtain protection from removal or a form of temporary relief, but neither those

24  forms of relief nor a path to nationality or citizenship are guaranteed. If requests for those

25  protections are not granted and the individual is put into removal proceedings and ordered

26  removed, they may be subject to mandatory detention while immigration officials try to execute

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.303

those efforts—which will fail because no other nation will recognize the stateless individual and accept them. And for individuals subsequently released or who have not entered removal proceedings, they are left in legal limbo. They have no nationality or legal status in the United States or elsewhere.

14.      Being stuck in this limbo comes with serious consequences. Stateless individuals face significant barriers to participating in the economy because, without a legal status, they cannot obtain authorization from the government to work legally. They also lack access to many social welfare or government services programs and cannot be involved in the political process. While they are here in the United States, they must navigate without consular assistance matters involving protection, travel documentation, and judicial proceedings. Instead, they must live with the permanent threat of detention or being put into removal proceedings, and they cannot return to a country of origin and pursue a life where political, economic, and social participation is possible.

15.      In essence, individuals who are stateless in the United States are part of a permanent underclass of people with no path to citizenship. They face increased insecurity and instability in their daily lives, restrictions on their ability to freely travel, detrimental employment and economic consequences as a result of their status that severely limit their upward mobility, and overall they must navigate their lives in American society without being fully part of society. This harm can be hard to quantify but cannot be understated—for individuals who are stateless there is simply no safe place to go. Limiting birthright citizenship in the United States will exponentially increase the number of individuals put into this situation and vastly expand the scope of those harms to those individuals, their families, and the United States at large.

DECLARATION OF
DAVID C. BALUARTE
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.304

1    I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3    DATED and SIGNED this __20th__ day of January 2025, at <u>New York, NY</u>.

4

5

6    _____

David C. Baluarte

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                          9           ATTORNEY GENERAL OF WASHINGTON
DAVID C. BALUARTE                                                Civil Rights Division
CASE NO. 2:25-cv-00127                                       800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA  98104
                                                                      (206) 464-7744

<table>
<tbody>
</tbody>
</table>

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9   STATE OF WASHINGTON; STATE OF
    ARIZONA; STATE OF ILLINOIS; and
10  STATE OF OREGON,

11                        Plaintiffs,

12      v.

13  DONALD TRUMP, in his official capacity
    as President of the United States; U.S.
14  DEPARTMENT OF HOMELAND
    SECURITY; BENJAMINE HUFFMAN, in
15  his official capacity as Acting Secretary of
    Homeland Security; U.S. SOCIAL
16  SECURITY ADMINISTRATION;
    MICHELLE KING, in her official capacity
17  as Acting Commissioner of the Social
    Security Administration; U.S.
18  DEPARTMENT OF STATE; MARCO
    RUBIO, in his official capacity as Secretary
19  of State; U.S. DEPARTMENT OF
    HEALTH AND HUMAN SERVICES;
20  DOROTHY FINK, in her official capacity
    as Acting Secretary of Health and Human
21  Services; U.S. DEPARTMENT OF
    JUSTICE; JAMES MCHENRY, in his
22  official capacity as Acting Attorney
    General; U.S. DEPARTMENT OF
23  AGRICULTURE; GARY WASHINGTON,
    in his official capacity as Acting Secretary
24  of Agriculture; and the UNITED STATES
    OF AMERICA,
25
                          Defendants.
26

NO. 2:25-cv-00127

DECLARATION OF
DR. CAITLIN PATLER

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.306**

1    I, Caitlin Patler, PhD, declare as follows:

2    1.    I am over the age of 18, competent to testify as to the matters herein, and make

3    this declaration based on my personal knowledge. If called to testify as a witness, I could and

4    would testify competently to the matters set forth below.

5    2.    I am an Associate Professor of Public Policy at University of California (UC),

6    Berkeley Goldman School of Public Policy. I am a faculty affiliate of the Berkeley

7    Interdisciplinary Migration Initiative, the Berkeley Population Center, and the Institute for

8    Research on Labor and Employment. Prior to joining the UC Berkeley faculty, I was an

9    Associate Professor of Sociology at UC Davis, where I was a Chancellor's Fellow and helped

10    establish the Global Migration Center. I received a Ph.D. in Sociology from the University of

11    California Los Angeles (UCLA) in 2014. I have a Master of Arts and Bachelor of Arts degrees

12    in Sociology, both from UCLA.

13    3.    My research focuses on the origins and reproduction of inequality in the United

14    States through an examination of immigration laws, legal statuses, and law enforcement

15    institutions as drivers of socioeconomic and health disparities. I also study the spillover and

16    intergenerational consequences of legal vulnerability and structural inequality for the health and

17    wellbeing of older adults, young adults, youth, and children. I have written over 50 peer-

18    reviewed journal articles and book chapters, commentaries, and research reports on these

19    subjects.

20    4.    I have received several internationally competitive awards. In 2021, I received

21    the American Sociological Association (ASA) Section on Mental Health Best Publication

22    Award. In 2019, I received the Pacific Sociological Association (PSA) Distinguished

23    Contribution to Sociological Perspectives award. In 2018, I received the ASA Latina/o

24    Sociology Section Distinguished Contribution to Research article award. My work has been

25    supported with nationally and internationally competitive grants from the ASA, the National

26    Academy of Education/Spencer Foundation, the National Science Foundation, the Russell Sage

---

DECLARATION OF                              2                 ATTORNEY GENERAL OF WASHINGTON
DR. CAITLIN PATLER                                                     Civil Rights Division
CASE NO. 2:25-cv-00127                                              800 Fifth Avenue, Suite 2000
                                                                       Seattle, WA 98104
                                                                         (206) 464-7744

Foundation, and the Sociological Initiatives Foundation, among others. As a recognized expert on issues related to immigration law enforcement, in 2024, I presented summaries of research before the National Academies of Science, Engineering and Medicine Committee on Population.

5.      My work has been presented to courts to aid in their consideration of issues concerning the rights of immigrants. In 2020, I authored a declaration to the United States District Court, Central District of California, analyzing the health profiles of certain individuals detained at Adelanto Detention Facility in 2013-14 who would have been classified as having "High-Risk conditions" by the Centers for Disease Control (CDC) for purposes of their vulnerability to COVID-19. *See* Reply Brief for Petition at Ex. 7, *Hernandez-Roman et al. v. Chad F. Wolf et al.*, No. 5:20-cv-00768-TJH-PVC (C.D. Cal., May 21, 2020). In 2019, I co-authored an amicus brief to the United States Supreme Court summarizing empirical research on the Deferred Action for Childhood Arrivals ("DACA") program. *See* Amici Curiae Brief of Empirical Scholars in Support of Respondents, *Dep't of Homeland Sec. et al.  v. Regents of the Univ. of S. Cal., et al.*, Nos. 18-587, 18-589, 18-588 (U.S. Oct. 9, 2019). In 2018 and 2015, research I did as part of my analysis of the implementation of the injunction in *Rodriguez v. Robbins*, 804 F.3d 1060 (9th Cir. 2015), *rev'd in part*, *Jennings v. Rodriguez*, 138 S.Ct. 830 (2018), was judicially noticed by the Court.  *See* Order, *Rodriguez v. Robbins*, No. 13-56706, ECF No. 133 at *4 (9th Cir. Oct. 28, 2015). My research has been cited in at least four federal courts of appeals and two federal district courts, as well as by the Department of Homeland Security in its response to public comments on the proposed  Rule on Deferred Action for Childhood Arrivals (DACA) CIS No. 2691-21; DHS Docket No. USCIS-2021-0006,  (Aug. 2022), as well as its Notice of Implementation of Keeping Families Together, CIS No. 2779-24; DHS Docket No. USCIS-2024-0010 (Aug. 2024). I have served as an expert on the economic and social impacts of US immigration detention in the California Senate Judiciary Committee.

6.      I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration, which includes a list of all of my publications over the past fifteen years.

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.308

7.    I have been retained by the State of Washington to provide a review of the research and academic literature on the impacts of denying birthright citizenship to certain children born in the United States, particularly with regard to education and health. In addition to my own research, I have reviewed a large body of peer-reviewed research on the socioeconomic and health disparities resulting from immigration law and legal statuses. I rely on my own research and this academic literature to inform my opinions.

8.    I have attached as Exhibit B to this Declaration a complete list of all references cited herein.

9.    My research and the academic literature show that citizenship confers legal, political, and social membership in the United States, thus creating paths to mobility. In contrast, undocumented immigrants are excluded from legal, political, and social membership, and thus face thwarted opportunities for mobility. In a comprehensive review of research on the integration of immigrants in the US, the National Academies of Sciences, Engineering, and Medicine concluded that immigrant legal status is a central determinant of immigrants' integration and mobility: "Given the significant potential to alter individuals' life chances, legal status has become a new axis of social stratification, similar to other social markers such as social class, gender, and race" (Waters, Pineau, and National Academies 2015:148), a "fundamental determinant of immigrant integration" (Hamilton, Patler, and Hale 2019:2). This is because the rights and benefits of citizenship structure access to opportunities, benefits, and resources not available to undocumented immigrants. These benefits include, e.g., federal loan support for higher education; access to the formal labor market; and access to health insurance and medical care, cash assistance, and other social services (Hamilton, Patler, et al. 2019; Perreira and Pedroza 2019). Undocumented immigration status also takes on negative social meaning through processes of politicization, stigmatization, and racialization (Asad and Clair 2018; Massey, Durand, and Pren 2016). In this way, citizenship advantage and undocumented disadvantage are

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

1  legally and socially produced, rather than stemming from innate or biological features of human

2  beings.

3       10.    My research and the academic literature has identified citizenship advantage and

4  corresponding undocumented disadvantage in educational outcomes among undocumented

5  immigrants who came to the US as children, with implications for their long-term mobility.[1]

6  Undocumented immigrant children attend K-12 schools alongside US citizen children, and many

7  do not realize they are undocumented, or the stakes of undocumented status, until they reach

8  adulthood and become aware of the barriers they face to higher education and the formal labor

9  market (Gonzales 2011, 2016). This realization, coupled with the corresponding fear of

10  deportation and lack of support and information, can keep some undocumented immigrant

11  children from completing high school (Jefferies 2014). One representative sample of Latina/o

12  young adults (age 18-26), captured in the California Young Adult Study (CYAS), found that

13  undocumented immigrant youth had more than double the probability of high school non-

14  completion, relative to US citizens (16% and 7%, respectively), even after controlling for

15  demographic and socioeconomic background and educational tracking (Patler 2018:16).

16       11.    Undocumented educational disadvantage persists after high school:

17  undocumented Latino youth in the CYAS had a predicted probability of 66% of enrolling in

18  post-secondary education, compared to 82% among the US-born control group (Patler

19  2018:1096). Another study, using a large, nationally representative sample of US households

20

---

21  [1] A large and established body of research identifies educational, labor market, occupational, and other disadvantages among undocumented US adults and older adults. *See e.g.*, Hall, Greenman, and Farkas 2010 ("Our estimates reveal a gross 17 percent wage disparity between documented and undocumented Mexican immigrant men, and a 9 percent documented-undocumented wage disparity for Mexican immigrant women. When worker human capital and occupation are held constant, these wage gaps reduce to 8 and 4 percent, respectively. We also find large differences in returns to human capital with undocumented Mexican immigrants having the lowest wage returns to human capital and having very slow wage growth over time"); Hirokazu Yoshikawa et al., Unauthorized Status and Youth Development in the United States: Consensus Statement of the Society for Research on Adolescence, 27(1) J. Rsch. Adolesc. 4, 6 (2017) (workers with unauthorized status face worse work conditions, higher rates of working below minimum wage, and lower rates of wage growth); Flores Morales 2021 (arguing that there is a "continuity of exclusion via policies" that "magnify inequalities on the basis of immigration status and racialization in older age.")

DECLARATION OF                                      5                    ATTORNEY GENERAL OF WASHINGTON
DR. CAITLIN PATLER                                                              Civil Rights Division
CASE NO. 2:25-cv-00127                                                        800 Fifth Avenue, Suite 2000
                                                                                Seattle, WA  98104
                                                                                  (206) 464-7744

captured in the Survey of Income and Program Participation (SIPP), compared undocumented

and documented Mexican and Central Americans aged 18-24, concluding: "our results indicate

that legal status matters: we find that the odds of college enrollment are about four times higher

for documented immigrants than their undocumented peers" (Greenman and Hall 2013:1492).

12.    Undocumented legal status also shapes the ability to persist and excel once

enrolled in college, both at the community college and university levels. Analyzing CYAS data,

one study found higher rates of discontinuous community college enrollment among

undocumented students, relative to their non-immigrant peers (Terriquez 2014). While another

study using administrative data from the CUNY system found that "undocumented students

either perform as well as or outperform their legal-status peers, particularly compared to

citizens," in community college and four-year college graduation rates and cumulative college

GPA, this is likely due to selection into these experiences; that is, more disadvantaged

undocumented immigrant students are likely to have been unable even to access these

experiences (Hsin and Reed 2020). Furthermore, undocumented Latino immigrants in the CUNY

system from 2002-2012 show evidence of achievement decline across their semesters of

enrollment, relative to documented and naturalized citizen peers (Kreisberg and Hsin 2020).

13.    There are numerous reasons for undocumented immigrants' difficulty persisting

and excelling in higher education. Undocumented immigrants cannot access federally funded

financial aid or work study. Terriquez found that: "the most common reason for withdrawing

from community college was not being able to afford college," reported by 81% of

undocumented students compared to 43% of their US citizen and lawful permanent resident

(LPR) peers (Terriquez 2014:1313). Structural factors including financial barriers and

institutional characteristics were also associated with reduced educational achievement among

Latino undocumented immigrants in the CUNY system (Kreisberg and Hsin 2020). Qualitative

research from children of working-class Latino immigrants in Los Angeles found that although

undocumented and US citizen children attended schools together and had similar social

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.311

1   incorporation processes, "knowledge of future barriers to college attendance" led to "a decline

2   in educational motivation" among some undocumented children (Abrego 2006). Another study,

3   using qualitative interview data from 37 undocumented college students in Massachusetts and

4   North Carolina found that "even when undocumented students gain access to higher education,

5   barriers to legal status generate chronic feelings of despair and hopelessness that persist

6   throughout their educational trajectories" (Bazo Vienrich and Torres Stone 2022:1). S*ee also*

7   (Williams 2016) (finding feelings of exclusion among undocumented university students).

8          14.    In contrast, undocumented students' educational outcomes improve when

9   structural barriers are removed and supports are enacted, e.g., through in-state tuition policies

10  that make college more affordable, through relief from removal and access to work authorization

11  via the Deferred Action for Childhood Arrivals (DACA) program, or through access to

12  citizenship via the Immigration Reform and Control Act (IRCA). One study using Current

13  Population Survey data from 1999-2012 found that "the policy of granting in-state tuition to

14  undocumented students does attain its intended goal and increases Mexican non-citizen college

15  enrollment rates by 4 percentage points" without impacting rates for native-born students

16  (Amuedo-Dorantes and Sparber 2014:21; see also Kaushal 2008). A longitudinal qualitative

17  study of undocumented immigrant youth before and after the passage of California's in-state

18  tuition policy provides context for the potential mechanisms for these changes: the policy not

19  only provided a more affordable path to higher education, but also "immediately relieved

20  stigma" and "provided a socially acceptable identity" (Abrego 2008:709).

21         15.    The DACA program also led to increased rates of high school completion

22  (Hamilton, Patler, and Savinar 2020), though there is more mixed evidence of DACA's impact

23  on higher education, likely due to many DACA recipients feeling compelled to work while work

24  authorization is valid, given the temporary nature of the program (Hamilton et al. 2020; Hsin

25  and Ortega 2018; Pope 2016). The educational gains from DACA may also have varied by the

26  age of the recipient, suggesting that "policy makers should ensure that opportunities to

---

DECLARATION OF                          7          ATTORNEY GENERAL OF WASHINGTON
DR. CAITLIN PATLER                                        Civil Rights Division
CASE NO. 2:25-cv-00127                                  800 Fifth Avenue, Suite 2000
                                                           Seattle, WA 98104
                                                            (206) 464-7744

**Supp.Add.312**

1   permanently legalize status are available to immigrants as early as possible in the life course"

2   (Hamilton, Patler, and Langer 2021:1).

3        16.    Unlike temporary legalization programs, access to citizenship provides a much

4   clearer path to higher education and socioeconomic mobility. The case of IRCA underscores the

5   importance of citizenship: utilizing data from the 2000 decennial census and a rigorous causal

6   identification strategy, Cortes shows that "immigrant youth who were granted legal status under

7   IRCA are 13.9 percentage points more likely to enroll in college," signifying a "25% increase

8   over the base college enrollment of 55%" (Cortes 2013:430, 432). The study concludes that

9   "immigrant youth are more likely to enroll in college when legal barriers are removed and

10  financial barriers lowered" (ibid). In summary, US citizenship creates structural opportunities

11  and paths to educational mobility, while undocumented status imposes barriers to mobility.

12       17.    My research and the academic literature shows that immigrant legal status is also

13  a fundamental determinant of health, including mental and physical health (Bacong and Menjívar

14  2021; Castañeda et al. 2015). Federal laws governing immigration status and immigrants' rights,

15  as well as state and local laws defining benefits based on citizenship, not only structure access

16  to health care (e.g., through (in)eligibility for Medicaid or access to preventative care outside of

17  community clinic settings), but also structure access to health-protective resources (e.g., through

18  state and local policies that (dis)allow access to state-sponsored public benefits or increase or

19  decrease immigration law enforcement, which can lead to delayed care) (Cabral and Cuevas

20  2020; Hamilton, Patler, et al. 2019; Perreira and Pedroza 2019; Wallace et al. 2019).

21       18.    These structural disadvantages, combined with other disadvantages imposed by

22  undocumented status (e.g., disadvantaged socioeconomic status that leads to poverty,

23  housing/food insecurity, and neighborhood/school disadvantage; chronic exposure to

24  deportation fear and/or discrimination based on racialized legal status, etc.) have severe

25  consequences for health: "Undocumented individuals are more likely to report greater depression

26  and social isolation, higher rates of hypertension with longer length of hospital stay, greater

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.313

anxiety and post-traumatic stress, and higher levels of acculturative stress compared to documented immigrants" (Cabral and Cuevas 2020:874). In addition, "undocumented immigrants present more advanced stage diseases, such as breast cancer and HIV infection…than their documented counterparts" at the initiation of treatment (Cabral and Cuevas 2020:874). Although some research finds undocumented immigrants have lower levels of physician-diagnosed health outcomes such as asthma or hypertension, "this may be a result of undocumented immigrants having limited access to healthcare," for the purposes of receiving diagnoses in the first place (Cabral and Cuevas 2020; see also Hamilton, Hale, and Savinar 2019). In summary, the cumulative effects of the adversities created by legal status increase risk of disease and poor mental and physical health.

19.    The health harms of immigration policies determining immigrant legal status and rights are profound for undocumented children, particularly with regard to mental health and emotional wellbeing. As undocumented children grow up in the United States, they become increasingly aware of the implications of their legal status and living in "an in-between social position where one's social identity (as an immigrant or an American) is not recognized or reflected by society" (Hamilton, Patler, et al. 2019:6; see also Gonzales and Chavez 2012; Gonzales, Suárez-Orozco, and Dedios-Sanguineti 2013; Suárez-Orozco et al. 2011). Formal exclusion from mainstream rites of passage in adolescence and young adulthood (e.g., getting a driver's license or job, going to college) can cause many young undocumented immigrants to feel hopeless and isolated (Gonzales 2011). Emotional wellbeing is further harmed by negative public portrayals of undocumented immigrants: "children's identities, feelings of self-worth, friendships, and relationships with school-based adults are compromised as they become aware of the hostile and disparaging portrayal of unauthorized immigrants in the media, as well as of the common stigma associated with being undocumented" (Hamilton, Patler, et al. 2019:6; see also Abrego 2006; Gonzales et al. 2013; Patler 2014; Suárez-Orozco et al. 2011). Qualitative studies, based on interviews with undocumented youth, describe some of the emotional and

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.314

physical manifestations of distress related to undocumented immigration status: "Many participants spoke of their anxieties, of chronic sadness, of depression, of overeating or undereating, of difficulties sleeping, and of a desire simply to never get out of bed. Participants talked about exacerbation of chronic diseases like high blood pressure, chronic headaches, toothaches, and bodily pain"(Gonzales et al. 2013:1187).

20. Undocumented status also creates chronic deportation worry: "children growing up in the shadow of undocumented status live with what is likely an immeasurable ever-present stress of the threat of the deportation of a loved one or potentially themselves" (Suárez-Orozco and Yoshikawa 2013:66; see also Abrego 2006; Gonzales 2011). This chronic stress is exacerbated following the actual detention or deportation of a loved one can cause further harm to wellbeing: In a qualitative study of children aged 11-18 who had experienced parental detention, "Younger children were reported to cry inconsolably, wake with night terrors, and cling to their remaining parents. Children of all ages reported loss of appetite or overeating, self-isolation, trouble sleeping or being unable to get out of bed, headaches, stomach pain, and dizziness" (Patler and Gonzalez 2020:896; see also Brabeck 2010; Patler et al. In press; Patler and Gonzalez 2023).

21. In these ways, undocumented immigration status interrupts children's ontological security—the ability to count on the promise of the future, which is central to trust: "Lack of ontological security is at the core of emotions [undocumented immigrant youth] must contend with, from frustration, fear, shame, and depression to anxiety about their future" (Vaquera, Aranda, and Sousa-Rodriguez 2017:298; see also Gonzales et al. 2013). Experts in child and adolescent development conclude: "These compromised ecologies lead to far from optimal developmental contexts for children of unauthorized parents" (Suárez-Orozco and Yoshikawa 2013:66).

22. The legal, political, and social exclusion faced by undocumented children can lead to poorer health. One study analyzed survey data from the 2005-2017 waves of the

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.315

California Health Interview Survey (CHIS) and found higher rates of poor self-reported health and among undocumented Latina/o immigrants who came to the US as children, compared to their naturalized citizen counterparts (Hamilton, Patler, and Savinar 2022). Another survey of middle- and high school aged Latino youth in North Carolina found higher rates of anxiety among undocumented adolescents, compared to documented peers (Potochnick and Perreira 2010).

23.     In the most extreme cases, despair about blocked paths to mobility caused by legal status can lead to self-harm, suicidal ideation, or even suicide itself: "Eighteen-year-old Joaquin Luna Jr. came to the U.S. with his parents as a 6-month-old infant. Growing up in the small town of Mission, Texas, among his American-born peers, this church-attending, guitar-playing, strong student had hoped to become the first in his family to pursue college. Despairing that his undocumented status would block his ability to achieve his dreams to go to college, however, he took his life on November 25, 2011" (Gonzales et al. 2013:1175). Unfortunately, research suggests mental health issues are not likely to be addressed through access to healthcare alone: Interviews with undocumented immigrant college students, some of whom can access mental healthcare services through student health plans, showed that treatment was viewed by some as "futile because it could not address underlying immigration-related issues" (Cha, Enriquez, and Ro 2019:193).

24.     State and federal policies and administrative programs that more directly address immigration status-related stressors may improve mental health, at least in the short-term. Qualitative research shows that in-state tuition policies gave immigrant youth in California an improved sense of wellbeing and renewed optimism about the future (Abrego 2008). Quantitative analyses of National Health Interview Survey (NHIS) support these conclusions, providing some evidence of improved self-related health and reduced psychological distress among noncitizen Mexican adults associated with in-state tuition policies, as well as increased

DECLARATION OF
DR. CAITLIN PATLER
CASE NO. 2:25-cv-00127

11

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.316

1   psychological distress associated with policies that ban in-state tuition access (Kaushal, Wang,

2   and Huang 2018).

3       25.     The Deferred Action for Childhood Arrivals (DACA) program addressed some

4   of the formal and informal exclusion faced by young undocumented immigrants by providing

5   relief from the immediate threat removal and granting work authorization. Multiple research

6   studies find strong evidence of DACA's association with improvements to self-reported health

7   and psychological distress (Patler, Hamilton, and Savinar 2021; Patler and Pirtle 2018;

8   Venkataramani et al. 2017). Moreover, the health-promoting impacts of DACA were

9   intergenerational: analyses of US birth records found that DACA-eligible Latina mothers gave

10  birth to healthier infants, on average, compared to ineligible Latina immigrants (Hamilton,

11  Langer, and Patler 2021). Another study, analyzing CHIS data found that following DACA's

12  initiation, DACA-eligible Latina mothers reported improved health among their US citizen

13  children who were, on average, under five years old (Patler et al. 2019). However, given DACA's

14  temporary nature and the formal efforts to rescind it, improvements to health among DACA-

15  eligible immigrants and their children may not have been sustained (Patler et al. 2019, 2021).

16  Evidence from programs providing permanent access to citizenship (IRCA) is more promising:

17  One study analyzed US birth records and found that in areas with higher concentration of IRCA

18  applications, infants' average birth weights increased and the likelihood of low birthweight births

19  was reduced by 5 to 15% (Timilsina 2023).

20      26.     In summary, undocumented immigration status and the disadvantages it confers

21  can lead to poorer physical and emotional health among undocumented immigrants.

22  Unaddressed, these harms may be long-term and intergenerational (Torres and Young 2016).

23      27.     Based on my own research and having reviewed the literature on the impacts of

24  citizenship and immigration status' on education and health, my expert opinion is that denying

25  citizenship to children born to undocumented parent(s) would be catastrophically harmful for

26  children's development, wellbeing, and mobility. These harms would extend beyond the millions

DECLARATION OF                                12              ATTORNEY GENERAL OF WASHINGTON
DR. CAITLIN PATLER                                                          Civil Rights Division
CASE NO. 2:25-cv-00127                                                    800 Fifth Avenue, Suite 2000
                                                                             Seattle, WA 98104
                                                                               (206) 464-7744
                                                                          **Supp.Add.317**

1     of impacted children themselves, impacting schools, neighborhoods, communities and, indeed,

2     our nation as a whole. Birthright citizenship is a cornerstone of the U.S. identity as a nation of

3     immigrants, promoting social cohesion, opportunity, and mobility. Ending birthright citizenship

4     would erode those principles and divide our national community, creating and reinforcing vast

5     inequality for generations to come.

