No. 25-807

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-127

## REPLY IN SUPPORT OF EMERGENCY MOTION FOR
## PARTIAL STAY PENDING APPEAL

BRETT A. SHUMATE
  *Acting Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

## INTRODUCTION

The district court premised a nationwide injunction on purported injuries to four States suing over claims that an Executive Order would improperly deny their residents rights under the Fourteenth Amendment and a related federal statute. That injunction was improper on multiple levels: the States' suit ignores settled limits on *parens patriae* and third-party standing; it rests on attenuated claims of harm that do not give rise to Article III standing; and the injunction is far broader than necessary to give the States relief even if they could overcome those hurdles.

None of the States' responses justifies the district court's sweeping injunction. The States relegate third-party standing doctrine to a footnote, urge the Court to ignore questions about their own Article III standing, and fail to explain why a more tailored injunction would be unable to remedy their purported harms. The injunction should be stayed as it applies beyond the named individual plaintiffs, or at a minimum as it applies beyond the State plaintiffs.

## ARGUMENT

### I. The States Cannot Assert the Rights of Third Parties.

The States' fundamental claim is that the Executive Order will lead the federal government to deny citizenship to individuals. As our motion explained, the States cannot assert the individual-rights claims of their residents, much less of residents of other States that agree with the Order's interpretation of the Fourteenth Amendment. The States have no *parens patriae* standing; they cannot circumvent basic third-party

standing principles; and in any event they assert only attenuated injuries. None of the States' efforts to paper over these deficiencies persuades.

**A.** The States make two unsuccessful attempts to recharacterize their claims as an attempt to assert their own rights rather than others' individual rights.

First, the States argue (at 9-10) that the Executive Order violates their sovereign interest by rendering illegal aliens exempt from regulatory jurisdiction. This tilts at windmills. Nothing in the Executive Order suggests that individuals covered by it are exempt from federal or state regulatory jurisdiction. To the contrary, and as the federal defendants explained in district court, the Citizenship Clause's reference to persons "subject to the jurisdiction" of the United States refers to *political* jurisdiction (a concept rooted in allegiance and protection) not *regulatory* jurisdiction (to which all persons in the United States are subject). There is no basis for construing the Executive Order to exempt individuals covered by it from state regulation.

Next, the States argue (at 14-15) that they "have a 'stake in the outcome of the controversy'" because the Citizenship Clause also determines state citizenship. Whether a State could assert a claim about state citizenship is beside the point, however, because the States have not done so here. Their claims are entirely about *federal* citizenship and the harms they allege will result from having fewer people in their States whom the federal government recognizes as citizens, regardless of what recognition of state citizenship the States confer. More generally, the States' theory

2

would mean that a State would automatically have standing to assert *any* individual's naturalization-related claims, as such policies would necessarily affect state citizenship as well. The States cite no authority supporting their sweeping theory.

**B.** When the States finally reach core principles of justiciability, they respond mostly by ignoring them. The States attempt to recharacterize the decisions in which the Supreme Court has repeatedly rejected suits by States seeking to litigate the individual-rights claims of residents as establishing that "state standing may exist against the federal government where the state is protecting its own interests and is not proceeding as *parens patriae*." Opp. 15. But those decisions allowed States to challenge federal laws only to the extent they directly regulated those States. In *South Carolina v. Katzenbach*, the Court "dismissed at the outset" claimed violations of individual rights, without regard to whether those violations indirectly injured the State. 383 U.S. 301, 323-24 (1966). The Court considered only those claims challenging federal laws *directly* regulating the State—by preempting existing state law, requiring states to have future rules pre-approved, and allowing federal examiners to change state voter rolls. *Id.* at 329-37. Similarly, in *Haaland v. Brackeen*, the Court rejected a State's attempts to assert individuals' equal protection rights. 599 U.S. 255, 295 (2023). The Court's discussion of "pocketbook injury" arose when it considered the claim that federal law directly imposed obligations on States to "keep[] records, provid[e] notice…, and produc[e] expert testimony." *Id.* at 296 (rejecting the State's

3

claim because these direct impositions "operate[d] independently" of the provisions the State asserted were unconstitutional). Here, of course, the Executive Order does not directly regulate the States. *See* Opp. 11 ("babies … will be subject to the Order").

