No. 25-807

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-127

## BRIEF FOR APPELLANTS

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

STATEMENT OF JURISDICTION ....................................................................2

STATEMENT OF ISSUES ..................................................................................2

CONSTITUTIONAL AND STATUTORY PROVISIONS ...............................3

STATEMENT OF THE CASE .............................................................................3

    A. Constitutional and Statutory Background.................................................3

    B. Factual Background ...................................................................................4

    C. Prior Proceedings......................................................................................5

SUMMARY OF ARGUMENT............................................................................8

STANDARD OF REVIEW ................................................................................11

ARGUMENT ......................................................................................................11

    I.     Plaintiffs Are Not Likely to Succeed on the Merits ..........................11

        A. The Executive Order Is Consistent with the Original
           Meaning of the Citizenship Clause...............................................13

           1. Persons Are "Subject to the Jurisdiction" of the
              United States if They Owe Primary Allegiance to
              the United States ..................................................................13

           2. Persons Temporarily or Unlawfully Present Do Not
              Owe the Requisite Allegiance to the United States ...........22

        B. The District Court's Contrary Holding Is Mistaken ...................35

        C. Plaintiffs' Statutory Claim Fails for the Same Reasons.............41

II.     The District Court's Injunctive Relief Is Substantially
        Overbroad ................................................................................41

        A.  The States Are Not Proper Parties and Thus Are Not
            Entitled to Injunctive Relief ..........................................42

            1.  The States Cannot Sue to Assert Claimed Individual
                Rights to Citizenship ..............................................42

            2.  The States Lack Article III Standing or Irreparable
                Harm from Their Alleged Injuries ..........................44

        B.  At a Minimum, the Injunction Should Be Narrowed Insofar
            as It Applies Nationwide and Needlessly Impinges on the
            Separation of Powers .......................................................49

        C.  The Remaining Equitable Factors Do Not Support the
            Preliminary Injunction ...................................................53

CONCLUSION ...........................................................................................55

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                      **Page(s)**

*Afroyim v. Rusk,*
   387 U.S. 253 (1967) ........................................................................................ 40

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ........................................................................................ 42

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ................................................................. 47, 50

*Benny v. O'Brien,*
   32 A. 696 (N.J. 1895) ..................................................................................... 26

*Berenyi v. District Dir., INS,*
   385 U.S. 630 (1967) ........................................................................................ 35

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ........................................................................................ 46

*California v. Azar,*
   911 F.3d 558 (9th Cir. 2018) ................................................................. 49, 51

*Carlson v. Reed,*
   249 F.3d 876 (9th Cir. 2001) ................................................................. 24, 30

*CASA, Inc. v. Trump,*
   No. CV DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025) ................... 8

*Cherokee Nation v. Georgia,*
   30 U.S. (5 Pet.) 1 (1831) ................................................................................ 25

*Chin Bak Kan v. United States,*
   186 U.S. 193 (1902) ........................................................................................ 38

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
   587 U.S. 262 (2019) ........................................................................................ 41

*DHS v. New York,*
   140 S. Ct. 599 (2020) ............................................................................... 50, 50

*Doe v. Trump,*
   No. CV 25-10135-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025) ........... 8

*East Bay Sanctuary Covenant v. Biden,*
  102 F.4th 996 (9th Cir. 2024) ................................................. 46, 47

*Elk v. Wilkins,*
  112 U.S. 94 (1884) ..................... 1, 9, 14, 15, 17, 24, 25, 35

*FDA v. Alliance for Hippocratic Med.,*
  602 U.S. 367 (2024) ....................................................... 45, 48

*Florida v. Mellon,*
  273 U.S. 12 (1927) ................................................................. 46

*Fong Yue Ting v. United States,*
  149 U.S. 698 (1893) ................................. 18, 23, 24, 29, 38

*Franchise Tax Bd. of Cal. v. Hyatt,*
  587 U.S. 230 (2019) ............................................................. 21

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ............................................................. 53

*General Bldg. Contractors Ass'n v. Pennsylvania,*
  458 U.S. 375 (1982) ....................................................... 13, 19

*Gill v. Whitford,*
  585 U.S. 48 (2018) ......................................................... 49, 51

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
  527 U.S. 308 (1999) ............................................................. 51

*Haaland v. Brackeen,*
  599 U.S. 255 (2023) ................................................. 16, 25, 43

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ............................................................. 33

*Hawaii v. Trump,*
  859 F.3d 741 (9th Cir.), *vacated and remanded,*
  583 U.S. 941 (2017) ............................................................. 52

*Hodgson v. De Beauchesne*
  [1858] 14 Eng. Rep. 920 (PC) ............................................. 23

*Inglis v. Trustees of Sailor's Snug Harbor,*
  28 U.S. (3 Pet.) 99 (1830) .................................................... 36

iv

*INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor,*
   510 U.S. 1301 (1993) ........................................................ 54

*Kaiser v. Blue Cross of Cal.,*
   347 F.3d 1107 (9th Cir. 2003) ........................................ 49

*Kaplan v. Tod,*
   267 U.S. 228 (1925) ......................................................30

*Karnoski v. Trump,*
   926 F.3d 1180 (9th Cir. 2019) ........................................ 11

*Kawakita v. United States,*
   343 U.S. 717 (1952) ....................................................... 32

*Kemp v. United States,*
   596 U.S. 528 (2022) ....................................................... 41

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) .................................................. 43, 44

*Kwock Jan Fat v. White,*
   253 U.S. 454 (1920) ....................................................... 38

*Labrador v. Poe ex rel. Poe,*
   144 S. Ct. 921 (2024) ................................................. 50, 51

*Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin,*
   599 U.S. 382 (2023) ....................................................... 25

*Lamar v. Micou,*
   112 U.S. 452 (1884) .................................................. 18, 30

*Lau Ow Bew v. United States,*
   144 U.S. 47 (1892) ......................... 10, 17, 23, 37, 38

*Lem Moon Sing v. United States,*
   158 U.S. 538 (1895) ......................................................38

*Lone Wolf v. Hitchcock,*
   187 U.S. 553 (1903) ....................................................... 16

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ....................................................... 49

v

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ........................................................ 13

*Martinez v. Bynum*,
    461 U.S. 321 (1983) ........................................................................ 24

*Maryland v. King*,
    567 U.S. 1301 (2012) ...................................................................... 54

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ........................................................................ 42

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ........................................................................ 19

*Mississippi Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) .......................................................................... 18

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1866) ......................................................... 53

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................................. 11, 31

*Murray v. Schooner Charming Betsy*,
    6 U.S. (2 Cranch) 64 (1804) .......................................................... 17

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .......................................................................... 43

*NYSRPA v. Bruen*,
    597 U.S. 1 (2022) ............................................................................ 39

*N.H. Indonesian Cmty. Support v. Trump*,
    No. 25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025) ........................... 8

*Nken v. Holder*,
    556 U.S. 418 (2009) ........................................................................ 53

*Park v. Barr*,
    946 F.3d 1096 (9th Cir. 2020) ....................................................... 30

*Pennsylvania v. New Jersey*,
    426 U.S. 660 (1976) ........................................................................ 48

vi

*Plyler v. Doe,*
    457 U.S. 202 (1982) ................................................................. 29

*Quirin, Ex parte,*
    317 U.S. 1 (1942) ............................................................... 16-17

*Rogers v. Bellei,*
    401 U.S. 815 (1971) ................................................................. 32

*Savorgnan v. United States,*
    338 U.S. 491 (1950) ................................................................. 32

*Schooner Exch. v. McFaddon,*
    11 U.S. (7 Cranch) 116 (1812) .......................................... 13, 16

*Slaughter-House Cases.*
    83 U.S. (16 Wall.) 36 (1873) ................................................. 14

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ................................................................. 43

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................. 13

*The Pizarro,*
    15 U.S. (2 Wheat.) 227 (1817) ............................................. 17

*The Venus,*
    12 U.S. (8 Cranch) 253 (1814) ............................................. 17

*Tilghman v. Proctor,*
    125 U.S. 136 (1888) ................................................................. 31

*Toll v. Moreno,*
    458 U.S. 1 (1982) ................................................................... 30

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................. 45

*Trump v. Hawaii,*
    585 U.S. 667 (2018) .......................................................... 33, 50

*United States v. Holliday,*
    70 U.S. (3 Wall.) 407 (1865) ................................................. 16

vii

*United States v. Kagama,*
    118 U.S. 375 (1886) ................................................ 16

*United States v. Manzi,*
    276 U.S. 463 (1928) ................................................ 35

*United States v. Mendoza,*
    464 U.S. 154 (1984) ................................................ 50

*United States v. Mrs. Gue Lim,*
    176 U.S. 459 (1900) ................................................ 38

*United States v. Rogers,*
    45 U.S. (4 How.) 567 (1846) ................................... 15

*United States v. Texas,*
    599 U.S. 670 (2023) ............................................ 45, 47

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ................................................ 24

*United States v. Wong Kim Ark,*
    169 U.S. 649 (1898) .......................... 1, 7, 10, 12, 14-15, 16, 18, 21, 23, 32, 36, 36-37, 37, 39, 40

*Verlinden B.V. v. Central Bank of Nigeria,*
    461 U.S. 480 (1983) ................................................ 16

*Warth v. Seldin,*
    422 U.S. 490 (1975) ................................................ 43

*Washington v. FDA,*
    108 F.4th 1163 (9th Cir. 2024) ............................... 46

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................. 11

*Winton v. Amos,*
    255 U.S. 373 (1921) ............................................... 15

**U.S. Constitution:**

Art. I, § 8, cl. 4 ...................................................... 33

Art. II, § 2, cl. 1 ..................................................... 53

Amend. XIV, § 1 ................................................ 1, 3, 11, 13, 21

**Statutes:**

Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27 ........................3

