No. 25-807

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATES OF WASHINGTON, ARIZONA, ILLINOIS, and OREGON,

*Plaintiffs-Appellees*,

CHERLY NORALES CASTILLO and ALICIA CHAVARRIA LOPEZ, on behalf
of themselves as individuals and others similarly situated,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Western District of Washington
Case No. 2:25-cv-00127-JCC
The Honorable John C. Coughenour

## PLAINTIFF STATES' ANSWERING BRIEF

NICHOLAS W. BROWN
*Attorney General of Washington*

COLLEEN M. MELODY, WSBA 42275
  *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

*(Additional Counsel on Signature Page)*

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   COUNTERSTATEMENT OF THE ISSUES ...................................3

III.  STATEMENT OF THE CASE....................................................3

      A.  President Trump Issues the Citizenship Stripping Order Within
          Hours of Taking Office .............................................................3

      B.  Procedural History.....................................................................4

          1.  The district court enjoins the Citizenship Stripping Order..................4

          2.  Other courts uniformly enjoin the Citizenship Stripping Order ..........6

          3.  Courts uniformly decline to stay the nationwide injunctions .............6

IV.   STANDARD OF REVIEW ......................................................7

V.    SUMMARY OF ARGUMENT ....................................................8

VI.   ARGUMENT ...........................................................................10

      A.  The District Court Has Authority to Declare the Citizenship
          Stripping Order Unlawful and Enjoin Its Implementation......................10

          1.  Appellants' challenges to the States' standing are irrelevant ............10

          2.  The States have standing to protect their pecuniary and
              sovereign interests...............................................................11

          3.  The States properly challenged the Citizenship Stripping Order
              under the Fourteenth Amendment's Citizenship Clause ..................21

      B.  The States Are Likely to Succeed on the Merits......................................25

          1.  The Citizenship Stripping Order is plainly unconstitutional .............26

2.  Appellants' "allegiance," "domicile," and "consent" arguments conflict with the Fourteenth Amendment's text and history, and have already been rejected by the Supreme Court ............................ 37

3.  The Citizenship Stripping Order independently violates the INA ..... 49

C.  The Remaining Injunction Factors Decisively Favor the States .............. 52

D.  The District Court's Nationwide Injunction Is Necessary to Provide Complete Relief .......................................................................................... 57

VII.  CONCLUSION ................................................................................. 63

# TABLE OF AUTHORITIES

### Cases

*Afroyim v. Rusk*,
   387 U.S. 253 (1967) ................................................................ 49, 56

*Ah How v. United States*,
   193 U.S. 65 (1904) ......................................................................35

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*,
   458 U.S. 592 (1982) .....................................................................21

*Am. Beverage Ass'n v. City & County of San Francisco*,
   916 F.3d 749 (9th Cir. 2019) ........................................................8

*Bank of Am. Corp. v. Miami*,
   581 U.S. 189 (2017) .....................................................................24

*Benny v. O'Brien*,
   32 A. 696 (N.J. Sup. Ct. 1895) ...................................................46

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ............................................................. passim

*Bostock v. Clayton County*,
   590 U.S. 644 (2020) .....................................................................50

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ......................................................18

*California v. Trump*,
   963 F.3d 926 (9th Cir. 2020) ......................................................21

*CASA, Inc. v. Trump*,
   No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025) ...................7

*CASA, Inc. v. Trump*,
   No. 25-cv-00201, 2025 WL 545840 (D. Md. Feb. 18, 2025) ..............7

*CASA, Inc. v. Trump*,
   --- F. Supp. 3d ----, No. 25-cv-00201,
   2025 WL 408636 (D. Md. Feb. 2, 2025)..............................................................6

*Chin Bak Kan v. United States*,
   186 U.S. 193 (1902) ......................................................................46

*City & County of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ............................................... 13, 15, 60

*City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
   944 F.3d 773 (9th Cir. 2019) ....................................................... 12, 17

*City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
   981 F.3d 742 (9th Cir. 2020) .......................................... 12, 15, 17, 53

*Davis v. Packard*,
   33 U.S. 312 (1834) ......................................................................21

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019) ....................................................... 11, 12, 15, 17

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ......................................................................21

*Doe #1 v. Trump*,
   957 F.3d 1050 (9th Cir. 2020)........................................ 57, 58, 59, 63

*Doe v. Trump*,
   --- F. Supp. 3d ----, Nos. 25-cv-10135, 25-cv-10139,
   2025 WL 485070 (D. Mass. Feb. 13, 2025)................................... 6, 19

*Dred Scott v. Sandford*,
   60 U.S. 393 (1857) ........................................................... 1, 30

*E. Bay Sanctuary Covenant v. Biden*,
   102 F.4th 996 (9th Cir. 2024)..............................................................16

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021)...................................................... passim

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ........................................................ 6, 58

*Elk v. Wilkins*,
    112 U.S. 94 (1884) ...................................................................... 39, 40

*Fedorenko v. United States*,
    449 U.S. 490 (1981) ............................................................................55

*Gee v. United States*,
    49 F. 146 (9th Cir. 1892) ...................................................................35

*George v. McDonough*,
    596 U.S. 740 (2022) ...........................................................................50

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) .................................................................... 22, 23

*Hecox v. Little*,
    104 F.4th 1061 (9th Cir. 2024)..................................................... 7, 58

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ..............................................................59

*Hirabayashi v. United States*,
    320 U.S. 81 (1943) .............................................................................34

*Horne v. Flores*,
    557 U.S. 433 (2009) ...........................................................................10

*Idaho v. Coeur d'Alene Tribe*,
    794 F.3d 1039 (9th Cir. 2015)............................................................54

*Inglis v. Sailors' Snug Harbor*,
    28 U.S. (3 Pet.) 99 (1830) .................................................................39

*INS v. Legalization Assistance Project of L.A. Cnty. Fed'n of Labor*,
    510 U.S. 1301 (1993) .........................................................................56

*INS v. Rios-Pineda*,
    471 U.S. 444 (1985) ...........................................................................34

v

*J.D. v. Azar*,
    925 F.3d 1291 (D.C. Cir. 2019) ..........................................................62

*Kawakita v. United States*,
    343 U.S. 717 (1952) ..........................................................................34

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) ..................................................................... 23, 24

*Kwock Jan Fat v. White*,
    253 U.S. 454 (1920) ..........................................................................46

*Labrador v. Poe ex rel. Poe*,
    144 S. Ct. 921 (2024) ................................................................... 60, 61

*Lamar, Archer & Cofrin, LLP v. Appling*,
    584 U.S. 709 (2018) ..........................................................................50

*League of United Latin Am. Citizens v. Regan*,
    996 F.3d 673 (9th Cir. 2021) .............................................................50

*Ledbetter v. Baldwin*,
    479 U.S. 1309 (1986) ................................................................... 53, 54

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..........................................................................24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................18

*Lynch v. Clarke*,
    1 Sand. Ch. 583 (N.Y. Ch. 1844) ................................................ 28, 45

*Maine v. Taylor*,
    477 U.S. 131 (1986) ..........................................................................21

*McBurnie v. RAC Acceptance E., LLC*,
    95 F.4th 1188 (9th Cir. 2024)............................................................61

*McCreery v. Somerville*,
    22 U.S. (9 Wheat) 354 (1824) ...........................................................29

*McGirt v. Oklahoma*,
  591 U.S. 894 (2020) ........................................................................20

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*,
  512 U.S. 218 (1994) ........................................................................52

*Missouri v. Trump*,
  128 F.4th 979 (8th Cir. 2025) .........................................................59

*Morissette v. United States*,
  342 U.S. 246 (1952) ........................................................................51

*Morrison v. California*,
  291 U.S. 82 (1934) ..........................................................................34

*Murray v. Schooner Charming Betsy*,
  6 U.S. (2 Cranch) 64 (1804) ..........................................................28

*N.H. Indonesian Cmty. Support v. Trump*,
  --- F. Supp. 3d ----, No. 25-cv-00038,
  2025 WL 457609 (D.N.H. Feb. 11, 2025) ......................................6

*Nebraska v. Su*,
  121 F.4th 1 (9th Cir. 2024) .............................................................16

*New Jersey v. Trump*,
  --- F.4th ----, No. 25-1170,
  2025 WL 759612 (1st Cir. March 11, 2025) ......................... 7, 16, 17

*New Jersey v. Trump*,
  No. 25-cv-10139, 2025 WL 617583 (D. Mass. Feb. 26, 2025) ............7

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ........................................................................15

*Nishikawa v. Dulles*,
  356 U.S. 129 (1958) ........................................................................34

*Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*,
  766 F.2d 228 (6th Cir. 1985) ..........................................................20

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) ..................................................................17

*Perkins v. Elg*,
   307 U.S. 325 (1939) ..................................................................34

*Plyler v. Doe*,
   457 U.S. 202 (1982) ..................................................................47

*Regan v. King*,
   134 F.2d 413 (9th Cir. 1943) ....................................................35

*Regan v. King*,
   319 U.S. 753 (1943) ..................................................................35

*Regan v. King,*
   49 F. Supp. 222 (N.D. Cal. 1942)..............................................35

*Rice v. Olson*,
   324 U.S. 786 (1945) ..................................................................21

*Schooner Exch. v. McFaddon*,
   11 U.S. (7 Cranch) 116 (1812) .......................................... 20, 33

*Slaughter-House Cases*,
   83 U.S. 36 (1872) .....................................................................39

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ..................................................................22

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ..................................................................22

*Texas v. Florida*,
   306 U.S. 398 (1939) ..................................................................47

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015)......................................................20

*The Venus*,
   12 U.S. (8 Cranch) 253 (1814) ..................................................47

*Trump v. Int'l Refugee Assistance Project*,
   582 U.S. 571 (2017) ............................................................... 58, 59

*United States ex rel. Hintopoulos v. Shaughnessy*,
   353 U.S. 72 (1957) ........................................................................34

*United States v. Rice*,
   17 U.S. (4 Wheat.) 246 (1819) .....................................................32

*United States v. Texas*,
   143 S. Ct. 51 (2022) ............................................................... 61, 62

*United States v. Texas*,
   599 U.S. 670 (2023) .......................................................... 10, 15, 16

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) ............................................................. passim

*Vance v. Terrazas*,
   444 U.S. 252 (1980) ......................................................................34

*Warth v. Seldin*,
   422 U.S. 490 (1975) .............................................................. 23, 24, 25

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ......................................................22

*Weedin v. Chin Bow*,
   274 U.S. 657 (1927) ......................................................................34

*Whole Woman's Health v. Hellerstedt*,
   579 U.S. 582 (2016) ......................................................................25

*Wyoming ex rel. Crank v. United States*,
   539 F.3d 1236 (10th Cir. 2008) ....................................................20

Constitutional Provisions

U.S. Const. art. I, §§ 1-3 ........................................................28

U.S. Const. art. IV, § 2 ..........................................................28

U.S. Const. amend. XIV, § 1 .......................................... 1, 18, 26

Ariz. Const. art. II, § 13 ........................................................19

Ariz. Const. art. II, § 26 ........................................................19

Ariz. Const. art. V, § 2 ..........................................................19

Ariz. Const. art. VII, § 2 ........................................................19

Ill. Const. art. III, § 1...........................................................19

Ill. Const. art. I, § 22 ...........................................................19

Ill. Const. art. I, § 24 ...........................................................19

Ill. Const. art. V, § 3 ...........................................................19

Or. Const. art. I, § 20...........................................................19

Or. Const. art. II, § 2 ...........................................................19

Wash. Const. art. I, § 12 ........................................................19

Wash. Const. art. I, § 24 ........................................................19

Wash. Const. art. VI, § 1 ........................................................19

Statutes

Civil Rights Act of 1866 § 1, ch. 31, § 1, 14 Stat. 27.............................41

8 U.S.C. § 1401 ...............................................................51

8 U.S.C. § 1401(a) ......................................................... 3, 50

8 U.S.C. § 1401(b) ...................................................................... 27, 41

8 U.S.C. § 1611(a) ............................................................................13

8 U.S.C. § 1611(c)(1)(B) ..................................................................13

42 U.S.C. § 1396b(v) ........................................................................13

705 Ill. Comp. Stat. 305/2(a) ...........................................................19

Ariz. Rev. Stat. § 21-201(1) ..............................................................19

