No. 25-807

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court
for the Western District of Washington
Case No. 2:25-cv-00127-JCC

The Honorable John C. Coughenour

## INDIVIDUAL PLAINTIFFS' ANSWERING BRIEF

Matt Adams
Glenda M. Aldana Madrid
Leila Kang
Aaron Korthuis
NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

*Attorneys for Individual Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

STATEMENT OF THE CASE ...............................................................3

I.    Legal Background and Executive Order 14160 .............................3

II.   Procedural Background...................................................................4

STATEMENT OF JURISDICTION ......................................................6

STANDARD OF REVIEW....................................................................6

SUMMARY OF ARGUMENT..............................................................7

ARGUMENT .......................................................................................10

I.    The Executive Order violates the Fourteenth Amendment..........10

      A.   *Wong Kim Ark* definitively resolves this case and rejects
           Defendants' arguments. ......................................................11

           1.   The Supreme Court held in *Wong Kim Ark* that "jurisdiction"
                means the authority to govern and the corresponding duty of
                obedience.................................................................11

           2.   Defendants' alternative definition of "subject to the
                jurisdiction" as requiring exclusive loyalty merely repeats
                *Wong Kim Ark*'s dissent. .......................................15

      B.   The Supreme Court has repeatedly confirmed that the
           Citizenship Clause has only two requirements—birth and
           jurisdiction—and that noncitizens satisfy those requirements. ..........25

      C.   To be "subject to the jurisdiction" of the United States means to
           be subject to its authority and laws.....................................28

           1.   Contemporaneous sources confirm the meaning of
                "jurisdiction." ..........................................................28

           2.   Defendants misplace their reliance on the Civil Rights Act of
                1866 as support for an unwritten "allegiance" requirement.....33

i

D.      Jus soli in the Citizenship Clause followed existing U.S. practice and common law. ....................................................35

E.      Defendants' "domicile" requirement is baseless. ...............39

      1.      Defendants err in asserting domicile is a requirement for citizenship and what domicile requires. ...................39

      2.      Even assuming allegiance and domicile were required—which they are not—the EO would violate the Fourteenth Amendment. ...........................................................41

F.      Defendants' remaining arguments cannot change the meaning of the Constitution. ................................................42

II.     The EO also violates the Immigration and Nationality Act (INA). ..............49

III.    Plaintiffs face irreparable harm absent a preliminary injunction. ..................50

IV.     The public interest and balance of hardships support the preliminary injunction. ....................................................55

V.      The scope of the injunction is appropriate. ....................................56

CONCLUSION ........................................................................58

STATEMENT OF RELATED CASES ....................................................60

CERTIFICATE OF COMPLIANCE ......................................................61

CERTIFICATE OF SERVICE..........................................................62

# TABLE OF AUTHORITIES

**Cases**

*Abramski v. United States*,
    573 U.S. 169 (2014) ........................................................44

*Afroyim v. Rusk*,
    387 U.S. 253 (1967) ....................................................1, 47

*Ariz. Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) .........................................54

*Baird v. Bonta*,
    81 F.4th 1036 (9th Cir. 2023) ..................................53, 55

*Bankamerica Corp. v. United States*,
    462 U.S. 122 (1983) ........................................................45

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002) ........................................................46

*Barzizas v. Hopkins*,
    23 Va. (2 Rand.) 276 (1824) ..........................................36

*Benny v. O'Brien*,
    32 A. 696 (N.J. 1895) .....................................................39

*Bostock v. Clayton Cnty.*,
    590 U.S. 644 (2020) ........................................................49

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987) .......................................57

*Bridges v. Wixon*,
    326 U.S. 135 (1945) ........................................................52

*Calvin v. Smith*,
    77 Eng. Rep. 377 (K.B. 1608) .......................................37

*Chicago, R.I. & P. Ry. Co. v. McGlinn*,
    114 U.S. 542 (1885) ........................................................15

*City & Cnty. of San Francisco v. USCIS*,
    944 F.3d 773 (9th Cir. 2019) .........................................43

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ................................................................30, 34

*Dred Scott v. Sandford*,
    60 U.S. 393 (1857) ...................................................................3, 36

*Edwards v. California*,
    314 U.S. 160 (1941) .....................................................................25

*Elk v. Wilkins*,
    112 U.S. 94 (1884) ..................................................................13, 18

*Elrod v. Burns*,
    427 U.S. 347 (1976) .....................................................................53

*Ennis v. Smith*,
    55 U.S. 400 (1852) ......................................................................40

*Gardner v. Ward*,
    2 Mass. (1 Tyng) 244 (1805) .......................................................35

*George v. McDonough*,
    596 U.S. 740 (2022) .....................................................................49

*Haaland v. Brackeen*,
    599 U.S. 255 (2023) .....................................................................18

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017).........................................................55

*In re Nunez*,
    18 F. Supp. 1007 (S.D. Cal. 1937) ...............................................50

*Inglis v. Trs. of Sailor's Snug Harbor*,
    28 U.S. 99 (1830) ........................................................................17

*INS v. Errico*,
    385 U.S. 214 (1966) ................................................................27, 47

*INS v. Rios-Pineda*,
    471 U.S. 444 (1985) ................................................................28, 47

*K.W. ex rel. D.W. v. Armstrong*,
    789 F.3d 962 (9th Cir. 2015)...........................................................7

*Kennedy v. Mendoza-Martinez,*
    372 U.S. 144 (1963), ...................................................................................51

*Korematsu v. United States,*
    323 U.S. 214 (1944) ....................................................................................47

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
    634 F.2d 1197 (9th Cir. 1980)....................................................................55

*Lake v. Ohana Mil. Cmtys., LLC,*
    14 F.4th 993 (9th Cir. 2021) ......................................................................16

*Loper Bright Enters. v. Raimondo,*
    603 U.S. 369 (2024) ....................................................................................45

*Ludlam v. Ludlam,*
    26 N.Y. 356 (1863) .....................................................................................36

*Lynch v. Clarke,*
    1 Sand. Ch. 583 (N.Y. Ch. 1844) ..............................................................35

*Matter of Cantu,*
    17 I&N Dec. 190 (BIA 1978) .....................................................................44

*Matter of S----,*
    2 I&N Dec. 908 (BIA 1947) .......................................................................44

*Matter of V-,*
    9 I. & N. Dec. 558 (BIA 1962) ..................................................................49

*McCreery's Lessee v. Somerville,*
    22 U.S. 354 (1824). .....................................................................................36

*Medina v. DHS,*
    313 F. Supp. 3d 1237 (W.D. Wash. 2018)................................................54

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012)......................................................................53

*Monterey Mech. Co. v. Wilson,*
    125 F.3d 702 (9th Cir. 1997)......................................................................53

*Morissette v. United States,*
    342 U.S. 246 (1952) ....................................................................................49

*Morrison v. California*,
    291 U.S. 82 (1934) ......................................................................27

*Munro v. Merchant*,
    28 N.Y. 9 (1863) ........................................................................36

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    422 F.3d 782 (9th Cir. 2005) ......................................................7

*Ng Fung Ho v. White*,
    259 U.S. 276 (1922) ..................................................................52

*Organized Vill. of Kake v. Egan*,
    369 U.S. 60 (1962) ....................................................................15

*Perkins v. Elg*,
    307 U.S. 325(1939) ..............................................................27, 46

*Plyler v. Doe*,
    457 U.S. 202 (1982) ........................................................25, 27, 47

*Preminger v. Principi*,
    422 F.3d 815 (9th Cir. 2005) ....................................................55

*Regan v. King*,
    134 F.2d 413 (9th Cir. 1943) ....................................................28

*Rogers v. Bellei*,
    401 U.S. 815 (1971) ..................................................................25

*Schneiderman v. United States*,
    320 U.S. 118 (1943) ..............................................................50, 51

*Slaughter-House Cases*,
    83 U.S. 36 (1872) ......................................................................25

*Smith v. Turner*,
    48 U.S. 283 (1849) ....................................................................15

*State v. Manuel*,
    20 N.C. (3 & 4 Dev. & Bat.) 144 (1838) ..................................35

*Sw. Voter Registration Educ. Project v. Shelley*,
    344 F.3d 914 (9th Cir. 2003) (en banc) ......................................6

*Tabares v. City of Huntington Beach*,
    988 F.3d 1119 (9th Cir. 2021)..................................................28

*The Schooner Exch. v. McFaddon*,
    11 U.S. (7 Cranch.) 116 (1812)...................................12, 17, 30, 31

*Trop v. Dulles*,
    356 U.S. 86 (1958) .............................................................51

*United States ex rel. Hintopoulos v. Shaughnessy*,
    353 U.S. 72 (1957) ............................................................27

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003)....................................................6

*United States v. Wong Kim Ark*,
    169 U.S. 649 (1898)...............................3, 11–29, 31, 34, 39, 46

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017)..................................................52

*Wisconsin Cent. Ltd. v. United States*,
    585 U.S. 274 (2018)............................................................28

*Zepeda v. INS*,
    753 F.2d 719 (9th Cir. 1983)...................................................56

## Constitutional Provisions

U.S. Const. amend XIV, § 1...............................................10

U.S. Const. amend. XV, § 1..............................................55

U.S. Const. art. II, § 1, cl. 5...........................................37

## Statutes

8 U.S.C. § 1101(a).......................................................42

8 U.S.C. § 1151(b)(2)(A)(i)..............................................53

8 U.S.C. § 1153 .....................................................42, 53

8 U.S.C. § 1154(a) ..........................................................................42

8 U.S.C. § 1158 ..............................................................................41

8 U.S.C. § 1159(b) ..........................................................................41

8 U.S.C. § 1182(a)(6)(A)(i) .............................................................51

8 U.S.C. § 1229a(a)(2) .....................................................................51

8 U.S.C. § 1255 ........................................................................42, 53

8 U.S.C. § 1302 ..............................................................................52

8 U.S.C. § 1401(a) .......................................................................3, 49

8 U.S.C. § 1611(c)(1)(B) .................................................................54

8 U.S.C. § 1612 ..............................................................................54

8 U.S.C. § 1641(b) ..........................................................................54

28 U.S.C. § 1292(a)(1) ......................................................................6

28 U.S.C. § 1331 ...............................................................................6

50 U.S.C. § 3802(a) ........................................................................26

## Session Laws

Act of March 27, 1804, § 2, 2 Stat. 298 (1804)............................30

An Act to protect all Persons in the United States in their Civil Rights,
    and furnish the Means of their Vindication, 14 Stat. 27 (1866)....................33

Chinese Exclusion Act, ch. 126, 22 Stat. 58 (1882)...............................22

Geary Act, ch. 60, 27 Stat. 25 (1892)..............................................23

McCreary Act, ch. 14, 28 Stat. 7 (1893) ..........................................23

Nationality Act of 1940, Pub. L. No. 76-853, 54 Stat. 1137 (1940) .........................3

Scott Act, ch. 1064, 25 Stat. 504 (1888) ........................................22

**Legislative Materials**

Cong. Globe, 39th Cong., 1st Sess. (1866) ....................................19, 20, 30–32, 34

*To Revise and Codify the Nat'y Laws of the United States into a
Comprehensive Nat'y Code: Hearings Before the Comm. on
Immig. and Naturalization on H.R. 6127 Superseded by H.R.
9980*, 76th Cong., 1st Sess., 38 (1940) .........................................................49


**Executive Orders**

Executive Order No. 14159,
90 Fed. Reg. 8443 (Jan. 20, 2025) ................................................................52

