## Case No. 25-807

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

STATE OF WASHINGTON, et al.,

*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, et al.,

*Defendants-Appellants.*

———————————————————

*Appeal from a Decision of the United States District Court for the Western District of Washington, No. 2:25-cv-00127-JCC · Honorable John C. Coughenour*

## BRIEF OF SOCIAL SCIENCE SCHOLARS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE

MOIRA HEIGES-GOEPFERT
ALINA PASTOR-CHERMAK
OUTTEN & GOLDEN LLP
One California Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 223-7846
Facsimile: (415) 638-8810

JUNO TURNER
RACHEL DEMPSEY
TOWARDS JUSTICE
303 E. 17th Avenue, Suite 400
Denver, CO 80203
Telephone: (720) 441-2236

OSSAI MIAZAD
OUTTEN & GOLDEN LLP
1225 New York Ave NW, Suite 1200B
Washington, D.C. 20005
Telephone: (202) 914-5097
Facsimile: (202) 847-4410

*Attorneys for Amici Curiae Social Science Scholars*

 COUNSEL PRESS INC.· (213) 680-2300          PRINTED ON RECYCLED PAPER 

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, I, Moira Heiges-Goepfert, as counsel for *amici curiae*, state that the *amici curiae* scholars do not have parent corporations, nor do they issue stock, and thus no publicly held corporation owns 10% or more of their stock.

Date: April 11, 2025            **OUTTEN & GOLDEN LLP**

By: *_/s/ Moira Heiges-Goepfert_*
   Moira Heiges-Geopfert

**OUTTEN & GOLDEN LLP**
Moira Heiges-Geopfert
Ossai Miazad
Alina Pastor-Chermak
mhg@outtengolden.com
om@outtengolden.com
APastor-Chermak@outtengolden.com

**TOWARDS JUSTICE**
Juno Turner
Rachel Dempsey
juno@towardsjustice.org
rachel@towardsjustice.org.

*Attorneys for Amici Curiae*

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ....................................................................i

TABLE OF AUTHORITIES ...................................................................iv

I.  INTERESTS OF *AMICI CURIAE* ..................................................1

II.  INTRODUCTION ............................................................................2

III.  ARGUMENT.....................................................................................5

A.  If Enforced, the Order Would Dramatically Expand the
Undocumented Population and Would Severely Disrupt
American Social and Economic Life. ....................................5

1.  The Order Is Vast in Scope, Reaching Millions of
Children Whose Parents Reside in the United States
on a Long-Term Basis...................................................5

2.  The Order Would Strip Citizenship from Millions of
Children Who Are Born and Raised in the United States,
and Whose Families Are Deeply Integrated into
American Society..........................................................7

3.  The Order Will Drastically Increase, Not Decrease,
the Population of Undocumented Immigrants ...........11

B.  Ending Birthright Citizenship Will Negatively Impact
the U.S. Economy.................................................................13

1.  Immigrants Strengthen American Economic
and Fiscal Health........................................................13

2.  Birthright Citizenship Increases Intergenerational
Mobility, Economic Growth, and Fiscal Health .......16

3.  Conversely, Denying Citizenship to U.S. Born
Children Will Reduce Economic Security and Likely
Increase Costly and Detrimental Deportations .........18

C.  Ending Birthright Citizenship Will Negatively Impact
Educational Attainment, Which in Turn Limits
Achievement and U.S. Growth ...........................................21

       1.     Immigration Status Impacts Early Learning, K-12, and Postsecondary Education ....................................................22

       2.     Citizenship Provides Opportunities that Lead to Improved Educational Outcomes................................................24

  D.     Ending Birthright Citizenship Will Negatively Impact Health Outcomes and Increase Costs ....................................................27

       1.     Without Citizenship or Lawful Status, Those Subject to the Order Will Lose Access to Health Care, Decreasing Health Outcomes and Burdening the Healthcare System.........27

       2.     Citizenship and Immigrant Legal Status Impact Mental Health and Wellbeing ....................................................29

       3.     The Health Impacts of Citizenship and Immigrant Legal Status Last a Lifetime ....................................................31

IV.   CONCLUSION.................................................................................33

CERTIFICATE OF SERVICE ......................................................................34

APPENDIX OF *AMICI CURIAE* ...........................................................35

# TABLE OF AUTHORITIES

Page(s)

**Constitutional Provisions:**

U.S. Const. Amend. XIV ...........................................................................1

**Regulations:**

Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025)......................................2

**Court Rules:**

Fed. R. App. P. 29 ....................................................................................1

**Other Authorities:**

A. Halpern-Manners et al., *The Effects of Education on Mortality: Evidence from Linked U.S. Census and Administrative Mortality Data*, 57(4) Demography 1513 (2020)........................................................26

Adrian Bacong & Ceclia Menjívar, *Recasting the Immigrant Health Paradox Through Intersections of Legal Status and Race*, 23(5) J. Immigr. Minority Health 1092 (2021).............................................27

Ahmed Alif et al., *Documentation Status and Psychological Distress Among New York City Community College Students*, 26(1) Cultural Diversity & Ethnic Minority Psych. 11 (2020) .........................................32

Alex Nowrasteh et al., *The Fiscal Impact of Immigration in the United States*, Cato Institute White Paper (Mar. 21, 2023) ...............................................15

Algernon Austin, *Mass Deportation: A Bad Idea for the US Economy*, Center for Economic and Policy Research (Jan. 16, 2025)................................20

Amanda Baran et al., *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Research Center (2017)..................8

American Immigration Council, *Mass Deportation: Devastating Costs to America, its Budget and Economy* (2024).......................................20

Amy Hsin & Francesc Ortega, *The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students*, 55(4) Demography 1487 (2018)..........................................................25

iv

Ana Gonzalez-Barrera & Jens Manuel Krogstad, *What We Know About Illegal Immigration from Mexico*, Pew Research Center (2019) ..........................9

Andrea Gómez Cervantes & Cecilia Menjívar, *Legal Violence, Health, and Access to Care: Latina Immigrants in Rural and Urban Kansas*, 61(3) J. Health & Soc. Behav. 307 (2020) ............................................................31

Anna Maria Mayda, *International Migration: A Panel Data Analysis of the Determinants of Bilateral Flows*, 23 J. of Population Econ. 1249 (2010)...........12

Anthony Carnevale et al., *The College Payoff: Education, Occupations, Lifetime Earnings*, Georgetown Univ. Center on Education and the Workforce (2011) ..................................................................................................25

Atheendar Venkataramani et al., *Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2(4) The Lancet 175 (2017)...................................30

Biblia S. Cha et al., *Beyond Access: Psychosocial Barriers to Undocumented Students' Use of Mental Health Services*, 233 Soc. Sci. Med. 193 (2019)..........30

Caitlin Patler & Whitney Laster Pirtle, *From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Young Adults?* 199(1) Soc. Sci. & Med. 39 (2018)..........................................................................................................................30

Caitlin Patler et al., *The Limits of Gaining Rights While Remaining Marginalized: The Deferred Action for Childhood Arrivals (DACA) Program and the Psychological Wellbeing of Latina/o Undocumented Young Adults*, 100(1) Soc. Forces 246 (2020) ......................................................24

Caitlin Patler, *Undocumented Disadvantage, Citizen Advantage, or Both? The Comparative Educational Outcomes of Second and 1.5-Generation Latino Young Adults*, 53(4) Int. Migration Rev. 1080 (2018)..............................22

Carl Davis, et al., *Tax Payments by Undocumented Immigrants*, Institute on Taxation and Economic Policy (2024).................................................................10

Cecilia Menjívar et al., *The Contradictions of Liminal Legality: Economic Attainment and Civic Engagement of Central American Immigrants on Temporary Protected Status*, 69(3) Soc. Problems 678 (2022) .............................8

Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants,* Center for Migration Research, University of Kansas (2017)............................................8, 9

Chloe East & Andrea Velásquez, *Unintended Consequences of Immigration Enforcement*, J. of Human Resources (2024)........................................20

Chloe East et al., *The Labor Market Effects of Immigration Enforcement*, 41(4) J. of Lab. Econ. 957 (2023) ............................................21

Congressional Research Service, *Deferred Action for Childhood Arrivals (DACA): By the Numbers* (2021) ("CRS 2021") ....................................7

David Card, *The Causal Effect of Education on Earnings*, Handbook of Labor Economics, Vol. 3 (1999).............................................25

David Cutler & Adriana Lleras-Muney, *Understanding Differences in Health Behaviors by Education*, 29 J. of Health Econ. 1 (2010)........................26

Donald Kerwin & Robert Warren, *US Foreign-Born Workers in the Global Pandemic: Essential and Marginalized*, 8(3) J. of Migration and Human Security 282 (2020) ..............................................10

Edward Vargas & Vickie D. Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, 19(4) J. Immigr. Minority Health 913 (2017) ...................27, 31

Elira Kuka et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA*, 12(1) Am. Econ. J. 293 (2020) ...................24

