No. 25-807

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, *et al.*,
*Plaintiffs-Appellees,*

v.

DONALD J. TRUMP, *et al.*,
*Defendants-Appellants.*

**Appeal from the District Court for the
Western District of Washington
No. 2:25-cv-00127-JCC
Honorable John C. Coughenour
United States District Judge**

**BRIEF OF AMICUS CURIAE WASHINGTON STATE HOSPITAL
ASSOCIATION AND WASHINGTON STATE MEDICAL ASSOCIATION
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE OF
THE DISTRICT COURT'S ORDER**

Paul J. Lawrence, WSBA #13557
Sarah E. Mack, WSBA #32853
Meha Goyal, WSBA #56058
PACIFICA LAW GROUP LLP
1191 Second Avenue, Suite 2000
Seattle, Washington 98101-3404
Telephone: 206.245.1700

*Attorneys for Amicus Curiae Washington
State Hospital Association and Washington
State Medical Association*

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae, Washington State Hospital Association and Washington State Medical Association (collectively, "Amici"), are not-for-profit entities that have no parent corporations. No corporation owns stock in any of the Amici. Amici is unaware of any judge serving on this Court who participated at any stage of the case. This is the first disclosure statement filed in this case by the above-identified amici, and this disclosure statement complies with Federal Rules of Appellate Procedure ("FRAP") 26.1 and Circuit Rule 26.1-1.

## STATEMENT OF COMPLIANCE WITH RULE 29

Pursuant to FRAP 29(a)(2), Amici respectfully submit this brief without filing for leave of court, having received consent from all Parties. Further, in accordance with FRAP 29(a)(4)(E), Amici state as follows: (i) none of the parties' counsel authored the brief in whole or in part; (ii) none of the parties or their counsel contributed money that was intended to fund preparing or submitting the brief; and (iii) no person other than Amici, their members, or their counsel, contributed money that was intended to fund preparing or submitting this brief.

# TABLE OF CONTENTS

I.    IDENTITY & INTEREST OF AMICI..........................................................1

    A.    Washington State Hospital Association ("WSHA")............................1
    B.    Washington State Medical Association ("WSMA")...........................2

II.   INTRODUCTION ............................................................................2

III.  ARGUMENT.................................................................................5

    A.    The Executive Order would significantly reduce funding available to
        hospitals and healthcare providers. ......................................5
        1.   The Executive Order will reduce federal funding for medical
            coverage. ................................................................5
        2.   The Executive Order will increase administrative costs for
            healthcare providers. ................................................11

    B.    The Executive Order Will Deter Noncitizen Immigrants from
        Accessing Health Care, Placing Greater Burdens on Hospitals and
        Doctors ...............................................................17
        1.   The Executive Order will negatively impact hospitals and the
            people they serve. ....................................................17
        2.   Effects of prior immigration policies exemplify the likely negative
            health outcomes of the Executive Order.............................21
        3.   Noncitizen immigrants face several barriers to accessing health
            care. ....................................................................25

IV.   CONCLUSION.............................................................................31

# TABLE OF AUTHORITIES

**Federal Statutes**

8 U.S.C. ch. 12 § 1101 ........................................................................21

Pub. L. 101-649..................................................................................21

**State Statutes**

RCW 70.170..........................................................................................4

Wash. Rev. Code § 70.170.060(1) ........................................................10

Wash. Rev. Code § 70.170.060(5) ..........................................................9

Wash. Rev. Code § 70.58A.100............................................................12

**Other Authorities**

Academy Health, *Return on Investment of Public Health System Funding*
  (June 2018) ....................................................................................20

Anderson, Ron J., MD**,** *Virtual Mentor: Why We Should Care for the
  Undocumented,* 10 Am. Med. Ass'n J. of Ethics 4:247 (2008) ...........20

Asch, S., et al., *Does fear of immigration authorities deter tuberculosis patients
  from seeking care?* 161(4) West J. Med. 373-6 (Oct. 1994) ...............22

Beltran, Lucia Felix, et al., *Born into Uncertainty: The Health and Social Costs of
  Ending Birthright Citizenship,*
  UCLA Latino Policy & Politics Institute (Feb. 12, 2025) ....................24

Cholera, Rushina, et al., *Health Care Use Among Latinx Children After 2017
  Executive Actions on Immigration*, 147 Pediatrics e20200272 (2021)................10

Dicentra Consulting, *Maternal Health in Washington State*, 2010–2022,
  Wash. Off. of Fin. Mgmt. (2025) ........................................................10

iii

Edward, Jean, *Undocumented Immigrants and Access to Health Care: Making a Case for Policy Reform,* Sage Journals (May 6, 2014) ..........................................21

Ettinger de Cuba, Stephanie, et al., *Reduced Health Care Utilization Among Young Children of Immigrants After Donald Trump's Election and Proposed Public Charge Rule*, 1(2) Health Aff. Scholar 1–9 (2023)..............................................10

*Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. Rev. 225 (2023) ...............................................................12

Fenton, Joshua J., *Effect of Proposition 187 on Mental Health Service Use in California: A Case Study* (1996)....................................................22

Ferguson, Governor Bob, *Budget Priorities for 2025–2027* (2025) .......................8

Flores, Glenn, et al., *The Health and Healthcare Impact of Providing Insurance Coverage to Uninsured Children,* 17 BMC Public Health 553 (May 23, 2017) .........................................29

Hacker, Karen, et al., *Barriers to Health Care for Undocumented Immigrants: A Literature Review*, 8 Risk Mgmt. & Healthcare Pol'y 175–83 (Oct. 30, 2015) .................................25

Hacker, Karen, et al., *The Impact of Immigration and Customs Enforcement on Immigrant Health*, 74(4) Soc. Sci. & Med. 586 (Aug. 2011) ...............................22

Kaiser Family Foundation (KFF), *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025) ...............................................................27

Ku, Leighton, et al., *Data Note: Medicaid's Role in Providing Access to Preventive Care for Adults,* Kaiser Family Foundation (KFF) (May 2017)..........................21

Lu, Michael C., et al., *Elimination of Public Funding of Prenatal Care for Undocumented Immigrant in California: A Cost/Benefit Analysis,* 182 Am. J. Obstet. Gynecol. 233–39 (Jan. 2000) ................................10

