No. 25-807

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATE OF WASHINGTON, et al.,

*Plaintiffs-Appellees*,

CHERLY NORALES CASTILLO and ALICIA
CHAVARRIA LOPEZ, on behalf of themselves as
individuals and others similarly situated,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court for the Western
District of Washington, Case No. 2:25-cv-00127-JCC
The Honorable John C. Coughenour

## BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS
## AND LOCAL GOVERNMENT OFFICIALS
## IN SUPPORT OF PLAINTIFFS-APPELLEES

Jonathan B. Miller
Elaine Poon
Katherine Courtney
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788

# TABLE OF CONTENTS

STATEMENT OF INTEREST ..............................................................1

SUMMARY OF ARGUMENT ............................................................2

ARGUMENT ...................................................................................4

I.   PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON
THE MERITS............................................................................4

    A.  The Order Violates the Citizenship Clause of the
Fourteenth Amendment...................................................4

    B.  The Order Violates the Immigration and Nationality
Act .................................................................................5

II.  A NATIONWIDE INJUNCTION IS NECESSARY TO
PROTECT THE PUBLIC INTEREST..........................................6

    A.  Citizenship Stripping Will Reduce Resident Eligibility
for Critical Public Services, Threatening Public Health
and Increasing Poverty ...................................................7

        1.  The Order Will Deny Citizenship to a Large
Number of *Amici*'s Residents ............................7

        2.  Citizenship Stripping Will Result in Lost Access to
Social Safety Nets for Children and Will Have
Severe Ripple Effects, Including Increased Illness
and Poverty ...........................................................9

            i.  Citizenship Stripping Will Lead to Declines in
Insurance Rates and Access to Health Care .............10

            ii.  Citizenship Stripping Will Limit the Reach of
Childhood Nutrition Programs ...................................13

            iii.  Federal Funding for Schooling-Related
Services and Foster Care Will Decrease ..................14

            iv.  By Reducing Eligibility for Federally Funded
Programs, the Order will Strain Local Safety-
Net Services...............................................................15

i

3.  Citizen Stripping Will Harm Non-Citizen Children and Localities for Years to Come ....................................16

B.  The Order Will Upend Established Practices of Using Birth Certificates to Demonstrate Citizenship, Jeopardizing Access to Public Benefits, Passports, and Other Privileges for Citizens ....................................19

C.  Local Governments Will Be Required to Adopt New Procedures for Verifying Citizenship and May Be Required to Overhaul Birth Certificate Issuance ..................23

III. NATIONWIDE RELIEF IS ESSENTIAL TO ENSURE UNIFORMITY IN CITIZENSHIP ELIGIBILITY AND PREVENT HARM ACROSS THE NATION ...........................24

CONCLUSION ....................................................................26

APPENDIX A – List of *Amici Curiae* ................................31

# TABLE OF AUTHORITIES

**CASES**

*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021) ............................................................26

*George v. McDonough,*
  596 U.S. 740 (2022) ..........................................................................6

*Hawaii v. Trump,*
  878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds and*
  *remanded,* 585 U.S. 667 (2018) ......................................................27

*I.N.S. v. Rios-Pineda,*
  471 U.S. 444 (1985) ............................................................................5

*Mariko v. Holder,*
  632 F.3d 1 (1st Cir. 2011) ................................................................5

*Plyler v. Doe,*
  457 U.S. 202 (1982) ..........................................................................18

*Schneiderman v. United States,*
  320 U.S. 118 (1943) ..........................................................................17

*United States v. Wong Kim Ark,*
  169 U.S. 649 (1898) .......................................................................4, 5

**STATUTES**

42 U.S.C. § 1396b(x)(3)(C) .................................................................22

42 U.S.C. § 18032(f)(3) .......................................................................11

8 U.S.C. § 1159(a) .................................................................................8

8 U.S.C. § 1159(b) .................................................................................8

8 U.S.C. § 1401(a) .................................................................................6

8 U.S.C. § 1611(a) ..........................................................................10, 11

8 U.S.C. § 1611(c)(1)(B) ...................................................................10

8. U.S.C. § 1641 .................................................................................16

8 U.S.C. § 1641(b) .............................................................................10

CAL. WELF & INST. CODE § 14007.8 ................................................17


**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. XIV, § 1 ...............................................................4


**REGULATIONS**

7 C.F.R. § 273.2(f)(1)(vii)...................................................................21

7 C.F.R. § 273.11(c)(3) .......................................................................14

20 C.F.R. § 51.42(a)............................................................................22

22 C.F.R. § 51.42 ...............................................................................22

34 C.F.R. § 300.154(d) .......................................................................15

42 C.F.R. § 435.306 ............................................................................11

42 C.F.R. § 457.320 ............................................................................11

## OTHER AUTHORITIES

Airin Martinez, *Household fear of deportation in relation to chronic stressors and salivary proinflammatory cytokines in Mexican-origin families post-SB 1070*, 5 SSM Population Health 188, 188-200 (2018) ............................................................19

Anna Gassman-Pines & Laura Bellows, *Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing*, 55 Am. Educ. Rsch. J., 897, 897-927 (2018) ........14

Brookings Institute, *Visa Outlook Explorer*........................................20

Center for Disease Control, *U.S. Standard Certificate Of Live Birth,* Nov. 2023................................................................................22

Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)*, Nov. 24, 2025 ................................................................................14

Department of Homeland Security, *Statement from DHS Spokesperson on Directives Expanding Law Enforcement and Ending Abuse of Humanitarian Parole*, Jan. 21, 2025 ............13

George Washington, *Farewell Address to the People of the United States* (Sept. 19, 1796)............................................................3

Holly A. Hill et al., *Vaccination Coverage by Age 24 Months Among Children Born in 2017 and 2018 - National Immunization Survey-Child, United States, 2018-2020*, 70 Morb Mortal Wkly Rep., 1435, 1435-1440 (2021)........................12

Jacob Hamburger, *The Consequences of Ending Birthright Citizenship* Wash. U. L. Rev. (forthcoming 2025) ........................25

Jean C. Williams, "*It's Always with You, that You're Different*": *Undocumented Students and Social Exclusion*, 20 *J. of Poverty*, 168, 168–193 (2015)............................................................19

John Creamer, United States Census Bureau, *Government Assistance Lifts 45.4 Million Out of Poverty in 2021*, Sept. 13, 2022........................................................................................16

Kaiser Family Foundation, *Key Facts on Health Coverage of Immigrants*, Jan. 15, 2025 ...............................................................11

Latino Policy and Politics Institute, Univ. of Cal., Los Angeles, *Born Into Uncertainty: The Health and Social Costs of Ending Birthright Citizenship,* Feb. 12, 2025 ...................................13

Lisa A. Gennetian et al., *Supplemental nutrition assistance program (SNAP) benefit cycles and student disciplinary infractions*, 90 Social Service Rev., 403, 403-433 (2016) ..............14

Mark D. Piehl et al., *Narrowing the gap: decreasing emergency department use by children enrolled in the Medicaid program by improving access to primary care,* 154 Archives Pediatrics Adolescent Med. 791, 791-95 (2000).............................12

National Association of Counties, *Policy Brief: Supplemental Nutrition Assistance Program (SNAP) Reauthorization and Appropriations,* Feb. 13, 2025 ........................................................24

