No. 25-807

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

STATE OF WASHINGTON, et al.,

Plaintiffs-Appellees,

v.

DONALD J. TRUMP, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the Western District of Washington
District Court Case No. 2:25-cv-127

———————————

## REPLY BRIEF FOR APPELLANTS

———————————

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................... 1

ARGUMENT ......................................................................................... 3

   I.    Plaintiffs Are Not Likely to Succeed on the Merits ............................. 3

      A.  Political Jurisdiction Is Not Merely Regulatory Jurisdiction .......................... 4

      B.  Political Jurisdiction Is Formed by Establishing Domicile, Which Entails a Greater Degree of Allegiance ................................. 6

      C.  The Citizenship Clause Adapted the Common Law to American Views, Departing from the English Rule ..................................... 15

      D.  The Individuals Covered by the Executive Order Are Not Completely Subject to the United States' Political Jurisdiction .......................................................................... 19

      E.  Plaintiffs' Statutory Claim Fails Because the Statute Has the Same Meaning as the Citizenship Clause ......................................... 20

   II.   The District Court's Injunctive Relief Is Substantially Overbroad .......................................................................................... 23

      A.  The States Are Not Proper Parties and Thus Are Not Entitled to Injunctive Relief ......................................................... 24

      B.  At a Minimum, the Injunction Should Be Narrowed ................................... 30

CONCLUSION ..................................................................................... 32

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Afroyim v. Rusk,*
   387 U.S. 253 (1967) ................................................... 14

*Barzizas v. Hopkins,*
   23 Va. (2 Rand.) 276 (1824) ..................................... 17

*Benny v. O'Brien,*
   32 A. 696 (N.J. 1895) ........................................... 18, 19

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ................................................... 29

*Carlson v. Reed,*
   249 F.3d 876 (9th Cir. 2001) .................................... 20

*Case v. Clarke,*
   5 F. Cas. 254 (C.C.D.R.I. 1828) (Story, J.) (No. 2490) ................................. 9

*Chicago, Rock Island & Pac. Ry. Co. v. McGlinn,*
   114 U.S. 542 (1885) ................................................... 14

*Cochise Consultancy, Inc. v. United States ex rel. Hunt,*
   587 U.S. 262 (2019) ................................................... 21

*Coddington v. Coddington,*
   20 N.J. Eq. 263 (Ch. 1869) ............................... 12-13, 13

*Department of Commerce v. New York,*
   588 U.S. 752 (2019) ................................................... 29

*Department of Homeland Sec. v. Regents of the Univ. of Cal.,*
   591 U.S. 1 (2020) ..................................................... 27

*Dred Scott v. Sandford,*
   60 U.S. (19 How.) 393 (1857) ..................................... 1

*Elk v. Wilkins,*
   112 U.S. 94 (1884) ........................................... 1, 4, 6, 7

*FDA v. Alliance for Hippocratic Med.,*
   602 U.S. 367 (2024) ................................................... 25

*Fong Yue Ting v. United States,*
    149 U.S. 698 (1893) ........................................................................... 8

*Gardner v. Ward,*
    2 Mass. (1 Tyng) 244 (1805) ......................................................... 17

*Goodell v. Jackson ex dem. Smith,*
    20 Johns. 693 (N.Y. 1823) ..................................................... 15, 17

*Haaland v. Brackeen,*
    599 U.S. 255 (2023) ................................................. 14, 26-27, 27

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir.), *vacated on other grounds,*
    583 U.S. 941 (2017) ........................................................................ 32

*Hodgson v. De Beauchesne* [1858],
    14 Eng. Rep. 920 (PC) .................................................................. 8

*INS v. Errico,*
    385 U.S. 214 (1966) ...................................................................... 22

*Jackson ex dem. Smith v. Goodell,*
    20 Johns. 188 (N.Y. Sup. Ct. 1822) ........................................ 15

*Kaplan v. Tod,*
    267 U.S. 228 (1925) ...................................................................... 23

*Kemp v. United States,*
    596 U.S. 528 (2022) ...................................................................... 21

*Kilham v. Ward,*
    2 Mass. (Tyng) 236 (1806) ........................................................ 17

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ...........................................................25, 27, 28

*Lau Ow Bew v. United States,*
    144 U.S. 47 (1892) .......................................................................... 8

*Lewis v. Casey,*
    518 U.S. 343 (1996) ...................................................................... 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 U.S. 118 (2014) ...................................................................... 26

iii

*Ludlam v. Ludlam,*
  31 Barb. 486 (N.Y. Gen. Term. 1860), *aff'd,*
  26 N.Y. 356 (1863) ................................................................ 17

*Lynch v. Clarke,*
  1 Sand. Ch. 583 (N.Y. Ch. 1844) ........................................ 16

*Martinez v. Bynum,*
  461 U.S. 321 (1983) ............................................................... 8

*M.M.V. v. Garland,*
  1 F.4th 1100 (D.C. Cir. 2021) ............................................. 24

*Moody v. NetChoice, LLC,*
  603 U.S. 707 (2024) ............................................................. 20

*Morrison v. California,*
  291 U.S. 82 (1934) ............................................................... 22

*National Ctr. for Immigrants Rights, Inc. v. INS,*
  743 F.2d 1365 (9th Cir. 1984) ............................................ 25

*Nishimura Ekiu v. United States,*
  142 U.S. 651 (1892) ............................................................. 23

*Nunez, In re,*
  18 F. Supp. 1007 (S.D. Cal.), *rev'd sub nom.*
  *Ex parte Nunez,* 93 F.2d 41 (9th Cir. 1937) ...................... 22

*Pennsylvania v. New Jersey,*
  426 U.S. 660 (1976) ............................................................. 29

*Perkins v. Elg,*
  307 U.S. 325 (1939) ............................................................. 22

*Ray Charles Found. v. Robinson,*
  795 F.3d 1109 (9th Cir. 2015) ............................................ 26

*Regan v. King,*
  134 F.2d 413 (9th Cir. 1943) .............................................. 22

*Schooner Exch. v. McFaddon,*
  11 U.S. (7 Cranch) 116 (1812) ......................................... 4, 8

*Smith v. Turner,*
  48 U.S. (7 How.) 283 (1849) ......................................... 13, 14

iv

*South Carolina v. Katzenbach*,
   383 U.S. 301 (1966) ................................................................. 26

*South Dakota v. Dole*,
   483 U.S. 203 (1987) ................................................................. 26

*State v. Manuel*,
   20 N.C. (3 & 4 Dev. & Bat.) 144 (1838) ................................ 17

*Texas v. United States*,
   126 F.4th 392 (5th Cir. 2025) .................................................. 31

*Town of Chester v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017) ................................................................. 24

*United States v. Hansen*,
   599 U.S. 762 (2023) ................................................................. 25

*United States v. Ju Toy*,
   198 U.S. 253 (1905) ................................................................. 23

*United States v. Rahimi*,
   602 U.S. 680 (2024) ................................................................. 15

*United States v. Rogers*,
   45 U.S. (4 How.) 567 (1846) ..................................................... 4

*United States v. Texas*,
   599 U.S. 670 (2023) ................................................................. 29

