No. 25-807

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

STATES OF WASHINGTON, ARIZONA, ILLINOIS, and OREGON,

*Plaintiffs-Appellees*,

CHERLY NORALES CASTILLO and ALICIA CHAVARRIA LOPEZ, on behalf of themselves as individuals and others similarly situated,

*Plaintiffs-Appellees*,

v.

DONALD TRUMP, in his official capacity as
President of the United States, et al.,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Western District of Washington
Case No. 2:25-cv-00127-JCC
The Honorable John C. Coughenour

## PLAINTIFF STATES' SUPPLEMENTAL BRIEF

NICHOLAS W. BROWN
*Attorney General of Washington*

COLLEEN M. MELODY, WSBA 42275
  *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
  *Assistant Attorneys General*
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200

*(Additional Counsel on Signature Page)*

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.   BACKGROUND ........................................................................2

III.  ARGUMENT ...............................................................................7

     A.  *CASA* Confirms the District Court Applied the Correct "Complete
         Relief" Standard in Issuing a Nationwide Injunction.................................7

     B.  A Nationwide Injunction Is Necessary to Provide the Plaintiff States
         with Complete Relief, and Defendants Present No Facts or Serious
         Argument Otherwise ...............................................................................12

IV.  CONCLUSION............................................................................20

# TABLE OF AUTHORITIES

Cases

*Barbara v. Trump*,
    No. 25-cv-244, 2025 WL 1904338 (D.N.H. July 10, 2025) ...................................2

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...................................9

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) ...................................10

*City & County of San Francisco v. Barr*,
    965 F.3d 753 (9th Cir. 2020) ...................................10

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020) ...................................11

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ...................................9

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ...................................9

*Hecht Co. v. Bowles*,
    321 U.S. 321 (1944) ...................................8

*Kinney-Coastal Oil Co. v. Kieffer*,
    277 U.S. 488 (1928) ...................................8

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ...................................4

*Missouri v. Trump*,
    128 F.4th 979 (8th Cir. 2025) ...................................10

*New Jersey v. Trump*,
    No. 25-cv-10139 (D. Mass. July 8, 2025). ...................................6

*Shaw v. Hunt,*
517 U.S. 899 (1996) ................................................................8

*Steele v. Bulova Watch Co.,*
344 U.S. 280 (1952) ................................................................7

*Trump v. CASA, Inc.,*
606 U.S. ----, 2025 WL 1773631 (June 27, 2025) ..................1

*Trump v. Hawaii,*
585 U.S. 667 (2018) ................................................................8

## Statutes

8 U.S.C. § 1611(a) ...................................................... 14, 16

8 U.S.C. § 1611(c)(1)(B) ............................................. 14, 16

42 U.S.C. § 1320b-7(a) ............................................... 14, 16

42 U.S.C. § 1320b-7(b)(1) ...............................................16

42 U.S.C. § 1320b-7(b)(2) ...............................................16

42 U.S.C. § 1320b-7(b)(4) ...............................................16

42 U.S.C. § 1396b(v) .................................................. 14, 16

## Regulations

42 C.F.R. § 435.406 .................................................... 14, 16

42 C.F.R. § 435.407 ........................................................17

42 C.F.R. § 435.956(b) ....................................................17

## Other Authorities

*Protecting the Meaning and Value of American Citizenship,*
Exec. Order 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) .......16

iii

U.S. Census Bureau, U.S. Dep't of Com., *Geographical Mobility in the Past Year by Age for Current Residence in the U.S., Am. Cmty. Survey, ACS 1-Year Estimates Detailed Tables, Table B07001*, https://tinyurl.com/mpau42e9................................................................13

## I.    INTRODUCTION

The Supreme Court's decision in *Trump v. CASA, Inc.*, 606 U.S. ----, 2025 WL 1773631 (June 27, 2025), confirms that the district court did not err, much less abuse its discretion, in reaching the factual conclusion that nationwide preliminary relief was necessary to protect the Plaintiff States from irreparable harm. The Court did not cast a sliver of doubt on the conclusion of every lower court that the Citizenship Stripping Order is plainly unlawful. It addressed only a remedy question, holding that universal injunctions designed to benefit non-parties likely exceed the statutory authority of federal courts under the Judiciary Act of 1789. In doing so, however, the Supreme Court reaffirmed the longstanding principle that injunctions should provide complete relief to plaintiffs. And this is the basis upon which the Plaintiff States sought, and the district court awarded, a nationwide injunction.