6         I declare under penalty of perjury under the laws of the State of Washington and the

7     United States of America that the foregoing is true and correct.

8

9         DATED and SIGNED this 20th day of January 2025, at Berkely, California.

10

11                 _____

12                 Caitlin Patler, PhD

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                13            ATTORNEY GENERAL OF WASHINGTON
DR. CAITLIN PATLER                                 Civil Rights Division
CASE NO. 2:25-cv-00127                         800 Fifth Avenue, Suite 2000
                                                  Seattle, WA 98104
                                                  (206) 464-7744

# PATLER DECLARATION

# EXHIBIT A

# CAITLIN PATLER

patler@berkeley.edu
www.caitlinpatler.com
January 2025

## PROFESSIONAL POSITIONS

*University of California-Berkeley*

| | |
|---|---|
| 2023-present | Associate Professor, Goldman School of Public Policy |
| | <u>Faculty Affiliate:</u> Berkeley Interdisciplinary Migration Initiative (BIMI), Berkeley Population Center (BPC), Institute for Research on Labor and Employment (IRLE) |
| | <u>Fellow</u>, Transactional Records Access Clearinghouse (TRAC) (2018-present) |

*University of California-Davis*

| | |
|---|---|
| 2016 – 2023 | Associate Professor, Department of Sociology |
| | <u>Chancellor's Faculty Fellow</u>, 2022-2027 |
| | <u>UC Davis Academic Senate Distinguished Teaching Award</u>, 2021 |
| | <u>Executive Committee Member/Co-founder</u>: UC Davis Global Migration Center |
| | <u>Advisory Committee</u>: Office of Public Scholarship and Engagement, 2019-2023 |
| | <u>Faculty Affiliate</u>: Center for Poverty & Inequality Research; Human Rights Program; Race, Ethnicity, and Immigration Research Cluster; Social Control Research Cluster |
| | <u>Immigration Associate</u>, UC-México Program (2018-2023) |
| | Assistant Professor, Department of Sociology, 2016-2021 |
| 2018 - 2020 | Postdoctoral Fellow, National Academy of Education/Spencer Foundation |

*University of California-Irvine*

| | |
|---|---|
| 2014 - 2016 | UC President's Postdoctoral Fellow, Department of Criminology, Law and Society |
| | <u>Affiliate</u>: Center for Demographic and Social Analysis |

## EDUCATION

| | |
|---|---|
| 2014 | Ph.D. Sociology, UCLA<br>*Dissertation:* "Young and Undocumented: The Impacts of Legal Status on the Incorporation of Immigrant Young Adults" |
| 2009 | M.A. Sociology, UCLA |
| 2003 | B.A. Sociology with College Honors, Magna Cum Laude, Minor in Chicana/Chicano Studies, UCLA |

Supp.Add.320

## PUBLICATIONS (*indicates student/trainee co-author)

### Edited Volumes

1. **Patler, Caitlin** and Bradford S. Jones. Under Review. "The US Deportation System." *RSF: Russell Sage Foundation Journal of the Social Sciences*

### Peer-Reviewed Journal Articles

1. Saadi, Altaf, **Caitlin Patler**, and Paola Langer.* In Press. "Duration in immigration detention and health harms." *JAMA Network Open*

2. **Patler, Caitlin**, Altaf Saadi, and Paola Langer.* In Press. "The health-related experiences of detained immigrants with and without mental illness." *Journal of Migration and Health*

3. **Patler, Caitlin** and Paola Langer.* In Press. "Has population mental health returned to pre-pandemic levels, among and between racialized groups and by immigration status?" *Social Science & Medicine-Mental Health.*

4. Langer, Paola,* **Caitlin Patler,** and Erin Hamilton. 2024. "Adverse infant health outcomes increased after the 2016 presidential election among U.S.-born and foreign-born mothers." *Demography.* 61 (4): 1211–1239.

5. Franco, Konrad,* **Caitlin Patler,** and Whitney N. Laster Pirtle. 2024. "COVID-19's Unequal Toll: Differences in Health-Related Quality of Life by Gendered and Racialized Groups." *Journal of Health and Social Behavior.* 65(1): 60-74.

6. **Patler, Caitlin**. 2024. "Blurring the Borders of Reentry: Socioeconomic Reintegration among Noncitizens following Release from Immigration Detention." *Social Problems.* 71(4): 975-995.

7. **Patler, Caitlin** and Gabriela Gonzalez. 2023. "Wellbeing, changes to academic behavior, and resilience among families experiencing parental immigration imprisonment." *American Behavioral Scientist.*

8. Erin Hamilton, **Caitlin Patler**, and Robin Savinar.* 2022. "Immigrant Legal Status Disparities in Health among 1st- and 1.5-Generation Latinx Immigrants in California." *Population Research and Policy Review.* 41: 1241-1260.

9. Franco, Konrad,* **Caitlin Patler**, and Keramet Reiter. 2022. "Punishing Status and the Punishment Status Quo: Solitary Confinement in U.S. Immigration Detention Facilities, 2013-2017." *Punishment & Society.* 24(2):170-195.

10. **Patler, Caitlin,** Shannon Gleeson, and Matthias Schonlau. 2022. "The Impact of Immigrant Legal Status and Human Capital on Legal Knowledge and Claims-Making in Low Wage and Unregulated Labor Markets." *Social Problems.* 69(2): 356-379.

11. Saadi, Altaf, **Caitlin Patler,** and Maria-Elena de Trinidad Young. 2021. "Cumulative Risk of Immigration Prison Conditions on Health Outcomes among Detained Immigrants in California." *Journal of Racial and Ethnic Health Disparities.* 29: 1-15.

12. Hamilton, Erin, **Caitlin Patler**, and Paola Langer.* 2021. "The Life Course Timing of Legalization: Evidence from the DACA Program." *Socius: Sociological Research for a Dynamic World.* 7:1-14.

13. **Patler, Caitlin**, Altaf Saadi, Maria-Elena de Trinidad Young, and Konrad Franco.* 2021. "Release from US Immigration Detention May Improve Physical and Psychological Stress and Health: Results from a Two-Wave Panel Study in California." *Social Science & Medicine-Mental Health.* 1: 1-11.

14. **Patler, Caitlin** and Altaf Saadi. 2021. "Risk of Poor Outcomes with COVID-19 Among Detained Immigrants: A Cross-sectional Study." *Journal of Immigrant and Minority Health.* 23(4): 863-866.

15. **Patler, Caitlin,** Jo Haile, and Erin Hamilton. 2021. "Paths to Mobility: A Longitudinal Evaluation of Earnings among Latina/o DACA Recipients in California." *American Behavioral Scientist.* 65(9): 1146-1164.

16. Hamilton, Erin, Paola Langer*, and **Caitlin Patler.** 2021. "DACA's Association with Birth Outcomes among Mexican-Origin Mothers in the United States." *Demography.* 58(3): 975-985.
    - Included in curated selection of *Demography* articles on immigration.

17. Gonzalez, Gabriela* and **Caitlin Patler**. 2021. "The Educational Consequences of Parental Immigration Detention." *Sociological Perspectives.* 64(2): 301-320.

18. **Patler, Caitlin,** Erin Hamilton, and Robin Savinar.* 2021. "The Limits of Gaining Rights while Remaining Marginalized: The Deferred Action for Childhood Arrivals (DACA) Program and the Psychological Wellbeing of Latina/o Undocumented Youth." *Social Forces.* 100(1): 246-272

19. Hamilton, Erin, **Caitlin Patler**, and Robin Savinar.* 2021. "DACA's Mixed Impacts on Education and Employment among Young Adult Immigrants in California." *Social Problems.* 68(3): 675-695.

20. **Patler, Caitlin** and Gabriela Gonzalez.* 2021. "Compounded Vulnerability: The Consequences of Immigration Detention for Institutional Attachment and System Avoidance in Mixed-Immigration Status Families." *Social Problems.* 68(4): 886-902.

21. Saadi, Altaf, Maria Elena De Trinidad Young, **Caitlin Patler**, Jeremias L Estrada, and Homer Venters. 2020. "Understanding U.S. Immigration Detention: Reaffirming Rights and Addressing Social-Structural Determinants of Health." *Health and Human Rights Journal.* 22(1): 187-198.

22. **Patler, Caitlin**, Erin Hamilton, Kelsey Meagher,* and Robin Savinar.* 2019. "Uncertainty about DACA May Undermine its Positive Impact on Health for Recipients and their Children." *Health Affairs.* 38(5): 738-745.

23. Hamilton, Erin, **Caitlin Patler**, and Jo Haile. 2019. "Growing up without Status: The Integration of Unauthorized Children and Children of Unauthorized Parents." *Sociology Compass.* 13(6): 1-14.

24. **Patler, Caitlin**, Jeffrey O. Sacha, and Nicholas Branic.* 2019. "The Black Box within a Black Box: Solitary Confinement Practices in a Subset of U.S. Immigrant Detention Facilities." *Journal of Population Research.* 35(4): 435-465.

25. **Patler, Caitlin**. 2018. "Undocumented Disadvantage, Citizen Advantage, or Both? The Comparative Educational Outcomes of Second and 1.5-Generation Latino Young Adults." *International Migration Review.* 52(4):1080-1110.

26. **Patler, Caitlin**. 2018. "To Reveal or Conceal: How Diverse Undocumented Youth Navigate Legal Status Disclosure." *Sociological Perspectives.* 61(6): 857-873.

27. **Patler, Caitlin**. 2018. "Citizens but for Papers: Undocumented Youth Organizations, Anti-Deportation Campaigns, and the Reframing of Citizenship." *Social Problems* 65 (1): 96–115.
    - Selected for inclusion in *Social Problems* 2019 curated issue on immigrants' incorporation

28. **Patler, Caitlin** and Whitney N. Laster Pirtle. 2018. "From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Young Adults?" *Social Science & Medicine.* 199(1):39-48.

29. **Patler, Caitlin** and Nicholas Branic.* 2017. "Patterns of Family Visitation during Immigration Detention." *RSF: Russell Sage Foundation Journal of the Social Sciences* 3(4):18-36.

30. **Patler, Caitlin** and Tanya Golash-Boza. 2017. "The Fiscal and Human Costs of Immigration Detention and Deportation in the United States." *Sociology Compass.* 11(11):1-9.

31. **Patler, Caitlin** and Roberto G. Gonzales. 2015. "Framing Citizenship: Media Coverage of Anti-Deportation Cases Led by Undocumented Immigrant Youth Organizations." *Journal of Ethnic and Migration Studies* 41(9):1453-1474.

**Peer-Reviewed Book Chapters, Commentaries, & Book Reviews**

32. **Patler, Caitlin**, Gabriela Gonzalez, Monica Cardenas Guzman,* and Guillermo Paez Gallardo.* 2024. "If I talk about it, I start crying: Children's Responses to Parental Imprisonment in US Immigration Prisons." In *Immigration Detention and Social Harm,* edited by Michelle Peterie. Routledge.

33. Diaz, Chanelle, Altaf Saadi, Joseph Nwadiuko, and **Caitlin Patler.** 2023. "Beyond Inevitable: Advancing research to address the multilevel health impacts of structural racism in the US immigration prison system." *Health Affairs.* 42(10): 1448-1455

34. **Patler, Caitlin**, Altaf Saadi and Ahilan Arulanantham. 2023. "Looking Back: Decarcerating Immigration Prisons as a Tool for Improved Health." *American Journal of Public Health.* 113(7): 732–735

35. **Patler, Caitlin**, Kristina Shull, and Katie Dingeman. 2019. "Detention and Deportation." in *The Routledge International Handbook of Migration Studies, Second Edition.*, edited by S. J. Gold and S. J. Nawyn. London and New York: Routledge.

36. **Patler, Caitlin**. 2016. "Everyday Illegal: When Policies Undermine Immigrant Families." *Contemporary Sociology: A Journal of Reviews.* 45: 597-599. (Book Review).

37. **Patler, Caitlin**. 2014. "Racialized Illegality: The Convergence of Race and Legal Status among Black, Latino and Asian-American Undocumented Young Adults." In Carty, Victoria, Rafael Luévano and Tekle Woldemikael, Eds. *Scholars and Southern Californian Immigrants in Dialogue: New Conversations in Public Sociology.* Lexington Press.

38. **Patler, Caitlin C**. 2010. "Alliance-Building and Organizing for Immigrant Rights: The Case of the Coalition for Humane Immigrant Rights of Los Angeles," in Milkman, Ruth et al. (editors), *Low-Wage Worker Organizing and Advocacy: The L.A. Model.* Ithaca, Cornell University Press.

**Research Reports, Policy Briefs, Op-Eds, and Other Publications**

1. **Patler, Caitlin.** 2024. "Immigration Policy." *Berkeley Public Policy Journal.* Spring/Summer 2024.

2. **Patler, Caitlin,** Altaf Saadi, Maria-Elena de Trinidad Young, Konrad Franco.* 2023. "Release from Detention Reduces Stress and Improves Health Among Detained Immigrants." UC Davis Center for Poverty and Inequality Research 11(7).

3. Hamilton, Erin, Paola Langer,* and **Caitlin Patler**. 2021. "DACA Associated with Improved Birth Outcomes Among Mexican-Immigrant Mothers." UC Davis Center for Poverty and Inequality Research 10(3).

4. **Patler, Caitlin**, Jackie Gonzalez, and Hamid Yazdan-Panah. 2021. Immigrant Detention and COVID-19: A Tragic Call to Action for Federal and State Officials. Harvard Immigration Initiative Policy Brief 7.

5. Franco, Konrad,* **Caitlin Patler,** and Keramet Reiter. 2020. Solitary Confinement in U.S. Immigration Prisons, 2013-2017. UC Davis Global Migration Center.
   - Reprinted in *Border Criminologies* blog by Oxford University Faculty of Law

6. Hamilton, Erin, **Caitlin Patler,** and Robin Savinar.* 2020. "DACA Enables Mobility, but its Uncertain Future Undermines Benefits for Recipients." UC Davis Center for Poverty and Inequality Research 9(2).

7. **Patler, Caitlin** and Erin Hamilton. 2020 (June 18). "Supreme Court decision is welcome news for DACA recipients but program remains vulnerable." Opinion-Editorial, *CalMatters.*

8. **Patler, Caitlin,** Altaf Saadi, and Hamid Yazdan-Panah. 2020. "Immigrant detention, COVID-19, and opportunities for action." Co-published by UC Davis Global Migration Center, Physicians for Human Rights, and Immigrant Defense Advocates.
   - Spanish language version published by El Observatorio de Legislación y Política Migratoria at the Colegio de la Frontera Norte, "Centros de detención de inmigrantes y COVID-19. Lecciones desde Estados Unidos y oportunidades para la acción" (with Altaf Saadi, Hamid Yazdan-Panah, and Ariadna Quiñares Navarette).

9. Hibel, Leah and **Caitlin Patler**. 2019 (August 27). "What will Indefinite Detention Do to Migrant Kids? The Evidence is Clear: No Detention Center is Safe and Healthy for Children." Opinion-Editorial, *The New York Times.*

10. **Patler, Caitlin**, Erin Hamilton, and Robin Savinar*. 2018. "DACA Uncertainty May Undermine its Positive Impact on Psychological Wellbeing." UC Davis Center for Poverty Research.

11. **Patler, Caitlin**. 2018. "The Impact of Deferred Action for Childhood Arrivals (DACA) on the Psychological Wellbeing of Young Immigrants." Scholars Strategy Network.

12. **Patler, Caitlin** and Jorge Cabrera. 2015. "From Undocumented to *DACAmented*: Benefits and Limitations of the Deferred Action for Childhood Arrivals (DACA) Program, Three Years Following its Announcement." UCLA Institute for Research on Labor and Employment.

13. **Patler, Caitlin**. 2015. "The Economic Impacts of Long-Term Immigration Detention in Southern California." UCLA Institute for Research on Labor and Employment.

14. Terriquez, Veronica, Uriel Rivera, and **Caitlin Patler**. 2013. "Leaders on Campus and in the Community: The Civic and Educational Pathways of California Dream Network Members." University of Southern California Center for the Study of Immigrant Integration.

15. Terriquez, Veronica, John Rogers, Alejandra Johnson-Vargas, and **Caitlin Patler**. 2013. "Powerful Learning: The Impact of CHIRLA's Wise Up! On Members' Educational and Civic Pathways." University of Southern California Center for the Study of Immigrant Integration and UCLA Institute for Democracy, Education, and Access.

16. Terriquez, Veronica and **Caitlin Patler**. 2012. "Aspiring Americans: Undocumented Youth Leaders in California." University of Southern California Center for the Study of Immigrant Integration.

17. **Patler, Caitlin** and Lauren D. Appelbaum. 2011. "Reaching the Dream: The Federal DREAM Act, the California Dream Act and Undocumented Student Activism." UCLA Institute for Research on Labor and Employment Research & Policy Brief No. 10.

## GRANTS, FELLOWSHIPS & AWARDS (Since PhD)

**Grants**

| 2024-2026 | Peder Sather Center for Advanced Study, UC Berkeley, "Exploring Undocumented Immigrants' Experiences Across National Contexts," Co-Principal Investigator (PI, Co-PI Synnove Bendixsen) |
| 2024-2025 | Institute for Research on Labor and Employment, UC Berkeley, "Sanctuary Immigration Policies and infant health," PI |
| 2021-2025 | National Science Foundation, "Depopulating Holding Centers during the COVID-19 Pandemic," PI (Co-PI: Altaf Saadi) |
| 2021-2023 | Russell Sage Foundation, "Reuniting Families: Understanding the impact of immigration prison decarceration due to the COVID-19 pandemic on detained immigrants and their families," PI (Co-PI: Altaf Saadi) |
| 2021-2023 | French American Cultural Exchange Thomas Jefferson Fund, "Immigrant Legal Status and Integration Across Four National Contexts," PI (Co-PI: Marie Mallet Garcia) |
| 2020-2022 | UC Davis Office of Research, "UC Davis Global Migration Center: Research, Policy and Action on Vulnerable, New, and Temporary Migrants," Co-PI (PI: Giovanni Peri, Co-PIs: Leticia Saucedo, Robert Irwin, Robyn Rodriguez) |
| 2019-2020 | Hellman Foundation, "The DACA Longitudinal Study (DLS)," PI |
| 2019-2020 | UC Davis Academic Senate Faculty Research Grant, "How Does Uncertainty about DACA Impact Participants? Evidence from the DACA Longitudinal Study," PI (Co-PI: Erin Hamilton) |
| 2018-2021 | National Science Foundation, "Effects of a Precarious Future on Youth Health and Wellbeing," PI (Co-PI: Erin Hamilton) |
| 2018-2019 | University of California-Mexico Initiative, "Debunking the Deportation Myths: The Economic, Social and Human costs of Detaining and Deporting Undocumented Immigrants," Co-PI (Co-PIs: Robert Irwin, Giovanni Peri, Leticia Saucedo) |
| 2018-2019 | Sociological Initiatives Foundation, "Deferred Action for Childhood Arrivals (DACA) Study: Wave Two," PI (community partner: Dream Team Los Angeles) |
| 2018-2019 | UC Davis Center for Regional Change Faculty Research Award, "Evaluating the Impacts of the Tenure and Termination of the Deferred Action for Childhood Arrivals Program on Immigrant Young Adults in California, 2012-2020," PI (Co-PI Erin Hamilton) |
| 2018-2019 | UC Davis Institute for Social Sciences Junior Faculty Research Grant, "From Undocumented to Lawfully Present: Do Changes to Legal Status under DACA Impact Immigrant Youth?" PI |
| 2017-2018 | UC Davis Academic Senate Faculty Research Grant, "The Impact of the Deferred Action for Childhood Arrivals (DACA) Program on the Wellbeing of Undocumented Californians," Co-PI (PI: Erin Hamilton) |
| 2016-2018 | The Russell Sage Foundation, "The Impacts of Long-Term Immigration Detention on Individuals, Households and Communities," PI |

| 2016 | Fund for the Advancement of the Discipline, supported by American Sociological Association and the National Science Foundation, "Collateral Consequences of Immigration Detention: The Impacts of Long-Term Parental Detention on Children and Households," PI |
|---|---|
| 2014-2016 | Sociological Initiatives Foundation Action Research Project Grant, "Assessing the Educational and Economic Trajectories, Civic Engagement, and Health Status of Deferred Action for Childhood Arrivals (DACA) Program Applicants," PI (community partner: Dream Team Los Angeles) |
| 2015 | UCLA Institute for Research on Labor and Employment Research Grant, "Collateral Consequences of Immigration Detention: The Impacts of Long-Term Parental Detention on Children and Households," PI |
| 2014 | UCLA Institute for Research on Labor and Employment Research Grants, PI |

**Fellowships**

| 2018-2019 | National Academy of Education (NAEd)/Spencer Foundation Post-Doctoral Fellowship, "From Undocumented to Lawfully Present: Do Changes to Legal Status under DACA Impact Educational Inequality among Latino Immigrant Youth?" |
|---|---|
| 2014-2016 | UC President's Postdoctoral Fellowship |

**Awards**

| 2022 | **UC Davis Chancellor's Fellow.** "Honors the achievements of outstanding faculty members early in their careers." |
|---|---|
| 2021 | **American Sociological Association Section on Mental Health Best Publication Award** (for Patler, Caitlin, Erin Hamilton, and Robin Savinar. 2021. "The Limits of Gaining Rights while Remaining Marginalized: The Deferred Action for Childhood Arrivals (DACA) Program and the Psychological Wellbeing of Latina/o Undocumented Youth." *Social Forces.* 100(1): 246-272) |
| 2021 | **UC Davis Distinguished Undergraduate Teaching Award**. "Presented to outstanding instructors who have greatly impacted their students." |
| 2019 | **Pacific Sociological Association Distinguished Contribution to Sociological Perspectives Award** (for Patler, Caitlin. 2018."To Reveal or Conceal: How Diverse Undocumented Youth Navigate Legal Status Disclosure." *Sociological Perspectives.* 61(6) 857-873). From the award letter: "[the article] stood out for the smart, timely, and important questions posed, robust data, and overall excellent sociological analysis." |
| 2018 | **American Sociological Association Latina/o Sociology Section Distinguished Contribution to Research Article Award** (for "Patler, Caitlin and Whitney L. Pirtle. "From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Young Adults?" *Social Science & Medicine.* 199(1):39-48. |
| 2017 | **UC Davis Diversity & Inclusion Initiative Award** for: "Building Bridges and Brave Spaces: Towards Documenting and Integrating Undocumented Voices at UC Davis" |

| 2015 | **UC Irvine ADVANCE Program for Equity and Diversity** Career Development Award |
| 2015 | Early Career Workshop Award, Law and Society Association |
| 2014 | American Sociological Association Spivack Program in Applied Social Research and Social Policy Community Action Research Award |

## COURSES TAUGHT

*UC Berkeley*
Public Policy 205: Capstone
Public Policy 290: US Immigration Policy

*UC Davis*
SOC 4: Immigration and Opportunity
SOC 4H: Immigration and Opportunity with College Honors
SOC 103: Evaluation Research Methods
SOC 195: Crimmigration
SOC 295: International Migration

## ADDITIONAL TRAINING

| 2024 | Difference-in-Differences, Arnold Ventures |
| 2019 | Treatment Effects Analysis, Statistical Horizons |
| 2019 | Longitudinal Data Analysis, Statistical Horizons |
| 2017 | OpEd Project "Write to Change the World" |
| 2017 | Multi-Level Models, StataCorp |
| 2011 | Qualitative Data Analysis with Dedoose |
| 2009 | Immigration Law, UCLA School of Law |
| 2008 | Immigrants' Rights Law, UCLA School of Law |

## INVITED LECTURES & KEYNOTES (Since PhD)

"Immigration Detention and Later Life Health Disparities." National Academies of Sciences, Engineering, and Medicine Committee on Population (CPOP) Seminar on Criminal Justice Involvement and Later Life Health Disparities, March 2024

"Government Data in Migration Research: Advantages, Pitfalls, and Examples," UCLA Center for the Study of International Migration, May 2022

"Immigration Status and Psychological Well-Being: Evidence from the DACA Program," Keynote speaker, Ackerman Lecture Series on Equality and Justice, Marxe School of Public and International Affairs, Baruch College, CUNY, November 2019.

"Immigration Detention and its Consequences for Individuals, Families, and Communities," The Conversation, Davis, CA. January 2019.

"Immigration Status and Psychological Wellbeing: A Representative Study of the DACA Program in California, 2012-2016." Columbia University. February 2018; University of California Davis Mental Health Initiative. May 2019.

"Citizens but for Papers:" Undocumented Youth Organizations, Anti-Deportation Campaigns & The Reframing of Citizenship, American River Community College Department of Sociology. December 2020, May 2019, December 2018, May 2018.

Patler CV - 8

"Legal Apartheid?: A Dialogue about Life under Mass Incarceration and Mass Deportation," American Sociological Association Annual Conference Special Session, Philadelphia, PA. August 2018.

"Blurring the Borders of Stigma: Socioeconomic Reintegration among Noncitizens following Imprisonment," UC Davis Hemispheric Institute on the Americas. Davis, CA. February 2018.

"DACA and Psychological Wellbeing," University of California Sacramento Center, Sacramento, CA. February 2018.

"How to Write a Successful Fund for the Advancement of the Discipline Proposal," Invited panelist, American Sociological Association Annual Conference, Montreal, Canada. 2017.

"Immigrant Rights Activism Going Forward," UC Berkeley. 2017.

"Qualitative Research Methods: In-Depth Interviewing in Hard-to-Reach Populations," UC Davis Sociology, 2016.

"Released but not Free: Socioeconomic Reintegration Following Long-Term Detention," UC Davis Migration Research Cluster, 2016.

"Bonding Out: Judicial Decision-Making in Immigration Bond Hearings," UC Merced, 2015.

"The Role of Empirical Work in Legal Analysis and Policy Advocacy," UCLA School of Law, 2015.

"Immigration Detention and Re-Entry in Southern California," UC Irvine, 2015.

"'Citizens but for Papers': Anti-Deportation Campaigns and the Reframing of Citizenship by Pro-Immigrant Organizations and the Media," UCLA Institute for Research on Labor and Employment, 2015.

"Bonding Out: Judicial Decision-Making in Immigrant Bond Hearings," Center for Demographic and Social Analysis, UC Irvine, 2015.

"Research Methods in Hard-to-Reach Populations: Planning, Implementing, and Analyzing Qualitative and Quantitative Research." University of Southern California. 2010, 2013, 2014

## SELECTED CONFERENCES, PRESENTATIONS & ORGANIZED PANELS (Since PhD)

"Immigration and the Criminal Legal System." Population Association of America Annual Meeting. 2023 (Organized panel).

"Immigrant apprehension, surveillance, and deportation." American Sociological Association Annual Meeting. 2024 (Organized regular session).

"Marriage and family formation in immigrant communities." American Sociological Association Annual Meeting. 2024 (Organized regular session).

"Undocumented immigration status and family inequality." American Sociological Association Annual Meeting. 2024 (Organized regular session).