The States consign to a footnote (at 15 n.5) their discussion of third-party standing. Even that footnote makes no effort to show that the States satisfy the requisites to bring suit under that doctrine. The States instead seek to dismiss the doctrine as "prudential." Opp. 15 n.5. But a prudential limitation is no less a limitation on justiciability. To the extent the States suggest that third-party standing limitations no longer exist after the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014), *Lexmark* expressly distinguished third-party standing from the types of prudential standing it was criticizing, *id.* at 127 n.3, and this Court has "conclude[d], in unison with all other courts to have spoken on the issue, that the third-party-standing doctrine continues to remain" post-*Lexmark*. *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1119 n.9 (9th Cir. 2015) (collecting cases).

Indeed, the States have no answer to the Supreme Court's decision in *Kowalski v. Tesmer*, 543 U.S. 125 (2004). The States observe—correctly—that the Supreme Court there "assum[ed] Article III standing" before addressing (and dismissing the case under) "the prudential rule" of third-party standing. Opp. 15 n.5. But that is precisely the point: even though the criminal defense attorneys in *Kowalski* asserted

4

that they suffered a pocketbook injury because of the denial of the right of counsel to individual criminal defendants, and the Supreme Court decided the case on that assumption, the Court nevertheless dismissed their suit. 543 U.S. at 129, 134. The same principle applies here: even assuming the States could establish a cognizable pocketbook injury traceable to the Executive Order for Article III purposes, *but see infra* pp. 5-7, third-party standing principles would preclude them from bringing this action. Simply calling the doctrine "prudential" does not mean it may be ignored.

## II. The States Lack Article III Standing.

**A.** In any event, the States also lack Article III standing. The States contend that their Article III standing is "irrelevant" because "the Individual Plaintiffs have standing." Opp. 16. That is baffling. "At least one plaintiff must have standing" for "each form of relief." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017). The district court here explained that the nationwide injunction issued was premised entirely on purported injuries to the States; the individual plaintiffs had sought "only to enjoin the implementation and enforcement of the Order as it relates to themselves." Add. 12 n.9. And even if those plaintiffs had sought nationwide relief, principles of Article III standing and equity would preclude granting nationwide relief at the behest of two individuals whose injuries would be entirely remedied by an injunction specific to them. The States must establish standing for nationwide relief because no other party sought or has standing for that relief. The cases the States cite

5

do not support the remarkable proposition that the States' standing is irrelevant. They start with the anodyne premise that only one plaintiff need have standing to empower a court to decide the merits. Opp. 16 (citing *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023); *Horne v. Flores*, 557 U.S. 433, 446 (2009)). But as our motion explained (at 17) Article III principles equally apply at the remedies stage, as do related principles of equity that limit the scope of injunctive relief to remedying a plaintiff's injury. *See Gill v. Whitford*, 585 U.S. 48, 66 (2018); *Lewis v. Casey*, 518 U.S. 343, 357, 358 n.6 (1996) ("Standing is not dispensed in gross" and "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). A plaintiff without standing has no injury to remedy. And the States' claim that *Horne* "rejected the argument that relief must be limited to the only plaintiff the Court found to have standing," Opp. 17, underscores their misunderstanding of bedrock equitable principles. There, this Court had concluded that a state education superintendent had standing to seek only a narrow remedy, *Flores v. Arizona*, 516 F.3d 1140, 1165 (9th Cir. 2008), but the Supreme Court explained that this view was based on a misunderstanding of the nature of the challenge the superintendent was bringing under Federal Rule of Civil Procedure 60 and the appropriate scope of judicial review and potential relief, *Horne*, 557 U.S. at 446 n.2; *see id.* at 452-54. The Court did not state, much less hold, that a plaintiff without standing could seek relief because some

6

other plaintiff has standing for narrower relief—a premise the Court expressly rejected in *Town of Chester*. 581 U.S. at 439-40.

**B.** Finally, the States fare no better in defending (at 10-13) the district court's conclusion that the States' downstream injuries are not too attenuated for Article III standing. The States make little effort to identify a limiting principle for their theory of downstream economic harm, which courts of appeals have routinely recognized would confer standing on States to sue over virtually every federal policy. *See, e.g., Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). Indeed, they do not even attempt to dispute that their theory would allow States to sue over virtually any change to federal policies that would affect the eligibility of aliens for benefits. *See* Mot. 15-16.