Civil Rights Act of 1870, ch. 114, § 18, 16 Stat. 140, 144 ................19

Expatriation Act of 1868, ch. 249, 15 Stat. 223 ................33

Immigration and Nationality Act,
    ch. 477, § 301, 66 Stat. 163, 235-36 (1952) ........3-4
    8 U.S.C. § 1101(a)(15)(B) ................ 24
    8 U.S.C. § 1101(a)(15)(F)(i) ................ 24
    8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b) ................ 24
    8 U.S.C. § 1101(a)(15)(H)(iii) ................ 24
    8 U.S.C. § 1101(a)(15)(J) ................ 24
    8 U.S.C. § 1101(a)(15)(M)(i) ................ 24
    8 U.S.C. § 1101(a)(15)(M)(iii) ................ 24
    8 U.S.C. § 1101(a)(15)(O)(ii)(IV) ................ 24
    8 U.S.C. § 1101(a)(15)(P) ................ 24
    8 U.S.C. § 1101(a)(15)(Q) ................ 24
    8 U.S.C. § 1401(a) ................ 2, 4, 6, 41
    8 U.S.C. § 1401(b) ................ 15
    8 U.S.C. § 1401(c) ................ 32

Nationality Act of 1940,
    ch. 876, § 201(a), 54 Stat. 1137, 1138 ................ 3, 19

Naturalization Act of 1790,
    ch. 3, 1 Stat. 103, 104 ................32

8 U.S.C. § 1612 ................ 47

28 U.S.C. § 1292(a)(1) ................ 2

28 U.S.C. § 1331 ................ 2

42 U.S.C. § 1316(e) ................ 58

**Regulatory Materials:**

Exec. Order No. 14,159,
  90 Fed. Reg. 8443 (Jan. 29, 2025) ................................. 4, 34, 54

Exec. Order No. 14,160,
  90 Fed. Reg. 8449 (Jan. 29, 2025) ........................................ 4

Exec. Order No. 14,165,
  90 Fed. Reg. 8467 (Jan. 30, 2025) .................................. 4, 54

Proclamation No. 10,886,
  90 Fed. Reg. 8327 (Jan. 29, 2025) .................................. 4, 54

**Rules:**

Fed. R. App. P. 4(a)(1) ......................................................... 2

Fed. R. Civ. P. 23 ............................................................... 50

**Legislative Materials:**

Cong. Globe, 39th Cong., 1st Sess. 572 (1866) ................... 19, 20, 26

Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) .......................40

2 Cong. Rec. 3279 (1874) ............................................27

*Report of H. Comm. on Foreign Affairs Concerning the Rights of American
  Citizens in Foreign States, in* Cong. Globe, 40th Cong.,
  2nd Sess. app. (1868) ............................................. 40

**Other Authorities:**

2 *A Digest of the International Law of the United States*
  (Francis Wharton ed., 2d. ed. 1887):
    § 183................................................................28
    § 198................................................................40

*Allegiance*, J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence*
  (Edward Hopper ed., 2d ed. 1860) ................................29

x

Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* (1912) .............................................. 38, 41

Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by t he Fourteenth Amendment to the Constitution of the United States* (1901) .............................27

Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* (1869) ....................................................................................................... 18, 32

A.V. Dicey, *A Digest of the Law of England* (1896) ................................23

85 Fed. Reg. 4219 (Jan. 24, 2020) .....................................................34

1 William Edward Hall, *A Treatise on International Law* (4th ed. 1895) ............................25

M.W. Jacobs, *A Treatise on the Law of Domicile* (1887):
    § 26 .....................................................................................................40
    § 71 ...............................................................................................29-30

*Jurisdiction*, Black's Law Dictionary (12th ed. 2024) ...........................35

Sidney Kansas, *Immigration and Nationality Act Annotated* (4th ed. 1953) ................................................................................41

2 James Kent, *Commentaries on American Law* (6th ed. 1848) ...........................21

Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress) ........................................................................20

Letter from William Marcy to Austrian Charge d'Affaires at Washington (reprinted in 44 British and Foreign State Papers (1865)) ............................................18

Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455 (2015) ..................................... 28

Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329 (2013) ......................................... 33

Samuel Freeman Miller, *Lectures on the Constitution of the United States* (1891) ..................................................................................27

xi

Minority Staff of S. Comm. on Homeland Sec. & Governmental
    Affairs, *Report on Birth Tourism in the United States* (2015),
    https://perma.cc/C8SA-ZG8X ............................................................34

Alexander Porter Morse, *A Treatise on Citizenship* (1881) ................................27

Robert Phillimore, *The Law of Domicil* (1847) ...................................................30

*Regulations Governing the Admission of Chinese* r. 2 (Feb. 26, 1907), *in*
    Bureau of Immigration & Naturalization, Dep't of Commerce
    & Labor, Doc. No. 54, *Treaty, Laws, and Regulations Governing the
    Admission of Chinese* (June 1908) ...............................................................38-39

Mark Shawhan, Comment, *The Significance of Domicile in Lyman
    Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351 (2010) ...................... 20

Spanish Treaty Claims Comm'n, U.S. Dep't of Justice,
    *Final Report of William Wallace Brown, Assistant Attorney-General* (1910) ............... 29, 39

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* (1834):
    § 44 ...........................................................................................................24
    § 48 ...........................................................................................................22

Hannis Taylor, *A Treatise on International Public Law* (1901) ...............................27

4 *The Digest of Justinian* 906a (Alan Watson trans., 1985) ..............................30-31

Emerich de Vattel, *The Law of Nations* (1797 ed.):
    § 213 .................................................................................................. 21, 31
    § 215 ...........................................................................................................21
    §§ 216-217 ...................................................................................................22

John Westlake, *International Law* (1904) ...........................................................27

## INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof," are citizens. U.S. Const. amend. XIV, § 1. To be "subject to the jurisdiction," the Clause requires the person be "not merely subject in some respect or degree … but completely subject to" the "political jurisdiction" of the United States. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). A country has political jurisdiction over those persons who owe it "direct and immediate allegiance," *id.*, and to whom the country owes the "reciprocal obligation[]" of "protection," *United States v. Wong Kim Ark*, 169 U.S. 649, 679 (1898) (quotation marks omitted). Citizens, of course, have this reciprocal relationship of allegiance and protection. So too, the Supreme Court has recognized that aliens "domiciled here" are "within the allegiance and the protection … of the United States" such that their children are subject to its jurisdiction for purposes of the Citizenship Clause. *Id.* at 693.

But these principles—and the text, history, and precedent from which they derive—demonstrate that children born to aliens in the United States temporarily or illegally do not come within the Clause. Such children lack the reciprocal relationship of allegiance and protection that would bring them within the political jurisdiction of the United States. To conclude otherwise, the district court read the phrase "subject to the jurisdiction" as referring to the United States's regulatory jurisdiction, which necessarily reaches all persons within U.S. territory. But that interpretation makes the

jurisdictional clause surplusage and makes nonsense of Supreme Court precedents explaining that children of Indians, foreign ambassadors, invading enemies, and persons aboard foreign public ships are not "subject to the jurisdiction" of the United States, even though the United States may (and in some cases does) regulate those classes of individuals. And the district court's mistaken understanding leaves Congress and the Executive Branch powerless to address concerns about individuals manipulating or flouting the nation's immigration laws to obtain the privileges of citizenship for their children. The Executive Order's interpretation of the Citizenship Clause is correct, and the preliminary injunction should be reversed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1331. It entered a preliminary injunction on February 6, 2025. ER-3. The United States filed a notice of appeal the same day. ER-135; *see* Fed. R. App. P. 4(a)(1). This court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1.     Whether the district court erred in holding that plaintiffs are likely to succeed on their claims that the Citizenship Clause and 8 U.S.C. § 1401(a) confer birthright citizenship on the children of aliens who are temporarily or unlawfully present in the United States.

2.     Whether the district court erred in issuing an overbroad, nationwide injunction premised on alleged injuries to four States.

2

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Pertinent constitutional and statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Constitutional and Statutory Background

Until 1866, federal law did not expressly provide for citizenship by birth in the United States. In the Civil Rights Act of 1866, Congress provided that "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." ch. 31, § 1, 14 Stat. 27, 27.

Months later, that same Congress proposed the Citizenship Clause of the Fourteenth Amendment. The Clause, as ratified in 1868, provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.

The 1866 Act's statutory definition of citizenship by birth remained in place until 1940, when Congress replaced it with a statute copying the text of the Citizenship Clause. That statute provided that any "person born in the United States, and subject to the jurisdiction thereof," is a citizen. *See* Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138. That provision was reenacted in the Immigration

3

and Nationality Act, ch. 477, § 301, 66 Stat. 163, 235-36 (1952), and remains the governing statute, *see* 8 U.S.C. § 1401(a).

### B. Factual Background

On January 20, 2025, President Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States. *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025); ER-60. The order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See, e.g.*, Exec. Order No. 14,165, 90 Fed. Reg. 8467 (Jan. 30, 2025); Proclamation No. 10,886, 90 Fed. Reg. 8327 (Jan. 29, 2025); Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025).

The Executive Order recognizes that the Constitution and corresponding statutory provision extend citizenship at birth to most people born in the United States but do not extend the privilege of U.S. citizenship where neither parent has a sufficient relationship with the United States, specifically when the father was not a citizen or lawful permanent resident and the mother was either: (1) unlawfully present or (2) lawfully but temporarily present (such as visiting under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa). ER-61-62, § 1.

The Executive Order directs the federal Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons in these two categories and (2) not to accept documents issued by state, local, or other governments purporting to recognize the U.S. citizenship of such persons. ER-62, § 2(a). The order specifies,

however, that those directives "apply only to persons who are born within the United States after" February 19.  ER-63, § 2(b).