Or. Rev. Stat. Ann. § 10.030(2) .........................................................19

Or. Rev. Stat. Ann. § 181A.490 .........................................................19

Or. Rev. Stat. Ann. § 181A.520 .........................................................19

Or. Rev. Stat. Ann. § 181A.530 .........................................................19

Wash. Rev. Code § 2.36.070 .............................................................19

## Regulations

42 C.F.R. § 435.406 ..........................................................................13

## Other Authorities

H.R. Rep. No. 82-1365 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 1653 .............51

*Citizenship of Children Born in the United States of Alien Parents*,
    10 Op. Att'y Gen. 328 (1862) .............................................................29

*Citizenship Reform Act of 1997 and Voter Eligibility Verification
    Act: Hearing Before the Subcommittee on Immigration and Claims of the
    House Committee on the Judiciary*,
    105th Cong., 1st Sess. (June 25, 1997) .................................................36

Clement L. Bouvé,
    *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in
    the United States* 340 (1912) .............................................................47

Cong. Globe, 39th Cong., 1st Sess. (1866)................................................. 42, 43, 46

Gabriel J. Chin & Paul Finkelman,
   *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal*
   *Immigration Regulation*,
   54 U.C. Davis L. Rev. 2215 (2021)....................................................................48

Garrett Epps,
   *The Citizenship Clause: A "Legislative History*,"
   60 Am. U. L. Rev. 331 (2010)....................................................................... 30, 42

Gerald L. Neuman,
   *Back to Dred Scott?*,
   24 San Diego L. Rev. 485 (1987).......................................................................49

James C. Ho,
   *Birthright Citizenship, The Fourteenth Amendment, and State Authority*,
   42 U. Rich. L. Rev. 969 (2008) ..........................................................................30

James C. Ho,
   *Defining "American" Birthright Citizenship and the Original*
   *Understanding of the 14th Amendment*,
   9 Green Bag 367 (2006) ......................................................... 28, 30, 39

Matthew Ing,
   *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the*
   *Citizenship Clause*,
   45 Akron L. Rev. 719 (2012) ........................................................ 28, 42

*Legis. Denying Citizenship at Birth to Certain Children Born in the United*
   *States*,
   19 Op. O.L.C. 340 (1995)................................................... 28, 36, 48, 49

Michael D. Ramsey,
   *Originalism and Birthright Citizenship*,
   109 Geo. L.J. 405 (2020)............................................................... passim

Frederick Van Dyne,
   *Citizenship of the United States* (1904)................................................29

Noah Webster,
  *An American Dictionary of the English Language* (1865)....................................27

*Protecting the Meaning and Value of American Citizenship*,
  Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ............... 3, 4, 14, 25

*To Revise and Codify the Nationality Laws of United States into a
  Comprehensive Nationality Code: Hearings Before the Comm. on Immigr.
  & Naturalization on H.R. 6127 Superseded by H.R. 9980*,
  76th Cong., 1st Sess. (1940)................................................................................51

## I.     INTRODUCTION

The Fourteenth Amendment's Citizenship Clause emerged out of one of our Nation's darkest chapters and embodies one of its most solemn promises. It was adopted following the Civil War to overturn the infamous holding in *Dred Scott v. Sandford*, 60 U.S. 393, 403 (1857), which denied citizenship to an entire class of persons based on their identity as "descendants of . . . slaves." The Citizenship Clause repudiated *Dred Scott* and reaffirmed the common law principle of *jus soli*, stating that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. Its operation is automatic and its scope broad. It provides our Nation a bright-line rule under which citizenship of those born on American soil cannot be conditioned on the citizenship, allegiance, domicile, immigration status, or nationality of one's parents. And for well more than a century, the Supreme Court, Congress, and the Executive Branch have continuously protected this cornerstone promise of birthright citizenship.

President Trump now seeks to impose a modern version of *Dred Scott*. His Executive Order of January 20, 2025—the Citizenship Stripping Order—declares that the Fourteenth Amendment does not confer citizenship to children born to parents who are undocumented or who have a lawful but temporary status, and it directs federal agencies to deprive those individuals of their rights. But nothing in

1

the Constitution grants the President, federal agencies, or anyone else authority to impose conditions on the grant of citizenship to individuals born in the United States.

This appeal therefore presents a straightforward application of settled law to an undisputed factual record. As the district court held, in consensus with every other federal court to review it, the Citizenship Stripping Order is flatly contrary to the Fourteenth Amendment's text and history, Supreme Court precedent, longstanding Executive Branch interpretation, and the Immigration and Nationality Act (INA). The district court also correctly recognized the grave harms the Order will cause to the States and their public agencies, public programs, public fiscs, and residents, and fashioned an appropriate injunction to remedy those harms: the nationwide injunction that preserves the longstanding status quo and provides the States with complete relief while the case proceeds.

The district court did not abuse its discretion. The Order is clearly illegal, the States have sovereign and pecuniary standing to challenge the Order under settled precedent, and they have overwhelmingly demonstrated entitlement to a nationwide preliminary injunction. An unworkable state-by-state patchwork rule of birthright citizenship would inflict the same harms that originally led the States to file suit. This Court should join the district court in rejecting Appellants' fringe legal arguments and affirm the preliminary injunction in full.

## II.  COUNTERSTATEMENT OF THE ISSUES

1.  Whether the district court properly exercised its discretion in granting a preliminary injunction where the States demonstrated that they are likely to succeed on the merits of their claims that the Citizenship Stripping Order violates the Fourteenth Amendment and 8 U.S.C. § 1401(a), presented unrebutted evidence of irreparable harm, and established that the equities and public interest strongly favored entry of the injunction.

2.  Whether the district court properly exercised its discretion in fashioning the injunction to apply nationwide because doing so was necessary to provide the States with complete relief, where a geographically checkered rule of birthright citizenship is unworkable and would impose on the States the same harms the district court enjoined.

## III.  STATEMENT OF THE CASE

### A.  President Trump Issues the Citizenship Stripping Order Within Hours of Taking Office

On January 20, 2025, President Trump issued an Executive Order entitled "Protecting the Meaning and Value of American Citizenship." Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025); 1-SER-64-67. Section 1 of the Order declares that U.S. citizenship "does not automatically extend to persons born in the United States" if, at the time of birth, the child's father is not a U.S. citizen or lawful permanent resident and their mother's presence in the United States is (1) unlawful

3

or (2) lawful but temporary. 90 Fed. Reg. at 8449. Section 2 states that it is the "policy of the United States" that no federal department or agency shall issue documents recognizing such persons as U.S. citizens or accept documents issued by State governments recognizing such persons as U.S. citizens if they are born after February 19, 2025. *Id*. Section 3 directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and mandates that officials cannot "act, or forbear from acting, in any manner inconsistent with this order." *Id*. at 8449-50.

## B.    Procedural History

### 1.    The district court enjoins the Citizenship Stripping Order

The day after President Trump signed the Citizenship Stripping Order, Washington, Arizona, Illinois, and Oregon (the States) filed a complaint and motion for a temporary restraining order. Dkts. 1, 10.[1] The district court granted the TRO. Dkt. 43. Soon thereafter, a group of expectant mothers filed a putative class action. The district court consolidated the cases, Dkt. 56, and the States and Individual Plaintiffs filed a consolidated complaint, ER-16-134. Each group of plaintiffs moved

---

[1] Docket citations are to the district court docket, Case No. 25-cv-127, unless otherwise noted.

4

for a preliminary injunction. 1-SER-22-58; Dkt. 74.

In seeking injunctive relief, the States detailed the sovereign harms they would suffer by having thousands of their residents deemed non-citizens, and they presented unrebutted evidence that, beginning immediately, the Order would cause the States to lose millions of dollars in federal funding for programs the States administer, such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-E foster care, and the Social Security Administration (SSA) Enumeration at Birth program. 1-SER-30-36, 42-51, 105-178, 252-278, 290-297; 2-SER-298-307. They also presented unrebutted evidence of the extensive and grievous harms the Order would inflict on the States' residents. 1-SER-105-119, 179-251.

The district court enjoined Appellants from enforcing or implementing the Citizenship Stripping Order, holding the States were likely to prevail on their constitutional claim because "[c]itizenship by birth is an unequivocal Constitutional right" that "[t]he President cannot change, limit, or qualify . . . via an executive order." ER-15. It concluded that the Order also likely violates the INA. ER-8. The district court also held that the States had standing and would suffer "irreparable economic harm in the absence of preliminary relief," and that the balance of the equities and public interest strongly weighed in favor of entering a preliminary injunction because "the rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'" ER-12-13

5

(quoting *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018)). Finally, the district court recognized that while "[i]t is axiomatic that injunctive relief must be narrowly tailored[,]" a nationwide injunction was necessary to provide the States with complete relief because "a geographically limited injunction would be ineffective" to relieve the States' financial and administrative burdens. ER-14.

### 2.    Other courts uniformly enjoin the Citizenship Stripping Order

Every court to consider the Order has broadly enjoined its implementation and enforcement. *See Doe v. Trump*, --- F. Supp. 3d ----, Nos. 25-cv-10135, 25-cv-10139, 2025 WL 485070, at *14-16 (D. Mass. Feb. 13, 2025) (issuing nationwide injunction in cases brought by state plaintiffs and private plaintiffs), *appeal filed*, No. 25-1170 (1st Cir.); *CASA, Inc. v. Trump*, --- F. Supp. 3d ----, No. 25-cv-00201, 2025 WL 408636, at *16-17 (D. Md. Feb. 2, 2025) (issuing nationwide injunction in case brought by organizational plaintiffs with nationwide membership), *appeal filed*, No. 25-1153 (4th Cir.); *N.H. Indonesian Cmty. Support v. Trump*, --- F. Supp. 3d ----, No. 25-cv-00038, 2025 WL 457609, at *6 (D.N.H. Feb. 11, 2025) (enjoining enforcement "in any manner with respect to the plaintiffs, and with respect to any individual or entity in any other matter or instance within the jurisdiction of this court").

### 3.    Courts uniformly decline to stay the nationwide injunctions

Appellants appealed and sought a partial stay of the injunction from this

Court. A motions panel unanimously denied Appellants' motion. No. 25-807, Dkt. 37.1. The federal government also sought to partially stay the nationwide injunctions issued in other cases, raising the same or similar arguments regarding standing and scope of relief presented in their stay motion to this Court. Every district and circuit court maintained the nationwide injunctions. *See New Jersey v. Trump*, --- F.4th ----, No. 25-117, 2025 WL 759612 (1st Cir. March 11, 2025); *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902 (4th Cir. Feb. 28, 2025); *New Jersey v. Trump*, No. 25-cv-10139, 2025 WL 617583 (D. Mass. Feb. 26, 2025); *CASA, Inc. v. Trump*, No. 25-cv-00201, 2025 WL 545840 (D. Md. Feb. 18, 2025).

On March 13, 2025, following stay denials by this Court, and the First and Fourth Circuits, Appellants sought a partial stay of each nationwide injunction from the Supreme Court. The Supreme Court called for a response, which the States filed on the same day as this Answering Brief. *See* Resp. to App. for Partial Stay, *Trump v. Washington*, No. 24A885 (Apr. 4, 2025).

## IV.   STANDARD OF REVIEW

A district court's grant of a preliminary injunction, including the injunction's scope, is reviewed for abuse of discretion. *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2024). "A district court abuses its discretion if it rests its decision 'on an erroneous legal standard or on clearly erroneous factual findings.'" *Am. Beverage*

*Ass'n v. City & County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (citation omitted).

## V.    SUMMARY OF ARGUMENT

The Citizenship Stripping Order flies in the face of constitutional text, historical understanding, and settled precedent. In issuing a preliminary injunction, the district court based its conclusions on standing, the injunction factors, and the propriety of nationwide relief on established precedent and an unrebutted record. The district court properly entered a nationwide injunction to prevent the Order from triggering a cascade of irreparable and immediate harms. This Court should affirm.

*First*, Appellants' halfhearted challenges to the States' standing are both irrelevant and meritless. They are irrelevant because the States' co-plaintiffs, the Individual Plaintiffs, undisputedly have standing and seek declaratory and injunctive relief on the same claims. Even if considered, Appellants' arguments are meritless because the overwhelming record is that the Citizenship Stripping Order will cause the States to suffer sovereign harms, forfeit unrecoverable funds from established federal contracts and grant programs, and be required to invest millions to abruptly change major healthcare and services programs that turn on citizenship. Under governing precedent, the States plainly have standing to prevent these harms.