Executive Order No. 14160,
90 Fed. Reg. 8449 (Jan. 20, 2025) .............................................................1, 4


**Attorney General & Office of Legal Counsel Opinions**

19 Op. O.L.C. 340 (1995) ........................................................................45

Case of Francois A. Heinrich,
14 Op. Att'ys Gen. 154, 155 (1872) ...........................................................44

Citizenship of Children Born Abroad of Naturalized Parents,
10 Op. Att'ys Gen. 329 (1862) ....................................................................37

Citizenship of Children Born in the United States of Alien Parents,
10 Op. Att'ys Gen. 328 (1862) ....................................................................36

Citizenship,
9 Op. Att'ys Gen. 373 (1859) ......................................................................37


**Regulations**

34 C.F.R. § 668.33 ....................................................................................54

Wash. Admin. Code § 388-400-0010....................................................................54

Wash. Admin. Code § 388-424-0030....................................................................54

ix

**Rules**

Fed. R. Evid. 201(b)(2) ....................................................................6

**Other Authorities**

1 Emmerich de Vattel, *The Law of Nations* (Joseph Chitty & Edward
    Ingraham, eds., 1853) ...................................................38

1 James Kent, *Commentaries on American Law* 15 (9th ed. 1858) .......................30

1 William Blackstone, *Commentaries*................................................38

C. Bouvé, *Exclusion and Expulsion of Aliens in the United States*
    (1912) .........................................................................26

Children: Born in the United States generally citizens,
    2 Wharton Digest, Ch. 7...............................................43, 44

Elliot Spagat, *Trump says he will offer 'gold cards' for $5 million
    path to citizenship, replacing investor visas*, Associated Press
    (Feb. 26, 2025) ...........................................................47

Garrett Epps, *The Citizenship Clause: A "Legislative History"*,
    60 Am. U. L. Rev. 331  (2010) ....................................32

Joseph Story, *Commentaries on the Conflict of Laws, Foreign and
    Domestic* (1834)...................................................39, 40

*Jurisdiction*, Benjamin Vaughan Abbott, *Dictionary of Terms and
    Phrases Used in American or English Jurisprudence* (1879).......................29

*Jurisdiction*, Noah Webster et al., *An American Dictionary of the
    English Language* (1865)...........................................29

Jus soli, 3 Hackworth Digest, ch. 9, §221 .............................................50

Kurt T. Lash, *The Origins of the Privileges or Immunities Clause,
    Part I: "Privileges and Immunities" As an Antebellum Term of
    Art*, 98 Geo. L.J. 1241 (2010) ....................................29

Mark Shawhan, *The Significance of Domicile in Lyman Trumbull's
    Conception of Citizenship*, 119 Yale L.J. 1351 (2010)................................40

Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405 (2020) ........................................................................3, 37

Opinions of the Principal Officers of the Executive Departments and Other Papers Relating to Expatriation, Naturalization, and Change of Allegiance (Gov't Printing Office 1873)..............................44, 46

Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case (1608), 9 Yale J.L. & Humans. 73 (1997)............................................38

Richard W. Flournoy, Jr., *Dual Nationality and Election*, 30 Yale L.J. 545 (1921) ..........................................................................44, 50

Robert Phillimore, *The Law of Domicil* (1847)........................................................41

Selective Service System, Immigrants & Dual Nationals, https://www.sss.gov/register/who-needs-to-register/#p1 (last accessed Apr. 4, 2025) ..................................................................26

William Rawle, *A View of the Constitution of the United States of America* (1825) ..........................................................................37

xi

**INTRODUCTION**

President Trump's Executive Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) (EO), which is entitled "Protecting the Meaning and Value of American Citizenship," does exactly the opposite, purporting to unilaterally alter the meaning of the Fourteenth Amendment's Citizenship Clause by directing federal agencies to bar certain persons born in the United States from the many benefits which U.S. citizenship bestows upon them. That directive flouts the Clause's plain text, along with more than a century of caselaw interpreting it. Ultimately, it is a misguided attack on one of our nation's most hallowed constitutional rights, based not on the law but on policy arguments.

Policy arguments, however, cannot alter constitutional text. "The very nature of our free government makes it completely incongruous to have a rule of law under which a group of citizens temporarily in office can deprive another group of citizens of their citizenship." *Afroyim v. Rusk*, 387 U.S. 253, 268 (1967). Defendants nevertheless press policy arguments as to who should be deemed to have sufficient allegiance to qualify for citizenship, focusing on the *parents*' immigration status. But the Citizenship Clause focuses only on whether the *child* born here is "subject to the jurisdiction" of the United States. Similarly, Defendants invoke the need for the executive to enforce immigration laws. But the EO does not address immigration law. Instead, it attempts to interfere with the

1

constitutionally enshrined right of birthright citizenship, which the Constitution makes clear is separate and apart from both immigration and naturalization matters. Neither the President nor Congress is authorized to restrict the terms of the Citizenship Clause.

Since Defendants filed this appeal, Plaintiff Cherly Norales gave birth to her child, N.D.A.N., in Burien, Washington on February 26, 2025—one week after the EO's effective date. But for the district court's preliminary injunction, baby N.D.A.N. would not be recognized as a U.S. citizen. Instead, pursuant to the EO, she would be deemed as having no lawful status, subject to the ever-present threat of immigration enforcement, forced to face the continual possibility of family separation, and deprived of pathways to better healthcare, education, and employment. The Fourteenth Amendment unambiguously forecloses Defendants' claimed power to deprive N.D.A.N.—and so many others like her—of their citizenship. Because serious, irreparable harm is nearly certain to occur, the balance of equities tips in Plaintiffs' favor, and the injunction is in the public interest, the district court was correct to grant injunctive relief, and this Court should so affirm.

## STATEMENT OF THE CASE

### I.  Legal Background and Executive Order 14160

Since the Founding era, *jus soli*—the principle that citizenship is determined

by one's birthplace, not by ancestry—was understood as the "baseline" with

respect to United States citizenship. Michael D. Ramsey, *Originalism and*

*Birthright Citizenship*, 109 Geo. L. J. 405, 413–14 (2020). The Fourteenth

Amendment was ratified in 1868 to constitutionalize this principle and repudiate

*Dred Scott v. Sandford*, which a decade earlier had held that *no* black person, free

or slave, could be a citizen. 60 U.S. 393, 404–05 (1857). The Supreme Court

affirmed the breadth of the resulting Citizenship Clause in *United States v. Wong*

*Kim Ark*, 169 U.S. 649 (1898). There, the Court held that the Clause's phrase

"subject to the jurisdiction thereof" does not turn on the immigration status or

citizenship of one's parents, concluding that a child born to Chinese nationals in

the United States was a citizen. Congress codified the Citizenship Clause's

guarantee of birthright citizenship in 1940, using the same language as that

provided in the Fourteenth Amendment. *See* Nationality Act of 1940, Pub. L. No.

76-853, § 201(a), 54 Stat. 1137, 1138 (1940) (codified at 8 U.S.C. § 1401(a)).

Despite these constitutional and statutory guarantees, moments after his

inauguration, President Trump issued an executive order attempting to redefine the

Citizenship Clause and limit *jus soli* in the United States. The EO purports to

reinterpret the meaning of the Clause's phrase "subject to the jurisdiction thereof" and claims that a child born in the United States is not entitled to citizenship if the mother is either (1) unlawfully present, or (2) in "lawful but temporary" status, unless—in either case—the father is a lawful permanent resident (LPR) or U.S. citizen. ER-62. The EO prohibits all federal departments and agencies from "issu[ing] documents recognizing United States citizenship" for all such persons born after 30 days from the date of the order. ER–62–63. The EO also directs certain agency heads to implement the order and issue public guidance within 30 days of the order. ER-63.

## II.     Procedural Background

On January 24, 2025, pregnant mothers Cherly Norales Castillo and Alicia Chavarria Lopez (Individual Plaintiffs) filed a putative class action in the Western District of Washington, challenging the EO's legality. *See* ER-5.[1] Both women are noncitizens residing in Washington. ER-47–48. They each left their countries of birth—Honduras and El Salvador, respectively—to flee severe violence and abuse, and have pending applications for asylum. ER-48–49. Both women feared that their children would be deemed undocumented upon birth under the EO, as neither they nor their partners are U.S. citizens or LPRs. ER-48–49. They filed suit on

---

[1]     A third plaintiff subsequently withdrew from the lawsuit. ER-5 n.2.

behalf of themselves and a proposed class of pregnant persons and future children residing in Washington State. ER-51–53.

On January 27, the Individual Plaintiffs filed a motion for class certification. Dkt. 58.[2] Earlier that same day, the district court consolidated their case with a related action filed by the states of Washington, Arizona, Illinois, and Oregon (Plaintiff States). *See* ER-18 n.2. The Plaintiff States filed a motion for a preliminary injunction, ER-3, and, on January 29, Individual Plaintiffs filed a supplemental preliminary injunction motion, which also requested provisional class certification, Dkt. 74 at 2 n.1.

On February 6, the district court issued a preliminary injunction, enjoining enforcement of the EO on a nationwide basis. ER-15. As a threshold matter, the district court concluded that the Plaintiff States have standing and confirmed that Individual Plaintiffs' standing was undisputed. ER-6 & n.3. The district court went on to conclude that the Plaintiffs were likely to succeed on the merits, finding that "the Government's position . . . does not have the text or precedent to support its interpretation of the Citizenship Clause." ER-12. The district court also found that both sets of plaintiffs established irreparable harm. ER-12–13. Regarding Individual Plaintiffs, the district court recognized that "[t]he constitutional

---

[2]     Docket citations are to the district court docket in the consolidated case, Case No. 2:25-cv-00127-JCC.

5

infringement and the specter of deportation" they alleged were "sufficiently irreparable" for purposes of the preliminary injunction. ER-13. The district court further determined that the balance of equities and the public interest "strongly" favored Plaintiffs. *Id.* The district court did not grant provisional class certification, ER–14 n.9, but instead granted a nationwide injunction as requested by Plaintiff States, ER-15 (determining that "[a]nything less is ineffectual").

Following entry of the preliminary injunction, Ms. Norales gave birth on February 26, 2025, in Burien, Washington. Ex. A.[3] Ms. Chavarria's due date is July 21, 2025. ER-23.

## STATEMENT OF JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STANDARD OF REVIEW

This Court's review of a decision granting a preliminary injunction is "limited and deferential." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). The Court "will reverse only if the

---

[3]     Plaintiffs respectfully request that the Court take judicial notice of the birth certificate. *See* Fed. R. Evid. 201(b)(2) (fact that is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" may be "[j]udicially [n]oticed"); *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of some public records, including the 'records and reports of administrative bodies.'" (citation omitted)).

district court 'abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact.'" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005) (citation omitted). Legal conclusions are reviewed de novo; factual findings, for clear error. *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015). The scope of the injunction is reviewed for abuse of discretion. *Id.*

## SUMMARY OF ARGUMENT

The Supreme Court's decision in *Wong Kim Ark* over 125 years ago resolves the questions presented in this case. There, the Court explained that the Citizenship Clause's requirement that a person be "subject to the jurisdiction" of the United States means that they be subject to its law and entitled to its protection. *Wong Kim Ark* carefully delineated the discrete groups that are *not* covered by the U.S.'s jurisdiction, explaining that the children born to Native Americans living in tribes, diplomats, and invading foreign armies are the sole exceptions referenced in the Citizenship Clause.