Emily Greenman & Matthew Hall, *Housing and Neighborhood Quality Among Undocumented Mexican and Central American Immigrants*, 42(6) Soc. Sci. Rsch. 1712 (2013)........................................23

Erin Hamilton et al., *DACA Enables Mobility, But Its Uncertain Future Undermines Benefits for Recipients*, 9(2) Center for Policy and Inequality Rsch. (2020) ..........................................24

Erin Hamilton et al., *DACA's Association with Birth Outcomes Among Mexican-Origin Mothers in the United States*, 58(3) Demography 975 (2021)...................................................29

Erin Hamilton et al., *Immigrant Legal Status Disparities in Health Among First- and One-point-five-Generation Latinx Immigrants in California*, 41 Pop. Rsch. & Policy Rev. 1241 (2022) ............................................................32

Erin Hamilton et al., *Transition into Liminal Legality: DACA's Mixed Impacts on Education and Employment Among Young Adult Immigrants in California*, 68(3) Social Problems 675 (2021)...................................................25

Francesc Ortega and Amy Hsin, *Occupational Barriers and the Productivity Penalty from Lack of Legal Status*, 76 Lab. Economics (2022)............................17

Gabriella Conti et al., *The Education-Health Gradient*, 100(2) Am. Econ. Rev. 234 (2010) ........................................................................25

Gilbert C. Gee et al., *Citizenship as Privilege and Social Identity: Implications for Psychological Distress*, 60(5-6) Am. Behavior. Sci. 680 (2016) ......................................................................................................26

Giovanni Peri & Reem Zaiour, *Citizenship for Undocumented Immigrants Would Boost U.S. Economic Growth*, Ctr. for Am. Progress (2021)...................17

Gregory Duncan et al., *Early Childhood Poverty and Adult Achievement, Employment and Health*, 93 Family Matters 27 (2013).......................................22

Heide Castañeda et al., *Immigration as a Social Determinant of Health*, 36 Ann. Rev. of Pub. Health 375 (2015)......................................................18, 27

Irene Bloomraad, *Becoming a Citizen: Incorporating Immigrants and Refugees in the United States and Canada*, Berkeley: University of California Press (2006)............................................................................................13

J.A. Martin et al, *Births: Final data for 2017*, 67(8) Nat'l Vital Stat. Rep. 1 (2018)..................................................................................................................12

Jacqueline Cabral & Adolfo G. Cuevas, *Health Inequities Among Latinos/Hispanics: Documentation Status as a Determinant of Health*, 7 J. Racial and Ethnic Health Disparities 874 (2020) ....................................28, 30

Jacqueline Torres & Maria-Elena D. Young, *A Life-Course Perspective on Legal Status Stratification and Health*, 2 SSM-Population Health 141 (2016).......................................................................................................27, 31, 32

James Heckman et al., *Returns to Education: The Causal Effects of Education on Earnings, Health, and Smoking,* 126 J. Polit. Econ. S197 (2018)..................................................................................................25

James K. Wong, *2023 National DACA Study* ..............................................8

Janet Currie & Anna Chorniy, *Medicaid and Child Health Insurance Program Improve Child Health and Reduce Poverty But Face Threats*, 21(8) Academic Pediatrics S146 (2021) ......................................19, 27

Jeffrey Reitz, *Warmth of the Welcome: The Social Causes of Economic Success for Immigrants in Different Nations and Cities*, Boulder: Westview Press (1998)..........................................................13

Jennifer Hunt, *Immigrant Patents Boost Growth*, 356 Science 697 (2017)...........26

Jennifer Van Hook and Michael Fix, *The Demographic Impacts of Repealing Birthright Citizenship*, Legal Briefs on Immigration Reform from 25 of the Top Legal Minds in the Country, Vol. 1, 173 (2011) ....................2

Jennifer Van Hook, Ariel Ruiz Soto, & Julia Gelatt, *Unauthorized Immigrant Population Reached 13.7 Million in 2023*, Migration Policy Institute (2025)...........................................................2

Jennifer Van Hook, *Who Are Immigrants to the US, Where Do They Come from and Where Do They Live*? (Feb. 4, 2025)..............................5, 11, 19

Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357(6355) Science 1041 (2017)..................................................................................................30

Jeremy Neufeld, *The Birth Tourism Bogeyman*, Niskanen Center (2020)..............12

Jorge González-Hermoso et al., *Mass Deportations Would Worsen Our Housing Crisis*, Urban Institute (2025) ................................................20

Kalena Cortes, *Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access*, 103(3) Am. Econ. Rev. 428 (2013)..................................................................................................24

Katharine Donato & Douglas S. Massey, *Twenty-First-Century Globalization and Illegal Migration*, Ann. Am. Acad. of Polit. and Soc. Sci. 666.1 (2016)...................................................................12

Kevin Berghuis, *Stopping the Practice of Citizenship for Sale*,
Ctr. for Immigration Studies (2020) .......................................................12

Krista Perreira & Juan Pedroza, *Policies of Exclusion: Implications
for the Health of Immigrants and Their Children*, 40 Annual Rev.
Pub. Health 147 (2019)...........................................................................27

Laxman Timilsina, *Immigration Policy Shocks and Infant Health*,
51 Econ. & Human Bio. 1 (2023) ...........................................................29

Leisy Abrego, *I Can't Go to College Because I Don't Have Papers:
Incorporation Patterns of Latino Undocumented Youth*,
4(3) Latino Studies 212 (2006) ..............................................................23

Leisy Abrego, *Legitimacy, Social Identity, and the Mobilization of Law:
The Effects of Assembly Bill 540 on Undocumented Students in California*,
33 L. & Soc. Inquiry 709 (2018) ............................................................22

Liwei Zhang & Wen-Jui Han, *Poverty Dynamics and Academic Trajectories
of Children of Immigrants*, 14 Int. J. of Env't Rsch. 9 (2017)...............22

Margarita Alegría et al., *Health Insurance Coverage for Vulnerable
Populations: Contrasting Asian Americans and Latinos in the
United States*, Inquiry (2006) .................................................................30

Martha Bailey et al., *Is the Social Safety Net a Long-Term Investment?
Large-Scale Evidence from the Food Stamps Program*, 91(3) Rev. Econ.
Stud. 1291 (2024) ...................................................................................19

Matthew Hall et al., *Legal Status and Wage Disparities for Mexican
Immigrants*, 89(2) Soc. Forces 491 (2010) ...........................................18

Matthew Lisiecki & Gerard Apruzzese, *Proposed 2024 Mass Deportation
Program Would Socially and Economically Devastate American Families*,
Center for Migration Studies (2024) ...................................................9, 20

NASEM, *The Economic and Fiscal Consequences of Immigration*,
National Academies Press (2017) .....................................................13, 16

Nicole Kreisberg & Amy Hsin, *The Higher Educational Trajectories of
Undocumented Youth in New York City*, 47(17) J. of Ethnic & Migration
Stud. 3822 (2021) ...................................................................................23

Nolan Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. of Pub. Econ. 98 (2016)...........................................................................................25

Peter Catron, *The Citizenship Advantage: Immigrant Socioeconomic Attainment in the Age of Mass Migration*, 124(4) Am. J. Socio. (2019) .............17

Philip Barrett, et al., *Immigration and Local Inflation,* IMF Working Papers (2025)...........................................................................................14

Philip Kasinitz, *Inheriting the City: The Second Generation Comes of Age*, Russell Sage Foundation (2008)...........................................................17

Phillip Kim et al., *Access (Not) Denied: The Impact of Financial, Human, and Cultural Capital on Entrepreneurial Entry in the United States*, 27 Small Business Econ. 5 (2006)...........................................................26

R.C. Smith et al., *Disrupting the Traffic Stop–to-Deportation Pipeline: The New York State Greenlight Law's Intent and Implementation*, 9(2) J. on Migration & Human Security 94 (2021)................................................31

R.C. Smith, *Dreams Achieved and Denied: Mexican Intergenerational Mobility*, Russell Sage Foundation (2024)......................................17, 24

Ran Abramitzky and Leah Boustan, *Streets of Gold: America's Untold Story of Immigrant Success*, New York: Public Affairs (2022) ....................................17

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5(3) Journal of Migration and Human Security, 577 (2017)...........................................................................................9

Robert Warren & Donald Kerwin, *Mass Deportations Would Impoverish US Families and Create Immense Social Costs*, 5(1) J. on Migration & Human Security 1 (2017) ..................................................................20

Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57(8) Am. Behavior. Sci. 1175 (2013) ...................................30, 32

Roberto Gonzales, *Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76(4) Am. Soc. Rev. 602 (2011) .........................................................22

Roxanne Kerani & Helena Kwakwa, *Scaring Undocumented Immigrants Is Detrimental to Public Health*, 108(9) Am. J. Pub. Health 1165 (2018) .............31

Sandra Echeverria & Olven Carrasquillo, *The Roles of Citizenship Status, Acculturation, and Health Insurance in Breast and Cervical Cancer Screening Among Immigrant Women*, 44 Med. Care 788 (2006) ......................28