Medicaid & CHIP Payment & Access Comm'n, *MACStats: Medicaid and CHIP Data Book* (2024), Ex. 6 at 18.................................................7

iv

Nat'l Partnership for Women & Families, *A Systemic Failure: Immigrant Moms and Babies Are Being Denied Health Care* (May 2021) .....................................19

Off. of Fin. Mgmt., *Multiple Agency Fiscal Note Summary* (Mar. 8, 2007)...........15

Partridge, Sarah, et al., *Inadequate Prenatal Care Utilization and Risks of Infant Mortality and Poor Birth Outcome: A Retrospective Analysis of 28,729,765 U.S. Deliveries over 8 Years* (July 2012).....................................................................18

Pillai, Drishti & Samantha Artiga, *2022 Changes to the Public Charge Inadmissibility Rule and the Implications for Health Care* (May 5, 2022)........... 23

Pillai, Drishti, et al., *Health and Health Care Experiences of Immigrants: The 2023 KFF/LA Times Survey of Immigrants* (Sept. 17, 2023).........................25

Pumphrey, David, *Decoding EMR Software Costs: What's the Real Price?* https://riveraxe.com/emr-software-cost/ (Dec. 26, 2024) .....................................15

Rao, Alisha, et al., *Key Facts on Health Care Use and Costs Among Immigrants* Kaiser Family Foundation (Sept. 23, 2024) ..........................................................28

Remus, Angela R., Caught Between Sovereigns: *Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. Rev. 225 (2023) ..................................................12

Rosenberg, Julia, *Insurance and Health Care Outcomes in Regions Where Undocumented Children Are Medicaid-Eligible*, 150 Pediatrics 2 (Sept. 2022) .................................................................................20

Schumacher, Shannon, et al., *Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants* Kaiser Family Foundation (KFF) (Sept. 17, 2023)..............................................27

Senate Bill 5093 ............................................................................................ 14, 15

UnitedHealth Grp., *The High Cost of Avoidable Hospital Emergency Department Visits* (July 22, 2019)............................................................................................28

USCIS, *Form N-600, Instructions*, OMB No. 1615-0057, at 1–2; *Form G-1055, Fee Schedule*...........................................................................................................14

Wash. Dep't of Health, *Birth Data File Technical Notes* (2024)............................12

Washington State Health Care Authority, *Apple Health Expansion* ........................9

Wash. State Inst. for Pub. Pol'y,
   *Hospital Staffing Plans in Washington State* (2024).............................................13

## I.        IDENTITY & INTEREST OF AMICI

Amici are nonprofit entities whose members are hospitals, physicians, physician assistants, resident physicians, medical students, and retired physicians across Washington. Amici's members have a compelling interest in this dispute as the Executive Order at issue, if allowed to go into effect, will adversely impact the ability of their members to provide high-quality, accessible healthcare and improve the health of all Washington communities, and result in harmful outcomes for the hospitals, healthcare providers, and citizens of Washington.

### A.        Washington State Hospital Association ("WSHA")

The Washington State Hospital Association ("WSHA") is a Washington not-for-profit trade association with principal offices in Seattle, Washington. WSHA's membership includes all 114 hospitals across Washington, which employ more than 120,000 Washington residents. WSHA's members include urban and rural hospitals, general and specialty care hospitals, including inpatient psychiatric care hospitals, and public and private hospitals. Ninety-one percent of member hospitals are non-profit or publicly owned. Members provide care through 648,000 inpatient and 12.5 million outpatient visits annually.

WSHA's mission is to improve the health of Washington residents through its involvement in all matters affecting the delivery, quality, accessibility, affordability, and continuity of health care. Its programs include support for indigent care, access

1

to medical services, and innovation in health service delivery. Members provide emergency care to all who need it, regardless of ability to pay. Hospital services are also provided regardless of immigration status.

## B.     Washington State Medical Association ("WSMA")

The Washington State Medical Association (WSMA) is the statewide association of physicians, surgeons and physician assistants, with over 13,000 members. The WSMA provides physician-driven, patient-focused advocacy as a knowledgeable and interested party in matters impacting the practice of medicine and the availability of health services for patients. The WSMA was founded over 100 years ago and is thoroughly familiar with the essential features of medical practice in Washington State. The WSMA works with Washington's lawmakers on legislation and has participated in court cases as a party and as amicus curiae on numerous occasions because of its comprehensive historical and contemporary knowledge of the practice of medicine and health care delivery in the State.

## II.     INTRODUCTION

The recent "Protecting the Meaning and Value of American Citizenship" Executive Order (hereinafter "Executive Order") targeting birthright citizenship poses significant risks to the healthcare system, with far-reaching consequences for patients, doctors, and hospitals alike. As a cornerstone of American law, birthright citizenship ensures that individuals born on U.S. soil automatically acquire

2

citizenship, regardless of their parents' status. By undermining this law, the Executive Order threatens to destabilize an already strained healthcare system. Moreover, hospitals that serve diverse, immigrant-rich communities may see a rise in legal and logistical complications, leading to a decrease in the accessibility of care. The impact of this Executive Order goes beyond politics; it directly affects the everyday functioning of our State and nation's healthcare system, endangering both its providers and the patients who depend on it.

Washington hospitals and physicians, like their counterparts across the country, are committed to providing the highest quality care to all patients, promising their competence, integrity, candor, compassion, and personal commitment to their patient's best interest and confidentiality. Indeed, they work every day to care for their patients without regard to their patients' ethnicity, national origin, or citizenship status. They know firsthand the benefits of preventive, early and accessible treatment and the risks of delayed treatment. As a point of professional responsibility, they are dedicated to building relationships of trust so they can provide adequate care, without regard to personal or social characteristics that are not clinically relevant.

Achieving these missions, however, does not come easily. Washington has one of the lowest numbers of hospital beds per capita in the United States. Hospitals are full, yet most Washington hospitals remain financially challenged. Across the

3

State, hospitals have struggled to collect adequate payment to cover the cost of the care they provide.