National Immigration Law Center, *Drivers Licenses* ..........................18

Office of the Texas Governor, *Governor Abbott Issues Executive Order Requiring Texas Hospitals to Collect, Report Healthcare Costs for Illegal Immigrants*, Aug. 8, 2024................................................................................................13

Patricia Gándara et al., *The Impact of a Broken Immigration System on U.S. Students and Schools,* Latino Policy & Politics Institute, Univ. Of Cal., Los Angeles, 2023 .......................15

Paul J. Chung et al., *Preventive care for children in the United States: quality and barriers*, 27 Ann. Rev. Public Health 491, 491-515 (2006).................................................................11

Pew Research Center, *What We Know About the H1-B Visa Program*. Mar. 4, 2025.....................................................................8

Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times, Mar. 10, 2025 .....................................................................12

Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57 Am. Behavioral Scientist, 1174, 1174-1199 (2013) ...............................19

Romina Tome et al., *Heightened immigration enforcement impacts US citizens' birth outcomes: Evidence from early ICE interventions in North Carolina*, 16 PLoS ONE (2021)..........13

Steven Carlson, Center on Budget and Policy Priorities, *SNAP is Linked with Improved Health Outcomes and Lower Health Care Costs*, Dec. 14, 2022 ............................................................14

United States Citizenship and Immigration Services, *H-1B Specialty Occupations* ......................................................................8

## STATEMENT OF INTEREST

*Amici* are local governments and local government officials representing 97 jurisdictions across 24 states.[1] *Amici* write in strong support of upholding the preliminary injunction issued by the district court. President Trump's January 2025 Executive Order "Protecting the Meaning and Value of American Citizenship" ("Order" or "Citizenship Stripping Order") plainly violates the Citizenship Clause of the Fourteenth Amendment, violates the Immigration and Nationality Act, and would cause immense harm across the nation if allowed to go into effect.

*Amici* write separately because local governments will face immediate and long-term irreparable harm if the Order goes into effect that overlaps with, yet is distinct from, the harm that will be felt by individuals, states, and organizations. By depriving substantial numbers of children born in the United States of citizenship, the Order will deny those children access to numerous federally funded public benefits. The Order will also upend the process for determining eligibility for such benefits even for children who *do* qualify for birthright citizenship because traditionally issued birth certificates will no longer serve as definitive evidence of citizenship. Local governments will be forced to confront the downstream harms that will flow from depriving community members of essential health and welfare benefits and educational services, including spikes in poverty, disease, and crime.

---

[1] No party or party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparation or submission of this brief. A list of all *amici* is provided at Appendix A. Pursuant to Fed. R. App. P. 29(a)(2), all parties have consented to the filing of this brief.

Local governments will also be on the frontlines of managing the administrative confusion that the Order will cause and will very likely need to invest in new systems to ascertain the citizenship of children born in their local hospitals and within city or county lines. To prevent these harms and for the additional reasons provided in this brief, *Amici* Local Governments and Government Officials urge this Court to affirm the district court's injunction.

## SUMMARY OF ARGUMENT

The bedrock understanding that children born in the United States are U.S. citizens, subject to very limited exceptions, is reflected in our communities. Children born on our soil attend our schools. When they are sick, they obtain services through local health providers. If they are neglected and abused, our child protective services step forward to help them. When they are victims of a crime, they are entitled to the full panoply of victim rights afforded to any resident. Likewise, if they commit a crime, they are "subject to the jurisdiction" of our state and federal laws and can be punished just like any other member of our community.

As they grow older, those who are Americans by virtue of birth serve our Nation, and our communities, with distinction. They serve in our military and shed blood for our country. They are our frontline workers, medical providers, and law enforcement personnel. They start businesses, teach schoolchildren, and contribute to our local and national economies. They become leaders in our communities, across a variety of sectors. And when they have their own children, they pass these American values on to the next generation. Like all "citizens by birth or choice,"

those born on American soil "concentrate [their] affections" in America.[2] The Citizenship Stripping Order thus stands at odds not just with the Fourteenth Amendment's guarantee of birthright citizenship but with our American values. It rejects the contributions of "citizens by birth," who have helped to build—and defend—our Nation and our local communities.

At the local level, the Order would undercut our social fabric and cohesion by creating a permanent class of people with unequal rights, subjecting those residents to stigma and discrimination and undermining their sense of belonging. If allowed to go into effect, the Order would cause residents to be restricted from full participation in the community. Infants who, but for the Order, would be U.S. citizens would become ineligible for federally funded benefits programs, including nutrition assistance and health care, putting their health and safety at risk. They will grow up under the specter of deportation, and as adults, they will be unable to vote, serve on juries, receive federal financial aid for higher education, work certain jobs, or run for office. These direct effects will cause broader harms, including to local economies, education rates, and public health outcomes. For these reasons, *Amici* join the Appellees in this case in respectfully requesting that this Court uphold the district court's preliminary injunction in full.

---

[2] George Washington, *Farewell Address to the People of the United States* (Sept. 19, 1796).

## ARGUMENT

### I.  PLAINTIFFS ARE HIGHLY LIKELY TO SUCCEED ON THE MERITS

The Citizenship Stripping Order is a flagrant attack on a pillar of American law and an attempt by the Executive Branch to rewrite the Constitution as well as federal statute. It contradicts the plain text of the Fourteenth Amendment and the Immigration and Nationality Act. The Order also runs headlong into the Supreme Court's decision over a century ago in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), rejecting categorically the proposition that the citizenship of children born in the United States depends on their parents' immigration status.

### A.    The Order Violates the Citizenship Clause of the Fourteenth Amendment

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1. The Citizenship Clause "affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including *all children* here born of resident aliens […]," subject to only very narrow exceptions. *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). That inescapable conclusion has been affirmed by the Supreme Court and lower courts in the more than 125 years since the decision in *Wong Kim Ark*. *See, e.g.*, *I.N.S. v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting that

undocumented resident "had given birth to a child, who, born in the United States, was a citizen of this country"); *Mariko v. Holder*, 632 F.3d 1, 8 n.4 (1st Cir. 2011) ("Because [the child] was born in the United States, she—unlike her parents—is a United States citizen.").

Appellants argue that the phrase "subject to the jurisdiction thereof" significantly limits the Constitutional grant of birthright citizenship. This argument has no basis in the text of the Fourteenth Amendment, lacks historical support, and conflicts with binding Supreme Court precedent. Apart from narrow exceptions, the Court affirmed that "the amendment in clear words and in manifest intent, includes the children born within the territory of the United States of *all other persons*, of whatever race or color, domiciled within the United States." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Appellants' attempt to import "domicile" and "allegiance" requirements onto the *parents* of children born in the United States is thus at odds with the Supreme Court's holding and reasoning in *Wong Kim Ark* and ignores the plain language of the Fourteenth Amendment.

### B.    The Order Violates the Immigration and Nationality Act

The Plaintiffs are also likely to succeed on their independent claim that the Order violates the statutory grant of birthright citizenship in section 1401(a) of the Immigration and Nationality Act, which provides for birthright citizenship for persons "born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). By adopting the verbatim language of the Fourteenth Amendment,

5

Congress enshrined the contemporaneous meaning of birthright citizenship into federal immigration law. *See George v. McDonough*, 596 U.S. 740, 746 (2022) (explaining that when Congress adopts language "obviously transplanted from another legal source it brings the old soil with it." (citation omitted) (cleaned up)). Accordingly, in adopting section 1401, Congress imported the Supreme Court's authoritative interpretation of the Citizenship Clause in *Wong Kim Ark* into the statutory meaning, which was universally accepted at the time. Accordingly, for the same reasons Appellees are likely to succeed on their Constitutional claim, so too are they likely to succeed on their statutory claim.