*United States v. Wong Kim Ark*,
   169 U.S. 649 (1898) .......................................... 1, 7, 8, 11, 12, 19

*United States ex rel. Hintopoulos v. Shaughnessy*,
   353 U.S. 72 (1957) ................................................................... 22

*United States ex rel. Mackey v. Coxe*,
   59 U.S. (18 How.) 100 (1855) ..................................................... 4

*Washington v. FDA*,
   108 F.4th 1163 (9th Cir. 2024) ................................................ 29

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ................................................. 27

*Wikimedia Found. v. National Sec. Agency*,
 857 F.3d 193 (4th Cir. 2017) ............................................................ 24

*Wildes v. Parker*,
 29 F. Cas. 1224 (C.C.D. Mass. 1839) (Story, J.) (No. 17,652) ................... 9

**Statutes:**

Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223 ................................. 18

Act of Mar. 3, 1871, ch. 120, 16 Stat. 544 ....................................... 6

8 U.S.C. § 1401 .................................................................. 20

8 U.S.C. § 1401(a) ............................................................... 23

**Legislative Material:**

Cong. Globe, 39th Cong., 1st Sess. (1866) ............................... 5, 6, 10

*Rep. of H. Comm. on Foreign Affairs Concerning the Rights
 of American Citizens in Foreign States*, *in*
 Cong. Globe, 40th Cong., 2nd Sess. (1868) .................................. 18

**Other Authorities:**

Gregory Ablavsky, *"With the Indian Tribes"*:
 *Race, Citizenship, and Original Constitutional Meanings*,
 70 Stan. L. Rev. 1025 (2018) .............................................. 15

Clement L. Bouvé, *A Treatise on the Laws Governing the
 Exclusion and Expulsion of Aliens in the United States* (1912) ............ 22

1 William Burge, *Commentaries on Colonial and Foreign Laws*
 (1838) .................................................................... 12

Frederick A. Cleveland, *American Citizenship as Distinguished
 from Alien Status* (1927) .............................................. 9, 12

Sterling E. Edmunds, *Aliens and the Draft*,
 5 St. Louis L. Rev. 23 (1920) .............................................

David Dudley Field, *Outlines of an International Code*
 (2d ed. 1876) ............................................................. 17

Richard W. Flournoy, *Dual Nationality and Election*,
30 Yale L.J. 545 (1921) .................................................................... 12, 21

H.W. Halleck, *International Law* (1861) ............................................... 13

3 Green Hayword Hackworth, *Digest on International Law*
(1942) ................................................................................................... 22

M.W. Jacobs, *A Treatise on the Law of Domicil* (1887) ................... 12, 13

Sidney Kansas, *Immigration and Nationality Act Annotated*
(4th ed. 1953) ...................................................................................... 21

2 James Kent, *Commentaries on American Law* (10th ed. 1860) ......... 12

Kurt T. Lash, *Prima Facie Citizenship* (rev. Apr. 17, 2025),
https://perma.cc/ARN2-5CSJ ...................................... 2-3, 4, 6, 16, 17

2 John Bassett Moore, *A Digest of International Law* (1906) ............... 13

4 Robert Phillimore, *Commentaries Upon International Law*
(2d ed. 1874) ........................................................................................ 9, 13

*Relations of Indians to Citizenship*,
7 Op. Att'y Gen. 746 (1856) .............................................................. 16

Joseph Story, *Commentaries on the Conflict of Laws* (6th ed. 1865) .......... 8, 13, 16

*The Nationality Act of 1940*,
54 Harv. L. Rev. 860 (1941) ............................................................. 22, 23

1 Travers Twiss, *The Law of Nations Considered as Independent
Political Communities* (1861) ........................................................... 9, 13

Henry Wheaton, *Elements of International Law*
(Richard Henry Dana, Jr., ed., 1866) ............................................... 13

Ilan Wurman*, Jurisdiction and Citizenship* (rev. Apr. 21, 2025),
https://perma.cc/5DFJ-Z9BN ..................................................... 11, 13, 17

## INTRODUCTION

The Citizenship Clause of the Fourteenth Amendment "rightly repudiated" the Supreme Court's "shameful decision in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), which misinterpreted the Constitution as permanently excluding people of African descent from eligibility for United States citizenship solely based on their race." ER-61. Rectifying that injustice to the recently freed slaves, all agree, was the principal purpose of the Citizenship Clause. Nothing in the Clause's text or historical context supports the conclusion that it also extended citizenship to birth tourists and other transient visitors or those who enter the country in violation of our laws.

On the contrary, the text makes clear that to qualify for birthright citizenship, an individual must be not only born in the United States, but also "subject to the jurisdiction thereof"—an independent requirement that the Supreme Court has held excludes those who are not "completely subject to the political jurisdiction of the country." *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). The children of aliens whose presence here is temporary or unlawful do not meet this requirement because they lack the requisite connection and allegiance to the United States.

A country has complete political jurisdiction over individuals who owe it sufficient allegiance, such as children of citizens and aliens lawfully "domiciled here," *id.*, but not over those who owe only the lesser allegiance of merely obeying the law, such as children of tribal Indians, *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). This distinction reflects principles that were well recognized at the time the Fourteenth

Amendment was ratified, when domicile was understood to confer a more substantial allegiance than mere presence, a type of allegiance akin to citizenship that subjected an individual to the complete jurisdiction of the country of domicile with corresponding rights and reciprocal duties. Children of aliens here temporarily or illegally, whose only allegiance is the duty to obey the laws while they are here, lack sufficient allegiance to come within the United States' complete political jurisdiction. This historically grounded explanation reconciles the Supreme Court's cases and explains the substantial focus on domicile in the debates leading up to the Citizenship Clause and the legal scholarship and Executive Branch practice in the years thereafter.

Plaintiffs offer no interpretation of the Citizenship Clause that explains that history or reconciles the Supreme Court's decisions in *Elk* and *Wong Kim Ark*. They argue that "subject to the jurisdiction thereof" refers only to regulatory jurisdiction (the ability to impose laws regulating individuals) or, amounting to the same thing, an individual's duty to obey those laws. This theory cannot explain *Elk* because Congress clearly had authority to regulate tribal Indians (even if Congress did not fully exercise that authority), and Indians owed a duty to obey those laws that had been imposed. Nor can it explain the other groups who fall outside the Clause.

Plaintiffs' failure to engage with tribal Indian citizenship, in particular, disregards the original meaning of the phrase "subject to the jurisdiction thereof." As plaintiffs' own amici acknowledge, debates over this phrase considered the status of tribal Indians at length. *See, e.g.*, Constitutional Law Scholars Amicus Br. 13-14; Kurt

2

T. Lash, *Prima Facie Citizenship* 45-54 (rev. Apr. 17, 2025), https://perma.cc/ARN2-5CSJ. In crafting the Citizenship Clause, Congress eschewed the Indian-specific language of the Civil Rights Act of 1866 and adopted a general test for all persons born in the United States. But plaintiffs offer no such general test. They have no explanation for why all individuals covered by the Executive Order (including the children of birth tourists) owe an allegiance or a duty to obey the laws that children of tribal Indians—who have a far stronger connection to the United States—lack.

Text and historical context thus confirm that the Executive Order's interpretation of the Citizenship Clause is correct, and the preliminary injunction should be reversed.