Because the Supreme Court held that nationwide injunctions can be appropriate to "award[] complete relief" to the parties themselves, it rejected Defendants' contention that the injunctions in this case and the District of Massachusetts, which was similarly designed to protect a group of state plaintiffs, were improper. The Supreme Court instead granted a partial stay *only* to the extent the injunctions go beyond what is necessary to provide the Plaintiff States and other plaintiffs with complete relief. As the Plaintiff States have consistently argued here, and as the district court concluded based on the unrebutted record, nationwide relief

is necessary in this case because "[a]nything less is ineffectual." ER-15. *CASA* confirms that the district court had authority to issue relief on a nationwide basis, and the Court should affirm the district court's injunction in full.

## II.    BACKGROUND

Like every federal court to review the Citizenship Stripping Order on the merits, the district court in this case concluded that it is flatly contrary to the Fourteenth Amendment's text and history, Supreme Court precedent, longstanding Executive Branch interpretation, and the Immigration and Nationality Act. *See* ER-7-12; States' Answering Br. at 6 (detailing other cases).[1] The district court also correctly recognized the grave harms it will cause to the Plaintiff States and their public agencies, programs, fiscs, and residents. ER-12-15. Based on the unrebutted record before it, the district court fashioned an appropriate injunction to remedy those harms: the nationwide injunction that provides the Plaintiff States with complete relief and preserves the centuries-old status quo while the case proceeds. *Id.* Now, as relevant to the scope-of-relief question following *CASA*, a few key points from the record bear highlighting.

*First*, the Plaintiff States have asserted from the beginning that a nationwide

---

[1] On July 10, 2025, the District of New Hampshire certified a provisional class that mirrors the categories of individuals covered under the Citizenship Stripping Order and issued a classwide preliminary injunction. *See Barbara v. Trump*, No. 25-cv-244, 2025 WL 1904338, at *16 (D.N.H. July 10, 2025). That injunction is stayed for seven days pending appeal.

2

injunction is necessary to provide them with complete relief—*not* that they wanted a universal injunction untethered from their actual harms. *See, e.g.*, 1-SER-52 ("A nationwide injunction is necessary due to the extraordinary nature of the Citizenship Stripping Order and the impossibility of fashioning an injunction of lesser scope that would provide complete relief to the Plaintiff States."); 2-SER-403-404 (explaining how nationwide relief "is required for complete relief" because if children born in other states are unlawfully deemed non-citizens under the Citizenship Stripping Order and move to the Plaintiff States, "the Plaintiff States will suffer the same irreparable injuries to their sovereign interests and substantial financial losses and administrative burdens that they would without any injunction at all"); *accord* 1-SER-19-20; Dkt. 31.1 at 18-20.

To support their request for an injunction, the Plaintiff States detailed the sovereign harms they would suffer by having thousands of their residents deemed non-citizens, and they presented undisputed evidence that, beginning immediately, the Order would cause the loss of millions of dollars in federal funding for programs the States administer, such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-E foster care, and the Social Security Administration's Enumeration at Birth program, and also impose mammoth costs and administrative burdens to modify those programs should the Citizenship Stripping Order take effect in full or in part. *See* 1-SER-30-38, 44-53, 107-180, 242-248, 254-279, 292-299;

2-SER-302-311.