Supp.Add.328

"The U.S. 2016 Election & Racialized Health Outcomes for Infants Born to US-born & Immigrant Mothers." Population Association of America Annual Meeting. 2022 (with Paola Langer* and Erin Hamilton)

"ICE Apprehensions in the U.S. Interior, 2014-2018." Population Association of America Annual Meeting. 2021 (with Konrad Franco*)

"Compounded Vulnerability: The Consequences of Immigration Detention for Institutional Attachment and System Avoidance in Mixed-Immigration-Status Families." La Migración Actual en América del Norte: Detención, Deportación, Retorno. Mexico City, Mexico. 2019 (with Gabriela Gonzalez*)

"DACA's Mixed Impacts on Education and Employment among Young Adult Immigrants in California" American Sociological Association. New York, NY. 2019 (with Erin Hamilton and Robin Savinar*)

"Uncertainty about DACA May Undermine its Positive Impact on Health for Recipients and their Children" American Sociological Association. New York, NY. 2019 (with Erin Hamilton and Robin Savinar*)

"Immigration Detention and Families." Debunking Deportation Myths Conference. Davis, CA. 2019.

"Solitary Confinement Practices in a Subset of U.S. Immigrant Detention Facilities." American Sociological Association. Philadelphia, PA. 2018 (with Jeffrey Sacha and Nicholas Branic*).

"Degrees of Inequality: The Diminished Returns to Human Capital for Workers with a Criminal Record." Population Association of America. Denver, CO. 2018 (with Angela Carter*).

"Solitary Confinement Practices in a Subset of U.S. Immigrant Detention Facilities." Southern Sociological Association Meeting. New Orleans, LA. 2018 (with Jeffrey Sacha and Nicholas Branic*).

"The Impact of Immigrant Legal Status and Human Capital Accumulation on Legal Knowledge and Claims-Making in Low Wage and Unregulated Labor Markets." American Sociological Association Conference. Montreal, Canada. 2017 (with Shannon Gleeson and Matthias Schonlau).

"The Socioeconomic Reintegration of Noncitizens following Incarceration and Detention." UC Annual International Migration Conference. Berkeley, CA. 2017.

"The Impacts of Long-Term Immigration Detention on Socioeconomic Reintegration." UC Davis Social Control Cluster. 2017.

"Assessing the Educational and Economic Trajectories, Civic Engagement, and Health Status of Deferred Action for Childhood Arrivals (DACA) Program Applicants." American Sociological Association Conference. Seattle, WA. 2016.

"Legal Status and Patterns of Family Visitation During Immigration Detention," American Sociological Association Conference. Seattle, WA. 2016.

"Legal Status and Patterns of Family Visitation During Immigration Detention," Russell Sage Foundation, New York NY. 2015.

"Undocumented Disadvantage, Citizen Advantage, or Both? Comparative Educational Outcomes of Second and 1.5-Generation Latino Young Adults." American Sociological Association Conference. Chicago, IL. 2015.

"Released But Not Free: The Impacts of Immigration Detention and Reentry on Employment, Housing, and Family Relationships," Law and Society Association Conference. Seattle, WA. 2015.

"Released But Not Free: The Impacts of Immigration Detention on Employment and Reentry," Blurring the

Border: Deporting Denizens in the 21st Century Conference. Merced, CA. 2015.

"Cross-National Perspectives on Immigration Detention and Deprivation of Liberty," International Borders of Crimmigration Conference, Leiden, Netherlands. 2014

## PROFESSIONAL AFFILIATIONS & SERVICE

**Editorial Board Member,** *Social Problems* (August 2021-June 2027)

**Reviewer, Journals and Books:** *AIMS Public Health, American Behavioral Scientist, American Journal of Sociology, American Sociological Review, Contemporary Ethnography, Contemporary Sociology, Demography, Ethnic and Racial Studies, Health Affairs, International Migration Review, Journal of Ethnic and Migration Studies, Journal of Health and Social Behavior, Journal of Immigrant and Minority Health, Journal of Marriage and Family, Law & Policy, Routledge, Rowman & Littlefield, Social Problems, Social Forces, Social Science & Medicine, Society and Mental Health, Sociology Compass, Sociology of Education, Sociology of Race and Ethnicity, Socius: Sociological Research for a Dynamic World*

**Reviewer, Research Grants:** National Science Foundation, Russell Sage Foundation (Presidential Grants, Research Grants, Pipeline Grants, Visiting Scholars), William T. Grant Foundation

### Mentorship Programs
- Robert Wood Johnson Foundation Health Policy Research Scholars, Home campus mentor (2021-present)
- Robert Wood Johnson Foundation Health Policy Research Scholars, Career Coach (2018-present)
- Hispanic Serving Institutions (HSI) Pathways Faculty Mentor (2019-2021)
- Russell Sag Foundation Doctoral Research Grant mentor (2024-present)

### Professional Memberships and Affiliations
- American Sociological Association
  - Latina/o Sociology Distinguished Contribution to Research Article Award Committee, 2018-2019
  - Spivack Program in Applied Social Research, Advisory Panel Member, 2015-2018
  - Section on Inequality, Poverty and Mobility: Sessions Organizer, 2018; Graduate Student Mentorship Program participant, 2018; Membership Committee Chair, 2014-2016
  - Section on Sociology of Law, Undergraduate Research Paper Award Committee, 2013
  - Section on International Migration, Roundtable Presider, 2013
- Crimmigration International Net of Studies (CINETS), Affiliate
- Law and Society Association, Member
- Population Association of America, Member
- University of California Criminal Justice and Health Consortium, Member (2015-2016)
- University of California Consortium on Law and Social Sciences, Member (2015-2016)

## SELECTED MEDIA COVERAGE

- Interviewed for *the Daily Californian,* "City Council to consider reaffirming Berkeley sanctuary city due to deportation threats." Jan 2025.

- Interviewed for *Berkeley News,* "Trump may be planning a sharp, extended conflict with California, experts say." Jan 2025.

- Interviewed for *San Jose Mercury News,* "Bay Area immigrants react to Trump's plan for mass deportation." December 2024.

Supp.Add.330

- Interviewed for *Gazetteer San Francisco,* "With Trump's reign looming, fusion centers pose risk to sanctuary city policies." December 2024

- Interviewed for *the Daily Californian,* "UC Berkeley issues advisory to international students ahead of Trump inauguration." December 2024.

- Interviewed for *the Daily Californian,* "'Scary to face:' International students encounter uncertainty under a Trump presidency." November 2024.

- Interviewed for *Texas Observer,* "How mass deportations would 'devastate' Texas." October 2024.

- Interviewed for *Mother Jones,* "What happens to a dream deferred? The fate of Dreamers, once at the center of the immigration debate, has become nighmtmare." June 2024.

- Interviewed for *KQED,* "Practice of Solitary Confinement Still an Issue in California" (radio), August 2022.

- Interviewed for Im/Migrant Lives Podcast, "Impact of detention and electronic monitoring on immigrant children's wellbeing," S01/E02, November 2023.

- Interviewed for *KQED* "ICE Overusing Solitary Confinement in California, Lawmakers Worry" (print), August 2022.

- Interviewed for *Sacramento Bee,* "How Joe Biden's immigration plan works, and what it would mean for California." January 2021.

- Research on solitary confinement in immigrant detention facilities featured by *KQED*, "ICE Misusing Solitary Confinement for COVID-19 Quarantine, Detainees Say," October 2020.

- Interviewed for NBC Affiliate KCRA, "California leaders react to SCOTUS DACA ruling." June 2020.

- Research featured by *International Consortium of Investigative Journalists*, "U.S. isolates detained immigrants from majority-black countries at high rate, study finds," April 2020.

- Interviewed for *Dallas Morning News,* "Did Trump's big talk, action on DACA affect the health of DACA beneficiaries," May 2019.

- Interviewed by *the Globe Post* about immigration and crime, November 2018

- Interviewed by *the California Aggie,* "Reality of ICE detention facilities subject of UC Davis professor's paper," November 2018

- Interviewed about immigration detention and immigration court by Snopes.com, August 2018

- Interviewed for Public Radio International (PRI), "DACA recipients saw their mental health improve. Now, advocates fear its end will have the opposite effect," November 2017

- DACA research cited in *The Atlantic* article, "From 'Dream Jobs' to Bussing Tables Again: The end of DACA would mean the end of economic mobility for hundreds of thousands of people," September 2017

- DACA research cited in *CNN* article, "The American nightmare Dreamers fear," September 2017

- DACA research cited in *Vox.com* article, "9 Facts that explain DACA," September 2017

Patler CV - 12

Supp.Add.331

- Interviewed for *Highly Relevant* podcast with Jack Rico about the rescinding of the DACA program, September 2017

- Interviewed for KFBK news radio about the rescinding of the DACA program, September 2017

- Research on DACA's impacts on psychological wellbeing featured on Valley Public Radio, NPR Central California, July 2017

- Research on DACA's impacts on psychological wellbeing featured by University of California News, "Immigration status has health implications for young Latinos, study shows," July 2017

- Research on DACA's impacts on psychological wellbeing featured by *Daily Democrat*, "Immigration status has health effects on young Latinos," June 2017

- Guest Post, "From Undocumented to DACAmented: Can Changes to Legal Status Impact Psychological Wellbeing? American Sociological Association Section on Inequality, Poverty, and Mobility. (with Whitney N. Laster Pirtle), June 2017

- Guest Blog Post, "From Undocumented to DACAmented: Can Changes to Legal Status Impact Psychological Wellbeing?" ImmigrationProf Blog, A Member of the Law Professors Blog Network. (with Whitney N. Laster Pirtle), June 2017

- Guest Blog Post, "From Undocumented to DACAmented: Can Changes to Legal Status Impact Psychological Wellbeing?" Youth Circulations Blog. (with Whitney N. Laster Pirtle), June 2017

- Research featured by the American Sociological Association, "Private Detention of Immigrants Deters Family Visits, Study Finds," August 2016

- Interviewed for: Kandil, Caitlin Yoshiko. "Jails Serve Inmates and Immigrants." *Los Angeles Times,* July 29, 2016

- Interviewed for: Change, Momo. "Oakland Man Facing Deportation for Nonviolent Drug Crime." *East Bay Express,* August 11, 2015

# PATLER DECLARATION

# EXHIBIT B

# References Cited

Abrego, Leisy. 2008. "Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California." *Law and Social Inquiry* 33(3):709–34.

Abrego, Leisy J. 2006. "I Can't Go to College Because I Don't Have Papers: Incorporation Patterns Of Latino Undocumented Youth." *Latino Studies* 4(3):212–31.

Amuedo-Dorantes, Catalina, and Chad Sparber. 2014. "In-State Tuition for Undocumented Immigrants and Its Impact on College Enrollment, Tuition Costs, Student Financial Aid, and Indebtedness." *Regional Science and Urban Economics* 49:11–24. doi: 10.1016/j.regsciurbeco.2014.07.010.

Asad, Asad, and Mathew Clair. 2018. "Racialized Legal Status as a Social Determinant of Health." *Social Science & Medicine* 199(1):19–28.

Bacong, Adrian M., and Cecilia Menjívar. 2021. "Recasting the Immigrant Health Paradox Through Intersections of Legal Status and Race." *Journal of Immigrant and Minority Health* 23:1092–1104. doi: https://doi.org/10.1007/s10903-021-01162-2.

Bazo Vienrich, Alessandra, and Rosalie A. Torres Stone. 2022. "The Educational Trajectories of Latinx Undocumented Students: Illegality and Threats to Emotional Well-Being." *Socius* 8:1–13. doi: 10.1177/23780231221135966.

Brabeck, Kalina and Qingwen Xu. 2010. "The Impact of Detention and Deportation on Latino Immigrant Children and Families: A Quantitative Exploration." *Hispanic Journal of Behavioral Sciences* 32(3):241–361. doi: 10.1177/0739986310374053.

Cabral, Jacqueline, and Adolfo G. Cuevas. 2020. "Health Inequities Among Latinos/Hispanics: Documentation Status as a Determinant of Health." *Journal of Racial and Ethnic Health Disparities* 7(5):874–79. doi: 10.1007/s40615-020-00710-0.

Castañeda, Heide, Seth M. Holmes, Daniel S. Madrigal, Maria-Elena DeTrinidad Young, Naomi Beyeler, and James Quesada. 2015. "Immigration as a Social Determinant of Health." *Annual Review of Public Health* 36:375–92. doi: 10.1146/annurev-publhealth-032013-182419.

Cha, Biblia S., Laura E. Enriquez, and Annie Ro. 2019. "Beyond Access: Psychosocial Barriers to Undocumented Students' Use of Mental Health Services." *Social Science & Medicine* 233:193–200. doi: 10.1016/j.socscimed.2019.06.003.

Cortes, Kalena E. 2013. "Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access." *The American Economic Review* 103(3):428–32.

Gonzales, Roberto G. 2011. "Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood." *American Sociological Review* 76(5):602–19.

Gonzales, Roberto G. 2016. *Lives in Limbo: Undocumented and Coming of Age in America*. Oakland: University of California Press.

Gonzales, Roberto G., and Leo R. Chavez. 2012. "Awakening to a Nightmare: Abjectivity and Illegality in the Lives of Undocumented 1.5-Generation Latino Immigrants in the United States." *Current Anthropology* 53(3):255–81.

1

Gonzales, Roberto G., Carola Suárez-Orozco, and Maria Cecilia Dedios-Sanguineti. 2013. "No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States." *American Behavioral Scientist* 57(8):1174–99.

Greenman, Emily, and Matthew Hall. 2013. "Legal Status and Educational Transitions for Mexican and Central American Immigrant Youth." *Social Forces* 91(4):1475–98.

Hamilton, Erin, Paola Langer, and Caitlin Patler. 2021. "DACA's Association with Birth Outcomes among Mexican-Origin Mothers in the United States." *Demography* 58(3):975–85.

Hamilton, Erin, Caitlin Patler, and Paola Langer. 2021. "The Life Course Timing of Legalization: Evidence from the DACA Program." *Socius: Sociological Research for a Dynamic World* 7:1–14.

Hamilton, Erin, Caitlin Patler, and Robin Savinar. 2021. "Transition into Liminal Legality: DACA's Mixed Impacts on Education and Employment among Young Adult Immigrants in California." *Social Problems* 68(3):675–95.

Hamilton, Erin, Caitlin Patler, and Robin Savinar. 2022. "Immigrant Legal Status Disparities in Health Among First- and 1.5-Generation Latinx Immigrants in California." *Population Research and Policy Review* 41(3):1241–60. doi: DOI: 10.1007/s11113-021-09689-w.

Hamilton, Erin R., Jo Mhairi Hale, and Robin Savinar. 2019. "Immigrant Legal Status and Health: Legal Status Disparities in Chronic Conditions and Musculoskeletal Pain Among Mexican-Born Farm Workers in the United States." *Demography* 56(1):1–24. doi: 10.1007/s13524-018-0746-8.

Hamilton, Erin R., Caitlin C. Patler, and Jo Mhairi Hale. 2019. "Growing up Without Status: The Integration of Children in Mixed-Status Families." *Sociology Compass* 3(6):1–14.

Hsin, Amy, and Francesc Ortega. 2018. "The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students." *Demography* 55(4):1487–1506. doi: 10.1007/s13524-018-0691-6.

Hsin, Amy, and Holly E. Reed. 2020. "The Academic Performance of Undocumented Students in Higher Education in the United States." *International Migration Review* 54(1):289–315. doi: 10.1177/0197918318825478.

Jefferies, Julian. 2014. "The Production of 'Illegal' Subjects in Massachusetts and High School Enrollment for Undocumented Youth." *Latino Studies* 12(1):65–87. doi: 10.1057/lst.2014.5.

Kaushal, Neeraj. 2008. "In-State Tuition for the Undocumented: Education Effects on Mexican Young Adults." *Journal of Policy Analysis and Management* 27(4):771–92. doi: 10.1002/pam.20366.

Kaushal, Neeraj, Julia Shu-Huah Wang, and Xiaoning Huang. 2018. "State Dream Acts and Education, Health and Mental Health of Mexican Young Adults in the U.S." *Economics & Human Biology* 31:138–49. doi: 10.1016/j.ehb.2018.08.013.

Kreisberg, A. Nicole, and Amy Hsin. 2021. "The Higher Educational Trajectories of Undocumented Youth in New York City." *Journal of Ethnic and Migration Studies* 47(17):3822–45. doi: 10.1080/1369183X.2020.1750947.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2016. "Why Border Enforcement Backfired." *American Journal of Sociology* 121(5):1557–1600.

Patler, Caitlin. 2014. "Racialized 'Illegality': The Convergence of Race and Legal Status among Black, Latino, and Asian American Undocumented Young Adults." Pp. 93–113 in *Scholars and Southern Californian Immigrants in Dialogue: New Conversations in Public Sociology*, edited by V. Carty, R. Luévano, and T. Woldemikael. Lanham, MD: Lexington Books.

Patler, Caitlin. 2018. "Undocumented Disadvantage, Citizen Advantage, or Both? The Comparative Educational Outcomes of Second and 1.5-Generation Latino Young Adults." *International Migration Review* 53(4):1080–1110. doi: 10.1111/imre.12347.

Patler, Caitlin, and Gaberiela Gonzalez. 2023. "Well-Being, Changes to Academic Behavior, and Resilience Among Families Experiencing Parental Immigration Imprisonment." *American Behavioral Scientist* In Press:1–18. doi: httpDs:O//dIo: i1.o0r.g1/107.711/0707/02070267464242312131221155988.

Patler, Caitlin, and Gabriela Gonzalez. 2021. "Compounded Vulnerability: The Consequences of Immigration Detention for Institutional Attachment and System Avoidance in Mixed-Immigration-Status Families." *Social Problems* 68(4):886–902.

Patler, Caitlin, Gabriela Gonzalez, Monica Cardenas Guzman, and Guillermo Paez Gallardo. In press. "'If I Talk About It, I Start Crying': Children's Responses to Parental Immigration Imprisonment in the US." in *Immigration Detention and Social Harm*, edited by M. Peterie. Sydney, Australia: Routledge.

Patler, Caitlin, Erin Hamilton, Kelsey Meagher, and Robin Savinar. 2019. "Uncertainty about DACA May Undermine Its Positive Impact on Health for Recipients and Their Children." *Health Affairs* 38(5):738–45.

Patler, Caitlin, Erin Hamilton, and Robin Savinar. 2021. "The Limits of Gaining Rights While Remaining Marginalized: The Deferred Action for Childhood Arrivals (DACA) Program and the Psychological Wellbeing of Latina/o Undocumented Young Adults." *Social Forces* 100(1):246–72. doi: 10.31235/osf.io/8dua9.

Patler, Caitlin, and Whitney N. Laster Pirtle. 2018. "From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Young Adults?" *Social Science & Medicine* 199(1):39–48. doi: 10.1016/j.socscimed.2017.03.009.

Perreira, Krista M., and Juan M. Pedroza. 2019. "Policies of Exclusion: Implications for the Health of Immigrants and Their Children." *Annual Review of Public Health* 40(7):147–66.

Pope, Nolan G. 2016. "The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants." *Journal of Public Economics* 143:98–114.

Potochnick, Stephanie R., and Krista M. Perreira. 2010. "Depression and Anxiety among First-Generation Immigrant Latino Youth: Key Correlates and Implications for Future Research." *The Journal of Nervous and Mental Disease* 198(7):470–77.

Supp.Add.336

Suárez-Orozco, Carola, and Hirokazu Yoshikawa. 2013. "Undocumented Status: Implications for Child Development, Policy, and Ethical Research." *New Directions for Child and Adolescent Development* 2013(141):61–78. doi: 10.1002/cad.20043.

Suárez-Orozco, Carola, Hirokazu Yoshikawa, Robert T. Teranishi, and Marcelo M. Suárez-Orozco. 2011. "Growing Up in the Shadows: The Developmental Implications of Unauthorized Status." *Harvard Educational Review* 81(3):438–73.

Terriquez, Veronica. 2014. "Dreams Delayed: Barriers to Degree Completion among Undocumented Community College Students." *Journal of Ethnic and Migration Studies* 41(8):1302–23.

Timilsina, Laxman. 2023. "Immigration Policy Shocks and Infant Health." *Economics & Human Biology* 51:1–18. doi: 10.1016/j.ehb.2023.101309.

Torres, Jacqueline M., and Maria-Elena D. Young. 2016. "A Life-Course Perspective on Legal Status Stratification and Health." *SSM - Population Health* 2:141–48.

Vaquera, Elizabeth, Elizabeth Aranda, and Isabel Sousa-Rodriguez. 2017. "Emotional Challenges of Undocumented Young Adults: Ontological Security, Emotional Capital, and Well-Being." *Social Problems* 64(2):298–314.

Venkataramani, Atheendar S., Sachin J. Shah, Rourke O'Brien, Ichiro Kawachi, and Alexander C. Tsai. 2017. "Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study." *The Lancet* 2(4):e175-181.

Wallace, Steven P., Maria-Elena De Trinidad Young, Michael A. Rodríguez, and Claire D. Brindis. 2019. "A Social Determinants Framework Identifying State-Level Immigrant Policies and Their Influence on Health." *SSM - Population Health* 7:1–9. doi: 10.1016/j.ssmph.2018.10.016.

Waters, Mary C., Marisa Gerstein Pineau, and National Academies, eds. 2015. *The Integration of Immigrants into American Society: Panel on the Integration of Immigrants into American Society*. Washington, DC: The National Academies Press.

Williams, Jean Calterone. 2016. "'It's Always with You, That You're Different': Undocumented Students and Social Exclusion." *Journal of Poverty* 20(2):168–93. doi: 10.1080/10875549.2015.1094766.

Supp.Add.337

1

2

3

4

5

6

7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
8
**AT SEATTLE**

9  STATE OF WASHINGTON; STATE OF
   ARIZONA; STATE OF ILLINOIS; and
10  STATE OF OREGON,

11                              Plaintiffs,

12        v.

13  DONALD TRUMP, in his official capacity
   as President of the United States; U.S.
14  DEPARTMENT OF HOMELAND
   SECURITY; BENJAMINE HUFFMAN, in
15  his official capacity as Acting Secretary of
   Homeland Security; U.S. SOCIAL
16  SECURITY ADMINISTRATION;
   MICHELLE KING, in her official capacity
17  as Acting Commissioner of the Social
   Security Administration; U.S.
18  DEPARTMENT OF STATE; MARCO
   RUBIO, in his official capacity as Secretary
19  of State; U.S. DEPARTMENT OF
   HEALTH AND HUMAN SERVICES;
20  DOROTHY FINK, in her official capacity
   as Acting Secretary of Health and Human
21  Services; U.S. DEPARTMENT OF
   JUSTICE; JAMES MCHENRY, in his
22  official capacity as Acting Attorney
   General; U.S. DEPARTMENT OF
23  AGRICULTURE; GARY WASHINGTON,
   in his official capacity as Acting Secretary
24  of Agriculture; and the UNITED STATES
   OF AMERICA,
25
                              Defendants.
26

NO. 2:25-cv-00127

DECLARATION OF
SARAH K. PETERSON

DECLARATION OF                                    1
SARAH K. PETERSON
CASE NO. 2:25-cv-00127

**Supp.Add.338**

I, Sarah K. Peterson, declare as follows:

1.     I am over the age of 18, competent to testify as to the matters herein and make this declaration based on my personal knowledge.

2.     I serve as the Washington State Refugee Coordinator and the Director of Washington's Office of Refugee and Immigrant Assistance (ORIA) within the Community Services Division of the Economic Services Administration (ESA) at the Washington Department of Social and Health Services (DSHS). Prior to joining ORIA in 2014, I worked for 14 years in nonprofit organizations that served immigrant and refugee communities in Philadelphia, Pennsylvania. In 2003, I earned my Master's Degree in Social Work from the University of Pennsylvania. I worked for HIAS Pennsylvania (Hebrew Immigrant Aid Society) for eight years helping to support their work in Philadelphia providing immigration legal services and refugee resettlement. It is at this organization that I gained direct experience helping people navigate federal immigration processes as well as access to public benefits programs.

3.     I direct Washington's Office of Refugee and Immigrant Assistance (ORIA), which administers over $100 million in state and federal funds to provide comprehensive services for refugees and immigrants living in Washington State. Washington State has a long legacy of welcoming people who are refugees and immigrants. ORIA offers programs and services that help people who are refugees and immigrants reach their full potential and contribute to thriving and diverse communities in Washington State.

4.     ORIA is housed within the Community Services Division (CSD), a Division within the Economic Service Administration (ESA), which is one of six administrations of the Washington Department of Social and Health Services (DSHS). ESA's core services focus on poverty reduction and safety net programs, child support services, and disability determinations. Nearly one out of every four Washington residents turned to DSHS for assistance with cash, food, child support, childcare, disability determinations, support for transitioning to employment, and other services. ESA's Community Services Division (CSD) operates the

DECLARATION OF
SARAH K. PETERSON
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

**Supp.Add.339**

federal and state public assistance programs that help low-income people meet their foundational needs and achieve economic security. Major programs include Temporary Assistance for Needy Families (TANF) and WorkFirst (Washington's welfare to work program), Basic Food (food assistance) and Basic Food Employment and Training, Refugee Cash Assistance, and others.

5.     ESA's Community Services Division (CSD) operates 52 different Community Services Offices (CSOs) and the Community Services Call Center that process client applications and determine eligibility for Washington's many public assistance programs, including cash and food assistance programs. ESA provides a variety of public assistance programs that draw from both federal and state resources and have many eligibility requirements, which include income levels, residency in Washington state, and verification of citizenship/immigration status. Eligibility for federally-funded cash and food assistance programs administered by ESA are limited to lawfully present immigrants who meet federally-defined eligibility standards that do not include unauthorized immigrants.[1] Washington state invests general state funds to mirror federal food and cash assistance to help individuals and families who are ineligible for federal programs, but eligibility still requires the immigrant be lawfully present.[2] Washington regulations for cash and food assistance define citizens to include individuals born in the United State or its territories.[3]

6.     ORIA works within CSD to ensure that refugee and immigrant families and individuals receiving public assistance have access to culturally sensitive and linguistically appropriate programs and services that aid them in rebuilding their lives. ORIA accomplishes this by partnering with more than 100 different community-based organizations across the state to provide direct services to more than 20,000 individuals annually. ORIA values our community

---

[1] *See* Wash. Admin. Code § 388-424-0010, 388-424-0020; 8 U.S.C. §§ 1611(a).
[2] Wash. Admin. Code §§ 388-424-0001, 388-424-0015, 388-424-0030. The only exceptions to the eligibility requirement of lawful presence for benefits administered by ESA are the Consolidated Emergency Assistance Program, a one-time emergency program, and the Disaster Cash Assistance Program, activated due to natural disasters or states of emergency.
[3] Wash. Admin. Code § 388-424-0001.