Like the district court, the States emphasize (at 12) the decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023). There, a state-controlled corporation received ongoing fees from a contract with the Department of Education servicing student loans that the federal government sought to cancel, and the Court held that the loss of those fees reflected a concrete injury to the corporation (and thus the State that controlled it). *Id.* at 2366. The only dispute in *Nebraska* was whether the state-controlled corporation was effectively part of the state or whether it was a separate entity whose injuries were thus not injuries to the state. *Id.* at 2366-68. Here, by contrast, the concern is not that the asserted financial injuries are insufficiently concrete; it is that any such injuries to the States are too attenuated—that is, too far

7

"removed from [their] distant (even if predictable) ripple effects" to establish standing. *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024); *see United States v. Texas*, 599 U.S. 670, 680 n.3 (2023) ("[W]hen a State asserts … that a federal law has produced only … indirect effects, the State's claim for standing can become more attenuated."). Here, the federal action withholds privileges of citizenship from certain individuals, and only indirectly affects the States.

### III. Even if the States Have Standing, the Nationwide Injunction Is Overbroad.

In attempting to defend the universal sweep of the district court's injunction, the States repeat (at 19-20) their speculative assertions about people moving between States. As we have shown (Mot. at 20), however, a narrower injunction tailored to the States' harms if those individuals do move between States would be sufficient to remedy their alleged injuries—a point the States do not contest. That alone is sufficient basis to narrow the sweep of the injunction.

Plaintiffs fare no better in suggesting (at 20) that the Supreme Court's decision in *Nebraska* silently repudiated *Gill*, *Califano*, and other cases making clear that injunctive relief should be limited to remedying a plaintiff's injury. *Nebraska* did not discuss the appropriate scope of relief at all, much less suggest that a nationwide injunction is appropriate in every case in which the Executive Branch is said to exceed its authority. Many federal policies apply broadly, and if the breadth of a policy were sufficient to warrant nationwide relief, "a nationwide injunction would result any time

8

an enjoined action has potential nationwide effects," turning "broad injunctions into the rule rather than the exception." *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019). The States have provided no basis to disregard settled principles about the scope of relief, which weigh decisively against a nationwide injunction.

## IV. The Remaining Stay Factors Warrant a Stay.

The remaining stay factors likewise favor a partial stay. The States' claims to irreparable harm simply repeat their erroneous claims to standing. And they still offer nothing demonstrating that the harms they face are actually irreparable: it is plaintiffs' burden to show irreparable harm, and they must demonstrate that the reimbursement and administrative procedures available under Medicaid and other programs are inadequate to redress their monetary losses. Nor do the States meaningfully grapple with the preliminary injunction posture of this case: they must show that irreparable harm will occur during the pendency of this case, not years in the future.

More generally, the States disregard the harms created by the district court's overbroad injunction. The point is not, as the States suggest, that irreparable harm is worked every time executive action is enjoined, Opp. 6, but instead that granting vastly overbroad relief—including relief that precludes even internal Executive Branch preparatory operations that cannot impose any harm on plaintiffs—interferes with the operations of a coequal branch of government in a manner that goes far beyond protecting plaintiffs from executive action a court believes may be unlawful. Such

9

harms surely weigh in the equitable calculus. *See INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

The States likewise urge that the government faces no harm because three other courts have also enjoined the Executive Order nationwide. Opp. 4, 7. Only two of those injunctions purport to apply nationwide. The government has already sought a stay of one of those injunctions insofar as it applies beyond the named plaintiffs, and will be moving today for a stay of the second injunction. Just as the States here do not concede that the existence of those injunctions obviates their showing of irreparable harm, the government is separately injured by each injunction and is seeking relief in a timely manner from each. Those injunctions thus provide no basis on which to deny a partial stay of the overbroad injunction here.

10

## CONCLUSION

For the foregoing reasons, this Court should stay the district court's nationwide preliminary injunction except as to the Individual Plaintiffs.

Respectfully submitted,

BRETT A. SHUMATE
  *Acting Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

 *s/ Derek Weiss*
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7256*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

February 2025

11

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Ninth Circuit Rules 32-3 and 27-1(1)(d) because it contains 2,481 words. This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss

## CERTIFICATE OF SERVICE

I hereby certify that, on February 19, 2025, I electronically filed the foregoing docketing statement with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users and that service will be accomplished by using the ACMS system.

*s/ Derek Weiss*
Derek Weiss