The Executive Order directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and not to "act, or forbear from acting, in any manner inconsistent with this order."  ER-63, § 3(a).  It further directs the heads of all federal agencies to issue public guidance "regarding this order's implementation with respect to their operations and activities."  ER-63, § 3(b).

## C. Prior Proceedings

**1.**  Within days, four States—Washington, Arizona, Illinois, and Oregon—and three individuals—expectant mothers seeking to represent a class of "similarly situated parents and their children" within the State of Washington—filed separate suits challenging the Executive Order.  Dkt. 1[1]; Complaint ¶¶ 5, 100, *Aleman v. Trump*, No. 25-cv-163 (W.D. Wash. Jan. 24, 2025), Dkt. 1.  The cases were consolidated, Dkt. 56, and one individual plaintiff withdrew, ER-18 n.2.  The district court has not ruled on the class-certification motion, so only the claims of the States and two individuals are currently at issue.

---

[1] Docket citations are to No. 25-cv-127 unless otherwise noted.

5

Plaintiffs claim the Citizenship Clause and 8 U.S.C. § 1401(a) "confer citizenship upon [the] individuals" covered by the Executive Order. ER-18, ¶ 2. The two expectant mothers allege that their children will be citizens but will not be treated as such because they and the fathers are illegally or temporarily present in the United States. ER-47-49. The States claim that individuals affected by the Executive Order will not qualify for federal financial assistance under programs the States administer, such as Medicaid and the Children's Health Insurance Program (CHIP), and thus the States will lose federal reimbursement and correspondingly spend more on state programs that provide care. ER-38-44. In addition, the States contend that they will lose fees under a contract with the Social Security Administration for each new application they process in the Enumeration at Birth program. ER-44-45. Finally, the States contend that they will incur costs adjusting administrative and operational processes to adapt to the Order. ER-45-47.

**2.** On January 23, the district court issued a nationwide temporary restraining order. Dkts. 43, 44. On February 6, the court granted a preliminary injunction barring "enforcement or implementation of the [Executive] Order on a nationwide basis." ER-15.

The court held that not just the individual plaintiffs but also the States had Article III standing. Although it did not analyze the States' standing in detail, it concluded that the States had alleged Article III injury based on "loss of federal funds," "operational disruptions[,] and administrative burdens." ER-5-6 (quotation

6

marks omitted).  The court relied on the same alleged injuries in concluding that the States faced irreparable harm from "unrecoverable costs." ER-12.

On the merits, the district court held that the text of the Fourteenth Amendment provides that someone is "born … in the United States, and subject to the jurisdiction thereof," whenever they are "born in the territorial United States." ER-8 (quotation marks omitted).  In the court's view, "jurisdiction" means "a geographic area within which" regulatory authority—which it called "political or judicial authority"—"may be exercised," and thus that children born in the United States are always subject to its jurisdiction.  ER-9 (quotation marks omitted).  The district court also characterized *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), as "clearly explain[ing]" that "subject to the jurisdiction thereof" "only excepted" children whose parents were in "three specific classes": "'members of the Indian tribes, … alien enemies in hostile occupation, [or] … diplomatic representatives of a foreign state.'"  ER-10 (quoting *Wong Kim Ark*, 169 U.S. at 682).

The court concluded that the remaining equitable factors favored an injunction. The balance of harms and the public interest merged, and because the court viewed the Executive Order as a constitutional violation, it held that the equities favored enjoining it.  ER-13.

In addressing the scope of relief, the district court construed the two individual plaintiffs to "seek only to enjoin the implementation and enforcement of the Order as it relates to themselves."  ER-14 n.9.  But it nevertheless believed that nationwide

injunctive relief was appropriate based on the States' claims because of "[t]he extreme nature of the equities"—by which it apparently meant its conclusion that the Executive Order reflects a "constitutional violation[]" that the government "has no legitimate interest in enforcing." ER-13-14. "In addition," the court reasoned, "a geographically limited injunction would be ineffective" to remedy the States' injuries. ER-14. "For example, babies born in other states would travel to the Plaintiff States" and "be eligible for services and support that, without nationwide relief, need be funded by the Plaintiff States." ER-14. The district court further noted the "recordkeeping and administrative burden from such an arrangement." ER-15.

**3.** The government appealed and sought a partial stay pending appeal of the nationwide scope of the injunction. A panel of this Court denied the motion. Order (Feb. 19, 2025).[2]

## SUMMARY OF ARGUMENT

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." As was apparent from the time of its enactment, the Clause's use of the phrase "subject

---

[2] Three other courts have enjoined enforcement of the Executive Order. *CASA, Inc. v. Trump*, No. CV DLB-25-201, 2025 WL 408636 (D. Md. Feb. 5, 2025); *Doe v. Trump*, No. CV 25-10135-LTS, 2025 WL 485070 (D. Mass. Feb. 13, 2025); *N.H. Indonesian Cmty. Support v. Trump*, No. 25-CV-38-JL-TSM, 2025 WL 457609 (D.N.H. Feb. 11, 2025).

8

to the jurisdiction" of the United States contemplates something more than being subject to regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, they must have a "direct and immediate allegiance" to this country. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for certain Tribal Indians, diplomats, or occupying enemies, it similarly does not hold for foreigners here temporarily or illegally. "[N]o one can become a citizen of a nation without its consent …." *Id.* at 103. And if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children.

The district court's view that the phrase "subject to the jurisdiction" encompasses anyone within the United States's regulatory jurisdiction reads that language out of the Clause, since everyone born on U.S. soil is subject to U.S. regulatory jurisdiction. It cannot explain the exclusion of children born to Tribal Indians, *see Elk*, 112 U.S. at 102, or the other exclusions the Supreme Court has recognized. That interpretation also would have made the Civil Rights Act of 1866—which served as the blueprint for the Citizenship Clause and defined citizenship by birth as including persons "not subject to any foreign power"—inconsistent with the Clause, even though it was enacted just months before the same Congress proposed the Fourteenth Amendment, was reenacted just two years after ratification, and was the statutory counterpart to the Citizenship Clause for over 70 years.

9

The district court also construed *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), to hold that the phrase "subject to the jurisdiction thereof" adopted the traditional English common-law exceptions from citizenship at birth for children of diplomats and occupying enemies while adding one—and only one—new exception for Tribal Indians. But that reading of *Wong Kim Ark* leaves "jurisdiction" without a coherent meaning. Such a reading conflicts with the interpretation of the Citizenship Clause that prevailed in Supreme Court decisions, Executive Branch practice, and the legal community's understanding in the decades *following* the decision in *Wong Kim Ark*. It also ignores how the Court carefully cabined its holding to the children of those with a "permanent domicil[e] and residence in the United States," *id.* at 652-53, a limitation that made sense in light of the Court's contemporaneous cases explaining the close relationship between domicile and the rights and duties of citizenship. *See, e.g.*, *Lau Ow Bew v. United States*, 144 U.S. 47, 61 (1892).

In any event, the district court's injunction is vastly overbroad. The district court's entry of nationwide relief at the behest of four States ignores that the States are not proper parties to litigate the citizenship rights of individuals, disregards limits on Article III standing, is based on no showing of irreparable injury, and confers overbroad relief unnecessary to remedy any injury the States could assert. The injunction is separately overbroad insofar as it enjoins the President and enjoins internal Executive Branch operations.

## STANDARD OF REVIEW

This Court "review[s] an order regarding preliminary injunctive relief for abuse of discretion, but review[s] any underlying issues of law de novo." *Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019) (per curiam). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

For a facial challenge to succeed, plaintiffs must "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid, or … sho[w] that the [Executive Order] lacks a plainly legitimate sweep." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (quotation marks omitted).

## ARGUMENT

### I.     Plaintiffs Are Not Likely to Succeed on the Merits.

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. Section 1401(a) of Title 8 similarly grants citizenship to any "person born in the United States, and subject to the jurisdiction thereof." Text, history, and precedent show that "subject to the jurisdiction" of the United States means *political* jurisdiction (a concept rooted in allegiance and

11

protection), not—as the district court believed—*regulatory* jurisdiction (to which all persons in the United States are subject).

The Supreme Court has identified multiple categories of persons who, despite birth in the United States, are not constitutionally entitled to citizenship because they are not "subject to the jurisdiction" of the United States: children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, children born on foreign public ships, and children of certain members of Indian tribes. *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898). Individuals in these categories all lack the requisite allegiance to the United States because of their primary allegiance to another sovereign. The Executive Order identifies two additional categories of persons that similarly lack the requisite allegiance: children born to aliens present temporarily and children born to aliens illegally in the United States. Because this suit has been litigated as a facial challenge, plaintiffs bear the especially heavy burden of demonstrating that the Executive Order would be unlawful in *all* its applications. Plaintiffs cannot demonstrate any unlawful application, much less meet that imposing standard.

### A. The Executive Order Is Consistent with the Original Meaning of the Citizenship Clause.

#### 1. Persons Are "Subject to the Jurisdiction" of the United States if They Owe Primary Allegiance to the United States.

The text and structure of the Fourteenth Amendment, as well as its drafting history and background principles of law, demonstrate that "subject to the jurisdiction" refers to persons who owe primary allegiance to the United States. The text imposes two requirements for citizenship by birth: a person must be "born … in the United States" and must separately be "subject to the jurisdiction thereof." U.S. Const. amend. XIV, § 1. The Clause's separate requirements make clear that some persons born "in the United States" are not "subject to" its "jurisdiction." This "jurisdiction," therefore, cannot simply be the power to regulate. The Supreme Court has explained that the regulatory "jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). As explained in detail below, that regulatory power extends to all persons born on U.S. soil, even to classes of persons—such as members of Indian tribes—that have always been understood to fall outside the Citizenship Clause. If "jurisdiction" means regulatory power, then the Clause's independent textual requirement would be redundant. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the [C]onstitution is intended to be without effect …."); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 90 (1998)

13

("Jurisdiction, it has been observed, is a word of many, too many, meanings."
(quotation marks omitted)).