*Second*, the Citizenship Stripping Order contravenes the Fourteenth Amendment's plain text and history, over a century of established precedent,

longstanding Executive Branch interpretation, and the INA. Appellants' invitations to append "allegiance" and "domicile" conditions on the grant of birthright citizenship lack any basis in the text or history of the Citizenship Clause, and Appellants point to *no* case that has ever accepted their view of the Fourteenth Amendment's or the INA's birthright citizenship guarantee. The district court correctly concluded that the States are extremely likely to succeed on the merits.

*Third*, the district court appropriately concluded that the remaining preliminary injunction factors—irreparable harm, the equities, and the public interest—all decisively favor the States. Absent an injunction, the States face significant and irreparable harms. They will lose millions of dollars in federal funds under existing contracts and grant programs, which they cannot recoup, and they will suffer major harms to their sovereign interests. And, if the Citizenship Stripping Order goes into effect, U.S.-born children who should be citizens *will* be born undocumented, subject to removal or detention, and many left stateless—among many other negative and long-term consequences.

*Fourth*, the district court acted well within its discretion in enjoining the Order nationwide. The district court did so to provide the States complete relief, the touchstone measure of an injunction's appropriate scope. Anything less would be unworkable and inconsistent with the national rule of citizenship, which is necessary to protect the States from sovereign and pecuniary harms as people inevitably travel

9

and move. Nationwide relief under these circumstances is appropriate and consistent with precedent.

## VI.    ARGUMENT

### A.    The District Court Has Authority to Declare the Citizenship Stripping Order Unlawful and Enjoin Its Implementation

#### 1.    Appellants' challenges to the States' standing are irrelevant

As a threshold matter, Appellants' challenges to the States' standing are a sideshow. *See* Opening Br. 10, 42-49. All agree that co-plaintiffs, the Individual Plaintiffs, have standing to seek declaratory and injunctive relief on the Citizenship Clause and INA claims at issue. For purposes of the preliminary injunction stage, the clear standing of individuals is enough for the Court to proceed to the merits. As the Supreme Court has held time and again, "[i]f at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023); *see Horne v. Flores*, 557 U.S. 433, 446 (2009) ("Because the superintendent clearly has standing to challenge the lower courts' decisions, we need not consider whether the Legislators also have standing to do so."); *United States v. Texas*, 599 U.S. 670, 709 n.1 (2023) (Alito, J., dissenting) ("In a case with multiple plaintiffs, Article III permits us to reach the merits if any plaintiff has standing.").

Appellants cannot bypass this rule by pointing to the nationwide scope of the preliminary injunction. Doing so is merely an attempt to avoid the abuse-of-discretion standard applicable to review of the injunction's scope. But the

10

issues are distinct: Once any plaintiff has standing for the claim and type of relief at issue, the Court proceeds to the separate question of whether the district court abused its discretion in granting an injunction that protects the States. As detailed below, the States overwhelmingly demonstrated their entitlement to an injunction, and the injunction's scope is eminently reasonable given the record of direct pecuniary and sovereign harms the States will suffer absent a nationwide injunction.

### 2. The States have standing to protect their pecuniary and sovereign interests

Even if considered, Appellants' standing arguments wither in the face of precedent. The States have standing because they presented undisputed evidence that the Citizenship Stripping Order will directly harm their legally protected pecuniary and sovereign interests, causing injury that is actual or imminent, "fairly traceable" to the Order, and redressable by an injunction. *See Biden*, 600 U.S. at 489; *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019). This is not a close question, and multiple independent grounds support the States' standing.

**a.** The States have standing to protect their pecuniary interests because the Order will defund and require substantial changes to existing public programs such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-E foster care, and SSA's Enumeration at Birth program. The district court correctly ruled in the States' favor on this ground, ER-5-6, and Appellants offer no persuasive counterargument.

11

The Supreme Court's recent decision in *Biden v. Nebraska*, 600 U.S. at 488-91, confirms why standing exists here. *Biden* held that where the federal government's action causes a direct reduction in the number of individuals a state entity serves—and therefore a loss of fees the state would otherwise receive under an existing contract—the loss is unquestionably concrete and direct for purposes of standing. *Id.* at 490-91. There, the loss was from the federal government's cancellation of student loans that a state entity earned fees for servicing. *Id.* at 490 ("This financial harm is an injury in fact directly traceable to the Secretary's plan . . . ."). And *Biden* merely reiterated the longstanding rule that state and local government plaintiffs have standing when federal action triggers concrete state funding losses. *See New York*, 588 U.S. at 767 (states had standing where inclusion of citizenship question on the census would cause them to "lose out on federal funds that are distributed on the basis of state population"); *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 754 (9th Cir. 2020) (states had standing based on reduction in federal payments due to decreased enrollment in public benefits); *City & County of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 787-88 (9th Cir. 2019) (same); *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (counties had standing based on likely lost grant funds).

The States have standing under this established precedent. The unrebutted

record shows that thousands of babies born each year will be subject to the Order, including more than 150,000 nationally and more than 1,100 per month in the Plaintiff States alone. 1-SER-108-110, 120-144. Denied citizenship, they will immediately become ineligible for federally backed healthcare coverage and social service programs the States administer pursuant to federal law, including Medicaid, CHIP, and Title IV-E foster care. ER-5-6; *see* 1-SER-149-156, 159-160, 162-166, 176-177, 257-258, 291-296; 2-SER-302-303. As a direct result, the States *will* lose contracted reimbursements they would otherwise receive. ER-5-6; *see*, *e.g.*, 1-SER-153-156 (estimating likely loss to Washington of nearly $7 million per year, if approximately 4,000 children become ineligible for Medicaid/CHIP); 1-SER-293-295 (detailing Oregon's millions of lost Title IV-E dollars if children made ineligible); 1-SER-261-263 (estimating Arizona's expected loss of more than $320 million in healthcare funding over the first 18 years of life for the first cohort subject to the Order); *see also* 1-SER-162-166; 2-SER-302-305.

Moreover, federal law *requires* the States to determine whether each resident served by federal benefits is eligible. 1-SER-149, 151-156, 165-166, 257-258, 291-296; 2-SER-302-303, 305; *see*, *e.g.*, 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406. The Order upends the current State systems that rely on birth certificates, place of birth, or SSNs to determine eligibility, and the States would be forced to create new systems to determine the citizenship of *every* child

they serve to avoid violating federal law. This means an immediate scramble to overhaul systems, update policies, and institute training—all within 30 days. 90 Fed. Reg. 8449 (Order effective "after 30 days"); ER-5-6; *see, e.g.*, 1-SER-154-156 (necessary system changes for Washington's Healthcare Authority would require 7-8 FTEs and take two to three years); 1-SER-260 (cost of implementing necessary changes to Arizona's Medicaid eligibility systems range from $2.3-4.4 million); *see also* 1-SER-172-173, 255, 267-269, 275-276, 295-296; 2-SER-305-307.

The States will also lose "administrative fees" they otherwise would receive under SSA's Enumeration at Birth program. *Biden*, 600 U.S. at 489-90. Pursuant to existing contracts with SSA, the States' vital statistics agencies collect newborn birth data, format it, and transmit it to the SSA to facilitate the assignment of SSNs. 1-SER-170-172, 254-255, 268, 273-274. This is how nearly all SSNs are assigned, 1-SER-170-171, and SSA pays the States approximately $4-5 for each SSN, totaling hundreds of thousands of dollars per year, 1-SER-171, 255, 268, 274. Under these agreements, the loss of revenue will begin immediately if SSA ceases issuing SSNs to children subject to the Order. 1-SER-171-172, 255, 268-269, 274-275 (Washington, Illinois, and Oregon each expect losses of between $7,230 to $38,129 per year due to decrease in SSNs assigned to newborns).

These losses constitute the exact type of direct financial loss—a going-forward reduction in "administrative fee[s]" and grant funds that the States

"otherwise would have earned under [their] contract[s]"—that confers standing. *Biden*, 600 U.S. at 489-90; *New York*, 588 U.S. at 767; *see also NFIB v. Sebelius*, 567 U.S. 519, 576-77 (2012) (Medicaid funding is "much in the nature of a contract") (cleaned up). Appellants bury *Biden* in a footnote and make no serious effort to address it, Opening Br. 46 n.5, and they ignore entirely *New York* and this Court's precedent that has found standing under similar circumstances, *see City & County of San Francisco*, 981 F.3d at 754; *City & County of San Francisco*, 897 F.3d at 1235. But ignoring law does not overcome it. The standing analysis is open-and-shut in the States' favor.

Appellants cite a footnote in *United States v. Texas*, 599 U.S. at 680 n.3, to argue that the States' harms are too indirect. Opening Br. 45-46. But *Texas* offers them no support. There, the Supreme Court held that the state plaintiffs' increased downstream costs to incarcerate and provide social services to non-citizens were not *redressable* because the judiciary could not interfere in the exercise of Article II prosecutorial discretion regarding whom to arrest and deport. *Texas*, 599 U.S. at 677-80. The Court did not disturb the district court's conclusion that the states suffered cognizable injuries, and no one "dispute[d] that even one dollar's worth of harm is traditionally enough to 'qualify as concrete injur[y] under Article III.'" *Id.* at 688 (Gorsuch, J., concurring) (citation omitted). Indeed, the Court stressed that its holding was "narrow" and limited to redressability concerns stemming from

prosecutorial discretion. *Id.* at 683-85. This Court has subsequently confirmed as much. *Nebraska v. Su*, 121 F.4th 1, 13 n.5 (9th Cir. 2024). Here, nothing about the Citizenship Stripping Order is remotely similar to the deference courts afford to the Executive Branch's arrest and prosecution decisions, and nothing about *Texas* undercuts the record here that the States' harms are direct and immediate, as was the case in *Biden*. *See New Jersey*, 2025 WL 759612, at *4 (First Circuit's rejection, at the stay stage, of Appellants' identical arguments based on *Texas*).

Appellants' other cases similarly do not help them. In *Washington v. FDA*, unlike here, the Court recognized that Idaho's asserted harm to its Medicaid system "depend[ed] on an attenuated chain of healthcare decisions by independent actors" that might indirectly affect state revenue through increased state expenditures. 108 F.4th 1163, 1174-75 (9th Cir. 2024); *see also id.* at 1170-71. And *East Bay Sanctuary Covenant v. Biden*, 102 F.4th 996 (9th Cir. 2024), did not address Article III standing at all. States tried to intervene but lacked a "significant protectable interest" under Rule 24(a). *Id.* at 1001. Their supposed interest in minimizing expenditures was deemed too "attenuated and speculative" because they were not at issue in the litigation. *Id*. at 1000-02. Here, as the district court found and the record makes clear, the States' harms are direct and result solely from the federal government's denial of newborns' citizenship—*i.e.*, the single action of one actor. ER-5-6.

Appellants' limitless "self-inflicted injuries" argument is likewise unavailing. *See* Opening Br. 48 (relying on *Pennsylvania v. New Jersey*, 426 U.S. 660 (1976)). They suggest that the States could avoid harm by simply no longer providing the services for which the States currently receive federal reimbursement. But precedent is clear: The involuntary *loss* of federal funding under longstanding programs and contracts, which the States would otherwise receive, is sufficient to support state standing. *See Biden*, 600 U.S. at 489-90 (lost fees sufficient despite Missouri's choice to enter student loan market); *New York*, 588 U.S. at 766-67 (lost funding sufficient without concern for whether states could withdraw from federally backed funding programs); *City & County of San Francisco*, 981 F.3d at 754 (same); *City & County of San Francisco*, 944 F.3d at 787-88 (same). Indeed, reasoning that the States could simply agree to suffer *more* harm by withdrawing from massive federal-state partnerships confirms that the States' harm is not self-inflicted in any sense. *See New Jersey*, 2025 WL 759612, at *5 ("After all, *Biden* did not deem the plaintiff-state's loss of the fees for servicing federal student loans to be the result of such a choice by the plaintiff and thus not a basis for its Article III standing.").