Defendants claim *Wong Kim Ark* instead instructs that a person's parents must have complete "allegiance"—or loyalty—to the United States for their child to be a U.S. citizen. This, however, is the *dissent's* argument in *Wong Kim Ark*. The Court repeatedly explained in *Wong Kim Ark* that "allegiance" as understood in the common law and antebellum U.S. caselaw meant a person was subject to the

7

government's "protection and control." The Court's decision carefully explained that each of the groups identified above is outside of U.S. jurisdiction because the United States does not enjoy full, unfettered control over them or the territory they occupy. Nor can Defendants use *Wong Kim Ark* to compare the noncitizen parents there to today's LPRs. Chinese nationals like the parents in *Wong Kim Ark* faced many restrictions, including a ban on becoming citizens, that meant their status in the United States was much more tenuous and fragile than today's LPRs.

Throughout the 20th century, the Supreme Court repeatedly recognized that the children of noncitizens born in the United States are U.S. citizens, even where the parents entered unlawfully or lacked lawful status. Regardless of a parent's immigration status, they—and more importantly, their children—are subject to the jurisdiction of the United States while residing in this country. This understanding of the term "subject to the jurisdiction thereof" is unassailably reinforced by other sources. Contemporaneous use of the term "jurisdiction" in antebellum caselaw and dictionaries confirms this understanding. Moreover, the drafters of the Fourteenth Amendment explicitly understood the phrase to except the children of Native Americans from citizenship but include the children of noncitizens other than the children of diplomats.

Defendants attempt to muddy these waters by turning to the pre-Fourteenth Amendment Civil Rights Act, which made citizens of those "not subject to any

foreign power." But that was not the language adopted in the Citizenship Clause. By choosing "subject to the jurisdiction thereof" instead, Congress employed a phrase with a different meaning and with well-recognized exceptions, as *Wong Kim Ark* explained.

The drafters also crafted the Clause against the backdrop of a common law tradition of birthright citizenship that courts in the antebellum era had repeatedly employed to recognize the birthright citizenship of people born to noncitizens.

Nor can Defendants insert a domicile requirement to strip children born here of their citizenship: that argument requires accepting Defendants' assertion that complete "loyalty" is required, which is incorrect. Moreover, domicile simply requires an intent to reside in the United States indefinitely and has no lawful status requirement. Individual Plaintiffs satisfy that inquiry.

Further, Defendants' supporting interpretive principles amount to nothing more than policy concerns that are irrelevant to the questions at hand. Notably, Defendants are plainly wrong about the history of executive practice. They overstate the authorities they do cite, then fail to cite the 150 years of executive practice that directly defy their new interpretation.

As for irreparable harm, the injury Individual Plaintiffs face here is unmistakable. The consequences of losing citizenship are grave: being torn away from families and removed to a country one has never known, not being able to

work, and not enjoying the many other rights and privileges that citizens enjoy. For similar reasons, the public interest and balance of equities favor Plaintiffs.

Finally, the scope of the injunction was not an abuse of discretion. Individual Plaintiffs moved for class certification, but instead of certifying the class, the district court entered a nationwide injunction. Absent the nationwide injunction, the district court would need to address the motion for class certification and issue preliminary injunctive relief for the proposed class. The district court also acted within its discretion by enjoining implementation of the EO, as Defendants would otherwise be permitted to begin violating the Constitution.

## ARGUMENT

### I. The Executive Order violates the Fourteenth Amendment.

The Citizenship Clause of the Fourteenth Amendment provides that "all persons born . . . in the United States, and subject to the jurisdiction thereof" are U.S. citizens. U.S. Const. amend XIV, § 1. For well over 125 years, it has been black letter law that the term "jurisdiction" means the power to exercise authority, regulate, legislate, or govern. *Wong Kim Ark* definitively adopted this understanding. That interpretation also accords with the legislative history of the Amendment, contemporaneous understanding of "jurisdiction," and the common law regarding birthright citizenship.

10

Defendants' attempt to add to this jurisdictional phrase the requirements of allegiance and domicile lacks any textual or historical basis. It is an ahistorical and policy-driven campaign to warp the plain meaning of the Citizenship Clause. Indeed, the interpretation Defendants advance is nothing more than the interpretation proffered by the dissent and rejected by the Court in *Wong Kim Ark*.

### A.    *Wong Kim Ark* **definitively resolves this case and rejects Defendants' arguments.**

1.    The Supreme Court held in *Wong Kim Ark* that "jurisdiction" means the authority to govern and the corresponding duty of obedience.

In *Wong Kim Ark*, the Supreme Court held that the phrase "subject to the jurisdiction thereof" requires that a person born in the United States be subject to U.S. law, i.e., subject to its authority to legislate, regulate, and govern. The Court explained that the sovereign—the United States—can expect "allegiance" of individuals within its territory. By "allegiance," the *Wong Kim Ark* court explained the person "owes obedience to the laws of th[e] government." 169 U.S. at 694 (citation omitted).

*Wong Kim Ark* further delineated the phrase "subject to the jurisdiction thereof" by defining who is *not* covered by it. As the Court summarized, that phrase was intended "to exclude, by the fewest and fittest words," the common law exceptions to birthright citizenship: namely, "children born of alien enemies in hostile occupation" and "children of diplomatic representatives of a foreign state."

11

*Id.* at 682. In addition, the Court noted that it also excluded children born aboard "foreign public ships" and those born to "members of the Indian tribes owing direct allegiance to their several tribes"—groups considered under the power of separate sovereigns. *Id.* at 693.

The Court explained at length why each of these classes of individuals were exempt. First, the "children of alien enemies, born during and within their hostile occupation," were not citizens because they were "not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction, of the king." *Id.* at 655. When a hostile foreign power seizes U.S. soil, the "sovereignty of the United States over the territory [is] . . . suspended" and thus the children born to the enemy there are not subject to U.S. authority. *Id.* at 683

Second, the "children of foreign sovereigns or their ministers," *id.* at 693, are not born "within the jurisdiction[] of the king," *id.* at 655, because "foreign ministers" are serving "in the place of the sovereign [they] represent[], or [are deemed] by a political fiction . . . extra-territorial," *id.* at 685 (quoting *The Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch.) 116, 138 (1812)).

Third, a person born on a ship is the "subject of the prince to whom his parents then owe allegiance; for he is still deemed under the protection of his sovereign, and born in a place where he has dominion." *Id.* at 659. Such children "born on foreign public ships," *id.* at 693, are not subject to U.S. jurisdiction

12

because a "sovereign . . . cede[s] a portion of his territorial jurisdiction . . . where he allows the troops of a foreign prince to pass through his dominions," *id.* at 684 (citation omitted).

Finally, the Court addressed the "anomalous case of the Indian tribes," *id.* at 683, as they "stand[] in a peculiar relation to the national government, unknown to the common law," *id.* at 682. *Wong Kim Ark* applied its opinion in *Elk v. Wilkins*, 112 U.S. 94 (1884), explaining that Native Americans—"although in a geographical sense born in the United States"—were not citizens because they belonged to "Indian tribes, . . . [which] were alien nations, distinct political communities, [and] the members of [those tribes] owed immediate allegiance to their several tribes." *Id.* at 681.

The common theme with respect to these exclusive categories is that "the party must be born within a place where the sovereign is at the time in full possession and exercise of his power, and the party must also at his birth derive protection from, and consequently owe obedience or allegiance to, the sovereign, as such, de facto." *Id.* at 659. Where this is true, an individual's physical presence in a country subjects that individual to that government's laws—and the person is therefore subject to its jurisdiction. *Id.* at 693–96. Specifically, the Court observed that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of

13

the United States." *Id.* at 693. This rule applies even if the person's allegiance is "local and temporary" and is "continuing only so long as he remains within our territory." *Id.* In such cases, the person is still "subject to [United States] jurisdiction," as "it is well known that by the public law an alien . . . for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government." *Id.* at 693–94.

This theme recurs throughout the opinion. For example, the Court explained that under the common law tradition that the United States inherited,

> aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, the faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born.

*Id.* at 658. Similarly, in reviewing legal authorities and cases from the colonies and antebellum United States, the Court concluded that during those periods, caselaw and treatises made clear that "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States." *Id.* at 675.

2.    Defendants' alternative definition of "subject to the jurisdiction" as requiring exclusive loyalty merely repeats *Wong Kim Ark*'s dissent.

Defendants' response to *Wong Kim Ark*'s comprehensive analysis is to ask this Court to adopt the two-person dissent as the controlling opinion. Specifically, Defendants claim that jurisdiction "cannot simply be the power to regulate." Op. Br. 13. Instead, they assert that "subject to the jurisdiction" means "political jurisdiction," which, according to Defendants, connotes an allegiance—or loyalty—requirement. *Id.* at 13–14. That loyalty requirement, they argue, excludes "those persons [who] owe allegiance to a different sovereign and thus are not regarded as owing the requisite allegiance to . . . the United States." *Id.* at 14.

Defendants use the term "political jurisdiction" from *Elk* to reach for a textual hook tying their "primary allegiance" (or loyalty) argument to the constitutional text. But that strained connection collapses under even minimal scrutiny, because political jurisdiction *is* regulatory jurisdiction. The term was used that way in the antebellum and post-Civil War period and is still used in that sense today. *See, e.g.*, *Smith v. Turner*, 48 U.S. 283, 422 (1849) (explaining that political jurisdiction includes that power to tax, reflecting that the term means the power to govern); *Chicago, R.I. & P. Ry. Co. v. McGlinn*, 114 U.S. 542, 546 (1885) (equating "political jurisdiction" and "legislative power"); *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 69–70 (1962) (quoting legislative debates that equated

15

"political jurisdiction" with a state's "police power"); *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1000–01 (9th Cir. 2021) (using political jurisdiction as synonymous with "legislative . . . jurisdiction.").

Tellingly, Defendants' argument is the *exact same argument* the *Wong Kim Ark* dissent made. Justice Fuller's key contention was that noncitizen parents "do not owe allegiance otherwise than to their own governments, and [thus] their children cannot be regarded as born within any other." 169 U.S. at 720 (Fuller, J., dissenting). Defendants likewise argue that non-LPR noncitizens "owe primary allegiance to a foreign sovereign" and that birthright citizenship requires the "direct and immediate allegiance" of one's parents. Op. Br. at 17.

*Wong Kim Ark* rejected this argument, holding that the jurisdictional phrase in the Citizenship Clause simply means the power to govern and expect obedience. *Supra* Sec. I.A.1. Defendants contend this understanding cannot be true because the United States retains the power to regulate the excepted groups identified in *Wong Kim Ark*. Op. Br. 16. But that facile response does not undercut *Wong Kim Ark's* holding. As an initial matter, *Wong Kim Ark* acknowledged that "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute." 169 U.S. at 683–84 (quoting *The Schooner Exch.*, 11 U.S. at 136). But even so, the sovereign may "waive the exercise of a part of that complete exclusive territorial jurisdiction." *Id.* at 684. That the sovereign chose to waive it does not

16

matter—what matters is that the excepted groups are not subject to the jurisdiction of the United States because the United States does not have "full possession and exercise of [its] power" over such groups or those groups' territory. *Id.* at 659 (quoting *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99, 155 (1830)).

Further, Defendants' assertion as to diplomats, Op. Br. 16, misses the point. Even if in theory the United States *could* eliminate foreign sovereign immunity, as a practical matter, that immunity exists, and the United States does not exercise its full jurisdiction. That is because "foreign ministers" can be "consider[ed] . . . as in the place of the sovereign [they] represent[], or by a political fiction[,] . . . extraterritorial, and therefore, in point of law, *not within the jurisdiction of the sovereign* at whose court [they] reside[]." 169 U.S. at 685 (emphasis added) (quoting *The Schooner Exch.*, 11 U.S. at 138).