Scott Baker, *Effects of Legal Status and Health Service Availability on Mortality*, Stanford Institute for Economic Policy Research (2010) ..................28

Stephanie Potochnick & Krista Perreira, *Depression and Anxiety Among First-Generation Immigrant Latino Youth: Key Correlates and Implications for Future Research*, 198(7) J. Nerv. Ment. Dis. 470 (2010)..................................................................................................29

Stephen Goss et al., *Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds*, Social Security Administration (2013)..................................................................................................10

Tara Watson, *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation*, 6(3) Am. Econ. J. 313 (2014).........31

U.S. Citizenship and Immigration Services, *Consideration of Deferred Action for Childhood Arrivals (DACA)* ................................................................7

Umair Ali et al., *Secure Communities as Immigration Enforcement: How Secure Is the Child Care Market?* 233 J. of Pub. Econ. (2024) .................20

Van Tran, *Social Mobility Across Immigrant Generations: Recent Evidence and Future Data Requirements*, Sage Journals (2018) ........................................17

Veronica Terriquez, *Dreams Delayed: Barriers to Degree Completion among Undocumented Community College Students*, 41(8) J. of Ethnic & Migration Stud. 1302 (2014)..................................................................23

Warwick McKibbin et al., *The International Economic Implications of a Second Trump Presidency*, Peterson Institute (2024) ..........................................21

Wendy Edelberg and Tara Watson, *New Immigration Estimates Help Make Sense of the Pace of Employment*, The Hamilton Project (Mar. 7, 2024) ...........15

Wendy Edelberg et al., *Immigration and the Macroeconomy in the Second Trump Administration*, The Hamilton Project (Dec. 3, 2024) .............................14

xi

## I.  INTERESTS OF AMICI CURIAE[1]

*Amici curiae* respectfully submit this brief in support of Plaintiffs-Appellees. *Amici*, listed in the Appendix, are a group of ninety-six professors representing a broad range of expertise in Social Science and related fields, including Demography, Economics, Political Science, Public Health, Public Policy, and Sociology, among others.  Through their scholarship and practice, *amici* have developed and reviewed an extensive base of research demonstrating the critical role that citizenship (and the fundamental rights and opportunities it affords) plays in strengthening economic, social, educational, and health-related outcomes, at the individual, family and national level.  This research demonstrates that, if enforced, the Executive Order ending birthright citizenship would create an ever-expanding underclass of undocumented U.S.-born children, to the detriment of American families, communities and indeed, the nation as a whole.

Accordingly, *amici* have a strong interest in ensuring that the Fourteenth Amendment is interpreted, as it has been historically, to grant birthright citizenship to all children born in the United States, regardless of their parents' status.

---

[1]     Pursuant to Federal Rule of Appellate Procedure 29, counsel affirms that no party's counsel authored any part of this brief.  No party or party's counsel contributed money that was intended to fund preparing or submitting this brief.  No person – other than *amici curiae* or their counsel – contributed money that was intended to fund preparing or submitting this brief.  All parties consented to the filing of this brief.

## II. INTRODUCTION

An extensive body of empirical research demonstrates that U.S. citizenship is a key driver of economic growth, educational attainment, and health, whereas the denial of legal status engenders legal, political, economic, and social exclusion to the detriment of immigrants and to the United States. Based on this research, it is our professional opinion that ending birthright citizenship pursuant to the President's Executive Order of January 20, 2025 (the "Order")[2] would cause serious harm, not only to U.S. immigrants and their children, but also to the entire United States.

Our estimates suggest that the Order, if implemented, would strip *4.74 million U.S.-born children* of citizenship over the next two decades, with impacted children representing more than one in every 18 (5.7%) U.S. births over that period.[3] Ending birthright citizenship would thus create by law – for the first time

---

[2] Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025).

[3] These figures are based on calculations by Jennifer Van Hook, April 5, 2025, using estimates of the unauthorized foreign-born population produced by Van Hook, Ruiz Soto and Gelatt (Jennifer Van Hook, Ariel Ruiz Soto, & Julia Gelatt, *Unauthorized Immigrant Population Reached 13.7 Million in 2023*, Migration Policy Institute (2025)), and projection methods similar to those used in Van Hook and Fix (Jennifer Van Hook and Michael Fix, *The Demographic Impacts of Repealing Birthright Citizenship*, Legal Briefs on Immigration Reform from 25 of the Top Legal Minds in the Country, Vol. 1, 173-86 (2011)). These figures are generally consistent with Plaintiffs-Appellees' estimate of the number of U.S births to two undocumented parents (153,007) in 2022, when extrapolated to the entire population of impacted parents over the next twenty years. Pls.-Apps.' Supp. Excerpts of Record (1-SER-107-146).

since slavery ended – a massive population of U.S.-born undocumented children whose caste-like status would be heritable and intergenerational, leaving many effectively stateless. The creation of this enduring underclass would disrupt 150 years of intergenerational upward mobility for immigrants and would reverberate broadly through the U.S. economy and society, undercutting American prosperity and wellbeing in key domains, and undermining foundational principles of equality and opportunity for generations.

*First*, stripping U.S.-born children of birthright citizenship would have profound economic consequences. Research shows that citizenship increases the social and economic mobility of immigrants, their children, and later generations, promoting economic stability, workforce participation, long-term economic growth, and increased fiscal contributions to the U.S. By dramatically expanding the population of undocumented individuals, who are systemically denied rights, the Order would limit immigrants' potential to make valuable economic contributions, place a significant strain on existing systems, and hinder America's mobility and growth.

*Second*, citizenship increases educational attainment, including by enabling students to afford college and linking educational effort to better jobs and lives in the future. Conversely, lacking legal status harms educational attainment, by delinking educational attainment from future job prospects, and by excluding

students from lawful employment, financial support, and even in some cases public colleges.  Research overwhelmingly shows that barriers to educational attainment create lifelong disadvantages and reduce earnings, decreasing future tax revenue and stifling innovation nationwide.

*Third*, research shows that citizenship protects access to healthcare, thereby reducing rates of physical and mental illness, while lacking citizenship or permanent status causes corresponding harms, from cradle to grave. Undocumented people are more likely to lack insurance and thus delay healthcare, which causes higher rates of mental and physical illness and earlier mortality, all of which limit productivity and burden the U.S. healthcare system.

In light of this well-developed body of research, our professional opinion is that ending birthright citizenship for U.S.-born children would undermine key drivers of first- and later-generation economic and social mobility, and harm the United States by reducing or blocking the contributions these generations will make.  Indeed, creating a system of hereditary disadvantage based on the legal status of one's ancestors would reinstitute – for the first time since the Civil War – intergenerational, categorical exclusions from key American institutions and rights for U.S.-born children, precisely the harm the Fourteenth Amendment was created to prevent.

4

## III. ARGUMENT

### A. If Enforced, the Order Would Dramatically Expand the Undocumented Population and Would Severely Disrupt American Social and Economic Life.

#### 1. The Order Is Vast in Scope, Reaching Millions of Children Whose Parents Reside in the United States on a Long-Term Basis.

The scope of the Order is extraordinarily broad: it strips citizenship from children born to parents who are living in the United States lawfully, along with those living here without authorization. The Order would thus harm a vast group of children (approximately 4.74 million in the next two decades alone) born to approximately 16.2 million non-Lawful Permanent Resident (LPR) or citizen immigrant parents who hold a wide range of immigration statuses.[4] Among these are temporary visa holders such as highly-skilled workers and students, undocumented immigrants, and others who reside lawfully in the U.S., including asylum seekers, Temporary Protected Status (TPS) holders, and DACA recipients, many of whom have been living in the U.S. for years with temporary authorization or pending permanent authorization, or who cannot safely return to their countries of origin.[5]

---

[4] Jennifer Van Hook, *Who Are Immigrants to the US, Where Do They Come from and Where Do They Live*? (Feb. 4, 2025) https://theconversation.com/who-are-immigrants-to-the-us-where-do-they-come-from-and-where-do-they-live-247430.

[5] *Id.*

Specifically, this group includes approximately 2.4 million individuals on temporary but often renewable visas (such as highly-skilled employment or student visas), many of whom have developed long-term ties, and who will seek (or are currently seeking) LPR or citizenship status.[6] Up to 3.9 million additional individuals have held "liminal" or in-between statuses, often for decades, with varying types of authorization. This includes 654,000 TPS holders; 562,000 DACA holders, who have lived in the U.S. since childhood; 521,000 persons with humanitarian parole (e.g., Afghans who assisted the U.S. military in Afghanistan); 169,000 with other types of Deferred Action (e.g. U-visas for victims of domestic violence) and approximately 2 million asylum applicants, who have presented themselves for inspection and been granted work permits while their cases move through the legal system.[7] In addition, there are approximately 9.7 million individuals in this group who lack formal authorization or protection from deportation, but who may have available pathways to status.[8] Collectively, these groups represent nearly one-third (31.4%) of the 51.3 million foreign-born people in the U.S. as of 2023.[9] Given the scope of the impacted population, the Order would inflict colossal harm, resulting in permanent social stratification and legal disenfranchisement for a substantial portion of the U.S. population.