Care for uninsured and underinsured patients presents particular challenges, especially in light of State requirements to provide free or reduced-cost care to people with incomes up to 400% of the federal poverty level (FPL). *See generally* RCW 70.170. Washington's hospitals in urban areas serve a wide range of needs and provide higher-level care to people across the state, including fragile newborns. Hospitals in rural and remote areas primarily serve vulnerable populations—the patient populations of such facilities, which operate on smaller or negative operating margins averaging between -2% and 2%, consist primarily of Medicaid and Medicare patients.

The Executive Order threatens the mission of Washington hospitals and healthcare providers by erecting barriers that will prevent residents of Washington communities from accessing care. It will reduce funding available to hospitals and healthcare providers that nevertheless are duty-bound to provide care and legally bound to provide emergency care. These economic burdens will grow exponentially over time threatening access to healthcare for everyone in the community. For the sake of the health and care for all people, Amici respectfully ask this Court to affirm the District Court's Order enjoining the Executive Order.

### III.    ARGUMENT

**A.    The Executive Order would significantly reduce funding available to hospitals and healthcare providers.**

To understand the impact of the Executive Order on the residents of Washington, it is important to consider the impact on the State's budget. Washington spends a significant portion of its budget on ensuring that all people across the State have access to medical care. The Executive Order would shift the funding responsibility for healthcare for babies no longer eligible for citizenship and their mothers from a shared responsibility between the State and the federal government entirely to the State and/or private actors, such as hospitals. This would significantly burden Washington's hospitals and healthcare providers.

**1.    The Executive Order will reduce federal funding for medical coverage.**

Washington hospitals and healthcare providers receive significant funding from the federal government to cover costs of healthcare for different populations. The implementation of the Executive Order would reduce or eliminate that federal funding, which in turn would significantly increase the costs borne by hospitals for the provision of care.

Washington State's Medicaid program covering low-income children is called Apple Health for Kids. Apple Health for Kids is broader than Medicaid and provides

5

care for all children up to 317% of the FPL regardless of immigration status.[1] Apple Health also covers prenatal and pregnancy-related care for pregnant individuals with incomes up to 215% FPL, regardless of immigration status.[2]

For children who are U.S. citizens or qualified non-citizens and fall below 215% FPL, Apple Health for Kids funding is through state and federally funded Medicaid.[3] For children who are U.S. citizens or qualified non-citizens and fall between 215%–317% FPL, funding comes from the State- and federally-funded Children's Health Insurance Program ("CHIP").[4] Most immigrants, however, including temporary visa holders and undocumented immigrants, are not eligible to enroll in federally funded coverage, such as Medicaid or CHIP. Instead, the State of Washington provides state funding to cover such non-citizen children up to 317% FPL.[5] Washington and the United States have a vested interest in the health of these babies. Without this state-funded coverage, most of these children would be left without insurance and, with a few exceptions, undocumented immigrants cannot purchase coverage through the Affordable Care Act Marketplaces.[6]

---

[1] 1-SER-152 ¶ 11.
[2] *Id*. ¶ 15.
[3] *Id*. ¶ 12.
[4] *Id*. ¶ 13.
[5] *Id*. ¶ 11.
[6] 1-SER-151 ¶ 10.

Birthright citizenship enables children of undocumented individuals to access healthcare coverage through Medicaid and CHIP, without relying exclusively on state funding. As of 2024, the Federal government's Medical Assistance Percentage (FMAP)—the percentage of Medicaid funding that the federal government contributes to each state—was 50% for Medicaid, and under Enhanced FMPA was 65% for CHIP.[7] As of December 2024, the Washington State Health Care Authority (HCA) administered Medicaid and CHIP funded coverage for more than 860,000 children in Washington.[8] According to WSHA data, Washington hospitals cared for 24% of that population over the course of the year. Washington's annual benefit expenditures under Medicaid/CHIP were approximately $2,844 per enrolled child. [9]

Eliminating birthright citizenship would create a class of children no longer eligible for this federally matched coverage. This surge in the number of children relying on healthcare coverage paid entirely by the State would significantly strain State resources, which in turn will burden hospitals' budgets and charity care funds, ultimately impacting the health of the State's communities.

---

[7] Medicaid and CHIP Payment and Access Commission, MACStats: Medicaid and CHIP Data Book (2024), Ex. 6 at 18, https://www.macpac.gov/wp-content/uploads/2024/12/MACSTATS_Dec2024_WEB-508.pdf.
[8] 1-SER-153 ¶ 16.
[9] *Id*.

As the record in this case reflects, thousands of children every year are born in Washington to undocumented immigrants.[10] Lapses in healthcare coverage and associated funding for providers for those children that, if citizens, would be eligible for CHIP, are inevitable. While hospitals will still provide emergency care for those children, the funding burden will shift to the State-funded Children's Health Program ("CHP") program[11] and potentially hospitals' uncompensated charity care, as providers will lose the 65% federal reimbursement for emergency care that would have been provided if the children were covered by CHIP.[12] Amici estimate total losses in federal healthcare reimbursement to total over $300 million over the next decade.

As of early 2025, Washington faces a projected budget deficit of more than $10-$15 billion over the next four years.[13] Given this reality, it is unlikely that Washington will be able to absorb the projected 83% of increased costs, or $106

---

[10] 1-SER-110 ¶ 11.

[11] Washington independently funds the Children's Health Program (CHP) as part of Apple Health for Kids. CHP provides coverage to non-citizen children under the age of 19 whose families have an income at or below 300% of the federal poverty level (FPL).

[12] 1-SER-157 ¶ 26.

[13] Governor Bob Ferguson, *Budget Priorities for 2025-2027* (2025), https://governor.wa.gov/sites/default/files/2025-01/Governor-electBobFergusonBudgetPriorities.pdf.

million, related to Apple Health for Kids coverage for immigrant children by 2035.[14] As a result, enrollment caps, similar to those implemented for the Apple Health Expansion Program, would likely need to be considered.[15]

Any limits on funding for this health care coverage will require hospitals and healthcare providers to incur increased costs through uncompensated charity care or by absorbing the costs of care without any reimbursement. That, in turn, means they will pass the costs to commercially insured patients. Washington state charity care laws require hospitals to provide free and reduce cost care to patients up to 400% FPL.[16] Patients who meet the FPL threshold for Medicaid or CHIP coverage are entitled to free hospital care if they are uninsured or underinsured.[17] Given the state budget deficit, the most likely outcome is that instead of the State expanding coverage to pay for the care of otherwise uncovered immigrants, hospitals will end up covering the cost of care. Hospitals will have no way to reduce the financial impact of this blow, as Washington law prohibits hospitals from adopting policies

---

[14] Amicus WSHA calculated this estimate based on the 83% projected increase in the CHP caseload if the Executive Order went into effect and current benefits spending for enrolled children.