## II.   A NATIONWIDE INJUNCTION IS NECESSARY TO PROTECT THE PUBLIC INTEREST

The district court correctly held that the public interest weighs strongly in favor of entering an injunction. By denying citizenship to thousands of children, the Citizenship Stripping Order will simultaneously render those children ineligible for the benefits and privileges that attach to citizenship, starting with federal health and welfare benefits that are essential for low-income families. In fact, the Order will jeopardize access to those benefits even for citizen children, because a U.S. birth certificate will no longer serve as definitive proof of citizenship. Without injunctive relief, communities will experience severe and irreparable harm associated with being excluded from federal benefits, including declines in preventative health care, poor nutrition, and inaccessibility of school-related services for children with disabilities. Local governments like *amici* will be forced to shoulder the burden of

6

addressing these community-level harms in addition to being saddled with implementing new administrative processes for determining citizenship.

## A. Citizenship Stripping Will Reduce Resident Eligibility for Critical Public Services, Threatening Public Health and Increasing Poverty

### 1. The Order Will Deny Citizenship to a Large Number of *Amici*'s Residents

The broad scope of the Order must be emphasized in framing the immediate impacts that will be felt by local governments and the communities they serve if the injunction is lifted. Though the political rhetoric surrounding President Trump's issuance of the Citizenship Stripping Order has focused on children born to newly arrived, undocumented parents, the Order denies citizenship much more broadly to children born to parents who are neither citizens nor legal permanent residents. The Order applies to children born to parents who are present in the United States lawfully but whose status is "temporary," which includes immigrants present on long-term work and student visas and their family members. Many of these visa holders have been living in the United States for years and are themselves on a pathway to permanent residency.[3]

---

[3] For example, H1-B visas, known as specialized occupation visas, are initially valid for three years and extendable to six years, and H1-B visa holders can apply for legal permanent residency. *See* United States Citizenship and Immigration Services, *H-1B Specialty Occupations,* https://www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last visited Apr. 11, 2025). In 2024, the federal government approved approximately 400,000 H1-B visa applications, including new applications and renewals. *See* Pew Research Center, *What We Know About the H1-*

The Order is ambiguous as to its broader application,[4] but could also potentially deny citizenship to children born to Deferred Action for Childhood Arrivals (DACA) recipients who themselves came to the United States as young children and have resided here continuously since. The Order may also apply to children of residents who have been granted asylum or are awaiting an asylum determination, and to refugees, all of whom may apply for legal permanent residency after being in the United States for one year.[5]

Overall, the record in this case shows that an estimated 150,000 children born to undocumented parents alone will be rendered ineligible for citizenship under the Order each year. 1-SER-108-110, 120-144. The total number of children denied citizenship will be higher, as this estimate excludes children born to immigrants whose status is "lawful but temporary." 1-SER-112. The considerable number of children that would be excluded from birthright citizenship under the Order is especially salient because neither the Order nor current federal immigration law provide any alternative legal immigration status to any child denied birthright

---

*B Visa Program*, Mar. 4, 2025, https://www.pewresearch.org/short-reads/2025/03/04/what-we-know-about-the-us-h-1b-visa-program/.

[4] The Order specifically states that the mothers whose status is "lawful but temporary" includes immigrants who came to the U.S. on tourist, work, and student visas, and under the Visa Waiver Program. *See* Exec. Order No. 14160, § 1, 90 Fed. Reg. 8449 (Jan. 20, 2025). It is unclear if this category also includes DACA recipients, asylees, refugees, individuals who have received withholding of removal, and other temporary statuses.

[5] *See* 8 U.S.C. §§ 1159(a), (b) (providing for adjustment of status for refugees and asylees, respectively).

citizenship. If the district court's nationwide injunction is lifted, the immediate effect will be that these children would lack legal immigration status in the United States upon birth.[6] *Amici* local governments and their communities will experience manifold consequences from this far-reaching Order.

> **2.    Citizenship Stripping Will Result in Lost Access to Social Safety Nets for Children and Will Have Severe Ripple Effects, Including Increased Illness and Poverty**

In denying citizenship to thousands of children born in the United States, the Order will render those children ineligible for essential public services, severely impacting public health and community well-being immediately and for years to come. Numerous federally funded public benefits programs targeted at low-income families are available only to citizens and to limited categories of resident aliens. *See* 8 U.S.C. §§ 1611(a) ("an alien who is not a qualified alien…is not eligible for any Federal public benefit"), (c)(1)(B) (defining "Federal public benefit" as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit"). These public safety net programs include, to name just a few examples, nutrition assistance through the Supplemental Nutrition Assistance Program (SNAP), health insurance through Medicaid and the Children's Health Insurance Program (CHIP), income-support, job training, and tuition assistance through the Temporary

---

[6] Indeed, some of these children will be born stateless if both their parents are from a country that does not automatically grant citizenship to children born abroad.

Assistance for Needy Families (TANF) program, school-related services, and foster care support. While lawful permanent residents, refugees, and asylum recipients can be eligible for these benefits, individuals holding work and student visas are not "qualified" immigrants. 8 U.S.C. § 1641(b). Nor are individuals who lack any legal status. *Id.*

Accordingly, the Order would strip many children born on U.S. soil of benefits that are essential to preventing disease and enabling low-income families to attain economic stability, providing the foundation for these residents to thrive and contribute to our communities. In doing so, the Order will undermine individual and public health and community well-being. This harm will be irreparable. Even if ultimately the Order is held unconstitutional and blocked by the courts, allowing it to go into effect while litigation is ongoing will immediately and irreversibly harm young children, who, for example, may miss critical early-childhood vaccinations or whose families will be denied income support necessary to keep them safely housed.

### i.    Citizenship Stripping Will Lead to Declines in Insurance Rates and Access to Health Care

To start, children denied citizenship under the Order will have very limited health insurance options. They will be ineligible for publicly subsidized insurance through Medicaid or CHIP. *See* 8 U.S.C. § 1611(a); 42 C.F.R. § 435.306 (Medicaid); 42 C.F.R. § 457.320 (CHIP). These children and their families will also be ineligible to enroll in private insurance through health insurance marketplaces. 42 U.S.C. §

10

18032(f)(3). The limited options for health insurance for immigrants is evident from recent data: in 2023, 50% of undocumented immigrants and 18% of lawfully present immigrants were uninsured, compared to only 8% of U.S.-born citizens and 6% of naturalized citizens.[7]

Children without health insurance are much less likely to receive preventative care, including vaccinations, health screenings, and wellness visits, making them more vulnerable to preventable diseases.[8] A decline in preventative health care at the individual level increases public health risks in the broader community. Obtaining high vaccination rates, for example, is essential to preventing the spread of communicable diseases among children, yet uninsured children are less likely to receive vaccines than insured children. A recent study found uninsured children to be 9.2% to 37.8% less likely to receive certain vaccines, varying by vaccine type, and 3.3% of the uninsured children in the study had received *no* vaccinations.[9] Any increase in the rate of unvaccinated children would increase the risks of disease spread and even death from preventable childhood illnesses at the community level. Preventative health care also reduces hospitalizations and emergency department

---

[7] Kaiser Family Foundation, *Key Facts on Health Coverage of Immigrants*, Jan. 15, 2025, https://www.kff.org/racial-equity-and-health-policy/fact-sheet/key-facts-on-health-coverage-of-immigrants/.