## ARGUMENT

### I.      Plaintiffs Are Not Likely to Succeed on the Merits.

The Civil Rights Act of 1866 and the Citizenship Clause of the Fourteenth Amendment repudiated *Dred Scott* and confirmed that freed slaves and their children were citizens of the United States. Plaintiffs' efforts to paint this case as a modern-day analogue to that odious decision are mistaken. No one disputes that *Dred Scott* is deservedly overruled—or that fixing the citizenship status of freed slaves and their children was the central purpose of the Citizenship Clause. But nothing about the historical context of the Citizenship Clause suggests that it extended to the children of foreigners who freely choose to enter the country illegally. The history of the Clause's adoption is entirely devoid of concern for such illegal aliens, a group that did not yet

3

exist given the absence of federal immigration restrictions. Instead, Congress chose language that would encompass freed slaves but still limited citizenship to individuals who are completely subject to the political jurisdiction of the United States—a category that excludes both transient visitors and illegal aliens.

### A. Political Jurisdiction Is Not Merely Regulatory Jurisdiction.

All agree that the phrase "subject to the jurisdiction thereof" in the Citizenship Clause excludes the U.S.-born children of (1) foreign ambassadors, (2) persons on foreign public ships, (3) invading armies, and (4) members of Indian tribes. These exceptions share a single common feature: the child's parents do not fall within the "political jurisdiction" of the United States because they lack sufficient allegiance to the United States and owe primary allegiance to another sovereign. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). That understanding of the Clause squares with its text. history, and the Supreme Court's precedents.

Plaintiffs, by contrast, press the view that "jurisdiction" encompasses all persons "subject to U.S. law, i.e., subject to its authority to legislate, regulate, and govern." Individuals Br. 11; *accord* States Br. 32. Thus, they contend, the mere obligation to obey U.S. law—which is shared by persons temporarily or unlawfully present—alone renders an individual "subject to the jurisdiction" of the United States.

That view cannot explain the long-recognized exceptions to the Citizenship Clause. Plaintiffs rely on dictionary definitions preceding the Fourteenth Amendment that define "jurisdiction" as "the 'power of governing or legislating'" or "'the power

4

or right of exercising authority.'" States Br. 27 (alteration omitted). But the United States plainly has the *power* to exercise authority over the categories of persons long understood to be excluded from the Citizenship Clause. *See Schooner Exch. v. McFaddon*, 11 U.S. (7 Cranch) 116, 146 (1812) (explaining that the immunity granted to foreign public ships could be "destroy[ed]" if the sovereign wished to "claim and exercise jurisdiction either by employing force, or by subjecting such vessels to the ordinary tribunals"); Gov't Br. 15-16.

Indian tribes are an especially powerful example. It was well settled by the time of the Citizenship Clause's ratification that the United States could exercise regulatory power over Indian tribes. *See, e.g., United States ex rel. Mackey v. Coxe*, 59 U.S. (18 How.) 100, 104 (1855) ("Cherokee country … is within our jurisdiction and subject to our laws."); *United States v. Rogers*, 45 U.S. (4 How.) 567, 572 (1846); *see* Lash, *supra*, at 23-24. The Congressional debates preceding the Clause reflected that understanding: multiple Senators recognized that Indian tribes were subject to congressional regulation. *See* Cong. Globe, 39th Cong., 1st Sess. 2893 (1866) (Senator Johnson stating that "the courts would have no doubt" about Congress's "authority to legislate" with respect to Indian tribes); *id.* at 2892 (Senator Doolittle stating that there were many Indians who were subject to U.S. regulatory jurisdiction "who ought not to be included as citizens"). As Senator (and former Attorney General) Reverdy Johnson observed, the few contrary statements during the debate (which plaintiffs

5

quote, Individuals Br. 19-20) conflated "the authority to legislate" with the extent to which Congress had actually legislated. *See* Cong. Globe, 39th Cong., 1st Sess. 2893.

Thus, the United States could "deal" with Indian tribes "through acts of Congress in the ordinary forms of legislation." *Elk*, 112 U.S. at 99. And indeed, shortly after ratification, Congress enacted a statute declaring that it would no longer recognize Indian tribes as "independent nation[s], tribe[s], or power[s] with whom the United States may contract by treaty." Act of Mar. 3, 1871, ch. 120, 16 Stat. 544, 566; *Elk*, 112 U.S. at 107.

"Jurisdiction" in the Citizenship Clause cannot mean the bare power to regulate or enforce federal law. It requires something more.

### B. Political Jurisdiction Is Formed by Establishing Domicile, Which Entails a Greater Degree of Allegiance.

**1.** As the repeated citations to the Congressional debates about tribal Indians show, "the debate" about the phrase *subject to the jurisdiction thereof* "predominantly focused on whether [it] included Native Americans," Constitutional Law Scholars Amicus Br. 13; *accord* Lash, *supra*, at 49-53, and was widely publicized to the ratifying public, *see* Lash, *supra*, at 53-54 & n.288. Accordingly, any theory of what makes someone "subject to the jurisdiction thereof" needs a coherent account of why tribal Indians are subject to the jurisdiction of the United States less completely than individuals who are granted citizenship under the Clause.

6

As we explained, Gov't Br. 13-22, the Supreme Court's cases make clear that the children of ambassadors, aliens aboard foreign public ships, invading armies, and Indian tribes are not "subject to the jurisdiction" of the United States because they are not "completely subject to" the "political jurisdiction" of the United States "and owing them direct and immediate allegiance." *Elk*, 112 U.S. at 102. Every Justice in *Elk*—as well as *Wong Kim Ark*—explained how "jurisdiction" for purposes of the Citizenship Clause depends on allegiance. *Elk*, 112 U.S. at 99, 101-02, 109; *id.* at 119-120 (Harlan, J., dissenting); *Wong Kim Ark*, 169 U.S. at 655-65, 679-94; *id.* at 710-31 (Fuller, J., dissenting). That principle is reenforced by the Clause's historical context and legislative history. Gov't Br. 18-22.

Given the Supreme Court's emphasis on "allegiance" as the criterion distinguishing Indian tribes, as well as its discussions of allegiance in connection with other recognized exceptions, plaintiffs' assertion that the Clause "has never been understood to exclude U.S.-born children based on their parents' … allegiance" and like claims are plainly mistaken. States Br. 27; *accord id.* at 26, 37, 38; Individuals Br. 11. The question is not whether allegiance is relevant but instead whether the requisite allegiance arises solely from birth on U.S. soil and, if not, what sort of connection gives rise to the "direct and immediate allegiance" needed to make someone "completely subject to" the "political jurisdiction" of the United States. *Elk*, 112 U.S. at 102.