*Second*, while arguing that nationwide injunctions are improper, Defendants have acknowledged that injunctions may be appropriately designed to provide plaintiffs with complete relief. 2-SER-376-377 (citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994)). And despite having the opportunity, they did not offer any alternative for the district court to consider and largely ignored the record of harm to the States and the chaos that will ensue should the United States, for the first time since the Civil War, have a citizenship rule that turns on a person's state of residence. Rather, at the district court, Defendants simply said "spillover effect[s] on state expenditures" are not sufficient and offered no further details. *Id.* Before this Court, Defendants challenge the scope of the injunction on the ground that universal injunctions are never permissible because they violate Article III— while still conceding the complete relief rule, declining to grapple with the factual record, and offering only threadbare criticisms of the district court's complete relief conclusion. Opening Br. at 49-52; *see also* Dkt. 21.1 at 17-18.

To date, Defendants have offered no evidence or serious proposal to show how a narrower injunction would actually work in light of the established rule of birthright citizenship, including the complex laws and state systems built upon the long-settled principle that all children born here are citizens. On appeal, Defendants' legal arguments regarding the Plaintiff States' need for complete relief have been

nothing more than ill-conceived (and evolving) suggestions. They first suggested that children moving to the Plaintiff States could be deemed categorically eligible for services regardless of their actual citizenship, which would violate federal law. *See* Opening Br. at 51-52; *infra* Section III.B. They then proposed that children simply be "treat[ed]" as citizens when they are physically present in the Plaintiff States, even though that would be impossible to manage in reality, place residents at grave risk of arrest and removal should they leave the Plaintiff States, and impose extensive new burdens on the Plaintiff States, which would be required to manually verify citizenship for those children born elsewhere who would not be given any type of citizenship-affirming document or an SSN when born in non-Plaintiff States. *See* Reply Br. at 30; *infra* Section III.B.

*Third*, the district court did not reflexively award a "universal" injunction that benefits non-parties. It expressly applied the "complete relief" standard in determining that its injunction should apply nationwide. Indeed, the district court anticipated the Supreme Court's guidance in *CASA*, recognizing that "[i]t is axiomatic that injunctive relief must be narrowly tailored." ER-14. It then noted that the Plaintiff States "contend anything less [than nationwide relief] cannot provide complete relief," and credited the unrebutted record showing as much. *Id.* For example, the district court explained that "babies born in other states would travel to the Plaintiff States[,]" and "[o]nce they do, those persons would be eligible for

services and support that, without nationwide relief, need be funded by the Plaintiff States, without federal support (even though that same funding would continue for babies born within the Plaintiff States to parents of comparable immigration status)." ER-14-15. The district court further recognized that the recordkeeping and administrative burdens from any narrower proposal mandated nationwide relief. ER-15. In short, the district court concluded, "relief must be nationwide" because "*[a]nything less is ineffectual*." *Id.* (emphasis added).

Against this backdrop, Defendants asked the Supreme Court for a partial stay of the district court's injunction, as well as two other injunctions. The Supreme Court issued its opinion on June 27, 2025, and this Court ordered supplemental briefing the same day. Dkt. 145.1. In light of the Supreme Court's direction that lower courts expeditiously consider the propriety of the injunction's scope, the Plaintiff States requested a limited remand so that the district court could, in the first instance, consider the impact of *CASA* and any proposals Defendants wish to offer regarding a narrower injunction. Dkt. 146.1. Defendants opposed that motion, saying they need not further develop their arguments or evidence regarding how a narrower injunction would work.[2] *See* Dkt. 147.1. That motion remains pending.

---

[2] Defendants took a similar position in the District of Massachusetts case, declining to submit any new proposals or evidence to support their arguments that a narrower, patchwork injunction would be sufficient to remedy those states' harms. *See New Jersey v. Trump*, No. 25-cv-10139, Dkt. 193 (D. Mass. July 8, 2025).