DECLARATION OF                                      3                ATTORNEY GENERAL OF WASHINGTON
SARAH K. PETERSON                                                              Civil Rights Division
CASE NO. 2:25-cv-00127                                                      800 Fifth Avenue, Suite 2000
                                                                                   Seattle, WA  98104
                                                                                    (206) 464-7744

Supp.Add.340

1   partners, and my team of professional staff and I engage with these community stakeholders on

2   a monthly and quarterly basis to understand how the programs that we oversee are impacting the

3   lives of refugees and immigrants. This regular community engagement enables ORIA to learn

4   and receive feedback about how state and federal policies impact people in the community.

5     7. I understand that the President has issued an Executive Order directing that

6   children born in the United States to undocumented parents are not to be deemed United States

7   citizens. The federal government's attempt to end birthright citizenship for children born in the

8   United States based on their parents' immigration status will cause a generation of babies born

9   in Washington State to become ineligible for the basic food and cash assistance programs that

10  prevent all children from living in deep poverty and support their health and stability. Based on

11  my experience with past changes to immigration and benefits laws, I believe that this order will

12  also discourage immigrants from accessing services that they are eligible for and need to rebuild

13  their lives in Washington communities. The Executive Order creates barriers for immigrants'

14  abilities to get the assistance they need to meet their basic needs, stabilize their lives, and fulfill

15  their full potential to contribute to diverse and thriving communities in Washington state.

16    8. As a result of the Order, babies stripped of citizenship and left without a qualified

17  immigration status will no longer be eligible for Washington's Basic Food program that provides

18  assistance for households to purchase and access nutritious foods. The program combines

19  federally funded Supplemental Nutrition Assistance Program (SNAP) and the state-funded Food

20  Assistance Program for Legal Immigrants (FAP). Food benefits are provided on a "household"

21  basis. To qualify for Basic Food, a household's earnings must fall below 200% ($53,300 for a

22  family of three) of the federal poverty level. Beneficiary households may use the benefit to

23  purchase food at one of the quarter million retailers authorized by the Food and Nutrition Service

24  to participate in the program. By stripping children of citizenship and therefore denying them

25  access to food assistance, the Order will affect children's access to sufficient and healthy food,

26  causing a negative impact on children's health and risking increasing rates of child hunger.

DECLARATION OF
SARAH K. PETERSON
CASE NO. 2:25-cv-00127

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.341

9.      In addition, individuals stripped of citizenship by the Order and left without a qualified immigration status will no longer be eligible for programs that use state and federal funding to provide cash assistance. This includes federally funded Temporary Assistance for Needy Families (TANF) and state funded State Family Assistance, Aged, Blind or Disabled Program, and Pregnant Women's Assistance. TANF utilizes federal funds from the U.S. Department of Health and Human Services and state funding to provide cash assistance to parents/caregivers with children and pregnant individuals to bolster their ability to meet their families' foundational needs, including a safe home, healthy food, reliable transportation, and school supplies. Washington's programs make income assistance available to individuals who are ineligible for TANF, including pregnant individuals and families in emergency conditions. This funding is used to alleviate emergency conditions by providing cash to assist with food, shelter, clothing, medical care, or other necessary items. Loss of eligibly for these programs for children who will be stripped of citizenship will result in children living in deep poverty without access to shelter, warm clothing, safety, and security.

10.     Under the current eligibility structure, children who are citizens by birth in Washington meet immigration eligibility for these federal and state cash and food assistance programs even if their parents do not. The household may therefore receive food or cash assistance based on the child's eligibility. When the children in a household are eligible for benefits but the parents are not eligible for or able to access benefits independently, we identify these as "child only cases." Stripped of citizenship by the Executive Order, these children and by reference their families will no longer be eligible for basic public benefits that foster health, stability, and community integration.

11.     This Executive Order would create confusion for CSD's public benefits specialist who determine eligibility. CSD will need to review the processes and procedures to ensure that no changes to the Automated Client Eligibility Systems are required. Additional staff training

DECLARATION OF
SARAH K. PETERSON
CASE NO. 2:25-cv-00127

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Supp.Add.342

1   and policy clarifications will be required to ensure the program and policy is implemented

2   accurately.

3        12.    If children subject to the Executive Order are no longer eligible for essential

4   public benefits through the government, they and their families will be forced to increasingly

5   rely on local non-profit and community-based organization to meet basic needs. Many of these

6   organizations are also facing reduction in funding and lack of resources for those in need. This

7   will strain local organizations and have a widespread negative impact on communities whose

8   residents will face barriers to health, stability, and opportunities to integrate and positively

9   contribute to their community. Lack of access to these safety net programs for these children

10  will create a domino effect leading to fewer and fewer resources available to the growing number

11  of people in need.

12       13.    From my experience working with community organizations during past changes

13  in federal immigration policy and from social science research of which I am aware, I also expect

14  there to be a "chilling effect" on enrollment in essential benefits even among families that have

15  members eligible for those benefits. Evidence from prior policy changes that affect public

16  benefits eligibility strongly suggests that many immigrants who are *not* directly subject to the

17  law will nevertheless withdraw from a broad array of public programs and services out of

18  confusion, fear, or an abundance of caution. The Executive Order is likely to have a negative

19  impact on the health and well-being of immigrant individuals and families, regardless of their

20  immigration status, because they will voluntarily disenroll from public benefits they are eligible

21  out of fear to interact with government programs.  Failing to receive essential public benefits

22  that support health, and stability will slow social integration, create new economic challenges

23  due to a lack of stability, and make it increasingly difficult for them to become fully self-

24  sufficient and integrated into our communities.

25       14.    If immigrant families fear accessing social services and benefits, this affects the

26  provision of emergency and other medical assistance, children's immunizations, and basic

DECLARATION OF
SARAH K. PETERSON
CASE NO. 2:25-cv-00127

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.343

1  nutrition programs, as well as the treatment of communicable diseases. Immigrants' fears of

2  obtaining these necessary medical and other benefits are not only causing them considerable

3  harm but are also jeopardizing the general public. For example, infectious diseases may spread

4  as the numbers of immigrants who decline immunization services increase. I believe the

5  Executive Order will undermine the State's priorities of increasing access to health care and

6  helping people to become self-sufficient.

7       15.      One of ESA's core missions is to reduce the number of people living in poverty.

8  Federal and state cash and food assistance programs provide people with the resources that they

9  need to keep people from living in deep poverty. The birthright citizenship executive order

10  creates walls that prevent ESA from being able to provide support to Washingtonians who will

11  be stripped of citizenship. The order will prevent individuals and families from receiving the

12  resources and supports that they need to thrive and become fully integrated into our local

13  communities.

14       I declare under penalty of perjury under the laws of the State of Washington and the

15  United States of America that the foregoing is true and correct.

16       DATED and SIGNED this 20th day of January 2025, at Seattle, WA

18
19                                   SARAH K. PETERSON

DECLARATION OF                                        7                    ATTORNEY GENERAL OF WASHINGTON
SARAH K. PETERSON                                                           Civil Rights Division
CASE NO. 2:25-cv-00127                                                   800 Fifth Avenue, Suite 2000
                                                                                Seattle, WA  98104
                                                                                  (206) 464-7744

Supp.Add.344



1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

10    STATE OF WASHINGTON; STATE OF
ARIZONA; STATE OF ILLINOIS; and
STATE OF OREGON,

11

                                Plaintiffs,

12

13        v.

14    DONALD TRUMP, in his official capacity
as President of the United States; U.S.

15    DEPARTMENT OF HOMELAND
SECURITY; BENJAMINE HUFFMAN, in

16    his official capacity as Acting Secretary of
Homeland Security; U.S. SOCIAL

17    SECURITY ADMINISTRATION;
MICHELLE KING, in her official capacity

18    as Acting Commissioner of the Social
Security Administration; U.S.

19    DEPARTMENT OF STATE; MARCO
RUBIO, in his official capacity as Secretary

20    of State; U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

21    DOROTHY FINK, in her official capacity
as Acting Secretary of Health and Human

22    Services; U.S. DEPARTMENT OF
JUSTICE; JAMES MCHENRY, in his

23    official capacity as Acting Attorney
General; U.S. DEPARTMENT OF

24    AGRICULTURE, GARY WASHINGTON,
in his official capacity as Acting Secretary

25    of Agriculture; and the UNITED STATES
OF AMERICA,

26                                Defendants.

NO. 2:25-cv-00127

DECLARATION OF
MAGALY SOLIS CHAVEZ

DECLARATION OF
MAGALY SOLIS CHAVEZ
CASE NO. 2:25-cv-00127

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.345**

I, Magaly Solis Chavez, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal and professional knowledge.

2.      I am the Executive Director of La Casa Hogar, a non-profit community-based organization in Yakima, Washington. Prior to becoming the Director in 2021, I was the organization's citizenship program manager for seven years. For over 30 years, La Casa Hogar has provided community services and education to Latina families in the Yakima Valley. In Yakima County, Latinos make up over 50% of the population, and in the Yakima School District 82% of the student population is Latino.

3.      La Casa Hogar's core programs include adult education, early learning, and citizenship education and legal services for individuals and families across Central Washington. We offer adult education including English classes, pre-GED, English-Spanish Language Exchange, and leadership development. Our Early Learning Center prepares children ages three to five to enter kindergarten and includes parent support classes. Annually La Casa Hogar serves over 1,000 individuals with educational opportunities across all three programs. We also provide referrals to over 4,500 community members annually seeking resources.

4.      In my seven years as the program manager at La Casa Hogar's citizenship program, I taught classes to prepare community members applying for citizenship. During my tenure as program manager, over 1000 people successfully naturalized and became US citizens because of their eligibility to apply for citizenship under immigration laws, as well as determination and commitment; the expertise of our team of staff and immigration attorney volunteers and board members makes this possible. Currently, approximately 500 adult immigrant students enroll in our citizenship classes. We are a Department of Justice-recognized organization and assist these students to apply for naturalization. Since 2014, over 2,300 immigrants have become U.S. citizens through our program. In working with citizenship students for ten years now, I have witnessed that obtaining citizenship offers stability particularly

DECLARATION OF
MAGALY SOLIS CHAVEZ
CASE NO. 2:25-cv-00127

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.346

by providing access to employment, economic, and housing opportunities. One of the biggest changes I have observed is an increased feeling of safety and sense of belonging for people who have lived in and contributed to the United States. This increased safety and stability for the persons who are eligible to apply and are granted citizenship creates security and peace of mind for their children and families as well, allowing families to no longer fear potential separation. I have observed that when people become citizens, they quickly and eagerly register to vote, participate in elections, and engage in local civic issues as the active community members they are.

5.      La Casa Hogar invests in education for Latina families because we know that equipping immigrant children and adults to participate fully in the community of the Yakima Valley leads to a healthier and thriving community for everyone.

6.      I am aware that President Trump has issued an Executive Order attempting to deny birthright citizenship to children of immigrant parents. This fulfills promises he made throughout his campaign to end birthright citizenship for children of undocumented parents. The news of this expected change in federal law and policy has caused uncertainty and fear in the community La Casa Hogar serves, and among other supporters who are not immigrants. I and my staff have directly listened to families we work with express the following concerns.

7.      Parents are concerned that if their children are stripped of citizenship, they will face the same challenges in life that they as parents have already experienced living undocumented in this country. These challenges include (but are not limited to) accessing education, services like basic healthcare, and difficulty building credit, which in turn, create barriers to obtaining both critical needs like a job, to even simple things like getting a cell phone plan. Parents are thinking about all the challenges they have had to navigate, and how their children will now have to navigate those same challenges and live in constant fear of potential familial separation.

DECLARATION OF
MAGALY SOLIS CHAVEZ
CASE NO. 2:25-cv-00127

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.347

8.       Parents are worried about how education and employment opportunities will be reduced for Latino children being born in the U.S., reducing economic mobility.

9.       Families are worried about their ability to travel anywhere outside the state.

10.      The community is concerned about the ability to have a healthy life because they fear they will not have access to needed services and benefits, including medical care.

11.      Many of the individuals La Casa Hogar works with have lived in the United States since they were young children. They do not have a home country to return to; the United States is the only home they know. Other individuals we work with are unable to return to their country of origin because of violence or persecution. Many of these individuals now have their own children and are raising their families. If their children born here are denied citizenship, the family will live in limbo, forced to raise their children without stability and the ability to fully participate in their new home; forced to raise their children in fear and instability.

12.      The community and staff at La Casa Hogar are concerned about how stripping citizenship from children will increase young people's feeling of a lack of belonging. Changes in immigration law that deprive children of protection and citizenship create fear. Fear drives young people to distance themselves from their family, culture, and language because being identified as an immigrant or associated with their family creates greater risk of deportation or other harms. Without lawful status, they likewise cannot experience full belonging in U.S. culture and communities. Our organization's vision is to cultivate connected community, and this change in federal law undermines people's ability to integrate with and contribute to their community.

///

///

///

DECLARATION OF
MAGALY SOLIS CHAVEZ
CASE NO. 2:25-cv-00127

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.348

1    I declare under penalty of perjury under the laws of the State of Washington and the

2    United States of America that the foregoing is true and correct.

3

4    DATED and SIGNED this 20th day of January 2025, at Yakima, Washington.

5

6

7    _____
     Magaly Solis Chavez

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                              5              ATTORNEY GENERAL OF WASHINGTON
MAGALY SOLIS CHAVEZ                                                Civil Rights Division
CASE NO. 2:25-cv-00127                                         800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA 98104
                                                                    (206) 464-7744

**Supp.Add.349**

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9  STATE OF WASHINGTON; STATE OF            NO. 2:25-cv-00127
   ARIZONA; STATE OF ILLINOIS; and
10  STATE OF OREGON,

11                      Plaintiffs,          DECLARATION OF
                                             KRYSTAL COLBURN
12       v.

13  DONALD TRUMP, in his official capacity
    as President of the United States; U.S.
14  DEPARTMENT OF HOMELAND
    SECURITY; BENJAMINE HUFFMAN, in
15  his official capacity as Acting Secretary of
    Homeland Security; U.S. SOCIAL
16  SECURITY ADMINISTRATION;
    MICHELLE KING, in her official capacity
17  as Acting Commissioner of the Social
    Security Administration; U.S.
18  DEPARTMENT OF STATE; MARCO
    RUBIO, in his official capacity as Secretary
19  of State; U.S. DEPARTMENT OF
    HEALTH AND HUMAN SERVICES;
20  DOROTHY FINK, in her official capacity
    as Acting Secretary of Health and Human
21  Services; U.S. DEPARTMENT OF
    JUSTICE; JAMES MCHENRY, in his
22  official capacity as Acting Attorney
    General; U.S. DEPARTMENT OF
23  AGRICULTURE; GARY WASHINGTON,
    in his official capacity as Acting Secretary
24  of Agriculture; and the UNITED STATES
    OF AMERICA,
25
                        Defendants.
26

DECLARATION OF
KRYSTAL COLBURN
CASE NO. 2:25-cv-00127

## DECLARATION OF KRYSTAL COLBURN

I, Krystal Colburn, hereby declare:

1. I am the Chief Reporting Officer and Assistant State Registrar of the Arizona Department of Health Services ("ADHS"), a position I have held since 2023. As Chief Reporting Officer and Assistant State Registrar, I provide overall leadership, management and direction to the Bureau of Vital Records (BVR), Cancer and Birth Defects Registries and the Office of Auditing. Prior to holding this position, I served as Section Chief and Assistant State Registrar for the BVR. I have been employed by the ADHS since 2007.

2. As Chief Reporting Officer and Assistant State Registrar, I have personal knowledge of the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by my staff.

### Arizona Department of Health Services

3. ADHS's mission is to promote, protect, and improve the health and wellness of individuals and communities in Arizona. To support that goal, ADHS performs many functions, including overseeing the BVR, which register vital events such as births. BVR's functions date back to the late 1800s and have been statutorily required since the early 1900s. Many state and federal agencies use birth certificates to determine eligibility for various programs, including but not limited to the issuance of driver licenses and U.S. passports.

### Registration and Birth Certificates of Newborns

4. Healthcare facilities coordinate with BVR to collect information to register a child's birth.

5. When a child is born in a healthcare facility, a medical attendant to the birth is statutorily obligated to register the birth. They provide the newborn's parents with a Certificate of Live Birth Worksheet that asks for several pieces of information, including the parents' place of

1

birth and Social Security Numbers (SSNs). The Worksheet does not inquire about the parents' immigration status.

6.  If the parents do not have an SSN, or do not wish to share it, they can leave that field blank or select none or unknown. Their omission of that information does not affect the newborn's ability to obtain a birth certificate. If parents do provide their SSNs, that information is stored only for child support enforcement purposes and is not used to verify their immigration status.

7.  After the newborn's parents complete and sign the Worksheet, hospital staff enter the information from the Worksheet into an electronic birth registration system maintained by BVR. BVR then creates and registers the birth certificate with the State.

8.  A newborn's completed birth certificate does not indicate whether the parents have an SSN. The only information on the parents is the mother's legal name, the father's full name (if provided), their places and dates of birth, and address. Currently, it is not possible to determine a foreign-born parent's immigration status from their child's birth certificate.

<u>Application for Social Security Number of Newborns</u>

9.  While completing the Certificate of Live Birth Worksheet to register a newborn for a birth certificate at a healthcare facility, parents may also request an SSN for the newborn through a Social Security Administration (SSA) program called Enumeration at Birth (EAB).

10. The EAB process is voluntary for families, but according to SSA, about 99% of SSNs for infants are assigned through this program.

11. After a healthcare facility receives a completed Certificate of Live Birth Worksheet, it submits electronically the information from the worksheet and a request for an SSN to BVR,

2

which then transmits that information and request to SSA. BVR only sends EAB records to SSA for enumeration of infants born within the past 12 months.

12. Arizona receives federal funding from the SSA for each SSN that is issued through the EAB process. The SSA has paid the State of Arizona $874,560.08 for FY 2024, $936,469.38 for FY 2025, and it is projected to pay $1,002,389.94 in FY 2026.

13. If birthright citizenship were revoked pursuant to the Executive Order, certain children born in the United States would no longer be considered citizens and would therefore be ineligible for an SSN.

14. If the number of births in Arizona stays constant or increases, but fewer of those children are considered citizens eligible for SSNs, then there will be fewer SSNs issued.

15. If fewer SSNs were issued through the EAB process due to the revocation of birthright citizenship, then this will result in reduced EAB funding to Arizona, perhaps a significant reduction.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21 day of January, 2025, in Phoenix, Arizona.

Krystal Colburn

Chief Reporting Officer and Assistant State Registrar
Arizona Department of Health Services

3

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9   STATE OF WASHINGTON; STATE OF          NO. 2:25-cv-00127
    ARIZONA; STATE OF ILLINOIS; and
10  STATE OF OREGON,

11                        Plaintiffs,          DECLARATION OF
                                               JEFFREY TEGEN
12       v.

13  DONALD TRUMP, in his official capacity
    as President of the United States; U.S.
14  DEPARTMENT OF HOMELAND
    SECURITY; BENJAMINE HUFFMAN, in
15  his official capacity as Acting Secretary of
    Homeland Security; U.S. SOCIAL
16  SECURITY ADMINISTRATION;
    MICHELLE KING, in her official capacity
17  as Acting Commissioner of the Social
    Security Administration; U.S.
18  DEPARTMENT OF STATE; MARCO
    RUBIO, in his official capacity as Secretary
19  of State; U.S. DEPARTMENT OF
    HEALTH AND HUMAN SERVICES;
20  DOROTHY FINK, in her official capacity
    as Acting Secretary of Health and Human
21  Services; U.S. DEPARTMENT OF
    JUSTICE; JAMES MCHENRY, in his
22  official capacity as Acting Attorney
    General; U.S. DEPARTMENT OF
23  AGRICULTURE; GARY WASHINGTON,
    in his official capacity as Acting Secretary
24  of Agriculture; and the UNITED STATES
    OF AMERICA,
25
                          Defendants.
26

DECLARATION OF
JEFFREY TEGEN
CASE NO. 2:25-cv-00127

## DECLARATION OF JEFFERY TEGEN

I, Jeffery Tegen, hereby declare:

1. I am the Assistant Director of the Division of Business and Finance at the Arizona Health Care Cost Containment System ("AHCCCS") Administration, which is Arizona's Medicaid agency.

2. My educational background includes a Bachelor of Science in Finance, a Master of Business Administration, and a Master of Health Service Administration. I have been employed as the Assistant Director of the Division of Business and Finance since May 2015.

3. I have compiled the information in the statements set forth below through personal knowledge, through AHCCCS personnel who have assisted me in gathering this information from our agency, and on the basis of documents that have been provided to and/or reviewed by me.

### AHCCCS Coverage and Eligibility

4. AHCCCS is Arizona's Medicaid agency that offers health care programs to serve Arizona residents who meet certain income and other requirements. AHCCCS's mission is to help Arizonans live healthier lives by ensuring access to quality healthcare across all Arizona communities.

5. AHCCCS is the largest insurer in Arizona, covering more than 2,714,609 individuals in State Fiscal Year 24. It uses federal, state, county, and other funds to provide health care coverage to the State's Medicaid-eligible population.

6. Eligibility for AHCCCS health insurance programs, including eligibility for Federal-State Medicaid and Children's Health Insurance Program ("CHIP"), depends in part on age, immigration status, and household income.

1

Supp.Add.355

7.  In general, children through the age of 18 (i) meet the income eligibility requirement for Federal-State Medicaid in Arizona if their household's modified adjusted gross income ("MAGI") is less than 133% to 147% of the federal poverty level ("FPL")[1], and (ii) meet the income eligibility requirement for CHIP in Arizona if their household's MAGI is less than 225% of the FPL.

8.  To be eligible for Federal-State Medicaid or CHIP, a child must also be a U.S. citizen or "lawfully residing" in the United States, as that term is defined by federal law.  "Lawfully residing" individuals are "lawfully present" and include qualified immigrants such as lawful permanent residents, asylees, refugees, and trafficking victims, as well as nonimmigrant visa holders and humanitarian status classes such as Temporary Protected Status and Special Immigrant Juvenile Status.  Children who are not citizens or "lawfully residing" are commonly referred to as undocumented.  The only exception to this eligibility requirement is for certain emergency services, which Federal-State Medicaid covers for individuals who are neither citizens nor "lawfully residing."  8 U.S.C. § 1611(b)(1); A.R.S. § 36-2903.03(F).

<u>Healthcare Coverage for Newborns in Arizona and Federal Funding</u>

9.  The amount of federal funding Arizona receives for health care it provides children through AHCCCS varies by federal program but generally represents 64% to 75% of Arizona's total health care expenditures for children. The specific federal program that applies depends on the child's age, household income, immigration status, and the health care service provided.

10. For children covered by the Federal-State Medicaid program, the federal government generally reimburses for 64% of Arizona's health care expenditures, but if federal CHIP allotment is available, Arizona can claim 75% reimbursement for children between 100%

---

[1] 147% for MAGI age 0-1, 141% for MAGI ages 1-5, 133% MAGI age 6-18.

2

Supp.Add.356

and 133% of FPL. For children covered by CHIP, the federal government generally reimburses 75% of Arizona's health care expenditures.

11. Federal funding for AHCCCS's Medicaid and CHIP programs is provided through an advance quarterly grant from the federal Center on Medicare and Medicaid Services ("CMS") to the State of Arizona, with a post-quarter reconciliation. This quarterly process begins with the State submitting to CMS a CMS-37 report, which estimates the reimbursable expenditures it expects to make for the upcoming quarter, six weeks before the quarter begins. For the January to March 2025 quarter, the State submitted the report in November 2024.

12. CMS then issues a quarterly federal grant the week before the start of the quarter. The State draws from this grant award during the quarter to partially fund its expenditures for Medicaid and CHIP.

13. Within 30 days after the end of a quarter, the State sends CMS a CMS-64 report, which reports all expenditures for the quarter.

14. Children from birth to age 18 typically have a range of health care needs that require services from various health care providers.

15. All children born in the United States and residing in Arizona whose family income is at or below 225% of the Federal Poverty Level are eligible for AHCCCS.

16. Presently, all children born in Arizona are U.S. citizens.

17. Thus, at present, AHCCCS coverage for newborns in Arizona is partially funded by the State and partially funded by the federal government, either through Medicaid or CHIP.

3

Fiscal and Public Health Impact of Revoking Birthright Citizenship

18. AHCCCS does not currently rely on a Social Security Number or parental immigration status to determine eligibility. Newborns are automatically approved for benefits through an automated process when a mother living in Arizona on AHCCCS gives birth. Citizenship is considered automatically verified if the child's birth is verified through this method since they are born in the United States.

19. If this methodology no longer applied, AHCCCS would need to update its eligibility policy and update three systems it uses: HEAPlus, PMMIS and AHCCCS Online. This would take approximately 12 months to implement the change. Based on the complexity of the potential update, the expense to change HEAplus would be approximately $1 million to $2.5 million and would take about 12 months to develop. In addition, it would cost $1.3 million to $1.9 million to update PMMIS and AHCCCS Online.

20. If AHCCCS were no longer able to automatically determine a newborn's eligibility through the deemed newborn process, this could cause service delays in healthcare coverage and access for all children while they go through the eligibility determination process. It would require the additional steps of verifying the citizenship status of the parents before being able to determine the child's eligibility, which could include obtaining additional information, including the SSN of the parents to run data matches or documentation of their citizenship. Depending on the volume, this could take additional staff to process these determinations, requiring additional funding to complete this new administrative work

21. AHCCCS provides certain emergency medical and behavioral health care services through the Federal Emergency Services Program ("FESP") for uninsured qualified and nonqualified

4

aliens, as specified in 8 U.S.C. § 1611 *et seq.*, who meet all requirements for Title XIX

eligibility as specified in the State Plan except for citizenship. *See also* A.R.S. § 36-2903.03.

22. The FESP covers emergency medical or behavioral health conditions, meaning a medical

condition or a behavioral health condition, including labor and delivery, manifesting itself by

acute symptoms of sufficient severity, including severe pain, such that the absence of

immediate medical attention could reasonably be expected to result in:

    a.  Placing the member's health in serious jeopardy;

    b.  Serious impairment to bodily functions;

    c.  Serious dysfunction of any bodily organ or part; or

    d.  Serious physical harm to self or another person.

*See* A.A.C. § R9-22-217.

23. In 2024 there were 4,519 births paid for by the FESP. For each of these births, the parent's

household income fell under 133% of the Federal Poverty Level and the parent would have

been eligible for Title XIX (Medicaid) if they were U.S. citizens or "lawfully residing."