The Supreme Court's cases identifying categories of persons not "subject to the
jurisdiction" of the United States for purposes of the Citizenship Clause thus have not
turned on the general power to regulate those persons.  Instead, the Court has
emphasized whether those persons owe allegiance to a different sovereign and thus
are not regarded as owing the requisite allegiance to—or being entitled to protection
from other sovereigns by—the United States.

That was the interpretation the Supreme Court adopted in its first encounter
with the Citizenship Clause.  In the *Slaughter-House Cases*, the Court explained that
"[t]he phrase, 'subject to its jurisdiction,'" operated to "exclude" from the Citizenship
Clause "children of ministers, consuls, and citizens or subjects of foreign States born
within the United States."  83 U.S. (16 Wall.) 36, 73 (1873).

Subsequently, in *Elk v. Wilkins*, 112 U.S. 94 (1884), the Supreme Court
addressed whether children of members of Indian tribes acquire citizenship at birth
under the Citizenship Clause.  The Court explained that the "evident meaning" of
"subject to the jurisdiction" "is, not merely subject in some respect or degree to the
jurisdiction of the United States, but completely subject to their political jurisdiction,
and owing them direct and immediate allegiance."  *Id.* at 102.  This political
jurisdiction is a "reciprocal" relationship: the United States receives allegiance from
the individual and provides that individual protection from other sovereigns.  *Wong*

14

*Kim Ark*, 169 U.S. at 679 (quotation marks omitted). Indian tribes did not meet this definition, the Court held, because the tribes were "alien nations" and "distinct political communities," and "[t]he members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States." *Elk*, 112 U.S. at 99.[3]

Notably, the Supreme Court in *Elk* reached this conclusion even as it acknowledged that Indian tribes within U.S. territory are subject to the regulatory power of the United States. *Elk* noted that Indian tribes were "within the territorial limits of the United States" and that Congress could deal with such tribes "either through treaties made by the president and senate, or through acts of congress." 112 U.S. at 99. More than two decades before the Citizenship Clause was adopted, the Supreme Court had thought:

> it too firmly and clearly established to admit of dispute, that the Indian tribes residing within the territorial limits of the United States are subject to [the United States'] authority, and where the country occupied by them is not within the limits of one of the States, Congress may by law punish any offen[s]e committed there, no matter whether the offender be a white man or an Indian.

*United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846). And in the years before and after *Elk*, the Court "thoroughly established that Congress has plenary authority over the Indians and all their tribal relations," *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see*

---

[3] Congress has since by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe." 8 U.S.C. § 1401(b).

15

*Haaland v. Brackeen*, 599 U.S. 255, 272-73 (2023), as Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866), Indian property; *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903), and Indian adoptions, *see Brackeen*, 599 U.S. at 276-80; while punishing Indians for crimes, *see United States v. Kagama*, 118 U.S. 375, 379-85 (1886).

The same is true of other categories of persons the Supreme Court has identified as outside the scope of the Citizenship Clause.  In particular, the Supreme Court has observed that "children of diplomatic representatives of a foreign state," "children born of alien enemies in hostile occupation," and children born "on foreign public ships" in our ports are not "subject to the jurisdiction" of the United States. *Wong Kim Ark*, 169 U.S. at 682, 693.  Here, too, the issue is not a lack of regulatory jurisdiction.  The immunity diplomatic officials enjoy from state and federal law, for example, was historically a product of "the consent of the nation itself," *Schooner Exch.*, 11 U.S. (7 Cranch) at 136, not some inherent inability to exercise regulatory jurisdiction over such individuals.  *See id.* at 146 (explaining that the immunity granted to foreign public ships could be "destroy[ed]" if the sovereign wished to "claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals"); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983) ("[F]oreign sovereign immunity is a matter of grace and comity …..").  Invading forces illustrate the same point: though the United States may exercise jurisdiction to punish "enemy invaders" for violations of the laws of war, *Ex parte Quirin*, 317 U.S. 1, 47

16

(1942), their children are not citizens by birth.  Instead, the central point is that such individuals—and their children—owe primary allegiance to a foreign sovereign.  That makes them not "completely subject" to the "political jurisdiction" of the United States because they do not owe direct and immediate allegiance." *Elk*, 112 U.S. at 102.

The children of citizens born in the United States, by contrast, plainly owe "direct and immediate allegiance" to the United States and are undoubtedly subject to its political jurisdiction.  And the Supreme Court has made clear that under some circumstances aliens may establish sufficient ties of allegiance so as to come within the Citizenship Clause's scope.  In particular, a person "owes allegiance" to the country in which he is "domiciled." *The Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.).  Such an individual "places him[self] out of the protection" of his former country, *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 120 (1804), and "becomes a member of the new society, at least as a permanent inhabitant, and is a kind of citizen of an inferior order … but is, nevertheless, united and subject to the society." *The Venus*, 12 U.S. (8 Cranch) 253, 278 (1814).

Thus, "foreigners who have become domiciled in a country other than their own acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 61-62 (1892).  As the Supreme Court explained, "aliens residing in a country, with the intention of making it a permanent place of abode, acquire, in one sense, a

17

domicil there, and, while they are permitted by the nation to retain such a residence and domicil, are subject to its laws, and may invoke its protection against other nations." *Fong Yue Ting v. United States*, 149 U.S. 698, 724 (1893); *accord id.* at 734 (Brewer, J., dissenting). For example, in 1853, the United States intervened to protect an unnaturalized U.S. domiciliary who had been seized by Austrian government officials while travelling in Turkey. *See* Alex Cockburn, *Nationality or the Law Relating to Subjects and Aliens* 118-22 (1869). As Secretary of State William Marcy protested, "[t]he establishment of his domicil" in America "invested him with the national character of this country, and with that character he acquired the right to claim protection from the United States." Letter from William Marcy to Austrian Charge d'Affaires at Washington (reprinted in 44 British and Foreign State Papers 997 (1865)).

The Supreme Court has thus explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance … of the United States" and subject to its political jurisdiction. *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Their children are therefore born "subject to the jurisdiction" of the United States for purposes of the Citizenship Clause: the Supreme Court has repeatedly explained that a child's domicile "follow[s] the independent domicil of his parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *accord Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Other interpretive principles confirm that the Citizenship Clause's reference to "jurisdiction" refers to political jurisdiction and obligations of allegiance. Months

18

before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as the "initial blueprint" for the Amendment, *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). The Act stated that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. at 27 (emphasis added). Congress "reenacted" the Civil Rights Act of 1866 shortly after ratification of the Fourteenth Amendment, Civil Rights Act of 1870, ch. 114, § 18, 16 Stat. 140, 144, and its citizenship language remained unchanged until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. at 1138. As this illustrates, Congress in the immediate wake of the Fourteenth Amendment regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction thereof" requirement.

Debates and correspondence about the Act and the Amendment show that members of Congress shared that understanding. Senator Lyman Trumbull, the Act's principal sponsor in the Senate, explained that its purpose was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). He summarized the Act to President Johnson as making citizens of "'all persons' born of parents domiciled in the United

19

States, except untaxed Indians."[4]  Representative John Broomall explained that the freed slaves were properly regarded as U.S. citizens by birth because they owed no allegiance to any foreign sovereign:  "[U]ntil the opponents of this measure can point to the foreign Power to which he is subject, the African potentate to whom after five generations of absence he still owes allegiance, I will assume him to be, what the bill calls him, a citizen of the country in which he was born."  *Id.* at 1262.  Similarly, during debates on the Amendment, Trumbull explained:  "What do we mean by 'subject to the jurisdiction of the United States?'  Not owing allegiance to anybody else. … It cannot be said of any Indian who owes allegiance, partial allegiance if you please, to some other Government that he is 'subject to the jurisdiction of the United States.'"  *Id.* at 2893.  Trumbull went on to equate being "subject to our jurisdiction" with "owing allegiance solely to the United States."  *Id.* at 2894.  Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power … shall be considered as citizens."  *Id.* at 2893.

Common-law and other sources reflected the same understanding.  Under the common law, "[t]wo things usually concur to create citizenship: [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth … within the ligeance of

---

[4] Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352-53 (2010) (quoting Letter from Sen. Lyman Trumbull to President Andrew Johnson (in Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress)).

the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (quotation marks omitted); *see also* 2 James Kent, *Commentaries on American Law* 42 (6th ed. 1848). The phrase "born … in the United States," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of "birth within the territory," *Wong Kim Ark*, 169 U.S. at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1, corresponds to the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

Similarly, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)—explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those born in the country, of parents who are citizens." Emmerich de Vattel, *The Law of Nations* § 212, at 101 (1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants" of that country, whom Vattel regarded as "a kind of citize[n]." *Id.* § 213, at 102; *see id.* § 215, at 102 ("If [the father] has fixed his abode in a … country, he is become a member of [that] society, at least as a perpetual inhabitant; and his children will be members of it also."). Citizenship does not extend, however, to children of foreigners who lack "the right of perpetual residence" in the country. *Id.* § 213, at 102. Such persons would instead owe allegiance to their parents' home countries, in accord with the principle that "children follow the condition of their fathers." *Id.* § 215, at 102. Vattel then

21

identified several additional exceptions to citizenship by birth in a country—children born "in the armies of the state," "in the house of its minister at a foreign court," or "in [its] vessels"—that track exceptions already recognized by the Supreme Court. *Id.* §§ 216-217, at 102-03.

American jurists acknowledged a similar distinction. As Justice Story explained, citizenship at birth required more than temporary physical presence:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834).