The argument also fails under this Court's precedent even if viewed as a "choice" by the States to participate in certain programs. In *California v. Azar*, 911 F.3d 558, 573-74 (9th Cir. 2018), the Court rejected the theory that state plaintiffs' economic injuries "will be self-inflicted because the states voluntarily chose to

provide money for contraceptive care to its residents through state programs." This Court reviewed *Pennsylvania v. New Jersey* and reiterated that "[c]ourts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation." *Id.* That rule makes sense, particularly here. The massive programs at issue—Medicaid and CHIP for healthcare, Title IV-E for foster care services, and SSA's EAB program for the issuance of nearly all SSNs in the country—were not invented by the States overnight to manufacture standing. The harms the States face are not self-inflicted, and they are more than sufficient to confer standing.

**b.** The States also have standing to protect their sovereign interests. The Citizenship Clause directly governs states by granting both national citizenship to those born in the United States, as well as citizenship in "the State wherein they reside." U.S. Const. amend. XIV, § 1. States unquestionably have a sovereign interest in defending a constitutional provision that directly regulates state citizenship. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). The States enacted their own constitutions after passage of the Fourteenth Amendment, granting rights based on state citizenship. *See, e.g.*, Wash. Const. art. I, § 12 (prohibiting unequal privileges or immunities to "any citizen" or "class of citizens"); *id.*, § 24 (recognizing right of "individual citizen" to bear arms in self-defense); Ariz. Const. art. II, § 13; *id.,* § 26; Or. Const. art. I, § 20; Ill. Const. art. I, § 24;

*id.*, § 22.

The States' constitutions and many of their laws also rely on the settled meaning of "United States citizen." These include laws requiring citizenship to vote in state elections, serve on state juries, hold local offices, and serve as a police or corrections officers. *See, e.g.*, Wash. Const. art. VI, § 1 (right to vote in state elections); Ariz. Const. art. VII, § 2 (same); Or. Const. art. II, § 2 (same); Ill. Const. art. III, § 1 (same); Wash. Rev. Code § 2.36.070 (juror qualifications); Ariz. Rev. Stat. § 21-201(1) (same); Or. Rev. Stat. Ann. § 10.030(2) (same); 705 Ill. Comp. Stat. 305/2(a) (same); Ariz. Const. art. V, § 2 (eligibility to hold certain state offices); Ill. Const. art. V, § 3 (same); Or. Rev. Stat. Ann. §§ 181A.490, .520, .530 (qualifications for police, corrections, and probation officers); *see also Doe*, 2025 WL 485070, at *5 n.7 (citing similar laws and explaining that "[s]tates have general sovereign interests in which persons are their citizens" and "likely also have sovereign interests in which persons are U.S. citizens").

As a result of the Citizenship Stripping Order, the meaning of "citizen" for purposes of these laws is suddenly "endangered and rendered uncertain." *Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 233 (6th Cir. 1985). If federal citizenship changes, the States will need to re-evaluate these state laws and decide whether state voting rights, state jury service, and more should turn on some new, state-specific definition of "citizenship." *See Texas v. United States*, 787 F.3d

19

733, 749 (5th Cir. 2015) (federal "pressure to change state law in some substantial way," including "laws [that] exist for the administration of a state program," constitutes a sovereign injury); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (federal action gives rise to sovereign standing where it "preempts state law" or "interferes with [a state's] ability to enforce its legal code").

Finally, by proclaiming that thousands of the States' residents are not "subject to the jurisdiction" of the United States, the Order purports to render them non-citizens of both the United States *and* the States. The federal government seems to assume that this would have no impact on anything other than these individuals' citizenship status, but it never explains why the impact would be so cabined, because every other example of groups historically considered not "subject to the jurisdiction" of the United States (diplomats, invading armies, Indian tribes) enjoys some degree of immunity from state laws. *See Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 138, 147 (1812); *McGirt v. Oklahoma*, 591 U.S. 894, 928 (2020) ("'The policy of leaving Indians free from state jurisdiction and control is deeply rooted in this Nation's history.'") (quoting *Rice v. Olson*, 324 U.S. 786, 789 (1945))); *Davis v. Packard*, 33 U.S. 312, 324 (1834). And any diminishment in their authority to regulate their own residents would clearly harm the States in their capacity as sovereigns. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (recognizing state standing to protect "exercise of

20

sovereign power over individuals and entities within the relevant jurisdiction" and "power to create and enforce a legal code, both civil and criminal"); *California v. Trump*, 963 F.3d 926, 936, 938-40 (9th Cir. 2020) (states had standing where federal actions would injure "their sovereign interests in enforcing their environmental laws"); *see also Maine v. Taylor*, 477 U.S. 131, 137 (1986).

In light of these injuries, the States easily have sovereign standing here.

### 3.   The States properly challenged the Citizenship Stripping Order under the Fourteenth Amendment's Citizenship Clause

Appellants next attempt to shield review of the Order by arguing that only individuals should be permitted to bring Citizenship Clause claims. In doing so, they cite no authority for a rule that the States may not litigate constitutional claims that implicate individual rights. Opening Br. 42. And for good reason—their position ignores a long history of state and local government challenges to Executive Branch actions that harm states, even when those cases *also* may impact individual rights. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 13 (2020) (reaching merits of claim brought by "States" that rescission of immigration benefit for state residents "infringed the equal protection guarantee of the Fifth Amendment's Due Process Clause"); *South Dakota v. Dole*, 483 U.S. 203, 205-06 (1987) (reaching merits of South Dakota's claims "present[ing] questions of the meaning of the Twenty-first Amendment" and its effect on state law "permit[ting] persons 19 years of age or older to purchase beer"); *South Carolina v. Katzenbach*,

383 U.S. 301, 325-37 (1966) (analyzing South Carolina's claims under Section 1 of the Fifteenth Amendment, which guarantees "[t]he right of citizens of the United States to vote"); *Washington v. Trump*, 847 F.3d 1151, 1161, 1164-67 (9th Cir. 2017) (states had standing for claim under Fifth Amendment, which "prohibits the Government from depriving individuals of their 'life, liberty, or property, without due process of law'") (citation omitted).

Appellants instead attack a strawman: *parens patriae* standing. Opening Br. 42. By now, the States are growing hoarse from explaining to Appellants that the States do not rely on a *parens patriae* theory. *See* 1-SER-16, 33-36; 2-SER-389; No. 25-807, Dkt. 31.1 at 15. And contrary to Appellants' claim, nothing in *Haaland v. Brackeen*, 599 U.S. 255 (2023), supports Appellants' effort to relabel the States' lawsuit as a *parens patriae* challenge. In *Brackeen*, Texas brought an equal protection challenge to the Indian Child Welfare Act. *Id.* at 294-95. While the Court held that Texas could not "assert equal protection claims on behalf of its citizens" as "parens patriae," it *separately* considered whether Texas had "alleged costs" that were "fairly traceable" to the challenged statute. *Id.* at 294-96. Although Texas failed to make that showing, the financial-harm analysis would have been irrelevant if states never have standing to bring constitutional equal protection claims against the federal government, or if courts were always to construe such claims as *parens*

*patriae* claims when brought. *Brackeen* confirms that the States' unique harms are an independent basis for standing.

At best, Appellants' cited cases give rise to a prudential objection to standing—not a constitutional one. *See* Opening Br. 43-44 (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (barring claims based on "prudential rules of standing" that are "apart from Art. III's minimum requirements"), and *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (citing *Warth*'s discussion of "prudential limitations" on standing)). As Appellants note, prudential standing has under certain circumstances been used to bar plaintiffs from "rais[ing] the rights of others." *Kowalski*, 543 U.S. at 129. This judge-made rule, which even in its heyday was not "absolute" and often "quite forgiving," was designed to ensure that the plaintiff "has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation." *Id.* at 129-30.

Prudential standing does not bar the States' claims. Appellants do not dispute the States' ability to fully and ably prosecute this case. And they omit to mention the Supreme Court's subsequent criticism of the prudential standing doctrine. In *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014), the Court rejected the argument Appellants offer here, namely that prudential standing should bar a plaintiff from bringing claims against an indirect competitor because there were "more direct plaintiffs" who could bring the claims. *Id.* at 123

23

(cleaned up). The Court placed the term "prudential standing" in quotation marks and observed that the doctrine is in tension with "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* (cleaned up). Because the claimant's "lost sales and damage to its business reputation g[ave] it standing under Article III," and because it likewise had an available cause of action under the Lanham Act, prudential standing was no bar to suit. *Id.* at 125; *see also Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 196 (2017) ("In *Lexmark*, we said that the label 'prudential standing' was misleading, for the requirement at issue is in reality tied to a particular statute.").

And even if prudential standing remains an available theory, the plain terms of *Warth* and *Kowalski* leave ample room for the States' standing here. Both cases preserve standing where a plaintiff seeks to vindicate its own "rights and interests" without "rest[ing] . . . on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499; *Kowalski*, 543 U.S. at 129 (same). As explained, the Citizenship Stripping Order unquestionably impacts rights and interests that belong *exclusively* to the States: it renders uncertain who is a citizen of the States; upsets the rules for state-run elections and jury systems; depletes millions of dollars from programs that *only* states may operate pursuant to federal law; and changes the terms on which federal officials will "accept documents issued by State, local, or other governments." 90 Fed. Reg. at 8449. This case presents no third-party standing

problem because no one *but* the States would have standing to enforce these unique and concrete state interests.

At bottom, Appellants' argument is that standing is absent if someone else (such as the States' residents) might *also* benefit from an injunction. But that has never been the law. As long as a case or controversy is present such that "[t]he Art. III judicial power exists," any relief ordered by the Court "may benefit others collaterally" without running afoul of any constitutional principle. *Warth*, 422 U.S. at 499; *see also Whole Woman's Health v. Hellerstedt*, 579 U.S. 582, 604 (2016) ("Nothing prevents this Court from awarding facial relief as the appropriate remedy for petitioners' as-applied claims."). The fact that the States' residents will benefit from the injunction below is not a bug in the system—it is a feature of State-initiated litigation where the interests of the States and their residents coincide.

## B. The States Are Likely to Succeed on the Merits

The district court was also correct that the States will likely succeed on the merits because the Citizenship Stripping Order unlawfully attempts to rob individuals of their constitutionally conferred and statutorily protected citizenship. A wall of authority—the Fourteenth Amendment's text and history, more than a century of Supreme Court and Ninth Circuit precedent, Executive Branch official positions, and the INA—makes clear that children born in the United States today are citizens, just like children born in the United States have been for more than 150

25

years. Appellants' fringe arguments to the contrary conflict with settled law and should be forcefully rejected.

### 1.     The Citizenship Stripping Order is plainly unconstitutional

**a.** Starting with the text, the Fourteenth Amendment's Citizenship Clause declares: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. This grant of citizenship contains no qualifiers based on the citizenship, allegiance, domicile, immigration status, or country of origin of one's parents. The Citizenship Clause's language is broad by design, and it ensures that virtually every child born on United States soil is a citizen at birth.

Resisting this simple conclusion, Appellants twist the phrase "subject to the jurisdiction thereof" beyond all recognizable bounds. But as a matter of text, history, and precedent, the group of U.S.-born individuals *not* subject to the jurisdiction of the United States is both extraordinarily small and well defined. As the Supreme Court has held, that phrase reflects a narrow and historically grounded exception for groups recognized as exempt from the United States' jurisdiction as a matter of fact, comity, or practice. In particular, it excludes U.S.-born children who are born to diplomats covered by diplomatic immunity and members of foreign armies at war

26

against the United States.[2] *United States v. Wong Kim Ark*, 169 U.S. 649, 704 (1898). It has never been understood to exclude U.S.-born children based on their parents' citizenship, immigration status, allegiance, or domicile.

This understanding makes sense as a textual matter. The "idea of legislative and executive jurisdiction—a nation's jurisdiction—comes from pre-Amendment international law and was also found in ordinary dictionaries of the time." Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 437 (2020). According to the 1865 edition of Webster's dictionary, for example, "jurisdiction as applied to nations meant the '[p]ower of governing or legislating,' 'the power or right of exercising authority,' the 'limit within which power may be exercised,' or 'extent of power or authority.'" *Id.* (quoting Noah Webster, *An American Dictionary of the English Language* 732 (1865)). That definition reflected common usage and widespread understanding that a nation's jurisdiction referred to its sovereign authority. *Id.* at 436-58; *see also* Matthew Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, 45 Akron L. Rev. 719, 729-30 (2012).