Second, Defendants misstate the law and history regarding the omission of Native Americans from the Citizenship Clause. Defendants argue their exclusion demonstrates that "subject to the jurisdiction" cannot mean the power to govern and expect obedience, since the government has some authority over Indian tribes. Op. Br. 15–16. But both *Elk* and *Wong Kim Ark*—as well as the legislative history of the Fourteenth Amendment—resoundingly reject this line of reasoning. Defendants plainly err in attempting to extrapolate from *Elk* additional hurdles for children born of noncitizens to establish that they are "subject to the jurisdiction"

17

of the United States. Instead, "[t]he decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country." 169 U.S. at 682.

At the time the Fourteenth Amendment was passed, Native American tribal members were not considered to be subject to the U.S.'s jurisdiction in important respects. That understanding remains the law today. *See Haaland v. Brackeen*, 599 U.S. 255, 310–13 (2023) (Gorsuch, J., concurring). As the Court explained in *Elk*, "[t]he Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign states; but they were alien nations, distinct political communities." 112 U.S. at 99. As such, the government was required to engage with them "either through treaties . . . or through acts of congress" expressly applying to them, for "[g]eneral acts of congress did not apply to Indians." *Id.* at 99–100. For this reason, the Court explained

> Indians born within the territorial limits of the United States, members of, and owing immediate allegiance to, one of the Indiana tribes, (an alien though dependent power,) although in a geographical sense born in the United States, are no more 'born in the United States and subject to the jurisdiction thereof,' within the meaning of the first section of the fourteenth amendment, than the children of subjects of any foreign government born within the domain of that government, *or the children born within the United States, of ambassadors or other public ministers of foreign nations.*

*Id.* at 102 (emphasis added).

The Fourteenth Amendment's legislative history confirms the framers' understanding of why the Citizenship Clause did not cover Native Americans. During the Senate debates on the Citizenship Clause, Senator Trumbull stated that Native American tribal members were not "subject to [U.S.] jurisdiction," explaining his understanding that the United States did not "exercise any civil or criminal jurisdiction" over "wild tribes of Indians," "take jurisdiction of murders and robberies and other crimes committed by one Indian upon another," or "punish[] them for instituting among themselves their own tribal regulations." Cong. Globe, 39th Cong., 1st Sess. Pt. 4, at 2893 (1866); *see also id.* at 2895 (Senator Howard noting the U.S. did not have "power to punish an Indian who is connected with a tribe for a crime committed by him upon another member of the same tribe"). Accordingly, Senator Trumbull declared: "[T]hey are not subject to our jurisdiction. . . . It is only those persons who come completely within our jurisdiction, who are subject to our laws, that we think of making citizens . . . ." *Id.* at 2893. Senator Johnson, who did not agree the exclusion of Native Americans was as clear, nonetheless shared the same understanding as to the meaning of jurisdiction. *Id.* ("I know of no better way to give rise to citizenship than the fact of birth within the territory of the United States, born of parents who at the time were *subject to the authority of the United States*." (emphasis added)). This discussion

demonstrates that, to the drafters, "subject to the jurisdiction thereof" meant the government's unencumbered ability to enforce U.S. laws against them. However, tribal sovereignty precluded such jurisdiction as to Native Americans. *Id.* at 2890 (Senator Howard explaining Native Americans were excluded because "[t]hey are regarded . . . as being *quasi* foreign nations").

Finally, Defendants briefly suggest that the example of foreign armies does not support Plaintiffs because "the United States may exercise jurisdiction to punish 'enemy invaders.'" Op. Br. 16. But no party disputes the government can punish those caught invading the United States. *Wong Kim Ark*, however, clarifies that where those invaders seize U.S. soil, albeit temporarily, the "sovereignty of the United States over the territory [is] . . . suspended," 169 U.S. at 683, and any children born to those hostile armed forces are therefore not "within the jurisdiction[] of" the United States, *id.* at 655.

Defendants also misconstrue what "allegiance" means in *Wong Kim Ark* (and elsewhere). *Wong Kim Ark* used the term "allegiance" to indicate that a person is subject to U.S. law and expected to obey that law. For example, the Court explained that "allegiance" has long meant a person is "under the protection and control of the crown." *Id*. at 658 (citation omitted). The Court then directly equated obedience and allegiance, observing that "be[ing] born within a place where the sovereign is at the time in full possession and exercise of his power" means that "at

20

his birth [a person] derive[s] protection from, and consequently owe[s] obedience or allegiance to, the sovereign." *Id.* at 659 (citation omitted). The opinion repeatedly equates the two, noting that citizenship requires "[f]irst, birth locally within the dominions of the sovereign; and, secondly, birth within the protection and *obedience*, or, in other words, within the ligeance, of the sovereign." *Id.* (emphasis added) (citation omitted). The concepts of "allegiance," "protection," and "obedience" were thus intertwined. *See, e.g.*, *id.* at 679 ("Allegiance and protection are, in this connection (that is, in relation to citizenship) reciprocal obligations." (citation omitted)). That connection demonstrates that owing allegiance simply meant a person born in the sovereign's territory was subject to the sovereign's rule and expected to obey it. *See, e.g.*, *id.* at 685–86, 694.

Even the *Wong Kim Ark* dissenters acknowledged this understanding, observing that under the common law, a person "born during a temporary stay of a few days [to foreign parents] . . . was irretrievably a British subject. The rule was the outcome of the connection in feudalism between the individual and the soil on which he lived, and the allegiance due was that of liege men to their liege lord." *Id.* at 707 (Fuller, J., dissenting) (internal citation omitted). The dissenters simply

21

objected to the majority's holding that the Citizenship Clause should be understood consistent to this common law principle. *Id.* at 707–09.[4]

Finally, Defendants' argument woefully misapprehends history by suggesting Chinese nationals residing in the United States had "direct and immediate," Op. Br. 17, or "complete," *id.* 22, to the United States. To the contrary, the status of Chinese immigrants living in the United States in the late 1800s was substantially less secure and much more tenuous than LPR status.

First, Chinese nationals like Wong Kim Ark's parents were not permitted to become U.S. citizens. *See* Chinese Exclusion Act, ch. 126, § 14, 22 Stat. 58, 61 (1882). Of course, this inability contrasts sharply with today's LPRs, who may naturalize after five years (at most). *See* 8 U.S.C. § 1427(a). This inability to naturalize meant that, under Defendants' logic, a Chinese national's primary loyalty the time of *Wong Kim Ark* would be to China—not the United States.

Second, at the end of the 19th century, most Chinese nationals' right to travel was severely limited. Legislation deprived Chinese "laborers" of the right to return

---

[4]      Defendants acknowledge this precedent, but err in claiming that that British common law is largely irrelevant despite the majority's consideration of it in *Wong Kim Ark*. Op. Br. 39–40. Moreover, *Wong Kim Ark*'s holding relies on other sources, including antebellum *U.S.* caselaw. *See* 169 U.S. at 662–64. And Defendants' fleeting "social contract" argument conflates a separate matter, simply asserting in conclusory style that the social contract requires exclusive or primary loyalty.

to the United States. *See* Scott Act, ch. 1064, 25 Stat. 504 (1888). The Scott Act even barred the re-entry of Chinese laborers who were previously authorized to return with a certificate of identity under the terms of the Chinese Exclusion Act. *See id.* §§ 1–2. This meant that the moment a Chinese person left the United States, they generally had no option but to return to China. By contrast, LPRs face few restrictions on their right to travel.

Third, in 1892, Congress required the registration of most Chinese, empowered their deportation, and created a presumption that many were unlawfully present. *See* Geary Act, ch. 60, 27 Stat. 25 (1892). Specifically, the law required Chinese "laborers" to obtain a certificate of residence and rendered unlawful the presence of any Chinese laborer who failed to do so. *See id.* § 6. As to non-laborer Chinese persons, the law subjected them to a presumption of being unlawfully present, "unless such person . . . establish[ed], by affirmative proof, . . . his lawful right to remain in the United States." *Id.* § 3.

Finally, Chinese nationals faced restrictions or outright bans on their ability to testify as to their own right to remain in this country. For example, under the Geary Act, if a laborer failed to obtain a certificate and subsequently faced deportation, that person needed "at least one credible white witness" to testify on their behalf. *Id.* § 6. Similarly, Chinese "merchants"—who were still allowed to leave and enter the United States—were required to "establish by the testimony of

23

two credible witnesses other than Chinese" that they had engaged in business prior to their departure from the United States. *See* McCreary Act, ch. 14, § 2, 28 Stat. 7, 8 (1893). LPRs today face no comparable restrictions (nor do other noncitizens).

This context is important to understanding *Wong Kim Ark*. It demonstrates when the Court stated that "Chinese persons, born out of the United States, remaining subjects of the emperor of China . . . are entitled to the protection of and owe allegiance to the United States, so long as they are permitted by the United States to reside here," 169 U.S. at 694, the Court was not referring to anything akin to LPR status, but instead was simply indicating that these "Chinese persons" had not at this time been removed from the United States.

In short, Defendants' attempt to read *Wong Kim Ark* as being cabined to those with LPR status by equating today's LPRs with the Chinese national of the late 19th century has no historical basis. To the contrary, Chinese nationals at that time faced a presumption of unlawful presence, had no right to travel, encountered restrictions on even defending themselves in proceedings, and had no right to become permanent members of the community through naturalization. Such restrictions reflect that Chinese immigrants were regarded as pariahs and underscore that immigration law at the time of *Wong Kim Ark* made the Chinese national's claim to remain in the United States tenuous and subject to revocation at any time, unlike today's LPRs. The fragile nature of their connections thus

undermines Defendants' claim that "allegiance" means primary or exclusive "loyalty." Instead, their status underscores that allegiance simply meant being subject to U.S. law.

### B. The Supreme Court has repeatedly confirmed that the Citizenship Clause has only two requirements—birth and jurisdiction—and that noncitizens satisfy those requirements.

As the district court recognized, Defendants' attempt to import a separate "allegiance" requirement requiring exclusive loyalty to the United States is a textual addition that "do[es] not appear in the Citizenship Clause, or anywhere in the Fourteenth Amendment." ER-9. To the contrary, Supreme Court precedent has repeatedly interpreted the Clause as having *only* two requirements: (1) birth, and (2) being subject to the jurisdiction of the United States. In the *Slaughter-House Cases*, the Court explained "it is only necessary that [a person] should be born or naturalized in the United States to be a citizen of the Union." 83 U.S. 36, 73–74 (1872). That national citizenship requires only birth and jurisdiction is found repeatedly in the Court's cases. *See, e.g.*, *Rogers v. Bellei*, 401 U.S. 815, 827, 830 (1971); *Edwards v. California*, 314 U.S. 160, 183 (1941) (Jackson, J., concurring) (national citizenship is "establishe[d] [by] . . . the mere circumstance of birth within the territory and jurisdiction of the United States").