---

[6]  *Id.*
[7]  *Id.*
[8]  *Id.*
[9]  *Id.*

### 2. The Order Would Strip Citizenship from Millions of Children Who Are Born and Raised in the United States, and Whose Families Are Deeply Integrated into American Society.

The vast majority of children who would be stripped of citizenship under the Order are not the children of visitors to the U.S., such as tourists or diplomats, but rather are U.S.-born children who will grow up in America, attending school, working, marrying and raising their families here, and who will know only America as their home.

Extensive research shows that the affected classes of immigrants are deeply integrated into, and contribute significantly to, American social and economic life. For example, DACA recipients are required to have arrived in the U.S. as children, to be currently enrolled in school or have at least a high school degree, and to have lived continuously in the U.S. since June 2007.[10] 73% of DACA recipients were under the age of 10 when they came to the U.S. (including 61% under age 7), and all have lived here for at least 18 (and up to 33) years.[11] DACA recipients enroll in postsecondary education and participate in the labor market at very high rates: A 2023 survey of DACA recipients found that 94% were either working or enrolled

---

[10] U.S. Citizenship and Immigration Services, *Consideration of Deferred Action for Childhood Arrivals (DACA)*, https://www.uscis.gov/DACA.

[11] Congressional Research Service, *Deferred Action for Childhood Arrivals (DACA): By the Numbers* (2021) ("CRS 2021").

in school and 31% were first time homeowners and paying a mortgage.[12] DACA

recipients are now also marrying and having children (24% in 2020), further

integrating them into American society.[13]

TPS holders are also strongly integrated into American economic and social

life.[14] Nationwide, TPS holders have significantly higher rates of labor force

participation than the overall U.S. population (88.5% compared to 62.9%).[15] TPS

holders from El Salvador, Honduras, and Haiti (the three countries with the largest

TPS populations in 2017) contributed a combined $4.5 billion in pre-tax wages or

salary income annually, and $45.2 billion over a decade; their combined

contributions to social security and Medicare over a decade were over $6.9

billion.[16] Furthermore, analyzing U.S. Census data, one 2017 study found that

11% of TPS workers from these three countries had opened their own U.S.

---

[12]     James K. Wong, *2023 National DACA Study*,
https://www.americanprogress.org/wp-content/uploads/sites/2/2024/03/New-DACA-Survey-2023-Toplines14.pdf.

[13]     CRS 2021.

[14]     Cecilia Menjívar et al., *The Contradictions of Liminal Legality: Economic Attainment and Civic Engagement of Central American Immigrants on Temporary Protected Status*, 69(3) Soc. Problems 678-698 (2022).

[15]     Cecilia Menjívar, *Temporary Protected Status in the United States: The Experiences of Honduran and Salvadoran Immigrants,* Center for Migration Research, University of Kansas (2017), https://www.wola.org/wp-content/uploads/2017/06/TPS_REPORT_FINAL.pdf.

[16]     Amanda Baran et al., *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Research Center (2017), https://www.ilrc.org/sites/default/files/resources/2017-04-18_economic_contributions_by_salvadoran_honduran_and_haitian_tps_holders.pdf.

businesses, thereby creating jobs.[17]  Another study found that over half of
Salvadorans and Hondurans had lived in the U.S. for over 20 years, nearly one-
third (32%) owned their own homes, and nearly two-thirds (61%) had at least one
U.S citizen child, suggesting high levels of assimilation.[18]

Undocumented immigrants are also deeply woven into American economic
and social life, and they, too, make important economic and fiscal contributions.
Analyzing U.S. Census data, one 2024 study found that 54% of all undocumented
people have lived in the U.S. for over a decade,[19] as have 83% of those from
Mexico.[20]  Undocumented immigrants are also integrated into American life
through their families.  The vast majority – over 7 million – live with at least one
U.S. citizen, and 5.5 million U.S. citizen children (many whose future siblings
would be rendered deportable by the Order) live with an undocumented person,
typically their parents.[21]

---

[17]     Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of
the US Temporary Protected Status Populations from El Salvador, Honduras, and
Haiti*, 5(3) Journal of Migration and Human Security, 577-592 (2017).

[18]     Menjívar, *supra* note 15.

[19]     Matthew Lisiecki & Gerard Apruzzese, *Proposed 2024 Mass Deportation
Program Would Socially and Economically Devastate American Families*, Center
for Migration Studies (2024) https://cmsny.org/publications/2024-mass-
deportation-program-devastate-american-families-101024/.

[20]     Ana Gonzalez-Barrera & Jens Manuel Krogstad, *What We Know About
Illegal Immigration from Mexico*, Pew Research Center (2019)
https://www.pewresearch.org/short-reads/2019/06/28/what-we-know-about-illegal-
immigration-from-mexico/.

[21]     Lisiecki & Apruzzese, *supra* note 19.

Moreover, undocumented persons play an important role in the U.S. economy, with higher labor force participation rates than native-born workers (77.2% vs. 63.5%).[22] The economy relies extensively on undocumented workers, three-fourths of whom (74%) work in essential occupations (versus 65% of U.S.-born workers).[23] Undocumented workers also paid $96.7 billion in federal, state, and local taxes in 2022.[24] Stephen Goss, the Social Security Administration's former chief actuary, estimated that undocumented workers' payroll taxes contributed a net positive $12 billion to Social Security in 2010 alone, thus helping to keep the system solvent.[25] Importantly, as the research reviewed below shows, undocumented immigrants' contributions to the U.S. would be even higher were they able to access citizenship.

---

[22]     *Id.*

[23]     Donald Kerwin & Robert Warren, *US Foreign-Born Workers in the Global Pandemic: Essential and Marginalized*, 8(3) J. of Migration and Human Security 282-300 (2020).

[24]     Carl Davis, et al., *Tax Payments by Undocumented Immigrants*, Institute on Taxation and Economic Policy (2024), https://itep.org/undocumentedimmigrants-taxes-2024/.

[25]     Stephen Goss et al., *Effects of Unauthorized Immigration on the Actuarial Status of the Social Security Trust Funds*, Social Security Administration (2013), https://www.ssa.gov/oact/NOTES/pdf_notes/note151.pdf.

### 3. The Order Will Drastically Increase, Not Decrease, the Population of Undocumented Immigrants.

If enforced, the Order will dramatically expand the population of individuals living in the U.S. without documentation and will destabilize U.S. communities, institutions and labor markets.

*First,* ending birthright citizenship will increase (not decrease) the undocumented population, and limit opportunities for U.S.-born children, with serious negative repercussions to the U.S. economy and society. Assuming steady rates of migration, mortality, and fertility, the birthright citizenship Order would strip *4.74 million children* of citizenship over the next two decades alone.[26] Over the next 20 years, this would more than double the portion of undocumented U.S. children to about *5.7% of all American children.*[27] The result will be a massive expansion of the undocumented population, which would continue to grow even without anyone crossing a border, because the Order would continue to strip citizenship from children intergenerationally.

*Second,* there is no evidence that access to birthright citizenship is a fundamental driver of migration. A large and established body of research shows that migrants (regardless of legal status) come to the U.S. and remain here for economic opportunity, family reunification, and to build lives free from poverty,

---

[26] Van Hook 2025, *supra* note 1.
[27] *Id.*

11

danger, or war.[28]  Ending birthright citizenship would not reduce these key drivers of migration.

Furthermore, while there is no scholarly evidence that "birth tourism" (where expectant mothers purportedly travel to the U.S. to give birth) significantly impacts migration, the estimate proffered by Defendants-Appellants' *amici* (citing 20,000-26,000 instances annually)[29] is disputed, and re-calculations are closer to 2,000.[30]  Even if accurate, these figures would represent a *negligible* proportion of births, only 0.0005-0.0067 of the 3,855,550 U.S. births in 2017.[31]  Ending birthright citizenship is also ill-suited to address so-called "birth tourism" because the Order is not tailored to its de minimis occurrence, and instead would irreparably harm millions of children who are not "tourists," but who instead will grow up as undocumented persons, even while only knowing America as home.

---

[28]  Katharine Donato & Douglas S. Massey, *Twenty-First-Century Globalization and Illegal Migration*, Ann. Am. Acad. of Polit. and Soc. Sci. 666.1 (2016); Anna Maria Mayda, *International Migration: A Panel Data Analysis of the Determinants of Bilateral Flows*, 23 J. of Population Econ. 1249-1274 (2010).

[29]  Amicus Brief of Iowa and 18 States, Dkt. 55.1 at 25 (citing Kevin Berghuis, *Stopping the Practice of Citizenship for Sale*, Ctr. for Immigration Studies (2020)).

[30]  Jeremy Neufeld, *The Birth Tourism Bogeyman*, Niskanen Center (2020), https://www.niskanencenter.org/the-birth-tourism-bogeyman/.