[15] Health Care Authority, *Apple Health Expansion*, https://www.hca.wa.gov/about-hca/programs-and-initiatives/apple-health-medicaid/apple-health-expansion.

[16] Wash. Rev. Code § 70.170.060(5).

[17] *Id.*

that would significantly reduce the numbers of patients they treat who are uninsured and who cannot pay for hospital services.[18]

In addition to increased long-term costs due to lack of preventative care, *see* Section B, *infra*,[19] the Order will increase costs for care in the short term. For example, a California study of pregnancy outcomes among undocumented women found that those who did not receive prenatal care had 147% higher postnatal care costs compared to those with at least one prenatal visit.[20] In 2021, the average postpartum care cost per pregnancy in Washington was $518 ($600 in 2024 dollars).[21] If as few as 25% of the 35,910 projected births in Washington to undocumented immigrant parents forego prenatal care due to fears of immigration

---

[18] Wash. Rev. Code § 70.170.060(1).

[19] *See also*, *e.g.*, Rushina Cholera, et al., *Health Care Use Among Latinx Children After 2017 Executive Actions on Immigration*, 147 Pediatrics e20200272 (2021), https://pubmed.ncbi.nlm.nih.gov/33097659/ (finding that after the 2017 executive orders on immigration, outpatient appointment cancellations among uninsured Latino children in North Carolina rose by 2.4% per week, peaking at 33.3% by the end of the study period), Stephanie Ettinger de Cuba, et al., *Reduced health care utilization among young children of immigrants after Donald Trump's election and proposed public charge rule*, 1(2) Health Affairs Scholar, 1-9 (2023), https://academic.oup.com/healthaffairsscholar/article/1/2/qxad023/7206916?utm_source=chatgpt.com&login=false.

[20] M.C. Lu, et al., *Elimination of public funding of prenatal care for undocumented immigrant in California: a cost/benefit analysis*, 182 Am. J. Obstetric Gynecology 233-9 (Jan. 2000) https://pubmed.ncbi.nlm.nih.gov/10649184/.

[21] Dicentra Consulting, *Maternal Health in Washington State, 2010-2022*, Washington Office of Financial Management (2025), https://ofm.wa.gov/sites/default/files/public/dataresearch/healthcare/utilization_quality/maternal_health_WA_state.pdf.

enforcement, this could result in an additional $7.9 million (in 2024 dollars) in postpartum care costs. As healthcare costs increase due to lack of preventative care,[22] and State costs rise, costs to insurers and paying patients will rise as well in order to compensate for the increased costs of higher-acuity care, and increased costs borne by hospitals for uncompensated charity care. The impact will be felt by everyone, not just undocumented persons.

### 2. The Executive Order will increase administrative costs for healthcare providers.

Should the Executive Order become effective, the Order will simultaneously force providers to incur increased administrative costs while losing critical federal funding. First, the Executive Order will significantly expand providers' roles in the birth documentation process, which will be costly and difficult to implement. Second, the necessary changes to healthcare coverage programs, as described above, will lead to additional costs to an already burdened system.

Doctors and hospitals play a vital role in certifying the births of U.S. citizens. Birthright citizenship alleviates some of the burden of documenting a newborn's citizenship. Eliminating birthright citizenship would introduce several new variables into the existing processes used to certify births.

---

[22] *See* III.B.1, *infra* 17-20.

In the vast majority of cases, a baby is born in a hospital, where hospital staff transmit information required by both State and Federal governments to the state agency responsible for collecting vital statistics.[23] In Washington, that agency is the Washington Department of Health (DOH).[24] That agency then reports relevant data to the federal government, maintains it for its own tracking purposes, and issues birth certificates, which do not collect parental immigration or citizenship information.[25] In Washington, birth facilities are required to register a birth to the State Department of Health within ten days of the birth.[26]

Washington uses the Washington Health and Life Events System (WHALES) for data entry related to birth certifications.[27] The system and the included fields must be updated each time the data to be collected changes.[28] If the Executive Order goes into effect, updates to the system will be required.

Beyond costs to the state to update technology, if the Executive Order is implemented there will be monetary and opportunity costs of training hospital staff to collect and interpret immigration data. If birthright citizenship is eliminated, it

---

[23] Angela R. Remus, *Caught Between Sovereigns: Federal Agencies, States, and Birthright Citizens*, 34 Stan. L. Rev. 225, 232 (2023).
[24] *See generally* 1-SER-171–75.
[25] *Id*. at ¶ 4–6.
[26] Wash. Rev. Code § 70.58A.100.
[27] 1-SER-172 ¶ 8.
[28] *See generally* Wash. Dept. Health, *Birth Data File Technical Notes* (2024), https://doh.wa.gov/sites/default/files/2024-11/422-160-BirthDataFileTechnicalNotes.pdf.

may fall to the hospital to validate the citizenship status of every patient. Hospital staff could be required to ask patients, even those with generations of U.S. citizenship in their families, to provide proof of their citizenship. Pregnancy and childbirth are intense experiences and childbirth often happens suddenly. Expecting every parent to bring their birth certificate or passport to the hospital is untenable.

Moreover, Washington is already experiencing a shortfall of more than 13,000 registered nurses.[29] Adding new documentation and reporting requirements for hospitals would further burden already understaffed medical professionals with the responsibility of learning and reporting new requirements.[30]

The process is further complicated by the fact that, depending on the citizenship status of the father, a child born to an undocumented person may or may not be eligible for U.S. citizenship under the Executive Order. When the father is not known or not available for citizenship verification, the process would be increasingly complicated, placing some babies in limbo with respect to legal status. Likewise, enrollment of newborns in Medicaid and CHIP will no longer be straightforward. Currently, all newborns are citizens, and the only necessary checks for Medicaid and

---

[29] Wash. State Inst. for Pub. Pol'y, *Hospital Staffing Plans in Washington State* (2024) https://www.wsipp.wa.gov/ReportFile/1795/Wsipp_Hospital-Staffing-Plans-in-Washington-State_Report.pdf at 2.
[30] Indeed, for children born abroad to U.S. citizen parents, there is a $1,335 fee to verify citizenship, which reflects the fact that assessing a child's citizenship is an arduous and expensive process. USCIS, Form N-600, Instructions, OMB No. 1615-0057, at 1–2; USCIS, Form G-1055, Fee Schedule.