[8] Paul J. Chung et al., *Preventive care for children in the United States: quality and barriers*, 27 Ann. Rev. Public Health 491, 491-515 (2006).

[9] Holly A. Hill et al., *Vaccination Coverage by Age 24 Months Among Children Born in 2017 and 2018 - National Immunization Survey-Child, United States, 2018-2020*, 70 Morb. Mortal. Wkly Rep., 1435, 1435-1440 (2021).

use, thus saving health care providers and the government money.[10]

Additionally, the Order will likely have a chilling effect on health care access for families with non-citizen children that *do* have health insurance because of increased fear of immigration enforcement. The Trump administration's prioritization of mass deportation has already led immigrant families to avoid even necessary outings,[11] and with federal immigration enforcement officials newly permitted to detain patients in hospitals,[12] families may choose to avoid any form of non-emergency healthcare.[13] The impact on health care access would likely be even

---

[10] *See, e.g.,* Mark D. Piehl et al., *Narrowing the gap: decreasing emergency department use by children enrolled in the Medicaid program by improving access to primary care*, 154 Archives Pediatrics Adolescent Med. 791, 791-95 (2000).

[11] Rebecca Davis O'Brien & Miriam Jordan, *A Chill Sets in for Undocumented Workers, and Those Who Hire Them*, N.Y. Times, Mar. 10, 2025, https://www.nytimes.com/2025/03/09/business/economy/immigrant-workers-deportation-fears.html.

[12] Department of Homeland Security, *Statement from DHS Spokesperson on Directives Expanding Law Enforcement and Ending Abuse of Humanitarian Parole*, Jan. 21, 2025, https://www.dhs.gov/news/2025/01/21/statement-dhs-spokesperson-directives-expanding-law-enforcement-and-ending-abuse.

[13] *See, e.g.*, Romina Tome et al., *Heightened immigration enforcement impacts US citizens' birth outcomes: Evidence from early ICE interventions in North Carolina*, 16 PLoS ONE (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7857575/ (2004 study finding increased immigration enforcement caused expectant mothers to seek prenatal care later and less frequently, negatively impacting newborn health outcomes); Latino Policy and Politics Institute, Univ. of Cal., Los Angeles, *Born Into Uncertainty: The Health and Social Costs of Ending Birthright Citizenship*, Feb. 12, 2025, https://latino.ucla.edu/wp-content/uploads/2025/02/UCLA-LPPI-Birthright-Costs-02132025.pdf (Public Charge Rule, which was later blocked by courts, led to a 12% drop in utilization of public safety net programs among immigrant families because of fear of jeopardizing green card applications.)

more acute in states like Texas, which since 2024 requires public hospitals to collect and report patient data on immigration status.[14]

## ii. Citizenship Stripping Will Limit the Reach of Childhood Nutrition Programs

In addition to increasing barriers to healthcare access, the Order will further undermine public health by reducing the number of families eligible for federal nutrition assistance benefits through the SNAP program. SNAP is considered "the nation's most important anti-hunger program." An average of 41 million people received benefits through SNAP each month in 2024.[15] Nutrition assistance is essential for young children and adults to thrive. Early-life nutrition provided through SNAP improves school performance: it is correlated with higher test scores and fewer disciplinary issues.[16] SNAP also has lifelong impacts: adults who received SNAP benefits as children have a lower risk of heart disease and obesity.[17] Critically,

---

[14] Office of the Texas Governor, *Governor Abbott Issues Executive Order Requiring Texas Hospitals to Collect, Report Healthcare Costs for Illegal Immigrants*, Aug. 8, 2024, https://gov.texas.gov/news/post/governor-abbott-issues-executive-order-requiring-texas-hospitals-to-collect-report-healthcare-costs-for-illegal-immigrants.

[15] Center on Budget and Policy Priorities, *Policy Basics: The Supplemental Nutrition Assistance Program (SNAP)*, Nov. 24, 2025, https://www.cbpp.org/research/food-assistance/the-supplemental-nutrition-assistance-program-snap.

[16] Anna Gassman-Pines & Laura Bellows, *Food Instability and Academic Achievement: A Quasi-Experiment Using SNAP Benefit Timing*, 55 Am. Educ. Rsch. J., 897, 897-927 (2018); Lisa A. Gennetian et al., *Supplemental nutrition assistance program (SNAP) benefit cycles and student disciplinary infractions*, 90 Social Service Rev., 403, 403-433 (2016).

[17] Steven Carlson, Center on Budget and Policy Priorities, *SNAP is Linked with Improved Health Outcomes and Lower Health Care Costs*, Dec. 14, 2022,

SNAP benefits are available to mixed-status families containing citizen children and non-citizen parents. *See* 7 C.F.R. § 273.11(c)(3) (requiring state agencies to determine eligibility of each household member). In these cases, stripping children of citizenship means parents will lose support for their children's nutritional needs, increasing the family's overall financial burden.

### iii. Federal Funding for Schooling-Related Services and Foster Care Will Decrease

The availability of other critical public services for children that are administered at the local level will also be impacted by the Order. Like other public benefits, federal funding for certain schooling-related services and for foster care is linked to immigration status. Federal law requires school districts to provide services to students with disabilities under the Individuals with Disabilities in Education Act, and partially reimburses districts for providing these services, but only for citizens and qualified immigrants. *See* 34 C.F.R. § 300.154(d) (federal reimbursement tied to child Medicaid eligibility). Under the Order, school districts would lose this funding for impacted students. Additionally, when policies hostile to immigrants are adopted, some parents choose not to send their children to school due to fear of deportation or other concern for their families.[18] When that happens, schools lose

---

https://www.cbpp.org/research/food-assistance/snap-is-linked-with-improved-health-outcomes-and-lower-health-care-costs.

[18] *See* Patricia Gándara et al., *The Impact of a Broken Immigration System on U.S. Students and Schools*, Latino Policy & Politics Institute, Univ. of Cal., Los Angeles,

attendance-based federal funding.

Similarly, many *amici* localities administer foster care programs that rely on federal Title IV-E funds, which again are only available for citizen and "qualified alien" children. *See* 8 U.S.C. § 1641. Reduced funding for these foster care programs will limit their effectiveness and the number of children they can serve. In both contexts, localities will have to bear the full financial burden of program operations if they are to continue to provide life-altering schooling-related and foster care services to all children that need them.

### iv. By Reducing Eligibility for Federally Funded Programs, the Order will Strain Local Safety-Net Services

Overall, federally funded public benefits help keep tens of millions of families out of poverty nationwide.[19] Denying children birthright citizenship under the Order and the attendant reduction in children eligible for public assistance will lead to spikes in hunger, poverty, and preventable disease across the nation. Even citizen children and families will face significant barriers to accessing the public services that they *are* eligible for because, as discussed below, *infra* Part II.C, regularly issued birth certificates will no longer suffice to demonstrate citizenship.