Here, too, the common law and the Supreme Court have long recognized gradations of allegiance. Every tourist or other temporarily present individual in U.S. territory owes "temporary and local allegiance" and is bound by U.S. law while present here, *Wong Kim Ark*, 169 U.S. at 685-86 (quoting *Schooner Exch.*, 11 U.S. (7 Cranch) at 144), just as U.S. citizens must obey local laws while present in another country. By contrast, aliens who have established domicile in the United States—in other words, have lawfully made the United States their "fixed and permanent home," *Martinez v. Bynum*, 461 U.S. 321, 331 (1983)—develop a degree of "allegiance to the country, very different from a mere obedience to its laws during a temporary residence." *Hodgson v. De Beauchesne* [1858] 14 Eng. Rep. 920, 932 (Privy Council); *see* Joseph Story, *Commentaries on the Conflict of Laws* § 49a, at 48 (6th ed. 1865) (discussing *Hodgson* as a "very extensiv[e] and learne[d] discuss[ion]" by "counsel of great eminence" and a "judge of very great learning"). Such domiciled aliens "acquire rights and must discharge duties in many respects the same as possessed by and imposed upon the citizens of that country." *Lau Ow Bew v. United States*, 144 U.S. 47, 62 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698, 734 (1893) (Brewer, J., dissenting) (similar). And unlike temporarily present aliens—whose obligation to, and protection by, the United States ends on their departure—domiciled aliens could call on the United States for diplomatic protection while abroad. *Fong Yue Ting*, 149 U.S. at 724.

A person's domicile—as opposed to merely temporary or local allegiance—had long been recognized as affecting which government (as a matter of comity) had

jurisdiction to determine an individual's rights.  "In dealing with domicil we are dealing with the question of jurisdiction—the right of the government to exercise control over the social population, and the rights of individuals to claim protection or to enjoy benefits which are attached to residence."  Frederick A. Cleveland, *American Citizenship as Distinguished from Alien Status* 34 (1927).  Contemporaneous treatises accordingly described "[d]omicil" as "the foundation of jurisdiction over persons" "under the Law of Nations," 1 Travers Twiss, *The Law of Nations Considered as Independent Political Communities* § 164, at 239 (1861), and a "ti[e] which bind[s], or … [a] caus[e] which subject[s], the individual to the jurisdiction of a particular territory," 4 Robert Phillimore, *Commentaries Upon International Law* 32 (2d ed. 1874).

Before the Fourteenth Amendment, citizenship for Article III of the Constitution was already understood to relate to domicile.  Whether someone was a "citizen" of a "state" for diversity jurisdiction depended on their domicile.  *See, e.g.*, *Case v. Clarke*, 5 F. Cas. 254, 254 (C.C.D.R.I. 1828) (Story, J.) (No. 2490).  Similarly, in the 1830s, Justice Story explained that a U.S. citizen domiciled in the United Kingdom "would be deemed an alien enemy" in the event of war and thought it an open question whether such an individual would qualify as a "foreign … citizen[] or subject[]" for purposes of diversity jurisdiction, given the oddity of treating a U.S. citizen domiciled abroad "as a foreign merchant and foreign subject" for "all purposes, except of suits in the courts of the United States."  *Wildes v. Parker*, 29 F. Cas. 1224, 1225-26 (C.C.D. Mass. 1839) (Story, J.) (No. 17,652) (certifying the

9

question to the Supreme Court and noting the divided but unreported outcome). In the 1860s, the relationships between domicile, degrees of allegiance, and citizenship were well understood.

Indeed, the language of the Civil Rights Act of 1866—the predecessor to the Citizenship Clause—was drafted with these degrees of allegiance in mind. Senator Trumbull explained that in drafting the Act he faced a "difficulty" in drafting language to cover "all the people born in the United States and who owe allegiance to it." Cong. Globe, 39th Cong., 1st Sess. 572. Namely, Trumbull initially considered using the phrase "all persons born in the United States and owing allegiance thereto" but rejected that approach because "upon investigation it was found that a sort of allegiance was due to the country from persons temporarily resident in it." *Id.* The Act's eventual language—persons were citizens if they were "not subject to any foreign power"—addressed this concern. The Citizenship Clause's use of affirmative language—being subject to the jurisdiction of the United States—was not intended to alter this result. *See, e.g.*, *id.* at 2890 (Senator Howard proposing language which he described as "declaratory of …. the law of the land already"); *id.* at 2894 (Senator Trumbull saying "the object to be arrived at" by the language in the Act and the Clause was "the same").[1]

---

[1] The change in language from "born in the United States and not subject to any foreign power, excluding Indians not taxed" to "born … in the United States and subject to the jurisdiction thereof" appears to have been motivated by concerns that

*Continued on next page.*

Domicile's significance as a marker of allegiance is also reflected in *Wong Kim Ark*. As we explained, the Supreme Court repeatedly emphasized that Wong's parents, though "subjects of the Emperor of China," had "a permanent domicil and residence in the United States." 169 U.S. at 653; *accord id.* at 652, 693, 696, 705. Indeed, a key passage on which plaintiffs rely—the Court's paragraph announcing its "conclusions" from its analysis of the common law and other antecedents, *id.* at 693-94; *see* States Br. 44-45; Individuals Br. 11—underscores the importance of domicile. That paragraph makes clear that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States," and thus that the Citizenship Clause "includes the children born within the territory of the United States of all other persons … *domiciled within the United States*." *Wong Kim Ark*, 169 U.S. at 693 (emphases added). And, echoing the language of *Elk*, the Court concludes by noting that those domiciled here are "*completely* subject to the political jurisdiction" of the United States by comparing their allegiance to those temporarily present: "seeing that" even a temporary visitor to "the dominions of a foreign government" has a duty of "obedience to the laws of that government" during his presence "independently" of any "domiciliation" or "oath of allegiance," the Court explained that it "can hardly be

---

"Indians not taxed" might be interpreted literally rather than as a term of art. *See* Ilan Wurman*, Jurisdiction and Citizenship* 70-71 (rev. Apr. 21, 2025), https://perma.cc/5DFJ-Z9BN.

denied that an alien is *completely* subject to the political jurisdiction of the country in which he resides." *Id.* at 693-94 (emphases added) (quotation marks omitted); *see* M.W. Jacobs, *A Treatise on the Law of Domicil* § 75, at 123 & n.2 (1887) (collecting cases equating residence and domicile); 2 James Kent, *Commentaries on American Law* 576 n.(c) (10th ed. 1860) (similar).

These points illustrate why in the years after *Wong Kim Ark*, treatises and Executive Branch practice regularly recognized that the children of those temporarily present in the United States were *not* citizens at birth. Gov't Br. 27, 38-39. Indeed, one of the only sources plaintiffs cite in the few decades immediately following *Wong Kim Ark* itself acknowledges the consensus of treatise-writers that "in order that a person born in the United States of alien parents may have American citizenship, his parents must have been domiciled in this country at the time of his birth," and admits that *Wong Kim Ark* "did not directly decide the precise point" because the "parents were domiciled in the United States." Richard W. Flournoy, *Dual Nationality and Election*, 30 Yale L.J. 545, 552 (1921).

**2.** These treatise-writers treated domicile as "one of the fundamental considerations in controversies over citizenship" because it was "so closely related to matters of civil jurisdiction." Cleveland, *supra*, at 35. As a matter of comity, the place where an individual was domiciled was the jurisdiction that determined the "numerous civil rights of the person." 1 William Burge, *Commentaries on Colonial and Foreign Laws* 32 (1838); *accord, e.g.*, *Coddington v. Coddington*, 20 N.J. Eq. 263, 264 (Ch.