# III.   ARGUMENT

## A.   *CASA* Confirms the District Court Applied the Correct "Complete Relief" Standard in Issuing a Nationwide Injunction

The Supreme Court's *CASA* decision addressed injunctions awarded to three types of plaintiffs—individuals, organizations, and states, including the Plaintiff States here. The federal government sought to partially stay the injunctions "and limit them to the parties." *CASA*, 2025 WL 1773631, at *5. In ruling on the Defendants' stay applications, the Court answered the question "whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions[,]"[3] which the Court defined as injunctions based on a district court's "asserti[on] [of] the power to prohibit enforcement of a law or policy against *anyone*." *Id.* at *4-5. In setting forth the type of injunctions it considered to be unauthorized, the Court distinguished between "universal" injunctions, designed primarily to protect non-parties, and "traditional, parties-only injunction[s]," which, while more limited, "can apply beyond the jurisdiction of the issuing court." *Id.* at *4 n.1 (citing *Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952)). As the Supreme Court explained, "[t]he difference between a traditional injunction and a universal injunction is not so much *where* it applies, but *whom* it protects[.]" *Id.*

The Court concluded that courts likely do not have the authority under the

---

[3] The Court "express[ed] no view on the Government's argument that Article III forecloses universal relief." *CASA*, 2025 WL 1773631, at *6 n.4.

Judiciary Act of 1789 to issue so-called "universal" injunctions designed to protect "anyone, anywhere." *Id.* at *4, 13. In doing so, however, the Court reiterated that there is no broad rule that injunctions applying nationwide or which incidentally benefit non-parties are per se impermissible. Instead, the Court reaffirmed the "complete-relief principle" that "has deep roots in equity[,]" explaining that "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at *10-11 (citing *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). And importantly, courts may do so where, as a practical matter, the relief may "advantag[e] nonparties," since "they do so only incidentally." *Id.* at *11 (citing *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). Indeed, the Court acknowledged there may be injuries "for which it is all but impossible for courts to craft relief that is complete *and* benefits only the named plaintiffs." *Id.* at *11 n.12 (citing *Shaw v. Hunt*, 517 U.S. 899 (1996) (racially gerrymandered congressional maps)). Thus, while complete relief "is the maximum a court can provide[,]" the Court confirmed that "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Id.* at *12 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

The Supreme Court's decision confirms that the district court's injunction is on sound legal footing. Indeed, the Court declined to conclude that the district court

injunctions to the States are impermissible under this established standard. *Id.* at *11-12. The Court recognized that, in contrast to the injunction entered as to the non-State plaintiffs, the lower court injunctions issued to protect the Plaintiff States by the district court below and the District of Massachusetts did not purport to directly benefit non-parties. *Id.* They instead reflected the decision that a broad injunction was necessary to remedy the States' injuries. *Id.* The Court thus granted the partial stay "*only to the extent* that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at *15 (emphasis added). And on that score, the Court did not question the States' standing. *Id.*

Consistent with *CASA*, this Court has previously recognized that "complete relief" must "give prevailing parties the relief to which they are entitled," and is appropriate even if it incidentally benefits non-parties. *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021) (citations omitted); *see also Doe #1 v. Trump*, 957 F.3d 1050, 1069-70 (9th Cir. 2020) (affirming "nationwide relief [as] necessary to afford the class members the relief to which they are entitled"). To be complete, that equitable relief "must remedy [all the] harms" the plaintiff suffers. *E. Bay Sanctuary Covenant*, 993 F.3d at 680; *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be 'no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'").

This Court has in turn regularly applied the complete relief standard in both

upholding and narrowing injunctions. *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1166-67 (9th Cir. 2017) (declining to narrow geographic scope of TRO barring enforcement of Executive Order nationwide where "the Government has not proposed a workable alternative form of the TRO that accounts for the nation's multiple ports of entry and interconnected transit system and that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders"); *City & County of San Francisco v. Barr*, 965 F.3d 753, 765 (9th Cir. 2020) (holding that "[w]hile extending this same relief to non-party jurisdictions beyond California's geographical bounds would likely be of consequence to those other jurisdictions, it does nothing to remedy the specific harms alleged by the Plaintiffs in this case"); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) ("[A]n injunction that applies only to the plaintiff states would provide complete relief to them. . . . The injunction must be narrowed to redress only the injury shown as to the plaintiff states."). *CASA* reaffirms the correct standard that this Court has often relied upon and which the district court followed.