However, because these children were born in the United States, the children were eligible

for Medicaid and qualified for AHCCCS, but they would not be eligible if birthright

citizenship were removed. If each of these children became ineligible for AHCCCS until 18,

using FFY2026 figures for FMAP of 64.34% (federal match) and capitation rates, then this

would likely cost the State $39,400 in federal revenue per child used to pay $61,300 in total

capitation payments over the first 18 years of that child's life.[2]

---

[2] Age < 1 CYE 2026 cap rate per month: $813.80
Age 1 – 20 CYE 2026 cap rate per month: $252.67
Total capitation for first 18 years: $813.80 * 12 + $252.67 * 12 * 17 = $61,300

5

24. AHCCCS does not have data to project the number of children born to undocumented parents in Arizona earning between 156% to 225% of the FPL. Under current birthright citizenship rules, these children would be U.S. citizens and eligible for Title XXI (KidsCare). Each child eligible for KidsCare has the same total capitation rate payments over the first 18 years of that child's life as above ($61,300), but the KidsCare FMAP of 75.04% is higher than the regular FMAP with federal revenue of $46,000 offsetting the total capitation payments over the first 18 years of the child's life. Assuming the income distribution of parents in the State who have an immigration status that excludes them from Medicaid coverage is uniform, AHCCCS estimates that approximately 3,126 births each year are of children who would be eligible for KidsCare under current birthright citizenship rules, but who would not be eligible if birthright citizenship were removed.

25. Removing birthright citizenship from the above 7,645 (4,519 + 3,126) children would reduce federal revenues to Arizona by $321,844,600 used to pay $468,638,500 in total capitation payments over the first 18 years of the children's lives.[3] This amount and the calculations in paragraphs 23 and 24 do not factor in inflation, population growth, or changes in the FMAP rate in future years and assume all the children remain eligible for AHCCCS until they turn 18. Additionally, these reductions in federal revenues to Arizona are only for the first "cohort" of children and only through their first 18 years of life. Each year, additional children would be born, adding to the lost revenue to the State.

26. Arizona draws federal funds on a daily basis. Therefore, any changes in policy would impact the State from the first month a child impacted by the policy change is born.

---

[3] Total Federal Revenue for 7,645 children = 4,519 * $39,400 + 3,126 * $46,000 = $321,844,600

6

Supp.Add.360

27. Having fewer newborns in Arizona qualifying as citizens could place increased strain on health systems throughout the State. AHCCCS currently provides emergency services only to those individuals who would otherwise qualify except for their immigration status. This provides a pathway for hospitals and other emergency service providers to receive reimbursement for the services they are required to provide to this population and reduces uncompensated care. However, this coverage does not extend to primary or preventive care. If these newborns would not be considered citizens by location of birth and therefore be ineligible for full AHCCCS services due to their citizenship status, the cost to the State would continue to accrue year after year through uncompensated non-emergent services provided by hospitals throughout Arizona, and for the much higher emergency services costs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of January, 2025, in Phoenix, Arizona.

_Jeffery Tegen_
_____
Jeffery Tegen
Assistant Director of the Division of
Business & Finance
Arizona Health Care Cost Containment
System Administration

7

<table>
<tr><td>1</td><td></td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td></td></tr>
<tr><td>4</td><td></td></tr>
<tr><td>5</td><td></td></tr>
<tr><td>6</td><td></td></tr>
</table>

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127 |
| Plaintiffs, | DECLARATION OF NADINE O'LEARY |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

DECLARATION OF
NADINE O'LEARY
CASE NO. 2:25-cv-00127

## DECLARATION OF NADINE O'LEARY

I, Nadine O'Leary, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am the Deputy Registrar of the State of Illinois, Department of Health (IL DPH or DPH), Department of Vital Records (DVR), a position I have held since 2019.

2. In this position, I direct, supervise, and issue instructions necessary to the efficient administration of a statewide system of vital records, the Office of Vital Record, and act as custodian of its record in accordance with 410 ILCS 535/5, as delegated by the State Registrar.

3. Prior to working with DVR, I worked at the Abraham Lincoln Presidential Library and Museum from 2012 to 2019; my last position at the Library and Museum was Acting Director. From 1999 to 2012, I worked for the Illinois Secretary of State's Organ and Tissue Donor Program as a Program Analyst and eventually as Program Director.

4. I earned a Bachelor of Arts from Knox College in Galesburg, Illinois.

5. I submit this Declaration in support of Plaintiff States' Motion for Temporary Restraining Order pertaining to the Executive Order entitled "Protecting the Meaning and Value of American Citizenship" (the "Citizenship Stripping Order"). I have compiled the information of the matters set forth below through personal knowledge, my review of information and records gathered by staff, and through IL DPH personnel who have assisted me in gathering this information. I also reviewed the Illinois data in "Birth to Unauthorized Immigrants in the State of Washington, Arizona, Illinois, and Oregon" Report prepared by the National Demographics Corporation. Compl. Ex. B, app. E. I have also familiarized myself with the Citizenship Stripping Order in order to understand its immediate and long-term impact on IL DPH and the State of Illinois.

1

<u>Illinois Department of Public Health</u>

6.  IL DPH's mission is to protect public health, promote healthy communities, and continue to improve the quality of health care in Illinois. To support that goal, IL DPH performs many functions, including regulating healthcare facilities and overseeing the Department of Vital Records (DVR), which registers vital events such as births.

<u>Registration and Birth Certificates of Newborns</u>

7.  Illinois healthcare facilities coordinate with DVR to collect information to register a child's birth.

8.  When a child is born in a healthcare facility, the person in charge of the facility or their designated representative is statutorily obligated to register the birth pursuant to Illinois Statute, which mirrors the U.S. standard form birth certificate. 410 ILCS 535/12. That individual provides the newborn's parents with a Certificate of Live Birth Worksheet ("Worksheet") that asks for several pieces of information, including the parents' place of birth and Social Security Numbers (SSNs). The Worksheet does not inquire about the parents' immigration status.

9.  If the parents do not have an SSN, or do not wish to share it, they can leave that field blank. Their omission of that information does not affect the issuance of the newborn's birth certificate. If parents do provide their SSNs, that information is stored only for child support enforcement purposes and is not used to verify their immigration status.

10. After the newborn's parents complete and sign the Worksheet, hospital staff enter the information from the Worksheet into an electronic birth system (IVRS) maintained by DVR. IVRS then routes the record to the appropriate Local Registrar to complete registration with the State.

<center>2</center>

11. A newborn's completed birth certificate does not indicate whether the parents have an SSN. The only information regarding the parents on a newborn's birth certificate is the mother's legal name, the father's full name (if provided), their places and dates of birth, residence, and mailing addresses. Currently, it is not possible to determine a foreign-born parent's immigration status from their child's birth certificate.

12. Healthcare facilities do not routinely ask patients, including new parents, for their immigration status. Generally, hospitals learn that information only when assessing a patient's eligibility for public benefits, which may depend on immigration status. If hospitals obtain immigration status information for patients, it is recorded in their health records and becomes protected health information that is shielded from disclosure under the Health Insurance Portability and Accountability Act ("HIPAA"). Currently, healthcare facilities do not verify the accuracy of the information provided by parents in this process.

13. If the newborn registration process had to be amended to provide for verification of the parents' citizenship and/or immigration status because of the Citizenship Stripping Order, this would impose considerable administrative burdens on State-run healthcare facilities. If healthcare facilities were required to confirm the accuracy of the parents' places of birth, SSNs, or immigration status, the facilities would incur significant new administrative costs related to implementing a system to substantiate the information provided and hire and train staff to do the same. Assuming this burden would further lead to delays in registration and issuance of the newborn's birth certificate, leaving a child born in Illinois in a limbo status until that system is created and implemented.

3

<u>Application for Social Security Number of Newborns</u>

14. While registering a newborn for a birth certificate at a healthcare facility, parents may also complete an application for an SSN for the newborn through a Social Security Administration ("SSA") program called Enumeration at Birth ("EAB").

15. The EAB process is voluntary for families, but according to SSA, about 99% of SSNs for infants are assigned through this program.

16. Under the EAB process, a question added to the Worksheet allows parents to voluntarily request a SSN for their newborn child. Hospital or birth center personnel enter the request for an SSN along with birth certification information in IVRS. DVR submits to the SSA the necessary information for it to assign an SSN to the newborn.

17. The EAB application asks for the parents' SSNs. Parents born outside the United States can apply for and receive an SSN for their child without including their own SSNs on the application. Currently, because children born in the United States are U.S. citizens, they are eligible for SSNs regardless of their parents' immigration status.

18. DVR only sends EAB records to SSA for enumeration of infants born within the past 12 months.

19. Illinois receives federal funding from the SSA EAB process on a quarterly basis for each SSN that is issued through the EAB process.  The State receives $4.19 per SSN issued through the EAB process. DVR requested over $500,000 in FY 2024 and just under $500,000 in FY2025 in IVRS for federal funding from the SSA EAB process. DVR uses those funds to support the payment of its administrative and operational costs.

20. For 2022, there were approximately 9,100 children born in Illinois to undocumented mothers. If birthright citizenship were revoked pursuant to the Citizenship Stripping Order, those

children would no longer be granted citizenship and would therefore be ineligible for an SSN. This estimate is based on the expert analysis provided by the National Demographics Corporation. Compl. Ex. B, app. E.

21. For 2022, there were approximately 5,200 children born in Illinois to two undocumented parents. If birthright citizenship were revoked pursuant to the Citizenship Stripping Order, those children would no longer be granted citizenship and would therefore be ineligible for an SSN. This estimate is based on the expert analysis provided by the National Demographics Corporation. *Id.*

22. If approximately 5,200 to 9,100 fewer SSNs were issued through the EAB process due to the revocation of birthright citizenship, this would result in an annual loss of EAB funding to IL DPH of approximately $21,788 to $38,129.

23. In addition to the loss in funding, state-run healthcare facilities would incur new administrative costs from expending resources to verify parents' immigration status before applying for a newborn's SSN through the EAB process. SSA will presumably require proof of parents' lawful status to issue an SSN under the Citizenship Stripping Order. State-run healthcare facilities would then be forced to consult with, and assist, families with obtaining the paperwork necessary to prove their immigration status. It is likely that the electronic system and guidelines for submitting SSN applications through that system—which are currently detailed in a 59-page SSA manual— would have to be revised. This would likely require healthcare facilities to train, and potentially hire, staff to work with parents in obtaining, and then verifying, the requisite documents to establish lawful immigration status.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

5

Executed this 21st day of January, 2025, in Springfield, IL

**Nadine J. O'Leary**

State Deputy Registrar
Division of Vital Records
Illinois Department of Public Health
925 E. Ridgely
Springfield, IL  62702

6

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127 |
| Plaintiffs, | DECLARATION OF JENNIFER A WOODWARD |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

DECLARATION OF
JENNIFER A. WOODWARD
CASE NO. 2:25-cv-00127

1

## DECLARATION OF JENNIFER A WOODWARD

I, Jennifer A. Woodword, declare as follows:

1.    I am over the age of 18 and have personal knowledge of the matters herein.

2.    I am the State Registrar at the Oregon Health Authority (OHA). I have held this position for 24 years, and have been with OHA since 1993. As State Registrar, I oversee Oregon's system of vital statistics, including the registration of vital events, such as births, and the issuance of vital records, including birth certificates. I am also familiar with OHA's relationship with the U.S. Social Security Administration, and OHA's role in SSA's "Enumeration at Birth" program for issuance of Social Security Numbers (SSNs) to babies born in Oregon.

3.    OHA's mission is to protect and improve the health of all people in Oregon. In carrying out that mission, it administers programs and provides services that touch the lives of all Oregonians and visitors to the State. OHA regulates healthcare facilities and oversees the Center for Health Statistics, among other things. The Center is responsible for the registration, preservation, amendment, and release of official state records of all births, deaths, fetal deaths, marriages and divorces that occur in Oregon. It also participates in the U.S. Social Security Administration's Enumeration at Birth program, enabling parents to request issuance of an SSN at or shortly after the time a baby is born, as part of completing the standard birth filing forms in Oregon.

4.    One primary function of the OHA is to oversee registration and release of birth certificates. The U.S. Department of Health and Human Services, National Center for Health Statistics (NCHS) develops standard form certificates for vital events, which it recommends that the States adopt to maintain nationwide uniformity in the system of vital statistics. Oregon has adopted the U.S. standard form birth certificate, with few modifications.

5.    The Oregon form to register a birth is called the Birth Record Parent Worksheet and is completed upon the birth of a newborn child. It requires entry of information about the

1    child and birthplace, information about the mother and father, and information for hospital use

2    only. The form asks for information about the parents, including place of birth and their SSN

3    if they have one or it is unknown. The form does not contain fields for immigration or

4    citizenship status of a baby's parents. Therefore, Oregon birth certificates do not collect

5    parental immigration or citizenship status information.

6         6.     Oregon's form to register a birth does not contain any field for immigration or

7    citizenship status of the baby. Babies born in Oregon have always been considered U.S.

8    citizens, and Oregon birth certificates have always been proof of U.S. citizenship sufficient to

9    obtain a U.S. passport or SSN. Oregon birth certificates contain no information or

10   representation about a baby's immigration or citizenship status.

11        7.     As part of the Birth Record Parent Worksheet, parents are asked whether they

12   wish to get an SSN for their children. They select either a "Yes" or "No" box when completing

13   the form.

14        8.     After the newborn's parents complete the Birth Record Parent Worksheet, the

15   hospital sends the information electronically to OHA through the Oregon Vital Events

16   Registration System (OVERS) and the birth is registered. OHA and the local public health

17   jurisdiction then use that information to create a birth certificate with the State.

18        9.     Oregon participates in the U.S. Social Security Administration's Enumeration

19   at Birth program. The EAB program is a process by which babies born in the United States

20   may obtain an SSN based on the submission of information from the State's vital statistics

21   agency rather than a separate application.

22        10.    The Birth Record Parent Worksheet asks for the parents' SSNs. Parents born

23   outside the United States can apply for and receive an SSN for their child born in the United

24   States without including their own SSNs. Because children born in the United States are U.S.

25   citizens, they are eligible for SSNs regardless of their parents' immigration status. The EAB

26   process facilitates a streamlined application and issuance of SSNs to U.S. Citizen babies born

DECLARATION OF          3
JENNIFER A. WOODWARD
CASE NO. 2:25-cv-00127

in Oregon. To my knowledge, based on its agreement with the SSA, more than 98 percent of parents in the United States voluntarily request an SSN for their newborns through the EAB program.

11.    After a healthcare facility receives a completed Birth Record Parent Worksheet indicating that an SSN is sought for a newborn child, it sends the required information to OHA. OHA then sends the required birth record information to the SSA in the prescribed format for the purpose of SSA issuing an SSN to the newborn child. The information sent must include the child's name, date of birth, place of birth, sex, mother's maiden name, father's name if listed on the birth registration document, the mother's address, the birth certificate number, and the parents' SSNs if available.

12.    In exchange for administering this program and formatting and transmitting certain data to the SSA, OHA receives federal funding from the SSA. Through a contract in place with the SSA, the State currently receives $4.82 per SSN assigned through the EAB process. In 2023 OHA received $158,381 through the program. Through three quarters of 2024, OHA has received $129,900. Under the agreement, OHA only sends EAB records and information to the SSA for enumeration of infants born within the past 12 months, and it receives payment only for records received for births in the current month and the prior two months. Further, the number of records processed and available for reimbursement is reduced by the number of births that are assigned an SSN in SSA Field Offices after the parent has applied for EAB at the hospital. In other words, OHA is only reimbursed for those SSNs assigned through EAB.    The annual payment received through the EAB program is approximately 2.1% percent of the Center's annual budget, and OHA uses those funds to support the payment of administrative and operational costs for the Center.

13.    If children born in Oregon become ineligible for SSNs because they are no longer citizens, OHA will lose federal funds because there will be a decrease in the number of SSN applications sent through the EAB process. For example, if there is an annual decrease of

DECLARATION OF                                          4
JENNIFER A. WOODWARD
CASE NO. 2:25-cv-00127

1  approximately 1,500 newborn children eligible for SSNs in Oregon and the SSA declines to

2  issue SSNs for those children, OHA would stand to lose approximately $7,230 per year. Based

3  on my experience, I anticipate that OHA would in fact see an even larger decrease in the

4  number of children eligible to obtain an SSN because data quality may decrease, making it

5  hard to provide enough information to SSA to get an SSN assigned.

6        14.     OHA also anticipates additional negative impacts based on the loss of birthright

7  citizenship to newborns in Oregon. If it were no longer the case that all children born in the

8  United States are U.S. citizens at birth and the newborn registration process had to be amended

9  to provide for verification of the parents' citizenship or immigration status, Oregon's vital

10  records system would have no immediate way to reflect this significant change. It would

11  instead require substantial operational time, manpower resources, and technological resources

12  from the Center and healthcare facilities in Oregon to respond to the change. The Center

13  endeavors to avoid deviation from the national standard to preserve interoperability of data

14  systems. Modifying required birth certificate information would require significant system

15  changes for the Center and additional rulemaking by OHA.

16        15.     Historically, the National Center for Health Statistics within the U.S. Centers

17  for Disease Control and Prevention (NCHS) has reviewed and revised U.S. standard vital form

18  certificates every 10-15 years only, by way of a years-long collaborative process with state

19  vital records officers and public health experts. Even if NCHS were to develop and promulgate

20  a new U.S. standard birth certificate that included fields for immigration or citizenship

21  information, adoption of a new form by OHA would require significant system changes, which

22  cannot occur overnight.

23        16.     A change of this scale would place significant new burdens on OHA and the

24  Center in particular. OHA would need to determine what changes are required to birth

25  certificates and what new information may need to be collected. Once determined, OHA would

26

DECLARATION OF
JENNIFER A. WOODWARD
CASE NO. 2:25-cv-00127

5

(381 of 436), Page 381 of 436
Case: 25-807, 02/18/2025, DktEntry: 32.1, Page 381 of 436
Case 2:25-cv-00127-JCC    Document 27    Filed 01/21/25    Page 6 of 7

1   need to work with NCHS to promulgate a new U.S. standard birth certificate for Oregon's

2   adoption. OHA then would have to promulgate a new rule to effectuate the changes.

3       17.     Meanwhile, approximately 38,000 babies are born every year in Oregon. That

4   is an average of more than 100 babies per day. It is unclear what would be required or requested

5   of OHA in connection with the registration of births that were to occur prior to the

6   implementation of updated birth certificates, since birth certificates are proof of U.S.

7   citizenship. OHA is not currently equipped to handle those new burdens; for example, it is hard

8   to know how we would go about determining the immigration status or citizenship of every

9   newborn (or their parents) when their immigration status is unclear to us, and whose job it

10  would be to make that determination. Most births are assisted births, and hospitals and

11  midwives are the ones who collect and transmit birth registration information to OHA.

12  Furthermore, all information we receive is self-reported, we have no way to verify it, and we

13  do not receive information concerning the parents' immigration or citizenship status.

14      18.     Furthermore, implementing any changes to the Oregon birth certificate—an

15  electronic system comprised of distinct end-user interfaces for medical providers to input data

16  for transmission to OHA, on the one hand, and files OHA can transmit to the SSA, for example,

17  on the other—would require substantial, unbudgeted expenditures by OHA.

18      I declare under penalty of perjury under the laws of the State of Oregon and the United

19  States of America that the foregoing is true and correct.

20

21

22

23

24

25

26

DECLARATION OF                                    6
JENNIFER A. WOODWARD
CASE NO. 2:25-cv-00127

1    DATED and SIGNED this 21st day of January 2025 at Portland, OR.

2

3    _____

4    Jennifer A. Woodward
     State Registrar
5    Oregon Health Authority

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF                        7
JENNIFER A. WOODWARD
CASE NO. 2:25-CV-00127

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

9

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127-JCC |
| Plaintiffs, | DECLARATION OF APRILLE FLINT-GERNER |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF APRILLE FLINT-GERNER       1
CASE NO. 2:25-cv-00127-JCC

## DECLARATION OF APRILLE FLINT-GERNER

I, Aprille Flint-Gerner, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge and records of the Oregon Department of Human Services that are kept in the ordinary course of its business.

2.      I am the Director for the Oregon Child Welfare Division of the Oregon Department of Human Services. (ODHS). I have served as Director since July 2023 and was previously the Child Welfare Interim Director. I am responsible for executive level oversight and administration of Oregon's foster care program and compliance with Title IV-E.

3.      I hold a Bachelor of Arts in African American Studies and a Master of Social Work from San Jose State University.  I have more than 25 years of experience in public sector work, including specialized experience in workforce and adaptive leadership development, community and cross-system engagement, and technical assistance and implementation support. I have specialized knowledge and expertise in many promising practices and equity frameworks in child welfare and human services. I am knowledgeable about the administration of the Child Welfare Division, including its implementation of Title IV-E.

4.      The Child Welfare Division of ODHS is focused on the well-being of children. Its mission is to ensure every child and family is empowered to live a safe, stable and healthy life. We are part of a larger statewide social system that works to support children, families and communities. Child Welfare focuses on keeping families together whenever it is safe to do so.

5.      One of ODHS's duties is to administer Oregon's child welfare system. Oregon's child welfare system is funded in part through an annual appropriation based on an open-ended formula grant entitlement operated by the U.S. Department of Health and Human Services (HHS) Federal Foster Care Program, known as Title IV-E.

6.      Title IV-E includes various programs that provide funding to children and ODHS. While ODHS provides foster care support for all children in the foster care system, regardless of

immigration status, it receives federal matching reimbursements for any funds that are directed to foster children eligible for Title IV-E. Children must be citizens or qualifying non-citizens to be entitled to enjoy benefits under Title IV-E and may be eligible as soon as birth. ODHS does not receive reimbursements based on their services to individuals who are undocumented or do not have a lawful, qualifying immigration status, as defined in Title IV-E. ODHS is also entitled to reimbursements for many types of administrative costs incurred in serving Title IV-E children, including the administration of various Title IV-E programs that ODHS administers and receives funding for.

7.    Included in Title IV-E's funding program is its "Adoption and Guardianship Assistance Program," which provides funding to facilitate the timely placement of children, whose special needs or circumstances would otherwise make it difficult for them to have permanency through adoption or guardianship. Under federal law, Child Welfare Division receives Title IV-E funding for the administrative functions of the Adoption and Guardianship Assistance Program, which includes:

a.    Overall: the determination and redetermination of eligibility; fair hearings and appeals; rate setting; other costs directly related only to the administration of the adoption and guardianship assistance program; the administration of any grievance procedures; negotiation and review of adoption/guardianship assistance agreements; post-placement management of subsidy payments; a proportionate share of related agency overhead; development of the case plan; referral to services; home studies; and mediation of post-finalization contact agreements.

b.    For adoptions: recruitment of adoptive homes; placement of the child in the adoptive home; case reviews conducted during a specific preadoptive placement for children who are legally free for adoption; case management and supervision

1      prior to a final decree of adoption; and a proportionate share of the development

2      and use of adoption exchanges.

3      8.      Title IV-E also includes a "Foster Care Maintenance Payments Program," which

4  provides funding for the regular costs of supervising and providing social services to children in

5  foster care. This includes: payments to cover the cost of (and the cost of providing) food,

6  clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability

7  insurance with respect to a child and reasonable travel to the child's home for visitation and

8  reasonable travel for the child to remain in the school in which the child is enrolled at the time

9  of placement. In the case of institutional care, it also includes the administration of providing all

10  of the services detailed above.

11      9.      Title IV-E funds the Independent Living Program services for youth who are age

12  14 and over and the Chafee educational stipends to support young adults pursuing higher

13  education after experiencing foster care.

14      10.     Title IV-E administrative funds support the training of agency staff, including

15  resource parents (who some states refer to as foster parents), as well as funding training for legal

16  representation for parents and children, Court-Appointed Special Advocates (CASA), and

17  members of the Citizen Review Board (CRB).

18      11.     Title IV-E funding is critical to ensuring high quality service to Oregon's children

19  who experience foster care today and in the future.

20      12.     The amount of federal funds that Oregon is entitled to under Title IV-E depends

21  on the number of Title IV-E eligible children. The amount Oregon receives is based on Oregon's

22  "eligibility rate" or "penetration rate," which is then used to determine the amount Oregon will

23  be reimbursed for providing services. The eligibility rate describes the percentage of Title IV-E

24  eligible children being served, compared against the total number of served children in foster

25  care, pursuant to the definition of foster care in 45 CFR 1355.20. The total number of children

26  being served depends on the services being provided. For example, Title IV-E reimburses Child

1    Welfare Division for payments for services in support of children placed in a resource family

2    home, a licensed group care facility, or in a home other than that of the child's parent, guardian,

3    or legal custodian. The reimbursed services include the recruitment, training, and management

4    of resource parents, the recruitment of adoptive families, and the facilitation of the adoption

5    process, among other services. The rate that CWD is reimbursed for the costs related to serving

6    children in paid out of home care is calculated by the number of days that Title IV-E eligible

7    children were in paid out of home care divided by the total number of days that all children

8    (including children ineligible for Title IV-E) were in paid out of home care.

9         13.    Because the penetration rate depends on the number of children eligible for Title

10    IV-E funding, even a small decrease in the number of children eligible for Title IV-E funding

11    would have dramatic impacts on the total amount of federal funding that Oregon receives under

12    Title IV-E.

13         14.    For example, in Federal Fiscal Year 2024, Oregon spent a total of $792,403,677

14    to administer its child welfare system. That same year, Oregon had a penetration rate of 49%

15    percent, based on approximately 2,200 children who are eligible for Title IV-E divided by

16    approximately 4,490 children in foster care on a given day. Consequently, even 45 fewer children

17    being eligible for Title IV-E funding would have decreased Oregon's penetration rate by 1%

18    percent, which would have decreased Oregon's reimbursement by $3.4 million. Or, taking a

19    different approach, if 1,500 children are born annually in Oregon who would not be considered

20    citizens under the federal executive order, then we can extrapolate the impact based on the

21    percentage of Oregon children who enter foster care. Using fiscal year 2024 dollars and foster

22    care percentages (.005%), there would be eight children who would enter foster care and would

23    not be considered citizens and who, therefore, would not be entitled to Title IV-E eligibility.

24    Even just eight fewer eligible children per year equates to $596,850.49 in lost federal funding

25    based on fiscal year 2024 expenditures.

26

DECLARATION OF APRILLE FLINT-GERNER     5
CASE NO. 2:25-cv-00127-JCC

Supp.Add.380

15.     The impact of the executive order on Oregon's child welfare system would not be limited to a reduction in federal funding for care of the children experiencing foster care. The recent executive order purporting to end birthright citizenship for children born in the United States based on their parent(s)' non-citizen/immigration status, if implemented, would have a variety of widespread impacts on Oregon's foster care program, including an increase in the operational and administrative costs for Oregon's foster care program.