### 2. Persons Temporarily or Unlawfully Present Do Not Owe the Requisite Allegiance to the United States.

As discussed, the text and structure of the Citizenship Clause, its history, and Supreme Court precedent all make clear that a person is "subject to the jurisdiction" of the United States only if they owe primary allegiance to the United States and not some other power. To determine whether a person is within the political jurisdiction of the United States, the Supreme Court has looked to the relationship between the person and the country, and the degree of allegiance and protection exchanged, under the background principles of the common law and the law of nations at the time of ratification of the Fourteenth Amendment. Under those principles, both classes of persons covered by the Executive Order are not subject to the complete political

22

jurisdiction of the United States. A child born of parents here temporarily is domiciled in, and owes primary allegiance to, his parents' home country. A child born to parents here unlawfully, who lack primary allegiance to the United States, similarly owes primary allegiance to his parents' home country. Neither child is subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

**a.** Persons lawfully but temporarily present in the United States retain their primary allegiance to their home countries. While they must respect U.S. law and are protected by U.S. law while temporarily present here, they have not established the requisite allegiance to the United States or received the necessary protection to come within the complete political jurisdiction of the United States. Although English and international law sources sometimes referred to all aliens as owing a "'temporary' allegiance," *Wong Kim Ark*, 169 U.S. at 657 (quoting A. V. Dicey, *A Digest of the Law of England* (1896)), those sources also understood that "[a] settled domicile in a country, imports an allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council). "[T]he law of nations" "recognized" "[t]hat those who have become domiciled in a country are entitled to a more distinct and larger measure of protection than those who are simply passing through, or temporarily in, it." *Fong Yue Ting*, 149 U.S. at 734 (Brewer, J., dissenting) (collecting sources). Because aliens present temporarily have not established domicile, they have not accepted those "rights and … duties" similar to "citizens," *Lau Ow Bew*, 144 U.S. at 61-62, which would form the

23

necessary "direct and immediate allegiance" to make them "completely subject to [the] political jurisdiction" of the United States, *Elk*, 112 U.S. at 102. *Cf. United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (explaining how constitutional rights often attach to people who "develo[p] sufficient connection with this country to be considered part of that community.")

Domicile is, "[i]n general," an individual's "true, fixed and permanent home," *Martinez v. Bynum*, 461 U.S. 321, 331 (1983) (quotation marks omitted), and formed when "[t]wo things … concur": "residence" in a place and the "intention of making it the home of the party." Story, *supra*, § 44. Temporarily present aliens plainly do not establish domicile; indeed, under the immigration laws, many classes of aliens— including tourists, students, and temporary workers—are admitted only on the express requirement that they have "a residence in a foreign country" they have "no intention of abandoning." 8 U.S.C. § 1101(a)(15)(B), (F)(i), (H)(ii)(a)-(b), (H)(iii), (J), (M)(i), (M)(iii), (O)(ii)(IV), (P), (Q); *see Carlson v. Reed*, 249 F.3d 876, 880-81 (9th Cir. 2001) (holding that an alien covered by such a requirement "lack[ed] the legal capacity to establish domicile in the United States"). And such individuals are not entitled to diplomatic protection from the United States when they travel abroad. *Cf. Fong Yue Ting*, 149 U.S. at 724 (explaining that domiciliaries "may invoke" diplomatic protection).

The United States' political connection to children of aliens present temporarily is far weaker than its relationship with children of "members of the Indian tribes,"

24

who fall outside the "jurisdiction" necessary under the Citizenship Clause. *Elk*, 112 U.S. at 99, 101-02. Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (quotation marks omitted). The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Despite the "enduring place" the Constitution "reserves for the Tribes … in the structure of American life," *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring), that link does not suffice as a constitutional matter for citizenship at birth, and the weaker link of aliens present temporarily even more obviously does not establish political jurisdiction or sufficient allegiance. *See, e.g.*, 1 William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

Here, too, the Fourteenth Amendment's historical background supports the conclusion that children born of parents temporarily present are not "subject to the jurisdiction" under the Citizenship Clause. Congressional debates over the Civil Rights Act and Fourteenth Amendment specifically addressed temporarily present foreigners. For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a

natural-born citizen." Cong. Globe, 39th Cong., 1st Sess. at 1117. But he recognized "except[ions]" for "children born on our soil to temporary sojourners or representatives of foreign Governments." *Id.* And during a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the qualification of being "subject to" its "jurisdiction"). *Id.* at 2768-69. One of his colleagues objected that "person[s] may be born in the United States and yet not be … citizen[s]," giving the example of "a person [who] is born here of parents from abroad temporarily in this country." *Id.* at 2769. Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case." *Id.* at 2768-69. Wade's broader version of the Citizenship Clause did not carry the day.

Similarly, the legal community's understanding following ratification accords with that understanding of the Fourteenth Amendment. In a passage later quoted in *Wong Kim Ark*, the Supreme Court of New Jersey interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right to citizenship." *Benny v. O'Brien*, 32 A. 696, 698 (N.J. 1895) (emphasis added). And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

Commentators likewise regularly recognized that the children of temporarily present aliens were not citizens. *See, e.g.*, Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States … ."); Samuel Freeman Miller, *Lectures on the Constitution of the United States* 279 (1891) (similar); Hannis Taylor, *A Treatise on International Public Law* 220 (1901) ("[C]hildren born in the United States to foreigners here on transient residence are not citizens, because by the law of nations they were not at the time of their birth 'subject to the jurisdiction.'"); Henry Brannon, *A Treatise on the Rights and Privileges Guaranteed by the Fourteenth Amendment to the Constitution of the United States* 25 (1901) (recognizing an exception to American citizenship at birth for "children of aliens born here while their parents are traveling or only temporarily resident"); John Westlake, *International Law* 220 (1904) ("[W]hen the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality ….").

The political branches operated from the same understanding following the Fourteenth Amendment's enactment. Six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment … concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that "a child born within the United States of parents who are not citizens, and who do not reside within the United States, … shall not be regarded as a citizen thereof." *Id.* Although the bill ultimately failed because of

27

"opposition to its expatriation provisions," its "parental domicile requirement" generated little meaningful "debate or controversy."  Justin Lollman, Note, *The Significance of Parental Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015).  It thus appears that members of Congress accepted that children born of non-resident alien parents were not subject to the United States' jurisdiction under the Citizenship Clause.

The Executive Branch, too, has taken the position at times that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents.  In 1885, Secretary of State Frederick T. Frelinghuysen denied a passport to an applicant who was "born of Saxon subjects, temporarily in the United States" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship."  2 *A Digest of the International Law of the United States* § 183, at 397-98 (Francis Wharton ed., 2d. ed. 1887) (Wharton's Digest).  Later the same year, Secretary Frelinghuysen's successor, Thomas F. Bayard, denied a passport to an applicant born "in the State of Ohio" to "a German subject" "domiciled in Germany," explaining that the applicant "was on his birth 'subject to a foreign power' and 'not subject to the jurisdiction of the United States.'"  *Id.* at 399-400.  And in 1910, a Department of Justice report explained that "it has never been held, and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States,

28

operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney-General* 124 (1910).

**b.** The same principles apply to aliens illegally present in the United States—like aliens whose presence is temporary, they lack both the requisite allegiance to the United States and the legal capacity to establish domicile here. Illegal aliens have never renounced their allegiance to a foreign power and are by definition within the United States in defiance of American law. That defiance is inconsistent with establishing the requisite "allegiance" to the United States necessary to be completely subject to its political jurisdiction. *See* J.J.S. Wharton, *Law Lexicon, or Dictionary of Jurisprudence* 40 (Edward Hopper ed., 2d ed. 1860) (defining "allegiance" as "natural, lawful, and faithful obedience"). Nor are such aliens entitled to the reciprocal benefits of allegiance. As noted, for those within its complete political jurisdiction, the government may offer its "protection against other nations." *Fong Yue Ting*, 149 U.S. at 724. Illegally present aliens can make no comparable claim to the diplomatic protection of the United States when they travel abroad.

Nor are illegal aliens capable of establishing allegiance through domicile in the United States. Domicile, recall, requires residence and an intent to remain indefinitely. Even if some illegal aliens may meet those requirements factually for purposes of state law, *see Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982), domicile, "being a creation of the law, contains within it certain legal fictions." M.W. Jacobs, *A Treatise on the Law of*

29

*Domicile* § 71, at 119 (1887). Two such rules have already been discussed. One is that a child's domicile follows its parents. *E.g.*, *Lamar*, 112 U.S. at 470. Second, and equally relevant, is that Congress may "preclude[]" classes of aliens "from establishing domicile in the United States." *Toll v. Moreno*, 458 U.S. 1, 14 (1982); *see also Kaplan v. Tod*, 267 U.S. 228, 230 (1925) (holding statute prohibiting entry legally precluded immigrant from "dwel[ling] within the United States" even while physically present). Provisions of the immigration laws that bar individuals from relinquishing their former domicile leave them without "the legal capacity to establish domicile in the United States," *Carlson*, 249 F.3d at 880-81, by precluding, as a legal matter, the intent necessary to establish domicile, regardless of the subjective desires or intentions of the alien. *Accord Park v. Barr*, 946 F.3d 1096, 1099 (9th Cir. 2020) (per curiam).

Individuals whose very presence in the United States is unlawful have even less claim to allegiance established by domicile. They have no lawful basis to establish a residence in the United States, much less to assert an intent to remain indefinitely in defiance of immigration laws. As this Court has noted, "[i]t would be inconsistent to conclude that Congress sought to preclude [those] who *comply* with federal immigration law" from establishing domicile while "permitting [those] who *violate*" it to do so. *Id.* Their unlawful presence cannot be a basis on which to claim allegiance to the United States. That, too, has a pedigree in the law of domicile. *See* Robert Phillimore, *The Law of Domicil* 63 (1847) (explaining that persons could not form a domicile in a place from which they were exiled); Dig. 50.1.31 (Marcellus, Digest 1) (4

*The Digest of Justinian* 906a (Alan Watson trans., 1985)) (stating that a person could not establish domicile somewhere "forbidden to him"); *cf.* Vattel, *supra*, § 213, at 102 (explaining that "inhabitants" are those "permitted to settle and stay in the country"). And it accords with the general equitable principle that no wrongdoer should "profit by his own wrong," *Tilghman v. Proctor*, 125 U.S. 136, 145 (1888), by allowing foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of its laws.