---

[2] The original understanding of the Fourteenth Amendment was that children born to certain Native American tribal members were not subject to the United States' jurisdiction at birth, as noted below, but such children have long been granted U.S. citizenship at birth pursuant to federal statute. *See* 8 U.S.C. § 1401(b).

**b.** The history of the Citizenship Clause confirms its plain language. Birthright citizenship stems from English common law's principle of *jus soli*—citizenship determined by birthplace. James C. Ho, *Defining "American" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367, 369 (2006). While the Constitution referenced citizenship, including the concept of citizenship by birth, prior to the Fourteenth Amendment's adoption, *see* U.S. Const. art. I, §§ 1-3; *id.* art. IV, § 2, its precise scope was left to the common law, Ramsey, *Originalism*, *supra*, at 410-12. The prevailing view was that the United States adopted "the English idea of subjectship by birth within the nation's territory," or the principle of *jus soli. Id.* at 413.

Under the pre-Fourteenth Amendment common law, "every person born within the dominions and allegiance of the United States, whatever were the situation of his parents, [was] a natural born citizen."[3] *Id.* at 415 (quoting *Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844)); *see also Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 119-20 (1804) (presuming that all persons born in the United States were citizens thereof); *McCreery v. Somerville*, 22 U.S. (9 Wheat) 354 (1824) (assuming that children born in Maryland to alien parents were

---

[3] Enslaved individuals, "shamefully, not being considered persons at all for many legal purposes, were ignored by the common law analysis." *See Legis. Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 342 n.7 (1995) (testimony from the U.S. Department of Justice, Office of Legal Counsel, discussing the Citizenship Clause's history).

28

native-born U.S. citizens); Frederick Van Dyne, *Citizenship of the United States* 3-7 (1904) (surveying United States common law authorities and concluding that "[i]t is beyond doubt" that prior to the Fourteenth Amendment's adoption and the Civil Rights Act of 1866, "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States"); *Citizenship of Children Born in the United States of Alien Parents*, 10 Op. Att'y Gen. 328 (1862) (Attorney General opinion concluding that a child born in the United States of alien parents who have never been naturalized is, by fact of birth, a native-born citizen of the United States). The recognized exceptions to this broad rule reflected those not subject to the United States' sovereign authority, including children of foreign diplomatic and foreign military forces on United States soil and children born to certain Native American tribal members who were born under the "dominion of their tribes," which were recognized as their own "national communities" not subject to the United States' jurisdiction. *See* Ramsey, *Originalism*, *supra*, at 415-16, 442-44.

The common law *jus soli* foundation was shaken when the Supreme Court infamously declared that citizenship did not extend to free descendants of slaves—in other words, that citizenship depended on one's identity rather than one's place of birth. *Dred Scott*, 60 U.S. at 404-05. In response to *Dred Scott* and the Civil War,

Congress and the States adopted the Fourteenth Amendment to "guarantee citizenship to virtually everyone born in the United States," with only the narrow exceptions previously recognized for diplomats, invading armies, and Native American tribal members not recognized to be subject to the United States' jurisdiction. James C. Ho, *Birthright Citizenship, The Fourteenth Amendment, and State Authority*, 42 U. Rich. L. Rev. 969, 971 (2008); *see also* Garrett Epps, *The Citizenship Clause: A "Legislative History*," 60 Am. U. L. Rev. 331, 352-59 (2010) (detailing ratification debate); Ho, *Defining "American" Birthright Citizenship*, *supra*, at 369-72 (detailing ratification debate and concluding that "[t]ext and history confirm that the Citizenship Clause reaches all persons who are subject to U.S. jurisdiction and laws, regardless of race or alienage").

**c.** The Fourteenth Amendment's broad promise of birthright citizenship is cemented by controlling U.S. Supreme Court precedent. More than 125 years ago, *Wong Kim Ark* confirmed that the Citizenship Clause guarantees citizenship to virtually all children born in the United States regardless of their parents' identity, citizenship, or immigration status. 169 U.S. at 704. In its decision, the Court exhaustively canvassed the Fourteenth Amendment's text and history, and relevant law and authorities from before and after its passage. In doing so, it held that the Citizenship Clause stood for "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of parents[.]" *Id.* at 688,

692-93. Thus, Wong Kim Ark, a child born in San Francisco to Chinese parents who could not themselves become U.S. citizens, was an American citizen. *Id.* at 704.

A central tenet of the Court's holding is its interpretation of the phrase "subject to the jurisdiction thereof." The Court was exceedingly clear about the meaning of that phrase. The "real object" of including that language was "to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases . . . recognized [as] exceptions to the fundamental rule of citizenship by birth within the country." *Id.* at 682. Those classes are the ones noted above: "children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign state[.]" *Id.* In addressing the Amendment's language, the Court explained that it "was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption." *Id.* at 676.

The Court's interpretation of the Citizenship Clause is neither dicta nor conclusory, and it confirms that the phrase "subject to the jurisdiction thereof" is a narrowly limited exception, but not superfluous. The Court analyzed how, with respect to each narrow exception, it had long been recognized that the United States' jurisdiction—its exercise of sovereign authority—was limited as a matter of fact or

31

as a matter of comity and practice. *Id.* at 682-83. It discussed *United States v. Rice*, for example, to explain "the case of a suspension of the sovereignty of the United States over part of their territory by reason of a hostile occupation"—that is, where as a matter of fact the United States could not exercise jurisdiction over occupied territory. *Id.* at 683 (citing 17 U.S. (4 Wheat.) 246 (1819)).

In expounding upon the otherwise broad meaning of jurisdiction as sovereign authority over all "persons within the territory," the Court relied most heavily upon Chief Justice Marshall's opinion in *Schooner Exchange*. That case "covered the whole question of what persons within the territory of the United States are subject to the jurisdiction thereof[,]" other than invading armies and Native Americans. *Id.* The Court started with the foundational principle that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." *Id.* at 683-84 (quoting *Schooner Exch.*, 11 U.S. at 136). While absolute, that exclusive territorial jurisdiction contained recognized exceptions accepted by the Nation itself as a sovereign entity. *Id.* Those established exceptions related to the presence of other sovereigns and their representatives, such as their ambassadors, ministers, and armed forces. *Id.* at 684-85 (citing *Schooner Exch.*, 11 U.S. at 137-39).

As the Court explained, no exception extended to aliens present in a non-diplomatic capacity within the United States. "When private individuals of one nation spread themselves through another as business or caprice may direct," the

Court recognized, "it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." *Id.* at 685-86 (quoting *Schooner Exch.*, 11 U.S. at 144). Thus, the Court accepted as an "incontrovertible principle[]" that an alien's presence "can never be construed to grant to them an exemption from the jurisdiction of the country[.]" *Id.* at 686.

With this broad understanding of jurisdiction established, the Court brought the point back to the Citizenship Clause's meaning: "The words 'in the United States, and subject to the jurisdiction thereof,'" must be understood "in the same sense in which the like words had been used by Chief Justice Marshall in the wellknown case of *The Exchang*e[.]" *Id.* at 687. In other words, contrary to Appellants' and certain amici's modern-day suggestion that the phrase refers only to those whose parents have an "unqualified allegiance" or sufficiently permanent "domicile," *Wong Kim Ark*'s interpretation of the phrase "subject to the jurisdiction thereof" is clear and binding. Virtually everyone who is born within the United States is born *subject to its jurisdiction*.

*Wong Kim Ark* is the authoritative interpretation of the Citizenship Clause's reach, but it is not the only example of the judiciary recognizing this sacrosanct constitutional right. The Supreme Court, the Ninth Circuit, and other courts have

repeatedly recognized that individuals born in this country are citizens subject to its jurisdiction—without any additional conditions. *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing that a child of two undocumented immigrants "was a citizen of this country" by virtue of being "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 329 (1939) ("[A] child born here of alien parentage becomes a citizen of the United States.").[4] Indeed, during World War II, this Court relied on *Wong Kim Ark* and affirmed a district court's rejection of an attempt to strike from voter rolls 2,600 people of Japanese descent who were born in the United States. *Regan v. King*, 49 F. Supp. 222, 223 (N.D. Cal. 1942), *aff'd*, 134 F.2d 413

---

[4] *Accord United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (recognizing that a child born to parents who overstayed temporary lawful stays was "of course, an American citizen by birth"); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980) ("Appellee . . . was born in this country, the son of a Mexican citizen. He thus acquired at birth both United States and Mexican citizenship."); *INS v. Errico*, 385 U.S. 214, 215 (1966) (explaining that children born in United States to parents who procured entry to country by fraudulent means "acquired United States citizenship at birth"); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958) ("Petitioner was born in Artesia, California, in 1916. By reason of that fact, he was a citizen of the United States, and because of the citizenship of his parents, he was also considered by Japan to be a citizen of that country."); *Kawakita v. United States*, 343 U.S. 717, 720 (1952) (noting that petitioner was born in the United States to Japanese citizen parents and "was thus a citizen of the United States by birth"); *Hirabayashi v. United States*, 320 U.S. 81, 96 (1943) (noting that tens of thousands of "persons of Japanese descent" living on Pacific coast "are citizens because born in the United States," even though "under many circumstances" they also were citizens of Japan "by Japanese law"); *Morrison v. California*, 291 U.S. 82, 85 (1934) ("A person of the Japanese race is a citizen of the United States if he was born within the United States."); *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (discussing *Wong Kim Ark* and noting that a child born in the United States "was nevertheless, under the language of the Fourteenth Amendment, a citizen of the United States by virtue of the jus soli embodied in the amendment"); *Ah How v. United States*, 193 U.S. 65, 65 (1904) (stating petitioner offered evidence that he was born in the United States "and therefore was a citizen").

(9th Cir. 1943), *cert. denied*, 319 U.S. 753 (1943). As the district court explained, it was "unnecessary to discuss the arguments of counsel" challenging those individuals' citizenship because it was "settled" that a child born "within the United States" is a U.S. citizen. *Id.* And even before *Wong Kim Ark*, this Court had held the same. *Gee v. United States*, 49 F. 146, 148 (9th Cir. 1892) (Chinese exclusion laws "are inapplicable to a person born in this country, and subject to the jurisdiction of its government, even though his parents were not citizens, nor entitled to become citizens").

**d.** The Executive Branch, too, has long accepted and firmly endorsed the established understanding of the Citizenship Clause. When the U.S. Department of Justice's Office of Legal Counsel (OLC) was asked in 1995 and 1997 to assess the constitutionality of legislation that would deny citizenship to children born to parents who were not citizens or permanent resident aliens, OLC reviewed the Citizenship Clause's text, history, and precedent, and concluded that such legislation would be "unquestionably" and "flatly" unconstitutional. *Legis. Denying Citizenship*, 19 Op. O.L.C. at 341; *Citizenship Reform Act of 1997 and Voter Eligibility Verification Act: Hearing Before the Subcommittee on Immigration and Claims of the House Committee on the Judiciary*, 105th Cong., 1st Sess. 21 (June 25, 1997) (statement of Dawn E. Johnson, Acting Assistant Attorney General, Office of Legal Counsel).

"Throughout this country's history," OLC explained, "the fundamental legal principle governing citizenship has been that birth within the territorial limits of the United States confers United States citizenship." *Legis. Denying Citizenship*, 19 Op. O.L.C. at 340. There was an historical aberration, of course. *Dred Scott* "sought to modify the founders' rule of citizenship," and in response, "Congress and the States adopted the Fourteenth Amendment in order to place the right to citizenship based on birth within the jurisdiction of the United States *beyond question*." *Id.* (emphasis added). The phrase "subject to the jurisdiction thereof," OLC detailed, "was meant to reflect the existing common law exception for discrete sets of persons who were deemed subject to a foreign sovereign and immune from U.S. laws," such as "foreign diplomats." *Id.* at 342. OLC accordingly concluded that "[a]part from these extremely limited exceptions, there can be no question that children born in the United States of aliens are subject to the full jurisdiction of the United States." *Id.*

In light of this authority, the Citizenship Stripping Order is plainly unconstitutional. The individuals it targets are "subject to the jurisdiction" of the United States just like virtually every other person born in the United States, and they cannot be deprived of their citizenship through an Executive Order.