Moreover, Supreme Court caselaw has made clear that the Citizenship Clause encompasses the children of noncitizens, including those of undocumented

parents. Significantly, in *Plyler v. Doe*, the Court relied on *Wong Kim Ark* to hold that undocumented immigrants are "within [the] jurisdiction" of any state where they are physically present. 457 U.S. 202, 215 (1982). The Court reasoned that an unlawful entry into the country "cannot negate the simple fact of [a person's] presence within the State's territorial perimeter." *Id.* It then went to explain that "[g]iven such presence," a noncitizen "is subject to the full range of obligations imposed by the State's civil and criminal laws." *Id.* Critically, the Court explained that "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10 (citing C. Bouvé, *Exclusion and Expulsion of Aliens in the United States* 425–27 (1912)). The dissenting judges did not dispute the basic proposition that the Fourteenth Amendment encompasses noncitizens, whether lawfully present or not. *See id.* at 243 (Burger, C.J., dissenting).[5]

---

[5]     Individual Plaintiffs and proposed class members are thus plainly subject to the jurisdiction of the United States. As just one example, the United States requires undocumented men to register for the Selective Service. *See* 50 U.S.C. § 3802(a); *see also* Selective Service System, Immigrants & Dual Nationals, https://www.sss.gov/register/who-needs-to-register/#p1 (last accessed Apr. 4, 2025) ("This includes, naturalized citizens, parolees, undocumented immigrants, legal permanent residents, asylum seekers, refugees, and all males with visas of any kind which expired more than 30 days ago.").

While *Plyer* focused on the Equal Protection Clause, *Wong Kim Ark* previously confirmed that "it is impossible to attribute to the words, 'subject to the jurisdiction thereof' . . . a less comprehensive meaning than to the words 'within its jurisdiction' (that is, of the state) at the end of [§ 1 of the Fourteenth Amendment]; or to hold that persons, who are indisputably 'within its jurisdiction' of the state, are not 'subject to the jurisdiction' of the nation." 169 U.S. at 696. Accordingly, *Plyer*'s holding that unlawful entrants and those unlawfully present were covered by the Equal Protection Clause also reaffirms that the Citizenship Clause covers them too. *See* 457 U.S. at 211 & n.10.

Consistent with this understanding, the Supreme Court has repeatedly recognized that all children born within the United States to noncitizen parents are entitled to citizenship by birth, regardless of the parents' status. For example, in *United States ex rel. Hintopoulos v. Shaughnessy*, the Court stated that a child born to two "illegal[ly] presen[t]" noncitizens was "of course, an American citizen by birth." 353 U.S. 72, 73 (1957). Similarly, in *INS v. Errico*, the Court acknowledged that a child had "acquired United States citizenship at birth" even though their noncitizen parents had entered the United States fraudulently. 385 U.S. 214, 215 (1966). Many other cases similarly recognize that noncitizens other than those subject to the exceptions expressly referenced in *Wong Kim Ark* obtain citizenship by birth on U.S. soil. *E.g.*, *Morrison v. California*, 291 U.S. 82, 85 (1934) (holding

27

that individual of Japanese ancestry was a citizen "if he was born within the United States" even though he would not have been eligible to naturalize if born abroad); *Perkins v. Elg*, 307 U.S. 325, 329 (1939) (holding that "at birth [plaintiff] became a citizen of the United States" notwithstanding parents' Swedish nationality); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing as U.S. citizen the child of two noncitizens who had entered unlawfully and were unlawfully present in the country). Circuit courts, including this Court, have adhered to the same understanding. *E.g.*, *Regan v. King*, 134 F.2d 413 (9th Cir. 1943) (per curiam) (affirming district court's judgment that all persons of Japanese descent born in the United States are citizens by birth).

In sum, the Supreme Court has reiterated time and again that the Citizenship Clause requires only birth and jurisdiction, and that those requirements are satisfied even where a person's parents have not abided by U.S. immigration laws.

**C.    To be "subject to the jurisdiction" of the United States means to be subject to its authority and laws.**

1.    <u>Contemporaneous sources confirm the meaning of "jurisdiction."</u>

In construing the Constitution's text, courts must "interpret the words consistent with their 'ordinary meaning . . . at the time'" of their enactment. *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (alteration in original) (citation omitted); *see also, e.g.*, *Tabares v. City of Huntington Beach*,

988 F.3d 1119, 1122 (9th Cir. 2021) (analysis of constitutional text must be grounded "in an understanding of the text's original public meaning at ratification"); Kurt T. Lash, *The Origins of the Privileges or Immunities Clause, Part I: "Privileges and Immunities" As an Antebellum Term of Art*, 98 Geo. L.J. 1241, 1246 (2010) (explaining that the drafters of the Fourteenth Amendment employed the "legal meanings and ideas that had emerged in antebellum judicial cases and legal commentary"). That is precisely what the Supreme Court did when analyzing the text of the Citizenship Clause just three decades after its drafting. *See Wong Kim Ark*, 169 U.S. at 653–54 (explaining the Clause should be interpreted by looking at its text and the history surrounding that text); *see also id.* at 654–99 (consulting, inter alia, common law sources, Attorney General opinions, early Republic caselaw, and Fourteenth Amendment legislative debate to interpret and contextualize the Citizenship Clause).

The Citizenship Clause's qualifying phrase—"subject to the jurisdiction"— had an accepted meaning prior to its inclusion in the Fourteenth Amendment. Specifically, "jurisdiction" or "subject to the jurisdiction" conveyed the idea that a person was subject to the authority or sovereign power of a country or government. Dictionaries at the time defined "jurisdiction" not only in terms of a court's power to decide cases but also as the "[p]ower of governing or legislating; the right of making or enforcing laws; the power or right of exercising authority." *Jurisdiction*,

Noah Webster et al., *An American Dictionary of the English Language* (1865); *see also Jurisdiction*, Benjamin Vaughan Abbott, *Dictionary of Terms and Phrases Used in American or English Jurisprudence* (1879) (defining term as "[t]he authority of government; the sway of a sovereign power").

Congress used the phrase this same way in legislation in the antebellum period. *See* Act of March 27, 1804, § 2, 2 Stat. 298, 299 (making the Act applicable in all places that were "subject to the jurisdiction of the United States"). While courts often used this phrase to reference their own jurisdiction, they also used it in this other sense—i.e., that of sovereign power. *See, e.g.*, *The Schooner Exch.*, 11 U.S. (7 Cranch) at 136 ("The jurisdiction of the nation within its own territory is necessarily exclusive and absolute. It is susceptible of no limitation not imposed by itself.").[6]

The legislative history reaffirms this established understanding of what "subject to the jurisdiction thereof" means. *See District of Columbia v. Heller*, 554 U.S. 570, 598–99, 603–04 (2008) (consulting, inter alia, ratification debates and correspondence related to those debates to understand the meaning of the Second

---

[6]     Notably, just as there was a common understanding of "jurisdiction," the principle that "ambassadors were exempted from all local jurisdiction, civil and criminal," was widely accepted in pre-civil war cases and legal commentary. 1 James Kent, *Commentaries on American Law* 15 (9th ed. 1858); *see also, e.g.*, *The Schooner Exch.*, 11 U.S. (7 Cranch) at 125, 127, 131–32 (counsel for both parties agreeing with this principle).

Amendment). When the language of the Citizenship Clause was first proposed by Senator Howard, vigorous debate ensued over the language's meaning with respect to whether it included "wild Indians" and Native Americans living in reservations. *See* Cong. Globe, 39th Cong., 1st Sess. 2890, 2892–97 (1866). That discussion highlights the framers' understanding that the qualifying language only excluded those on U.S. territory over whom the United States did not exercise full power. *See supra* Sec. I.A.

In addition, prior to that conversation on Native Americans, and consistent with that understanding of "jurisdiction," Senator Howard clarified one group of U.S.-born children who, "of course," were not granted birthright citizenship by the amendment: those born to "foreigners, aliens, who belong to the families of embassadors [sic] or foreign ministers." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). As it was well known, *see supra* Sec. I.A.1, the United States, like other sovereign nations, "cede[d] a portion of [its] territorial jurisdiction" over ambassadors such that their children were not fully subject to the U.S.'s authority, *The Schooner Exch.*, 11 U.S. (7 Cranch) at 138–39, and were understood at birth to be subjects of the sovereign whom their parent "represents," *Wong Kim Ark*, 169 U.S. at 660 (citation omitted).

The conversation surrounding the citizenship of children of other noncitizens evinces the same understanding of "jurisdiction." Criticizing the Clause, Senator

Cowan of Pennsylvania decried the idea that "the child of the Chinese immigrant" and "the child of a Gypsy" would be considered citizens under the Clause. Cong. Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). Yet while challenging the wisdom of such a choice, Senator Cowan acknowledged that like "a sojourner," such people "ha[ve] a right to the protection of the laws." *Id.*[7] Indeed, neither he nor anyone else questioned that which was readily apparent: the children of Chinese (and other noncitizens) were "subject to the jurisdiction" of the United States.

This was because the framers understood that the Citizenship Clause enshrined into law the concept of birthright citizenship, or *jus soli*. When Senator Howard first introduced the language of the Citizenship Clause, he affirmed that it was "simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States." *Id.* Senator Cowan opposed the proposal *because* it would base citizenship on "the mere fact that a man is born in the country," invoking the specter of an invasion by undesirable noncitizens. *Id.* at 2890–91 ("[I]s it proposed that the people of California are to remain quiescent while they are overrun by a flood of

---

[7]    As Professor Garrett Epps argues, "the discussion of Gypsies provides about the closest thing we are likely to get to the issue of illegal immigration," as they were described by Senator Cowan with the same vitriol used to describe undocumented noncitizens today. Garrett Epps, *The Citizenship Clause: A "Legislative History"*, 60 Am. U. L. Rev. 331, 361 (2010).

immigration of the Mongol race? Are they to be immigrated out of house and home by Chinese?"). But the rest of the Senators were not persuaded by Senator Cowan's objections, and in response, Senator Conness of California noted his support for the Clause's declaration "that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States." *Id.* at 2891. *Jus solis* thus became the law of the land.[8]

2.   Defendants misplace their reliance on the Civil Rights Act of 1866 as support for an unwritten "allegiance" requirement.

Knowing this legislative history refutes their argument, Defendants last turn to the Civil Rights Act of 1866 to contend that "subject to the jurisdiction thereof" requires complete loyalty to the United States. That Act was passed two years before ratification of the Fourteenth Amendment and conferred citizenship on "all persons born in the United States, and *not subject to any foreign power*." An Act to protect all Persons in the United States in their Civil Rights, and furnish the Means of their Vindication. 14 Stat. 27, 27 (1866) (emphasis added). Defendants assert that this language served as an "initial blueprint" for the Fourteenth Amendment and supports an allegiance requirement. Op. Br. 19 (citation omitted). But that

---

[8]   Defendants suggest that Senator Wade's proposal to define who is a citizen precludes Plaintiffs' understanding of the final text's language. Op. Br. 26. But as noted above, the "subject to the jurisdiction thereof" language was added to ensure that the text included the specific, acknowledged exemptions to birthright citizenship—namely, ambassadors and Native Americans. *Supra* Sec. I.A.

33

argument misapprehends both the meaning of the Civil Rights Act's citizenship provision and, fundamentally, the operation of constitutional law.

Critically, Defendants ignore that *Wong Kim Ark* resolved this issue, explaining that "any possible doubt" as to the meaning of the Civil Rights Act's citizenship provision was "removed when the negative words . . . 'not subject to any foreign power,' gave way . . . to the affirmative words, 'subject to the jurisdiction of the United States.'" 169 U.S. at 688. As the Supreme Court has recognized, it is this affirmative constitutional language—not the language of the Civil Rights Act—that controls. *Cf. Heller*, 554 U.S. at 589 ("It is always perilous to derive the meaning of an adopted provision from another provision deleted in the drafting process.")