[31]  J.A. Martin et al, *Births: Final data for 2017*, 67(8) Nat'l Vital Stat. Rep. 1-50 (2018).

### B. Ending Birthright Citizenship Will Negatively Impact the U.S. Economy.

Research overwhelmingly demonstrates that immigration enhances economic stability and long-term growth, and that citizenship, in particular, opens doors to expanded labor markets, entrepreneurship, fiscal contributions, and intergenerational economic mobility. Conversely, the denial of citizenship limits economic opportunity and mobility, diminishing not only individual and family prosperity, but also weakening the entire U.S. economy.[32]

### 1. Immigrants Strengthen American Economic and Fiscal Health.

Immigration contributes strongly and positively to American economic and fiscal health, according to a 2017 report by the National Academies of Science, Engineering, and Medicine ("NASEM 2017") based on a review of decades of research by a large, interdisciplinary team of experts.[33]

*First*, immigration drives the U.S. economy by addressing an underpinning demographic imbalance in American society. Without immigration, the country's increasingly older population would be supported by a smaller and decreasing pool

---

[32] Jeffrey Reitz, *Warmth of the Welcome: The Social Causes of Economic Success for Immigrants in Different Nations and Cities*, Boulder: Westview Press (1998); Irene Bloomraad, *Becoming a Citizen: Incorporating Immigrants and Refugees in the United States and Canada*, Berkeley: University of California Press (2006).

[33] NASEM, *The Economic and Fiscal Consequences of Immigration*, National Academies Press (2017), https://doi.org/10.17226/23550.

13

of active workers.  By bringing new, younger, working-age individuals into the labor market, immigration has brought better balance to the U.S. workforce.[34] *Second*, immigration increases economic demand through the goods and services that immigrants buy and sell.[35]  *Third*, immigrants tend to be more geographically mobile than native-born Americans, thus decreasing frictions in the labor market.[36] *Fourth*, immigrants are disproportionately likely to start businesses and do innovative work that drives job creation for U.S.-born workers.[37]

*Fifth*, immigrant workers often perform jobs that complement native-born workers, which increases both native-born workers' job opportunities – for example, construction supervisors of immigrant construction workers – and their capacity to take those jobs – for example, native-born women who can work outside the home because they can afford childcare.[38]  This complementary function of immigrant workers can also lower inflation in pricing for such goods or services.[39]

---

[34]     *Id.*

[35]     *Id.*

[36]     *Id.*

[37]     *Id.*

[38]     *Id.*; Wendy Edelberg et al., *Immigration and the Macroeconomy in the Second Trump Administration*, The Hamilton Project (Dec. 3, 2024) https://www.hamiltonproject.org/publication/post/immigration-and-the-macroeconomy-second-trump-administration/.

[39]     Philip Barrett, et al., *Immigration and Local Inflation,* IMF Working Papers (2025) https://www.imf.org/en/Publications/WP/Issues/2025/01/10/Immigration-and-Local-Inflation-560285.

*Sixth,* immigration increases GDP. The NASEM 2017 report estimates that in 2013 alone, immigration increased U.S. GDP by at least 11%, or the equivalent of about 2 trillion in 2016 dollars. Given the positive economic impacts of immigration, researchers estimate that the current Trump Administration's restrictive immigration policies will cause the GDP to fall by 0.1-0.4%, or the equivalent of $30-110 billion.[40]

Finally, the NASEM 2017 report found that, projected over 75 years, the fiscal impacts of immigrants are "generally positive at the federal level," a conclusion shared by a 2023 Cato Institute report updating these findings, using and adapting the NASEM 2017 report's methods.[41] The Cato Institute report also found that immigrants "consistently [have] more positive fiscal NPVs" (i.e., Net Present Value, meaning "the total lifetime fiscal impact of an individual and their potential descendants") as compared to "those of native-born Americans."[42]

---

[40]    Wendy Edelberg and Tara Watson, *New Immigration Estimates Help Make Sense of the Pace of Employment*, The Hamilton Project (Mar. 7, 2024), https://www.hamiltonproject.org/publication/paper/new-immigration-estimates-help-make-sense-of-the-pace-of-employment/.

[41]    Alex Nowrasteh et al., *The Fiscal Impact of Immigration in the United States*, Cato Institute White Paper (Mar. 21, 2023), https://www.cato.org/white-paper/fiscal-impact-immigration-united-states. Of course, both immigrants *and* U.S. citizens usually receive more in services than they pay in local or state taxes, because most services are delivered at the local or state level, while most taxes are paid at the federal level. *Id.*

[42]    *Id.* at 163.

Ending birthright citizenship would disrupt this long-established pattern of key economic and fiscal contributions of immigrants and their later-generation children by reducing the earning potential of those later generations, thus undermining America's future fiscal health.

    **2.**    **Birthright Citizenship Increases Intergenerational Mobility, Economic Growth, and Fiscal Health.**

Birthright citizenship bolsters America's economic prosperity, growth, and fiscal health through macro-level impacts that are strongly driven by U.S.-born second-generation mobility.

Second-generation children born to immigrant parents—who historically have been granted citizenship under the Fourteenth Amendment, but whose citizenship would be stripped by the Order—have a large, positive fiscal impact on our economy and contribute significantly to government revenue. According to the NASEM 2017 report, these second-generation individuals provide a net fiscal contribution to the U.S. of $85,000 (paying more in taxes than they receive in services) over their lifetimes, due in part to increased wages relative to their foreign-born parents. They were also found to have made higher long-term

contributions, and to have greater upward mobility, than their counterparts with native-born parents.[43]

These gains are a direct result of birthright citizenship, which grants second-generation workers access to the formal labor market, leading to increased job opportunities, higher wages, increased tax revenue and decreased government spending.[44] For example, one study analyzing the impacts of citizenship on immigrants and their descendants between 1900 and 1940 found that children of immigrants who had gained citizenship earned 12% more than children of immigrants who had not gained citizenship.[45] Similarly, a recent long-term qualitative study traced how gaining U.S. citizenship or permanent legal status dramatically increased individual and family income and educational attainment.[46] As this research shows, birthright citizenship plays a powerful role in spurring

---

[43]    Ran Abramitzky and Leah Boustan, *Streets of Gold: America's Untold Story of Immigrant Success*, New York: Public Affairs (2022); Peter Catron, *The Citizenship Advantage: Immigrant Socioeconomic Attainment in the Age of Mass Migration*, 124(4) Am. J. Socio. (2019); Philip Kasinitz, *Inheriting the City: The Second Generation Comes of Age*, Russell Sage Foundation (2008); Van Tran, *Social Mobility Across Immigrant Generations: Recent Evidence and Future Data Requirements*, Sage Journals (2018).

[44]    Francesc Ortega and Amy Hsin, *Occupational Barriers and the Productivity Penalty from Lack of Legal Status*, 76 Lab. Economics (2022); *see also* Giovanni Peri & Reem Zaiour, *Citizenship for Undocumented Immigrants Would Boost U.S. Economic Growth*, Ctr. for Am. Progress (2021), https://www.americanprogress.org/article/citizenship-undocumented-immigrants-boost-u-s-economic-growth/.

[45]    Catron 2019, *supra* note 43.

[46]    R.C. Smith, *Dreams Achieved and Denied: Mexican Intergenerational Mobility*, Russell Sage Foundation (2024).

intergenerational economic mobility, which, by proxy, enriches the broader economy.

### 3. Conversely, Denying Citizenship to U.S. Born Children Will Reduce Economic Security and Likely Increase Costly and Detrimental Deportations.

Stripping birthright citizenship from this critical second-generation group would render them U.S.-born undocumented persons, thus limiting their upward mobility, and harming them, their families, and American economy, especially if it leads to more deportations.

Without birthright citizenship, millions of U.S.-born children will be unable to work in the formal labor market, leading to fewer job opportunities, reduced incomes and worse working conditions. For example, a 2010 study analyzing nationally representative data found that undocumented Mexican men earned 17% less, and undocumented Mexican women earned 9% less, than their documented Mexican counterparts.[47] Other research found that undocumented workers more often face dangerous, unhealthy working conditions, which can compromise future health and productivity.[48]

Ending birthright citizenship would also disqualify millions of U.S.-born children from access to critical benefits that protect health and economic security,

---

[47] Matthew Hall et al., *Legal Status and Wage Disparities for Mexican Immigrants*, 89(2) Soc. Forces 491-513 (2010).
[48] Heide Castañeda et al., *Immigration as a Social Determinant of Health*, 36 Ann. Rev. of Pub. Health 375-392 (2015).

increasing future government spending. For example, a summary of twenty years of economic research found that children's access to public health insurance improved health outcomes and lowered government expenditures by a factor of 4 to 1.[49] When the lifetime benefits to children were factored into this analysis, the benefit-cost ratio rose to 12.66 to 1.[50] Likewise, a national study using data from 17.5 million Americans showed that access to food stamps during the first five years of life produced statistically significant improvements in human capital, economic self-sufficiency, quality of neighborhood and life expectancy, with an estimated the net benefit-cost ratio of 62:1.[51]

Finally, by rendering nearly five million additional people undocumented, and deportable, over the next two decades alone,[52] the Order would likely result in correspondingly increased numbers of deportations. Research shows that mass

---

[49]    Janet Currie & Anna Chorniy, *Medicaid and Child Health Insurance Program Improve Child Health and Reduce Poverty But Face Threats*, 21(8) Academic Pediatrics S146-53 (2021).