CHIP eligibility are family size and income level. With the Executive Order in place, a manual verification system for the newborn's citizenship status will need to be implemented to determine eligibility for federally-funded healthcare coverage. While the baby remains in this legal limbo, hospitals and doctors will end up providing care to the baby, often uncompensated, regardless of citizenship status.

Recent experience also confirms that hospitals incur significant administrative costs whenever expanding existing systems. For instance, Washington has recently made multiple policy changes, updating and expanding requirements for hospitals to provide free and discounted care to patients. These updates required significant administrative changes from hospitals, including updates to public-facing charity care policies, changed procedures for patient check-in, screening procedures for financial assistance eligibility, updated application forms and informational materials, and updates to employee training. All of these changes came at significant cost, and administrative effort, taxing an already strained healthcare system. Similar administrative costs and burdens are likely to apply if the Executive Order goes into effect.

Likewise, in 2007, Washington State passed Senate Bill 5093 ("SB 5093"), which expanded Apple Health for Kids eligibility for children and formally recognized Apple Health as an entitlement for non-citizen and undocumented

children.[31] The Bill came with significant administrative costs related to outreach, eligibility processing, and managing increased enrollment. With a target of enrolling 54,400 additional children by June 2010, the estimated fiscal impact for the 2007–2009 biennium included: $6.6 million in general fund state (GFS) for outreach and education efforts, $470,000 GFS for workload increases, $4.4 million GFS for increased CHP caseload growth, and $21.1 million GFS for increased Medicaid and CHIP caseload growth.[32] Based on SB 5093, where the average administrative cost per new enrollee was $217 (or $328 in 2024 dollars), if Washington enrolls 40,659 additional children in CHP by 2035 at a similar cost, total administrative spending could exceed $13.3 million in 2024 dollars over the next decade.

The administrative burdens inherent in the Executive Order would add to this recent strain. It could require hospitals to update Electronic Health Records ("EHRs") to accommodate the new data collection requirements. Each modification to these electronic records systems could cost hospitals $5,000-$20,000 depending on the complexity of the build.[33] Companies that administer EHRs may not have the ability to make updates, and would have to pay programmers to build work-arounds in the software, which is also burdensome and costly.

---

[31] *Id.*
[32] Office of Financial Management, *Multiple Agency Fiscal Note Summary*, https://fnspublic.ofm.wa.gov/FNSPublicSearch/GetPDF?packageID=17151
[33] David Pumphrey, *Decoding EMR Software Costs: What's the Real Price?* (Dec. 26, 2024) https://riveraxe.com/emr-software-cost/.

Hospitals and providers will also need to update training with respect to any changes the state makes to ProviderOne, Washington's Medicaid Management Information System (MMIS). Providers use MMIS to manage Medicaid-related services, including submitting claims and verifying patient eligibility—which is coded for current eligibility guidelines. Providers will need to update procedures and training to account for inevitable changes to codes in ProviderOne that determine a patient's coverage and funding source. Washington hospitals, therefore, will incur significant administrative costs to adopt the additional work the Executive Order will thrust upon them and will likely have to absorb these increased administrative costs without State funding assistance.

Washington hospitals are already in significant financial distress, requiring reductions in services or even the closure of entire units. Further financial hits will imperil access to all types of care for entire communities. Currently, approximately 80 of Washington's 102 licensed hospitals are experiencing negative operating margins. Washington state hospitals lost over $4.5 billion from operations over the period 2020-2024 and these operating losses are continuing in 2025. Labor and delivery services are often among those that must be cut to balance budgets because they are very expensive to operate, requiring staff capable of delivering a baby to be on call 24 hours a day, seven days a week regardless of the volume of deliveries. Over the past two years one labor and delivery unit has permanently closed, and two

others have closed but managed to reopen. Increased costs pressures are causing reductions in other services as well.

**B.    The Executive Order Will Deter Noncitizen Immigrants from Accessing Health Care, Placing Greater Burdens on Hospitals and Doctors**

Lifting the preliminary injunction on the Executive Order will preclude more people from accessing preventive and timely health care.  The result is worse health outcomes that burden hospital resources and health care professionals, and add to the cost burdens of running hospitals and medical facilities. Worse health outcomes are particularly dangerous for babies and pregnant women. Good prenatal, birth, postnatal, and early infancy health care are essential for the rest of a baby's life.

**1.    The Executive Order will negatively impact hospitals and the people they serve.**

The Executive Order will create more barriers to health care access for patients. One example is in the context of prenatal and pregnancy-related care. Washington Medicaid currently covers income-qualified pregnant individuals regardless of citizenship, which is possible because the unborn children are deemed covered at conception and are therefore eligible for CHIP from conception through birth.[34] If the Executive Order is implemented, and children of those who are not

---

[34] 1-SER-152 ¶ 15.

17

citizens or permanent residents are no longer eligible for U.S. citizenship, Washington will lose the federal funds it receives for prenatal care coverage.[35]

Lack of prenatal care can have devastating impacts on babies and mothers, and incurs long-term costs. A study published in the American Journal of Obstetrics and Gynecology examining the impact of public funding for prenatal care for undocumented immigrants found that of undocumented women in California, nearly 10% received no prenatal care.[36] These women were four times more likely to deliver low birth-weight infants and over seven times more likely to have preterm births compared to those who received prenatal care.[37] Additionally, a retrospective analysis of 28,729,765 deliveries in the United States over an eight-year period found that inadequate prenatal care was associated with significantly increased risks of adverse outcomes, including a 3.75-fold increase in prematurity, a 1.94-fold increase in stillbirth, a 2.03-fold increase in early neonatal death, a 1.67-fold increase in late neonatal death, and a 1.79-fold increase in overall infant mortality.[38]

---

[35] *See supra*, section III.A.1.