---

2023 (58% of surveyed educators reported observing increased absenteeism related to increased immigration enforcement).

[19] John Creamer, United States Census Bureau, *Government Assistance Lifts 45.4 Million Out of Poverty in 2021*, Sept. 13, 2022, https://www.census.gov/library/stories/2022/09/government-assistance-lifts-millions-out-of-poverty.html.

Inevitably it will be states, cities, and counties that are forced to deal with the downstream consequences of reduced federally funded health and welfare benefits to children and families. State and local governments already fund and provide services to people who are excluded from the federal safety net.[20] Yet, *amici* local governments do not have the resources to absorb the anticipated spike in demand that would follow implementation of the Order. In our federal system, counties and cities provide safety-net services to uninsured, low-income, and vulnerable populations. County governments generally run public hospitals, community health centers, and free health clinics. Cities, counties, and states collaborate to provide homelessness services. Local education departments provide resources to high-needs students in schools. And law enforcement officials address public safety issues that arise in correlation with increases in poverty. Upholding the district court's injunction strongly serves the public interest because it will prevent a flood of demand, and an inevitable strain, on these local services.

### 3.    Citizen Stripping Will Harm Non-Citizen Children and Localities for Years to Come

Stripping children born in the United States of citizenship will harm affected children and the localities they call home not just in the short-term, but for years to come. Children targeted by the Order will be excluded from the "priceless benefits"

---

[20] For example, in recent years California expanded Medi-Cal insurance coverage to all children and adults, irrespective of immigration status. *See* CAL. WELF & INST. CODE § 14007.8.

of citizenship. *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). Over forty years ago, the Supreme Court cautioned against the creation of "a permanent caste of undocumented resident aliens . . . denied the benefits that our society makes available to citizens and lawful residents." *Plyler v. Doe*, 457 U.S. 202, 218–19 (1982). In unilaterally seeking to rewrite the Constitution, the Order would do exactly that, leading to the creation of a permanent "underclass"—the existence of which will invariably fray "the fabric of our society." *Id.* at 219, 221.

In addition to the immediate impacts on health, nutrition, and economic security described above, the Order also creates the dire immediate possibility that a baby born to lawfully present parents would be at risk of deportation. The resulting family separation would inevitably wreak untold havoc on families and communities. For children who remain in the United States, the harm associated with being denied citizenship will compound as they become adults. They will be ineligible for a driver's license in 31 states.[21] If they plan to attend college, they will be forced to do so without access to federal student loans. When they enter the workforce, they will be ineligible to work for the federal government and may even be excluded from any lawful employment. They will be unable to vote in state or federal elections, run for higher office, or serve on juries. And all the while, they would face the threat of deportation, despite knowing no other home, the stress of

---

[21] National Immigration Law Center, *Drivers Licenses*, https://www.nilc.org/work/drivers-licenses/ (last visited Apr. 11, 2025).

which itself causes negative health outcomes.[22]

Children born as non-citizens will also experience stigma and social exclusion, undermining their ability to integrate into local communities. Although these children will, like their citizen peers, go to local schools, learn to speak English, internalize U.S. values, and envision their futures here, they will at the same time be excluded from core aspects of American life. Scholars have documented the severe negative impacts of social exclusion and discrimination on undocumented youth in the United States, including persistent feelings of fear, stress, and shame.[23] When residents experience social isolation and exclusion, local governments are left to deal with the associated consequences, like increased rates of crime and unemployment, and poor educational outcomes.

Not only will the Order have long-term and devastating impacts on children born in the United States as non-citizens, but it will also likely have the intended effect of deterring at least some immigrants. For example, the Order risks imposing a "brain drain" on localities that rely on international recruitment to thrive. Any international applicant considering a job offer or an acceptance to a university in the

---

[22] *See* Airin Martinez, *Household fear of deportation in relation to chronic stressors and salivary proinflammatory cytokines in Mexican-origin families post-SB 1070*, 5 SSM Population Health 188, 188-200 (2018).

[23] *See, e.g.*, Jean C. Williams, *"It's Always With You, that You're Different": Undocumented Students and Social Exclusion*, 20 J. of Poverty, 168, 168–193 (2015); Roberto G. Gonzales et al., *No Place to Belong: Contextualizing Concepts of Mental Health Among Undocumented Immigrant Youth in the United States*, 57 Am. Behavioral Scientist, 1174, 1199 (2013).

United States may rightfully be wary of moving, even temporarily, to a country where their child would be denied benefits and potentially face harm. Local economies are bolstered by robust, competitive universities and corporations that recruit and produce great talent. The Order undermines these recruitment efforts.

According to the Brookings Institute, "The U.S. is grappling with growing labor shortages across various industries [...] [i]mmigrant labor plays a pivotal role, stabilizing our workforce and driving economic growth." [24] Arizona, California, Florida, Georgia, Illinois, Massachusetts, New Jersey, New York, Texas, and Washington are all projected to have high demand for additional work visas to meet their market needs over the next several years. For example, Washington state is projected to require over 50,000 new international workers in Business and Finance and STEM fields by 2030.[25] The Order would make it more difficult to address these needs in the labor market.

### B. The Order Will Upend Established Practices of Using Birth Certificates to Demonstrate Citizenship, Jeopardizing Access to Public Benefits, Passports, and Other Privileges for Citizens

On a practical level, by limiting birthright citizenship, the Order will throw into disarray existing administration of public benefits programs, the provision of identity documents, and access to other privileges that requires proof of citizenship.

---

[24] Brookings Institute, *Visa Outlook Explorer* https://www.brookings.edu/articles/visa-outlook-explorer/ (last visited Apr. 11, 2025).

[25] *Id.*

Over the last 150 years, federal, state, and local governments have built an administrative structure centered around the accepted fact that birth in the United States is a guarantee of citizenship. The United States has no federal birth registry or national identification document granted at birth. Instead, states and local governments (often county health departments and recorders, in coordination with state agencies) register local births and issue birth certificates. In most cases, birth registry information for U.S. born citizens is automatically forwarded to federal agencies to generate social security numbers through the Enumeration at Birth Program. *See* 1-SER-172.

The system for administering federally funded public benefits, including the health and welfare benefits available to low-income families discussed above, *supra* Part II.A.2, relies on locally issued birth certificates to demonstrate citizenship and attendant eligibility. *See, e.g.*, 7 C.F.R. § 273.2(f)(1)(vii) (allowing birth certificates to prove identity for SNAP benefits); 42 U.S.C. § 1396b(x)(3)(C) (birth certificates may be submitted when documentary evidence of citizenship is required to prove Medicaid eligibility). Birth certificates are also a primary document that citizens must submit when applying for other identification documents, including passports, social security cards, and REAL-IDs. *See, e.g.*, 22 C.F.R. § 51.42 (a person born in the United States can submit a birth certificate as proof of citizenship for a passport application).