1869) (explaining that it was "well settled" that the government of a person's domicile "regulated" "the positive and relative status of [the] person"); Story, *supra*, § 51, at 53; Henry Wheaton, *Elements of International Law* § 84, at 141 (Richard Henry Dana, Jr., ed., 1866).  It was this relationship that caused treatise-writers to describe domicile as "the foundation of jurisdiction over persons" "under the Law of Nations," 1 Twiss, *supra*, § 164, at 239, and a "caus[e] which subject[s] the individual to the jurisdiction of a particular territory," 4 Phillimore, *supra*, at 32.

The United States thus yielded to the country of an alien's domicile to determine whether the alien was a minor, Story, *supra*, § 66, at 71; the rights of married women, *id.* § 66a, at 72; the rules of inheritance for personal property, Wheaton, *supra*, § 83, at 140; the forum to administer divorces, *Coddington*, 20 N.J. Eq. at 264, and insolvency proceedings, Jacobs, *supra*, § 47, at 80 n.3; to subject an individual to conscription, H.W. Halleck, *International Law* 385 (1861); or tax worldwide income, 2 John Bassett Moore, *A Digest of International Law* § 183, at 59-61 (1906).  *See also* Ilan Wurman, *Jurisdiction and Citizenship* 80-84 (rev. Apr. 21, 2025), https://perma.cc/5DFJ-Z9BN (discussing how non-domiciled foreigners were subjected to less jurisdiction under then-prevailing international law).[2]

---

[2] The individual plaintiffs' reliance on other uses of "political jurisdiction" (at 15-16) reinforces the point that the term does not just refer to territorial jurisdiction. Justice Wayne's separate opinion in *Smith v. Turner*, 48 U.S. (7 How.) 283 (1849), recognizes a "distinction between territorial and political jurisdiction" and explains that a state "may have territorial jurisdiction for most of the purposes of sovereignty,

*Continued on next page.*

13

This limited exercise of civil jurisdiction over non-domiciled aliens means that they would not be citizens under the Citizenship Clause even if, as the States argue, persons are excluded when the United States' "exercise of sovereign authority … was limited as a matter of fact or as a matter of comity and practice." States Br. 31-32; *accord id.* at 26. This response to the problem that the United States had authority to regulate those classes historically understood to fall outside the Citizenship Clause fails in part because there is no reason to focus, as plaintiffs implicitly do, on *criminal* jurisdiction to the exclusion of *civil* jurisdiction, particularly when the Civil Rights Act of 1866 and the Fourteenth Amendment focused on civil rights.[3] Moreover, a test based on the extent of authority exercised would depart from the strict English common-law rule plaintiffs argue the Clause adopted.

---

without political jurisdiction for some of them." *Id.* at 422-43 (opinion of Wayne, J.). And *Chicago, Rock Island & Pacific Railway Co. v. McGlinn*, 114 U.S. 542 (1885), merely says that "legislative power" "is involved in" "political jurisdiction." *Id.* at 546. Plaintiffs' other examples postdate the Citizenship Clause by a century and do not address the Clause.

[3] Plaintiffs do not suggest post-ratification changes in the extent of authority Congress exercised would change the constitutional status of these long-recognized categories. Plaintiffs do not (and could not) dispute that today the United States exercises substantial—indeed, "plenary"—regulatory authority over Indian tribes across "a wide range of areas, including criminal law, domestic violence, employment, property, tax, and trade." *Haaland v. Brackeen*, 599 U.S. 255, 272, 275 (2023). Yet plaintiffs recognize that children born to members of tribes are not "subject to" its "jurisdiction" for purposes of the Citizenship Clause and, thus, receive citizenship at birth only by statute. States Br. 27 n.2, 41; Individuals Br. 13, 18. Moreover, a dynamic test for the extent of jurisdiction exercised would be inconsistent with "the purpose of the" Clause, which was to put freed slaves' citizenship rights "beyond the legislative power." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

14

### C. The Citizenship Clause Adapted the Common Law to American Views, Departing from the English Rule.

Plaintiffs attempt to draw support from English common law and early American sources, but these cannot overcome the Citizenship Clause itself. The Constitution "did not purport to take English law or history wholesale and silently download it into" American law. *United States v. Rahimi*, 602 U.S. 680, 722 n.3 (2024) (Kavanaugh, J., concurring). While the English common law regarded children even of transients as citizens at birth, there is no dispute that the Citizenship Clause departed from English common law in some respects. As early as the 1820s, American courts rejected the suggestion that members of Indian tribes were born citizens, even though they satisfied the English common-law rule. When the New York Supreme Court of Judicature applied the English common-law rule to conclude that tribal Indians were "born in allegiance to the government of this state, for [New York's] jurisdiction extends to every part of the state; they receive protection from [New York], and are subject to [New York's] laws," *Jackson ex dem. Smith v. Goodell*, 20 Johns. 188, 192-93 (N.Y. Sup. Ct. 1822), Chancellor Kent reversed its decision because Indians had "never been regarded as citizens or members of [New York's] body politic," *Goodell v. Jackson ex dem. Smith*, 20 Johns. 693, 710 (N.Y. 1823); *see* Gregory Ablavsky, *"With the Indian Tribes": Race, Citizenship, and Original Constitutional Meanings*, 70 Stan. L. Rev. 1025, 1056 (2018) (stating that "Indians were described as subjects" of the King "by both British officials and Native peoples themselves");

15

*Relations of Indians to Citizenship*, 7 Op. Att'y Gen. 746, 749 (1856) (concluding that Indians were not citizens even though they are "in our allegiance" in a more limited sense of the term).

Moreover, as noted, Justice Story explained that citizenship at birth required more than temporary physical presence. Story, *supra*, § 48, at 46. The individual plaintiffs (at 39 n.11) suggest that Story's statement is undermined because he followed it with an acknowledgment that this idea was not "universally established," Story, *supra*, § 48, at 46. But given that the treatise covered both American and English law, *see id.* at xi-xiii, Story's qualification is merely evidence of how American views had begun to differ from the strict English rule. Importantly, by Reconstruction, the Republicans championing the Civil Rights Act of 1866 and the Citizenship Clause had adopted the American position, as evidenced by the repeated references to principles of domicile in discussions of the Civil Rights Act and the Citizenship Clause. *See* Gov't Br. 19-20; *see also* Lash, *supra*, at 18 (noting speech by Representative Bingham declaring that "all free persons born and *domiciled* within the United States" are citizens (emphasis added) (quotation marks omitted)).

Against this background, plaintiffs rely heavily on *Lynch v. Clarke*, 1 Sand. Ch. 583 (N.Y. Ch. 1844), but plaintiffs overstate its importance. Julia Lynch was born during the four years her parents spent in the United States, and the New York court concluded that she was a citizen at birth under the English common-law rule. *Id.* at 587, 640-46, 655. But there is little indication that *Lynch* reflected a universal view,

16

much less one incorporated wholesale into the Citizenship Clause.[4]  As David Dudley Field observed, *Lynch* "seems not to be entirely approved" and "probably would at the most be considered as authority only in regard to the right of succession to real property within that State."  David Dudley Field, *Outlines of an International Code* 132 n.1 (2d ed. 1876).  When New York judges were later faced with the inverse of *Lynch*—a child born to Americans temporarily abroad—they divided on whether the child was also a citizen of the foreign country.  Wurman, *supra*, at 28-29 (discussing *Ludlam v. Ludlam*, 31 Barb. 486, 503 (N.Y. Gen. Term. 1860), *aff'd*, 26 N.Y. 356 (1863)).  Nor was *Lynch* the test that New York applied to all of its inhabitants, notably tribal Indians.  *See Goodell*, 20 Johns. 693.  Given that the debates about the phrase "subject to the jurisdiction thereof" focused on Indian citizenship, *Lynch* unsurprisingly played almost no role in those debates.  Lash, *supra*, at 20-21.