Other Circuits have similarly upheld nationwide injunctions in order to ensure that political jurisdictions are provided complete relief. For instance, in *Missouri v. Trump*, 128 F.4th 979, 985, 997 (8th Cir. 2025), the Eighth Circuit affirmed a nationwide injunction because it provided "complete relief" for states that challenged the authority of the federal government to forgive student loans.

10

In rejecting the defendants' request to narrow the injunction to loans held by the Missouri loan servicer, the court relied on the fact that individuals move across state lines to explain why a nationwide injunction was required for "complete relief." *Id.* at 997. It explained that "[t]hrough a process called rebalancing, the Department can move student loan accounts from one servicer to another." *Id.* Thus, "[a] borrower could spend nine years living in Kansas, paying off loans thinking he would obtain forgiveness, only to move to Missouri in year ten or have his accounts shifted to MOHELA and no longer be eligible under the federal officials' preferred approach." *Id.* (explaining that a narrower injunction would not provide complete relief because it would also "create chaos and uncertainty" and "be difficult to administer").

So too in *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020). There, Chicago sought an injunction prohibiting the federal government from enforcing unlawful immigration-related conditions on recipients of federal funding under the Edward Byrne Memorial Justice Assistance Grant Program (Byrne JAG). *Id.* at 886-87. After acknowledging the debate around the propriety of "universal injunctions," the Seventh Circuit affirmed an injunction against the conditions nationwide on the ground that doing so was necessary "to provide complete and accurate relief to Chicago now and in the future." *Id.* at 921-28. The Court acknowledged, in a decision that anticipated *CASA*'s holding, that "[i]t is widely accepted—even by self-professed opponents of universal injunctions—that a court

may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties." *Id.* at 920-21 (citing *Califano*, 442 U.S. at 702). Applying that rule, the court explained that "the slice of the Byrne JAG pie that Chicago receives is related to the slices received by Illinois and other states, and if the imposition of the unlawful conditions eliminates Illinois or other states from receiving their own awards, then that can impact Chicago's award as well." *Id.* at 921. Thus, "[c]omplete relief to Chicago requires that in calculating its grants the unlawful grant conditions are not applied program-wide." *Id.* at 928.

*CASA* confirms that the district court properly applied these equitable principles. It will surely require narrower relief in some cases where courts had issued true "universal" injunctions going beyond what is needed to provide complete relief to plaintiffs. But this case falls well within the equitable authority *CASA* reaffirmed. This Court should therefore consider the same question that the parties briefed, and the district court considered, below: whether a narrower injunction will provide the Plaintiff States with complete relief. As the district court correctly concluded, it would not.

**B.    A Nationwide Injunction Is Necessary to Provide the Plaintiff States with Complete Relief, and Defendants Present No Facts or Serious Argument Otherwise**

In light of *CASA*'s confirmation that broad injunctive relief is permissible where needed to provide plaintiffs with complete relief, the district court's injunction

is plainly appropriate. The district court explicitly concluded that "relief must be nationwide" because "[a]nything less is ineffectual." ER-15. That conclusion is well supported by the unrebutted record in this case and confirmed by the federal Defendants' failure to offer any serious proposal for how a narrower injunction would possibly work. Indeed, even now, Defendants have opposed the Plaintiff States' request for a limited remand that would require Defendants to put their cards on the table. Dkt. 147.1. Given Defendants' repeated refusal to contribute anything to the record or meaningfully develop their arguments, they must now take it as it is.