16.     In addition to impacts on those subject to this new policy, the federal government's action would increase the cost of ODHS's administration of its foster care programs and, at the same time, decrease the amount of federal funding Oregon receives to reimburse administrative and maintenance costs related to its services for foster children in Oregon.

17.     ODHS is required by federal law to verify the citizenship status of all individuals receiving foster care support under Title IV-E, to determine the child's eligibility. Currently, the primary method of citizenship verification is through birth certificates held by other state agencies. Because ODHS can serve children as soon as they are born, it relies on birth certificates to determine whether young children are eligible under Title IV-E. When a child enters foster care, ODHS does not otherwise verify the citizenship of their biological parents in any way, as the parent(s)' citizenship is irrelevant to the services that Child Welfare provides.

18.     ODHS has no system in place to determine the citizenship of a child's parents when the child enters foster care. If ODHS were required to change its practices to conform with the federal government's executive order, ODHS would also need to develop that system and develop updated comprehensive training for staff, partners, and other contracted agencies who carry out Title IV-E duties. For example, ODHS would likely need to update its training and guidance around which children are citizens and therefore eligible for Title IV-E funding, and which children are only eligible for state-only programs. Moreover, Title IV-E requires ODHS to verify the citizenship of each child for whom it seeks federal reimbursements. While ODHS

DECLARATION OF APRILLE FLINT-GERNER     6
CASE NO. 2:25-cv-00127-JCC

(389 of 436), Page 389 of 436
Case: 25-807, 02/18/2025, DktEntry: 32.1, Page 389 of 436
Case 2:25-cv-00127-JCC   Document 65   Filed 01/27/25   Page 7 of 8

1  was previously able to rely on birth certificates to meet its federal obligation, it would no longer

2  be able to do so and would need to create a process to verify the citizenship of the parents at the

3  time the child enters foster care to determine whether the ODHS is entitled to federal

4  reimbursements. This would be a significant and costly administrative burden on the State and

5  ODHS.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

1    I declare under penalty of perjury under the laws of the State of Oregon and the United

2  States of America that the foregoing is true and correct.

3    DATED and SIGNED this 24th day of January, at Happy Valley, OR.

4

5

6    APRILLE FLINT-GERNER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF APRILLE FLINT-GERNER    8
CASE NO. 2:25-cv-00127-JCC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; BENJAMINE HUFFMAN, in his official capacity as Acting Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. 2:25-cv-00127 <br> Judge John C. Coughenour |

## DECLARATION OF HEIDI E. MUELLER

I, Heidi E. Mueller, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true and correct:

1. I am Director of the Illinois Department of Children and Families Services ("IL DCFS" or "DCFS"), a position I have held since February 1, 2024. I served as the Acting Director of IL

1

DCFS from February 2024 until March 21, 2024. On March 22, 2024, I was unanimously confirmed by the Illinois Senate as Director of IL DCFS. As Director of IL DCFS, I oversee the care, custody, and services to abused, neglected and dependent minors placed in DCFS's custody by Illinois Courts as well as programs provided to children and families at risk of coming into foster care.

2.  Prior to holding this position, from December 2016 to February 2024, I served as the Director of the Illinois Department of Juvenile Justice where I oversaw the care, custody, and services provided to youth committed to that department by Illinois Courts. I was first appointed by Governor Bruce Rauner after having served from April 2014 to December 2016 as the Deputy Director of Programs, responsible for the Department of Juvenile Justice's service array and rehabilitative model. From 2012 to 2014, I served as the Executive Director of the Illinois Juvenile Justice Commission, advising the Governor and the General Assembly regarding juvenile justice policy and practice and administering the State's federal grant funding under the Juvenile Justice and Delinquency Prevention Act.

3.  I hold a bachelor's degree, cum laude, in psychology and history from Macalester College, completed Master's level studies in Social Psychology from Stony Brook University, and earned a Juris Doctor degree from the University of Chicago Law School.

4.  I submit this Declaration in support of Plaintiff States' Motion for Preliminary Injunction pertaining to the Executive Order entitled "Protecting the Meaning and Value of American Citizenship" (the "Citizenship Stripping Order"). I have compiled the information of the matters set forth below through personal knowledge, my review of information and records gathered by staff, and through IL DCFS personnel who have assisted me in gathering this

2

Supp.Add.385

information. I have also read the Citizenship Stripping Order in order to understand its immediate and long-term impact on IL DCFS and the State of Illinois.

<div align="center">Department of Children and Family Services Background</div>

5. IL DCFS is the state agency mandated to investigate allegations of child abuse and neglect, maintain records regarding those investigations, and offer preventative and other services in Illinois. IL DCFS provides services to families at risk of having children enter foster care and to abused, neglected, and dependent youth who are placed in State custody and their families to address the issues that brought the family to the attention of the State with the goal of reunifying the families or providing alternative permanency living arrangements for youth. IL DCFS oversees the licensing and certification of relative and foster family homes for youth in the custody of the State and the licensing of other childcare institutions and placements for youth in DCFS care and custody. IL DCFS also provides early childhood care and education programs as part of the State's child welfare service system.

6. IL DCFS was created by the Children and Family Services Act "to provide social services to children and their families, to operate children's institutions, and to provide certain other rehabilitative and residential services as enumerated in this Act." 20 ILCS 505/1. Those services include: ensuring the necessary number of placements and other resources of sufficient quality and variety to meet the needs of children and families; providing direct child welfare services through public or private childcare programs or facilities, which protect and promote the health, safety, and welfare of children, including abused and neglected children; and placing children who have been removed from their parents in appropriate living arrangements.

<div align="center">3</div>

7. IL DCFS is also mandated to provide arrangements and monitor rehabilitative services for children and their families on a voluntary basis or who are under a court order. 325 ILCS 5/8.4.

8. IL DCFS is a statewide agency that operates in all 102 counties in the State of Illinois. DCFS consists of a central office and four regions: Cook County, Northern, Central and Southern. Each region is divided into field service areas. The general statewide management and support functions of the agency are currently performed at the central office level.

9. IL DCFS contracts with community-based child welfare contributing agencies ("CWCA") throughout the State to provide services for children and families. These services include case management services for families and children who remain together and are at risk of coming into foster care.

10. IL DCFS directly and through CWCAs provides foster care and residential placement and other services to children and youth removed from their parents.

11. DCFS provides services regardless of a child's or family's immigration status.

12. DCFS supervised or administered foster care for 19,514 children in 2023. As of the end of the state fiscal year on June 30, 2024, DCFS supervised or administered foster care for 18,854 children.

13. Children can enter IL DCFS's care at any time prior to their 18th birthday. In State Fiscal Year 2024 (July 1, 2023 to June 30, 2024) 6,252 children entered foster care. The breakdown of the ages of those children at the time they entered foster care is: 1,455 children were less than one year old; 1,942 children were between one year to five years old; 1,414 children were six to ten years old; 1,329 children were 11 to 16 years old; and 112 were 17 years old.

Supp.Add.387

14. In calendar year 2024, 5,991 children entered foster care: 1,373 children were less than one year old; 1,827 were one year to five years old; 1,352 were six to ten years old; 1,308 were 11 to 16 years old; and 131 of those children were 17 years old.

15. DCFS must timely identify the needs of children and youth placed in their custody and provide timely and appropriate services and placements to meet those identified needs and ensure children and youth in DCFS custody are cared for.

### Federal Funding Tied to a Child's Citizenship Status

16. Section 471 of the Social Security Act provides that for a state to obtain foster care maintenance payment reimbursements for a child in foster care, the State Plan must set forth that the state has procedures in effect for verifying the citizenship or immigration status of the child. 42 U.S.C. 671 (a)(27).

17. IL DCFS receives several sources of federal funding for providing services to children that are contingent on the child's immigration status. DCFS receives federal funding for providing services to eligible children, children that are a U.S. citizen or a "qualified alien." DCFS does not receive federal funding for providing similar services to children who are undocumented.

18. Prior to the enactment of the Citizenship Stripping Order, DCFS received federal funding for providing services to income-eligible children including those whose parents' immigration status was unknown or not determined.

19. If the Executive Order is implemented, IL DCFS will not receive the same level of federal funding for the provision of services to children even though it will continue to provide the same services to children regardless of their immigration status, as required by State law.

20. DCFS would also have to use its limited resources (resources that would otherwise directly provide for the care of youth) to create, implement, and update systems for all its programs to

track and determine the citizenship status of newborn children entering its care, even if the immigration status of a child's parents is unknown or indeterminable.

21. Title IV-E of the Social Security Act ("Title IV-E") requires the federal government to provide grants to state foster care agencies with approved Title IV-E plans, including IL DCFS, to assist those agencies with the costs of foster care maintenance for eligible children, as well as for adoption, guardianship, prevention, and other support services.

22. Title IV-E entitles Illinois to claim partial reimbursement from the federal government for IL DCFS's foster care expenditures for children who are removed from a home and placed in foster care and who meet the eligibility criteria for the former Aid to Families with Dependent Children ("AFDC") program, as it was in effect on July 16, 1996.

23. The 1996 AFDC program also limits federal public benefits to United States citizens and "qualified aliens." As IL DCFS understands the Title IV-E limitations independently, *cf.* 8 U.S.C. § 1641, and per the AFDC criteria, children who are undocumented are not "qualified aliens," and thus DCFS does not receive any federal reimbursement for its foster care expenditures for those children.

24. Federal funding under Title IV-E covers foster care maintenance payments for eligible children and provides for partial reimbursement of the State's administrative expenses associated with its foster care system. Foster care maintenance payments cover the cost of basic necessities, including food, clothing, shelter, daily supervision, and school supplies for eligible children in DCFS's care. Federal funding is provided on a quarterly basis after the State submits claims for eligible expenditures associated with eligible children.

25. Partial reimbursement of DCFS's administrative expenses is calculated by using the State's "penetration rate" or "eligibility rate," which is the percentage of children in foster care who

6

are eligible for Title IV-E funding. This loosely equates to the percentage of children in foster care who came from families with limited resources. That rate describes the percentage of Title IV-E eligible children DCFS serves, compared against the total number of children in DCFS's foster care, pursuant to the definition of foster care in 45 CFR 1355.20. IL DCFS must calculate a penetration rate for each quarter. For federal Fiscal Years 2023 and 2024, IL DCFS's penetration rate was between 26 and 34 percent: for those years, federal funds covered approximately 26 to 34 percent of the administrative expenses associated with DCFS's provision of foster care for eligible children.

26. In Federal Fiscal Year 2024, IL DCFS received almost **$140** million in Title IV-E federal funding for administrative expenses and foster care maintenance payments for eligible children.

27. Title IV-E federal funds also include funding for the Adoption Assistance Program, which facilitates the timely adoption of children with special needs or circumstances. Under federal law, DCFS receives Title IV-E funding for administering the Adoption Assistance Program, including assessing a child's eligibility for DCFS care, conducting hearings and appeals, and recruiting adoptive homes for identified children, among other administrative functions.

28. Based on DCFS's experience, it is very likely that DCFS serves U.S. citizen children with parents whose status would disqualify their child from birthright citizenship under the Citizenship Stripping Order. In calendar year 2024, 1,373 children entered foster care in Illinois in the first year of their lives. Those children were eligible for inclusion in the tabulation of federal funding received by IL DCFS, but children with parents of disqualifying status would be ineligible for inclusion in that tabulation under the Citizenship Stripping Order.

7

29. If children born to undocumented parents in Illinois who require foster care services were not given citizenship status as of birth, thereby becoming undocumented, IL DCFS would, consistent with state law, including the Children and Family Services Act, 20 ILCS 505; the Abused and Neglected Child Reporting Act, 325 ILCS 5; and the Illinois Juvenile Court Act, 705 ILCS 405, and the terms of the Consent Decree entered in *B.H. v. Mueller*, 88-cv-5599 (N.D. Ill. Dec. 20, 1991) continue to provide these children with foster care services as needed. However, because those children would be ineligible for Title IV-E funding, DCFS would not receive any reimbursement from the federal government under Title IV-E for providing those services. DCFS, and Illinois would be solely responsible for funding care for those children via its foster care and adoption systems.

30. Given all that, if the Citizenship Stripping Order took effect, IL DCFS would not receive a significant share of federal funds under Title IV-E based on the exclusion of children who are undocumented from the calculation of IL DCFS's expected federal funding.

### Costs of Ascertaining Citizenship Status

31. DCFS needs to determine the citizenship status of the children it serves in order for Illinois to accurately obtain quarterly Title IV-E reimbursements from federal sources for foster care services provided to eligible children. Children are only eligible for the afore-listed programs and services if they are U.S. citizens or "qualified aliens."

32. Prior to the issuance of the Citizenship Stripping Order, IL DCFS relied on a child's birth certificate as evidence of U.S. citizenship. This is administratively simple, especially with respect to newborns that DCFS caseworkers may interact with shortly after birth.

8

33. If birthright citizenship were terminated and DCFS could not rely on a child's birth certificate as proof of citizenship, it would significantly complicate DCFS's ascertainment of certain foster care services provided for that child that are reimbursable under Title IV-E.

34. To ascertain eligibility stemming from citizenship, DCFS caseworkers would have to develop a new system for determining the citizenship and immigration status of children entering its care. That system would likely require DCFS to take steps to determine, verify, and document the immigration status of the parents of children who come into foster care. It would cost considerable time and resources to implement such a system. This would be especially difficult in certain circumstances where parents are unwilling to engage with DCFS. DCFS would also incur significant costs to train DCFS caseworkers to implement that system.

35. While the precise costs are difficult to estimate without further guidance from the federal government on how states must determine citizenship status for federal benefits and Title IV-E eligibility, it could easily cost millions of dollars. Because quarterly submissions to the federal government for Title IV-E reimbursements are due at the end of April 2025, DCFS would have to develop and begin implementing such a system immediately, which may not be possible in the short timeframe.

36. Developing such a system to ascertain a child's citizenship status would also divert DCFS's limited resources from providing services to at risk children in Illinois to the detriment of children that benefit from a variety of DCFS's programs.

37. Separately, DCFS occasionally takes temporary custody of newborn children who have been abandoned, such as pursuant to Illinois's Abandon Newborn Infant Protection Act. (Protection Act), 325 ILCS 2/1-70. The parents of such abandoned children may be unknown, and DCFS

9

would therefore be unable to ascertain their eligibility for the above-mentioned federal programs.

38. Indeed, if a newborn is abandoned pursuant to the Protection Act, Illinois law permits an individual relinquishing a newborn infant to remain anonymous, absent any evidence of abuse or neglect of the child. 325 ILCS 2/30. DCFS could therefore be prevented from being able to determine the immigration status of the abandoned newborn's parents unless that information were volunteered.

39. Consequently, DCFS would be unable to establish that abandoned newborns are U.S. citizens eligible for Title IV-E reimbursement for DCFS—regardless of the actual immigration status of the newborn's parents. In summary, the Citizen Stripping Order will have an immediate and detrimental effect on the operations and finances of IL DCFS and harm the vulnerable youth and families we serve.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 27th day of January 2025, in Chicago, Illinois.

**Heidi E. Mueller**
Director
IL Department of Children and Family Services
60 East Van Buren Street
Suite 1339
Chicago, Illinois 60605
Heidi.Mueller@Illinois.gov

10

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; and STATE OF OREGON, | NO. 2:25-cv-00127-JCC |
| Plaintiffs, | DECLARATION OF MOZHDEH OSKOUIAN |
| v. | |
| DONALD TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of Homeland Security; U.S. SOCIAL SECURITY ADMINISTRATION; MICHELLE KING, in her official capacity as Acting Commissioner of the Social Security Administration; U.S. DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as Secretary of State; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of Health and Human Services; U.S. DEPARTMENT OF JUSTICE; JAMES MCHENRY, in his official capacity as Acting Attorney General; U.S. DEPARTMENT OF AGRICULTURE; GARY WASHINGTON, in his official capacity as Acting Secretary of Agriculture; and the UNITED STATES OF AMERICA, | |
| Defendants. | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF
MOZHDEH OSKOUIAN
CASE NO. 2:25-cv-00127-JCC

1

**Supp.Add.394**

### DECLARATION OF MOZHDEH OSKOUIAN

I, Mozhdeh Oskouian, declare as follows:

1.      I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal and professional knowledge.

2.      I am an attorney at law, admitted in the State of Washington and currently employed by Northwest Immigrant Rights Project (NWIRP) as its co-Deputy Director. I have worked as an immigration attorney at NWIRP for the last nineteen years. From December of 2005 to July of 2006, I worked as a Staff Attorney in the Violence Against Women Act (VAWA) Unit. From July of 2006 until mid-2015 I supervised the VAWA Unit. From 2015 until June 2023, I was the directing attorney of NWIRP's Seattle office. I became one of NWIRP's co-Deputy Directors in June of 2023, and continue serving in this role. In this role, I supervise NWIRP's Seattle and Granger offices and supervise all the work done by NWIRP's attorneys on behalf of our clients

3.      Northwest Immigrant Rights Project (NWIRP) is a nonprofit organization that serves low-income immigrants in Washington State through direct representation, community education, and systemic advocacy. NWIRP provides direct legal representation and assistance in immigration matters to thousands of people with low incomes each year who come from over 150 countries and speak over 60 different languages. NWIRP is also the largest provider of legal services to persons in immigration proceedings in Washington. NWIRP is a trusted provider of immigration-related community education for immigrant communities and social service providers. NWIRP serves the community through four offices in Washington State in Granger, Seattle, Tacoma and Wenatchee.

4.      I have extensive experience on cases focusing on immigrant rights. I have represented over a hundred immigrants before the Immigration Court, the Board of Immigration Appeals and the Federal Courts. I have also represented hundreds of clients with various forms of immigration applications before United States Citizenship and Immigration Services,

DECLARATION OF
MOZHDEH OSKOUIAN
CASE NO. 2:25-cv-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.395

1    including applications for family visas, naturalization, VAWA forms of relief, temporary

2    protected status, asylum, and administrative appeals.

3        5.    I have reviewed the Executive Order "Protecting the Meaning and Value of

4    American Citizenship" signed by President Trump on January 20, 2025. The order purports to

5    strip citizenship from persons born in the United States to 1) a mother with undocumented status

6    and father without U.S. citizenship or permanent residency; or to 2) a mother with temporary

7    status and father without U.S. citizenship or permanent residency. As a result of the Order, these

8    children will lack citizenship or any legal immigration status at birth. The Immigration and

9    Nationality Act (INA) does not provide any alternative legal status to persons born in the United

10   States. Moreover, under the INA the vast majority of persons subject to the Order will have no

11   pathway to even apply for lawful status in the United States. This is true not only at the time of

12   their birth, but also throughout the course of their lifetime. Instead, they will grow up and live

13   undocumented, forced to remain in the legal shadows of the country they were born in.

14       6.    The INA provides two primary paths to lawful permanent residence—family

15   visas and employment visas, but neither path is available for the overwhelming majority of

16   undocumented newborns whose parents are not U.S. citizens or lawful permanent residents. The

17   Order targets those persons whose parents are not U.S. citizens or lawful permanent residents.

18   Under the Immigration and Nationality Act, only U.S. citizens and lawful permanent residents

19   are eligible to file family visa petitions for their children. Thus, none of the parents of persons

20   targeted by the Order are eligible to file family visa petition for their newborn children.

21   Moreover, even if later in life they become eligible for a family visa petition, for example by

22   marrying a U.S, citizen, they would be ineligible to apply for adjustment of status to lawful

23   permanent resident status. This is because in order to apply for adjustment of status a person

24   must demonstrate that they have been "inspected and admitted or paroled into the United States."

25   *See* 8 U.S.C. § 1255(a). Because these persons were born in the United States, they have never

26

DECLARATION OF
MOZHDEH OSKOUIAN
CASE NO. 2:25-cv-00127-JCC

3

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

Supp.Add.396

1    been inspected and admitted or paroled into the United States, which is a statutorily required

2    element to apply for adjustment of status.

3           7.     Further, persons living without legal status cannot simply travel abroad and be

4    admitted upon their return, as they are not authorized to reenter the United States if they have no

5    status. *See* 8 U.S.C. § 1182(a)(7) (rendering persons ineligible to be admitted into the United

6    States if they do not have lawful immigration status). The beneficiary of a visa petition filed by

7    a U.S. citizen spouse may instead apply for a visa at a U.S. embassy or consulate in a foreign

8    country, but this is a lengthy process that would require them to be admitted into the foreign

9    country for a significant period of time. Moreover, because they have been living without status

10   in the United States, they will inevitably be subject to what is referred to as the 10 year bar for

11   having departed after living without status for more than one year in the United States. *See* 8

12   U.S.C. § 1182(a)(9)(B)(ii). As a result they would not be granted permission to return to the

13   United States for at least ten years, unless they were granted a discretionary waiver. *Id.* Waivers

14   are only available to those who can establish that "the refusal of admission to such immigrant

15   alien would result in extreme hardship to the citizen or lawfully resident spouse or parent." 8

16   U.S.C. § 1182(a)(9)(B)(v). The waiver does not take into account the extreme hardship to the

17   person, but instead only weighs the hardship caused to the U.S. citizen or lawful permanent

18   resident spouse or parent. Notably, these waivers generally take more than a year to be approved.

19   In the meantime, the person is left to languish in the foreign country with no assurance that the

20   discretionary waiver will ultimately be granted. Finally, it is important to note that this difficult

21   process is not even available for all the persons who are not married to U.S. citizens or lawful

22   permanent residents.

23          8.     Persons targeted by this Order would also be ineligible to obtain lawful

24   permanent resident status through employment visa petitions because even if they eventually

25   graduate from college with a specialized skill required for employment visas, and are offered

26   qualifying employment, they would similarly be ineligible to adjust status because they were not

DECLARATION OF
MOZHDEH OSKOUIAN
CASE NO. 2:25-cv-00127-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
(206) 464-7744

**Supp.Add.397**

inspected and admitted or paroled into the United States, as required by 8 U.S.C. § 1255(a). Moreover, they face an additional bar: because they would not have status they would be independently barred by 8 U.S.C. § 1255(c), which renders a person ineligible who "accepts unauthorized employment prior to filing an application for adjustment of status or who is in unlawful immigration status on the date of filing the application for adjustment of status." Finally, most would not qualify to even apply for an employment visa through an embassy or consulate abroad because as noted above, persons who depart the United States and who have lived without status in the United States for more than a year are rendered inadmissible for ten years, 8 U.S.C. § 1182(a)(9)(B)(ii), and most will not have a qualifying relative to even apply for the discretionary waiver.

9.    Because the INA does not provide an alternative legal status to persons born in the United States who are not U.S. citizens, children stripped of citizenship by the Order and left undocumented will be at immediate risk of removal from the United States. This includes being at risk of being arrested and detained by Immigration and Customs Enforcement, even while they go through the removal (i.e., deportation) process. If placed in removal proceedings, most will not qualify for any immigration status. The most common form of relief from removal for persons who have no lawful status is to apply for cancellation of removal. *See* 8 U.S.C. § 1229b. However, they would not qualify for the first type of cancellation, § 1229b(a), as that only provides relief for persons who have already been granted lawful permanent residence. The vast majority would not qualify for the second type of cancellation, §1229b(b)(1), as that is only available for persons who have been continuously residing in the U.S. for at least ten years and are able to demonstrate that their removal would cause "exceptional and extremely unusual hardship" to either a U.S. citizen or lawful permanent resident spouse, parent or child. *See* 8 U.S.C. § 1229b(b)(1)(D). Even if these persons were not placed in removal proceedings until after ten years had passed, the vast majority would not have a qualifying relative, i.e., U.S. citizen or lawful permanent resident spouse, parent or child. And even those with a qualifying relative

DECLARATION OF
MOZHDEH OSKOUIAN
CASE NO. 2:25-cv-00127-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.398

1   must demonstrate that it causes the qualifying relative not just hardship, but "exceptional and

2   extremely unusual hardship," an extremely difficult standard to satisfy. Indeed, to reinforce the

3   difficult standard the statute placed a numerical limit so that no more than 4,000 people may be

4   granted cancellation of removal in any given year. *See* 8 U.S.C. § 1229b)(e)(1).Our office

5   represents many undocumented persons in removal proceedings who have a qualifying relative

6   and are statutorily eligible to apply for cancellation of removal under 8 U.S.C. § 1229b(b)(1),

7   and who present compelling equities—including demonstrating family separation and the loss

8   of a parent where a child has physical or mental disabilities. Yet immigration judges regularly

9   deny such applications finding the hardship they present is similar to the hardship of hundreds

10  of other undocumented persons who are ordered removed each week.

11       10.    While there are other limited forms of immigration relief, they only apply to a

12  small section of the population. For example, asylum is only available to persons who

13  demonstrate a well-founded fear of persecution on account of a protected ground (race, religion,

14  nationality, membership in a particular social group or political opinion). *See* 8 U.S.C. §§

15  1101(a)(42), 1158. In my experience undocumented persons who have not already lived in the

16  country where they fear persecution are highly unlikely to qualify as they will not be able to

17  demonstrate objective evidence that they will individually be targeted despite having no past

18  persecution. Special Immigrant Juvenile Visas are only available for children who have been

19  abandoned, abused or neglected by a parent. 8 U.S.C. § 1101(a)(27)(J)(i). Similarly, U visas are

20  only available for persons who have been the victim of enumerated crimes that caused substantial

21  harm, and subsequently cooperated with the investigation or prosecution of the crime. *See* 8

22  U.S.C. § 1101(a)(15)(U). The vast majority of persons subject to the Order will remain without

23  any path to lawful immigration status. Instead, they will be forced to remain undocumented,

24  living in fear of any encounter with public officials. In my experience working directly with

25  clients living without legal immigration status, the fear of detention and deportation is

26  profoundly detrimental to their wellbeing and the ability to fully integrate into their communities.

DECLARATION OF                                6        ATTORNEY GENERAL OF WASHINGTON
MOZHDEH OSKOUIAN                                              Civil Rights Division
CASE NO. 2:25-cv-00127-JCC                                    800 Fifth Avenue, Suite 2000
                                                             Seattle, WA 98104
                                                             (206) 464-7744

Supp.Add.399

1    Our clients are often afraid to call the police or the fire department, as they have heard of others

2    who ended up being reported to immigration after calling such authorities. Some clients are even

3    afraid of taking their children to the hospital, or interacting with school officials.

4          11.    In most states undocumented persons have no right to apply for a driver's license.

5    Even in Washington State, they will not be eligible for REAL ID-compliant identification, which

6    starting in May 2025 will be required for domestic air travel. Their ability to travel even within

7    the United States will be severely limited. Many clients live in fear of interactions with

8    immigration officials at airports or bus stations.