In any event, even if some illegal aliens were capable of establishing allegiance through domicile in defiance of federal law, that would not support the facial claim here. Many illegal aliens do not intend to remain here indefinitely and thus have not formed the intent necessary to establish domicile even as a factual matter. Indeed, it is not even clear what category the individual plaintiffs here fall into, as neither pleads facts about their intent to remain here indefinitely, their continued connections to their home countries, and whether they would desire to return if conditions in those countries changed. *See* ER-23, ER-48. Plaintiffs cannot "establis[h] that no set of circumstances exists under which the [Executive Order] would be valid." *NetChoice, LLC*, 603 U.S. at 723 (quotation marks omitted).

**c.** If any doubt remained about the proper application of the Citizenship Clause to children of aliens temporarily or unlawfully in the United States, related

31

principles of interpretation would compel resolving that doubt in favor of the Executive Order's construction.

Countries have for centuries extended citizenship to the foreign-born children of their citizens, *see, e.g.*, *Wong Kim Ark*, 169 U.S. at 668-71 (discussing English history); Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104; *cf.* 8 U.S.C. § 1401(c). The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971). The individual "who has a dual nationality will be subject to claims" of allegiance "from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship." *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952); *cf. Savorgnan v. United States*, 338 U.S. 491, 500 (1950) ("The United States has long recognized the general undesirability of dual allegiances.").

Recognizing citizenship for the children of temporarily and illegally present aliens—thereby imposing a duty of protection on the United States—could also conflict with the other nation's claims of allegiance, creating "problems for the governments involved." *Bellei*, 401 U.S. at 832. For instance, the War of 1812 resulted in part from the Royal Navy's impressment of sailors whom the United Kingdom viewed as British subjects, but whom the United States viewed as American citizens. Cockburn, *supra*, at 70-79. In the 1860s, Congress and the Executive Branch

32

were taking steps to reduce the frequency of dual allegiance, enacting the Expatriation Act of 1868, ch. 249, 15 Stat. 223, and entering into the Bancroft treaties to coordinate the rights of an immigrant's former and adopted country, *see* Robert E. Mensel, *Jurisdiction in Nineteenth Century International Law and Its Meaning in the Citizenship Clause of the Fourteenth Amendment*, 32 St. Louis U. Pub. L. Rev. 329, 376-79 (2013). The Citizenship Clause was ratified at a time when the focus was on avoiding dual nationality.

In addition, "any policy toward aliens is vitally and intricately interwoven with … the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (quotation marks omitted). Although Congress may not deny citizenship to those protected by the Citizenship Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. art. I, § 8, cl. 4. Congress would retain the power to extend citizenship to the children of aliens present illegally or temporarily, just as it has extended citizenship to the children of members of Indian tribes, but a reading of the Citizenship Clause that compelled that result would deprive the political branches of the power to address serious problems caused by near-universal citizenship at birth.

33

Nor are these idle concerns. The ease of international travel and advances of medicine have allowed foreigners to come to the United States and give birth on a scale without precedent in earlier centuries. A "birth tourism" industry has developed to help expectant mothers travel to the United States to secure U.S. citizenship for their children. *See* Minority Staff of S. Comm. on Homeland Sec. & Governmental Affairs, *Report on Birth Tourism in the United States* 1 (2015), https://perma.cc/C8SA-ZG8X. "[B]irth tourism companies" have even collected hefty fees to facilitate such travel to the United States. *Id.* at 25. One such company charged between $22,000 and $38,000 for a full package including assistance in securing a visa, airfare, and housing and healthcare in the United States. *Id.* at 26; *see id.* at 25-31. That practice "demeans the naturalization process by monetizing the privilege of U.S. citizenship." *Id.* at 39. It also defies U.S. law, under which "obtaining United States citizenship for a child … is an impermissible basis" for a tourist visa. 85 Fed. Reg. 4219, 4223 (Jan. 24, 2020). The Constitution does not grant citizenship in such circumstances.

Similarly, some illegal aliens enter the United States to engage in "hostile activities, including espionage, economic espionage, and preparations for terror-related activities," and these and other aliens "present significant threats to national security and public safety." Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443. On the district court's view, Congress and the Executive Branch are powerless to prevent the children of such individuals from becoming citizens. But again, the Constitution does not grant citizenship in such circumstances.

34

Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. District Dir., INS*, 385 U.S. 630, 637 (1967). While the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of aliens present temporarily or illegally, any ambiguity should be resolved against extending citizenship. Congress may extend citizenship in such circumstances if it wishes to do so.

## B. The District Court's Contrary Holding Is Mistaken.

The district court offered several rationales for concluding that the Executive Order was unlawful in all its applications. None withstands scrutiny.

**1.** The district court held that the phrase "subject to the jurisdiction" must refer to "'a geographic area within which political or judicial authority may be exercised'" and from that concluded that "anyone who answers to the political or judicial authority of the United States is 'subject to [its] jurisdiction.'" ER-9 (alteration in original) (quoting *Jurisdiction*, Black's Law Dictionary (12th ed. 2024)). But as discussed, *see supra* pp. 14-16, that reading cannot explain the Supreme Court's precedents interpreting the Citizenship Clause and is inconsistent with the text of the Clause itself. Children of members of Indian tribes do not acquire citizenship at birth by virtue of the Clause, *Elk*, 112 U.S. at 102, but are plainly subject to the United States' regulatory power. Nor would a decision to withdraw immunity from foreign public ships or ambassadors, *see supra* p. 16, make children born on such ships or to

ambassadors citizens under the Clause. Moreover, that reading makes the phrase "subject to the jurisdiction" redundant with the separate requirement that individuals must be born "in the United States." *Cf.* ER-8 (holding the Clause covers "any individual who is born in the territorial United States").

**2.** The district court was also wrong to conclude, ER-9-11, that *Wong Kim Ark* resolved whether the children of aliens present temporarily or illegally are citizens under the Citizenship Clause. To the contrary, the Court precisely identified the narrow question presented there:

> whether a child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but *have a permanent domicil and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

169 U.S. at 653 (emphasis added).

In analyzing that question, the Supreme Court repeatedly relied on the parents' domicile and permanent residence. For example, it quoted an opinion in which Justice Story recognized that "the children, even of aliens, born in a country, *while the parents are resident there* under the protection of the government, … are subjects by birth." *Id.* at 660 (emphasis added) (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting)). It quoted the New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the general rule, that *when the parents are domiciled here* birth establishes the right to citizenship." *Id.* at 692 (emphasis added) (quotation

36

marks omitted).  It explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States."  *Id.* at 693 (emphasis added).  And it noted that "persons … owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as *all other aliens residing in* the United States."  *Id.* at 694 (emphases added).

After reviewing the relevant history, the Court concluded that the Amendment extends citizenship to "children born, within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*."  *Id.* (emphasis added).  The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, but *have a permanent domicil and residence in the United States*, … and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

That emphasis on domicile was not accidental.  The Supreme Court in the years before and after *Wong Kim Ark* repeatedly addressed the rights of Chinese immigrants, which frequently turned on whether they were domiciled in the United States.  Before *Wong Kim Ark*, the Court had held in *Lau Ow Bew* that "Chinese merchants domiciled in the United States" were exempt from the requirement to obtain a certificate of entry, 144 U.S. at 61, while in *Fong Yue Ting* it had noted that a domiciled Chinese resident could "invoke [America's] protection against other

37

nations," *Fong Yue Ting*, 149 U.S. at 724.  In *Lem Moon Sing v. United States*, the Court held that the domiciliary status of a Chinese resident did not entitle them to judicial review of their exclusion.  158 U.S. 538, 546 (1895).  After *Wong Kim Ark*, the Court continued to treat domiciled Chinese residents differently, *see, e.g.*, *United States v. Mrs. Gue Lim*, 176 U.S. 459, 468 (1900), and described and applied *Wong Kim Ark* as addressing domiciled permanent residents, *see Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902); *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920).  The domiciliary status of Chinese residents was significant because of the relationship between domicile, allegiance, and protection in international law.  *See, e.g.*, *Lau Ow Bew*, 144 U.S. at 61-62; *Fong Yue Ting*, 149 U.S. at 724; *accord id.* at 734 (Brewer, J., dissenting).  This relationship and its implications for the Citizenship Clause was well understood at the time.  *Cf.* Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 423 (1912) ("It is of interest to note the frequency [in *Wong Kim Ark*] with which the terms 'residence' and 'domicile' are used in connection with 'allegiance' and 'subject to the jurisdiction.'").

Executive practice recognized the limitations of *Wong Kim Ark*'s holding.  The official regulations governing the administration of the Chinese Exclusion Acts exempted any person who had "been born in the United States, of parents who at the time of his birth have a permanent domicile and residence in the United States." *Regulations Governing the Admission of Chinese* r. 2 (Feb. 26, 1907), *in* Bureau of Immigration & Naturalization, Dep't of Commerce & Labor, Doc. No. 54, *Treaty,*

*Laws, and Regulations Governing the Admission of Chinese* 34, 34 (June 1908). The Department of Justice, likewise, explained in 1910 that the decision "goes no further" than addressing children of foreigners "domiciled in the United States," and that *Wong Kim Ark* did not address the status of children of "parents who are accidentally or temporarily in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *supra*, at 121, 124; *see also supra* p. 27 (collecting post-*Wong Kim Ark* commentary).