2.    **Appellants' "allegiance," "domicile," and "consent" arguments conflict with the Fourteenth Amendment's text and history, and have already been rejected by the Supreme Court**

Notwithstanding this mountain of authority, Appellants argue that the Courts, Congress, and the Executive Branch have been laboring for more than a century under an unknowing misapprehension about the true nature of the Fourteenth Amendment.[5] They are wrong as a matter of constitutional text and history, and their arguments are foreclosed by *Wong Kim Ark*.

**a.** Appellants' boldest claim is that persons are born "subject to the jurisdiction" of the United States only if they have "direct and immediate allegiance" and a "requisite" and "primary allegiance" to the United States. Opening Br. 1, 9, 12-14, 17, 22-24, 29. But the Citizenship Clause makes no reference to allegiance, and their argument conflicts squarely with *Wong Kim Ark*, which held that a person born in the United States was a citizen at birth even though he and his parents were "subjects of the Emperor of China." 169 U.S. at 652. Indeed, the Court recognized that to "exclude[] from citizenship the children born in the United States of citizens or subjects of other countries, would be to deny citizenship to thousands of persons . . . who have always been considered and treated as citizens of the United

---

[5] Numerous amici press similar arguments, which fail for the same reasons. *See* Br. of Iowa and 18 States at 9-19; Br. of Tennessee at 9-19; Br. of E. Meese at 3-16.

States." *Id.* at 694. This alone is sufficient to reject Appellants' atextual "allegiance" requirement.

The problems with Appellants' "allegiance" argument run even deeper because they ignore how that term is used by the binding legal authorities that have construed it. As *Wong Kim Ark* confirms, nearly everyone owes direct allegiance and is subject to the Nation's jurisdiction by virtue of their birth or presence in the United States. As the Court explained, "[t]he fundamental principle of the common law with regard to English nationality was birth *within the allegiance*—also called 'ligealty,' 'obedience,' 'faith,' or 'power'—of the king. The principle embraced all persons born within the king's allegiance, and subject to his protection." *Id.* at 655 (emphasis added). "Such allegiance and protection were mutual," the Court explained, "and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; [they] were predicable of aliens in amity, so long as they were within the kingdom." *Id.*

The Court traced this understanding from the common law of England to the *jus soli* principle as adopted in U.S. common law and reflected in the Fourteenth Amendment. *Id.* at 659-61 ("Allegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is; and allegiance by birth is that which arises from being born within the dominions and under the protection of a particular sovereign.") (quoting *Inglis v. Sailors' Snug Harbor*, 28

38

U.S. (3 Pet.) 99, 155 (1830)); *id.* at 662-664 (collecting additional authorities). Indeed, the Court drew a line from this common law understanding to the narrow exclusions for those few categories of individuals who are not subject to the United States' jurisdiction at birth. *Id.* at 682-83. Thus, the district court got it exactly right in explaining that "so long as a person is born within a territory, then allegiance to that territory is a foregone conclusion." ER-11.

**b.** Appellants turn nonetheless to *Elk v. Wilkins*, 112 U.S. 94 (1884), the *Slaughter-House Cases*, 83 U.S. 36 (1872), and a slew of nonbinding authorities to try to read "allegiance" and "domicile" requirements into the Citizenship Clause. Opening Br. 13-22. Their arguments rehash well-trodden and widely rejected bases for attempting to adopt exclusionary interpretations of the Citizenship Clause. *See* Ramsey, *Originalism*, *supra*, at 436-58; Ho, *Defining "American" Birthright Citizenship*, *supra*, at 376-77. Indeed, they largely depend on ignoring the Court's majority opinion in *Wong Kim Ark*. *See* 169 U.S. at 678-82 (repudiating the dicta in the *Slaughter-House Cases* that suggested a narrow view of the Citizenship Clause and discussing how *Elk v. Wilkins* does not support denying citizenship to children born to foreign parents on U.S. soil).

Take *Elk*, which Appellants rely upon most heavily. That case recognized the founding-era view that certain Native American tribal members were not subject to the United States' jurisdiction at birth, and addressed whether a Native American

individual who was not born a U.S. citizen nonetheless obtained citizenship by virtue of "sever[ing] his tribal relation to the Indian tribes, and fully and completely surrender[ing] himself to the jurisdiction of the United States[.]" 112 U.S. at 95, 98-99. To be sure, as Appellants note, *Elk* remarked that the phrase "subject to the jurisdiction" "evident[ly]" meant "not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance." *Id.* at 102.

But Appellants ignore the rest of the decision and how it aligns with *Wong Kim Ark*. Just after making the statement Appellants cite, the *Elk* Court drew an express comparison between individuals born to Native American tribes and "the children born within the United States, of ambassadors or other public ministers of foreign nations." *Id.* This was because tribes were recognized as "distinct political communities, with whom the United States might and habitually did deal, as they thought fit, either through treaties made by the president and senate, or through acts of congress in the ordinary forms of legislation." *Id.* at 99; *see also* Ramsey, *Originalism*, *supra*, at 441-44 (discussing common understanding that Native Americans were not viewed as subject to the United States' jurisdiction due to their "degree of self-government and independence from U.S. interference in internal tribal matters" and fact that many tribes were "as a practical matter, beyond U.S. authority").

40

Nor do we have to speculate on this question. The Court in *Wong Kim Ark* expressly addressed the limited reach of *Elk*, clarifying any misconception about the language Appellants rely upon. *Wong Kim Ark*, 169 U.S. at 682. The Court concluded that *Elk* "concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents . . . not in the diplomatic service of a foreign country." *Wong Kim Ark*, 169 U.S. at 682; *accord* Ramsey, *Originalism*, *supra*, at 419-20. *Elk* is accordingly of no help to Appellants—particularly because the Citizenship Stripping Order is unquestionably *not* about the status of Native American children, whose citizenship is conferred separately by statute. 8 U.S.C. § 1401(b).

Appellants next point to the Civil Rights Act of 1866, which provided that "[a]ll persons born in the United States, and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act of 1866 § 1, ch. 31, § 1, 14 Stat. 27, at 27; *see* Opening Br. 18-19. Nothing about that Act supports Appellants' reading of the Citizenship Clause. All involved in its passage understood that the 1866 Act's language included the children of immigrants. *See* Ramsey, *Originalism*, *supra*, at 451-54; Epps, *The Citizenship Clause*, *supra*, at 349, 350-52. In fact, when one senator asked whether the original proposed language "would have the effect of naturalizing the children of Chinese and Gypsies born in this country[,]" Senator Trumbull, the Act's author,

responded, "Undoubtedly." Cong. Globe, 39th Cong., 1st Sess. 498.[6] That was so even though, at the time, Chinese immigrants could not become naturalized U.S. citizens and "Gypsies" were, if present, likely present unlawfully. *See* Epps, *The Citizenship Clause*, *supra*, at 350-52. Thus, insofar as this was a "blueprint" for the Fourteenth Amendment's Citizenship Clause, it shows that Appellants are wrong.

Were there any lingering question, *Wong Kim Ark* answered it when the Court explained that "any possible doubt" regarding the 1866 Act's scope "was removed" with passage of the Fourteenth Amendment. 169 U.S. at 471-72. All involved in passage of the Fourteenth Amendment understood that the Citizenship Clause guaranteed citizenship to virtually all U.S.-born children regardless of the race, citizenship, status, allegiance, or domicile of their parents. *See* Ramsey, *Originalism*, *supra*, at 441-51; Epps, *The Citizenship Clause*, *supra*, at 350-62. For instance, in one telling example, Senator Cowan argued against ratification because "[i]f the mere fact of being born in the country confers that right," of citizenship, then the

---

[6] Appellants try to resist this history by citing an out-of-context statement from Senator Trumbull that the Act's purpose was to "make citizens of everybody born in the United States who owe[d] allegiance to the United States." Opening Br. 19. The sentences immediately following the one they cite make clear that Senator Trumbull was referring to the known exclusion for diplomats. Cong. Globe, 39th Cong., 1st Sess. 572 ("We cannot make a citizen of the child of a foreign minister who is temporarily residing here."); *see also* Ing, *Birthright Citizenship, Illegal Aliens, and the Original Meaning of the Citizenship Clause*, *supra*, at 757 (discussing Senator Trumbull's allegiance comments in context).

children of parents "who have a distinct, independent government of their own," "who owe [the state] no allegiance," and who would "settle as trespassers" would also be citizens. Cong. Globe, 39th Cong., 1st Sess. 2891; *id.* at 2890 (statement of Sen. Cowan) ("Is the child of the Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen? . . . . Have they any more rights than a sojourner in the United States?"). All agreed that Senator Cowan properly understood the Citizenship Clause's broad scope, and the Senate adopted the broad language to which he objected.[7] *See id.* at 2891 (Senator Conness confirming that the Citizenship Clause as proposed would provide citizenship to "children begotten of Chinese parents in California").

Finally, Appellants' "allegiance" argument would lead to absurd consequences if accepted. Using a newborn's quantum of allegiance as a test for citizenship would appear to mean that *no* child born to dual citizens, non-citizens, or lawfully present immigrants would be a citizen at birth. That is not and has never been the law, and even the Citizenship Stripping Order is inconsistent with that view.

---

[7] Appellants selectively quote another statement from Senator Trumbull, in which he said, when discussing the phrase "Indians not taxed," that "[Indians] are not subject to our jurisdiction in the sense of owing allegiance solely to the United States." Cong. Globe, 39th Cong., 1st Sess. 2894; Opening Br. 19. The context of his statement makes clear that he was explaining why Native American tribes, as politically independent peoples not fully subject to the sovereign authority of the United States, were understood not to be subject to the jurisdiction thereof. *See* Cong. Globe, 39th Cong., 1st Sess. 2894; *see also* Ramsey, *Originalism*, *supra*, at 449-50.

**c.** Appellants' attempt to read a requirement of "domicile" of one's parents into the Citizenship Clause also fails. The Fourteenth Amendment's text does not refer to domicile at all. That makes sense because it was ratified against the backdrop of the common law, which recognized birthright citizenship for all with only the narrow exceptions noted above. While Appellants cite authorities and cherry pick language referring to domicile, they cite no binding case interpreting the Citizenship Clause to support their argument, and none of their authorities holds that to be subject to the United States' jurisdiction, a person must be domiciled here. *See* Opening Br. 18-20, 23-31.

To be sure, Appellant cite the passing references to domicile in *Wong Kim Ark*. Those reflect the stipulated facts of the case. 169 U.S. at 653. The Court's analysis in no way relied on a parental domicile requirement, and the full context confirms as much. In the same passage Appellants cite, the Court reiterated that "[i]t can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he resides[.]" *Id.* at 693. And indeed, the Court stated that being completely subject to the political jurisdiction of the Nation did *not* turn on the nature of one's domicile or intent to remain. "Independently of a residence with intention to continue such residence; independently of any domiciliation; independently of the taking of any oath of allegiance, or of renouncing any former allegiance," the Court said, "it is well known that by the public law an alien, or a

44

stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government[.]" *Id.* at 693-94 (cleaned up). That is, without regard to "domiciliation," such persons are *subject to the jurisdiction* of the United States. *Id.*

This aspect of *Wong Kim Ark*'s holding was consistent with the common law, which did not impose a parental domicile requirement for birthright citizenship. Indeed, the Court cited favorably the seminal case of *Lynch v. Clarke*, 1 Sand. Ch. 583, 638 (N.Y. Ch. 1844), in discussing the pre-ratification understanding of birthright citizenship. *Wong Kim Ark*, 169 U.S. at 664. In *Lynch*, the Chancery Court of New York held that a child "born in this state, of alien parents, during their temporary sojourn" was a natural-born citizen. 1 Sand. Ch. at 583, 638, 673, 683. *Lynch* noted that the child's parents "came here as an experiment, without any settled intention of abandoning their native country, or of making the United States their permanent abode." *Id.* at 638. And after surveying numerous authorities, the Court concluded that there was "no doubt but that [the U.S.-born child] was a citizen of the United States[.]" *Id.* at 683.