Defendants nonetheless argue the Civil Rights Act's text still matters because it remained on the books after the Fourteenth Amendment's ratification. Op. Br. 19. But Congress's decision not to repeal the statute does not transform it into controlling constitutional authority, particularly when "no act or omission of [C]ongress . . . can affect citizenship acquired as a birthright, by virtue of the constitution itself, without aid of any legislation." *Wong Kim Ark*, 169 U.S. at 703; *see also id.* ("[T]he fourteenth amendment . . . has conferred no authority upon

[C]ongress to restrict the effect of birth, declared by the constitution to constitute a sufficient and complete right to citizenship.").[9]

### D. *Jus soli* in the Citizenship Clause followed existing U.S. practice and common law.

The Fourteenth Amendment's guarantee of birthright citizenship for *all* people born in the United States (with limited exceptions) was not a novel concept at the time.

Prior to the amendment's enactment, courts and legal commentators already generally understood that the doctrine of *jus soli*, that is, citizenship by birth, made people born in the United States citizens. *See, e.g.*, *Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844) ("It is impossible to hold that there has been any relaxation from the common law rule of citizenship by means of birth within our territory."); *Gardner v. Ward*, 2 Mass. (1 Tyng) 244 (1805) ("I take it, then, to be established, with a few exceptions not requiring our present notice, that a man, born within the jurisdiction of the common law, is a citizen of the country wherein he is born."); *Kilham v. Ward*, 2 Mass. (1 Tyng) 236, 264–65 (1806) (opinion of

---

[9]     Moreover, the Act was consistent with the Citizenship Clause, as the framers understood that the phrase "not subject to a foreign power" did not deny birthright citizenship to the children of noncitizens. *See, e.g.*, Cong. Globe, 39th Cong., 1st Sess. 498 (1866) (Senator Trumbull responding that the Civil Rights Act would "[u]ndoubtedly" "have the effect of naturalizing the children of Chinese and Gypsies born in this country"); *see also id.* at 2891 (Senator Conness declaring that the children begotten of Chinese parents in California had already been "declared [citizens] . . . by law").

Sewall, J.) ("The doctrine of the common law is, that every man born within its jurisdiction is a subject of the sovereign of the country where he is born . . . ."); *State v. Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) 144, 151 (1838) ("[A]ll free persons born within the State are born citizens of the State."); *Barzizas v. Hopkins*, 23 Va. (2 Rand.) 276, 278 (1824) ("The place of birth, it is true, in general, determines the allegiance.").[10]

Notably, the question of whether *jus soli* applied to children born to noncitizens arose prior to Reconstruction, and there too courts applied the doctrine to hold that they were U.S. citizens. For example, in *McCreery's Lessee v. Somerville*, the Court's decision observed that the U.S.-born daughters of an Irish citizen were "native born citizens of the United States." 22 U.S. 354, 354 (1824). Several other cases around the time of the Civil War held or observed the same. *See, e.g.*, *Munro v. Merchant*, 28 N.Y. 9, 40 (1863) (assuming that plaintiff "born in this state of non-resident alien parents . . . is *prima facie* a citizen"); *Ludlam v. Ludlam*, 26 N.Y. 356, 371 (1863) ("[B]y the law of England the children of alien parents, born within the kingdom, are held to be citizens."). The Department of

---

[10]    Prior to the Fourteenth Amendment, this principle had a racial component: enslaved people born in the United States were not considered citizens. The citizenship status of free black people prior to the Civil War was complex and determined by both state law, *see, e.g.*, Martha S. Jones, *Birthright Citizens: A History of Race and Rights in Antebellum America* 25–34 (2018), and federal law, *see, e.g.*, *Dred Scott*, 60 U.S. 393.

Justice held the same view at the time. *See* Citizenship of Children Born in the United States of Alien Parents, 10 Op. Att'ys Gen. 328, 328 (1862) ("[C]hildren born in the United States of alien parents, who have never been naturalized, are native-born citizens of the United States . . . ."); Citizenship of Children Born Abroad of Naturalized Parents, 10 Op. Att'ys Gen. 329, 330 (1862) (similar); Citizenship, 9 Op. Att'ys Gen. 373, 374 (1859) (similar).

Indeed, the Constitution in 1789 assumed people obtained citizenship at birth. Article II requires that the President be a "natural born citizen" to hold that office. U.S. Const. art. II, § 1, cl. 5. That "natural born citizen" was not defined indicates that the Founders assumed *jus soli* would apply on U.S. soil.

Leading legal commentators agreed. As one stated:

> Therefore every person born within the United States, its territories or districts, whether the parents are citizens or aliens, is a natural born citizen in the sense of the constitution . . . . Under our constitution the question is settled by its express language [in the clause regarding eligibility to be president].

William Rawle, *A View of the Constitution of the United States of America* 80–81 (1825); *see also* Ramsey, *supra* p. 3, at 414 (citing additional founding-era legal commentators agreeing with these principles).

These sources reflect the common law background that the Founders inherited. English law applied *jus soli*, including as to noncitizens residing in English territory. In 1608, *Calvin's Case* held that birthright citizenship made

37

"subjects" of all people born within territories held by the English crown. *See Calvin v. Smith*, 77 Eng. Rep. 377, 382 (K.B. 1608). Specifically, the case "determined that all persons born within any territory held by the King of England were to enjoy the benefits of English law as subjects of the King. A person born within the King's dominion owed allegiance to the sovereign and in turn was entitled to the King's protection." Polly J. Price, *Natural Law and Birthright Citizenship in* Calvin's Case (1608), 9 Yale J.L. & Humans. 73, 73–74 (1997). A century and a half later, this remained the law, including as to noncitizens. As Blackstone explained, allegiance was due to the King by all people born on English soil. 1 William Blackstone, *Commentaries* *354–62. And as a result, the same people were also considered "subjects." Indeed, Blackstone explicitly noted that because of the "natural allegiance" everyone born on English soil owed to the monarch, "[t]he children of aliens, born here in England, are, generally speaking, natural-born subjects, and entitled to all the privileges of such." *Id.* at 361–62.

Defendants rely on the international law treatise of Emmerich de Vattel to dispute how citizenship is defined under U.S. law. Op. Br. 21–22. However, his position is simply inconsistent with the Citizenship Clause's text, antebellum caselaw, and the common law upon which it is based. Moreover, even Vattel recognized that, where a country's "civil or political laws may . . . ordain otherwise" regarding who is a citizen, it was those "regulations [that] must be

38

followed." 1 Emmerich de Vattel, *The Law of Nations* § 214 (Joseph Chitty & Edward Ingraham, eds., 1853); *see also id.* (recognizing "there are states, as, for instance, England, where the single circumstance of being born in the country naturalises the children of a foreigner"). Of course, here—like England—the language of the Citizenship Clause adopted a view of citizenship that was contrary to the one Vattel espoused as the "law of nature." *Id.* § 215.[11]

### E.    Defendants' "domicile" requirement is baseless.

#### 1.    Defendants err in asserting domicile is a requirement for citizenship and what domicile requires.

Defendants also rely on the Supreme Court's reference to "domicile" in *Wong Kim Ark* to attempt to exclude from birthright citizenship any child born here to a person who, in Defendants' view, is only a "temporary" resident. As they explain it, "domicile" is how one's allegiance is determined. Op. Br. 22–23.

As an initial matter, Defendants' entire argument about domicile assumes they are correct about allegiance requiring "primary" or "complete" loyalty to the United States. As described above, that view is mistaken: *Wong Kim Ark* makes clear that birth and jurisdiction alone determine citizenship under the Fourteenth

---

[11]    Nor does Justice Story support their position. Op. Br. 22. He wrote that a "reasonable qualification" to birthright citizenship would be to exclude children of foreigners "abiding there for temporary purposes," but he followed that by noting that "[i]t would be difficult, however, to assert, that in the present state of public law such a qualification is universally established." Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834).

Amendment. *See supra* Sec. I.A–B. The two requirements of birth and jurisdiction are "everything relating to the acquisition of citizenship by facts occurring within the limits of the United States." 169 U.S. at 688. Defendants' reliance on *Benny v. O'Brien*, 32 A. 696 (N.J. 1895), is also misplaced, as one state supreme court's statement regarding domicile cannot alter the text or meaning of the Citizenship Clause.

Moreover, Defendants are also incorrect that domicile requires both a lawful and permanent intent to reside. Op. Br. 24, 29. Instead, "only two prerequisites for domicile . . . exist[ed]: "residence; and . . . intention of making it the home of the [person]." Mark Shawhan, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L.J. 1351, 1353 (2010) (third and fourth alterations in original) (quoting Story, *Commentaries on the Conflict of Laws*, *supra* n.11, § 43). That view of domicile "was subsequently endorsed by the U.S. Supreme Court, federal circuit courts, and state courts." *Id.* at 1354 (footnotes omitted); *see also Ennis v. Smith*, 55 U.S. 400, 423 (1852) ("[T]o constitute [domicile, there must be] actual residence in the place, with the intention that it is to be a principal and permanent residence."). Notably, none of the cases on which Defendants rely to define domicile involve any interpretation of the Citizenship Clause or shed light on the meaning of the term at the time of ratification. *See, e.g.*, Op. Br. 24, 30.

40

2.    Even assuming allegiance and domicile were required—which
they are not—the EO would violate the Fourteenth
Amendment.

Even if the Court permitted Defendants to add allegiance and domicile into

the Citizenship Clause, such a requirement would not exclude the U.S.-born

children of Individual Plaintiffs and of numerous other groups of noncitizens.

First, Defendants flatly err in claiming that "neither [Plaintiff] pleads facts

about their intent to remain here indefinitely" or regarding their connections with

their countries of birth. Op. Br. 31. Both Ms. Norales and Ms. Chavarria have

testified that Washington is their home, that they seek to remain safely in the

United States, and that they fear the prospect of removal. ER-48–49; 1-SER-281

(explaining decision to move to Seattle because her partner had "settled" there); 1-

SER-287 (describing Washington as her "home"). Indeed, both have pending

asylum applications, 1-SER-281; 1-SER-287, thus demonstrating that they wish to

remain in the United States with protection from removal, *see* 8 U.S.C.

§ 1158(c)(1)(A) (prohibiting removal of asylee to country of nationality); *see also*

*id.* § 1159(b) (providing pathway to lawful permanent residence for individuals

granted asylum). Moreover, by law, asylees cannot "voluntarily avail[]

[themselves] of the protection of [their] country of nationality," *id.*

§ 1158(c)(2)(D); thus, Individual Plaintiffs "could not form a domicile in [the]

41

place from which they were exiled," Op. Br. 30 (citing Robert Phillimore, *The Law of Domicil* 63 (1847)).

Second, domicile does not require a lawful and permanent intent to remain. But even if it did, Defendants fail to recognize that far from acting "in defiance of immigration laws," Op. Br. 30, many noncitizens with temporary status undergo lengthy processes to obtain legal status, and eventually, their lawful permanent residence. In addition to asylum, the INA provides pathways to permanent residence for numerous groups with temporary or unlawful status, including for victims of domestic violence, human trafficking, or other crimes, or youth who have been abused, abandoned, or neglected. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(U), (T), (a)(27)(J), (a)(51); *id.* § 1255(h), (l), (m); *id.* § 1154(a). Many classes of individuals with temporary employment-based statuses also qualify to become LPRs. *See, e.g.*, *id.* § 1153(b). All such individuals may hold unlawful or temporary statuses, but are nevertheless "capable of establishing allegiance through domicile," Op. Br. 29, if it were a requirement—which it is not.