[50]    *Id.*

[51]    Martha Bailey et al., *Is the Social Safety Net a Long-Term Investment? Large-Scale Evidence from the Food Stamps Program*, 91(3) Rev. Econ. Stud. 1291-1330 (2024).

[52]    Van Hook 2025, *supra* note 1.

deportations are not only costly to taxpayers;[53] they also hurt the overall economy, without fixing the problems they purport to address.[54]

Because immigrants are over-represented in foundational economic sectors like agriculture, caregiving, and construction, mass deportations would likely cause higher food prices and inflation.[55] Causal research on the Secure Communities program found that deportations caused a decrease in the supply of household workers, which increased the cost of childcare and cleaning services, and led to fewer U.S.-born mothers working outside the home.[56] These findings are consistent with broader estimates that the deportation of the current undocumented population could increase inflation by 9.6 percent by 2028 and decrease GDP by

---

[53]   American Immigration Council, *Mass Deportation: Devastating Costs to America, its Budget and Economy* (2024), https://www.americanimmigrationcouncil.org/sites/default/files/research/mass_deportation_report_2024.pdf.

[54]   Lisiecki & Apruzzese 2024; Robert Warren & Donald Kerwin, *Mass Deportations Would Impoverish US Families and Create Immense Social Costs*, 5(1) J. on Migration & Human Security 1-8 (2017).

[55]   Algernon Austin, *Mass Deportation: A Bad Idea for the US Economy*, Center for Economic and Policy Research (Jan. 16, 2025), https://cepr.net/publications/mass-deportation-a-bad-idea/; *see also* Jorge González-Hermoso et al., *Mass Deportations Would Worsen Our Housing Crisis*, Urban Institute (2025), https://www.urban.org/urban-wire/mass-deportations-would-worsen-our-housing-crisis.

[56]   Chloe East & Andrea Velásquez, *Unintended Consequences of Immigration Enforcement*, J. of Human Resources (2024); Umair Ali et al., *Secure Communities as Immigration Enforcement: How Secure Is the Child Care Market?* 233 J. of Pub. Econ. (2024).

7.4%.[57]  Past mass deportation efforts also failed to increase job opportunities for U.S.-born workers because immigrants, including undocumented immigrants, typically perform jobs that complement U.S.-born workers, rather than substitute for them, as discussed above.[58]

This research strongly indicates that ending birthright citizenship would harm not only those directly impacted by the Order, but also the overall U.S. economy.

### C.  Ending Birthright Citizenship Will Negatively Impact Educational Attainment, Which in Turn Limits Achievement and U.S. Growth.

U.S. citizenship confers rights and opportunities that increase children's educational attainment across all levels of schooling, which then promotes stronger economic contributions to U.S. society.  Conversely, undocumented status reduces access to key supports that allow children to fully reach their educational potential, and blocks their access to the labor market. Combined, these exclusions can create a lifetime of disadvantage, thus limiting economic and social mobility.

---

[57]    Warwick McKibbin et al., *The International Economic Implications of a Second Trump Presidency*, Peterson Institute (2024), https://www.piie.com/sites/default/files/2024-09/wp24-20.pdf.

[58]    Chloe East et al., *The Labor Market Effects of Immigration Enforcement*, 41(4) J. of Lab. Econ. 957-96 (2023).

### 1. Immigration Status Impacts Early Learning, K-12, and Postsecondary Education.

Research shows that undocumented status causes children to be more likely to experience poverty due to denial of access to key social programs, which subsequently lowers school readiness and future educational attainment.[59] Moreover, as they grow up, undocumented children become increasingly aware of the barriers they face to higher education and the formal labor market, and face constant fear of deportation, harming high school completion rates.[60] One representative sample of Latina/o young adults found that undocumented immigrant youth had more than double the likelihood of high school non-completion, relative to U.S. citizens (16% and 7%, respectively), controlling for demographic and socioeconomic background and educational tracking.[61]

Undocumented immigration status also contributes to educational disadvantages after high school, significantly restricting students' ability to

---

[59] Gregory Duncan et al., *Early Childhood Poverty and Adult Achievement, Employment and Health*, 93 Family Matters 27-35 (2013); Liwei Zhang & Wen-Jui Han, *Poverty Dynamics and Academic Trajectories of Children of Immigrants*, 14 Int. J. of Env't Rsch. 9 (2017).

[60] Roberto Gonzales, *Learning to Be Illegal: Undocumented Youth and Shifting Legal Contexts in the Transition to Adulthood*, 76(4) Am. Soc. Rev. 602-619 (2011); Leisy Abrego, *Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California*, 33 L. & Soc. Inquiry 709-34 (2018).

[61] Caitlin Patler, *Undocumented Disadvantage, Citizen Advantage, or Both? The Comparative Educational Outcomes of Second and 1.5-Generation Latino Young Adults*, 53(4) Int. Migration Rev. 1080-1110 (2018).

succeed in college. One study found that undocumented Latino young adults have a lower likelihood of enrolling in some type of post-secondary education, compared to U.S.-born youth (66% compared to 82%, respectively).[62] Another study compared undocumented and documented Mexican and Central Americans aged 18-24, concluding that "the odds of college enrollment are about four times higher for documented immigrants than their undocumented peers."[63]

Undocumented immigrants also face barriers to persisting in, and completing, higher education.[64] Being denied access to federally funded work-study, most merit-based scholarship programs, and work authorization, they struggle with costs. "[T]he most common reason for withdrawing from community college was not being able to afford college," as reported by 81% of undocumented students compared to 43% of their U.S. citizen and LPR peers.[65] Moreover, lacking

---

[62] *Id.*

[63] Emily Greenman & Matthew Hall, *Housing and Neighborhood Quality Among Undocumented Mexican and Central American Immigrants*, 42(6) Soc. Sci. Rsch. 1712-25 (2013).

[64] Nicole Kreisberg & Amy Hsin, *The Higher Educational Trajectories of Undocumented Youth in New York City*, 47(17) J. of Ethnic & Migration Stud. 3822-45 (2021); Leisy Abrego, *I Can't Go to College Because I Don't Have Papers: Incorporation Patterns of Latino Undocumented Youth*, 4(3) Latino Studies 212-31 (2006).

[65] Veronica Terriquez, *Dreams Delayed: Barriers to Degree Completion among Undocumented Community College Students*, 41(8) J. of Ethnic & Migration Stud. 1302-23 (2014).

legal status breaks the link between academic effort and better job and life prospects in the future, because students know that, regardless of how hard they try, they cannot secure higher paying jobs in the formal labor market.[66]

### 2. Citizenship Provides Opportunities that Lead to Improved Educational Outcomes.

Access to citizenship or lawful status leads to improved educational outcomes. The 1986 Immigration Reform and Control Act (IRCA), which granted legal status to around three million previously undocumented immigrants in the U.S., provides a telling case study. Research shows that immigrant youth who were granted legal status under IRCA were "13.9 percentage points more likely to enroll in college" than their peers who did not get legal status.[67] Similarly, the DACA program significantly increased high school attendance and completion,[68]

---

[66]    Smith, *supra* note 46; Caitlin Patler et al., *The Limits of Gaining Rights While Remaining Marginalized: The Deferred Action for Childhood Arrivals (DACA) Program and the Psychological Wellbeing of Latina/o Undocumented Young Adults*, 100(1) Soc. Forces 246-72 (2020).

[67]    Kalena Cortes, *Achieving the DREAM: The Effect of IRCA on Immigrant Youth Postsecondary Educational Access*, 103(3) Am. Econ. Rev. 428-432 (2013); Smith *supra* note 46.

[68]    Erin Hamilton et al., *DACA Enables Mobility, But Its Uncertain Future Undermines Benefits for Recipients*, 9(2) Center for Policy and Inequality Rsch. (2020); Elira Kuka et al., *Do Human Capital Decisions Respond to the Returns to Education? Evidence from DACA*, 12(1) Am. Econ. J. 293-324 (2020).

although its impact on higher education is more varied, likely because many

DACA recipients feel compelled to work while work authorization is valid.[69]

Improved educational outcomes associated with citizenship and status also

translate into economic, health, and innovation benefits for all of society. *First*,

decades of research shows that increased education translates into increased adult

earnings.[70] Attaining a bachelor's degree is worth "an additional $1.3 million over

the lifetime compared to those without a college degree (in 2009 dollars)."[71]

*Second*, increased education has a positive causal effect on health outcomes.[72]

Increased education also reduces morbidities, mortality, and birth complications,

---

[69] Erin Hamilton et al., *Transition into Liminal Legality: DACA's Mixed Impacts on Education and Employment Among Young Adult Immigrants in California*, 68(3) Social Problems 675-95 (2021); Amy Hsin & Francesc Ortega, *The Effects of Deferred Action for Childhood Arrivals on the Educational Outcomes of Undocumented Students*, 55(4) Demography 1487-1506 (2018); Nolan Pope, *The Effects of DACAmentation: The Impact of Deferred Action for Childhood Arrivals on Unauthorized Immigrants*, 143 J. of Pub. Econ. 98-114 (2016).