[36] Michael C. Lu, et al., *Elimination of public funding of prenatal care for undocumented immigrants in California: A cost/benefit analysis*, Jan. 2000, https://www.sciencedirect.com/science/article/abs/pii/S0002937800705187

[37] *Id.*

[38] Sarah Partridge, et al., *Inadequate Prenatal Care Utilization and Risks of Infant Mortality and Poor Birth Outcome: A Retrospective Analysis of 28,729,765 U.S. Deliveries over 8 Years*, July 2012, https://www.researchgate.net/publication/230573498_Inadequate_Prenatal_Care_

Moreover, lack of pregnancy-related care leads to increases in miscarriages, gestational diabetes, excessive bleeding, fetal distress during birth, postpartum depression, unplanned caesarean sections, and avoidable hospitalizations and emergency department visits.[39]   These consequences are consistent with the experience of Amici.[40]

All of these complications for pregnant mothers and newborns drive financial losses for hospitals. Poor prenatal care and the associated birth complications escalate costs of Neonatal Intensive Care Unit ("NICU") care, a significant cost burden for healthcare systems. Every dollar spent on prenatal care avoids at least

---

Utilization_and_Risks_of_Infant_Mortality_and_Poor_Birth_Outcome_A_Retrosp ective_Analysis_of_28729765_US_Deliveries_over_8_Years.

[39] *See* National Partnership for Women & Families, *A Systemic Failure: Immigrant Moms and Babies are Being Denied Health Care*, May 2021, https://nationalpartnership.org/report/immigrant-moms-and-babies-denied/.

[40] Chief Executive Officer of EvergreenHealth (a WSHA member that operates two acute care hospitals in Washington), Ettorre Palazzo, has reported that there are serious downstream consequences and long-term medical harm that could impact patients, including delated treatment and life-threatening complications from untreated, preventable conditions. In turn, hospitals will see increased, costly, emergency department visits, and long-term mortality and disability for patients who could have remained healthy if they had access to timely appropriate treatment. Likewise, Dr. Rose Bissonnette, an obstetrician gynecologist at Olympic Health Center in Port Angeles, WA,  reports significant health care harm to women concerned about immigration enforcement or stigmatization, as they often are only seen once their medical concerns become an emergency, which increases costs and leads to worse healthcare outcomes.

four dollars in neonatal intensive care services for low-birth-weight or premature babies.[41]

Well visits and pediatric care, access to which is negatively affected by immigration policies like the Executive Order,[42] are also essential for long-term health. Young families make many visits to primary or pediatric care in the baby's early months of life. Cardiac or lung issues, metabolic issues, challenges with feeding, and risks of sudden infant death and many other health concerns are all examined and addressed in immediate post-partum care. Unaddressed, these health issues can lead to lifelong problems, disability, or death. Expansion of enrollment for children in public health insurance programs has been associated with positive health outcomes and reduced preventable instances of expensive medical care, including reduced infant and child mortality, improved birth weight, and reduced preventable hospitalizations during childhood.[43] Childhood vaccinations alone can save $5-$11 for every $1 invested.[44] Further, access to preventative care through

---

[41] Ron J. Anderson, MD, *Virtual Mentor: Why We Should Care for the Undocumented*, 10 Am. Med. Ass'n J. of Ethics 4: 247 (2008).

[42] *See* III.B.2, *infra* at 21 *et seq.*

[43] Julia Rosenberg, *Insurance and Health Care Outcomes in Regions Where Undocumented Children Are Medicaid-Eligible*, 150 Pediatrics at 2 (Sept. 2022).

[44] Academy Health, *Return on Investment of Public Health System Funding* (June 2018) at 2, https://academyhealth.org/sites/default/files/roi_public_health_spending_june2018.pdf.

Medicaid reduces the risks of long-term, expensive medical needs that doctors may be required to treat and hospitals may be required to cover out of their own funding.[45]

## 2. Effects of prior immigration policies exemplify the likely negative health outcomes of the Executive Order

Another example is the impact immigration policies have on immigrants' willingness to seek preventative and timely health care. The federal Immigration Act of 1990[46] changed the percentages of immigrants admitted to the United States, resulting in an influx of immigrants to boost the workforce and economy of the United States.[47] In response, many states proposed and/or implemented new immigration policies restricting immigrant access to public services. In California, voters passed Proposition 187, which prohibited undocumented immigrants from accessing any public services, including health care and education.[48] Studies on the impact of that Proposition found that immigrants feared obtaining medical care and

---

[45] KFF, *Data Note: Medicaid's Role in Providing Access to Preventive Care for Adults* (May 2017), https://www.kff.org/medicaid/issue-brief/data-note-medicaids-role-in-providing-access-to-preventive-care-for-adults/#:~:text=Preventive%20care%20can%20reduce%20disease,$75%20billion%20in%20Medicaid%20costs).

[46] Pub. L. 101-649, amending 8 U.S.C. ch. 12 § 1101 *et seq.*

[47] Jean Edward, *Undocumented Immigrants and Access to Health Care: Making a Case for Policy Reform*, (May 6, 2014), https://journals.sagepub.com/doi/abs/10.1177/1527154414532694.

[48] *Id.*

delayed or discontinued care as a result.[49] A study performed in San Francisco County demonstrated a substantial decrease in the use of outpatient mental health services by young Hispanics following the passage of the proposition.[50]

Physician groups grew concerned that legislation requiring physicians to report undocumented immigrants to immigration authorities would delay curative care, particularly for patients with tuberculosis ("TB"). A study published in the Western Journal of Medicine showed that 47% of those who cited fear of immigration authorities delayed care more than 60 days from the onset of TB symptoms, as compared to 18% of those who did not share the same fear.[51] Because each patient potentially exposed an average of ten contacts to TB during the course of delaying care, such an increase would spread TB widely, well beyond just those who delayed care.[52] Currently, this could expose more people to infectious diseases such as measles or whooping cough, which have been on the rise.

---

[49] Karen Hacker, et al., *The impact of Immigration and Customs Enforcement on immigrant health: Perceptions of immigrants in Everett, Massachusetts, USA* 74(4) Social Science & Medicine 586, (Aug. 2011), https://www.sciencedirect.com/science/article/abs/pii/S0277953611003522?via%3Dihub.