While the exact form and content of birth certificates, and the processes for their issuance, varies by locality, the federal government provides guidance to promote uniformity in collecting vital statistics and requires that birth certificates conform to certain criteria to be used for federal purposes. 1-SER-171. For example, federal regulations governing passport applications require that a birth certificate submitted in support of a passport application "show the full name of the applicant, the applicant's place and date of birth, the full name of the parent(s), and must be signed by the official custodian of birth records, bear the seal of the issuing office, and show a filing date within one year of the date of birth." 20 C.F.R. § 51.42(a). Conspicuously absent is any requirement that birth certificates include information about a newborn child's parents' immigration status.[26] Local agencies thus have no reason to, and do not, collect information about parents' immigration status as part of the routine process of issuing birth certificates. *See, e.g.*, 1-SER-171 ("Washington birth certificates do not collect parental immigration or citizenship information."); 1-SER-269 (In Illinois "[c]urrently, it is not possible to determine a foreign-born parents' immigration status from their child's birth certificate" and "[h]ealthcare facilities do not routinely ask patients, including new parents, for their immigration status."); 1-SER-275 ("Oregon birth certificates do not collect parental immigration or citizenship status information").

---

[26] *See also* Center for Disease Control, *U.S. Standard Certificate Of Live Birth,* Nov. 2023, https://www.cdc.gov/nchs/data/dvs/birth11-03final-acc.pdf.

Accordingly, if the Executive Order goes into effect, birth certificates as currently issued will no longer be adequate for demonstrating U.S. citizenship or, in turn, eligibility for federally funded public benefits and critical identity documents. Applicants for federal welfare benefits or passports would need to prove their parents' immigration status as a prerequisite to proving their own U.S. citizenship based on birthright. The effects of this administrative change will surely ripple much more broadly, as the use of birth certificates to demonstrate citizenship extends beyond these contexts.

If the Order goes into effect, states and localities will be left to grapple with the administrative consequences that follow. The federal government delegates the administration of most federally funded public benefits to the states, which in some cases delegate, in turn, to counties.[27] As the Appellee States explain in their answering brief, states will struggle to administer benefits programs under the Order, having no immediate means of demonstrating the eligibility of local applicants to the federal government. Appellee States Br. at 52; *see also* 1-SER-168 (describing likely necessity of reforming state processes for making eligibility determinations for federal foster care funding). Counties will face the same predicament. The

---

[27] For example, counties in 10 states are delegated responsibility for administering SNAP benefits, representing 34.3% of program participants. National Association of Counties, *Policy Brief: Supplemental Nutrition Assistance Program (SNAP) Reauthorization and Appropriations,* Feb. 13, 2025, https://www.naco.org/resources/supplemental-nutrition-assistance-program-snap-reauthorization-and-appropriations.

predictable result is that, at least initially, states and counties will be *unable* to prove their residents' eligibility for federally funded benefits programs and countless eligible citizens will be denied essential benefits.

The ramifications of denying newborns and young children health insurance, nutrition assistance, and educational benefits will be both immediate and dire. These consequences will unfold immediately in all corners of the country if the preliminary injunction is not upheld, starting with the first baby born on U.S. soil, whether to citizen parents or not, after the Order goes into effect. With nearly 10,000 babies born each day in the United States, the chaos that will ensue will rapidly snowball.

## C. Local Governments Will Be Required to Adopt New Procedures for Verifying Citizenship and May Be Required to Overhaul Birth Certificate Issuance

The Order provides no guidance, or even proposal, for how citizenship for children born in the United States will be confirmed—for any purpose—if it goes into effect. Whatever new bureaucratic systems are put into place, a substantial administrative burden will surely fall on states and local governments, as partners to the federal government in public benefits administration.[28] Local governments will likely need to develop new processes and procedures to comply with new federal

---

[28] *See* Jacob Hamburger, *The Consequences of Ending Birthright Citizenship*, Wash. U. L. Rev. (forthcoming 2025), available at SSRN: https://ssrn.com/ abstract=5106022 (describing the "bureaucratic consequences" of the Executive Order as related to the issuance of passports, social security numbers, and federal and state benefits).

rules. Adopting such new administrative systems will, of course, require significant time and expense at every stage, including design, training, and implementation.

As the primary document relied upon for demonstrating citizenship for U.S. born citizens, the process for issuing a birth certificate itself, as well as the form and content of a birth certificate, will quite possibly have to be overhauled. State and local agencies involved in the newborn birth registration process may be required to establish procedures to verify and substantiate information about parents' citizenship and/or immigration status. The burden of designing and implementing any such reforms, and dealing with pitfalls that inevitably emerge, will be immense. However it is done, creating new systems for verifying the immigration status of the parents of every child born into the United States cannot be done overnight. In the meantime, chaos in the administration of public benefits and issuance of identity documents will surely ensue.

## III.  NATIONWIDE RELIEF IS ESSENTIAL TO ENSURE UNIFORMITY IN CITIZENSHIP ELIGIBILITY AND PREVENT HARM ACROSS THE NATION

As *amici* have detailed above, the legal problems with the Order are significant and the harms it will cause extend well beyond this Circuit and the parties to the litigation. The district court did not abuse its discretion in awarding nationwide relief, which is necessary to protect the public interest and avoid the severe, irreversible harm that would arise from patchwork application of the Citizenship Stripping Order.

24

The Ninth Circuit has "previously [] recognized that the 'Constitution requires a *uniform* Rule of Naturalization; Congress has instructed that the immigration laws of the United States should be enforced vigorously and *uniformly*; and the Supreme Court has described immigration policy as a comprehensive and *unified* system." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (emphasis in the original) (quoting *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 511 (9th Cir. 2018), *aff'd in part, rev'd in part, vacated in part*, 591 U.S. 1 (2020)). Accordingly, where immigration policies are challenged in court, this Circuit has upheld nationwide injunctions to ensure uniform application of immigration laws while litigation is pending. *See, e.g., Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds and remanded*, 585 U.S. 667 (2018) ("Because this case implicates immigration policy, a nationwide injunction was necessary to give Plaintiffs a full expression of their rights").

The need for a nationwide permanent injunction to maintain uniform rules governing birthright citizenship while the constitutionality of the Citizenship Stripping Order is litigated could not be more evident. If the Order is enjoined in some states and as to some individuals, while being allowed to go into effect in other states and as to other individuals, the result would be a great variation in the availability of citizenship rights across state borders. Such patchwork application may incentivize expectant parents to relocate to jurisdictions where injunctions are in force. Many of the jurisdictions represented in this coalition of local governments

and officials are not located in states where attorneys general or other parties are pursuing a case to enjoin the Order. Yet all of *amici*'s communities, across every state where they are located, will suffer greatly if the Order is allowed to go into effect. As detailed above, loss of federal benefits will have serious economic security and public health impacts across the nation. Absent nationwide relief, our jurisdictions may need to bring additional lawsuits, intervene in existing legal actions, or take other steps to ensure protection for our governments and our communities. That would be inefficient for our communities and the judiciary. Finally, the federal government suffers no prejudice from the nationwide injunction. After all, it has recognized birthright citizenship at least since ratification of the Fourteenth Amendment.

## CONCLUSION

President Trump's Citizenship Stripping Order brazenly violates the Fourteenth Amendment and threatens to unleash turmoil in *amici*'s communities, injuring countless children and families. For these reasons and for the reasons provided by Appellees, *Amici* Local Governments and Government Officials respectfully request that this Court uphold the district court's injunction in full.