When the Citizenship Clause was being ratified, Congress was criticizing the mode of reasoning employed in *Lynch*—that "everything that was law in England before, was law in America after the Revolution" —as having "no just foundation," and in particular objecting to American courts' acceptance of the English common

---

[4] The other cases on which plaintiffs rely largely do not address the issue at hand, instead applying English law to citizenship at birth in pre-revolutionary English colonies.  *See, e.g.*, *Gardner v. Ward*, 2 Mass. (1 Tyng) 244 (1805); *Kilham v. Ward*, 2 Mass. (Tyng) 236, 265 (1806); *Barzizas v. Hopkins*, 23 Va. (2 Rand.) 276, 278 (1824).  Others are passing, exceptionless references to citizenship at birth that would have implied that even children of ambassadors were citizens.  *See, e.g.*, *State v. Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) 144, 151 (1838).

17

law's "obsolete claim of inalienable allegiance." *Rep. of H. Comm. on Foreign Affairs Concerning the Rights of American Citizens in Foreign States*, *in* Cong. Globe, 40th Cong., 2nd Sess. app. at 94, 99 (1868). Just weeks after the Fourteenth Amendment was ratified, Congress passed the Expatriation Act of 1868, forcefully repudiating the English doctrine of inalienable allegiance to one's birth country as incompatible with "the enjoyment of the rights of life, liberty, and the pursuit of happiness." Act of July 27, 1868, ch. 249, § 1, 15 Stat. 223, 223.

Courts in the decades after ratification also understood the Citizenship Clause to depart from the English common-law rule. *Elk* and *Wong Kim Ark* acknowledged that the Clause departed from the English rule in how it treated Indians. The New Jersey Supreme Court in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895)—which *Wong Kim Ark* quoted favorably, 169 U.S. at 692-93—similarly recognized that America departed in how it treated non-domiciled aliens. The court reasoned that the Civil Rights Act and Citizenship Clause make clear that some aliens' children are not citizens because they are "subject to [a] foreign power." *Benny*, 32 A. at 697. The "[p]ersons intended to be excepted," the court explained, are "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of the sovereign power to which they belong…." *Id.* By contrast, for people who settled here and raised their children here—*i.e.*, became "domiciled here"—"it is clear that it will never be conceded by our government that such persons are subject to any foreign power" because they are instead "subject to the jurisdiction

18

of the United States." *Id.* at 697-98.  The States (at 46) plainly misread *Benny* to dismiss the court's references to domicile—as they do for *Wong Kim Ark*—as merely the question presented and not relevant to the case's holding.

Plaintiffs underscore their misunderstanding of the relevant principles in arguing that the Executive Order's understanding of the Citizenship Clause would call into question the citizenship of all children born to "dual citizens," "lawfully present immigrants," States Br. 43, or "the *millions* of European immigrants who entered the United States in the 19th and 20th centuries," Individuals Br. 46.  As we have explained, *see* Gov't Br. 17-18, a person can be subject to the "political jurisdiction" of the United States, *Wong Kim Ark*, 169 U.S. at 693, even if they remain citizens of another nation (as Wong's parents were).[5]

### D. The Individuals Covered by the Executive Order Are Not Completely Subject to the United States' Political Jurisdiction.

In short, the text and history of the Citizenship Clause, Supreme Court precedents, and other sources all support the conclusion that only persons completely subject to the political jurisdiction of the United States fall within the scope of the Citizenship Clause.  That category includes citizens and aliens who are lawfully domiciled here, whose children are "subject to the jurisdiction" in the relevant sense. But that category does not include persons temporarily present in the United States or

---

[5] Plaintiffs' comparison of the status of Wong's parents and lawful permanent residents today (Individuals Br. 22-24) is entirely beside the point; the salient point is that Wong Kim Ark's parents were domiciled in the United States.

19

those illegally present, who lack "the legal capacity to establish domicile in the United States." *Carlson v. Reed*, 249 F.3d 876, 880-81 (9th Cir. 2001); Gov't Br. 24, 30.

Plaintiffs have little response to this basic point. Plaintiffs ignore entirely the precedents of the Supreme Court and this Court concluding that temporarily or illegally present aliens cannot establish domicile. Even if domicile is generally established by presence with an intent to remain, States Br. 46-47; Individuals Br. 40, that does not address Congress's well-recognized authority to limit the ability to establish domicile in the United States, consistent with historical limitations on acquiring domicile. After ignoring these barriers, the States (at 47) then invert the relevant test, asserting that "many" aliens covered by the Executive Order can establish domicile. But plaintiffs bring a *facial* challenge to the Order and thus must show that the Order is unlawful in *all* its applications. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

### E. Plaintiffs' Statutory Claim Fails Because the Statute Has the Same Meaning as the Citizenship Clause.

Plaintiffs argue that even if the Executive Order reflects the original meaning of the Citizenship Clause, this Court should nonetheless affirm because the 1940 and 1952 enactment of 8 U.S.C. § 1401 and its precursor codified the "bright-line grant of birthright citizenship," which they assert was "confirmed in *Wong Kim Ark*," States Br. 51, and was "universally understood" at the time, Individuals Br. 50.

Plaintiffs, however, point to no "well-settled" interpretation, *Kemp v. United States*, 596 U.S. 528, 539 (2022), necessary to overcome the general rule that similarly worded legal instruments should be read to have the same meaning, *see Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 587 U.S. 262, 268 (2019). As discussed, the weight of legal authority in the decades after *Wong Kim Ark* recognized that the decision was limited to children born to individuals domiciled in the United States and did not extend to the children of temporary visitors. In contrast to the numerous authorities advancing this reading between 1898 and 1952, *see* Gov't Br. 27, 38-39, plaintiffs rely almost entirely on authorities that either pre-date *Wong Kim Ark* or post-date the statutes. And as noted above, at least one of their sources from the relevant time period, Flournoy's *Yale Law Journal* article, acknowledges that it is challenging the consensus view. Flournoy, *supra*, at 552.

Plaintiffs cite a report by the Roosevelt administration that accompanied the bill Flournoy helped draft and Flournoy's own testimony to Congress to urge that Congress intended to reject any requirement of domicile (States' Br. 50-51), but neither is not particularly probative about whether the disagreement identified by Flournoy had resolved into a consensus on that issue. To the contrary, the continued disagreement between the report and testimony inserted into the legislative history and contemporaneous treatises strongly suggests it had not. *See* Sidney Kansas, *Immigration and Nationality Act Annotated* 183 (4th ed. 1953) (describing the statute as excluding "children of … transients or visitors").