And on that record, a geographically limited injunction would result in the same kinds of irreparable harms to the Plaintiff States as no injunction at all. The reason is simple: families often move across state lines.[4] *See CASA*, 2025 WL 1773631, at *12 ("Children often move across state lines or are born outside their parents' State of residence."). As a result, absent nationwide relief, the Plaintiff States may (depending on the exact scope of relief) suffer the same sovereign injuries

---

[4] The federal government's own data confirms the significant numbers of children who move to the Plaintiff States from other states each year. *See* U.S. Census Bureau, U.S. Dep't of Com., *Geographical Mobility in the Past Year by Age for Current Residence in the U.S., Am. Cmty. Survey, ACS 1-Year Estimates Detailed Tables, Table B07001*, https://tinyurl.com/mpau42e9 (American Community Survey data indicating that in 2023, an estimated 212,616 people moved to Washington from other states, including 29,175 children aged 1-17; an estimated 256,203 people moved to Arizona from other states, including 36,312 children aged 1-17; an estimated 203,758 people moved to Illinois from other states, including 24,773 children aged 1-17; and an estimated 125,246 people moved to Oregon from other states, including 15,565 children aged 1-17).

with respect to newly minted non-citizens who move to the States—those individuals will be excluded from the citizenry, depriving the States of their service (*e.g.*, as jurors, officeholders, police officers, and voters) and impacting the States' laws that turn on citizenship status. This will present the Plaintiff States with the same kinds of harms as newborns born in the States who are stripped of their citizenship. *See* States' Answering Br. at 18-21 (discussing sovereign harms to States).

With respect to the Plaintiff States' pocketbook injuries, it is undisputed that the States will suffer continued injuries and losses if children born outside their borders are denied citizenship pursuant to the Citizenship Stripping Order. Many such children will move into the Plaintiff States, meaning that the Plaintiff States' agencies would still be required to overhaul their systems to verify eligibility for Medicaid, CHIP, and Title IV-E because they must verify the actual citizenship or qualifying immigration status of *every* child they serve, regardless of where they were born. *See, e.g.*, 42 U.S.C. § 1320b-7(a) (requiring states who administer federally funded benefits to operate "eligibility verification system[s]"); *see also* 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406. *Accord* 1-SER-151, 153-158, 167-168, 259-260, 293-298; 2-SER-306-307, 309.

To avoid that straightforward and chaotic result, Defendants now say on appeal that the States could simply treat noncitizens moving to the States as eligible

for federally funded medical and social programs, Opening Br. at 52, and even go so far as to suggest that a child born in non-Plaintiff States can simply be "treat[ed] as a citizen while the child is in a plaintiff State," Reply Br. at 30. These suggestions fail for two independent reasons, as the Plaintiff States have explained previously.

*First*, Defendants have consistently refused to meaningfully elaborate upon their proposal for narrowing the injunction, thus depriving the Plaintiff States and the Court of the ability to fully understand how it might operate or rebut the notion that it might provide the Plaintiff States with complete relief. *See Wilkins v. United States*, 598 U.S. 152, 158 (2023) (for "efficiency and fairness, our [adversarial] legal system . . . require[s] parties to raise arguments themselves and to do so at certain times"). As the Plaintiff States have explained, the appropriate forum for that argument is in the district court, in order to permit that court to develop a record regarding the adequacy of Defendants' new proposal, and Defendants' refusal to agree to a limited remand or provide additional details about how the injunction might properly be narrowed constitutes forfeiture of any such opportunity. *Cf. J.D. v. Azar*, 925 F.3d 1291, 1336 (D.C. Cir. 2019) (a court is "not obligated to undertake the task of chiseling from the government's across-the-board ban a different policy the government never identified, endorsed, or defended").

*Second*, even if considered on their own terms, Defendants' proposals would come nowhere close to providing the Plaintiff States with complete or meaningful

15

relief—chaos is still assured under their new "narrower" proposals to this Court. The thrust of Defendants' suggestions is that a child's American citizenship could turn on and off depending on the state where the child is physically present or the purpose for which one's citizenship is being used. But with respect to the idea that children present in the Plaintiff States could simply be deemed eligible for Medicaid, CHIP, or Title IV-E services, or have citizenship be "sometimes on, sometimes off," Defendants ignore that the Plaintiff States are required by federal law to verify actual citizenship status for the programs they operate. *See* 1-SER-151, 153-158, 167-168, 259-260, 293-298; 2-SER-306-307, 309; *see, e.g.*, 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42 C.F.R. § 435.406. Absent changes to a host of federal laws and regulations, Defendants' proposal simply can't work.