9          12.    Undocumented persons are not eligible to obtain an employment authorization

10    document (EAD) or a Social Security number, both necessary to work lawfully for those who

11    cannot prove citizenship or lawful permanent residency. Undocumented individuals are not

12    eligible for work authorization under any of the avenues available under the INA. *See* 8 C.F.R.

13    § 274a.12. Because of this they face a much higher likelihood of being exploited by employers

14    who know they face difficulty in finding employment. Over the years I have worked with

15    countless clients where employers have withheld their last paycheck or denied them overtime

16    because the employers are confident that undocumented persons, fearing immigration

17    enforcement, will not report the employer's unlawful conduct.

18          13.    The order will exponentially increase the undocumented population in

19    Washington State. As the largest provider of immigration legal services in Washington,

20    NWIRP's services are already in high demand. Even with a staff of over 180, we are unable to

21    meet the needs of the majority of immigrant community members who contact us seeking

22    representation. The majority of persons placed in removal proceedings are forced to represent

23    themselves, and must stand alone against an ICE attorney before the immigration judge.

24    Similarly, for persons not in removal proceedings we are not able to represent everyone who

25    seeks our assistance. Instead we use waitlists for most types of affirmative relief. The Order

26    would add thousands of additional undocumented children in Washington who will at some point

DECLARATION OF
MOZHDEH OSKOUIAN
CASE NO. 2:25-cv-00127-JCC

7

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744

Supp.Add.400

1    likely need legal representation. This will stretch the already full capacity of NWIRP and other

2    immigration legal providers in Washington

3           14.    We have already received phone calls from worried parents who ask whether their

4    children will now lose their citizenship and whether they should pull their children out of school,

5    or whether they should withdraw from WIC or cut off food stamps for their children. Many

6    parents have sacrificed so much of their lives in order to find stability and safety for their

7    children. Now they are distraught knowing that their children potentially face a lifetime of

8    uncertainly, hiding in the shadows, limited to an underground economy which has caused the

9    parents so much pain in their lifetime. Many have explained that their children have nowhere to

10   go in their home country, talking about how difficult it would be for their children, many who

11   do not even speak, read and write in the language of their parents' home country.

12          15.    It is very difficult to respond to these inquiries other than ensuring them that the

13   U.S. Constitution and the Supreme Court of this Country have made clear, for more than a

14   century, that their children who are born in the United States, are entitled to citizenship,

15   regardless of the fact that the parents have no lawful status.

16

17          I declare under penalty of perjury under the laws of the State of Washington and the

18   United States of America that the foregoing is true and correct.

19

20          DATED and SIGNED this 27th day of January 2025, at Seattle, Washington.

21

22                                                    _____

23                                                    MOZHDEH OSKOUIAN

24

25

26

DECLARATION OF                          8          ATTORNEY GENERAL OF WASHINGTON
MOZHDEH OSKOUIAN                                      Civil Rights Division
CASE NO. 2:25-cv-00127-JCC                          800 Fifth Avenue, Suite 2000
                                                      Seattle, WA  98104
                                                        (206) 464-7744

**Supp.Add.401**

1                                     The Honorable Judge John C. Coughenour

2

3

4

5

6

7

8                     **UNITED STATES DISTRICT COURT**

                **WESTERN DISTRICT OF WASHINGTON**

9                            **AT SEATTLE**

10  STATE OF WASHINGTON, *et al.*,        NO. 2:25-cv-00127-JCC

11                Plaintiffs,

12                             REPLY IN SUPPORT OF PLAINTIFF

       v.                       STATES' MOTION FOR

13                             PRELIMINARY INJUNCTION

     DONALD TRUMP, in his official capacity

14  as President of the United States, *et al.*,    NOTE ON MOTION CALENDAR:

                             FEBRUARY 6, 2025

15                Defendants.

16

17

18

19

20

21

22

23

24

25

26

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

## TABLE OF CONTENTS

2

3

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT .................................................................................................. 1

    A.   The Court Has Authority to Declare the Citizenship Stripping Order Unlawful
    and Enjoin Its Implementation .................................................................... 1

        1.   The Plaintiff States have standing to protect their sovereign interests ............. 2

        2.   The Plaintiff States have standing to protect their pecuniary interests ............. 3

        3.   The Plaintiff States have standing to bring challenges under the
        Citizenship Clause .................................................................................. 6

        4.   The Plaintiff States can obtain declaratory and injunctive relief directly
        under the Fourteenth Amendment and the INA ................................. 8

    B.   The Plaintiff States Are Extremely Likely to Succeed on the Merits .................... 10

        1.   The Citizenship Stripping Order is blatantly unconstitutional ........................ 10

        2.   The Citizenship Stripping Order independently violates the INA ................. 15

    C.   The Remaining Injunction Factors Decisively Favor the Plaintiff States ............... 16

    D.   A Nationwide Injunction Is Required for Complete Relief .................................... 17

III.  CONCLUSION ............................................................................................... 18

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

i

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.403**

## TABLE OF AUTHORITIES

### <u>Cases</u>

*Afroyim v. Rusk*,
   387 U.S. 253 (1967).................................................................................. 1, 8, 17

*Alaska v. U.S. Dep't of Transp.*,
   868 F.2d 441 (D.C. Cir. 1989) ............................................................................. 3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982)......................................................................................... 2, 7

*Arizona v. United States*,
   567 U.S. 387 (2012)............................................................................................ 16

*Armstrong v. Exceptional Child Ctr., Inc.*,
   575 U.S. 320 (2015).............................................................................................. 8

*Biden v. Nebraska*,
   --- U.S. ---, 143 S. Ct. 2355 (2023)................................................................... 3

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987) ......................................................................... 17

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) .............................................................................. 5

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ........................................................................... 8

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
   944 F.3d 773 (9th Cir. 2019) .............................................................................. 5

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
   981 F.3d 742 (9th Cir. 2020) ......................................................................... 4, 5

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)............................................................................................. 5

*Colgate v. Harvey*,
   296 U.S. 404 (1935)............................................................................................. 6

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)...................................................................................... 1, 3, 5

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)................................................................................................ 9

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

ii

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.404**

*DeVillier v. Texas*,
   601 U.S. 285 (2024) .................................................................................... 9

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ................................................................... 17

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) ..................................................................... 17

*Elk v. Wilkins*,
   112 U.S. 94 (1884) ...................................................................................... 13

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) .................................................................................... 16

*Gen. Land Office v. Biden*,
   722 F. Supp. 3d 710 (S.D. Tex. 2024) ......................................................... 4

*George v. McDonough*,
   596 U.S. 740 (2022) .................................................................................... 15

*Haaland v. Brackeen*,
   599 U.S. 255 (2023) ...................................................................................... 7

*HIAS, Inc. v. Trump*,
   985 F.3d 309 (4th Cir. 2021) ..................................................................... 18

*Kantor v. Wellesley Galleries, Ltd.*,
   704 F.2d 1088 (9th Cir. 1983) ..................................................................... 6

*Karnoski v. Trump*,
   No. C17-1297-MJP, 2017 WL 6311305 (W.D. Wash. Dec. 11, 2017) ................... 8

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ...................................................................................... 6

*Madden v. Kentucky*,
   309 U.S. 83 (1940) ........................................................................................ 6

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) .................................................................................... 17

*Maine v. Taylor*,
   477 U.S. 131 (1986) ...................................................................................... 2

*McPherson v. Blacker*,
   146 U.S. 1 (1892) ........................................................................................ 12

*Murphy Co. v. Biden*,
   65 F.4th 1122 (9th Cir. 2023) ...................................................................... 9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.405**

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) ................................................................ 4

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
  766 F.2d 228 (6th Cir. 1985) ............................................................. 2

*Plyler v. Doe*,
  457 U.S. 202 (1982) ................................................................... 10, 13

*Schooner Exch. v. McFaddon*,
  11 U.S. (7 Cranch) 116 (1812) ........................................................ 11

*Sierra Club v. Trump*,
  929 F.3d 670 (9th Cir. 2019) .......................................................... 8, 9

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966), ........................................................................ 7

*Sprint Commc'ns., Inc. v. Jacobs*,
  571 U.S. 69 (2013) ............................................................................ 6

*Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  737 F. Supp. 3d 426 (N.D. Tex. 2024) ............................................. 4

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ............................................................ 3

*Trump v. Hawaii*,
  585 U.S. 667 (2018) .......................................................................... 9

*Trump v. Int'l Refugee Assistance Project*,
  582 U.S. 571 (2017) ........................................................................ 17

*United States v. Rice*,
  17 U.S. (4 Wheat.) 246 (1819) ....................................................... 10

*United States v. Texas*,
  599 U.S. 670 (2023) ..................................................................... 3, 4

*United States v. Wong Kim Ark*,
  169 U.S. 649 (1898) ................................................................. passim

*Warth v. Seldin*,
  422 U.S. 490 (1975) .......................................................................... 6

*Washington v. Trump*,
  847 F.3d 1151 (9th Cir. 2017) ........................................................ 8, 9

*Washington v. U.S. Food & Drug Admin.*,
  108 F.4th 1163 (9th Cir. 2024). ........................................................ 2

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

iv

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.406**

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................. 7

*Wyoming ex rel. Crank v. United States*,
  539 F.3d 1236 (10th Cir. 2008) ........................................................................... 3

### Constitutional Provisions

U.S. Const. amend. XIV, § 1 ................................................................................... 6

U.S. Const. amend. XV, § 1 .................................................................................... 7

Ariz. Const. art. V, § 2 ........................................................................................... 2

Ariz. Const. art. VII, § 2 ......................................................................................... 2

Ill. Const. art. III, § 1 ............................................................................................. 2

Ill. Const. art. V, § 3 .............................................................................................. 2

Or. Const. art. II, § 2 .............................................................................................. 2

Wash. Const. art. VI, § 1 ........................................................................................ 2

### Statutes

8 U.S.C. § 1401 .................................................................................................... 10

8 U.S.C. § 1503 ...................................................................................................... 9

705 Ill. Comp. Stat. 305/2(a) ................................................................................. 2

Ariz. Rev. Stat. § 21-201(1) ................................................................................... 2

Or. Rev. Stat. Ann. § 10.030(2) ............................................................................. 2

Or. Rev. Stat. Ann. § 181A.490 ............................................................................. 2

Or. Rev. Stat. Ann. § 181A.520 ............................................................................. 2

Or. Rev. Stat. Ann. § 181A.530 ............................................................................. 2

Wash. Rev. Code § 2.36.070 .................................................................................. 2

### Other Authorities

Cong. Globe, 39th Cong., 1st Sess. ...................................................................... 14

Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and
  the Origins of Federal Immigration Regulation*,
  54 U.C. Davis L. Rev. 2215 (2021) .................................................................... 13

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

v

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.407**

Garrett Epps, *The Citizenship Clause: A "Legislative History,"*
  60 Am. U. L. Rev. 331 (2010) ............................................................................... 14

Gerald L. Neuman, *Back to* Dred Scott*?,*
  24 San Diego L. Rev. 485 (1987) .......................................................................... 13

*Legislation Denying Citizenship at Birth to Certain Children Born in the United States,*
  19 Op. O.L.C. 340 (1995) ...................................................................................... 10

Michael D. Ramsey, *Originalism and Birthright Citizenship,*
  109 Geo. L.J. 405 (2020) ................................................................... 6, 11, 13, 14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

vi

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

## I.    INTRODUCTION

Defendants' opposition fails to rebut what the Plaintiff States have shown: Defendants should be enjoined from implementing the Citizenship Stripping Order on a nationwide basis. Anything less will result in direct, substantial, and irreparable harm to the Plaintiff States and their residents. It would also return the Nation to a shameful episode of our history in which entire classes of people born on American soil are treated as undeserving of inclusion in American civic life. That is the approach to citizenship embodied in *Dred Scott* that the people and the states rejected in ratifying the Fourteenth Amendment. It is "undeniable," the Supreme Court has said, that the Citizenship Clause's drafters "wanted to put citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967). The Plaintiff States ask the Court to honor the Fourteenth Amendment's promise and *keep* birthright citizenship beyond the power of the Administration to destroy.

## II.    ARGUMENT

### A.    The Court Has Authority to Declare the Citizenship Stripping Order Unlawful and Enjoin Its Implementation

Defendants first challenge the Plaintiff States' standing and otherwise argue that the Citizenship Stripping Order should be shielded from judicial scrutiny. ECF No. 84 (Opp.) at 7. But the Plaintiff States have offered undisputed evidence that the Order will directly harm their legally protected interests, causing harm that is actual or imminent, "fairly traceable" to the Order, and redressable by an injunction. *See Dep't of Com. v. New York*, 588 U.S. 752, 766-67 (2019). Specifically, the Plaintiff States' sovereign and pecuniary interests will be immediately harmed as a direct result of the Order's attempted denial of citizenship to thousands of the Plaintiff States' residents. ECF No. 63 (States' Mot.) at 6-9. Defendants wave away these harms as too indirect or self-inflicted, but their assertions ignore governing law and the facts presented. Nor do Defendants' remaining procedural complaints hold water.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

1

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.409

**1.    The Plaintiff States have standing to protect their sovereign interests**

Defendants do not dispute that the Plaintiff States have a sovereign interest in protecting their "power to create and enforce a legal code, both civil and criminal[.]" *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986) ("[A] State clearly has a legitimate interest in the continued enforceability of its own statutes."). Nor do they dispute that the Plaintiff States are injured if thousands of residents are suddenly immune from state regulatory jurisdiction. Their only response is the conclusory assertion that the Citizenship Stripping Order "has no effect on the states' ability to 'create and enforce a legal code.'" Opp. at 11. But that is plainly wrong. Under the Citizenship Stripping Order, thousands of state residents will be deemed not subject to the jurisdiction of the United States, directly injuring the Plaintiff States' "'sovereign interest' in the retention of [their] authority" to regulate individuals within their borders. *Washington v. U.S. Food & Drug Admin*., 108 F.4th 1163, 1176 (9th Cir. 2024).

Moreover, many of the Plaintiff States' constitutions and laws rely on the settled meaning of "United States citizen." This includes laws requiring citizenship to vote in state elections, serve on state juries, hold local offices, and serve as a police or corrections officers. *See, e.g.*, Wash. Const. art. VI, § 1 (right to vote in state elections); Ariz. Const. art. VII, § 2 (same); Or. Const. art. II, § 2 (same); Ill. Const. art III, § 1 (same); Wash. Rev. Code § 2.36.070 (juror qualifications); Ariz. Rev. Stat. § 21-201(1) (same); Or. Rev. Stat. Ann. § 10.030(2) (same); 705 Ill. Comp. Stat. 305/2(a) (same); Ariz. Const. art. V, § 2 (eligibility to hold certain state offices); Ill. Const. art. V, § 3 (same); Or. Rev. Stat. Ann. §§ 181A.490, .520 .530 (qualifications for police, corrections, and probation officers).

As a result of the Citizenship Stripping Order, the meaning of "citizen" for purposes of these state laws is suddenly "endangered and rendered uncertain." *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985). If federal citizenship changes, the Plaintiff States will need to re-evaluate these state laws and decide whether state voting rights,

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

2

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.410**

1    state jury service, and more should turn on a state-specific definition of "citizenship." *See Texas*

2    *v. United States*, 787 F.3d 733, 749 (5th Cir. 2015) (federal "pressure to change state law in some

3    substantial way," including "laws [that] exist for the administration of a state program,"

4    constitutes a sovereign injury); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242

5    (10th Cir. 2008) (federal action gives rise to sovereign standing where it "preempts state law" or

6    "interferes with [a state's] ability to enforce its legal code"); *Alaska v. U.S. Dep't of Transp.*,

7    868 F.2d 441, 443-44 (D.C. Cir. 1989) (federal rule's "preemptive effect" on "construction of

8    state laws" is sufficient for sovereign standing). The Plaintiff States easily have sovereign

9    standing here.

10         **2.**      **The Plaintiff States have standing to protect their pecuniary interests**

11         Defendants' attempt to downplay the financial and administrative harms to the Plaintiff

12    States fares no better. They contend that under *United States v. Texas*, 599 U.S. 670 (2023), *any*

13    injury is too "indirect" and "downstream." They also make the laughable assertion that the

14    Plaintiff States' harm is "self-inflicted" because the States may simply withdraw from critical

15    federal-state programs like Medicaid, CHIP, Title IV-E, and SSA's Enumeration at Birth

16    program. Defendants are wrong for three reasons.

17         First, Defendants' position cannot be squared with the Supreme Court's decision in

18    *Biden v. Nebraska*, --- U.S. ----, 143 S. Ct. 2355, 2365-66 (2023). There, the Supreme Court held

19    that Missouri had standing to challenge federal action cancelling student loans because a state

20    entity serviced loans under contract with the federal government and Missouri alleged the

21    challenged action would cost it millions in fees "it otherwise would have earned under its

22    contract." *Id.* at 2366. That harm was neither too indirect nor "self-inflicted," even though

23    Missouri was under no obligation to contract with the federal government to service student

24    loans. *See id.* at 2365-66. The Plaintiff States here face the same situation. States' Mot. at 6-9;

25    *see also New York*, 588 U.S. at 767 (holding that plaintiff states had standing where inclusion of

26    a citizenship question on the census would cause states to "lose out on federal funds that are

REPLY IN SUPPORT OF PLAINTIFF       3       ATTORNEY GENERAL OF WASHINGTON
STATES' MOTION FOR PRELIMINARY       Civil Rights Division
INJUNCTION -- No. 2:25-cv-00127-JCC       800 Fifth Avenue, Suite 2000
      Seattle, WA 98104-3188
      (206) 464-7744

**Supp.Add.411**

1   distributed on the basis of state population"); *City & Cnty. of San Francisco v. U.S. Citizenship*

2   *& Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020) (holding that states had standing to challenge

3   federal action that would reduce the number of individuals eligible for federally backed programs

4   like Medicaid). The cases Defendants cite, Opp. at 8-10, involved generalized assertions

5   regarding speculative future impacts and do not undercut the Plaintiff States' standing here.

6       Second, Defendants' "indirect, downstream" harms argument relies on a single footnote

7   in *Texas* taken out of context. *Id.* In that case, Texas and Louisiana asserted standing to challenge

8   DHS's guidelines setting forth discretionary immigration enforcement priorities. *Texas*, 599 U.S.

9   at 674. The Supreme Court held that the states' injuries in the form of increased costs to

10  incarcerate and provide social services to non-citizens were not redressable because the judiciary

11  could not interfere in the exercise of Article II executive discretion, which courts generally lack

12  meaningful standards to review. *Id.* at 677-80. The Court did not disturb the district court's

13  conclusion that the states suffered cognizable injuries and no one "dispute[d] that even one

14  dollar's worth of harm is traditionally enough to 'qualify as concrete injur[y] under Article III.'"

15  *Id.* at 688 (Gorsuch, J., concurring) (citation omitted).

16      The *Texas* holding by its own terms was "narrow" and limited to the redressability

17  concerns of arrest and prosecutorial discretion policies. *Id.* at 683-84. Indeed, as the Ninth Circuit

18  has explained, *Texas* "pertained to prosecutorial inaction where the injury was not redressable"

19  and does not pose a barrier where, as here, an asserted injury is "more than merely speculative"

20  and will be redressed by the requested injunction. *Nebraska v. Su*, 121 F.4th 1, 13 n.5 (9th Cir.

21  2024). Other courts likewise have refused to accept the federal government's overbroad reading

22  of footnote 3. *See, e.g.*, *Texas v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 737 F.

23  Supp. 3d 426, 435 (N.D. Tex. 2024); *Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 723-24

24  (S.D. Tex. 2024). The Court should reject Defendants' strained reading here, too.

25      Third, Defendants' boundless "self-inflicted injuries" argument, Opp. at 10, has been

26  squarely rejected by the Ninth Circuit. *See California v. Azar*, 911 F.3d 558, 573-74 (9th Cir.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

4

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

2018) (rejecting argument that state plaintiffs' economic injuries "will be self-inflicted because the states voluntarily chose to provide money for contraceptive care to its residents through state programs" because "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation"). The Supreme Court's decision in *Clapper v. Amnesty International USA*, 568 U.S. 398, 417-18 (2013), which Defendants quote out of context, does not support their position, either. *Clapper* held that the domestic plaintiffs' voluntary actions based on subjective fears of possible government surveillance of foreigners were insufficient to confer standing because the alleged harm was not fairly traceable to the Government's purported foreign surveillance activities. *Id.* The Supreme Court's "too many links in the chain" traceability holding does not suggest that plaintiffs can suffer cognizable harm only when a federal law or directive compels their action, as Defendants argue.[1] Opp. at 10-11.

Defendants' arguments, if accepted, would seal the courthouse doors shut to nearly all plaintiffs. There is simply no way to reconcile Defendants' arguments with precedent. *See Nebraska*, 143 S. Ct. at 2365-66 (lost fees sufficient despite Missouri's choice to enter student loan market); *New York*, 588 U.S. at 766-67 (lost funding sufficient without concern for whether states could withdraw from federally backed funding programs); *City & Cnty. of San Francisco*, 981 F.3d at 754 (same); *see also City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 788 (9th Cir. 2019) (rejecting DHS's reliance on *Clapper* where state plaintiffs demonstrated disenrollment in public programs and rising administrative costs). The questions the Court must answer are whether the Plaintiff States will suffer cognizable harm and whether that harm will be redressed by an injunction. The answer to both is yes.

---

[1] Defendants also ignore that the Plaintiff States are obligated by law to care for wards within their custody. By inflicting pecuniary injuries on the Plaintiff States' programs, the Citizenship Stripping Order injures the Plaintiff States' sovereign interests in caring for children within their custody.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

5

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Supp.Add.413

### 3.    The Plaintiff States have standing to bring challenges under the Citizenship Clause

Defendants next make a much bolder claim, arguing that the Plaintiff States can *never* have standing to assert claims under the Citizenship Clause. Opp. at 11-12. The Fourteenth Amendment's text and history show otherwise.

The Citizenship Clause renders individuals born in the United States "citizens of the United States *and of the State wherein they reside*." U.S Const. amend. XIV, § 1 (emphasis added). This text squarely implicates the states, and the history of the Citizenship Clause is in accord. In ratifying the Fourteenth Amendment, the states actively agreed to nationalize and constitutionalize the baseline rule of birthright citizenship. *See, e.g.*, Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 417 (2020) ("The Amendment also, by its plain language, nationalized the idea of citizenship: state citizenship was linked directly to national citizenship, and states would not have power to deny state citizenship to national citizens living within the state."); *Kantor v. Wellesley Galleries, Ltd.*, 704 F.2d 1088, 1090 (9th Cir. 1983) (recognizing that the Fourteenth Amendment "broadened the national scope of the Government under the Constitution by causing citizenship of the United States to be paramount and dominant instead of being subordinate and derivative [to state citizenship]") (quoting *Colgate v. Harvey*, 296 U.S. 404, 427-28 (1935), *overruled on other grounds*, *Madden v. Kentucky*, 309 U.S. 83 (1940)). Because the Citizenship Clause's meaning directly affects the states, the Plaintiff States have a direct "stake in the outcome of the controversy." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).[2]

---

[2] Defendants cite *Warth*, but fail to note that the quoted portion, which purports to limit plaintiffs from raising claims that implicate the rights of others, is not part of the Article III analysis but rather a "limitation[]" that is "essentially [a] matter[] of judicial self-governance . . . ." 422 U.S. at 500. Since *Warth*, the Supreme Court has clarified that so-called "prudential standing" is in tension with the principle that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014) (cleaned up); *see also Sprint Commc'ns., Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) ("Federal courts, it was early and famously said, have 'no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'") (citation omitted).

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

6

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.414

1    Defendants' cited cases stand at most for the principle that states cannot generally bring

2  *parens patriae* claims against the federal government. *See* Opp. at 12-13.[3] But the Plaintiff States

3  are not bringing *parens* claims here, and the law is clear that state standing may exist against the

4  federal government where the state is not proceeding as *parens patriae*. For example, in *South*

5  *Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966), the Court explained "at the outset" that

6  South Carolina would lack standing to challenge the Voting Rights Act of 1965 if it brought suit

7  as "the parent of its citizens." But the Court did not dismiss South Carolina's lawsuit for lack of

8  standing—it evaluated the state's Fifteenth Amendment claims on the merits. *Id.* at 325-37. That

9  was so even though the Fifteenth Amendment speaks to "[t]he right of citizens of the United

10 States to vote," and does not expressly assign rights to the states. U.S. Const. amend. XV, § 1.

11 But, of course, the challenged federal action *did* affect South Carolina—it "temporarily barred

12 [the state] from enforcing the [literacy test] portion of its voting laws." *Katzenbach*, 383 U.S. at

13 319. Accordingly, South Carolina had standing. *Id.* at 334-37.

14    The same is true of *Haaland v. Brackeen*, 599 U.S. 255 (2023). *See* Opp. at 12-13. In

15 *Brackeen*, Texas brought an equal protection challenge to the Indian Child Welfare Act. *Id.* at

16 294-95. As Defendants correctly cite, the Court held that Texas could not "assert equal protection

17 claims on behalf of its citizens" as "*parens patriae*." *Id.* (citing *Snapp*, 458 U.S. at 610 n.16).

18 But the analysis did not end there. The Court separately considered whether Texas had "alleged

19 costs" that were "fairly traceable" to the challenged federal statute. *Id.* at 296. Although Texas

20 failed to make an adequate showing of financial harm to the state, that analysis would have been

21 irrelevant if states *never* have standing to bring Fourteenth Amendment claims. The rule is that

22 *parens patriae* claims are off limits where states do not identify a separate harm to their own

23 interests, but claims based on a "direct pocketbook injury" are fair game. *Id.* Because the Plaintiff

24 States have demonstrated sovereign injuries and concrete, direct funding losses as a result of the

25    _____

26    [3] Of course, the Plaintiff States' considerable evidence of the harms to their residents from the Citizenship Stripping Order *are* squarely relevant to the Court's consideration of the "balance of equities" and the "public interest," two mandatory *Winter* factors that Defendants essentially ignore. *See* Opp. at 44.

REPLY IN SUPPORT OF PLAINTIFF                7                ATTORNEY GENERAL OF WASHINGTON
STATES' MOTION FOR PRELIMINARY                                              Civil Rights Division
INJUNCTION -- No. 2:25-cv-00127-JCC                                     800 Fifth Avenue, Suite 2000
                                                                           Seattle, WA  98104-3188
                                                                                (206) 464-7744

                                                                            **Supp.Add.415**

1    Order—tens of thousands of dollars that will be lost under contracts with SSA and millions in

2    lost Medicaid, CHIP, and Title IV-E funding—the Plaintiff States have standing.