In short, the only question presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicil and residence in the United States." 169 U.S. at 653; *see id.* at 705. The Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Id.* at 679 (quotation marks omitted). More generally, *Wong Kim Ark*'s historical discussion of English common law *jus soli* principles— which undergird many of the district court's broad statements—are not particularly instructive here. Children born to domiciled foreigners were treated identically under English common law and the Citizenship Clause because they were regarded as owing sufficient allegiance to the sovereign. But that does not mean that the Citizenship Clause matched the English common law in every detail. The Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *NYSRPA v. Bruen*, 597 U.S. 1, 39 (2022).

39

That admonition holds particular force here. The Supreme Court had already held—and *Wong Kim Ark* acknowledged—that the Citizenship Clause departs in important respects from English common law. The Clause's exception for children of members of Indian tribes was "unknown to the [English] common law," *Wong Kim Ark*, 169 U.S. at 682. *Wong Kim Ark* did not purport to overturn *Elk*, and its holding should not be characterized in a way that would render *Elk* wrongly decided or would leave "jurisdiction" without a coherent meaning. Moreover, the English *jus soli* tradition was premised on unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, *Report of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94, 95 (1868) (explaining that "the American Constitution is itself proof that Blackstone's [English] theory of allegiance was not accepted by the American governments"); Cong. Globe, 40th Cong., 2nd Sess. 868, 967, 1130-31 (1868) (statements objecting to English doctrine). The Clause thus permits voluntary renunciation of citizenship, even though English common law did not. *See Afroyim v. Rusk*, 387 U.S. 253, 257-62 (1967). And more generally, "[n]o country ha[d] carried" the idea that establishing "domicil[e]" "stamp[ed]" an immigrant with his new home's "national character" "further than that of the United States." Wharton's Digest § 198, at 482 (quotation marks omitted); *see* Jacobs, *supra*, § 26, at 36 n.12 ("There has … from the first been a

40

stronger disposition in the American cases to put national character upon the general principles of domicil than is apparent in the English cases.").

### C. Plaintiffs' Statutory Claim Fails for the Same Reasons.

Plaintiffs also bring claims under 8 U.S.C. § 1401(a), which provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen. Absent a "well-settled" meaning to the contrary, *Kemp v. United States*, 596 U.S. 528, 539 (2022) (quotation marks omitted), texts adopting identical wording generally convey the same meaning. *Cf. Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019). As discussed above, the Citizenship Clause does not cover the children of aliens temporarily or unlawfully present in the United States, and treatises and other sources continued to recognize the limitations on *Wong Kim Ark*'s holding and that citizenship at birth required more than a temporary presence. *See* Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (describing the statute as excluding "children of alien diplomats and consuls," as well as "transients or visitors"); Bouvé, *supra*, at 423. Plaintiffs' statutory claim thus fails for the same reasons as their constitutional claim.

## II.    The District Court's Injunctive Relief Is Substantially Overbroad.

The district court noted that the individual plaintiffs here sought relief "only to enjoin the implementation and enforcement of the [Executive] Order as it relates to themselves." ER-14 n.9. It nevertheless issued a nationwide injunction premised on

41

alleged harms to four States. That was improper in multiple respects, beginning with the fact that the States are not proper plaintiffs. The States cannot assert individual-rights claims of their residents, even if they have some articulable financial harm. And they have also failed to demonstrate an Article III injury, much less an irreparable one. Finally, redressing their purported harms would not require *nationwide* relief.

The injunction has two additional flaws: It enjoins the President, despite the Supreme Court's express statement that such injunctions are improper, and it forbids the government from taking any steps to implement the policy, even though those steps inflict no harm on any plaintiff. At a minimum, those unnecessary intrusions on the separation of powers should be corrected.

## A. The States Are Not Proper Parties and Thus Are Not Entitled to Injunctive Relief.

### 1. The States Cannot Sue to Assert Claimed Individual Rights to Citizenship.

The States claim that their future residents may be denied the rights or privileges of citizenship by the federal government and that this will indirectly cost the States money. But "it is no part of [a State's] duty or power to enforce [its people's] rights in respect of their relations with the Federal Government," *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923), and thus a "State does not have standing as *parens patriae* to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982). The Supreme Court likewise has refused to countenance States' "thinly veiled attempt[s] to circumvent the limits

42

on *parens patriae* standing," *Brackeen*, 599 U.S. at 295 n.11, by asserting derivative injuries from the alleged violations of individuals' rights.

In *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), South Carolina lacked standing to claim that a federal statute violated its citizens' due-process rights because a State has no due process rights of its own and also could not invoke its citizens' rights "against the Federal Government." *Id.* at 323-24. Similarly, in *Brackeen*, 599 U.S. 255, Texas lacked standing to claim that a federal statute violated its citizens' equal-protection rights because Texas "ha[d] no equal protection rights of its own" and could not "assert third-party standing" to bring such a suit. *Id.* at 294-95, 295 n.11. And in *Murthy v. Missouri*, 603 U.S. 43 (2024), Missouri lacked standing to claim that the federal government had violated the Free Speech Clause by censoring the speech of its citizens whose views Missouri was allegedly prevented from hearing. *Id.* at 76.

Ordinary third-party standing limitations reinforce the point. A plaintiff generally "must assert his own legal rights and interests." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). A constitutional claim should ordinarily be brought by the person "at whom the constitutional protection is aimed," that is, "the party with the right." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation marks omitted). Crucially, this principle precludes litigating others' claims even when the putative plaintiff "has alleged injury sufficient to meet" Article III requirements. *Warth*, 422 U.S. at 499. In *Kowalski*, the Court addressed a challenge by criminal defense

43

attorneys to a state statute that limited the appointment of counsel for indigent defendants. 543 U.S. at 127. The Court assumed that the attorneys had established Article III standing through allegations that the law "has reduced the number of cases in which they could be appointed and paid as assigned appellate counsel" for future "hypothetical indigents." *Id.* at 127, 129 n.2 (quotation marks omitted). But the Court held that notwithstanding that pocketbook injury, the attorneys could not sue to assert their putative clients' constitutional right to counsel. *Id.* at 134.

These precedents control here. Just as South Carolina, Texas, and Missouri could not sue the federal government to vindicate individuals' rights under the Due Process, Equal Protection, and Free Speech Clauses—and lawyers cannot assert indigent defendants' constitutional rights to government-funded attorneys because those lawyers would lose out on fees—the plaintiff States here cannot assert the Citizenship Clause rights of future state residents on the theory that those residents' citizenship status may affect States' eligibility for certain federal reimbursements.

### 2. The States Lack Article III Standing or Irreparable Harm from Their Alleged Injuries.

Even apart from these principles, the district court erred in concluding that the States have standing on the basis of "economic and administrative harms" the States would purportedly suffer through the "loss of federal funds," "'operational disruptions[,] and administrative burdens'" created by the Executive Order. ER-5-6.

44

To establish Article III standing, the States must show a judicially cognizable injury that is fairly traceable to the defendant and likely redressable by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The States' showing of causation "must not be too speculative or too attenuated," an inquiry that includes examining whether "the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024).

The States' claim the Executive Order will indirectly reduce the federal funding they receive, and thus cause expenditures of state funds in other programs, does not satisfy Article III. The Supreme Court recently rejected nearly identical claims in *United States v. Texas*, where States challenged federal actions that, in their view, increased the number of noncitizens in their States, thereby imposing costs to "supply social services such as healthcare and education to noncitizens." 599 U.S. 670, 674 (2023). The Supreme Court held those costs insufficient to confer standing:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated. In short, none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit.

*Id.* at 680 n.3 (citations omitted).

That holding was only the most recent in a series of cases rejecting state standing based on downstream effects of federal policy. The Supreme Court long ago

45

rejected claims that States had standing to challenge federal policy on the basis that it "induc[ed] potential taxpayers to withdraw property" and thereby diminished the State's tax base, explaining that such harms are "purely speculative, and, at most, only remote and indirect." *Florida v. Mellon*, 273 U.S. 12, 17-18 (1927). This Court has rejected similar claims. *E.g.*, *Washington v. FDA*, 108 F.4th 1163, 1175-76 (9th Cir. 2024).

These principles foreclose the States' standing here. The Executive Order simply regulates how the federal government will approach certain individuals' citizenship status. No State has a legally cognizable interest in whether the federal government recognizes the U.S. citizenship of a particular individual. Any incidental downstream economic effects from the number of citizens residing in a State are insufficient to establish standing. *See id.* at 1174-76 (reasoning that increased state Medicaid costs were the sort of "indirect" fiscal injuries that fell short of Article III); *East Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (holding that States lack "a significant protectable interest in minimizing their expenditures" from immigration-related policy changes because "such incidental effects are … attenuated and speculative").[5] To conclude otherwise would imply that every State has Article III

---

[5] The indirect, downstream nature of the States' claimed harm distinguishes this case from *Biden v. Nebraska*, 600 U.S. 477 (2023), where the challenged federal policy would have directly deprived a state-government corporation of ongoing fees that it would otherwise earn under a federal contract. *See id.* at 490.

standing to litigate the citizenship status of every person residing within its borders. That is not the law.

The States' standing theory illustrates that no "limits on state standing" would remain if "any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State." *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). That is particularly salient in the immigration context, where the Supreme Court and this Court have rejected claims of state standing premised on the economic effects of the presence or absence of noncitizens. *Texas*, 599 U.S. at 680 n.3; *East Bay*, 102 F.4th at 1002. While illegal aliens generally are not eligible for federal benefits, certain "qualified aliens," such as lawful permanent residents, asylees, or refugees, may qualify for federal benefits in certain circumstances (including Medicaid and CHIP). *See, e.g.*, 8 U.S.C. § 1612. On the States' theory, every State would have standing to challenge a change in the federal government's policies for conferring "qualified alien" status, which would affect eligibility for federal programs.