Nothing Appellants cite undercuts this conclusion. Appellants point to a bill from 1874 that never passed, selective language from congressional hearings,[8]

---

[8] For example, Senator Wilson's "sojourner" comment that Appellants reference was a single remark made without support to specific contemporary authorities. The temporary nature of one's presence was not an issue being debated.

statements from a handful of commentators, and two passport denials from 1885. *See* Opening Br. 25-28. They also cite a New Jersey case, *Benny v. O'Brien*, 32 A. 696, 697-98 (N.J. Sup. Ct. 1895), which *Wong Kim Ark* quoted, but *Benny* referenced domicile because of the facts and question presented and nowhere implemented a parental domicile requirement. Nor did *Wong Kim Ark* read it as mandating a domicile requirement. 169 U.S. at 692. In short, none of Appellants' authorities can override *Wong Kim Ark*, which set forth an authoritative holding about the Citizenship Clause's scope. And insofar as Appellants turn to the post-*Wong Kim Ark* decisions in *Chin Bak Kan v. United States*, 186 U.S. 193 (1902), and *Kwock Jan Fat v. White*, 253 U.S. 454 (1920), they fare no better. Neither case imposed a domicile requirement under the Citizenship Clause.

Finally, reading a domicile requirement into the Citizenship Clause would turn birthright citizenship into a largely subjective test about the parents' intentions, which has never been the law. Domicile is based on residence and "the purpose to make the place of residence one's home." *Texas v. Florida*, 306 U.S. 398, 424 (1939) (citing *Mitchell v. United States*, 88 U.S. 350 (1874)). It exists regardless of an

---

*See* Cong. Globe, 39th Cong., 1st Sess. 1117. Even worse, the statements by Senator Wade that Appellants cite were made with respect to draft language regarding privileges and immunities, not the Citizenship Clause. And even if considered, they don't support Appellants. As Senator Wade explained, the law regarding citizenship at the time excluded only those such as foreign ministers—a situation that "could hardly be applicable to more than two or three or four persons." Cong. Globe, 39th Cong., 1st Sess. 2769.

46

individuals' immigration status. *See Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982) (explaining that "illegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State") (citing Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 340 (1912)). And as understood at the time, "[i]f it sufficiently appear[s] that the intention of removing was to make a permanent settlement, or for an indefinite time, the right of domicil is acquired by a residence even of a few days." *The Venus*, 12 U.S. (8 Cranch) 253, 279 (1814). Thus, if this "domicile" requirement were actually the law, birthright citizenship would always have turned on the parents' intentions, which no case has ever suggested. And such a rule would not support the Citizenship Stripping Order in any event, because many of those denied citizenship under the order—such as asylees, refugees, and many undocumented immigrants—are clearly domiciled here because they intend to stay in the United States. Appellants' newfound "domicile" rule of birthright citizenship is baseless.

**d.** Departing even further from the established meaning of the Citizenship Clause, Appellants argue that "if the United States has not consented to someone's enduring presence, it follows that it has not consented to making citizens of that person's children." Opening Br. 9. That argument is frivolous. There is no consent requirement in the plain text of the Citizenship Clause, and surely whether someone is subject to the United States' jurisdiction does not depend on "mutual consent." *Id.*

at 40; *see Legislation Denying Citizenship*, 19 Op. O.L.C. at 347 (rebutting "consent theory" because it would "require repudiation of the language of the Constitution itself, the clear statements of the Framers' intent, and the universal understanding of 19th and 20th century courts"). Even if considered on its own terms, the argument makes no sense, as the district court rightly pointed out. "The fact of the matter is that the United States *has* consented to the citizenship of children born on its territory, through ratification of the Fourteenth Amendment." ER-12.

This "consent" argument is also fundamentally at odds with the purpose of the Fourteenth Amendment. Illegally imported slaves were not legally or consensually present in the United States, yet there is no question that the Citizenship Clause extended citizenship to their children. *See, e.g.*, Gabriel J. Chin & Paul Finkelman, *Birthright Citizenship, Slave Trade Legislation, and the Origins of Federal Immigration Regulation*, 54 U.C. Davis L. Rev. 2215, 2250 (2021) ("This history demonstrates that there were clearly 'illegal aliens,' both free migrants banned under the 1803 law and illegally imported slaves, in the United States before and during the consideration of the Fourteenth Amendment."); Gerald L. Neuman, *Back to Dred Scott?*, 24 San Diego L. Rev. 485, 497-99 (1987) (detailing the history of enslaved individuals who were imported illegally and recognizing that the Fourteenth Amendment was intended to grant citizenship to all native-born

48

individuals of African descent). Appellants and amici cannot square their arguments with this undisputed reach of the Fourteenth Amendment.

Finally, Appellants and certain amici states raise arguments about "birth tourism" and make derisive statements about immigrants untethered to the record. Opening Br. 33; Br. of Iowa and 18 States at 1-3, 20-27; Br. of Texas at 5-9. This resort to nakedly political talking points proves the States' point. As the Justice Department previously recognized, "the text and legislative history of the citizenship clause as well as consistent judicial interpretation make clear that the amendment's purpose was to remove the right of citizenship by birth from transitory political pressures." *Legis. Denying Citizenship*, 19 Op. O.L.C. at 347. "The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship," *Afroyim v. Rusk*, 387 U.S. 253, 263, 268 (1967), and no amount of extra-record rhetoric can stand in for good faith constitutional interpretation.

The district court correctly held that the States are overwhelmingly likely to succeed on the merits of their Fourteenth Amendment claim.

### 3. The Citizenship Stripping Order independently violates the INA

The States are also exceedingly likely to prevail on their claim under the INA. It is a fundamental canon of statutory interpretation that "[w]here Congress employs a term of art 'obviously transplanted from another legal source,' it 'brings the old

soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (citing *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019)); *see Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 721-22 (2018) (presuming the enacting Congress is "aware of the longstanding judicial interpretation of [a] phrase" that it codifies "and intend[s] for it to retain its established meaning"). And like any statute, the INA must be "interpret[ed] . . . in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020); *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 691 (9th Cir. 2021).

Section 1401(a) of the INA faithfully tracks the Citizenship Clause's language. It states: "The following shall be nationals and citizens of the United States at birth:[] a person born in the United States, and subject to the jurisdiction thereof[.]" 8 U.S.C. § 1401(a). As the INA's legislative history confirms, that shared language was intended to codify the Fourteenth Amendment's protections as understood at the time of its enactment in 1940 and again in 1952.[9] *See To Revise and Codify the Nationality Laws of United States into a Comprehensive Nationality Code: Hearings Before the Comm. on Immigr. & Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess. 38 (1940) (Section 201 language

---

[9] 8 U.S.C. § 1401 was first enacted as Section 201 of the Nationality Act of 1940 and reenacted as Section 301 of the Immigration and Nationality Act of 1952. *See* H.R. Rep. No. 82-1365 (1952), *as reprinted in* 1952 U.S.C.C.A.N. 1653, 1734 ("The bill carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth.").

regarding citizenship at birth "is taken of course from the fourteenth amendment to the Constitution"); *id.* at 418 (explaining that "[i]t accords with the provision in the fourteenth amendment to the Constitution" and recognizing that "it is the fact of birth within the territory and jurisdiction, and not the domicile of the parents" that determines citizenship). The INA thus incorporates "the cluster of ideas that were attached" to the Fourteenth Amendment by 1940 and 1952. *Morissette v. United States*, 342 U.S. 246, 263 (1952). That "cluster of ideas" is the bright-line grant of birthright citizenship confirmed in *Wong Kim Ark*. *See* H.R. Rep. No. 82-1365, 1952 U.S.C.C.A.N. at 1675-76 (1952 House Report discussing the Citizenship Clause as interpreted by *Wong Kim Ark*).

Appellants acknowledge the linguistic overlap, but they argue that the INA should *also* be reinterpreted to include their new tests for who is "subject to the jurisdiction" of the United States. Opening Br. 41. Yet they nowhere acknowledge that Congress adopted the Citizenship Clause's language as understood in 1940 and 1952—not the revisionist view now proposed by the President. *See MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231-32 (1994) ("What we have here, in reality, is a fundamental revision of the statute . . . . [That] was not the idea Congress enacted into law in 1934."). Thus, even if Appellants were correct that the Citizenship Clause should be reinterpreted (and they are not), it would not matter.

51

The INA independently sets the bar under which the grant of birthright citizenship cannot fall, and the Order dives well below that floor.

## C.     The Remaining Injunction Factors Decisively Favor the States

The remaining factors—irreparable harm, the equities, and the public interest—overwhelmingly supported issuance of a preliminary injunction, as the district court correctly held. ER-12-13.

**1**. Starting with irreparable harm, the district court held that the States "are likely to suffer irreparable economic harm in the absence of preliminary relief." ER-12. That finding is well supported by the factual record (to which only the States contributed) and is nowhere near an abuse of discretion. The unrebutted record established that if thousands of babies born each year in the States are denied citizenship, the States will lose millions of dollars in federal reimbursements for children who will immediately become ineligible for federal programs, including Medicaid, CHIP, and Title IV-E foster care. *See* 1-SER-153-156, 162-165, 261-262, 293-294; 2-SER-302-305. They will lose tens of thousands of dollars annually under their existing contracts with SSA to process birth data for newborns obtaining SSNs. 1-SER-171-172, 255, 268-269, 274-275. And they will bear substantial financial and operational burdens to create new systems to determine citizenship of each child they serve through federal-state programs. 1-SER-154-156, 165-166, 172-173, 177, 260, 267, 295-296; 2-SER-305-307.

52

These are precisely the types of harms that are irreparable and support preliminary injunctive relief. *See, e.g.*, *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (finding irreparable harm when organizations "will suffer a significant change in their programs and a concomitant loss of funding absent a preliminary injunction"); *City & County of San Francisco*, 981 F.3d at 762 (finding irreparable harm when money damages are unavailable and states "likely are bearing and will continue to bear heavy financial costs because of withdrawal of immigrants from federal assistance programs and consequent dependence on state and local programs") (citation omitted); *see also Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986) (Powell, J., in chambers) (harm is irreparable when "[t]he State will bear the administrative costs of changing its system to comply" and is unlikely to recover those costs in litigation).

Appellants speculate that the States could try to recover certain lost reimbursements (but not all) through vaguely identified administrative avenues for denied claims under Medicaid and CHIP. Opening Br. 48-49. Their argument is smoke and mirrors. The States have no means to recover lost federal funds from a sovereign defendant for thousands of individuals deemed categorically *ineligible* for Medicaid, CHIP, Title IV-E, or SSA's Enumeration at Birth program. *See Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015). Nor do Appellants rebut the overwhelming evidence that the States will have to expend

significant resources to update and modify systems used to verify citizenship *now*. That loss is plainly irreparable, *Ledbetter*, 479 U.S. at 1310, and the district court did not abuse its discretion in so concluding.

**2.** The district court also acted well within its discretion in concluding that "the balance of equities and the public interest strongly weigh in favor of entering a preliminary injunction." ER-13. These factors could not tip more sharply in favor of the States.

Beyond the States' direct economic losses and harms, detailed above, the Citizenship Stripping Order deprives children in the States of a foundational constitutional right and subjects them to harms that span a lifetime—harms that directly impact the States' communities. Citizenship confers the "right to full and equal status in our national community, a right conferring benefits of inestimable value upon those who possess it." *Fedorenko v. United States*, 449 U.S. 490, 522 (1981) (Blackmun, J., concurring). It guarantees the opportunity to participate and belong in society—to live free from fear of deportation and to vote, serve on a jury, and travel. *See* 1-SER-205-206; 2-SER-311-312. It offers the opportunity to achieve economic, health, and educational potential through the right to work legally and eligibility for social supports, such as federally backed healthcare benefits, cash and food assistance during vulnerable times or emergencies, and eligibility for federal student financial aid. 1-SER-182-187, 212-215, 242-244. In short, citizenship

54

"confers legal, political, and social membership in the United States, thus creating paths to mobility." 1-SER-211, 249-250.

By purporting to revoke birthright citizenship, the Citizenship Stripping Order will immediately deny these rights and benefits to more than 150,000 children born each year in the United States, condemning most to a life without authorized immigration status and some to statelessness. 1-SER-108, 203-204; 2-SER-310-314. Instead of the right to full participation and belonging in their home country—the United States—these children will be forced to live "in the shadow," under the constant risk of deportation and unable to obtain work authorization as they grow up.1-SER-205-206, 217; 2-SER-310-314. They will be less likely to complete high school or enroll in higher education and will earn less at almost every stage of their lifetimes than their citizen counterparts. 1-SER-182-186, 212-213. They will be more likely than their citizen peers to experience disease, depression, anxiety, and social isolation. 1-SER-215-218. Stated differently, "denying birthright citizenship to children born in the U.S. to undocumented parents will create a permanent underclass of people who are excluded from U.S. citizenship and are thus not able to realize their full potential." 1-SER-181-182.

Appellants do not address these extensive harms that will follow if the Order takes effect—likely because those harms are the point. They instead try to conjure harm to the Executive Branch by invoking the President's supposed "broad authority

55

over and responsibility for immigration matters."[10] Opening Br. 67. That argument is baseless. This is not a case about "immigration." It is a case about citizenship rights that the Fourteenth Amendment and federal statute intentionally and explicitly placed "beyond the power of any governmental unit to destroy." *See Afroyim*, 387 U.S. at 263. Nor do Appellants offer authority remotely holding that the President has the power they claim. The single-Justice opinion they cite, *INS v. Legalization Assistance Project of Los Angeles County Federation of Labor*, 510 U.S. 1301, 1304-06 (1993) (O'Connor, J., in chambers), spoke to the President's authority to "take Care that the Laws be faithfully executed" and "supervise the conduct of the Executive Branch." It did not recognize a President's authority to pick and choose which Americans enjoy the right to citizenship. *Id.*

Appellants further complain that the Executive Branch is irreparably injured by delaying advance preparations for the Citizenship Stripping Order. Opening Br. 54. Yet as the district court explained, the federal government "has no legitimate interest in enforcing an Order that is likely unconstitutional and beyond its authority." ER-13. In contrast, "the public has an interest in ensuring that the '[laws] enacted by [their] representatives are not imperiled by executive fiat.'"

---

[10] Certain amici states likewise complain about harm they say they will suffer if immigration is not reduced. *See* Br. of Iowa and 18 States at 3; Br. of Texas at 3-6; Br. of Tennessee at 1. Those arguments are at best policy complaints—not arguments about the proper scope of the Fourteenth Amendment or whether the district court abused its discretion in granting the injunction based on the record presented.

*E. Bay Sanctuary Covenant*, 993 F.3d at 679 (cleaned up). It will cause Appellants no harm to refrain from implementing a plainly unlawful Order and to simply maintain the status quo as it has existed for more than a century.

The public is not benefitted by returning our Nation to a reprehensible chapter of American history when *Dred Scott* excluded Black Americans from citizenship— an exclusionary view soundly rejected by the people and their representatives through the Fourteenth Amendment. The Citizenship Stripping Order's grave deprivation of rights belies any public interest in its implementation or enforcement. The balance of equities and public interest accordingly demanded that the district court protect the status quo and preserve the promise of citizenship as it has long existed while this case proceeds. *See Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (recognizing that "the public interest favors preserving the *status quo*" when new federal policy represents a change and will harm plaintiffs and the public).

## D. The District Court's Nationwide Injunction Is Necessary to Provide Complete Relief

Appellants' final challenge is to the nationwide scope of the injunction. They argue that nationwide injunctions categorically "exceed 'the power of Article III courts'" and contradict public policy. Opening Br. 50. Precedent from this Court and the Supreme Court holds otherwise. The district court did not abuse its discretion in enjoining the Order nationwide to protect the States and their residents.

**1.** "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project* (*IRAP*), 582 U.S. 571, 579 (2017). As this Court has explained, equitable relief "is acceptable where it is 'necessary to give prevailing parties the relief to which they are entitled[,]'" *E. Bay Sanctuary Covenant*, 993 F.3d at 680 (citation omitted), and "there is 'no general requirement that an injunction affect only the parties in the suit[,]'" *Hecox*, 104 F.4th at 1090 (citation omitted). Thus, when nationwide relief is necessary to provide complete relief to the parties before it, this Court has "consistently recognize[d] the authority of district courts to enjoin unlawful policies on a universal basis." *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (quoting *E. Bay Sanctuary Covenant*, 932 F.3d at 779); *Doe #1*, 957 F.3d at 1070 ("[A] more limited injunction . . . would 'needlessly complicate agency and individual action in response to the United States's changing immigration requirements[.]'") (citation omitted).

Courts, including the Supreme Court and this Court, have thus upheld nationwide injunctions where necessary to provide complete relief. *See IRAP*, 582 U.S. at 579, 582 (allowing nationwide injunction against enforcement of Executive Order section that exceeded presidential authority); *Doe #1*, 957 F.3d at 1069 (declining to stay nationwide injunction and explaining that "there is no bar"

58

against such an injunction "when it is appropriate"); *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) ("A nationwide injunction is no more burdensome on the federal officials than necessary and is more workable."). Indeed, such injunctions have been particularly warranted in circumstances where, as here, the fact that individuals move between states exposes plaintiffs to irreparable harm and requires response to a new patchwork of legal rules and federal policies. *See E. Bay Sanctuary Covenant*, 993 F.3d at 680-81 (affirming nationwide injunction where plaintiff organizations would lose clients under a more limited injunction); *HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (affirming nationwide injunction for organizations that "place[d] refugees throughout the country").

The injunction here fits comfortably within this long line of precedent. As the district court concluded in light of the unrebutted record, a nationwide injunction is necessary to provide the States complete relief. ER-14. If the States' pregnant residents happen to give birth in any other non-party state, or if individuals from any of those states move to any of the States, the States will suffer the exact irreparable injuries to their sovereign and pecuniary interests they would if there were no injunction at all. Indeed, the States will suffer the same sovereign injuries with respect to newly minted non-citizens who travel or move to the States. And the States will be required to overhaul their systems to verify eligibility for Medicaid, CHIP, and Title IV-E because they must verify the citizenship of *every* child they serve,

regardless of where they were born. 1-SER-149, 151-156, 165-166, 257-258, 291-296; 2-SER-302-303, 305. Succinctly put, relief *cannot* be "structured" on a more "individual basis," *E. Bay Sanctuary Covenant*, 993 F.3d at 680, and this case presents the precise type of "nationwide impact" that warrants nationwide relief, *City & County of San Francisco*, 897 F.3d at 1231, 1244-45.

**2.** In attacking the district court's order, Appellants' boldly claim that "five Justices[] [have] conclud[ed] that universal injunctions providing relief outside the parties to the case are likely impermissible." Opening Br. 51 (citing *Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921 (2024)). The concurrences in *Labrador* do no such thing, and they certainly do not constitute precedent sufficient to satisfy this Circuit's "high standard" of being "clearly irreconcilable" with prior precedent permitting nationwide injunctions. *McBurnie v. RAC Acceptance E., LLC*, 95 F.4th 1188, 1193 (9th Cir. 2024).

*Labrador* involved two individuals challenging a state law that restricted minors' access to gender-affirming care. 144 S. Ct. at 921. The district court enjoined the law in its entirety, including sections of the law that governed care that the plaintiffs did not seek to access. *Id.* at 921-22. The Supreme Court granted a partial stay pending appeal, allowing the injunction to take effect only "as to the provision to the plaintiffs of the treatments they sought below[.]" *Id.* at 921. The scenario in *Labrador* is unlike the situation here because nationwide relief is necessary to

60

provide the States complete relief *on the claims they brought*. There is no argument that the district court enjoined sections of the Citizenship Stripping Order not at issue in the States' challenge. And of course, the *Labrador* Court was merely ruling on a stay application and did not reach any decision on the propriety of nationwide injunctions generally. *Id.*

Nor do the concurrences say what Appellants claim. While Justice Gorsuch, joined by two other Justices, expressed displeasure with the number of universal injunctions, he did not conclude that they were "impermissible." *Id.* at 926-28. Indeed, Justice Gorsuch has separately voted at times to permit nationwide injunctions. *E.g.*, *United States v. Texas*, 143 S. Ct. 51 (2022). Justice Kavanaugh, joined by Justice Barrett, was even more limited in his concurrence, which focused on explaining how the Supreme Court typically resolves emergency stay applications. 144 S. Ct. at 928. He remarked without taking a position that "prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law," *id.* at 931, and wrote that he concurred in granting the partial stay requested only because Idaho was likely to succeed in that particular case, *id.* at 933 n.4. Appellants read too much into *Labrador* and offer nothing to support a rule that would categorically prohibit nationwide injunctions.

**3.** Finally, Appellants suggest for the first time (and only in passing) that a narrower injunction might have sufficed, claiming that the States could obtain

sufficient relief if Appellants were enjoined to treat noncitizens moving to the States as eligible for federally funded medical and social programs. Opening Br. 52. The district court did not abuse its discretion in failing to consider this argument for the obvious reason that Appellants never raised it. *See* 1-SER-3-6; 2-SER-372-374; *see also* 1-SER-17-18, 50-51; 2-SER-399-400. That alone defeats their argument, as "the district court is not obligated to undertake the task of chiseling from the government's across-the-board ban a different policy the government never identified, endorsed, or defended." *J.D. v. Azar*, 925 F.3d 1291, 1336 (D.C. Cir. 2019). Even if considered, though, Appellants' belated proposal would solve nothing with respect to the States' sovereign injuries. And with respect to the healthcare and social service programs the States operate, Appellants' vague proposal would be unworkable and "needlessly complicate[d]," *Doe #1*, 957 F.3d at 1070, at a minimum, because it would require the States to violate federal law, which *requires* them to verify the citizenship of each person that they serve under programs like Medicaid, CHIP, and Title IV-E. 1-SER-149, 151-156, 165-166, 257-258, 291-296; 2-SER-302-303, 305.

In sum, the Citizenship Stripping Order's attempt to unilaterally amend the Fourteenth Amendment and discard a federal statute necessitates an injunction that preserves the guarantee of birthright citizenship as it has long existed: A uniform right that applies nationwide and is beyond the President's power to destroy.

## VII.  CONCLUSION

The Court should affirm the district court in full.

RESPECTFULLY SUBMITTED this 4th day of April 2025.

NICHOLAS W. BROWN
 *Attorney General of Washington*

*s/ Lane Polozola*
COLLEEN M. MELODY, WSBA 42275
 *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
 *Assistant Attorneys General*
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

NOAH G. PURCELL, WSBA 43492
 *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
 *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200
noah.purcell@atg.wa.gov
cristina.sepe@atg.wa.gov
marsha.chien@atg.wa.gov
*Attorneys for State of Washington*

KRIS MAYES
 *Attorney General of Arizona*
JOSHUA D. BENDOR
 *Solicitor General*

64

LUCI D. DAVIS
  *Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
Telephone: 602-542-3333
Joshua.Bendor@azag.gov
Luci.Davis@azag.gov
*Attorneys for State of Arizona*


KWAME RAOUL
  *Attorney General of Illinois*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
Illinois Attorney General's Office
115 South LaSalle St.
Chicago, IL 60603
Telephone: 312-814-5526
Jane.Notz@ilag.gov
Alex.Hemmer@ilag.gov
*Attorneys for State of Illinois*


DAN RAYFIELD
  *Attorney General of Oregon*
BENJAMIN GUTMAN
  *Solicitor General*
MICHAEL A. CASPER
  *Senior Assistant Attorney General*
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: 503-378-4402
Michael.Casper@doj.oregon.gov
*Attorneys for State of Oregon*

65

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the Plaintiff-Appellee States state that they know of one related case pending in this Court: *Washington v. Trump*, No. 25-674 (9th Cir. filed Jan. 31, 2025) (appealing the denial of a motion to intervene).

DATED this 4th day of April 2025.

*s/ Lane Polozola*
LANE POLOZOLA

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2025, I electronically filed the foregoing documents with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users, and that service will be accomplished by using the ACMS system.

DATED this 4th day of April 2025.

*s/ Lane Polozola*
LANE POLOZOLA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-807

I am the attorney or self-represented party.

**This brief contains** | 15,374 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◉ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

　　☐ it is a joint brief submitted by separately represented parties.

　　☒ a party or parties are filing a single brief in response to multiple briefs.

　　☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated | | .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Lane Polozola | **Date** | April 4, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**　　　　　　　　　　　　　　　　　　　　　　　　　　*Rev. 12/01/22*