## F.   Defendants' remaining arguments cannot change the meaning of the Constitution.

Finally, Defendants rely on several arguments about unenacted legislation, executive passport denials, interpretive principles, and policy concerns to assert that the EO is lawful. None aid their position.

42

First, Defendants cite an unenacted 1874 law to make the dubious claim that the draft bill's text suggested Congress thought "children of non-resident alien parents were not subject to the United States' jurisdiction." Op. Br. 28. That a single member of Congress espoused this view in an unpassed bill says nothing about what the Citizenship Clause means. To the contrary, "[i]f this legislative history is probative of anything, it is probative only of the fact that Congress chose *not* to codify [Defendants'] interpretation." *City & Cnty. of San Francisco v. USCIS*, 944 F.3d 773, 797 (9th Cir. 2019).

Second, Defendants' reliance on executive practice only hurts their position. Defendants take two 1880s passport denials out of context. Op. Br. 28. Both Secretaries of State involved, however, assumed a natural-born U.S. citizen *loses* their birthright citizenship if their noncitizen parents take them out of the country while still a minor and they do not elect to reclaim that citizenship upon reaching the age of majority. *See* Children: Born in the United States generally citizens, 2 Wharton Digest, Ch. 7, §183, at 397 (Secretary Frelinghuysen declaring in earlier decision that "[a] child born in this country to a foreign father, when taken by his father abroad, acquires his father's domicil and nationality"); *id.* at 399–400 (Secretary Bayard, while denying birthright citizenship, nonetheless asserting that the passport applicant would "now be clothed with American nationality" if he had remained in the United States until "he was of full age and then elected an

American nationality"). These denials thus implicitly, if contradictorily, recognized that such persons were U.S. citizens at birth, consistent with the prevailing understanding of other Secretaries of State. *See, e.g.*, *id.* at 395 ("[A]s a general rule, a person born in this country, though of alien parents . . ., is under the laws of the United States deemed a citizen of the United States . . . ."). Moreover, the passport denials occurred before the executive had the benefit of the Supreme Court's decision in *Wong Kim Ark*.

That the single DOJ report from 1910 presents a different view offers Defendants little help. The vast and overwhelming weight of executive authority runs in precisely the *opposite* direction. For nearly 150 years, executive officials have repeatedly interpreted *Wong Kim Ark* and the Citizenship Clause as the district court did. *See, e.g.*, Case of Francois A. Heinrich, 14 Op. Att'ys Gen. 154, 155 (1872), 1872 WL 3694 ("[A] person born in this country, though of alien parents who have never been naturalized, is, under our law, deemed a citizen of the United States by reason of the place of his birth."); *see also, e.g.*, Opinions of the Principal Officers of the Executive Departments and Other Papers Relating to Expatriation, Naturalization, and Change of Allegiance 18 (Gov't Printing Office 1873); Wharton Digest*,* 43, at 394–97, 402; Richard W. Flournoy, Jr., *Dual Nationality and Election*, 30 Yale L.J. 545, 552–53 (1921); *Matter of S----*, 2 I&N Dec. 908, 909 (BIA 1947); *Matter of Cantu*, 17 I&N Dec. 190, 196–98 (BIA

44

1978); 19 Op. O.L.C. 340, 341–49 (1995). This weight of executive authority *against* Defendants' position maters, as the executive's longstanding and consistent interpretation "is powerful evidence that interpreting the [text] in [this] way is natural and reasonable." *Abramski v. United States*, 573 U.S. 169, 203 (2014) (Scalia, J., dissenting); *see also Bankamerica Corp. v. United States*, 462 U.S. 122, 130 (1983) (relying in part on "over 60 years" of government interpretation and practice to reject government's new proposed interpretation of the law at issue).

Third, the "principles of interpretation" Defendants cite, Op. Br. 32, are nothing more than an attempt to overwrite the Constitution with policy. This Court should reject that effort and instead "interpret [the law], no matter the context, based on the traditional tools of [textual] construction, not individual policy preferences." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374 (2024).

Defendants' first claimed interpretive principle is that the Court should avoid a reading of the Citizenship Clause that would allow for dual nationalities. Op. Br. 32–33. According to them, "[t]he Citizenship Clause was ratified at a time when the focus was on avoiding dual nationality." Op. Br. 33. But even if true, contemporaneous treatment of the issue reflected that the Fourteenth Amendment's text anticipated and permitted such dual nationality. Indeed, in the years

immediately following the Amendment's passage, Secretary of State Fish

explained that children born to foreign parents in the United States are

> born to a double character: the citizenship of the father is that of the
> child so far as the laws of the country of which the father is a citizen
> are concerned and within the jurisdiction of that country; but the child,
> from the circumstances of his birth, may acquire rights and owes
> another fealty besides that which attaches to the father.

Opinions of the Principal Officers, *supra* p. 44, at 18. *Wong Kim Ark* itself quoted

this very language, explaining that it "is entitled to much weight." 169 U.S. at 690–

91. Moreover, Defendants' principle would call into question the *millions* of

European immigrants who entered the United States in the 19th and 20th centuries,

and whose children acquired the citizenship of both their parents and U.S.

birthright citizenship. Understandably then, the Supreme Court has rejected the

exact line of reasoning Defendants now urge this Court to adopt. *See id.* at 667

(recognizing it was the "tendency" in Europe to grant citizenship through

parentage), 698 (noting U.S.-born children of European citizens "have always been

considered and treated as citizens of the United States"); *Perkins*, 307 U.S. at 329

(explaining that a person's Swedish citizenship "does not compel the conclusion

that she has lost her own citizenship acquired under our law").

Defendants next claim the need for "flexibility" in interpreting the

Constitution to achieve the current administration's goal of limiting "international

travel" for people it believes are coming to the United States to give birth. Op. Br.

33–34. This is simply an unabashed effort to "alter the [Constitution's] text in order to satisfy the policy preferences" of the current executive, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002). While Defendants frame this argument as a matter of the President's "foreign relations" power, Op. Br. 33 (citation omitted), the Supreme Court explicitly rejected a similar foreign affairs claim. As it explained then, the

> undeniable purpose of the Fourteenth Amendment to make citizenship of Negroes permanent and secure would be frustrated by holding that the Government can rob a citizen of his citizenship without his consent by simply proceeding to act under an implied general power to regulate foreign affairs or some other power generally granted.

*Afroyim*, 387 U.S. at 263.[12]

Defendants also argue the Clause should be reinterpreted to stop "hostile activities" by noncitizens. Op. Br. 34. But again, policy preferences do not dictate constitutional interpretation. Moreover, the Supreme Court has repeatedly recognized the citizenship of persons born to parents who engaged in unlawful activity. *See, e.g.*, *Rios-Pineda*, 471 U.S. at 446; *Errico*, 385 U.S. at 215–16. Defendants also violate "fundamental conceptions of justice" by "directing the

---

[12]    As part of this argument, Defendants also assert that the EO was necessary to avoid "monetizing the privilege of U.S. citizenship." Op. Br. 34 (citation omitted). Yet the Trump administration recently proposed putting green cards up for sale at $5,000,000 a piece. *See* Elliot Spagat, *Trump says he will offer 'gold cards' for $5 million path to citizenship, replacing investor visas*, Associated Press, Feb. 26, 2025, https://apnews.com/article/investor-visas-trump-immigration-eb5-gold-cards-cdb943dd1633bc234bb715fa20914e05.

onus of a parent's misconduct against his children." *Plyler*, 457 U.S. at 220; *see also Korematsu v. United States*, 323 U.S. 214, 243 (1944) (Jackson, J., dissenting) ("[I]f any fundamental assumption underlies our system, it is that guilt is personal and not inheritable.").[13]

Finally, Defendants claim "any ambiguity should be resolved against extending citizenship" when interpreting the Constitution, citing two Supreme Court cases that have nothing to do with constitutional interpretation. Op. Br. 35. But there is no ambiguity in the Constitution's text, and, in any event, all other tools of textual interpretation point in a direction different than the one Defendants suggest.

\* \* \*

Defendants' appeal is nothing more than a transparent attempt to convert *Wong Kim Ark*'s dissent into the law of the land. This Court should reject that request, as the holding in *Wong Kim Ark*—and many subsequent decisions— plainly requires.

---

[13]     Defendants' invocation of espionage and terrorism to justify denying citizenship to the children of noncitizens in this country is reminiscent of the "morally repugnant order[s]" of the past that the Supreme Court has disavowed. *Trump v. Hawaii*, 585 U.S. 667, 710 (2018). Japanese internment in World War II was similarly based on specious security claims. Defendants' evidence-less arguments about the broad criminality and security risks of noncitizens are nothing more than the outgrowth of "misinformation, half-truths and insinuations that for years have been directed against [immigrants] by people with racial and economic prejudices." *Korematsu*, 323 U.S. at 239 (Murphy, J., dissenting).

## II.     The EO also violates the Immigration and Nationality Act (INA).

The EO additionally violates 8 U.S.C. § 1401(a), which guarantees birthright citizenship to persons "born in the United States, and subject to the jurisdiction thereof." Congress enacted this language in 1940 and reenacted it in 1952 to codify the prevailing interpretation of the Fourteenth Amendment—specifically *Wong Kim Ark. See supra* p. 3; *Matter of V-*, 9 I. & N. Dec. 558, 560 (BIA 1962) (noting 1952 act "carries forward substantially those provisions of the Nationality Act of 1940 which prescribe who are citizens by birth" (citation omitted)).

Congress made clear it was incorporating the Fourteenth Amendment's meaning: the statutory language mirrors the Amendment verbatim, and the legislative history confirms it was "taken . . . from the fourteenth amendment." *To Revise and Codify the Nat'y Laws of the United States into a Comprehensive Nat'y Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., 38 (1940). As the Supreme Court has explained, when Congress borrows constitutional language, it brings "the old soil with it." *George v. McDonough*, 596 U.S. 740, 746 (2022) (citation omitted); *Morissette v. United States*, 342 U.S. 246, 263 (1952). And § 1401 must be "interpret[ed] . . . in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654 (2020).

49

By the time § 1401 was enacted, it was universally understood that "subject to the jurisdiction" excluded only a narrow class of people—e.g., foreign diplomats and occupying forces—not noncitizens generally. As early as 1921, Richard Flournoy—a State Department official and later drafter of the 1940 Act—wrote that children born in the U.S. to "sojourners or transients" are citizens. Flournoy, *supra* p. 44, at 552–53. In 1930, the State Department affirmed that a child born at Ellis Island to a noncitizen mother who was never admitted was still a citizen at birth. Jus soli, 3 Hackworth Digest, ch. 9, §221, at 10. And in 1937, a federal court recognized U.S. citizenship for three U.S.-born children of a deportable mother. *In re Nunez*, 18 F. Supp. 1007, 1007–08 (S.D. Cal. 1937), *rev'd on other grounds*, 93 F.2d 41 (9th Cir. 1937). Moreover, as noted above, in the years before and immediately after § 1401 was enacted, the Supreme Court repeatedly recognized the citizenship of persons in cases before it, including where the parents had violated the immigration laws. *Supra* pp. 27–28.

Thus, independent of any constitutional argument, § 1401 provides an independent statutory basis to enjoin the EO.

## III.    Plaintiffs face irreparable harm absent a preliminary injunction.

Defendants do not challenge that the Individual Plaintiffs face irreparable harm. *See* Op. Br. 44–49. Nor could they, as no adequate legal remedy exists for the loss of the "priceless benefits that derive from [citizenship]." *Schneiderman v.*

*United States*, 320 U.S. 118, 122 (1943). The EO's directive to strip persons of birthright citizenship amounts to "the total destruction of the individual's status in organized society" and constitutes "a form of punishment more primitive than torture." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). As the Supreme Court has recognized time and again, "[c]itizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), whose "value and importance" is "difficult to exaggerate," *Schneiderman*, 320 U.S. at 122.

These statements are not an exaggeration. Without a preliminary injunction, baby N.D.A.N. faces the prospect of immediate removal and separation from her family. The INA provides no alternative legal status for persons born in the United States. Section 1401(a) is the only statute in the INA that addresses birth in the United States, and thus if N.D.A.N. is not covered by it or the Citizenship Clause, she will be considered undocumented and subject to immediate removal. Section 1229a(a)(2) of Title 8 specifies that a person may be charged in removal proceedings for "any applicable ground of inadmissibility under section 1182(a) . . . or any applicable ground of deportability under section 1227(a)." 8 U.S.C. § 1229a(a)(2). Section 1182(a)(6) renders inadmissible any noncitizen "present in the United States without being admitted or paroled." *Id.* § 1182(a)(6)(A)(i). As such, N.D.A.N. and all other children targeted by the EO are subject to removal proceedings, with few, if any, defenses. *See* 2-SER-314–17, ¶¶ 5–10 (expert

51

declaration explaining how a child born without any status in the United States has no viable routes to status in most instances).[14]

This prospect of deporting N.D.A.N. from her country of birth, and taking her away from her parents, threatens Individual Plaintiffs with "the loss 'of all that makes life worth living.'" *Bridges v. Wixon*, 326 U.S. 135, 147 (1945) (quoting *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922)). Such "separation from family members" is a well-recognized irreparable harm factor. *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (per curiam) (citation omitted); *see also, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (per curiam) ("separated families" are a "substantial injur[y] and even irreparable harm[]").

Even if they are not removed, people like baby N.D.A.N. will grow up and be deemed undocumented, forced to remain in the legal shadows of the country where they were born. Most will have no pathway to legal status throughout the

---

[14]    A separate executive order entitled "Protecting the American People Against Invasion" only underscores the risk of enforcement action. *See* Executive Order No. 14159, 90 Fed. Reg. 8443 (Jan. 20, 2025). That order directs the Department of Homeland Secretary to initiate a registration process pursuant to 8 U.S.C. § 1302 for persons without lawful status, along with civil and criminal penalties for those who fail to register. *Id.* at 8444. It also instructs her to take all appropriate action "to ensure the efficient and expedited removal of [noncitizens] from the United States." *Id.* at 8445. The registration process becomes mandatory April 11, 2025, and includes instructions that parents must register any child under the age of 14. *See Alien Registration Requirement*, https://www.uscis.gov/alienregistration (last visited Apr. 3, 2025).

course of their lifetime. For example, none of the parents of persons targeted by the EO are eligible to file family visa petitions for their newborn children, as only U.S. citizens and LPRs are eligible to do so. 8 U.S.C. §§ 1151(b)(2)(A)(i), 1153(a). Nor are employment visas an option. Even if they eventually graduate from college with a specialized skill and are offered qualifying employment, they still lack key eligibility requirements. Specifically, persons targeted by the EO would be ineligible to obtain LPR status through employment visa petitions because they were never "inspected and admitted or paroled" into the United States, *id.* § 1255(a), as well as for being "in unlawful immigration status on the date of filing the application for adjustment of status," *id.* § 1255(c). *See also* 2-SER-314–16, ¶¶ 6–8 (expert declaration describing barriers to family and employment-based status).

In addition, by violating the Citizenship Clause, the EO inflicts the "deprivation of constitutional rights," which "unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also, e.g.*, *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("We have stated that an alleged constitutional infringement will often alone constitute irreparable harm." (citation omitted)); *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (similar).

The EO also threatens to deprive the children it renders undocumented of many federal rights and benefits. For example, only "qualified" noncitizens enumerated under 8 U.S.C. § 1641(b) are eligible to receive "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided . . . by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(B); *see also id.* § 1612 (limiting eligibility for Supplemental Security Income and Supplemental Nutritional Assistance Program (food stamps)). While Washington State provides food and cash assistance to certain noncitizens who do not qualify for similar federal benefits, the state's eligibility requirements exclude most noncitizens without *any* lawful status. *See* Wash. Admin. Code § 388-424-0030 (defining eligibility for food assistance program); *id.* § 388-400-0010 (defining eligibility for state family assistance).

Similarly, the EO will severely limit the educational and career opportunities of the targeted children, including rendering them ineligible for federal financial aid. *See* 20 U.S.C. § 1091(a)(5); 34 C.F.R. § 668.33(a)–(b). Such "loss of opportunity to pursue one's chosen profession constitutes irreparable harm." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017); *see also Medina v. DHS*, 313 F. Supp. 3d 1237, 1251 (W.D. Wash. 2018) (finding Deferred Action for

54

Childhood Arrivals recipient's potential loss of opportunity to pursue his profession constituted irreparable harm).

Lastly, the EO's purported stripping of citizenship has cascading effects on other civil rights protected by the Constitution. Most notably, it eliminates the constitutional right to vote, *see* U.S. Const. amend. XV, § 1, thus constituting irreparable harm. *See supra* pp. 52–53.

In sum, the district court was plainly correct to recognize that the EO inflicts irreparable harm on Individual Plaintiffs (and, by extension, baby N.D.A.N.) and that there was an according need "to preserve the status quo ante litem." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980).

## IV. The public interest and balance of hardships support the preliminary injunction.

The district court properly found that the balance of equities and the public interest weigh in favor of preserving the status quo. As this Court has repeatedly affirmed, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042 (citation omitted); *see also Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) ("[A]ll citizens have a stake in upholding the Constitution." (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

By contrast to the irreparable harm to Plaintiffs, *see supra* pp. 50–54, Defendants fail to identify any concrete harm they will suffer from continuing to recognize birthright citizenship. That the EO purports to be "part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border," Op. Br. 54, has no bearing on the balance of equities. This case concerns natural-born U.S. citizens and their constitutional rights—not the laws governing immigration. Furthermore, the federal government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983).

The preliminary injunction rightly maintains the status quo that has governed birthright citizenship for over 125 years. Thus, the public interest and balance of hardships plainly support a nationwide preliminary injunction.

## V.     The scope of the injunction is appropriate.

The district court ruled on Individual Plaintiffs' request for injunctive relief by focusing just on them alone. *See* ER-14 n.9. However, Individual Plaintiffs requested provisional class certification and injunctive relief for the entire class of similarly impacted Washington State residents. Dkt. 58 at 1–2, 19; Dkt. 74 at 1, 2 n.1. It is undisputed that the Plaintiffs have standing to challenge the EO, ER-6 n.3, and, by extension, that the proposed class members do so as well. Given the

serious harms that Plaintiffs and putative class members will suffer if the EO is permitted to go into effect, *see supra* pp. 50–54, *see also* ER-13, it is critical that this Court retain the nationwide scope of the injunction to "provide complete relief to the plaintiffs" and ensure all putative class members benefit from it, Op. Br. 49 (citation omitted); *see also Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987) ("[A]n injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

The district court also did not abuse its discretion by preventing internal implementation of the EO. Once the court (correctly) determined that the EO was unlawful, there was no reason to allow Defendants to work to implement it. Defendants' assertion that they should now be allowed to "tak[e] steps to implement the policy," Op. Br. 42, is nothing more than a request to begin violating the Constitution, and enjoining such violations was plainly within the district court's authority. While Defendants argue that "internal review procedures" should not be enjoined absent a showing of harm, Defendants' own brief belies this argument about "internal" implementation, as they make clear what they will *actually* do is "develop[] and publish[] the regulations and guidance contemplated by [the EO]." Op. Br. 52–53.

Any such implementation would create confusion, stress, and fear among putative class members, who would understandably interpret such steps as having a real effect on their and their children's citizenship status. *See* 1-SER-281–82, ¶¶ 11–13 (Plaintiff Norales describing her fear and distress caused by uncertainty around her child's status); 1-SER-287–88, ¶¶ 10–12 (similar, for Plaintiff Chavarria). Accordingly, the district court acted well within its discretion by enjoining implementation here.

## CONCLUSION

For all the foregoing reasons, the Court should affirm the preliminary injunction in its entirety.

Respectfully submitted this 4th of April, 2025.

s/ Matt Adams
Matt Adams, WSBA No. 28287
matt@nwirp.org

s/ Glenda M. Aldana Madrid
Glenda M. Aldana Madrid,
WSBA No. 46987
glenda@nwirp.org

s/ Leila Kang
Leila Kang, WSBA No. 48048
leila@nwirp.org

s/ Aaron Korthuis
Aaron Korthuis, WSBA No. 53974
aaron@nwirp.org

NORTHWEST IMMIGRANT
RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
(206) 957-8611

*Counsel for Individual Plaintiffs*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Individual Plaintiffs state that they know of one related case pending in this Court, arising out of the same consolidated district court case: *Washington v. Trump*, No. 25-674 (9th Cir. filed Jan. 31, 2025).

DATED this 4th day of April 2025.

s/ Leila Kang
Leila Kang, WSBA No. 48048
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
leila@nwirp.org

## CERTIFICATE OF COMPLIANCE

This brief contains 13,991 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f), and thus complies with the word limit of Ninth Circuit Rule 32-1. The brief's size and typeface comply with Federal Rule of Appellate Procedure 32(a)(5) and (6).

DATED this 4th day of April 2025.

s/ Leila Kang
Leila Kang, WSBA No. 48048
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
leila@nwirp.org

61

## CERTIFICATE OF SERVICE

I hereby certify that, on April 4, 2025, I electronically filed the foregoing brief and attached exhibit with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users and that service will be accomplished by using the ACMS system.

DATED this 4th day of April 2025.

s/ Leila Kang
Leila Kang, WSBA No. 48048
Northwest Immigrant Rights Project
615 Second Avenue, Suite 400
Seattle, WA 98104
leila@nwirp.org

# EXHIBIT A



## STATE OF WASHINGTON
## DEPARTMENT OF HEALTH

### CERTIFICATE OF LIVE BIRTH



STATE FILE NUMBER:
**146-2025-013047**

DATE ISSUED:
**MARCH 14, 2025**

FIRST AND MIDDLE NAME(S):

N█████ D█████

LAST NAME(S):

A███████ N███████

DATE AND TIME OF BIRTH:

████████ 2025   04:59 AM

SEX:
**FEMALE**

PLACE OF BIRTH (CITY, COUNTY, STATE):
**BURIEN, KING COUNTY, WASHINGTON**

FACILITY:
**ST ANNE HOSPITAL**

MOTHER'S NAME PRIOR TO FIRST MARRIAGE:
**CHERLY DANIRA NORALES CASTILLO**

MOTHER'S PLACE OF BIRTH:
**HONDURAS**

MOTHER'S DATE OF BIRTH:
████, **1988**

FATHER'S NAME:

████████████

FATHER'S PLACE OF BIRTH:
**HONDURAS**

FATHER'S DATE OF BIRTH:
████, **1986**

DATE FILED:
**MARCH 07, 2025**

FEE NUMBER:
**197452721**

1

DOH 422-132 (0 15)

NOT VALID IF PHOTOCOPIED OR ALTERED