[70] *See e.g.*, David Card, *The Causal Effect of Education on Earnings*, Handbook of Labor Economics, Vol. 3 (1999); James Heckman et al., *Returns to Education: The Causal Effects of Education on Earnings, Health, and Smoking*, 126 J. Polit. Econ. S197-246 (2018).

[71] Anthony Carnevale et al., *The College Payoff: Education, Occupations, Lifetime Earnings*, Georgetown Univ. Center on Education and the Workforce (2011) https://www.ed.gov/sites/ed/files/policy/highered/reg/hearulemaking/2011/collegepayoff.pdf.

[72] Gabriella Conti et al., *The Education-Health Gradient*, 100(2) Am. Econ. Rev. 234-238 (2010).

which decrease strains on the healthcare system.[73]  *Third,* higher levels of education lead to increased entrepreneurship and innovation, particularly among immigrants.[74]  For example, immigrants are twice as likely to apply for patents, and their patenting per capita increases the GDP by 1.4 to 2.4 percentage points over a decade.[75]

By stripping the citizenship of millions of U.S.-born children, the Order would substantially restrict their educational attainment, thereby decreasing impacted children's ability to fully contribute to American society over the course of their lives.

---

[73]    A. Halpern-Manners et al., *The Effects of Education on Mortality: Evidence from Linked U.S. Census and Administrative Mortality Data*, 57(4) Demography 1513-1541 (2020); David Cutler & Adriana Lleras-Muney, *Understanding Differences in Health Behaviors by Education*, 29 J. of Health Econ. 1-28 (2010).

[74]    Phillip Kim et al., *Access (Not) Denied: The Impact of Financial, Human, and Cultural Capital on Entrepreneurial Entry in the United States*, 27 Small Business Econ. 5-22 (2006).

[75]    Jennifer Hunt, *Immigrant Patents Boost Growth*, 356 Science 697 (2017).

**D.  Ending Birthright Citizenship Will Negatively Impact Health Outcomes and Increase Costs.**

**1.  Without Citizenship or Lawful Status, Those Subject to the Order Will Lose Access to Health Care, Decreasing Health Outcomes and Burdening the Healthcare System.**

Citizenship and lawful status facilitate critical access to health care from cradle to grave, which promotes better long-term health.[76]  Ending birthright citizenship would deny millions of U.S.-born babies these benefits, resulting in lifelong harms to their health, their family members' health, and the health of the nation as a whole.[77]

First, lacking legal status directly harms health by blocking access to health insurance.  As discussed *supra*, restricting access to public health insurance not only decreases health outcomes, it also increases government expenditures through higher medical costs.[78]  Facing decreased access to preventative care, undocumented people often put off seeking medical attention until health

---

[76]  Adrian Bacong & Ceclia Menjívar, *Recasting the Immigrant Health Paradox Through Intersections of Legal Status and Race*, 23(5) J. Immigr. Minority Health 1092 (2021); Heide Castañeda et al., *Immigration as a Social Determinant of Health*, 36 Annual Rev. Pub. Health 375-92 (2015); Krista Perreira & Juan Pedroza, *Policies of Exclusion: Implications for the Health of Immigrants and Their Children*, 40 Annual Rev. Pub. Health 147-166 (2019).

[77]  Jacqueline Torres & Maria-Elena D. Young, *A Life-Course Perspective on Legal Status Stratification and Health*, 2 SSM-Population Health 141-148 (2016); Edward Vargas & Vickie D. Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, 19(4) J. Immigr. Minority Health 913-20 (2017).

[78]  Currie & Chorniy, *supra* note 49.

conditions have worsened, requiring more costly intervention, including emergency care.[79]

Delays in treatment may also arise from undocumented immigrants' deportation fears, such that "undocumented immigrants present more advanced stage diseases, such as breast cancer and HIV infection . . . than their documented counterparts" at the initiation of treatment.[80] Among Latina women ages 50-70 surveyed in the 2000 National Health Interview Survey, noncitizens were 14% less likely than citizens to have obtained a mammogram in the past two years and 11% less likely than citizens to have obtained a pap smear in the past three years.[81]

Research shows that citizenship or permanent status may reverse some of these harms: For example, an analysis of IRCA's impacts on mortality rates in California showed reduced mortality among the IRCA-eligible immigrants following passage of the legislation.[82] Another study analyzed U.S. birth records and found that in areas with a higher concentration of IRCA applications, infants' average birth weights increased, and the likelihood of low birthweight births was

---

[79] *Id.*

[80] Jacqueline Cabral & Adolfo G. Cuevas, *Health Inequities Among Latinos/Hispanics: Documentation Status as a Determinant of Health*, 7 J. Racial and Ethnic Health Disparities 874-879 (2020).

[81] Sandra Echeverria & Olven Carrasquillo, *The Roles of Citizenship Status, Acculturation, and Health Insurance in Breast and Cervical Cancer Screening Among Immigrant Women*, 44 Med. Care 788-92 (2006).

[82] Scott Baker, *Effects of Legal Status and Health Service Availability on Mortality*, Stanford Institute for Economic Policy Research (2010), https://ideas.repec.org/p/sip/dpaper/09-018.html.

reduced by 5 to 15%.[83]  Similarly, analyses of U.S. birth records found that

DACA-eligible Latina mothers gave birth to healthier infants, on average,

compared to ineligible Latina immigrants.[84]

> ### 2. Citizenship and Immigrant Legal Status Impact Mental Health and Wellbeing.

Legal status also impacts mental health outcomes.  For instance, in one

study, noncitizens reported greater psychological distress than naturalized and

U.S.-born citizens.[85]  Another survey of middle- and high school aged Latino youth

in North Carolina found higher rates of anxiety among undocumented adolescents,

compared to documented peers.[86]  Mental and related health harms of

undocumented status include "greater depression and social isolation, higher rates

of hypertension with longer length of hospital stay, greater anxiety and post-

traumatic stress, and higher levels of acculturative stress" compared to immigrants

---

[83]     Laxman Timilsina, *Immigration Policy Shocks and Infant Health*, 51 Econ. & Human Bio. 1-18 (2023).

[84]     Erin Hamilton et al., *DACA's Association with Birth Outcomes Among Mexican-Origin Mothers in the United States*, 58(3) Demography 975-85 (2021).

[85]     Gilbert C. Gee et al., *Citizenship as Privilege and Social Identity: Implications for Psychological Distress*, 60(5-6) Am. Behavior. Sci. 680-704 (2016).

[86]     Stephanie Potochnick & Krista Perreira, *Depression and Anxiety Among First-Generation Immigrant Latino Youth: Key Correlates and Implications for Future Research*, 198(7) J. Nerv. Ment. Dis. 470-477 (2010).

with lawful status.[87]  Indeed, despair about blocked paths to mobility caused by undocumented status can lead to self-harm, suicidal ideation, or suicide.[88]  Lacking legal status can even discourage people from seeking mental health care despite having access to it: for example, some undocumented immigrant college students reported feeling treatment was "futile because it could not address underlying immigration-related issues."[89]

Conversely, research shows that even having partial inclusion through DACA correlated with improvements to self-reported health, psychological distress, and mental illness.[90]  One study found that DACA eligibility of mothers also reduced their children's mental health diagnoses by over 50%.[91]

---

[87]    Cabral & Cuevas, *supra* note 80; Margarita Alegría et al., *Health Insurance Coverage for Vulnerable Populations: Contrasting Asian Americans and Latinos in the United States*, Inquiry (2006), https://doi.org/10.5034/inquiryjrnl_43.3.

[88]    Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57(8) Am. Behavior. Sci. 1175 (2013).

[89]    Biblia S. Cha et al., *Beyond Access: Psychosocial Barriers to Undocumented Students' Use of Mental Health Services*, 233 Soc. Sci. Med. 193 (2019).

[90]    Caitlin Patler & Whitney Laster Pirtle, *From Undocumented to Lawfully Present: Do Changes to Legal Status Impact Psychological Wellbeing Among Latino Immigrant Young Adults?* 199(1) Soc. Sci. & Med. 39-48 (2018); Atheendar Venkataramani et al., *Health Consequences of the US Deferred Action for Childhood Arrivals (DACA) Immigration Programme: A Quasi-Experimental Study*, 2(4) The Lancet 175-181 (2017).

[91]    Jens Hainmueller et al., *Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health*, 357(6355) Science 1041-1044 (2017).

### 3. The Health Impacts of Citizenship and Immigrant Legal Status Last a Lifetime.

The health harms to children resulting from the denial of U.S. citizenship or permanent status occur directly and indirectly and follow them into adulthood, with broader impacts to the U.S. economy and society.[92]  Just as undocumented status may discourage adults from seeking medical care for themselves, parents concerned about deportation may fear taking their children to the doctor for preventative health care, which can lead to more severe health issues and more costly care.[93]

In addition, undocumented status creates chronic fear across childhood and adolescence, harming children's social, educational, and even brain development.[94]  Undocumented youth in a qualitative interview study reported that lacking status caused many health challenges, including "chronic sadness, [] depression, [] overeating or undereating, [] difficulties sleeping, and [] a desire simply to never get out of bed (and) exacerbation of chronic diseases like high

---

[92]  Torres, *supra* note 77.

[93]  Andrea Gómez Cervantes & Cecilia Menjívar, *Legal Violence, Health, and Access to Care: Latina Immigrants in Rural and Urban Kansas,* 61(3) J. Health & Soc. Behav. 307-323 (2020); Vargas & Ybarra, *supra* note 77; R.C. Smith et al., *Disrupting the Traffic Stop–to-Deportation Pipeline: The New York State Greenlight Law's Intent and Implementation*, 9(2) J. on Migration & Human Security 94-110 (2021).

[94]  Roxanne Kerani & Helena Kwakwa, *Scaring Undocumented Immigrants Is Detrimental to Public Health*, 108(9) Am. J. Pub. Health 1165-1166 (2018); Tara Watson, *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation*, 6(3) Am. Econ. J. 313-338 (2014).

blood pressure, chronic headaches, toothaches, and bodily pain."[95]  By early adulthood, fear of deportation predicts higher depression.[96]

These added stresses lead to worse health outcomes.  One study found higher rates of poor self-reported health among undocumented Latino immigrants who came to the U.S. as children, compared to their naturalized citizen counterparts.[97]  By creating a new, and continuously expanding, class of undocumented U.S.-born children, the Order would institutionalize these additional stressors and barriers to health care, with resulting harms to the U.S. economy and society.[98]

For over 150 years, the Constitutional promise of birthright citizenship has driven U.S. economic growth, social integration, educational attainment and health.  By erecting permanent, legal barriers in each of these domains, the Order would institutionalize a massive, undocumented underclass, prevent millions of U.S.-born children from fully participating in society, and undermine American growth for generations to come.

---

[95]     Gonzales et al., *supra* note 88 at 1187.
[96]     Ahmed Alif et al., *Documentation Status and Psychological Distress Among New York City Community College Students*, 26(1) Cultural Diversity & Ethnic Minority Psych. 11 (2020).
[97]     Erin Hamilton et al., *Immigrant Legal Status Disparities in Health Among First- and One-point-five-Generation Latinx Immigrants in California*, 41 Pop. Rsch. & Policy Rev. 1241-60 (2022).
[98]     Torres, *supra* note 77.

## IV.   CONCLUSION

For the foregoing reasons, the District Court's ruling preliminarily enjoining

the Order should be affirmed.

Date:  April 11, 2025

By: */s/ Moira Heiges-Goepfert*
Moira Heiges-Geopfert

**TOWARDS JUSTICE**
Juno Turner
Rachel Dempsey
juno@towardsjustice.org
rachel@towardsjustice.org

**OUTTEN & GOLDEN LLP**
Moira Heiges-Geopfert
Ossai Miazad
Alina Pastor-Chermak
mhg@outtengolden.com
om@outtengolden.com
APastor-Chermak@outtengolden.com

*Attorneys for Amici Curiae*

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-807

I am the attorney or self-represented party.

**This brief contains** | 6,960 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⬤ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | /s/ Moira Heiges-Goepfert | **Date** | April 11, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that, On April 11, 2025, I electronically filed the foregoing Brief via the Court's CM/ECF Electronic Filing System. The Court's CM/ECF Electronic Filing System sends a Notice of Docket Activity to all registered users and service on them will be accomplished by the appellate CM//ECF system.

By:  /s/ Moira Heiges-Goepfert
     Moira Heiges-Goepfert

     *Attorney for Amici Curiae*

# APPENDIX OF *AMICI CURIAE*[99]

- Abigail Andrews, University of California San Diego
- Adrian Bacong, Stanford University School of Medicine
- Ajay Chaudry, New York University
- Alana LeBrón, University of California, Irvine
- Amada Armenta, University of California Los Angeles (UCLA)
- Amy Hsin, Queens College, CUNY
- Angela S. García, University of Chicago
- Anne Pebley, University of California Los Angeles (UCLA)
- Ariela Schachter, Washington University in St. Louis
- Asad Asad, Stanford University
- Bradford Jones, University of California, Davis
- Brinton Lykes, Boston College
- Brittany Morey, University of California, Irvine
- Caitlin Patler, University of California Berkeley
- Carola Suarez-Orozco, Harvard Graduate School of Education
- Catalina Amuedo Dorantes, University of California Merced
- Catherine Ramirez, University of California Santa Cruz
- Cecilia Menjívar, University of California Los Angeles (UCLA)
- Chenoa Flippen, University of Pennsylvania
- Chiara Galli, University of Chicago
- Chloe East, University of Colorado Denver
- Chris Tilly, University of California Los Angeles (UCLA)
- Chris Zepeda-Millan, University of California Los Angeles (UCLA)
- Cristina Mora, University of California Berkeley

---

[99] Institutional affiliations are provided solely for purposes of identification. This brief does not purport to represent the institutional views of any entity with which *Amici* are affiliated.

- Cybelle A. Fox, University of California Berkeley
- Dave Brotherton, City University of New York
- David Fitzgerald, University of California San Diego
- Deborah Balk, City University of New York
- Edward Telles, University of California Irvine
- Eileen Diaz McConnell, Arizona State University
- Elizabeth Aranda, University of South Florida
- Erin Hamilton, University of California Davis
- Evelyn Nakano Glenn, University of California Berkeley
- Felicia Arriaga, Baruch College
- Francisco Lara-Garcia, Hofstra University
- Goleen Samari, University of Southern California
- Hana Brown, Wake Forest University
- Hani Mansour, University of Colorado Denver
- Heba Gowayed, CUNY Hunter College
- Heidy Sarabia, California State University Sacramento
- Helen Marrow, Tufts University
- Hirokazu Yoshikawa, New York University
- Holly Reed, City University of New York, Queens College
- India Ornelas, University of Washington
- Jean Beaman, City University of New York Graduate Center
- Jenna Nobles, University of California Berkeley
- Jennifer Jones, Northwestern University
- Jennifer Van Hook, The Pennsylvania State University
- Jody Agius Vallejo, University of Southern California (USC)
- John Mollenkopf, City University of New York
- John Torpey, City University of New York Graduate Center
- Jorge Delvas, Boston University

- Kalina Brabeck, Rhode Island College
- Katharine Donato, Georgetown University
- Kevin Johnson, University of California Davis
- Leisy Abrego, University of California Los Angeles (UCLA)
- Lisa García Bedolla, Chancellor's Professor, UC Berkeley
- Lisa Martinez, University of Denver
- Lisa Park, University of California Santa Barbara
- Mae Ngai, Columbia University
- Manuel Barajas, California State University Sacramento
- Manuel Pastor, University of Southern California (USC)
- Margaret Peters, University of California Los Angeles (UCLA)
- Margarita Alegria, Massachusetts General Hospital and Harvard Medical School
- Maria-Elena Young, University of California Merced
- Mary C. Waters, Harvard University
- May Sudhinaraset, University of California Los Angeles (UCLA)
- Michael A. Clemens, George Mason University
- Michael White, Brown University
- Natalie Matsuoka, University of California Los Angeles (UCLA)
- Natasha Warikoo, Tufts University
- Patricia Gandara, University of California Los Angeles (UCLA)
- Patrisia Macias-Rojas, University of Illinois at Chicago
- Paul Ong, University of California Los Angeles (UCLA)
- Peter Catron, University of Washington
- Philip Kasinitz, City University of New York
- Randall Kuhn, UCLA Fielding School of Public Health
- Richard Alba, City University of New York Graduate Center

- Robert Courtney Smith, Baruch College and City University of New York Graduate Center
- Rocío Rosales, University of California Irvine
- Roger Waldinger, University of California Los Angeles (UCLA)
- Rubén G. Rumbaut, University of California Irvine
- Sarah Bishop, Baruch College
- Seth Holmes, University of California Berkeley
- Shannon Gleeson, Cornell University
- Sofya Aptekar, City University of New York
- Sophia Rodriguez, New York University
- Stephanie L. Canizales, University of California Berkeley
- Susan K. Brown, University of California Irvine
- Tanya Golash-Boza, University of California Merced
- Tom Wong, University of California San Diego
- Tomás Jiménez, Stanford University
- Vanessa Ribas, University of California San Diego
- Wendy D. Roth, University of Pennsylvania
- William D. Lopez, University of Michigan
- Xóchitl Bada, University of Illinois Chicago