[50] Joshua J. Fenton, *Effect of Proposition 187 on Mental Health Service Use in California: A Case Study* (1996), https://www.healthaffairs.org/doi/10.1377/hlthaff.15.1.182

[51] S. Asch, et al., *Does fear of immigration authorities deter tuberculosis patients from seeking care?* 161(4) West J. Med. 373-6 (Oct. 1994), https://pmc.ncbi.nlm.nih.gov/articles/PMC1022616/?page=1.

[52] *Id.*

Even when restrictive immigration policies are implemented and then reversed, their chilling effects remain. For example, in 2019, new regulations broadened the scope of programs that the federal government could consider in determining whether an immigrant was a "public charge."[53] Under the public charge rule, the federal government could deny entry into the United States or deny legal permanent resident status to an individual who has become or is likely to become dependent on the federal government for subsistence.[54] The new regulations allowed the federal government to consider the use of health, nutrition, and housing programs, which had been previously excluded from the public charge determination.[55] That policy change increased fears among immigrant families about participating in programs and seeking services, including health coverage and care.[56] While very few people subject to public charge determinations were eligible for the public programs listed in the 2019 rule, it nonetheless had broad chilling effects on program participation across immigrant families. Fear and confusion about the

---

[53] Drishti Pillai and Samantha Artiga, *2022 Changes to the Public Charge Inadmissibility Rule and the Implications for Health Care* (May 5, 2022), https://www.kff.org/racial-equity-and-health-policy/issue-brief/2022-changes-to-the-public-charge-inadmissibility-rule-and-the-implications-for-health-care/.
[54] *Id.*
[55] *Id.*
[56] *Id.*

regulation led to individuals forgoing enrollment in or disenrolling themselves and their children from unrelated programs.[57]

These impacts have been long lasting. In 2022, the Biden Administration reversed the public charge policy changes, yet in 2023, close to 12% of adults in immigrant families continued to avoid critical safety net programs like Medicaid, Supplemental Nutrition Assistance Program, ("SNAP"), and housing assistance, fearing it could jeopardize their green card applications.[58] The chilling effect was especially pronounced in mixed-status families. In December 2023, the fear of jeopardizing their green card applications continued to disproportionately affect mixed-status families, with 24% of adults in mixed-status families avoiding public programs compared to 12% in green card and citizen families and 7% in all-citizen immigrant families.[59]

Washington doctors have seen the impact of these chilling effects firsthand. This fear precludes individuals from seeking critical care. As a result, hospitals will be required to cover necessary care for those people out of their own uncompensated funds.

---

[57] *Id.*

[58] Lucia Felix Beltran, et al., *Born into Uncertainty: The Health and Social Costs of Ending Birthright Citizenship*, (Feb. 12, 2025), https://latino.ucla.edu/wp-content/uploads/2025/02/UCLA-LPPI-Birthright-Costs-02132025.pdf.

[59] *Id.*

### 3. Noncitizen immigrants face several barriers to accessing health care.

The negative effects of past immigration policies on healthcare have exacerbated the existing barriers that immigrants, especially noncitizen immigrants, face in accessing healthcare. Noncitizen immigrants, especially those who are undocumented, are more likely than documented residents to report barriers to accessing health care, and more likely to postpone care or not access care at all.[60] Indeed, a 2023 survey conducted by KFF and the Los Angeles Times revealed that 38% of likely undocumented immigrants have no regular source of care other than emergency room care, compared to 18% of lawfully present immigrants and 12% of naturalized citizens.[61] The same survey showed that 31% of likely undocumented immigrants skipped or postponed care in the prior twelve months, compared to 23% of lawfully present immigrants, and 19% of naturalized citizens.[62] The reported barriers to accessing health care included national and state-level policies and individual barriers.[63]

---

[60] Drishti Pillai, et al., *Health and Health Care Experiences of Immigrants: The 2023 KFF/LA Times Survey of Immigrants*, (Sept. 17, 2023), https://www.kff.org/racial-equity-and-health-policy/issue-brief/health-and-health-care-experiences-of-immigrants-the-2023-kff-la-times-survey-of-immigrants/.
[61] *Id.*
[62] *Id.*
[63] Karen Hacker, et al., *Barriers to health care for undocumented immigrants: a literature review*, 8 Risk Mgmt. and Healthcare Pol'y 175-183 (Oct. 30, 2015), https://pmc.ncbi.nlm.nih.gov/articles/PMC4634824/.

National and state policies include limiting access to health insurance and the types of required documents to obtain health care services. Indeed, about seven in ten immigrant adults who skipped or postponed care report they did so due to cost or lack of health coverage.[64] Likewise, undocumented immigrants cannot obtain social security numbers and other forms of federally authorized identification, which are often required to access public health services and health insurance.[65] Some states, such as Florida and Texas, already require hospitals that receive Medicaid and CHIP funding to ask patients about their immigration status when seeking inpatient and emergency care. This requirement has caused delays in seeking care and increased psychological distress due to safety concerns and fear of family separation.[66] The need for documentation has spilled over to even those immigrants who are documented and has adversely affected authorized children of undocumented parents when those parents have not sought preventive care for their children because of the inability to provide documentation for themselves.[67]

---

[64] Pillai, *supra* note 60.
[65] Edward, *supra* note 47.
[66] Beltran, *supra* note 58.
[67] Hacker, *supra* note 63.

Individual barriers to accessing health care include fear of deportation, confusion about immigration laws, shame and stigma.[68] About three quarters of all immigrants, rising to nine in ten likely undocumented immigrants, say they are not sure whether use of public assistance for food, housing, or health care can affect an immigrant's ability to get a green card, or mistakenly believe that use of this assistance will negatively affect the ability to get a green card.[69] Undocumented immigrants report that they do not want to be a burden on the system or feel they will be stigmatized if they seek services.[70] Indeed, immigrants are less likely to access or utilize preventative health services, especially in the areas of cancer screening, vaccinations, and pediatric and prenatal care.[71] Even though the Executive Order has not taken effect, at least one doctor has noticed increased anxiety

---

[68] KFF, *Key Facts on Health Coverage of Immigrants* (Jan. 15, 2025), https://www.kff.org/racial-equity-and-health-policy/fact-sheet/key-facts-on-health-coverage-of-immigrants/.

[69] Shannon Schumacher, et al., *Understanding the U.S. Immigrant Experience: The 2023 KFF/LA Times Survey of Immigrants* (Sept. 17, 2023), https://www.kff.org/report-section/understanding-the-u-s-immigrant-experience-the-2023-kff-la-times-survey-of-immigrants-findings/; Alisha Rao, et al., *Key Facts on Health Care Use and Costs Among Immigrants* (Sept. 23, 2024), https://www.kff.org/racial-equity-and-health-policy/issue-brief/key-facts-on-health-care-use-and-costs-among-immigrants/.

[70] Hacker, *supra* note 63.

[71] Edward, *supra* note 47.

surrounding immigration enforcement that is generating fears of seeking hospital care.[72]

As a result of a lack of access to preventative care, immigrants are more likely to access emergency care instead, delaying early detection and prevention of illnesses. Emergency care is significantly more expensive than standard outpatient care. Indeed, the average cost of treating common primary care treatable conditions at a hospital emergency department is $2,032, which is 12 times higher than visiting a physician's office ($167) and 10 times higher than traveling to an urgent care center ($193) to treat those same conditions.[73] In other words, visiting either a physician's office or an urgent care facility instead of a hospital save an average of more than $1,800 per visit.[74]

---

[72] Chief Executive Officer of Othello Community Hospital (a WSHA member with a small critical access hospital in rural Washington), Connie Agenbroad, has reported that the Executive Order would impact a significant portion of their patients, putting a financial strain on the hospital and adding to medical debt for many of their patients. Further, she notes that her patients would likely avoid outpatient appointments, such as pediatric visits, well child visits, and routine vaccines due to fear and lack of insurance.

[73] UnitedHealth Group, *The High Cost of Avoidable Hospital Emergency Department Visits* (July 22, 2019), https://www.unitedhealthgroup.com/newsroom/posts/2019-07-22-high-cost-emergency-department-visits.html.

[74] *Id.*

Equally as important, postponed or foregone care can lead to preventable conditions, chronic diseases going undetected, and worsening conditions.[75] Almost one in ten immigrant adults (representing 40% of those who skipped or postponed care) say that their health got worse as a result of skipping or postponing care.[76] The share of immigrant adults reporting that their health worsened rises to 19% of uninsured immigrant adults and 14% of likely undocumented immigrant results.[77] Advances in the stages of the disease process that are undetected can pose serious threats to the health and well-being of the community as a whole while consequently increasing health care expenditures.[78] Again, these long-term care threats and consequences are particularly acute for newborn babies.

A prospective observational study of Medicaid/CHIP-eligible minority children compared outcomes at one-year among those who obtained coverage versus those who remained uninsured.[79] The study found that at one-year, uninsured children were significantly more likely than newly-insured children to report that: their health status was not excellent or very good (46% vs. 27%); they didp not have

---

[75] Pillai, *supra* note 60.

[76] *Id.*

[77] *Id.*

[78] Edward, *supra* note 47.

[79] Glenn Flores, et al., *The health and healthcare impact of providing insurance coverage to uninsured children: A prospective observational study* 17 BMC Pub. Health 553 (May 23, 2017), https://bmcpublichealth.biomedcentral.com/articles/10.1186/s12889-017-4363-z.

a primary care provider (68% vs. 18%); they had no usual source of preventative care (20% vs. 0.5%), they had no usual source of sick care (12% vs. 3%); and they delayed or did not get needed care (48% vs. 13%).[80] Lack of well-baby care in the early months and years can have lifelong impacts to the child and their family. In the same prospective study, costs at a one-year follow-up for uninsured children were significantly higher for most expenses compared with children who obtained health insurance. The costs of hospitalizations was $1,131.08 for uninsured children compared to $730.85 for insured children; wages and other costs related to parental missed work days was $522.79 for uninsured children compared to $126.20 for insured children; and the total costs were $5,154.63 for uninsured children and $2,268.88 for insured children.[81] The increased costs of hospitalizations for uninsured children reflected their decreased access to primary care providers, preventative services, and treatment for illnesses, coupled with greater unmet healthcare need, resulting in longer hospital stays or admissions with greater severity of illness. Because there will be more children not covered by Medicaid, these costs will be borne by CHP and hospitals. The Executive Order, in sum, will exacerbate the negative health impacts immigrants face and the resulting burdens to hospitals.

---

[80] *Id.*

[81] *Id.*

## IV.     CONCLUSION

The Executive Order poses a grave threat to the stability and effectiveness of not only Washington's healthcare system, but the country's healthcare system as a whole. By undermining the essential work of doctors, medical providers, and hospitals, it jeopardizes the well-being of patients and the ability of healthcare professionals to carry out their duties in accordance with established standards of care. The harm to public health and the erosion of the foundational principles of medical practice are both profound and irreparable. Amici respectfully urge this Court to affirm the District Court's injunction to prevent these detrimental effects from taking hold, ensuring that the health of the people of Washington and the integrity of its healthcare system are preserved.

DATED this 11th day of April, 2025.

PACIFICA LAW GROUP LLP

By: */s/ Paul J. Lawrence*
      Paul J. Lawrence, WSBA #13557
      Sarah E. Mack, WSBA #32853
      Meha Goyal, WSBA #56058
      PACIFICA LAW GROUP LLP
      1191 Second Avenue, Suite 2000
      Seattle, Washington 98101-3404
      Telephone: 206.245.1700
      Facsimile: 206.245.1750
      Paul.lawrence@pacificalawgroup.com
      Sarah.mack@pacificalawgroup.com
      Meha.goyal@pacificalawgroup.com
      *Attorneys for Amicus Curiae Washington State Hospital Association and Washington State Medical Association*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of April, 2025, I electronically filed the foregoing document with the Clerk of the Court of Appeals, Ninth Circuit using the PACER/ACMS system which sends notification of such filing to all parties who are registered with the PACER/ACMS system.

DATED this 11th day of April, 2025.

/s/ Gabriela DeGregorio
Gabriela DeGregorio, Legal Assistant
PACIFICA LAW GROUP LLP

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)**  | 25-807

I am the attorney or self-represented party.

**This brief contains** | 6,443 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [ ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | */s/ Paul J. Lawrence* | **Date** | 4/11/2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                        *Rev. 12/01/22*