Respectfully submitted,

*/s/ Jonathan B. Miller*

Jonathan B. Miller
Elaine Poon
Katherine Courtney
PUBLIC RIGHTS PROJECT
490 43rd Street, #115
Oakland, CA 94609
(510) 738-6788
jon@publicrightsproject.org

*Attorneys for Amici Curiae*

Dated: April 11, 2025

27

## ADDITIONAL COUNSEL

ROSALYN GUY-MCCORKLE
Allegheny County Solicitor
445 Fort Pitt Boulevard, Suite 300
Pittsburgh, PA 15219
*Attorney for Allegheny County,*
  *Pennsylvania*

ATLEEN KAUR
City Attorney
Guy C. Larcom City Hall
301 East Huron, 3rd Floor
Ann Arbor, MI 48104
*Attorney for the City of Ann Arbor,*
  *Michigan*

EBONY M. THOMPSON
City Solicitor
Baltimore City Department of Law
100 N. Holliday Street
Baltimore, MD 21202
*Attorney for the City of Baltimore,*
  *Maryland*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of
  Chicago
121 North LaSalle Street, Room 600
Chicago, IL 60602
*Attorney for the City of Chicago,*
  *Illinois*

ZACHARY M. KLEIN
Columbus City Attorney
77 N. Front Street, 4th Floor
Columbus, OH 43215
*Attorney for the City of Columbus,*
  *Ohio*

CARLOS PABELLON
Corporation Counsel
DAVID R. GAULT
Deputy Corporation Counsel
Room 419, City-County Building
210 Martin Luther King, Jr.,
  Boulevard
Madison, WI 53703
*Attorneys for County of Dane,*
  *Wisconsin*

KATIE MCLOUGHLIN
Acting City Attorney
1437 Bannock Street
Denver, CO 80202
*Attorney for the City and County of*
  *Denver, Colorado*

KIMBERLY M. REHBERG
City Attorney
101 City Hall Plaza, Suite 2200
Durham, NC 27701
*Attorney for the City of Durham,*
  *North Carolina*

CHRISTIAN D. MENEFEE
Harris County Attorney
Harris County Attorney's Office
1019 Congress Street
Houston, TX 77002
*Attorney for Harris County, Texas*

28

LEESA MANION
Prosecuting Attorney
Chinook Building
401 5th Avenue Suite 800
Seattle, WA 98104
*Prosecuting Attorney for Martin Luther King, Jr. County, Washington*

MICHAEL HAAS
City Attorney
210 Martin Luther King Jr. Blvd.,
Room 401
Madison, WI 53703
*Attorney for the City of Madison, Wisconsin*

BRIAN E. WASHINGTON
County Counsel
3501 Civic Center Drive,
San Rafael, CA 94903
*Attorney for the County of Marin, California*

KRISTYN ANDERSON
City Attorney
350 S. Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis, Minnesota*

SUSAN K. BLITCH
County Counsel
188 W. Alisal Street, 3rd Floor
Salinas, CA 93901
*Attorney for the County of Monterey, California*

JOHN P. MARKOVS
Montgomery County Attorney
101 Monroe Street
Rockville, MD 20850
*Attorney for Montgomery County, Maryland*

MURIEL GOODE-TRUFANT
Corporation Counsel
100 Church Street
New York, NY 10007
*Counsel for the City of New York, New York*

LAURA CONOVER
County Attorney
Pima County Attorney's Office
32 North Stone Avenue
Tucson, AZ 85745
*Attorney for Pima County, Arizona*

KRYSIA KUBIAK
City Solicitor and Chief Legal Officer
414 Grant Street
Pittsburgh, PA 15219
*Attorney for the City of Pittsburgh, Pennsylvania*

ROBERT TAYLOR
City Attorney
1221 SouthWest Fourth Avenue,
Room 430
Portland, OR 97204
*Attorney for the City of Portland, Oregon*

JEFFREY DANA
City Solicitor
444 Westminster Street, Suite. 220
Providence, RI 02903
*Attorney for the City of Providence,
Rhode Island*

SUSANA ALCALA WOOD
City Attorney
915 I Street
Sacramento, CA 95814
*Attorney for City of Sacramento,
California*

LYNDSEY M. OLSON
City Attorney
400 City Hall & Court House
15 West Kellogg Boulevard
Saint. Paul, MN 55102
*Attorney for the City of St. Paul,
Minnesota*

HEATHER FERBERT
San Diego City Attorney
1200 Third Ave., Suite 1100
San Diego, CA 92101
*Attorney for the City of San Diego,
California*

TONY LOPRESTI
County Counsel
70 West Hedding Street East Wing,
9th Floor
San José, CA 95110
*Attorney for the County of Santa
Clara, California*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica,
California*

MIKE RANKIN
City Attorney
P.O. Box 27210
Tucson, AZ 85726-7210
*Attorney for the City of Tucson,
Arizona*

LAUREN LANGER
City Attorney
Best Best & Krieger LLP
300 S. Grand Avenue, 25th Floor
Los Angeles, CA 90071
*Attorney for City of West Hollywood,
California*

## APPENDIX A – List of *Amici Curiae*

## Local Governments

City of Alameda, California

Allegheny County, Pennsylvania

City of Ann Arbor, Michigan

City of Austin, Texas

City of Baltimore, Maryland

City of Chicago, Illinois

City of Columbus, Ohio

Dane County, Wisconsin

City and County of Denver, Colorado

City of Durham, North Carolina

City of Evanston, Illinois

Harris County, Texas

King County, Washington

City of Madison, Wisconsin

Marin County, California

City of Minneapolis, Minnesota

County of Monterey, California

Montgomery County, Maryland

31

City of New York, New York

Pima County, Arizona

City of Pittsburgh, Pennsylvania

City of Portland, Oregon

City of Providence, Rhode Island

City of Sacramento, California

City of St. Paul, Minnesota

City of San Diego, California

County of Santa Clara, California

City of Santa Monica, California

City of Tucson, Arizona

City of West Hollywood, California

**Local Government Leaders**

Josh Acevedo
*District 2 City Representative, City of El Paso, Texas*

Brenda Adams
*Supervisor, Town of Canaan, New York*

Luis Alejo
*Supervisor, Monterey County, California*

Soli Alpert
*Rent Stabilization Board Chair, City of Berkeley, California*

Miguel Arredondo
*Consolidated Independent School District Trustee At-Large,*
*City of San Marcos, Texas*

Valarie Bachelor
*Unified School District Board Director, City of Oakland, California*

Brian Beck
*Councilmember, City of Denton, Texas*

Sarah Benatar
*Treasurer, Coconino County, Arizona*

Celina Benitez
*Mayor, City of Mount Rainier, Maryland*

Ravinder Bhalla
*Mayor, City of Hoboken, New Jersey*

Justin Bielinski
Supervisor, Milwaukee County, Wisconsin

Xouhoa Bowen
*Vice Mayor, City of San Leandro, California*

Lisa Brown
*Clerk/ Register of Deeds, Oakland County, Michigan*

Bill Burgess
*Clerk, Marion County, Oregon*

Jackie Butler
*Precinct 1 Commissioner, El Paso County, Texas*

Barb Byrum
*Clerk, Ingham County, Michigan*

Chris Canales
*Councilmember, City of El Paso, Texas*

33

Michael Chameides
*Supervisor, Columbia County, New York*

John Clark
*Mayor, Town of Ridgway, Colorado*

Domonique Clemons
*Clerk and Register of Deeds, Genesee County, Michigan*

Jeff Corpora
*Councilmember, Northampton County, Pennsylvania*

Christine Corrado
*Councilmember, Town of Brighton, New York*

Becky Corran
*Councilmember, City of Las Cruces, New Mexico*

Mindy Cuppy
*Clerk, City of Sacramento, California*

Kara Davis
*District Attorney, Wasco County, Oregon*

Olgy Diaz
*Councilmember, City of Tacoma, Washington*

Roger Dickinson
*District 2 Councilmember, City of Sacramento, California*

Michael Dougherty
*District Attorney, Boulder County, Colorado*

Dennis Michael Dvorchak
*Supervisor, Town of Hillsdale, New York*

Jack Eckblad
*District 4 Board Supervisor, Milwaukee County, Wisconsin*

Saundra Edwards
*School Committee Member, City of Lawrence, Massachusetts*

Diane M. Ellis-Marseglia
*Commissioner and Vice-Chair, Bucks County, Pennsylvania*

Scott Esserman
*At-Large Public School Board Member, City of Denver, Colorado*

Johnny Flores
*School Board Trustee, City of Hays, Texas*

Nikki Fortunato Bas
*Supervisor, Alameda County, California*

Brenda Gadd
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Ed Gainey
*Mayor, City of Pittsburgh, Pennsylvania*

Adrian Garcia
*Precinct 2 Commissioner, Harris County, Texas*

Heidi Garrido
*Councilmember, City of Hopkins, Minnesota*

Alyssa Garza
*Deputy Mayor Pro Tem, City of San Marcos, Texas*

Caroline Gomez-Tom
*District 14 Board Supervisor, Milwaukee County, Wisconsin*

Lorenzo Gonzalez
*Place 5 Councilmember, City of San Marcos, Texas*

Eric Guerra
*District 6 Councilmember, City of Sacramento, California*

Jonathan Guzmán
*School Committee Vice-Chair, City of Lawrence, Massachusetts*

Beau Harbin
*Legislator and Democratic Minority Leader, Cortland County, New York*

Robert J. Harvie, Jr.
*Commissioner and Chair, Bucks County, Pennsylvania*

Bear Heiser
*Mayor Pro Tem, City of Kyle, Texas*

Michele Hirsch
*Adlerperson, City of Kingston, New York*

Jani Hitchen
*Councilmember, Pierce County, Washington*

Iliana Holguin
*Commissioner, El Paso County, Texas*

Stephanie Howse-Jones
*Councilmember, City of Cleveland, Ohio*

Susan Hughes-Smith
*Legislator, Monroe County, New York*

Debbie Ingalsbe
*Precinct 1 Commissioner, Hays County, Texas*

Christopher Jaramillo
*School Board President, Norristown Area School District, Pennsylvania*

Clay Lewis Jenkins
*Judge, Dallas County, Texas*

Lisa Kaplan
*Councilmember, City of Sacramento, California*

36

Lawrence Kestenbaum
*Clerk and Register of Deeds, Washtenaw County, Michigan*

Lisa Lawitzke
*Clerk, Township of Bellevue, Michigan*

Drew Lawrence
*Councilmember, New Cumberland County, New Jersey*

Jerald Lentini
*Director, Town of Manchester, Connecticut*

Jessie Lopez
*Councilmember, City of Santa Ana, California*

Stephanie Loredo
*Governing Board Member, Culver City Unified School District, California*

Quinton Lucas
*Mayor, City of Kansas City, Missouri*

Joseph Makhlouf
*Alderperson, City of Wauwatosa, Wisconsin*

Caity Maple
*District 5 Councilmember, City of Sacramento, California*

Adrian Mapp
*Mayor, City of Plainfield, New Jersey*

Alexander Marion
*Auditor, City of Syracuse, New York*

Randall Martin
*1st Ward Supervisor, City of Hudson, New York*

Juan Miguel Martinez
*Supervisor, Milwaukee County, Wisconsin*

37

Yasmine-Imani McMorrin
*Councilmember, City of Culver, California*

Jessica McParlin
*Chief Deputy Treasurer, Sandoval County, New Mexico*

Carolina Mejia
*Commissioner, Thurston County, Washington*

Ryan Mello
*Executive, Pierce County, Washington*

William Moehle
*Supervisor, Town of Brighton, New York*

Jessee Muñiz-Poland
*Director, Town of Manchester, Connecticut*

Omar Narvaez
*District 6 Councilmember, City of Dallas, Texas*

Anne O'Connor
*Board Supervisor, Milwaukee County, Wisconsin*

Myra Ortiz
*School Committee Member, City of Lawrence, Massachusetts*

Sean Parker
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Dontae Payne
*Mayor, City of Olympia, Washington*

Isabel Piedmont-Smith
*Councilmember, City of Bloomington, Indiana*

Veronica Pillar
*Legislator, Tompkins County, New York*

Phil Pluckebaum
*District 4 Councilmember, City of Sacramento, California*

Jacqueline "Jack" Porter
*Commissioner, City of Tallahassee, Florida*

Delishia Porterfield
*Councilmember At Large, Metropolitan Nashville & Davidson County, Tennessee*

Zohaib "Zo" Qadri
*Councilmember, City of Austin, Texas*

Jaime Resendez
*Councilmember, City of Dallas, Texas*

Ryan Richardson
*City Attorney, City of Oakland, California*

Lenin Roa
*School Committee Member, City of Lawrence, Massachusetts*

Michael Rodriguez
*22nd Ward Alderperson, City of Chicago, Illinois*

Miguel Sanchez
*Councilmember, City of Providence, Rhode Island*

Jasmin Santana
*Councilmember, City of Cleveland, Ohio*

Dawn Marie Sass
*Clerk/Deputy Treasurer, Town of Exeter, Wisconsin*

Eli Savit
*Prosecuting Attorney, Washtenaw County, Michigan*

Gina-Louise Sciarra
*Mayor, City of Northampton, Massachusetts*

Sandra Sepulveda
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Kony Serrano Portillo
*Councilmember, Town of Edmonston, Maryland*

David Stout
*Precinct 2 Commissioner, El Paso County, Texas*

Zulfat Suara
*Councilmember at Large, Metropolitan Nashville & Davidson County, Tennessee*

Clifford Thompson
*Unified School Board Director, City of Oakland, California*

Terry Vo
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Anissa Welch
*Mayor, City of Milton, Wisconsin*

Ginny Welsch
*Councilmember, Metropolitan Nashville & Davidson County, Tennessee*

Braxton White
*Commissioner, Clarion County, Pennsylvania*

Robin Wilt
*Councilmember, Town of Brighton, New York*

Gregory Young
*Supervisor, Fulton County, New York*

Estevan Zarate
*Independent School District Trustee, City of Round Rock, Texas*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, *Amici Curiae* state that they know of one related case pending in this Court: *Washington v. Trump*, No. 25-674 (9th Cir. filed Jan. 31, 2025) (appealing the denial of a motion to intervene).

*/s/ Jonathan B. Miller*
Jonathan B. Miller
Public Rights Project

Dated: April 11, 2025

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** _____25-807_____

I am the attorney or self-represented party.

**This brief contains 6,352 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Jonathan B. Miller*        **Date:** April 11, 2025
        Jonathan B. Miller

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was this day served on all counsel via the court's electronic service system.

*/s/ Jonathan B. Miller*
Jonathan B. Miller
Public Rights Project

Dated: April 11, 2025