21

Plaintiffs' other sources show, at most, that the issue remained a contested one—not that there was a "well-settled" meaning incorporated into the statute. Apparently divergent views were reached, for example, about the status of a child born to parents awaiting admission at Ellis Island. *Compare The Nationality Act of 1940*, 54 Harv. L. Rev. 860, 861 (1941) (concluding they were not citizens), *with* 3 Green Hayword Hackworth, *Digest on International Law* § 221, at 10 (1942) (reporting, after passage of the 1940 statute, earlier State Department memorandum concluding that one such person was a citizen). Even scholars who argued that aliens here illegally *should* be covered by the Fourteenth Amendment identified no case law supporting their position. *See* Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 425-27 (1912). And the other authorities plaintiffs cite predating the 1940 statute do not address the question. *See In re Nunez*, 18 F. Supp. 1007, 1007 (S.D. Cal.) (noting that children born to a woman while lawfully residing in United States were citizens even though she later became deportable), *rev'd sub nom. Ex parte Nunez*, 93 F.2d 41 (9th Cir. 1937); *Perkins v. Elg*, 307 U.S. 325, 327 (1939) (involving a child born to naturalized American citizens); *Morrison v. California*, 291 U.S. 82 (1934). Post-enactment authorities do not evidence a pre-enactment, settled meaning, and in any event do not address the issue either. *Regan v. King*, 134 F.2d 413 (9th Cir. 1943) (per curiam); *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957); *INS v. Errico*, 385 U.S. 214, 215 (1966).

22

Finally, even if plaintiffs were able to show a well-settled meaning of "subject to the jurisdiction thereof," their facial claim would fail because many individuals covered by the Executive Order would not be "in the United States" as that term was understood in 1940 and 1952. The Supreme Court's decisions in *Kaplan v. Tod*, 267 U.S. 228, 230 (1925); *United States v. Ju Toy*, 198 U.S. 253, 263 (1905); and *Nishimura Ekiu v. United States*, 142 U.S. 651, 661 (1892), had created a well-understood legal rule that parents who had not been legally admitted in the United States "were not within the United States" but were legally treated as "still [being] at the frontier" and thus would not fall within the statutes. *The Nationality Act of 1940*, *supra*, at 861 n.8. Therefore, even if the midcentury understanding of 8 U.S.C. § 1401(a)'s requirement to be born "subject to the jurisdiction" of the United States could help plaintiffs, the midcentury understanding of the second requirement of being "born in the United States" would defeat their facial challenge.

## II. The District Court's Injunctive Relief Is Substantially Overbroad.

As our opening brief explained, the district court's nationwide injunction—premised entirely on the claims of the State plaintiffs—was inappropriate. The States cannot sue to vindicate individuals' Citizenship Clause rights and, in any event, lack Article III standing. And even if the States were proper parties, a nationwide injunction is not necessary to provide the States complete relief. Thus, even if the

plaintiffs are entitled to injunctive relief, the injunction should be narrowed to the individual plaintiffs.

### A. The States Are Not Proper Parties and Thus Are Not Entitled to Injunctive Relief.

**1.** The States begin by rejecting the relevance of their standing, suggesting it is irrelevant because the individual plaintiffs have standing. States Br. 10-11. That is manifestly wrong. The States correctly note that the presence of one plaintiff with standing is "enough for the Court to proceed to the merits," States Br. 10, and the individual plaintiffs' claims here are a basis to decide the merits. But the Supreme Court has been equally clear that "[a]t least one plaintiff must have standing" for "each form of relief." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017); *see Lewis v. Casey*, 518 U.S. 343, 357, 358 n.6 (1996) ("Standing is not dispensed in gross," and "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). That is why the other circuits to have addressed a similar argument have explained that standing issues may be bypassed only where "each party for whom standing was at issue requested identical relief." *Wikimedia Found. v. NSA*, 857 F.3d 193, 217 (4th Cir. 2017). Here, by contrast, the States seek "'additional' individualized relief" beyond what was sought by the individual plaintiffs. *M.M.V. v. Garland*, 1 F.4th 1100, 1110 (D.C. Cir. 2021). The individual plaintiffs never requested a nationwide injunction, and the district court expressly premised its nationwide injunction on remedying purported injuries to the

States.  If the States are not proper parties, there is plainly no basis for a nationwide injunction.[6]

**2.**  The States fail to overcome the general rule that a party "must assert his own legal rights" and not the rights of "third parties."  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation marks omitted); *accord, e.g.*, *United States v. Hansen*, 599 U.S. 762, 769 (2023); *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 393 n.5 (2024).  Yet the States seek to enjoin an Executive Order they allege "directs federal agencies to deprive *individuals of their rights*," "rob[s] *individuals of their* constitutionally conferred and statutorily protected *citizenship*," States Br. 1, 25 (emphases added), and "strip[s] *individuals of their right* to citizenship," ER-54 (emphasis added).  *See also* States Br. 2, 55-56; ER-18.

The States thus seek to litigate the rights of third parties—current and future residents—because of downstream effects the rights of those individuals might have on the States.  That is precisely the scenario in which litigating the claims of others is forbidden.  In *Kowalski*, for example, the Supreme Court assumed that criminal defense attorneys had established Article III standing through allegations that a state law "reduced the number of cases in which they could be appointed and paid as

---

[6] The individual plaintiffs also argue a class-wide injunction would be appropriate.  But the district court declined to certify a class, ER-14 n.9, and "in the absence of class certification, the preliminary injunction may properly cover only the named plaintiffs."  *National Ctr. for Immigrants Rights, Inc. v. INS*, 743 F.2d 1365, 1371 (9th Cir. 1984).

assigned appellate counsel" for future "hypothetical indigents," but nevertheless held that the attorneys could not assert those individuals' constitutional right to counsel. 543 U.S. at 127, 129 n.2, 134.

The States' various efforts to avoid the rule against third-party standing are unsuccessful. They first suggest the rule does not apply after *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). States Br. 23-24. But *Lexmark* expressly distinguished third-party standing from the prudential doctrines it criticized. 572 U.S. at 127 n.3. And this Court has joined "all other courts to have spoken on the issue" in holding "that the third-party-standing doctrine … remain[s]" post-*Lexmark*. *Ray Charles Found. v. Robinson*, 795 F.3d 1109, 1118 n.9 (9th Cir. 2015) (collecting cases).

That rule forecloses the States' claim here, and none of the cases they cite suggests otherwise. Most involve allegations that the States' own rights were violated. *South Dakota v. Dole* addressed a grant requirement that required States to adopt a particular drinking age to receive federal funds, which South Dakota contested under the Twenty-first Amendment. 483 U.S. 203, 205 (1987). *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), expressly declined to consider arguments that the federal law violated any individual rights, *id.* at 324, only addressing the States' challenge that their sovereignty was violated by legislation regulating the State itself—preempting state voting law, imposing additional procedures for state legislation, and imposing federal supervision over their elections, *id.* at 307, 333-37. Similarly, in *Haaland v. Brackeen*,

26

599 U.S. 255 (2023), Texas was allowed to challenge only those portions of the statute that imposed legal obligations on the State itself—provisions requiring Texas to maintain and make available certain records, to notify certain individuals of involuntary proceedings to place children in foster care, and to produce expert testimony before terminating parental rights.  *Id.* at 266, 287-88, 296.[7]

Finally, *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) (per curiam), falls within an "exception" to the rule against third-party standing that applies when "the party asserting the right has a 'close' relationship with the person who possesses the right" and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 129-30.  While the application of these criteria has been, at times, "quite forgiving," *id.* at 130, the States do not invoke this exception and it does not apply here, where multiple individuals are pursuing their claims here and elsewhere.

Indeed, the States do not invoke any recognized exception to third-party standing principles.  They instead put forward a variety of supposed legal rights that belong to the States themselves.  States Br. 18-20, 24.  But like the States' purported "pocketbook" injuries, these supposed injuries are entirely dependent on a determination about the individual rights of state residents.  Even if those purported

---

[7] *Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020), involved dozens of plaintiffs seeking overlapping relief, rendering any disputes about the States' standing irrelevant.  *See id.* at 36 n.7.

injuries were viable under Article III, such claims would still be barred by third-party standing principles. *Kowalski*, 543 U.S. at 134.

More generally, the district court did not rely on these harms in assessing standing or fashioning injunctive relief, and for good reason. The Executive Order does not purport to dictate how the States determine citizenship for purposes of "state-run elections or jury systems," States Br. 23, and the States have no cognizable interest in how *federal* officials react when they receive state-issued identity documents. Indeed, the States' theory appears to be that they would be free to assert *any* individual's citizenship or naturalization-related claims, as such policies would necessarily affect state citizenship as well. The States cite no authority supporting that sweeping premise. At a minimum, such harms cannot establish irreparable harm justifying a preliminary injunction, as children subject to the Order would not be eligible to vote or serve on juries for many years.

**3.** The injuries the district court relied on are also insufficient. The States premise standing on purported losses of federal funding from programs administered by the States but jointly funded by States and the federal government. States Br. 11. At the outset, the programs at issue—Medicaid, the Children's Health Insurance Program, and the Enumeration at Birth Program—involve circumstances where the federal government reimburses for services provided under the program. *See, e.g.*, 1-SER-153 (Washington pays $2,844 per child on physical health care coverage, with 55% reimbursed by the federal government and the remainder paid by the state). But

28

when someone is ineligible, neither the State nor the federal government pays for the individual under the program, and the State would not incur the costs for which reimbursement would be reduced. The States' injuries here thus turn on the claim that they would incur other expenses because of a voluntary decision to provide services outside the federal program—a self-inflicted injury that cannot support standing. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam).

In any event, these sorts of downstream effects of federal policy on State expenditures are the sort of attenuated and indirect effects that cannot give rise to State standing. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023); *Washington v. FDA*, 108 F.4th 1163, 1175-76 (9th Cir. 2024). The States rely (at 12) on *Department of Commerce v. New York*, 588 U.S. 752 (2019), and *Biden v. Nebraska*, 600 U.S. 477 (2023), but those cases involved much more direct claims of harm than those at issue here. *Department of Commerce* involved allegations about the loss of federal funds "distributed on the basis of state population" from an undercount on the decennial census. 588 U.S. at 767. Those funds were thus directly tied to the enumeration and were not coupled with an offsetting reduction in state spending. And *Nebraska* is even further afield: there, the federal government cancelled contracts serviced by an arm of a state, again a far more direct injury than the downstream effects a decision about citizenship has on determining who will or will not be eligible to receive federal assistance. 600 U.S. at 490.

Finally, the States suggest (at 20-21) that the Executive Order will affect their ability to regulate noncitizens within their borders. This tilts at windmills. Nothing in the Executive Order suggests that individuals covered by it are exempt from federal or state regulatory jurisdiction. To the contrary, the central point is that individuals are required to obey U.S. law—and may be punished for violating it—without being "subject to" its "jurisdiction" for purposes of the Citizenship Clause.

### B. At a Minimum, the Injunction Should Be Narrowed.

**1.** The States pay lip service to the principle that injunctive relief should be no broader than necessary to provide complete relief to the plaintiffs, States Br. 57-61, but they fail to justify the district court's nationwide injunction. The States argue that the injunction must be nationwide because a child born in Maine or Florida might move to Washington (or another plaintiff State), or a resident of a plaintiff State might give birth in another State. States Br. 59-60. As we explained, Gov't Br. 52, treating the child as a citizen while the child is in a plaintiff State would provide complete relief for the plaintiff States' purported injuries.

Aside from an unexplained assertion that this would be "unworkable," the States do not seriously dispute that this narrower injunction would provide them complete relief. *See* States Br. 61-62. Plaintiffs claim (States Br. 61) that the opening brief is "the first time" the federal defendants suggested a narrower injunction, but the defendants have repeatedly argued that a geographically limited injunction would provide complete relief. *See* 1-SER-8 (requesting "an order that provided relief only

30

within their borders"); 2-SER-376-377.  Finally, the States raise (at 62) single-sentence, unexplained objections that a narrower injunction would not remedy their sovereign injuries and that they are legally required to verify citizenship of individuals in federally funded programs.  Neither argument is substantial.  An injunction applicable to persons in the plaintiff States would provide complete relief and would not require altering the States' procedures for verifying citizenship.  And state-by-state relief has been workable in other immigration-related contexts.  *See Texas v. United States*, 126 F.4th 392, 420-21 (5th Cir. 2025) (enjoining the enforcement of the Deferred Action for Childhood Arrivals Program but limiting relief to Texas).

The need to tailor the injunction is especially apparent given that other States oppose injunctive relief.  While the plaintiff States dismiss their sister States as pressing mere "policy complaints" about the "harm" those States will suffer "if immigration is not reduced," States Br. 56 n.10, in considering the balance of harms and the public interest, there is no basis for privileging the plaintiff States' harms over other States', particularly where a narrower injunction would fully remedy the plaintiff States' harms.

**2.**  The injunction also improperly prohibits executive agencies from formulating or issuing public guidance about how they would implement the Citizenship Order.  Plaintiffs suggest that "[o]nce the court … determined that the [Executive Order] was unlawful, there was no reason to allow Defendants to work to implement it."  Individuals Br. 57; *accord* States Br. 56-57.  This Court has already

31

explained that there is no basis to enjoin "internal review procedures that do not burden individuals outside of the executive branch of the federal government." *Hawaii v. Trump*, 859 F.3d 741, 786 (9th Cir.) (per curiam), *vacated on other grounds*, 583 U.S. 941 (2017). Plaintiffs do not and cannot claim harm from internal steps, and the injunction by definition is "not narrowly tailored to addressing only the harms alleged," particularly given the general rule that the government is given the "widest latitude in the dispatch of its own internal affairs." *Id.* (quotation marks omitted).

## CONCLUSION

The preliminary injunction should be reversed, or at a minimum narrowed.

Respectfully submitted,

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
SHARON SWINGLE
BRAD HINSHELWOOD

  *s/ Derek Weiss*
DEREK WEISS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7325*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-5365*
  *derek.l.weiss@usdoj.gov*

April 2025

32

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Circuit Rule 32-1(b) and Circuit Rule 32-2 because it is a single brief replying to multiple briefs and contains 8,303 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Derek Weiss*
Derek Weiss