For their Medicaid programs, for example, the Plaintiff States must verify through electronic systems the citizenship or qualifying immigration status of every person they serve. 42 U.S.C. §§ 1320b-7(a), (b)(1), (b)(2), (b)(4); *see* 42 C.F.R. § 435.406(c) (requiring verification of citizenship); *id*. § 435.956 (requiring verification through electronic means). Of course, SSNs will not be available to children born in the non-Plaintiff States, because the Citizenship Stripping Order says so. *See Protecting the Meaning and Value of American Citizenship*, Exec. Order 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025) (directing that "no department or agency of the United States government shall issue documents recognizing United States

citizenship, or accept documents . . . purporting to recognize United States citizenship" for covered newborns).

Where an individual's citizenship cannot be verified through electronic means with an SSN, the State Medicaid agency must work directly with the individual to complete verification and obtain documentation as to their citizenship. 42 C.F.R. § 435.956(b). And for those individuals who lack an SSN, the agency must "assist the individual in obtaining an SSN" so that the State can verify citizenship using the SSN once obtained. *Id.* § 435.956(b)(1)(i); *see also id.* § 435.407(e) (requiring states to assist applicants "in a timely manner" to "secur[e] satisfactory documentary evidence of citizenship"). As for manual verification, that requires documentation, and only certain forms of documentation like passports and certificates of citizenship are deemed acceptable as proof of citizenship, nearly all of which, like SSNs, will not be available to children born in non-Plaintiff States. *See* 42 C.F.R. § 435.407. In other words, absent a nationwide injunction, the Citizenship Stripping Order creates a problem—a patchwork system of citizenship and documentation—that the Plaintiff States will then bear the added burden of addressing.

Thus, even accepting Defendants' threadbare suggestion at face value, the Plaintiff States will suffer irreparable harm in overhauling and operating their services programs for the thousands of children per year who will move to the Plaintiff States without documentation of citizenship. Washington's Medicaid

agency, the Healthcare Authority (HCA), for example, explained how the automated verification process (operated consistent with federal law) would be upset and result in substantial new burdens on the agency. Currently, HCA uses an individual's SSN (consistent with federal law) to confirm identity and citizenship through what is called the "federal hub." 1-SER-153. For individuals who are citizens but lack SSNs, the agency must engage in a manual verification process that requires working with the individual to obtain proof of citizenship. 1-SER-154. Simply put, "[t]his is a manual process in which HCA works to verify an individual's citizenship or status on a case-by-case basis. It is administratively burdensome for both the individuals and HCA staff." *Id.* For children born in non-Plaintiff States who will not have SSNs or other citizenship affirming documents under Defendants' narrower injunction proposal, State Medicaid agencies will necessarily have to engage in a more burdensome process to try to verify their citizenship status on a case-by-case basis, while also assisting those individuals in trying to obtain SSNs or other proof of citizenship, which the Defendants have never confirmed would be provided. *Id.*; *see generally* 1-SER-262 (Arizona Medicaid agency assistant director explaining that an increase in non-automatic verifications for newborns will require additional staff to process verifications and additional funding to complete new administrative work).

    In addition to this increased verification burden, the Plaintiff States' agencies

will see their verification systems upended completely under a patchwork system where citizenship depends on one's place of birth and the status of a child's parents. In Washington, for example, changing HCA's verification systems to deal with a new patchwork birthright citizenship rule will require the work of at least 7-8 FTEs, training for thousands of staff, and several years' work. 1-SER-158. The harm and ongoing burdens will likewise be triggered in the other Plaintiff States. In Arizona, changes to the existing verification process for the State's Medicaid agency—even for newborns born in the state—would take approximately a year and cost between $2.3 million and $4.4 million. 1-SER-262. And the same is true for the Plaintiff States' child welfare agencies, which must verify the citizenship of children they serve and do not currently verify the status of children's parents at all, which is necessary to determine citizenship status under the Citizenship Stripping Order; each will face substantial burdens to update and modify their systems. *See, e.g.*, 1-SER-162, 1-SER-167-168 (Washington); 1-SER-297 (Oregon); 2-SER-306-310 (Illinois).

In sum, Defendants' proposals are unworkable, will still impose irreparable harms on the Plaintiff States, and *CASA* declined the opportunity to endorse them as a basis for limiting the district court's injunction. Had Defendants raised in the district court their proposed alternative to have citizenship "turn on" within the Plaintiff States for certain purposes when children move from other states, the

district court could have considered the factual and administrative complications it raises. Having declined to do so—including by opposing the Plaintiff States' request for a limited remand—Defendants cannot accuse the district court of an abuse of discretion. The record is unrebutted that a patchwork system of U.S. citizenship will cause the Plaintiff States substantial and irreparable harm, and *CASA* confirms the district court applied the correct standard in fashioning the injunction on a nationwide basis.

## IV.   CONCLUSION

This Court should affirm the district court's injunction in full.

RESPECTFULLY SUBMITTED this 11th day of July 2025.

NICHOLAS W. BROWN
  *Attorney General of Washington*

*s/ Lane Polozola*
COLLEEN M. MELODY, WSBA 42275
  *Civil Rights Division Chief*
LANE POLOZOLA, WSBA 50138
DANIEL J. JEON, WSBA 58087
ALYSON DIMMITT GNAM, WSBA 48143
  *Assistant Attorneys General*
Washington Attorney General's Office
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
206-464-7744
colleen.melody@atg.wa.gov
lane.polozola@atg.wa.gov
daniel.jeon@atg.wa.gov
alyson.dimmittgnam@atg.wa.gov

NOAH G. PURCELL, WSBA 43492
  *Solicitor General*
CRISTINA SEPE, WSBA 53609
MARSHA CHIEN, WSBA 47020
  *Deputy Solicitors General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
360-753-6200
noah.purcell@atg.wa.gov
cristina.sepe@atg.wa.gov
marsha.chien@atg.wa.gov
*Attorneys for State of Washington*

KRIS MAYES
  *Attorney General of Arizona*
JOSHUA D. BENDOR
  *Solicitor General*

21

LUCI D. DAVIS
  *Senior Litigation Counsel*
Arizona Attorney General's Office
2005 N. Central Ave.
Phoenix, AZ 85004
Telephone: 602-542-3333
Joshua.Bendor@azag.gov
Luci.Davis@azag.gov
*Attorneys for State of Arizona*


KWAME RAOUL
  *Attorney General of Illinois*
JANE ELINOR NOTZ
  *Solicitor General*
ALEX HEMMER
  *Deputy Solicitor General*
Illinois Attorney General's Office
115 South LaSalle St.
Chicago, IL 60603
Telephone: 312-814-5526
Jane.Notz@ilag.gov
Alex.Hemmer@ilag.gov
*Attorneys for State of Illinois*


DAN RAYFIELD
  *Attorney General of Oregon*
BENJAMIN GUTMAN
  *Solicitor General*
MICHAEL A. CASPER
  *Senior Assistant Attorney General*
Oregon Department of Justice
1162 Court St. NE
Salem, OR 97301
Telephone: 503-378-4402
Michael.Casper@doj.oregon.gov
*Attorneys for State of Oregon*

22

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2025, I electronically filed the foregoing documents with the Clerk of the Court by using the Appellate Case Management System. I further certify that the participants in the case are ACMS users, and that service will be accomplished by using the ACMS system.

DATED this 11th day of July 2025.

*s/ Lane Polozola*
LANE POLOZOLA

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-807

I am the attorney or self-represented party.

**This brief contains** | 4,760 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◉ complies with the length limit designated by court order dated June 27, 2025.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Lane Polozola | **Date** | July 11, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                 *Rev. 12/01/22*