3    **4.    The Plaintiff States can obtain declaratory and injunctive relief directly under the Fourteenth Amendment and the INA**

4    

5    The final procedural barrier Defendants assert is a passing argument that the Plaintiff

6    States "lack a cause of action." Opp. at 15-17. But it is well established that plaintiffs who have

7    demonstrated Article III standing, including states, can obtain prospective declaratory and

8    injunctive relief to prevent unlawful and *ultra vires* federal action that violates the Constitution

9    and federal statutes. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233-35

10   (9th Cir. 2018) (affirming judgment in favor of local government plaintiffs on ground that

11   Executive Order was an unconstitutional violation of the separation of powers); *Washington v.*

12   *Trump*, 847 F.3d 1151, 1164-65 (9th Cir. 2017) (denying motion to stay injunction that barred

13   Executive Order's enforcement or implementation where Washington was likely to prevail on

14   constitutional due process claims); *Karnoski v. Trump*, No. C17-1297-MJP, 2017 WL 6311305,

15   at *7-9 (W.D. Wash. Dec. 11, 2017) (enjoining enforcement of President Trump's Presidential

16   Memorandum excluding transgender individuals from the military where Washington and

17   individual plaintiffs asserted claims under the First and Fifth Amendments).

18   Indeed, "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers

19   is the creation of courts of equity, and reflects a long history of judicial review of illegal

20   executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015); *see also*

21   *Sierra Club v. Trump*, 929 F.3d 670, 694, 696-97 (9th Cir. 2019) ("The Supreme Court has 'long

22   held that federal courts may in some circumstances grant injunctive relief against' federal

23   officials violating federal law.") (quoting *Armstrong*, 575 U.S. at 326-27). The Court likewise

24   has authority to declare even duly enacted laws unconstitutional under the Citizenship Clause.

25   *See Afroyim*, 387 U.S. at 254-67 (federal statute that stripped citizenship under certain

26   circumstances violated the Citizenship Clause).

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

8

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.416**

1   None of Defendants' authority, *see* Opp. at 15-17, stands for the extraordinary

2   proposition that the Court is powerless to review the legality of the Citizenship Stripping Order.

3   The only case Defendants cite, *DeVillier v. Texas*, 601 U.S. 285, 291 (2024), dealt with the

4   availability of a cause of action *for damages* against the federal government under the Fifth

5   Amendment's Takings Clause. It said nothing to suggest that plaintiffs cannot seek declaratory

6   and injunctive relief—equitable relief—to prevent constitutional violations. *Id.* at 292. It in fact

7   recognized the opposite. *Id.* That makes sense because it is "beyond question that the federal

8   judiciary retains the authority to adjudicate constitutional challenges to executive action."

9   *Washington*, 847 F.3d at 1164.

10   For the same reasons, the INA provision that allows individuals already denied certain

11   discrete benefits to pursue declaratory judgment lawsuits, 8 U.S.C. § 1503, presents no barrier

12   to the Plaintiff States' claims. Defendants cite no authority for the proposition that this provision,

13   which says individuals "may" bring a declaratory judgment action, somehow shields from

14   judicial review the Executive Branch's rewriting of the Fourteenth Amendment to declare entire

15   classes of U.S.-born individuals to be non-citizens. Opp. at 16-17. And even when provisions of

16   the INA purport to restrict judicial review, the Supreme Court has interpreted limitations

17   narrowly. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020).

18   Courts can and do entertain challenges to executive action that violates the constitution and

19   federal statutory provisions. *See Trump v. Hawaii*, 585 U.S. 667, 683 (2018) (reviewing states'

20   claims that presidential restriction on immigration violated INA); *Sierra Club*, 929 F.3d at 699

21   ("Here, no statute expressly makes Plaintiffs' claims reviewable, but, as we have explained,

22   Plaintiffs do have an adequate remedy in a court: an equitable cause of action for injunctive

23   relief."); *Murphy Co. v. Biden*, 65 F.4th 1122, 1128-31 (9th Cir. 2023) (discussing authority to

24   review executive action that is *ultra vires* and violates federal statute). The Court should do the

25   same here.

26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

9

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**Supp.Add.417**

**B.    The Plaintiff States Are Extremely Likely to Succeed on the Merits**

The plain text of the Fourteenth Amendment and the INA guarantee citizenship to all born in the United States and subject to its jurisdiction, regardless of one's race, ethnicity, alienage, or the immigration status of one's parents. The Citizenship Clause's history confirms this understanding. *See* States' Mot. at 10-11. Binding precedent confirms this understanding. *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898); *see also Plyler v. Doe*, 457 U.S. 202, 211-15 (1982). And every branch of government has confirmed this understanding for the past 150 years. *See* 8 U.S.C. § 1401; *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 342 (1995); States' Mot. at 9-14. Defendants' counterarguments are meritless.

**1.    The Citizenship Stripping Order is blatantly unconstitutional**

Defendants' core contention is that children born to undocumented and many legal immigrants are not actually "subject to the jurisdiction" of the United States, and thus not entitled to birthright citizenship, under a theory never before adopted by any court. They are wrong as a matter of constitutional text and history, and their arguments are foreclosed by the Supreme Court's decision in *Wong Kim Ark*.

As the Supreme Court explained in *Wong Kim Ark*, "[t]he real object" of including the "subject to the jurisdiction thereof" language was "to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases . . . recognized [as] exceptions to the fundamental rule of citizenship by birth within the country." 169 U.S. at 682. Those two classes are "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state[.]" *Id.* The Court explained at length how in each of these cases, the United States' exercise of sovereign power was limited either in fact, as a matter of common law and practice, or in the case of Native American tribes, as a result of their tribal sovereignty. *Id.* at 683 (discussing *United States v. Rice*, 17 U.S. (4 Wheat.) 246 (1819)

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

10

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.418**

1   (regarding hostile invasion and the suspension of sovereign power over occupied territory), and

2   *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812) (explaining why diplomats

3   are not subject to the United States' jurisdiction even though the Nation's sovereign power is

4   necessary and absolute in its territory)); *see also* Ramsey, *Originalism*, *supra*, at 436-58

5   (detailing mid-Nineteenth Century understanding of what it meant to be "subject to the

6   jurisdiction" of the United States).

7          The Supreme Court, reviewing many of the authorities Defendants now cite, concluded

8   that "[t]he fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth

9   within the territory, in the allegiance and under the protection of the country, including all

10  children here born of resident aliens[.]" *Wong Kim Ark*, 169 U.S. at 693. The *only* individuals

11  understood not to be subject to the United States' jurisdiction at birth were children born to

12  diplomats or enemies during hostile occupation, those born on foreign ships, and those born to

13  members of Native American tribes. *Id.* The Court made clear, in language that forecloses

14  Defendants' modern-day interpretation:

15          The amendment, in clear words and in manifest intent, includes the children born
16          within the territory of the United States of all other persons, of whatever race or
            color, domiciled within the United States. Every citizen or subject of another
17          country, while domiciled here, is within the allegiance and the protection, and
            consequently subject to the jurisdiction, of the United States. His allegiance to the
18          United States is direct and immediate, and, although but local and temporary,
            continuing only so long as he remains within our territory, is . . . "strong enough to
19          make a natural subject, for, if he hath [a child] here, that [child] is a natural-born
            subject"; and his child . . . "[i]f born in the country, is as much a citizen as the
20          natural-born child of a citizen . . . ."

21

22  *Id.* (cleaned up). The Court reiterated that "[i]t can hardly be denied that an alien is completely

23  subject to the political jurisdiction of the country in which he resides[.]" *Id.* "Independently of a

24  residence with intention to continue such residence; independently of any domiciliation;

25  independently of the taking of any oath of allegiance, or of renouncing any former allegiance,"

26  the Court stated, "it is well known that by the public law an alien, or a stranger born, for so long

REPLY IN SUPPORT OF PLAINTIFF                          11                    ATTORNEY GENERAL OF WASHINGTON
STATES' MOTION FOR PRELIMINARY                                            Civil Rights Division
INJUNCTION -- No. 2:25-cv-00127-JCC                                      800 Fifth Avenue, Suite 2000
                                                                         Seattle, WA  98104-3188
                                                                              (206) 464-7744

Supp.Add.419

1  a time as he continues within the dominions of a foreign government, owes obedience to the

2  laws of that government[.]" *Id.* at 693-94. That is, such persons are subject to the United States'

3  jurisdiction.

4      The Court's reasoning is complete and its holding dispositive. None of the individuals

5  targeted in the Citizenship Stripping Order today enjoy any type of immunity from general laws

6  or represent another sovereign nation or political entity. The Defendants' "surplusage" argument,

7  Opp. at 19-20, is accordingly resolved by simply reading the Fourteenth Amendment's plain

8  text. Without "subject to the jurisdiction thereof," the Citizenship Clause would extend to the

9  narrow categories that have long been recognized by courts, Congress, and the Executive to be

10  exempt from the Citizenship Clause's grant of birthright citizenship.

11      Defendants nonetheless attempt to import two new non-textual requirements, complete

12  "allegiance" and "lawful domicile," by chaining together selective quotes from cases unrelated

13  to the interpretation of the Citizenship Clause. Opp. at 20-25. But allegiance and lawful domicile

14  appear nowhere in the Fourteenth Amendment. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892)

15  ("The framers of the constitution employed words in their natural sense; and, where they are

16  plain and clear, resort to collateral aids to interpretation is unnecessary, and cannot be indulged

17  in to narrow or enlarge the text . . . ."). And with respect to the requirement of being "subject to

18  the jurisdiction thereof," it was clear at ratification that this phrase included all non-citizens who

19  were physically present in the United States, absent the very narrow exceptions recognized at

20  common law and noted above. *Wong Kim Ark* interpreted the Citizenship Clause's language and

21  directly forecloses Defendants' argument. 169 U.S. at 693.

22      Nor do those non-textual requirements comport with the Citizenship Clause's history.

23  Illegally imported enslaved individuals were not "lawfully domiciled" in the United States under

24  Defendants' interpretation, yet there is no question that the Citizenship Clause applied to their

25  children. *See, e.g.*, Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade*

26  *Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215,

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

12

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.420**

1    2250 (2021) ("This history demonstrates that there were clearly 'illegal aliens,' both free

2    migrants banned under the 1803 law and illegally imported slaves, in the United States before

3    and during the consideration of the Fourteenth Amendment."); Gerald L. Neuman, *Back to* Dred

4    Scott*?*, 24 San Diego L. Rev. 485, 497-99 (1987) (detailing the history of enslaved individuals

5    who were imported illegally and recognizing that the Fourteenth Amendment was intended to

6    grant citizenship to all native-born individuals of African descent).[4]

7         Defendants also turn to *Elk v. Wilkins*, 112 U.S. 94 (1884), the *Slaughter-House Cases*,

8    83 U.S. 36 (1872), and a slew of nonbinding authorities that predate *Wong Kim Ark* and *Plyler*

9    to try to read extra requirements into the Citizenship Clause. Opp. at 20-21, 28-30. Defendants'

10   arguments re-hash well-trodden and widely rejected bases for attempting to adopt exclusionary

11   views of the Citizenship Clause. *See, e.g.*, Ramsey, *Originalism*, *supra*, at 436-58 (analyzing

12   common arguments for reading "subject to the jurisdiction thereof" narrowly with respect to

13   undocumented immigrants and concluding they are all contrary to the Fourteenth Amendment's

14   text and history). In short, *Wong Kim Ark* cemented the meaning of the Citizenship Clause in a

15   manner consistent with *Elk*. *See Wong Kim Ark*, 169 U.S. at 682 (recognizing that *Elk* "concerned

16   only members of the Indian tribes within the United States and had no tendency to deny

17   citizenship to children born in the United States of foreign parents . . . not in the diplomatic

18   service of a foreign country"); *accord* Ramsey, *Originalism*, *supra*, at 419-20 (discussing *Elk*).

19   The Supreme Court likewise dismissed the dicta in the *Slaughter-House Cases* that suggested a

20   narrow view of the Citizenship Clause. *Id.* at 677-80.

21        Nowhere in *Wong Kim Ark* did the Supreme Court recognize a "lawful domicile" or

22   "exclusive allegiance" requirement for one to be subject to the United States' jurisdiction.

23   Indeed, the dissent made similar arguments to those Defendants offer today. *Id.* at 729 (Fuller,

24   C.J., dissenting) ("If children born in the United States were deemed presumptively and

25   generally citizens, this was not so when they were born of aliens whose residence was merely

26        [4] Available at: https://digital.sandiego.edu/sdlr/vol24/iss2/8/.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

13

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  temporary, either in fact or in point of law."). Those arguments were rejected, and the Citizenship

2  Clause's broad scope was established. *Id.* at 694.

3        Defendants further point to the Civil Rights Act of 1866, but that Act confirms that they

4  are wrong. The Act provided that "[a]ll persons born in the United States, and not subject to any

5  foreign Power, are hereby declared to be citizens of the United States, without distinction of

6  color." Civil Rights Act of 1866 § 1; *see* Cong. Globe, 39th Cong., 1st Sess. 474, 498 (1866).

7  All involved in its passage understood that this language included the children of immigrants,

8  regardless of their background. When one senator asked whether this language "would have the

9  effect of naturalizing the children of Chinese and Gypsies born in this country[,]" for example,

10  Senator Trumbull, the Act's author, responded, "Undoubtedly." Cong. Globe, 39th Cong., 1st

11  Sess. 498.[5] This was true even though, at the time, Chinese immigrants could not become

12  naturalized U.S. citizens and "Gypsies" were, if present, likely present unlawfully. *See* Garrett

13  Epps, *The Citizenship Clause: A "Legislative History,"* 60 Am. U. L. Rev. 331, 350-52 (2010);

14  Ramsey*, Originalism*, *supra*, at 451-52 (discussing 1866 Act).

15        Finally, even if the Civil Rights Act of 1866 did not include immigrants in its citizenship

16  clause—and it did—the Fourteenth Amendment's Citizenship Clause certainly confers

17  citizenship to the children subject to the Citizenship Stripping Order. All involved in its passage

18  understood that the Citizenship Clause guaranteed citizenship to virtually all U.S.-born children

19  regardless of the race or citizenship of their parents. Indeed, it was introduced to confirm that

20  "every person born within the limits of the United States, and subject to their jurisdiction, is by

21  virtue of natural law and national law a citizen of the United States." Cong. Globe, 39th Cong.,

22  1st Sess. 2890 (statement of Sen. Howard). Senator Cowan, notably, argued against ratification

23  because "[i]f the mere fact of being born in the country confers that right," of citizenship, then

---

24       [5] Defendants stitch the legislative history of the Civil Rights Act of 1866 and the Fourteenth Amendment's

25  ratification debates together to argue that Senator Trumbull equated being "subject to our jurisdiction" with "owing
allegiance solely to the United States." Opp. at 21-22. Senator Trumbull made the latter statement in explaining

26  why Native American tribes are not subject to the jurisdiction of the United States, not as a blanket statement about
the Citizenship Clause. *See* Cong. Globe, 39th Cong., 1st Sess. 2894; *see also* Ramsey*, Originalism*, *supra*, at 449.

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

14

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.422**

1   the children of parents "who have a distinct, independent government of their own," "who owe

2   [the state] no allegiance," and who would "settle as trespassers" would also be citizens. *Id.* at

3   2891; *id.* at 2890 (statement of Sen. Cowan) ("Is the child of the Chinese immigrant in California

4   a citizen? Is the child of a Gypsy born in Pennsylvania a citizen? . . . Have they any more rights

5   than a sojourner in the United States?"). All agreed that Senator Cowan properly understood the

6   Citizenship Clause's broad scope, and the Senate adopted that broad language anyway. *See id.*

7   at 2891 (Senator Conness confirming that the Clause as proposed would provide citizenship to

8   "children begotten of Chinese parents in California," because the 1866 Act made that the case

9   by law and "it is proposed to incorporate the same provision in the fundamental instrument of

10  the nation" and "declare that the children of all parentage whatever . . . should be regarded and

11  treated as citizens of the United States.").

12        Ultimately, the Citizenship Clause was adopted to "remove[] all doubt as to what persons

13  are or are not citizens of the United States." *Id.* (statement of Sen. Howard). *Wong Kim Ark*

14  confirmed the Citizenship Clause's proper interpretation, and there is still no doubt today. The

15  Plaintiff States are likely to succeed on the merits.

16        **2.      The Citizenship Stripping Order independently violates the INA**

17        Defendants argue that the Plaintiff States' INA claim fails "because [it] depend[s] on the

18  plaintiffs' incorrect construction of the Fourteenth Amendment." Opp. at 40. But they miss the

19  point. Because Congress "employ[ed] a term of art obviously transplanted from another legal

20  source," the INA brought "the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022)

21  (cleaned up). The "old soil" was, and is, the established understanding of the Citizenship Clause

22  set forth in *Wong Kim Ark. See* States' Mot. at 14-15. Because Defendants do not dispute that

23  the Citizenship Stripping Order attempts to exclude a *new* category of individuals from the

24  Citizenship Clause's reach based on a theory that has never been accepted, it is contrary to the

25  INA as properly construed. The Plaintiff States are likely to prevail on their INA claim.

26

REPLY IN SUPPORT OF PLAINTIFF          15          ATTORNEY GENERAL OF WASHINGTON
STATES' MOTION FOR PRELIMINARY                            Civil Rights Division
INJUNCTION -- No. 2:25-cv-00127-JCC                     800 Fifth Avenue, Suite 2000
                                                          Seattle, WA  98104-3188
                                                             (206) 464-7744

C.    **The Remaining Injunction Factors Decisively Favor the Plaintiff States**

The irreparable harm, public interest, and equities factors compel an injunction. Defendants offer no serious response regarding the extensive harms the Citizenship Stripping Order will cause to the Plaintiff States and their residents. Defendants suggest merely that the operational chaos and financial losses the Plaintiff States will suffer "are not directly attributable to the EO" and muse that there might be another way to recover certain lost reimbursements. Opp. at 41. They are wrong on all accounts.

The Plaintiff States' harms flow directly from the unilateral reclassification of *thousands* of individuals as non-citizens—individuals whose citizenship the Plaintiff States must verify to be reimbursed under longstanding programs like Medicaid, CHIP, and Title IV-E. *See* States' Mot. at 7-9, 16-19. Likewise, the Plaintiff States are integral participants in SSA's Enumeration at Birth program. *See id.* at 8, 17-18. It is not speculative that the Plaintiff States will lose money under their existing agreements with SSA; thousands of children born in each Plaintiff State will be deemed ineligible for SSNs, and as a result, the Plaintiff States will not be able to receive SSA payments for processing their birth data. *Id.* Despite these direct harms, Defendants nowhere acknowledge that money damages are not recoverable against sovereign defendants like the federal government. *See id.* at 15-16. Nor do they rebut the overwhelming evidence that the Plaintiff States will have to expend significant resources to update and modify systems used to verify citizenship and immigration status *now* for the programs the Plaintiff States administer. *See id.* at 18-19.

Defendants instead invite the Court to grant them unchecked power to determine citizenship by executive fiat, invoking the federal government's "broad, undoubted power over the subject of immigration and the status of aliens." Opp. at 44 (citing *Arizona v. United States*, 567 U.S. 387, 394 (2012)).[6] But this is not a case that threatens a "severe intrusion into [a] core

---

[6] Defendants assert that the Court should dismiss the President, Opp. at 45, but the Supreme Court has recognized that "the president's actions may [] be reviewed for constitutionality." *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

16

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

**Supp.Add.424**

1    executive authority." Opp. at 44. It is a case about citizenship rights that are intentionally *beyond*

2    the President's authority. And as the Supreme Court has confirmed, "[t]he very nature of our

3    free government makes it completely incongruous to have a rule of law under which a group of

4    citizens temporarily in office can deprive another group of citizens of their citizenship." *Afroyim*,

5    387 U.S. at 268. Neither the equities nor the public interest favor allowing the Defendants to

6    wage a war on the citizenship of children born on American soil. *See E. Bay Sanctuary Covenant*

7    *v. Biden*, 993 F.3d 640, 679 (9th Cir. 2021) ("[T]he public has an interest in ensuring that the

8    '[laws] enacted by [their] representatives are not imperiled by executive fiat.'") (cleaned up).

9    **D.    A Nationwide Injunction Is Required for Complete Relief**

10    Absent an injunction preserving the 157-year-old status quo nationwide, the Plaintiff

11    States' ultimate remedy—requiring the federal government to recognize U.S. citizens *as*

12    *citizens*—would lose its meaning. Defendants do not dispute that the Court has discretion to

13    fashion an appropriate injunction, including a nationwide injunction, as necessary to provide the

14    Plaintiff States with complete relief. Opp. at 44-45 (citing *Madsen v. Women's Health Ctr., Inc.*,

15    512 U.S. 753, 765 (1994)). Nor could they. The Supreme Court and Ninth Circuit have

16    confirmed as much. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579, 581

17    (2017) (allowing nationwide injunction as to enforcement of portions of Executive Order that

18    exceeded presidential authority); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020)

19    (declining to stay nationwide injunction and explaining that "there is no bar" against such

20    injunctions "when it is appropriate") (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir.

21    1987)).

22    Defendants' request for a more limited injunction ignores the practical realities that

23    would accompany a geographically checkered rule of birthright citizenship and glosses over the

24    extraordinary nature of the Citizenship Stripping Order. Nationwide injunctions are particularly

25    warranted where, as here, the fact that individuals can and do move between states exposes the

26    plaintiffs to irreparable harm. *See, e.g.*, *E. Bay Sanctuary Covenant*, 993 F.3d at 680-81 (holding

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

17

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

1   that district court did not abuse discretion in entering nationwide injunction of rule that conflicted

2   with the INA where plaintiff organizations would be harmed by losing clients who may have

3   entered the United States at a location not covered under a geographically limited injunction);

4   *HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (affirming nationwide injunction

5   prohibiting enforcement of Executive Order where organizations "place[d] refugees throughout

6   the country" and demonstrated irreparable harm from the order taking effect in other

7   jurisdictions). If individuals born in other states are deemed non-citizens under the Order and

8   move to the Plaintiff States, the Plaintiff States will suffer the same irreparable injuries to their

9   sovereign interests and substantial financial losses and administrative burdens that they would

10  without any injunction at all.

### III.    CONCLUSION

12      The Plaintiff States request that the Court issue a nationwide preliminary injunction

13  barring the Citizenship Stripping Order's enforcement or implementation.

14

15      DATED this 4th day of February 2025.

16                          NICHOLAS W. BROWN
                            Attorney General
17

18                          *s/ Lane M. Polozola*
                            COLLEEN M. MELODY, WSBA #42275
19                          Civil Rights Division Chief
                            LANE POLOZOLA, WSBA #50138
20                          DANIEL J. JEON, WSBA #58087
                            ALYSON DIMMITT GNAM, WSBA #48143
21                          Assistant Attorneys General
                            Wing Luke Civil Rights Division
22                          Office of the Washington State Attorney General
                            800 Fifth Avenue, Suite 2000
23                          Seattle, WA 98104-3188
                            (206) 464-7744
24                          colleen.melody@atg.wa.gov
                            lane.polozola@atg.wa.gov
25                          daniel.jeon@atg.wa.gov
                            alyson.dimmittgnam@atg.wa.gov

26                          *Attorneys for Plaintiff State of Washington*

REPLY IN SUPPORT OF PLAINTIFF                    18          ATTORNEY GENERAL OF WASHINGTON
STATES' MOTION FOR PRELIMINARY                                      Civil Rights Division
INJUNCTION -- No. 2:25-cv-00127-JCC                              800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA  98104-3188
                                                                      (206) 464-7744

1

2  I certify that this memorandum contains 6,383
   words, in compliance with the Local Civil Rules.

3  KRIS MAYES
   *Attorney General of Arizona*

4

5  *s/ Joshua Bendor*
   Joshua D. Bendor (AZ No. 031908)*
6  Luci D. Davis (AZ No. 035347)*
   Gabriela Monico Nunez (AZ No. 039652)*
   Office of the Arizona Attorney General
7  Firm State Bar No. 14000
   2005 N. Central Ave.
8  Phoenix, AZ 85004
   (602) 542-3333
9  Joshua.Bendor@azag.gov
   Luci.Davis@azag.gov
10 Gabriela.MonicoNunez@azag.gov
   ACL@azag.gov

11
   *Pro hac vice
12 Attorneys for Plaintiff State of Arizona*

13 KWAME RAOUL
   *Attorney General, State of Illinois*

14

15 *s/ Rebekah Newman*
   REBEKAH NEWMAN, ARDC #6327372*
16 Assistant Attorney General
   Special Litigation Bureau
   Office of the Illinois Attorney General
17 115 South LaSalle St., Floor 35
   Chicago, IL 60603
18 Tel. (773) 590-6961
   rebekah.newman@ilag.gov

19
   *Pro hac vice
20 Attorneys for Plaintiff State of Illinois*

21 DAN RAYFIELD
   *Attorney General, State of Oregon*

22

23 */s/ Carla A. Scott*
   CARLA A. SCOTT, WSBA #39947
24 THOMAS H. CASTELLI, OSB #226448*
   Senior Assistant Attorneys General
   Oregon Department of Justice
25 100 SW Market Street
   Portland, OR 97201
26 (971) 673-1880

REPLY IN SUPPORT OF PLAINTIFF            19       ATTORNEY GENERAL OF WASHINGTON
STATES' MOTION FOR PRELIMINARY                             Civil Rights Division
INJUNCTION -- No. 2:25-cv-00127-JCC                     800 Fifth Avenue, Suite 2000
                                                        Seattle, WA  98104-3188
                                                             (206) 464-7744

Carla.A.Scott@doj.oregon.gov
Thomas.Castelli@doj.oregon.gov

*Pro hac vice*
*Attorneys for Plaintiff State of Oregon*

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

20

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744

Supp.Add.428

1

**CERTIFICATE OF SERVICE**

2       I hereby certify that the foregoing document was electronically filed with the United

3    State District Court using the CM/ECF system. I certify that all participants in the case are

4    registered CM/ECF users and that service will be accomplished by the CM/ECF system.

5

6       Dated this 4th day of February 2025 in Seattle, Washington.

7

8                              *s/ Tiffany Jennings*_____
                               Tiffany Jennings

9                              Paralegal

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

REPLY IN SUPPORT OF PLAINTIFF
STATES' MOTION FOR PRELIMINARY
INJUNCTION -- No. 2:25-cv-00127-JCC

21

ATTORNEY GENERAL OF WASHINGTON
Civil Rights Division
800 Fifth Avenue, Suite 2000
Seattle, WA  98104-3188
(206) 464-7744