More generally, the States' theory would confer standing to challenge any federal policy that results in an increase in state expenditures or loss of state revenues. For example, the States' claimed interest in future fees from the Social Security Administration, ER-44-45, would, if sufficient, imply that the States would equally have standing to challenge any federal action that lowers the birthrate within their

47

borders (*e.g.*, enhanced immigration enforcement). Neither the Supreme Court nor this Court has ever endorsed such a boundless theory.

Finally, the States' asserted injuries regarding health, social, and administrative services are not traceable to the Executive Order, which does not require the States to provide those services. The States have *voluntarily* chosen to provide certain benefits without regard to the recipient's citizenship, and the self-inflicted costs they incur do not confer Article III standing. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) ("No State can be heard to complain about damage inflicted by its own hand."). The States likewise cannot rely on "operational disruptions and administrative burdens," ER-6, from an Executive Order that does not require those changes or impose any penalty for failing to make them. *See Alliance for Hippocratic Med.*, 602 U.S. at 394-95.

The same points illustrate that even if the States' claim of lost reimbursements were sufficient for standing, they have failed to show that any such injuries occurring between now and final judgment would be irreparable. Plaintiffs have not shown—and the district court did not find—that any missed federal reimbursements under the Social Security Enumeration at Birth, Medicaid, or CHIP programs could not be recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs.

For example, Medicaid and CHIP provide avenues for States to pursue administrative and judicial review of disputes. *See, e.g.*, 42 U.S.C. § 1316(e). The States

48

have not alleged they would be unable to utilize these processes to recover any lost monies.[6]  Courts routinely reject arguments that requiring exhaustion of claims through an administrative process that could result in payment of contested claims constitutes irreparable harm.  *See, e.g.*, *Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115-16 (9th Cir. 2003).  Similarly, neither the States nor the district court explained why contract payments to the States for relaying Social Security applications could not be received at the conclusion of this suit if the Social Security Administration ultimately issues social security numbers to those applicants.  Thus, even assuming these purported injuries could establish Article III standing, the States have not clearly established irreparable injury.

### B. At a Minimum, the Injunction Should Be Narrowed Insofar as It Applies Nationwide and Needlessly Impinges on the Separation of Powers.

**1.**  At a minimum, these flaws underscore the inappropriateness of the district court's nationwide preliminary injunction.  Both Article III and traditional equitable principles require that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quotation marks omitted); *see Gill v. Whitford*, 585 U.S. 48, 66 (2018) (explaining that under Article III "a plaintiff's remedy

---

[6] The district court relied on *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), but the claim there was that individuals losing private insurance would impose costs on the States.  States' inability to seek reimbursement from private insurers fundamentally differs from their ability to seek reimbursement from the federal government.

must be 'limited to the inadequacy that produced his injury'" (alteration adopted)).

Nationwide injunctions, like the one at issue here, exceed "the power of Article III

courts," conflict with "longstanding limits on equitable relief," and impose a severe

"toll on the federal court system." *Trump v. Hawaii*, 585 U.S. at 713 (Thomas, J.,

concurring); *see DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J.,

concurring in the grant of stay).

Nationwide injunctions circumvent the carefully calibrated rules governing

class actions in federal courts—a point particularly salient here, where the district

court has not yet acted on plaintiffs' request to certify a class. *See* Fed. R. Civ. P. 23;

ER-14 n.9. They encourage forum shopping. *Arizona*, 40 F.4th at 396 (Sutton, C.J.,

concurring). They empower a single district court to pretermit meaningful litigation

on the same issue in other courts, thereby preventing further percolation of the issues.

*See DHS*, 140 S. Ct. at 600 (Gorsuch, J., concurring). And they operate

asymmetrically, granting relief to strangers nationwide if a single plaintiff prevails but

not precluding litigation by others if the plaintiff loses. *Cf. United States v. Mendoza*,

464 U.S. 154, 159-60 (1984) (holding that non-mutual collateral estoppel does not

apply against the federal government).

The Supreme Court recently reiterated the problems posed by nationwide

injunctions in granting a stay in *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024). There,

the district court had preliminarily enjoined the defendant from enforcing a state law

against parties and nonparties. The Supreme Court stayed the district court's order

50

"except as to" the specific plaintiffs. *Id.* at 921. That stay was premised on five Justices' conclusion that universal injunctions providing relief outside the parties to the case are likely impermissible. *Id.* at 927 (Gorsuch, J., concurring in the grant of stay); *see id.* (emphasizing that "[l]ower courts would be wise to take heed"); *id.* at 933 n.4 (Kavanaugh, J., concurring in the grant of stay).

The district court here paid lip service to the principle that "injunctive relief must be narrowly tailored" but concluded that "[t]he extreme nature of the equities" "alone" warranted "nationwide relief." ER-14. That is a non sequitur. Neither the structural separation-of-powers principles embodied in the law of Article III standing, *see Gill*, 585 U.S. at 65, nor the forms of relief traditionally afforded by courts of equity, *see Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999), turn on whether a court views the merits of a controversy as clear or the equities as "extreme."

The district court also suggested that "a geographically limited injunction would be ineffective" to give the States relief because "babies born in other states would travel to the Plaintiff States" and "would be eligible for services and support that, without nationwide relief, need be funded by the Plaintiff States." ER-14. That speculative premise is inadequate to support a nationwide injunction. The States have provided no evidence that such moves are likely to occur before final judgment in this case. This Court has previously reversed nationwide injunctions that lacked record support, *see, e.g.*, *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018), and the lack of

51

any factual foundation for the district court's speculation is itself sufficient basis to reject its reasoning here.

In any event, an injunction that required defendants to treat such moving individuals as eligible for these States' federally funded medical and social programs would fully remedy the States' alleged injuries without requiring nationwide relief. In other words, the States' asserted injuries would be fully redressed by enjoining the Executive Order within the plaintiff States, including as to persons who were born elsewhere but later move to those States. The district court did not explain why such alternatives would be ineffective to remedy the States' asserted injuries.

**2.** The district court's injunction also exceeded its proper scope in two additional ways. First, the injunction covers even the "implementation" of the Executive Order, apparently including the Executive Branch's preparatory steps. But these steps are "inward-facing tasks" "that pertain to internal government operations and procedures" which this Court has held should not be enjoined. *Hawaii v. Trump*, 859 F.3d 741, 786 (9th Cir.) (per curiam), *vacated and remanded*, 583 U.S. 941 (2017). The plaintiffs here, like in *Hawaii v. Trump*, are not harmed by "internal review procedures that do not burden individuals outside of the executive branch of the federal government." *Id.* The district court's injunction also improperly interferes with the President's Article II authority to supervise the Executive Branch, including his authority to "require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective

52

Offices."  U.S. Const. art. II, § 2, cl. 1; *see* ER-63, § 3(b) (directing the "heads of all executive departments and agencies" to develop and issue guidance).  The injunction should thus be narrowed so as not to bar officials from developing and publishing the regulations and guidance contemplated by Sections 2(a) and 3(b) of the Executive Order, so long as those regulations and guidance are not enforced against any individuals.

Second, the injunction applies to all defendants, including the President.  But the Supreme Court has made clear that there is "no jurisdiction" "to enjoin the President in the performance of his official duties."  *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (quotation marks omitted); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).  The district court refused to consider this objection on the ground that the government also noted it would warrant dismissal of the President as a defendant, stating that such a request was "procedurally improper."  ER-7 n.4.  But whether the government could obtain dismissal at that point has no bearing on whether a preliminary injunction can properly reach the President.  It cannot.

### C. The Remaining Equitable Factors Do Not Support the Preliminary Injunction.

Finally, the preliminary injunction inflicts irreparable injuries on the government and the public, whose interests "merge" in this context.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

53

As discussed above, plaintiffs are unlikely to succeed on the merits, and the injunction should be reversed on that basis. But the equities and public interest also favor denying preliminary injunctive relief. An injunction that prevents the President from carrying out his broad authority and constitutional responsibility is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers). The challenged Executive Order is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. That immigration policy is designed to combat the "significant threats to national security and public safety" posed by unlawful immigration. *See* Exec. Order No. 14,159, § 1, 90 Fed. Reg. at 8443; *see also* Exec. Order No. 14,165, 90 Fed. Reg. 8467; Proclamation No. 10,886, 90 Fed. Reg. 8327. Addressing the Executive Branch's prior misinterpretation of the Citizenship Clause is one component of that broader effort, removing incentives to unlawful immigration and closing exploitable loopholes.

The equities are particularly lopsided given the breadth of the injunction. The injunction applies nationwide to all implementation and enforcement of the Executive Order. As noted, the States cannot plausibly claim any injury from internal Executive Branch action to formulate policies and guidance, and delaying advance preparations for the policies of a democratically elected government imposes its own "form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

54

chambers).  Nor can the plaintiff States plausibly claim to represent the public interest for a nationwide injunction.  Eighteen other States filed an amicus brief opposing a preliminary injunction below, *see* Dkt. 89-1, and a nineteenth filed an amicus brief in this Court, *see* Amicus Br. of Tenn.

## CONCLUSION

For the foregoing reasons, the preliminary injunction should be reversed, or at a minimum narrowed.

Respectfully submitted,

YAAKOV M. ROTH
*Acting Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

*s/ Derek Weiss*
DEREK WEISS
*Attorneys, Appellate Staff*
*Civil Division, Room 7325*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5365*
*derek.l.weiss@usdoj.gov*

March 2025

55

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, appellants state that they know of one

related case pending in this Court: *Washington v. Trump*, No. 25-674 (9th Cir. filed Jan.

31, 2025) (appealing the denial of a motion to intervene).

s/ *Derek Weiss*
Derek Weiss

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32-1(a) because it contains 13,997 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss