**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF ILLINOIS; STATE OF OREGON; DELMY FRANCO ALEMAN; CHERLY NORALES CASTILLO; ALICIA CHAVARRIA LOPEZ, | No. 25-807 |
| | D.C. No. 2:25-cv-00127-JCC |
| *Plaintiffs - Appellees*, | |
| | OPINION |
| v. | |
| DONALD J. TRUMP; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; SOCIAL SECURITY ADMINISTRATION; UNITED STATES DEPARTMENT OF STATE; MARCO RUBIO, in his official capacity as United States Secretary of State; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; DOROTHY FINK, in her official capacity as Acting Secretary of United States Department of Health and Human Services; DOJ - UNITED STATES DEPARTMENT OF JUSTICE; PAMELA BONDI, Attorney | |

2          STATE OF WASHINGTON V. TRUMP

General; UNITED STATES
DEPARTMENT OF
AGRICULTURE; GARY
WASHINGTON, Acting Secretary of
the United States Department of
Agriculture; UNITED STATES OF
AMERICA; KRISTI NOEM, in her
official capacity as Secretary of
Homeland Security; JEFF WU,
Acting Administrator, Centers for
Medicare and Medicaid Services;
CENTERS FOR MEDICARE AND
MEDICAID SERVICES; FRANK
BISIGNANO, Commissioner of
Social Security,

*Defendants - Appellants*.

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted June 4, 2025
Submission Vacated June 6, 2025
Resubmitted July 23, 2025
Seattle, Washington

Filed July 23, 2025

Before: Michael Daly Hawkins, Ronald M. Gould, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Bumatay

## SUMMARY[*]

## Birthright Citizenship

The panel (1) affirmed the district court's grant of a universal preliminary injunction in favor of Washington, Arizona, Illinois and Oregon, and held that President Trump's Executive Order No. 14160, which purports to deny citizenship to the children born in United States territory of parents temporarily or unlawfully present in the United States, is invalid and unconstitutional; and (2) dismissed the claims of Individual Plaintiffs, a group of noncitizen pregnant women representing a putative class, because they are covered by a certified class action in another federal court.

The district court consolidated actions filed by the States and Individual Plaintiffs, and entered a preliminary injunction enjoining defendants from enforcing or implementing the Executive Order on a universal basis. After the district court granted its injunction, other courts throughout the country also enjoined implementation and enforcement of the Executive Order.

The Supreme Court accepted review on the scope of the injunction and held that the universal scope of the injunction was impermissible insofar as it was based on individual and associational plaintiff standing, leaving open the question of whether the universal injunction may be justified in order to give complete relief to the States. *Trump v. CASA, Inc.*, 606 U.S. ____, No. 24A884, 2025 WL 1773631 (June 27,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

2025). The district court of New Hampshire has since provisionally certified a nationwide class of plaintiffs and issued a classwide preliminary injunction, which it stayed until July 17, 2025, pending appeal in the First Circuit. *"Barbara," et al. v. Trump*, No. 25-cv-244-JL-AJ, 2025 WL 1904338 (D. N.H. July 10, 2025).

The panel held that the States had standing to bring suit because the loss of federal reimbursements, funding, and additional expenses incurred by the development of a new system to determine citizenship and public program eligibility were concrete and imminent economic injuries-in-fact, traceable to the Executive Order, and redressable by an injunction.

The panel declined to exercise jurisdiction with respect to the Individual Plaintiffs' action and dismissed their claims because, to the extent that their claims were not moot, they were covered by the class action certified by the district court of New Hampshire in *Barbara*.

Addressing the merits, the panel held that the Executive Order is invalid and unconstitutional because it contradicts the plain language of the Fourteenth Amendment's Citizenship Clause, which grants citizenship to "all persons born in the United States and subject to the jurisdiction thereof." The plain text and ordinary meaning of the Fourteenth Amendment, controlling precedent interpreting the Citizenship Clause, drafting history, and most post-ratification public understanding weighed in favor of interpreting the phrase "subject to jurisdiction thereof" to mean subject to United States authority and laws. Accordingly, the State Plaintiffs were likely to succeed on the merits of their claim that the Executive Order violates the Citizenship Clause by denying citizenship to

children who are born in the United States and are "subject to the jurisdiction thereof."

For the same reasons, the State Plaintiffs were likely to succeed on the merits of their claim that the Executive Order violates the Immigration and Nationality Act, 8 U.S.C. § 1401(a), which provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen. Congress made clear when enacting this statute that it was borrowing the statutory language from the Fourteenth Amendment.

The State Plaintiffs met their burden of showing that they were likely to suffer irreparable harm in the absence of preliminary relief because denial of reimbursements and administrative costs were economic injuries for which monetary damages under these circumstances are not available. The balance of equities tipped in the State Plaintiffs' favor, and the injunction was in the public interest because the Executive Branch does not have a legitimate interest in violating the Constitution.

Addressing the scope of the injunction, the panel held that the district court did not abuse its discretion in issuing a universal injunction in order to give the States complete relief. Because the States' residents may give birth in a non-party state, and individuals subject to the Executive Order may move between states, the States would need to overhaul their eligibility-verification systems for determining citizenship and incur administrative burdens. It was impossible to avoid this harm absent a uniform application of the Citizenship Clause throughout the United States.

Concurring in part and dissenting in part, Judge Bumatay joined Section III.B of the majority opinion in declining to reach the Individual Plaintiffs' claims. As the majority

observed, it appears that both of the Individual Plaintiffs have given birth, meaning their children are United States citizens—raising mootness concerns. It was also a good call to avoid potential conflict with the overlapping class action pending in the District of New Hampshire.

Judge Bumatay dissented in part because he concluded that the State Plaintiffs have no standing at this time. First, the State Plaintiffs have not identified a cognizable sovereign interest, and they can't sue the federal government on behalf of their citizens. Second, the State Plaintiffs' asserted pecuniary injuries are too speculative and contingent at this stage to constitute injuries in fact. Third, the State Plaintiffs' alleged loss of federal reimbursements for public benefits was a self-inflicted injury that doesn't confer standing. Finally, *Biden v. Nebraska,* 600 U.S. 477 (2023), involving President Biden's student loan forgiveness program, does not provide standing. Absent a party with Article III standing, it's premature to address the merits of the citizenship question or the scope of the injunction.

## COUNSEL

Noah G. Purcell (argued), Solicitor General; Marsha J. Chien and Cristina Sepe, Deputy Solicitors General; Nicholas W. Brown, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; Alyson D. Gnam, Daniel J. Jeon, and Lane Polozola, Assistant Attorneys General; Colleen M. Melody, Civil Rights Division Chief; Office of the Washington Attorney General, Seattle, Washington; Matt Adams (argued), Aaron Korthuis, Glenda M. Aldana Madrid, and Leila Kang;

Northwest Immigrant Rights Project, Seattle, Washington; Luci D. Davis, Senior Litigation Counsel; Joshua Bendor, Solicitor General; Kris Mayes, Arizona Attorney General; Office of the Arizona Attorney General, Phoenix, Arizona; Rebekah Newman, Assistant Attorney General; Alex Hemmer, Deputy Solicitor General; Jane E. Notz, Solicitor General; Kwame Raoul, Illinois Attorney General; Office of the Illinois Attorney General, Chicago, Illinois; Michael A. Casper, Senior Assistant Attorney General; Benjamin Gutman, Solicitor General; Dan Rayfield, Oregon Attorney General; Office of the Oregon Attorney General, Salem, Oregon; for Plaintiffs-Appellees.

Eric D. McArthur (argued), Deputy Assistant Attorney General; Derek Weiss, Bradley Hinshelwood, Sharon Swingle, and Mark R. Freeman, Attorneys, Appellate Staff; Brad P. Rosenberg, Trial Attorney; Yaakov M. Roth, Acting Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Jeremiah L. Morgan and William J. Olson, William J. Olson PC, Vienna, Virginia; Richard B. Sanders, Land Use and Property Law PLLC, Gig Harbor, Washington; for Amici Curiae America's Future, Gun Owners of America, Gun Owners of California, Gun Owners Foundation, Citizens United, U.S. Constitutional Rights Legal Defense Fund, Leadership Institute, and Conservative Legal Defense and Education Fund.

R. Trent McCotter, Boyden Gray PLLC, Washington, D.C.; Daniel Z. Epstein, America First Legal Foundation, Washington, D.C.; Joel B. Ard, Ard Law Group PLLC, Kingston, Washington; for Amici Curiae Members of Congress.

John R. Scannell, Seattle, Washington, for Amici Curiae Certain Citizens of the United States of America.

Whitney D. Hermandorfer, Director of Strategic Litigation; J. Matthew Rice, Solicitor General; Jonathan Skrmetti, Attorney General & Reporter; Office of the Tennessee Attorney General, Nashville, Tennessee; for Amicus Curiae State of Tennessee.

Joseph M. Nixon, Public Interest Legal Foundation Inc., Alexandria, Virginia, for Amicus Curiae Former United States Attorney General Edwin Meese III.

Zachary Berg, Special Counsel; Ryan G. Kercher, Chief, Special Litigation Division; Ryan D. Walters, Deputy Attorney General for Legal Strategy; Ralph Molina, Deputy First Assistant Attorney General; Brent Webster, First Assistant Attorney General; Ken Paxton, Texas Attorney General; Office of the Texas Attorney General, Austin, Texas; for Amicus Curiae State of Texas.

Eric H. Wessan, Solicitor General; Brenna Bird, Iowa Attorney General; Office of the Iowa Attorney General, Des Moines, Iowa; Steve Marshall, Alabama Attorney General, Office of the Alabama, Attorney General, Montgomery, Alabama; Tim Griffin, Arkansas Attorney General, Office of the Arkansas Attorney General, Little Rock, Arkansas; James Uthmeier, Florida Attorney General, Office of the Florida Attorney General, Tallahassee, Florida; Raul R. Labrador, Idaho Attorney General; Idaho Office of the Attorney General, Boise, Idaho; Theodore E. Rokita, Indiana Attorney General, Office of the Indiana Attorney General, Indianapolis, Indiana; Kris W. Kobach, Kansas Attorney General, Office of the Kansas Attorney General, Topeka, Kansas; Liz Murrill, Louisiana Attorney General, Office of the Louisiana Attorney General, Baton Rouge, Louisiana;

STATE OF WASHINGTON V. TRUMP 9

Lynn Fitch, Mississippi Attorney General, Office of the Mississippi Attorney General, Jackson, Mississippi; Andrew T. Bailey, Missouri Attorney General, Office of the Missouri Attorney General, Kansas City, Missouri; Austin Knudsen, Montana Attorney General, Office of the Montana Attorney General, Helena, Montana; Michael T. Hilgers Nebraska Attorney General, Office of the Nebraska Attorney General, Lincoln, Nebraska; Drew Wrigley, North Dakota Attorney General, Office of the North Dakota Attorney General, Bismarck, North Dakota; Dave Yost, Ohio Attorney General, Office of the Ohio Attorney General, Columbus, Ohio; Gentner Drummond, Oklahoma Attorney General, Office of the Oklahoma Attorney General, Oklahoma City, Oklahoma; Alan Wilson, South Carolina Attorney General, Office of the South Carolina Attorney General, Columbia, South Carolina; Marty Jackley, South Dakota Attorney General, Office of the South Dakota Attorney General, Pierre, South Dakota; Derek E. Brown, Utah Attorney General, Office of the Utah Attorney General, Salt Lake City, Utah; Bridget Hill, Wyoming Attorney General, Office of the Wyoming Attorney General, Cheyenne, Wyoming; for Amici Curiae Iowa and 18 States.

James V. Lacy, Wewer & Lacy LLP, Laguna Niguel, California, for Amici Curiae United States Justice Foundation and Policy Issues Institute.

Christopher J. Hajec, Immigration Reform Law Institute, Washington, D.C., for Amicus Curiae Immigration Reform Law Institute.

**OPINION**

GOULD, Circuit Judge:

Washington, Arizona, Illinois, and Oregon ("States") and individual expectant mothers ("Individual Plaintiffs") challenge as unconstitutional Executive Order No. 14160 ("Executive Order"), which purports to deny citizenship to the children born in United States territory of parents temporarily or unlawfully present in the United States. *See Protecting the Meaning and Value of American Citizenship*, Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025). The district court entered a universal preliminary injunction which bars implementation of the Executive Order. Defendants appeal, contending that the States lack standing to challenge the Executive Order, that it was error to issue a preliminary injunction, and that the scope of the injunction is overbroad.

We address whether the Executive Order is constitutional and valid. We conclude that the Executive Order is invalid because it contradicts the plain language of the Fourteenth Amendment's grant of citizenship to "all persons born in the United States and subject to the jurisdiction thereof." We have jurisdiction under 28 U.S.C. § 1292(a)(1).

Because the Individual Plaintiffs are covered by a certified class action in another federal court,[1] we decline to exercise jurisdiction over their claims and dismiss them. But because State Plaintiffs have standing and are likely to succeed in demonstrating that the Executive Order is

---

[1] *"Barbara," et al. v. Trump*, No. 25-cv-244-JL-AJ, 2025 WL 1904338 (D. N.H. July 10, 2025).

unconstitutional, we affirm the district court's grant of a preliminary injunction and its determination that a universal preliminary injunction is necessary to give the States complete relief on their claims.

## I. FACTS AND PROCEDURAL HISTORY

### A

The Fourteenth Amendment was adopted after the Civil War, in order to reject and refute the holding of *Dred Scott v. Sandford*, 60 U.S. 393, 403 (1857), which in substance held that slaves and descendants of slaves were not citizens of the United States, and "to put citizenship beyond the power of any governmental unit to destroy." *Afroyim v. Rusk*, 387 U.S. 253, 263 (1967).

When the Fourteenth Amendment was ratified, whether birthright citizenship applied to the children of noncitizens was still an open question. But the Supreme Court answered that question in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). When the case was decided, Chinese nationals in the United States were not permitted to become citizens. *See* Chinese Exclusion Act, ch. 126, § 14, 22 Stat. 58, 61 (1882). Chinese laborers could not re-enter the United States if they left. *See* Scott Act, ch. 1064, 25 Stat. 504 (1888). Chinese laborers were also required to obtain a certificate of residence, and non-laborer Chinese persons were subject to a harsh presumption that they were unlawfully present. *See* Geary Act, ch. 60, 27 Stat. 25 (1892).

Against that backdrop, the Supreme Court considered the case of Wong Kim Ark, a Chinese-American man who was denied reentry to the United States, despite being born in the United States. *Wong Kim Ark*, 169 U.S. at 652–53. The Supreme Court canvassed English common law, early

American decisions, and citizenship's meaning to the Fourteenth Amendment's drafters and then held that the Citizenship Clause stands for "the fundamental rule of citizenship by birth within the dominion of the United States, notwithstanding alienage of the parents[.]" *Id.* at 68, 692–93. For that reason, although Wong Kim Ark's parents would have been unable to naturalize or even return to the United States, Wong Kim Ark acquired United States citizenship "by birth within the United States." *Id.* at 704–05. Since *Wong Kim Ark* was decided in 1898, and until this challenged Executive Order, the Judiciary, Congress, and the Executive Branch have consistently and uniformly protected the Citizenship Clause's explicit guarantee of birthright citizenship regardless of the immigration status of an individual's parents.

**B**

On January 20, 2025, President Trump issued an Executive Order titled "Protecting the Meaning and Value of American Citizenship." Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 20, 2025). Section 1 of the Executive Order states in relevant part,

> the privilege of United States citizenship does not automatically extend to persons born in the United States:
>
> (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or
>
> (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such

as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

90. Fed. Reg. at 8449.

Section 2 states that it is the "policy of the United States" that no federal department or agency shall issue documents recognizing such persons as United States citizens or accept documents issued by state governments recognizing such persons as citizens if they are born 30 days from the date the Executive Order was issued. *Id.*

Section 3 directs the Secretary of State, Attorney General, Secretary of Homeland Security, and Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and mandates that officials cannot "act, or forbear from acting, in any manner inconsistent with this order." *Id.* at 8449–50.

**C**

The day after the President signed the Executive Order, the States filed a complaint and motion for a temporary restraining order. The district court granted the temporary restraining order. Shortly thereafter, the Individual Plaintiffs filed a putative class action. The district court consolidated the cases, and the States and Individual Plaintiffs filed a consolidated complaint. Each group of plaintiffs moved for a preliminary injunction.

14          STATE OF WASHINGTON V. TRUMP

On February 6, 2025, the district court granted a preliminary injunction, enjoining Defendants from enforcing or implementing the Executive Order on a universal basis. The district court concluded that the States had standing and that the Individual Plaintiffs' standing was undisputed. On the merits, the district court concluded that the Executive Order likely violates both the Constitution and the Immigration and Nationality Act (INA). The district court also concluded that the States would suffer "irreparable economic harm in the absence of preliminary relief," and that the Individual Plaintiffs faced the irreparable harm of "constitutional infringement and the specter of deportation." Finally, the district court concluded that the balance of the equities and public interest strongly weighed in favor of entering a preliminary injunction, because "the rule of law is secured by a strong public interest that the laws 'enacted by their representatives are not imperiled by executive fiat.'" The district court granted a universal injunction after determining that a geographically limited injunction would be ineffective to relieve the States' financial and administrative burdens.

After the district court granted its injunction, other courts throughout the country also enjoined implementation and enforcement of the Executive Order. *See Doe v. Trump*, No. 25-cv-10135, 25-cv-10139, 2025 WL 485070, at \*14–16 (D. Mass. Feb. 13, 2025) (universal injunction); *CASA, Inc. v. Trump*, No. 25-cv-00201, 2025 WL 408636, at \*16–17 (D. Md. Feb. 2, 2025) (universal injunction); *N.H. Indonesian Cmty. Support v. Trump*, No. 25-cv-00038, 2025 WL 457609, at \*6 (D. N.H. Feb. 11, 2025) (injunction "with respect to any individual or entity . . . within the jurisdiction of this court"). The Supreme Court accepted review on the scope of the injunction and held that the universal scope of

the injunction was impermissible insofar as it was based on individual and associational plaintiff standing, leaving open the question whether the universal injunction may be justified in order to give complete relief to the appellee States. *Trump v. CASA, Inc.*, 606 U.S. ___, No. 24A884, 2025 WL 1773631 (June 27, 2025). The district court of New Hampshire has since provisionally certified a nationwide class of plaintiffs and issued a classwide preliminary injunction, which it stayed until July 17, 2025, pending appeal in the First Circuit. *See* "*Barbara," et al. v. Trump*, No. 25-cv-244-JL-AJ, 2025 WL 1904338 (D. N.H. July 10, 2025).

## II. STANDARD OF REVIEW

A district court's grant of a preliminary injunction, including the injunction's scope, is reviewed for abuse of discretion. *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2024). "A district court abuses its discretion if it rests its decision 'on an erroneous legal standard or on clearly erroneous factual findings.'" *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (*en banc*). Legal conclusions are reviewed *de novo* while factual findings are reviewed for clear error. *K.W. ex rel. D.W. v. Armstrong*, 789 F.3d 962, 969 (9th Cir. 2015).

## III. STANDING

Because a "question of appellate jurisdiction must always be resolved before the merits of an appeal are examined or addressed," we first address the questions of standing. *In re Application for Exemption from Elec. Pub. Access Fees by Jennifer Gollan & Shane Shifflett*, 728 F.3d 1033, 1036 (9th Cir. 2013) (internal quotation marks and citation omitted). "[S]tanding must be met by persons seeking appellate review, just as it must be met by persons

16 STATE OF WASHINGTON V. TRUMP

appearing in courts of first instance." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013) (internal quotation marks and citation omitted). "All that is needed to entertain an appeal" on an issue, however, "is one party with standing." *Brnovich v. DNC*, 594 U.S. 647, 665 (2021).

Under Article III of the United States Constitution, a plaintiff has standing if the plaintiff can show (1) an "injury in fact" that is concrete and particularized and actual or imminent, not hypothetical; (2) that the injury is fairly traceable to the challenged action of the defendant; and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Under this general rule, standing requires a showing of injury, causation, and redressability. *See id.*

## A. STATE PLAINTIFFS

The Supreme Court has held that a state has standing to bring suit where the federal government's action directly reduces the number of individuals that a state entity serves, causing a loss of revenue that the state would have otherwise received under an existing federal contract. *See Biden v. Nebraska*, 600 U.S. 477, 490 (2023); *see also Dep't of Com. v. New York*, 588 U.S. 752, 767–68 (2019) (finding standing where the inclusion of a citizenship question was likely to lead to the undercounting of the states' populations, and that this undercounting would cause states to lose out on federal funds distributed on the basis of state population); *City & Cnty. of San Francisco v. United States*, 981 F.3d 742, 754 (9th Cir. 2020) (holding that states had standing to challenge a DHS rule that would render immigrants likely to participate in federal programs inadmissible and ineligible for permanent residence status, thereby decreasing

enrollment in public benefits and federal payments to the states).

Here, the States contend that the Executive Order would cause them an economic injury by defunding and requiring substantial changes to existing public programs such as Medicaid, the Children's Health Insurance Program (CHIP), Title IV-E foster care, and Social Security Act (SSA)'s Enumeration at Birth program. The States have presented evidence that more than 1100 infants born each month in the Plaintiff States would be subject to the Executive Order. If those infants are denied citizenship, they will be ineligible for federally-backed state-run programs such as Medicaid, CHIP, and Title IV-E foster care. States generally do not receive federal reimbursements based on services to individuals who do not have a lawful, qualifying immigration status. The States accordingly allege that they will lose millions of dollars of contracted reimbursements that they would otherwise receive.

Also, federal law requires the States to determine whether each resident served by federal benefits is eligible. *See, e.g.*, 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a)(c)(1)(B); 42 C.F.R. § 435.406. Because current State systems rely on birth certificates, place of birth, or Social Security Numbers (SSNs) to determine eligibility, the States contend that they will need to create new systems to determine citizenship and maintain compliance with federal law. The States also contend that they will lose "administrative fees" that they would otherwise receive under the SSA's Enumeration at Birth program. *See Biden*, 600 U.S. 489–90. State agencies transmit birth data to the SSA to facilitate the assignment of SSNs, in exchange for $4–5 per SSN from the SSA. If the SSA no longer issued

18            STATE OF WASHINGTON V. TRUMP

SSNs to children subject to the Executive Order, the States expect losses of $7,320–$38,129 per year.

Defendants argue these alleged losses are "incidental downstream economic effects" that are too indirect to confer standing. Defendants rely on *United States v. Texas*, 599 U.S. 670, 674 (2023), wherein the Supreme Court stated in a footnote that when a state asserts that federal law or policy has only generated indirect effects on state revenues or state spending, "the State's claim for standing can become more attenuated." *Id.* at 680 n.3. Defendants also cite *Washington v. FDA*, 108 F.4th 1163, 1175–76 (9th Cir. 2024), in which we held that a state did not have standing to challenge the FDA's elimination of its in-person dispensing requirement for mifepristone, because the state's claimed increase in Medicaid costs was too indirect.

We conclude that the States have shown that the loss of reimbursements, funding, and additional expenses incurred by the development of a new system to determine eligibility are concrete and imminent injuries-in-fact, traceable to the Executive Order, and redressable by an injunction. We agree with the district court that the automatic and direct effect of denying citizenship to children affected by the Executive Order renders them ineligible for federal programs and for Social Security Numbers, which results in a quantifiable loss of funding to the States. Nothing about this pecuniary injury is speculative given that it is "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). These losses are not an "indirect" effect on state spending that relies on a chain of causation with multiple links, or assumptions about the effects of medication, or the unpredictable actions of third parties. *Cf. Texas*, 599 U.S. at 680 n.3; *Washington*, 108 F.4th at 1175–76. Instead, as in *Biden v. Nebraska*, the direct effect of the

challenged federal action is to decrease the number of people for which the state will receive federal funding and "administrative fees." 600 U.S. at 477, 489.

Defendants' contentions to the contrary are not persuasive. They suggest that any economic losses would be "self-inflicted," because the State need not provide social services to an individual who is ineligible under the federal program unless they so choose. However, it was not a voluntary choice by the States for the federal government to stop paying for these services, or to assume the costs that follow. *See Dep't of Com.*, 588 U.S. at 767 (finding that losing "out on federal funds that are distributed on the basis of state population" was a "sufficiently concrete and imminent injury to satisfy Article III"). And the Supreme Court in *Biden v. Nebraska* found that Missouri had alleged standing, even though its financial injury stemmed from its choice to service federal loans. *See* 600 U.S. 489–490. Defendants also claim that the Executive Order does not require any changes to State systems and does not "impose any penalty for failing to make them." Although the Executive Order does not on its face impose a duty on the States to change their methods of determining federal eligibility, the States would nonetheless be required to make these changes to comply with other federal laws. *See, e.g.*, 42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a)(c)(1)(B); 42 C.F.R. § 435.406.

Defendants also argue that, even assuming that the States satisfy Article III, recognizing standing here would violate the prohibition on *parens patriae* standing. A "[s]tate does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 61 n.16 (1982). To be sure, the Supreme Court has denied states' attempts to

assert third-party standing as "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing." *Haaland v. Brackeen*, 599 U.S. 255, 295 n.11 (2023) (stating that Texas claimed third-party standing "on behalf of non-Indian families."); *see also Murthy v. Missouri*, 603 U.S. 43, 76 (2024).

But the States here are not asserting standing based on the rights of their citizens; instead, they assert injuries to their own pocketbooks that will be caused by enforcement of the Executive Order. Unlike in *Brackeen* and *Murthy*, the asserted pocketbook injuries are concrete, particularized, and traceable. *Cf. Brackeen*, 599 U.S. at 295–96 ("[T]hese alleged costs are not 'fairly traceable' to the placement preferences, which 'operate independently' of the provisions Texas identifies."); *Murthy*, 603 U.S. at 75 ("The States have not identified any specific speakers or topics that they have been unable to hear or follow.").

Finally, Defendants contend that third-party standing limitations also bar standing for State plaintiffs. Prudential limitations on federal court jurisdiction dictate that: (1) a party must assert his or her own legal rights and interests, not those of others; (2) the courts will not adjudicate "generalized grievances" (i.e. "abstract questions of wide public significance"); and (3) a party's claims must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *See Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474–75 (1982) (citations omitted); *see also Warth v. Seldin,* 422 U.S. 490, 499 (1975) (a plaintiff "must assert his own legal rights and interests"); *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (noting that a constitutional claim should be brought by the person "at whom the constitutional protection is

aimed"). However, "[the Supreme Court] has allowed standing to litigate the rights of third parties when enforcement of the challenged restriction against the litigant would result indirectly in the violation of third parties' rights." *Warth*, 422 U.S. at 510.

We conclude that third-party standing limitations do not bar this action. The Executive Order operates directly as to the States by preventing the States from receiving funding and administrative fees that they would otherwise receive. In addition, the Executive Order prohibits departments and agencies of the United States from accepting documents issued by State governments purporting to recognize United States citizenship for persons subject to the Executive Order. *See* 90 Fed. Reg. 8449. As a result, if the Executive Order is upheld, States will have to modify their methods of determining United States citizenship and eligibility for federal programs. The enforcement of the challenged government action against the States thus results in the violation of third parties' rights. *See Warth*, 422 U.S. at 510. We conclude that the States have standing to challenge the Executive Order as violative of the Fourteenth Amendment's Citizenship Clause.

## B. INDIVIDUAL PLAINTIFFS

We decline to exercise our jurisdiction with respect to the Individual Plaintiffs' action and dismiss their claims. At the time that this lawsuit was filed, the Individual Plaintiffs were a group of pregnant women who are noncitizens with pending applications for asylum, representing a putative class of pregnant persons and future children residing in Washington State. Defendants do not dispute their standing. Individual Plaintiffs allege that their children would be denied citizenship as a result of the Executive Order taking

effect, and that that denial of citizenship would cause loss to them of various federal benefits. We agree with the district court that a denial of citizenship is a concrete and imminent injury-in-fact, traceable to the Executive Order, and redressable by an injunction.

However, one of the Individual Plaintiffs has since given birth while the Executive Order is enjoined, meaning that her child is now a citizen, while the other Individual Plaintiff was due to give birth earlier this month. Because Defendants claim that the Executive Order does not have retroactive effect, if both Individuals have given birth before this opinion is published, there may be a question of mootness as to the Individuals' claims. Typically, if a district court certifies a class before the class representative's claim becomes moot, "mooting the putative class representative's claim will not moot the class action." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1090 (9th Cir. 2011). "But where, as here, the plaintiff's claim becomes moot before the district court certifies the class, the class action normally also becomes moot." *Slayman v. FedEx Ground Package Sys.*, 765 F.3d 1033, 1048 (9th Cir. 2014). Because the district court below did not certify the class, there remains a question as to whether Individual Plaintiffs' claims are moot, or whether an exception to mootness applies. We decline to address that question, because we determine that to the extent the Individual Plaintiffs have live claims, those claims are covered by the class action certified by the district court of New Hampshire in *Barbara*, and dismissal of the Individual Plaintiffs is proper on those grounds. "A court may choose not to exercise its jurisdiction when another court having jurisdiction over the same matter has entertained it and can achieve the same result." *Crawford v. Bell*, 599 F.2d 890, 893 (9th Cir. 1979).

The district court of New Hampshire certified a class that includes:

> All current and future persons who are born on or after February 20, 2025, where (1) that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*Barbara*, 2025 WL 1904338, at \*16. Individual Plaintiffs' children undoubtedly are encompassed by that class definition. Individual Plaintiffs' claimed injuries on appeal relate to the harm faced by their children: the prospect of removal and separation from their families, the exclusion from legal immigration status if not removed, the denial of lawful employment and educational opportunities, and the deprivation of both constitutional and statutory rights. Moreover, both the class certified in *Barbara* and the Individual Plaintiffs here seek an injunction of the Executive Order on the basis that it violates the Fourteenth Amendment and the INA. *See id.* at \*1. There is no reason to believe that these claims will not be "fully and vigorously litigated" by the *Barbara* class representatives. *See Crawford*, 599 F.2d at 893. Because Individual Plaintiffs' children can obtain relief for those injuries through the class certified by the District Court of New Hampshire, and because relief in this court may conflict with or circumscribe the flexibility of relief in that other case, we decline to exercise our

jurisdiction over the Individual Plaintiffs' claims and proceed only with the State Plaintiffs' claims.

## IV.  PRELIMINARY INJUNCTION

A party is only entitled to a preliminary injunction if the party demonstrates "[1] that [it] is likely to succeed on the merits; [2] that [it] is likely to suffer an irreparable harm in the absence of preliminary relief; [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "Likelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' we need not consider the other factors." *California v. Azar*, 911 F.3d 558, 575 (2018) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted)).  We first consider whether the plaintiffs are likely to succeed on the merits of their claims.  Upon determining that they are likely to succeed, we then proceed to consider the remaining prongs of the *Winter* test.

### A.  MERITS

Plaintiffs contend that the Executive Order violates the Fourteenth Amendment's Citizenship Clause.  They also contend that the Executive Order violates the INA, 8 U.S.C. § 1401.  We first address whether the Executive Order violates the Citizenship Clause.

#### 1.  Fourteenth Amendment

The text of the Fourteenth Amendment's Citizenship Clause explicitly reads: "All persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State in which they reside."  U.S. Const. amend. XIV, § 1, cl. 1.  The parties dispute the meaning of "subject to the jurisdiction thereof."

Plaintiffs contend that the phrase "subject to jurisdiction thereof" means "subject to United States authority and laws," and exempts a small and well-defined group of people who are born in United States territory yet not subject to United States authority. Because the Executive Order attempts to exempt from citizenship persons who are both born in the United States and subject to United States authority, Plaintiffs contend that it violates the Citizenship Clause.

Defendants, in contending that the Executive Order is constitutional, advance a novel interpretation of the phrase "subject to the jurisdiction thereof." They first contend that "jurisdiction" as used in the Citizenship Clause does not refer to "regulatory jurisdiction," i.e., jurisdiction as defined by a government's authority and lawmaking power, but instead refers to "political jurisdiction," which they define as "a concept rooted in allegiance and protection." By their definition, persons are only subject to the political jurisdiction of the United States if they "owe primary allegiance to the United States," excluding "those persons [who] owe allegiance to a different sovereign." They then contend that a person only owes such allegiance to the country in which the person is permanently domiciled, and the domicile of a child follows the domicile of the parent. They assert that because individuals present temporarily or unlawfully in the United States cannot establish permanent domicile, their children born on United States soil do not owe allegiance to the United States and are not subject to its political jurisdiction.

### a. Ordinary Meaning

We conclude that the text of the Fourteenth Amendment supports the Plaintiffs' interpretation. In interpreting the text

26          STATE OF WASHINGTON V. TRUMP

of the Constitution, courts are "guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 544 U.S. 570, 576 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). When the Fourteenth Amendment was adopted, as it is today, "jurisdiction" was commonly used in reference to the power of the courts, defined as "[t]he legal power or authority of hearing and determining causes." Noah Webster, *An American Dictionary of the English Language* 732 (1865). But in reference to nations, "jurisdiction" was also defined as the "[p]ower of governing or legislating; the right of making or enforcing laws; the power or right of exercising authority;" and the "limit within which power may be exercised," or "extent of power or authority." *Id*; *see also* Benjamin Vaughan Abbott, *Dictionary of Terms and Phrases Used in American or English Jurisprudence* 671 (1879) (defining jurisdiction as "[t]he authority of government; the sway of a sovereign power."). This ordinary meaning of jurisdiction is consistent with Plaintiffs' interpretation of "subject to the jurisdiction thereof" as subject to the laws and authority of the United States.

Defendants point to no contrary dictionary definitions that define jurisdiction in terms of allegiance and protection. Indeed, they make no arguments about the ordinary meaning of the Citizenship Clause at all. Defendants' only argument based on the text of the Citizenship Clause is that "subject to the jurisdiction" cannot simply refer to "regulatory jurisdiction," because that definition would render the Citizenship Clause's requirement of jurisdiction surplusage. They claim that the United States has "exclusive and absolute" regulatory jurisdiction within its territory, so that

all children born in the United States are subject to its jurisdiction. *Id.* They further contend that that definition does not explain why certain groups, such as Native Americans and children of diplomats, were excluded from citizenship.

Supreme Court precedent makes clear that reading "subject to the jurisdiction thereof" to mean "subject to United States authority and laws" is not redundant. In *Wong Kim Ark*, the Supreme Court directly addressed the meaning of the phrase "subject to the jurisdiction thereof." 169 U.S. 649. The Court stated that "[t]he real object of" the dual requirements of birth in U.S. territory and being subject to United States jurisdiction was, "to exclude, by the fewest and fittest words, (besides children of members of the Indian tribes, standing in a peculiar relation to the National Government, unknown to the common law), the two classes of cases, – children born of alien enemies in hostile occupation, and children of diplomatic representatives of a foreign State, both of which . . . had been recognized exceptions to the fundamental rule of citizenship by birth within the country." *Id.* at 682.

The Court in *Wong Kim Ark* held that these "classes of cases" are not fully subject to United States authority and laws, despite Defendants' contentions to the contrary. The Court, relying on Chief Justice Marshall's opinion in *Schooner Exchange*, said that while "[t]he jurisdiction of the nation within its own territory is necessarily exclusive and absolute," there are certain cases "in which every sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction." *Id.* at 683–684 (quoting *Schooner Exch. v. McFaddon*, 11 U.S. 116, 136 (1812)). When a hostile foreign power occupies United States territory, the Court said that "[t]he sovereignty of the United

States over the territory [is], of course, suspended, and *the laws of the United States* could no longer be rightfully enforced there[.]" *Id.* at 683 (quoting *United States v. Rice*, 17 U.S. 246, 254 (1819)) (emphasis added). With respect to the immunity of foreign ministers from United States jurisdiction, "the immunity itself is granted by the governing power of the nation to which the minister is deputed." *Id.* at 685 (quoting *Schooner Exch.*, 11 U.S. at 138).

The Court contrasted these two groups with private individuals, who it stated cannot be exempt from the jurisdiction of the country that they are in, because,

> When private individuals of one nation spread themselves through another as business or caprice may direct . . . it would be obviously inconvenient and dangerous to society, and *would subject the laws to continual infraction*, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country.

*Id.* at 685–86 (quoting *Schooner Exch,* 11 U.S. at 144) (emphasis added). The Court's primary concern, in distinguishing private individuals from the exempted groups, was whether they were subject to the laws and enforcement power of the United States. Because the Court in *Wong Kim Ark* reasoned that the words "subject to the jurisdiction thereof" must be understood "in the same sense in which the like words had been used by Chief Justice Marshall in the well known case of The Exchange," the Court must have understood the phrase to refer to the United

States's ability to fully subject an individual to its laws. *See id.* at 687.

The Court in *Elk v. Wilkins* similarly exempted members of Indian tribes from citizenship because they were not subject to the full regulatory authority of the United States.**[2]** 112 U.S. 94 (1884). While the United States could deal with the Tribes "either through treaties made by the President and Senate, or through acts of Congress in the ordinary forms of legislation," the Court in *Elk* recognized that, "[g]eneral acts of Congress did not apply to Indians, unless so expressed as to clearly manifest an intention to include them." *Id.* at 100–01. This statement reflects the unique position of the Tribes, which have sovereignty and are not subject to the full regulatory jurisdiction of the United States. *See, e.g., Haaland v. Brackeen*, 599 U.S. 255, 310–313 (2023) (Gorsuch, J., concurring) (explaining that the Tribes have inherent sovereignty and are free from state jurisdiction and control).

Accordingly, the Court in *Elk* said that members of Tribes were no more subject to the jurisdiction of the United States "than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States, of ambassadors or other public ministers of foreign nations." 112 U.S. at 102. Regardless, the Court in *Wong Kim Ark* also held clearly that "[t]he decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not-in the diplomatic service of a

---

[2] Congress later expanded citizenship to Native American children via statute. *See* 8 U.S.C. § 1401(b) (1924).

foreign country." 169 U.S. at 682. Because the Supreme Court has made clear that children of diplomats, children of invading armies, and children of tribal members were understood not to be fully subject to United States authority and laws, interpreting jurisdiction in accordance with its ordinary meaning is not redundant.

### b. Supreme Court Precedent

The argument that Supreme Court precedent supports Defendants' reading is similarly unavailing. First, Defendants' claimed distinction between political jurisdiction and regulatory jurisdiction is not supported by precedent. Both the Supreme Court and our Court have used "political jurisdiction" to refer merely to the United States' lawmaking authority. *See, e.g.*, *Smith v. Turner*, 48 U.S. 283, 422 (1849) (describing taxation as part of political jurisdiction); *Chicago, R.I. & P. Ry. Co. v. McGlinn*, 114 U.S. 542, 546 (1885) (describing political jurisdiction as involved in legislative power); *Lake v. Ohana Mil. Cmtys., LLC*, 14 F.4th 993, 1000–01 (9th Cir. 2021) (equating political jurisdiction with "legislative . . . jurisdiction").

Second, the Court did not hold or even hint that there was a requirement of "primary allegiance" or exclusive allegiance in either *Elk* or *Wong Kim Ark*. To the contrary, the *Wong Kim Ark* Court repeatedly equated allegiance merely with obedience to the laws of the sovereign, saying that "[a]llegiance is nothing more than the tie or duty of obedience of a subject to the sovereign under whose protection he is . . . ." *See, e.g.*, *id.* at 659–661 (quoting *Inglis v. Sailors' Snug Harbor*, 28 U.S. 99, 155 (1830)). Under English common law, "[s]uch allegiance and protection were mutual . . . and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath

of allegiance; but were predicable of aliens in amity, so long
as they were within the kingdom." *Id.* at 655. Rather than
describe this allegiance as primary or exclusive, the Court
characterized the allegiance owed by foreign "individuals
and merchants" as "temporary and local" which was
necessary to avoid "subjecting the laws to continual
infraction." *Id.* at 685 (quoting *Schooner Exch,* 11 U.S. at
144). The context of the opinion makes clear that the Court
did not view allegiance as a separate and unspoken
requirement of jurisdiction. Instead, it considered allegiance
to be part and parcel of what Defendants now label
"regulatory" jurisdiction.

Third, the proposed requirement of "permanent
domicile" in order to establish political jurisdiction also
finds no basis in the text of the Citizenship Clause or its
interpreting precedent. The *Wong Kim Ark* Court uses the
phrase "permanent" only in connection with domicile once,
stating that although Wong Kim Ark's parents left the
United States in 1890, they "were at the time of his birth
domiciled residents of the United States, having previously
established and still enjoying a permanent domicil[e] and
residence therein at San Francisco." *Id.* at 652. This
statement reflects the stipulated facts of the case, and the
Court did not mention "permanent" domicile in its
interpretation of the Citizenship Clause. *See id.* at 652 ("The
facts of this case, as agreed by the parties are as
follows . . . .").

In its analysis, the Court said, "[e]very citizen or subject
of another country, while domiciled here, is within the
allegiance and the protection, and consequently subject to

the jurisdiction, of the United States." *Id.* at 693. But the
Court immediately continued:

> It can hardly be denied that an alien is
> completely subject to the political
> jurisdiction of the country in which he
> resides—seeing that, as said by Mr. Webster,
> when Secretary of State, in his Report to the
> President on Thrasher's Case in 1851, and
> since repeated by this court, "independently
> of a residence with intention to continue such
> residence; *independently of any
> domiciliation*; independently of the taking of
> any oath of allegiance or of renouncing any
> former allegiance, it is well known that, by
> the public law, an alien, or a stranger born,
> for so long a time as he continues within the
> dominions of a foreign government, *owes
> obedience to the laws of that government*, and
> may be punished for treason, or other crimes,
> as a native-born subject might be, unless his
> case is varied by some treaty stipulations."

*Id.* at 693–94 (quoting 6 Daniel Webster, *The Works of
Daniel Webster* 526 (1851) (emphasis added)). It is clear
from this quoted passage both that domicile did not play a
significant role in the Court's analysis of the Citizenship
Clause's requirements, and that the Court viewed political
jurisdiction as equivalent to obedience to the laws.

The text and ordinary meaning of the Citizenship Clause,
as well as Supreme Court precedent interpreting the
Citizenship Clause, support the Plaintiffs' interpretation that
"subject to the jurisdiction thereof" means "subject to the

laws and authority of the United States." By contrast, Defendants give no analysis of the ordinary meaning of the Citizenship Clause to support their contention that jurisdiction requires primary allegiance and permanent domicile, and the textual links they offer based on the Supreme Court precedent cited above are unavailing.

### c. Historical Background

We conclude that the historical background of the Fourteenth Amendment also supports Plaintiffs' interpretation. We look to the historical background of Constitutional Amendments when they codify preexisting rights. *See Heller*, 554 U.S. at 592. Although the Fourteenth Amendment extended the right of citizenship regardless of race, the Supreme Court concluded that it reaffirmed "the fundamental principle of citizenship by birth within the dominion." *See Wong Kim Ark*, 169 U.S. at 675; *see also id.* at 688 (stating that the Fourteenth Amendment's Citizenship Clause is "declaratory of existing rights, and affirmative of existing law" and "intended to allay doubts and to settle controversies which had arisen, and not to impose any new restrictions upon citizenship").

Birthright citizenship is derived from the English common law principle of *jus soli*, or citizenship determined by birthplace. James C. Ho., *Defining "American" Birthright Citizenship and the Original Understanding of the 14th Amendment*, 9 Green Bag 367, 369 (2006); *see also Wong Kim Ark*, 169 U.S. at 655. As the Court in *Wong Kim Ark* explained, all children born in England were considered natural-born subjects, whether they were born by subjects or born by those who had taken an oath of allegiance, or whether they were born by non-subjects within the kingdom. *Id.*

Before the Fourteenth Amendment was adopted in 1868, the prevailing view was that the United States adopted this idea of citizenship by birth within the territory.**[3]** *See, e.g.*, *id.* at 658; *Lynch v. Clarke*, 1 Sand. Ch. 583, 663 (N.Y. Ch. 1844) ("It is impossible to hold that there has been any relaxation from the common law rule of citizenship by means of birth within our territory."); *Gardner v. Ward*, 2 Mass. (1 Tyng) 244 (1805) ("I take it, then, to be established, with a few exceptions not requiring our present notice, that a man, born within the jurisdiction of the common law, is a citizen of the country wherein he is born."); *State v. Manuel*, 20 N.C. (3 & 4 Dev. & Bat.) 144, 151 (1838) ("[A]ll free persons born within the State are born citizens of the State."); *Munro v. Merchant*, 28 N.Y. 9, 40 (1863) (assuming that plaintiff "born in this state of non-resident alien parents . . . is *prima facie* a citizen"); *see also* Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L.J. 405, 410–12 (2020).

To contend that historical background supports their understanding that *jus soli* citizenship required primary allegiance, Defendants rely heavily on the international law treatises of Emmerich de Vattel, an 18th-century Swiss jurist. But Vattel's views on citizenship are plainly inconsistent with United States law and do not support Defendants' argument. In Vattel's view, children of foreign permanent residents born within the territory were not full

---

[3] Enslaved individuals were often "ignored by the common law analysis," *see Legis. Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 342 n.7 (1995), and the citizenship of free black people before the Civil War was disputed and often determined in part by state law. *See* Martha S. Jones, *Birthright Citizen: A History of Race and Rights in Antebellum America* 25–34 (2018).

citizens, which is inconsistent with the American conception of birthright citizenship even under Defendants' interpretation. *See* Emmerich de Vattel, *The Law of Nations* §§ 213, 214, at 102 (saying that foreigners who are permitted to stay in a country are "a kind of citizens *of an inferior order*, and are united to the society without participating in all of its advantages," and because children "follow the condition of their fathers," the children of permanent residents would not be full citizens) (emphasis added). Vattel recognized that his accounting of citizenship was not the case for all nations, noting, "there are states, as, for instance, England, where the single circumstance of being born in the country naturalizes the children of a foreigner." *Id.* § 214, at 102.

Defendants also cite Justice Story's view that a "reasonable qualification" to birthright citizenship would be to exclude children of foreigners "abiding there for temporary purposes." Joseph Story, *Commentaries on the Conflict of Laws, Foreign and Domestic* § 48 (1834). Although Justice Story may have thought this qualification would be reasonable, he noted that "[i]t would be difficult, however, to assert, that in the present state of public law that such a qualification is universally established." *Id.* Accordingly, Defendants cite no compelling historical source asserting that primary allegiance or permanent domicile were required at common law. Instead, the common law understanding of jurisdiction within the sovereign's territory, and the recognized immunities from it, are more consistent with Plaintiffs' interpretation of the Citizenship Clause.

### d. Drafting History

"It is dubious to rely on [drafting] history to interpret a text that was widely understood to codify a pre-existing right, rather than to fashion a new one." *Heller*, 554 U.S. at 589–99, 603–04. But to the extent that drafting history is relevant here to any degree, we conclude that the drafting history favors Plaintiffs' interpretation.

When Senator Howard introduced the amendment, he said that the Citizenship Clause "will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons." Cong. Globe, 39th Cong., 1st Sess. 2890 (1866). Although the amendment was a subject of fierce debate, the Senators did not dispute its meaning as it pertained to the children of foreigners. In fact, Senator Cowan criticized the proposed amendment precisely because it would base citizenship on the "mere fact that a man is born in the country." *Id.* at 2890–91. He opposed the proposed amendment because it would grant birthright citizenship to the children of noncitizens who he believed "owe [the United States] no allegiance [and] who pretend to owe none." *Id.* But even Senator Cowan acknowledged that like "a sojourner," such groups "ha[ve] a right to the protection of the laws." *Id.* at 2890. Senator Conness responded by arguing that given the small number of foreigners and sojourners within the United States, Senator Cowan's policy concern of granting citizenship to these groups would not come to pass. *Id.* at 2891–92; *id.* at 2892 (stating that the amendment is a "simple declaration that a score or a few score of human beings born in the United States shall be regarded as citizens of the United States, entitled to civil rights, to the right of equal defense,

to the right of equal punishment for crime with other citizens"). Thus, the proponents of the amendment did not contend that children of people who owe no allegiance to the United States would not be granted citizenship but instead accepted this consequence. *See id.* at 2891 ("[C]hildren of all parentage whatever, born in California, should be regarded and treated as citizens of the United States.").

Defendants contend that Senator Trumbull, the drafter of the Civil Rights Bill, equated "subject to the jurisdiction of the United States" with "owing allegiance solely to the United States." *Id.* at 2893–94. But he did so in the context of the debate over tribal sovereignty, noting that Indian tribes "are not subject to our jurisdiction in the sense of owing allegiance solely to the United States," because "[i]t is only those persons who come completely within our jurisdiction, *who are subject to our laws*, that we think of making citizens." *Id.* at 2893–94 (emphasis added). The Senators recognized that as "quasi foreign nations," Indian tribes and tribal members were distinct from other noncitizens. *See id.* at 2890, 2894–95 (remarks of Senator Howard). And any understanding that the Citizenship Clause required allegiance was most definitely not universal. Senator Cowan opposed the Citizenship Clause because it would extend birthright citizenship to children of "people who . . . owe [my state] no allegiance." *Id.* at 2891. Senator Trumbull confirmed that the text covers all persons "who are subject to our laws." *Id.* at 2893.

Defendants rely heavily on the Civil Rights Act of 1866 and its legislative history to contend that "subject to the jurisdiction thereof" requires sole loyalty to the United States. But in contrast, we conclude that the legislative history of the Civil Rights Act is not persuasive here. "It is always perilous to derive the meaning of an adopted

provision from another provision deleted in the drafting process." *Heller*, 554 U.S. at 590.

The Civil Rights Act of 1866 was passed two years before the ratification of the Fourteenth Amendment and conferred citizenship on "all persons born in the United States, and not subject to any foreign power." Civil Rights Act of 1866, § 1, ch. 31, § 1, 14 Stat. 27, 27 (1866). This language, of course, is not the language that was ultimately adopted in the text of the Fourteenth Amendment. Concluding that the Fourteenth Amendment affirms existing law and does not create new restrictions, the Supreme Court in *Wong Kim Ark* noted, "any possible doubt . . . was removed when the negative words of the Civil Rights Act, 'not subject to any foreign power,' gave way, in the Fourteenth Amendment of the Constitution, to the affirmative words, 'subject to the jurisdiction of the United States.'" 169 U.S. at 688. The Framers of the Fourteenth Amendment decided **not** to use the language of the Civil Rights Act of 1866, and "no act or omission of [C]ongress . . . can affect citizenship acquired as a birthright, by virtue of the constitution itself, without aid of any legislation." *Id.* at 703. Stated another way, the language of Civil Rights Act of 1866 cannot modify the grant of birthright citizenship clearly and explicitly conferred by the Fourteenth Amendment.

### e. Public Understanding

Reinforcing our analysis above, we further conclude that the post-ratification public understanding of the Fourteenth Amendment supports the Plaintiffs' interpretation of the Citizenship Clause. "[T]he examination of a variety of legal and other sources to determine the public understanding of a legal text in the period after its enactment or

ratification . . . is a critical tool of constitutional interpretation." *Heller*, 554 U.S. at 605.

As discussed extensively above, the Supreme Court's interpretation of the Citizenship Clause in *Wong Kim Ark* supports Plaintiffs' interpretation, because the Supreme Court there repeatedly equated jurisdiction with being subject to the laws of the United States. *See supra* Sections IV.A.1.a, IV.A.1.b. Supreme Court decisions since then have repeatedly reaffirmed that all private noncitizens are subject to the jurisdiction of the United States while within its territory. In *Plyler v. Doe*, the Supreme Court held that, for the purposes of the Equal Protection Clause, "[u]se of the phrase 'within its jurisdiction' . . . confirms[] the understanding that the protection of the Fourteenth Amendment extends to anyone, citizen or stranger, who is subject to the laws of a State, and reaches into every corner of a State's territory," so the Equal Protection Clause applies to undocumented immigrants. 457 U.S. 202, 215 (1982). Because the Court in *Wong Kim Ark* stated that persons who are within the jurisdiction of a state for the purposes of the Equal Protection Clause must also be "subject to the jurisdiction" of the nation, 169 U.S. at 696, it follows that *Plyler*'s holding reaffirms that all persons subject to the laws of the states are subject to the jurisdiction of the United States.

Further, after *Wong Kim Ark* was decided, the Supreme Court has repeatedly recognized that the children of undocumented immigrants are citizens if born within the territory of the United States. *See United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (stating that a child born to two illegally present noncitizens was "of course, an American citizen by birth."); *INS v. Errico*, 385 U.S. 214, 215 (1966) (stating that the child of two noncitizen

parents who fraudulently entered the United States "acquired citizenship at birth"); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (recognizing as United States citizen the child of two noncitizens who were unlawfully present in the country).

The overwhelming majority of Executive Branch practice also supports Plaintiffs' interpretation. In 1871, the Secretary of State wrote that the Fourteenth Amendment was "simply an affirmation of the common law of England of this country," and "[t]he qualification, 'and subject to the jurisdiction thereof,' was probably intended to exclude the children of foreign ministers, and of other persons who may be within our territory with rights of extra territoriality." 2 Francis Wharton, *A Digest of the International Law of the United States*, Ch. 7, § 183, at 394. In 1873, the Secretary of State wrote to the President, "The child born of alien parents in the United States is held to be a citizen thereof and to be subject to duties with regard to this country which do not attach to the father." Opinions of the Principal Officers of the Executive Departments and Other Papers Relating to Expatriation, Naturalization, and Change of Allegiance 18 (Gov't Printing Office 1873). In 1947, the Board of Immigration Appeals (BIA) concluded that a man born in the United States to Polish parents, who returned to Poland at age three and served in the Polish army, was nevertheless a United States citizen. *Matter of S----*, 2 I&N Dec. 908, 909 (BIA 1947). In 1978, the BIA held that a man born on then-United States territory to Mexican parents was born "subject to the jurisdiction" of the United States, without regard for whether his parents intended or were permitted to be domiciled in the United States and despite the fact that "[o]fficials . . . were not aware that the [the land] was a part of the county," and the United States did not actually

exercise its jurisdiction over the land. *Matter of Cantu*, 17 I&N Dec. 190, 193–98 (BIA 1978).

Perhaps most notably, in 1995 and 1997 the United States Department of Justice Office of Legal Counsel (OLC) directly addressed the constitutionality of legislation that would deny citizenship to children born to parents who were not citizens or permanent residents. OLC reviewed the Citizenship Clause's text, history, and precedent, and concluded, for the same reasons we do today, that such legislation would be "unquestionably" and "flatly" unconstitutional. *Legis. Denying Citizenship*, 19 Op. O.L.C. at 341; *Citizenship Reform Act of 1997 and Voter Eligibility Verification Act: Hearing Before the Subcommittee on Immigration and Claims of the House Committee on the Judiciary*, 105th Cong., 1st Sess. 21 (June 25, 1997) (statement of Dawn E. Johnson, Acting Assistant Attorney General, Office of Legal Counsel).

Defendants cite only a few post-ratification interpretations of the Fourteenth Amendment that Defendants contend support their view. First, they cite a proposed 1874 bill that would have provided that "a child born within the United States of parents who are not citizens and who do not reside within the United States . . . shall not be regarded as a citizen thereof." 2 Cong. Rec. 3279 (1874). The draft bill was never enacted and represents only the view of a single member of a Congress. *See City & Cnty. of San Francisco v. USCIS*, 944 F.3d 774, 797 (9th Cir. 2019) (stating that legislative history of an unenacted bill is only probative "of the fact that Congress chose *not* to codify [Defendants'] interpretation").

As evidence of Executive Branch practice that they contend is consistent with their interpretation of the

42          STATE OF WASHINGTON V. TRUMP

Citizenship Clause, Defendants cite two passport denials in 1885 and a Department of Justice report from 1910. But with respect to the passport denials, both Secretaries of State relied on the assumption that a natural-born United States citizen would *lose* birthright citizenship if their noncitizen parents removed the child from the country while still a minor and the child did not reclaim citizenship as an adult. *See* 2 Francis Wharton, *A Digest of the International Law of the United States*, Ch. 7, § 183, at 397; *id.* at 399–400. The 1910 report presents a different view, but the weight of the evidence is nevertheless in Plaintiffs' favor. Defendants even acknowledge the weight of the evidence, contending that the Executive Order "address[es] the Executive Branch's prior misinterpretation of the Citizenship Clause." But the fact that most Executive Branch interpretation is contrary to Defendants' interpretation is relevant evidence that Defendants' novel interpretation is incorrect. *See Bankamerica Corp v. United States*, 462 U.S. 122, 130 (1983).

The plain text and ordinary meaning of the Fourteenth Amendment, controlling precedent interpreting the Citizenship Clause, drafting history, and most post-ratification public understanding weigh in favor of Plaintiffs' interpretation of the Citizenship Clause.[4] For that reason, we conclude that Plaintiffs are likely to succeed on the merits of their claim that the Executive Order violates the Citizenship Clause by denying citizenship to children who

---

[4] Defendants also advance policy arguments to support their interpretation of the Constitution. "But as with most questions of law, the policy pros and cons are beside the point." *CASA*, 2025 WL 1773631, at *13. The Executive Branch cannot "alter the [Constitution's] text in order to satisfy [its] policy preferences." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002).

are born in the United States and "subject to the jurisdiction thereof."

## 2. Immigration and Nationality Act

For the same reasons, Plaintiffs are likely to succeed on the merits of their claim that the Executive Order violates the Immigration and Nationality Act (INA). 8 U.S.C. § 1401(a) provides that "a person born in the United States, and subject to the jurisdiction thereof" is a citizen. Congress made clear when enacting this statute that it was borrowing the statutory language from the Fourteenth Amendment. *To Revise and Codify the Nat'y Laws of the United States into a Comprehensive Nat'y Code: Hearings Before the Comm. on Immig. and Naturalization on H.R. 6127 Superseded by H.R. 9980*, 76th Cong., 1st Sess., 38 (1940). A statute adopting language from another source generally conveys the original source's well-settled meaning. *See, e.g.*, *George v. McDonough*, 596 U.S. 740, 746 (2022). And more generally, a statute's language is "interpret[ed] . . . in accord with the ordinary public meaning of its terms at the time of its enactment." *Bostock v. Clayton County*, 590 U.S. 644, 654 (2020). Because we conclude that the meaning of "subject to the jurisdiction thereof" had been settled by the Supreme Court in *Wong Kim Ark* and had been settled in public understanding at the time that the statute was enacted, *see supra* Section IV.A.1, we likewise conclude that the Executive Order likely violates the INA. Accordingly, Plaintiffs have shown a strong likelihood of success on the merits both on their Constitutional Fourteenth Amendment claim and on their statutory claim under the INA, satisfying the first prong [1] of the *Winter* prerequisites to gain an injunction.

## B. REMAINING PRELIMINARY INJUNCTION FACTORS

Plaintiffs must also show "[2] that [they are] likely to suffer an irreparable harm in the absence of preliminary relief; [3] the balance of equities tips in [their] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. For the reasons that follow, we conclude that Plaintiffs have met their burden with respect to the remaining factors.

### 1. Irreparable Harm

The irreparable harm analysis focuses on irreparability, "irrespective of the magnitude of the injury." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). The Plaintiff States urge a theory of economic harm. Economic harm is not normally considered irreparable. *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). But we have held that economic harm is irreparable when monetary damages are unavailable. *Azar*, 911 F.3d at 581; *see also City & Cnty. of San Francisco*, 981 F.3d at 762.

The district court found that the State Plaintiffs are likely to suffer irreparable economic injury, on the basis that they will be denied federal reimbursements for medical care and social services provided to children no longer considered citizens under the Executive Order and will incur substantial administrative costs associated with complying with the Executive Order. We conclude that the district court did not abuse its discretion.

Because Defendants are federal officials and federal agencies, money damages are unavailable in this case. *United States v. Testan*, 424 U.S. 392, 400 (1976) ("In a suit against the United States, there cannot be a right to money

damages without a waiver of sovereign immunity. . . ."). Defendants nevertheless contend that the costs incurred by the States could be "recovered through submission of claims after final judgment or through the administrative procedures applicable to those programs." But Defendants do not explain how administrative procedures would enable the States to receive reimbursements for the thousands of children who will be declared ineligible for such reimbursements by the Executive Order. Nor do Defendants address the States' well-supported contention that the States would incur costs of developing new systems to determine which children born in their territory are citizens and which children are not. *See Ledbetter v. Baldwin*, 479 U.S. 1309, 1310 (1986) (Powell, J., in chambers) (harm is irreparable when "[t]he State will bear the administrative costs of changing its system to comply" and is unlikely to recover those costs in litigation). Because the denial of reimbursements and administrative costs are economic injuries for which monetary damages are not available, we conclude that the State Plaintiffs' injuries are irreparable. *See Azar*, 911 F.3d at 581.

## 2. Balance of the Equities and Public Interest

When the government is a party, the final two factors merge. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). We have held that constitutional violations weigh heavily in favor of an injunction, because "all citizens have a stake in upholding the Constitution." *Hernandez v. Sessions*, 872 F.3d 976, 996 (9th Cir. 2017) (quoting *Preminger v. Principi*, 422 F.3d 815, 822 (9th Cir. 2005)). For that reason, "[a] plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). Further, the rule

of law is secured by a strong public interest that the laws "enacted by their representatives are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 9 F.3d 742, 779 (9th Cir. 2018) (cleaned up).

The balance of the equities may in certain cases tip in the government's favor where an injunction poses a substantial administrative burden on the government and would delay the deportation of deportable immigrants not eligible for relief. *See INS v. Legalization Assistance Project of the L.A. Cnty. Fed'n of Labor*, 510 U.S. 1301, 1305–06 (1993) (O'Connor, J., in chambers). But the federal government "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 722 (9th Cir. 1983).

We affirm the district court's conclusion that the likely constitutional violations here weigh in favor of an injunction and that Defendants have "no legitimate interest in enforcing an Order that is likely unconstitutional and beyond its authority." Defendants in their briefing contend that because the challenged Executive Order "is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border," the Executive Branch would be irreparably injured by the delay in implementing its policies that the preliminary injunction may entail. But the preliminary injunction in no way prevents the Executive Branch from addressing unlawful immigration and does not infringe on the Executive Branch's power to ensure that the laws are faithfully executed. *Cf. INS*, 510 U.S. at 1305–06 (a stay order by Justice O'Connor concluded that the district court's order "would impose a considerable administrative burden on the INS" and would delay the deportation of deportable

noncitizens). In sharp contrast to *INS*, the preliminary injunction here merely prevents the Executive Branch from denying citizenship to individuals who are likely constitutionally entitled to citizenship. Because, as the district court correctly concluded, the Executive Branch does not have a legitimate interest in violating the Constitution, the Executive Branch has not shown that either the public interest or the balance of equities tips in its favor.

## V. SCOPE OF THE INJUNCTION

The scope of a district court's preliminary injunction, like the grant of the preliminary injunction itself, is reviewed for abuse of discretion. *See Hecox*, 104 F.4th at 1073. "A district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction," and "[a]ppellate review of those terms 'is correspondingly narrow.'" *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (quoting *Coca-Cola Co. v. Overland, Inc.*, 692 F.2d 1250, 1256 n.16 (9th Cir. 1982)). However, injunctive relief "must be tailored to remedy the specific harm alleged," and "[a]n overbroad injunction is an abuse of discretion." *Id.*

As the Supreme Court recently held, "federal courts lack authority to issue" universal injunctions. *CASA*, 2025 WL 1773631, at \*13 (June 27, 2025). However, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at \*11 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)) (emphasis added in *CASA*). The Supreme Court acknowledged that, "[t]he complete-relief inquiry is more complicated for the state respondents," and a universal injunction may be necessary "to provide the States *themselves* with complete relief." *See id.* at \*12. The

Supreme Court declined to take up that argument, leaving it to the lower courts to "determine whether a narrower injunction is appropriate." *Id.*

The district court below concluded that a universal preliminary injunction is necessary to provide the States with complete relief. We conclude that the district court did not abuse its discretion in issuing a universal injunction in order to give the States complete relief. States' residents may give birth in a non-party state, and individuals subject to the Executive Order from non-party states will inevitably move to the States. *See* U.S. Census Bureau, U.S. Dep't of Com., *Geographical Mobility in the Past Year by Age for Current Residence in the U.S., Am. Cmty. Survey, ACS 1-Year Estimates Detailed Tables, Table B07001*, https://tinyurl.com/mpau42e9. To account for this, the States would need to overhaul their eligibility-verification systems for Medicaid, CHIP, and Title IV-E. For that reason, the States would suffer the same irreparable harms under a geographically-limited injunction as they would without an injunction. *See supra* Section III.A.

This is so even if, as Defendants suggest, Defendants were enjoined to treat children affected by the Executive Order who move to the States as eligible for federally funded medical and social programs. Defendants did not raise this proposed narrower injunction below. On that basis alone, we conclude that the district court did not abuse its discretion, because the district court was not obligated to consider an argument that the Defendants never raised. *See Wilkins v. United States*, 598 U.S. 152, 158 (2023).

But even if Defendants had raised this argument below, it fails. Enjoining Defendants to deem these children eligible for Medicaid, CHIP, or Title IV-E services would not

remedy the States' administrative harms. The States are
required by federal law to verify the actual citizenship status
of individuals for the programs that they operate. *See*, *e.g.*,
42 U.S.C. § 1396b(v); 8 U.S.C. §§ 1611(a), (c)(1)(B); 42
C.F.R. § 435.406. Because the Executive Order provides
that "no department or agency of the United States
government shall issue documents recognizing United States
citizenship, or accept documents . . . purporting to recognize
United States

Citizenship," the States would be unable to verify the
citizenship of children through their established systems.
*See Protecting the Meaning and Value of American
Citizenship*, Exec. Order 14,160, 90 Fed. Reg. 8449 (Jan. 20,
2025). This is no surprise as the States' relevant regulations
are based on the longstanding premise of nationwide
birthright citizenship, the status quo ante litem. *See
Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1024
(9th Cir. 2016) (noting that the "purpose of a preliminary
injunction is to preserve the status quo ante litem"). Thus,
the States would be obligated to overhaul their existing
systems for determining citizenship and incur an
administrative burden even if the injunction were narrowed
as Defendants suggest. Again, these are costs that are not
recoverable in damages. *See Testan*, 424 U.S. at 400;
*Ledbetter*, 479 U.S. at 1310. It is impossible to avoid this
harm absent a uniform application of the Citizenship Clause
throughout the United States. For that reason, we conclude
that the district court did not abuse its discretion in issuing a
universal preliminary injunction, and we affirm the
injunction's scope.

## VI.  CONCLUSION

Article II of the Constitution establishes the scope of presidential powers. *See generally* U.S. Const. art. II. The President has the power to issue executive orders if they "stem either from an act of Congress or from the Constitution itself," on matters that fall within that scope established by Article II. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). But one power that the President was not granted, by Article II or by any other source, is the power to modify or change any clause of the United States Constitution. Perhaps the Executive Branch, recognizing that it could not change the Constitution, phrased its Executive Order in terms of a strained and novel interpretation of the Constitution.[5]

The district court correctly concluded that the Executive Order's proposed interpretation, denying citizenship to many persons born in the United States, is unconstitutional. We fully agree. The Defendants' proposed interpretation of the Citizenship Clause relies on a network of inferences that are unmoored from the accepted legal principles of 1868. This runs the risk of "'extrapolat[ing]' from the Constitution's text and history 'the values behind [that right], and then . . . enforc[ing] its guarantees only to the extent they serve (in the courts' views) those underlying values.'" *United States v. Rahimi*, 602 U.S. 680, 710 (2024) (Gorsuch, J., concurring) (quoting *Giles v. California*, 554

---

[5] The Executive Order attempts to qualify and limit the plain language of the Constitution's citizenship clause, which by its terms only says that a person born in the United States and subject to its jurisdiction is a citizen, by adding the notion that the person must be a child of a citizen or lawful permanent resident. The precise language of the Executive Order is set forth in the text above quoting section 1 of the Executive Order. *See supra* Section I.B.

U.S. 353, 375 (2008)). We reject this approach because it is contrary to the express language of the Citizenship Clause, the reasoning of *Wong Kim Ark*, Executive Branch practice for the past 125 years, the legislative history to the extent that should be considered, and because it is contrary to justice.

**AFFIRMED**

BUMATAY, Circuit Judge, concurring in part and dissenting in part:

For good reason, this case elicits strong reactions from all sides. Fewer questions could be more important than deciding who is entitled to American citizenship. And this is understandably so—citizenship in our country is worth fighting for. And it's also worth ensuring that it is only conferred on those legally eligible to receive it. Despite, or perhaps because of, this, courts must be vigilant in enforcing the limits of our jurisdiction and our power to order relief. Otherwise, we risk entangling ourselves in contentious issues not properly before us and overstepping our bounds. No matter how significant the question or how high the stakes of the case—at all times, we must adhere to the confines of "the judicial Power." U.S. Const. art. III, § 2, cl. 1. Exceeding those limits—even to settle a divisive issue—violates the Constitution.

Among the most profound innovations of our Constitution is our system of separated powers—one that grants each branch of our government only limited authority. The Founding generation understood this division was necessary to preserve liberty and prevent tyranny. With their

personal experience at the hands of the British
government—with its Star Chamber, arbitrary
pronouncements, and other abuses—they knew that
concentrating too much authority in only a few hands
corrupts and threatens our freedoms. As a result, they
established strict constitutional guardrails to keep each
branch in its lane.

A vital separation-of-powers limit on the judiciary is that
we may only grant party-specific relief. Under the
constraints placed on lower courts by Congress, we may
order only the "sorts of equitable remedies traditionally
accorded by courts of equity at our country's inception."
*Trump v. CASA, Inc.*, 606 U.S. ___, 145 S. Ct. 2540, 2551
(2025) (simplified). For too long, this limit was ignored. All
too often, district courts have issued universal injunctions—
mandating relief to both injured plaintiffs and non-parties
alike—as a matter of course. But, simply put, universal
injunctions "lack a historical pedigree" and "fall outside the
bounds of a federal court's equitable authority under the
Judiciary Act." *Id.* at 2554. Indeed, runaway universal
injunctions conflict with the judicial role—encouraging
federal courts to "act more like a legislature by decreeing the
rights and duties of people nationwide."
*United States v. Texas,* 599 U.S. 670, 703 (2023)
(Gorsuch, J., concurring). So the Supreme Court has put an
end to that practice.

To adhere to the separation of powers, then, federal
courts must not grant an injunction "broader than necessary
to provide complete relief to each plaintiff with standing to
sue." *CASA*, 145 S. Ct. at 2562–63. No longer can a single
district court judge casually enjoin the actions of the political
branches *everywhere* against *everyone* all at once. Now,
plaintiffs must establish that a sweeping injunction is truly

necessary for "complete relief." And that inquiry must be
searching—requiring the closest scrutiny to the plaintiff's
claimed injury. "[T]he broader and deeper the remedy the
plaintiff wants, the stronger the plaintiff's story needs to be."
*Id*. at 2558 (quoting S. Bray & P. Miller, *Getting into Equity*,
97 Notre Dame L. Rev. 1763, 1797 (2022)). True,
sometimes complete relief may incidentally benefit non-
parties, as in a public nuisance. *See id.* at 2557. But the key
is that sweeping relief of that sort is "by far the exception,"
justified only when "it would be all but impossible to devise
relief that reaches only the plaintiffs." *Id.* at 2565 (Thomas,
J., concurring) (simplified). Thus, we should approach any
request for universal relief with good-faith skepticism,
mindful that the invocation of "complete relief" isn't a
backdoor to universal injunctions. Otherwise, *CASA* would
be a mere drafting exercise rather than a binding precedent.
And finally, it's worth remembering that "complete relief"
functions not as a floor but as a ceiling—it's not a
"guarantee" but the "maximum a court can provide." *Id.* at
2558 (majority opinion). Equity sometimes demands that
courts grant *less* than complete relief.

Standing is another separation-of-powers mechanism to
guard against judicial overreach. Standing keeps courts in
their place: deciding only concrete disputes between an
injured plaintiff and a defendant according to the law.
Requiring an injury in fact before exercising jurisdiction
"prevent[s] the judicial process from being used to usurp the
powers of the political branches." *Clapper v. Amnesty Int'l.
USA*, 568 U.S. 398, 408 (2013). Courts, then, can't be used
to strike down disfavored laws on a whim. Instead, to invoke
the judicial power, plaintiffs must establish actual harm
traceable to the law. Otherwise, we risk transforming the
judiciary into the "roving commission," *United States v.*

*Hansen*, 599 U.S. 762, 786 (2023) (Thomas, J., concurring) (simplified), for the "free-floating review" of executive and congressional action expressly rejected by the Founders, *Moody v. NetChoice, LLC*, 603 U.S. 707, 761 (2024) (Thomas, J., dissenting).    The Founders left non-particularized challenges to disfavored policy to the ballot box—not the courts.

And these two guardrails—party-specific relief and standing—must work in tandem.  We can't tighten one but loosen the other.  That would be like squeezing one end of a balloon—it just pushes all the air to the other end.  The net result is the same—inflated power for the judiciary.  So with our authority to issue universal injunctions sharply curtailed, we must resist the temptation to expand our authority by reflexively granting third-party standing, indulging speculative harms, or allowing other jurisdictional end-runs. That concern is particularly acute in our dealings with States because they are often "not directly subject to the challenged policy" yet may seek wider-ranging redress than individual plaintiffs for "at most, collateral injuries." *See CASA*, 145 S. Ct. at 2566 (Alito, J., concurring).    As Justice Alito warned, lower courts must remain "conscientious[]" in applying third-party standing doctrine, "including against state plaintiffs."  *Id.*  Otherwise, we grant States the power to "create a potentially significant loophole" evading the limits on universal injunctions by artful pleading.  *Id.*  That's why we must be "rigorous" in our state-standing analysis if reaching the merits of the dispute would "force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).  In these cases, courts should not intervene "unless obliged to do so in the proper performance of our judicial function, when the question is

raised by a party whose interests entitle him to raise it."
*Valley Forge Christian Coll. v. Ams. United for Separation
of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting
*Blair v. United States*, 250 U.S. 273, 279 (1919)).    The
separation of powers demands no less.

With these principles in mind, I return to this case.  On
January 20, 2025, the President issued an Executive Order
directing the federal government to no longer recognize the
U.S. citizenship of children born in the United States to
parents on a temporary visa or unlawfully present in the
country.  *See Protecting the Meaning and Value of American
Citizenship*, Exec. Order No. 14,160, 90 Fed. Reg. 8449.
(Jan. 20, 2025).  The States of Washington, Arizona, Illinois,
and Oregon ("State Plaintiffs") immediately challenged the
Executive Order.    Cherly Norales Castillo and Alicia
Chavarria Lopez ("Individual Plaintiffs") also sued on
behalf of their then-unborn children, who wouldn't receive
U.S. citizenship under the Executive Order.  On February 6,
2025, the district court enjoined the enforcement and
implementation of the Executive Order on a universal basis.
The United States appealed.

I join Section III.B of the majority opinion in declining
to reach the Individual Plaintiffs' claims.  As the majority
observes, it appears that both Individual Plaintiffs have
given birth, meaning their children are United States
citizens—raising mootness concerns.  It's also a good call to
avoid potential conflict with the overlapping class action
pending in the District of New Hampshire.  *See Church of
Scientology of Cal. v. U.S. Dep't of Army*, 611 F.2d 738, 750
(9th Cir. 1979).

But in rigorously applying our standing doctrine, I
conclude that State Plaintiffs have no standing at this time.

Absent a party with Article III standing, it's premature to address the merits of the citizenship question or the scope of the injunction.

I respectfully dissent in part.

## I.

## State Plaintiffs Lack Standing

The federal government asserts that the State Plaintiffs lack standing to challenge the Executive Order. In response, State Plaintiffs claim standing to protect their sovereign and pecuniary interests. Neither ground establishes standing. First, State Plaintiffs haven't identified a cognizable sovereign interest, and they can't sue the federal government on behalf of their citizens. Second, State Plaintiffs' asserted pecuniary injuries are too speculative and contingent at this stage to constitute injuries in fact. Third, State Plaintiffs' alleged loss of federal reimbursements for public benefits is a self-inflicted injury that doesn't confer standing. Finally, *Biden v. Nebraska,* 600 U.S. 477 (2023), doesn't provide standing.

## A.

## No Sovereign or Third-Party Standing

State Plaintiffs first argue standing to bring this challenge based on their "sovereign interests" or their ability to litigate constitutional claims that implicate their residents' individual rights.

State Plaintiffs' first theory of standing is easy to dismiss. They assert a "sovereign interest" in defending against regulation of "state citizenship." Even if such an interest exists, State Plaintiffs haven't shown how the Executive Order regulates *state* citizenship in any way. *See*

*Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923) (observing that States' "sovereign rights" are not implicated if the federal government does not "require the states to do or to yield anything"). By its express terms, the Order only implicates the meaning of *United States* citizenship and only directs action by federal executive agencies. And State Plaintiffs point to no language in the Order that implicitly alters state citizenship. At most, they suggest that deeming some of their residents not "subject to the jurisdiction" of the United States might confer on those residents "some degree of immunity from state laws." Absolutely nothing in the Executive Order says that, nor has any party advanced that view. So, while creative, this alleged injury is neither concrete nor imminent. This theory easily fails.

State Plaintiffs' next theory of standing seeks to vindicate the rights of their citizens. Altering who is a United States citizen, they assert, might affect their residents' ability to vote in local elections, serve on juries, hold local office, and become police officers. They also argue that they can challenge the Order based on a "long history" of state and local government challenges to Executive Branch action impacting individual rights. Try as they may to disclaim it, distilled down, these arguments are no more than an assertion of third-party standing on behalf of their citizens—also known as *parens patriae*. And it's blackletter law that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (simplified). That makes "th[is] issue open and shut." *Id.*

Standing doctrine "strongly disfavors so-called 'third-party standing.'" William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 157

(2023). Generally, a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (simplified). The risks of relaxing third-party standing are obvious: "the courts might be 'called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.'" *Id.* (simplified).

Given large state populations and the broad interests they may seek to vindicate, these concerns apply with greater force when States assert third-party standing. Just as federal courts are not "roving commissions assigned to pass judgment on the validity of the Nation's laws," *Hansen*, 599 U.S. at 786 (Thomas, J., concurring) (simplified), neither are States anointed privileged litigants to challenge disfavored federal government action. Like other parties, States must show a cognizable harm to themselves—not just their residents—before invoking federal court jurisdiction to challenge federal government policy. As the Court recognized long ago, "[w]hile the state, under some circumstances, may sue [as representatives of its citizens] for the protection of its citizens . . . it is no part of its duty or power to enforce their rights in respect of their relations with the federal government." *Mellon*, 262 U.S. at 485–86. That's because "it is the United States, and not the state, which represents them as *parens patriae*." *Id.* at 486.

Indeed, in our constitutional system, the People are sovereign and do not need States to act as intermediaries. *See* Ann Woolhandler & Michael G. Collins, *State Standing*, 81 Va. L. Rev. 387, 439 (1995) (arguing that the traditional "preference for state-versus-individual actions over

government-versus-government actions enhanced the status of the individual as a rights-holder against government"); *Kowalski*, 543 U.S. at 130 (considering "whether there is a 'hindrance' to the possessor's ability to protect his own interests" when deciding whether to allow third-party standing). After all, the common law basis for *parens patriae* was the need to protect those who could not protect themselves. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 600 (1982) (The royal prerogative serves to protect those who "are legally unable, on account of mental incapacity, whether it proceed from 1st. nonage: 2. idiocy: or 3. lunacy: to take proper care of themselves and their property.") (quoting J. Chitty, Prerogatives of the Crown 155 (1820)); 3 William Blackstone, Commentaries 47 (The King "is the general guardian of all infants, idiots, and lunatics."). Because our constitutional system enables individuals to vindicate their own rights, courts should disfavor state third-party standing.

The Supreme Court has a long history of upholding this principle. In *South Carolina v. Katzenbach*, 383 U.S. 301 (1966), the Court held that South Carolina lacked standing to challenge a federal statute that the State alleged violated its citizens' due-process rights. Because the State itself had no due process rights, it could not raise its citizens' rights "against the Federal Government, the ultimate *parens patriae* of every American citizen." *Id.* at 324. Next, in *Brackeen*, 599 U.S. 255, the Supreme Court held that Texas did not have standing to argue that a federal statute violated its citizens' equal-protection rights. Again, the Court held that a State could not "assert third-party standing" to bring a suit when the State itself "ha[d] no equal protection rights of its own." *Id.* at 294, 295 n.11. And most recently, in *Murthy v. Missouri*, 603 U.S. 43, 76 (2024), the Court held that

Missouri lacked standing to bring First Amendment claims against alleged federal government censorship of its citizens on behalf of its citizens.

So State Plaintiffs' assertion of standing to protect their residents collides with third-party standing limitations. Though they couch it otherwise, we can't ignore "thinly veiled attempt[s] to circumvent the limits on *parens patriae* standing." *Brackeen*, 599 U.S. at 295 n.11. At bottom, State Plaintiffs' concerns are their residents' rights and relationships with the federal government. But as the numerous suits filed by individual plaintiffs nationwide against the Executive Order show, individuals are themselves capable of remedying any alleged injury. Given this, we must deny third-party standing for State Plaintiffs.

## B.

## Pecuniary Injuries Too Speculative and Contingent

State Plaintiffs next assert an array of pecuniary harms to their fiscs. First, they claim that the Executive Order will reduce their share of federal reimbursements from Medicaid, Children's Health Insurance Program ("CHIP"), and Title IV-E foster care services. Because only services provided to those with U.S. citizenship or certain legal immigration statuses are eligible for reimbursement under these federal programs, State Plaintiffs allege that they will not receive reimbursements for services provided to children born to undocumented aliens or aliens with temporary visas. Second, the States maintain that they will incur administrative expenses to redesign their public assistance programs and retrain their staff to verify citizenship under the Executive Order. If citizenship is no longer determined by birth in the United States, State Plaintiffs surmise that they will need to design new citizen-verification protocols,

update their IT infrastructure, and instruct staff to ensure compliance with federal assistance programs. Finally, the States contend that they will lose processing fees from the Social Security Administration ("SSA") for transmitting birth-record data on U.S. citizens. Currently, the SSA pays State Plaintiffs $4 to $5 in service fees for the data, which the agency uses to generate Social Security numbers. State Plaintiffs fear they will stop receiving this funding because some children born in their States will no longer be citizens under the Executive Order.

But all these projected injuries suffer the same fatal defect. Because they sit downstream of the Executive Order's direct effects, they rely on speculation about how the Order might be implemented and assumptions about how independent third parties might react to its implementation. But "[a]ny prediction how the Executive Branch might eventually implement" the Executive Order is "no more than conjecture." *Trump v. New York*, 592 U.S. 125, 131 (2020) (simplified). And so this case "does not—at this time— present a dispute appropriately resolved through the judicial process." *Id.* (simplified).

**1.**

As stated above, we must rigorously enforce our Article III jurisdictional rules when asked to interfere with the actions of the political branches. "A foundational principle of Article III is that 'an actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'" *Id.* (simplified). So plaintiffs must satisfy "[t]wo related doctrines of justiciability"—standing and ripeness—to advance an Article III case or controversy. *Id.*

First, to show standing, plaintiffs must establish an injury in fact, causation, and redressability. Speculation can't be

used to satisfy these requirements. The injury in fact must be "concrete, particularized, and imminent rather than conjectural or hypothetical." *Id.* (simplified). Alleged injuries must be "impending" with some "certain[ty];" the mere "possibl[ility]" of "future injury" is "too speculative for Article III purposes." *Clapper*, 568 U.S. at 409 (simplified). And the causation requirement "rules out" standing based on "attenuated links," such as "where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). So "Plaintiffs cannot rely on speculation about 'the unfettered choices made by independent actors not before the courts'" to claim standing. *Clapper*, 568 U.S. at 414 n.5 (simplified). The bottom line—any asserted injury can't be "too speculative or too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383.

Second, plaintiffs must show the case is "ripe" for judicial intervention. A claim that hinges on "contingent future events that may not occur as anticipated, or indeed may not occur at all" is "not ripe for adjudication." *Texas v. United States*, 523 U.S. 296, 300 (1998) (simplified). When challenging federal actions, courts often defer review until a concrete controversy crystallizes. That's because "[d]etermination of the scope" of a federal action "in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Int'l Longshoremen's & Warehousemen's Union, Loc. 37 v. Boyd*, 347 U.S. 222, 224 (1954). This is especially so when a case "require[s] guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.

**2.**

State Plaintiffs' allegations of pecuniary injuries are "riddled with contingencies and speculation." *Trump*, 592 U.S. at 131. Their theory of standing requires us to swallow two big pills—(1) state standing based on speculative assumptions about the indirect, downstream costs of federal government action; and (2) state standing based on predictions about how a federal policy might be implemented. Together, these concerns doom jurisdiction.

**a.**

To begin, the Executive Order itself doesn't directly withhold funding to the States or require the States to expend any funds. And we should be skeptical of state challenges to executive action premised on indirect fiscal effects. As the Court recently told us:

> [I]n our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending. And when a State asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated.

*Texas*, 599 U.S. at 680 n.3.

In *Texas*, Texas and Louisiana advanced the same derivative-costs theory that State Plaintiffs make here. The two States challenged new Department of Homeland Security ("DHS") Guidelines prioritizing the arrest of only certain undocumented aliens. *See id.* at 673–74. To establish standing, they claimed that leaving more undocumented aliens within their borders would force them

to spend "more money on law enforcement, incarceration, and social services." *Id.* at 687 (Gorsuch, J., concurring). Even crediting those factual assertions, the Court found the alleged injury "too attenuated" to support state standing. *See id.* at 680 n.3. After all, contingent injuries, like those based on economic harms tied to predicted population changes, will seldom amount to a cognizable Article III injury.

As Chief Judge Sutton asked in a similar context:

> Are we really going to say that any federal regulation of individuals through a policy statement that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain? Even though it "would make a mockery . . . of the constitutional requirement of case or controversy," the States' boundless theory of standing—in which all peripheral costs imposed on States by actions of the President create a cognizable Article III injury—would allow them to challenge a "disagreeable war." Alexander Bickel, *The Voting Rights Cases*, 1966 Sup. Ct. Rev. 79, 89–90 (1966). That is a bridge much too far.

*Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (Sutton, C.J.) (simplified).

To Chief Judge Sutton's concerns, I add my own. Taken to its logical endpoint, the States' theory would grant them standing to contest virtually any federal action that might tangentially affect who lives or is born within their borders. That's because, according to State Plaintiffs, every person

who crosses their borders represents a monetary cost or benefit on their financial ledgers. Consider some examples. If the President were to raise the annual refugee cap—does a State have standing to sue because the presence of more aliens might someday increase state expenditures on schools or emergency medical care? Or if Congress were to permit nationwide over-the-counter access to hormonal birth control—does a State have standing to sue because easier access could depress future birth rates, and thereby reduce the accompanying SSA administrative fees? Indeed, why wouldn't a State have standing to challenge the removal of a single alien from within its borders given the individual's potential fiscal impact on the State? The Constitution's case-or-controversy requirement does not stretch so thin.

If bare conjecture that a federal action might marginally alter a State's population—and thereby its finances—were sufficient for standing, the injury-in-fact prerequisite would mean little. States would be empowered to litigate every national policy dispute under the guise of protecting their treasuries. Merely by hypothesizing downstream fiscal effects, States could enjoy near-automatic access to federal court while other litigants face exacting hurdles. Such asymmetry threatens to convert States into de facto "general-public-interest plaintiffs," drawing Article III courts into political contests we were never meant to referee. Ann Woolhandler & Michael G. Collins, *Reining in State Standing*, 94 Notre Dame L. Rev. 2015, 2030 (2019). At a minimum, we should require costs to state treasuries to be "directly traceable" to the federal government action to establish standing. *Biden*, 600 U.S. at 490.

**b.**

But these indirect effects aren't the end of the story. Because the Executive Order was essentially enjoined on day one, we don't know how it will actually be implemented. The Executive Order directs federal agencies to "issue public guidance" within 30 days "regarding this order's implementation with respect to their operations and activities." But the district court immediately enjoined any federal agency from "[t]aking any further steps in reliance on the Executive Order," including providing any implementation guidance. Thus, nothing indicates the government's plan for enforcing the Order, and any prediction as to how it will do so is merely a guess.

Courts are often reluctant to recognize standing or ripeness when a government action is challenged too soon to understand its consequences. *See, e.g.*, *Trump*, 592 U.S. at 132–34; *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653 (9th Cir. 2017) (concluding that "allegations about the potential economic effects" of a law yet to be implemented "were necessarily speculative"). Predicting how a presidential parchment setting a policy goal transforms into the mechanics of actual government policy "involves a significant degree of guesswork." *Trump*, 592 U.S. at 132. Given that the government will eventually need to consider "both legal and practical constraints, making any prediction about future injury just that—a prediction." *Id.* at 133. Recognizing standing and ripeness based on speculative and contingent injuries risks premature interpretation of federal policy on a barebones record.

State Plaintiffs' claimed injuries depend on discretionary decisions that have yet to be made, and so any assessment of their claims to standing can only be made after further

development.  Allowing "the Executive Branch's decisionmaking process [to] run its course" would "bring[] more manageable proportions to the scope of the parties' dispute," and supply the clarity essential to our review. *Id.* at 134 (simplified).  Rather than breeze past our constitutional limits to get to the merits, all this uncertainty requires restraint.  Simply, that the Executive Order *could* be administered in a way that harms State Plaintiffs does not establish that it *will* be so administered.  Nothing prevents the federal government from adopting measures that would reduce or eliminate any projected costs to the States.  But until those discretionary choices are made, State Plaintiffs' purported injuries remain "too speculative" and "too attenuated." *All. for Hippocratic Med.*, 602 U.S. at 383.  So Article III demands we wait until the federal government provides its plans before acting.  If State Plaintiffs' fears become concrete after implementation is announced, federal courts will stand ready to fulfill their constitutional duty.

\* \* \*

Based on these twin concerns—speculation on indirect, downstream costs and assumptions about uncertain implementation—judicial intervention at this stage is premature.

**3.**

Drilling down more closely on State Plaintiffs' specific allegations confirms that they are, at this time, too speculative and too contingent.

State Plaintiffs' theory of fiscal injury begins from the premise that every child denied citizenship under the Executive Order will likewise be categorically barred from Medicaid, CHIP, and Title IV-E foster care benefits.  But the

Executive Order's "impact on funding is [un]certain." *Trump*, 592 U.S. at 133. Each of these federal programs extends not exclusively to U.S. citizens, but also to certain "qualified aliens." 8 U.S.C. § 1641(b). The Executive Order itself is silent on what immigration status these children would receive. If they are granted lawful permanent residence, parole, or another qualifying status, the federal benefits—and the accompanying federal reimbursements— could remain available. *See id.* State Plaintiffs also presuppose, again without support, that the federal government will withhold every dollar of matching funds, that no other appropriations or grants will offset the difference, and that private social-service groups will not fill any gaps in coverage.

Thus, the Executive Order "will not inexorably have the direct effect on downstream access to funds or other resources predicted by" State Plaintiffs. *Trump*, 592 U.S. at 133. How the Department of Health and Human Services ("HHS"), DHS, and other federal agencies will address these issues is a "fundamental uncertainty impeding proper judicial consideration at this time." *Id.*

Nor do State Plaintiffs identify any evidence that federal agencies will implement the Executive Order in the maximally punitive fashion they predict. Washington, for example, suggests without evidence that it will lose pregnancy-care reimbursements for undocumented women whose newborns will lack citizenship. That is merely a guess.

State Plaintiffs also rely on demographic assumptions to allege these pecuniary harms. They assume that the population of undocumented aliens in their States will remain constant, that families will not relocate or repatriate,

and that they will seek coverage under the specified state programs. Whether any of this occurs turns on a morass of independent variables, including interstate migration patterns, economic cycles, immigration enforcement policies, future congressional appropriations, and the discretionary policy choices of state, local, and federal governments.

State Plaintiffs' theory of "administrative burdens" fares no better. It depends on a string of unsupported predictions: that HHS, SSA, and other relevant agencies will immediately rewrite eligibility regulations, refuse to grandfather existing processes, mandate immediate and costly system overhauls, and deny both transitional funding and phased-compliance periods. Yet federal agencies possess ample discretion to soften any new requirements—by staggering effective dates, supplying technical assistance, or fully subsidizing implementation—and the record contains no indication that they will choose the most onerous path. In any event, because the Executive Order by itself doesn't direct States to alter their verification systems, the expenses State Plaintiffs might elect to incur at this stage are "at least partly within [their] own control," and are neither imminent nor unavoidable. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 564 n.2 (1992).

Finally, State Plaintiffs' claimed loss of Social Security processing fees rests on still another unsupported chain of speculation: that SSA will bar newborns without U.S. citizenship from receiving Social Security numbers, that SSA will see no value in continuing to receive the data supplied by State Plaintiffs, and that SSA will withhold the processing fee. State Plaintiffs haven't shown that SSA will refuse to either assign Social Security numbers to non-U.S. citizens or compensate States for transmitting birth-record

data regardless of citizenship. *See, e.g.*, 20 C.F.R. § 422.104(a).

All this is too speculative and contingent to support jurisdiction over State Plaintiffs' claim at this stage. Article III doesn't give courts license to game out "what-ifs" or to indulge worst-case scenarios. State Plaintiffs' fiscal projections rest on a chain of speculative assumptions—hypothesizing the most punishing implementation to inflict maximum financial loss. In short, every fiscal injury that State Plaintiffs project depends on compounded assumptions about how multiple independent actors—federal agencies, healthcare administrators, private social services, and even individual parents—might respond to the Executive Order. The alleged harms don't flow from the Executive Order "in the abstract," but rather from whatever measures the federal agencies may eventually adopt to implement its directive. *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). This is insufficient for Article III jurisdiction.

Rigorous enforcement of the Article III requirement is indispensable. Without it, federal courts would become a forum for any parties to air generalized grievances. Even worse, federal judges would be transformed into "virtually continuing monitors of the wisdom and soundness" of federal government action. *Allen v. Wright*, 468 U.S. 737, 760 (1984) (simplified).

## C.

### Any Lost Reimbursement Would Be Self-Inflicted

In addition to being too speculative and contingent, any loss of federal reimbursements for state assistance programs would not give rise to Article III standing because it would be a "self-inflicted injur[y]"—"not fairly traceable to the

[federal government's] purported activities." *See Clapper*, 568 U.S. at 418. Even if losses in federal reimbursements were to come to fruition, they would be caused by State Plaintiffs' own voluntary choices to extend benefits to aliens ineligible to receive federal benefits. Simply, the "unilateral decision[] by a group of States" to extend healthcare and other benefits to those not entitled to federal reimbursement does not create a basis to attack the Executive Order because any "financial injury" suffered would be "due to their own independent" decisions. *FEC v. Cruz*, 596 U.S. 289, 297 (2022). After all, State Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves[.]" *Clapper*, 568 U.S. at 416.

*Pennsylvania v. New Jersey*, 426 U.S. 660 (1976), tells federal courts to guard against self-inflicted injuries by States. In that case, Pennsylvania gave its residents tax credits for taxes paid to other States. In turn, New Jersey taxed income earned by Pennsylvanians in New Jersey. The result—Pennsylvania lost tax revenue because of New Jersey's tax. *Id.* at 662–63. Pennsylvania then sued New Jersey. The Court wasn't sympathetic to Pennsylvania. "[N]othing prevent[ed] Pennsylvania from withdrawing [its tax] credit for taxes [its residents] paid to New Jersey," according to the Court. *Id.* at 664. Thus, the "injuries to the [State's] fisc[] were self-inflicted, resulting from decisions by the[] . . . state legislature[]." *Id.* So when a State can avoid lost revenue by changing its tax laws, that State lacks standing to recoup the funds. Although *Pennsylvania* was a matter of original jurisdiction, the Court later made clear its principle also applies to Article III standing. *See Cruz*, 596 U.S. at 297.

State Plaintiffs complain that the Executive Order will cause them to lose federal reimbursement for their social

assistance programs. They identify several state-funded programs—such as Medicaid, CHIP, and Title IV-E foster care—which they say will be underfunded because of the Executive Order. But any unreimbursed expenditures would be the result of the States' choices to offer services to those ineligible for reimbursement—not the Executive Order.

Take Washington's "Apple Health" program. Apple Health is the umbrella name for Washington's medical assistance programs, which include the state-run side of Medicaid and CHIP. Both federal programs reimburse States a certain percentage of funds used to cover qualifying healthcare expenses. Historically, the CHIP federal match has been about 65%. Under federal law, with some limited exceptions, illegal aliens and those without a qualifying immigration status are not eligible for Medicaid, CHIP, or other federal benefits. So federal reimbursement is contingent on U.S. citizenship or another qualifying immigration status, such as being a legal permanent resident. Despite those restrictions on federal reimbursement, Washington decided to provide healthcare coverage to income-qualified children "regardless of immigration status." So while citizenship or lawful immigration status is a prerequisite for Medicaid or CHIP reimbursement, Washington volunteers to cover *all* children—even if they do not meet the "immigration status requirements" for federal reimbursement.

This is a classic self-inflicted loss. Washington's theory of injury is that the Executive Order will lead to more non-U.S. citizens residing in the State, that the State will need to provide healthcare benefits for those aliens, and that the federal government will refuse to reimburse the State for those benefits. But the decision to provide coverage to individuals regardless of immigration status was

Washington's alone. *See* Wash. Rev. Code § 74.09.470. Indeed, just last year, in 2024, Washington chose to expand its medical assistance programs to undocumented adults. *See* 2023–25 Supplemental Operating Budget, ch. 376, § 211(82)(a), 2024 Wash. Laws 1, 338–39. Presumably, State Plaintiffs would argue that this brand new policy decision exacerbates their alleged injury.

Though States may extend their assistance programs to anyone they like, the federal government's refusal to reimburse them for a voluntary policy decision would not create a cognizable injury. Put differently, had Washington not independently chosen to cover undocumented aliens' healthcare expenses, then the Executive Order would not impact Washington's reimbursements at all. The federal government would continue to provide reimbursements for those who qualify. That the State elects to service residents beyond those who qualify for federal reimbursement makes its alleged injury directly traceable to Washington State— not Washington, D.C.

Ultimately, "[n]othing in the challenged [Executive Order] required the plaintiff States to offer [expanded healthcare benefits]; accordingly, the financial injury those States [allege they will suffer is] due to their own independent" funding decisions—not the Executive Order. *See Cruz*, 596 U.S. at 297 (citing *Pennsylvania*, 426 U.S. at 664). And "[n]o State can be heard to complain about damage inflicted by its own hand." *Pennsylvania*, 426 U.S. at 664.

### D.

### *Biden v. Nebraska* Doesn't Confer Standing

State Plaintiffs rely chiefly on *Biden v. Nebraska* to conclude that their asserted pecuniary injuries support standing. They cite the case for the proposition that when the federal government cuts the number of accounts a state entity serves—and thereby decreases the federal funding or administrative fees to which the State would otherwise be entitled under a contract or grant—the federal government causes the State to suffer a concrete and direct injury. That may be a fine abstract of *Biden*, but it's far afield from the derivative injuries State Plaintiffs assert here. Simply put, the alleged harms in *Biden* were the direct and inescapable result of federal action and were in no way speculative or contingent.

*Biden* arose from the federal government's attempt to forgive a wide swath of student loans. *See Biden*, 600 U.S. at 487–89. In August 2022, the Department of Education announced that it was issuing "waivers and modifications" under the Higher Education Relief Opportunities for Students Act of 2003. *See id.* at 487. As it turned out, these "waivers and modifications" amounted to a plan to forgive a monumental sum of student debt. *See id.* The plan was "straightforward"—borrowers with incomes below $125,000 would have their loans discharged up to $10,000 per borrower. *Id.* at 488. Estimates projected 43 million borrowers eligible for relief and cancellation of about $430 billion in debt principal. *Id.*

That impending loan cancellation set off alarm bells for Missouri. Years before, Missouri had created the Missouri Higher Education Loan Authority ("MOHELA"), an instrumentality of the State, to hold and service student

loans. *See id.* at 488–89, 490–91. MOHELA owned over $1 billion of loans. *See id.* at 489. Further, it had contracted with the federal government to service nearly $150 billion of federal loans—meaning that MOHELA would collect payments on those loans and provide customer service to borrowers. *See id.* This was good business for MOHELA, which received $88.9 million in administrative fees for the five million federal accounts it serviced. *Id.* at 489–90. The loan-forgiveness plan would have completely discharged "roughly half of all federal borrowers"—meaning "MOHELA could no longer service those closed accounts." *Id.* at 490. So if the loan-forgiveness plan took effect, MOHELA would lose "$44 million a year in fees that it otherwise would have earned under its contract with the Department of Education." *Id.* That "financial harm [was] an injury in fact directly traceable to the Secretary's plan." *Id.*

The alleged injuries in *Biden* were certain and direct, not speculative or contingent. Because the "terms of the debt cancellation plan [were] straightforward," there was no way MOHELA could escape unscathed—it was going to lose $44 million a year as a direct result of the plan. *Id.* at 488, 490. That's not the case here. As discussed above, it's *speculative* what effect the Executive Order will have on the reimbursement and administration of Medicaid, CHIP, and Title IV-E programs. Any fiscal impact would only be derivative of the Executive Order's implementation. And since the preliminary injunction went into effect before the government had an opportunity to sketch out the specifics of the Executive Order's enforcement, a real possibility exists that the federal government may mitigate any downstream consequences affecting these assistance programs. The same goes for the SSA's processing fees. Nothing stops the

federal government from continuing to collect birth data from the States or from continuing to pay processing fees. On these contingent questions, the Executive Order is silent. So the Executive Order by itself doesn't command that States lose future downstream payments or payouts.

Thus, while *Biden* supports the proposition that the loss of federal funding or administrative fees *can* be a "direct" injury for standing purposes, that principle begs the question of whether such a loss *will occur at all*. The more indirect and derivative the costs, the more those injuries become speculative and contingent. Picture it this way, a scraped knee is the predictable—and maybe even likely— consequence of riding a skateboard. And once a child falls from his skateboard and bloodies his knees, that child has suffered a "direct injury." But no one would say that the child was "injured" as soon as his parents gifted him the skateboard—no matter how predictable the injury may have been. Likewise, the speculative and contingent consequences of the Executive Order on federal funding and administrative fees is worlds apart from the "straightforward" terms of the cancellation plan in *Biden*— which clearly would have discharged "roughly half" of the loans MOHELA serviced. *Id.* at 488, 490. In short, *Biden* does not control this case because that case had nothing to do with Article III's bar on speculative and contingent injuries.

## II.

Because we don't have jurisdiction to review State Plaintiffs' claims at this time, I do not address their merits or the scope of the district court's injunction.

I respectfully dissent in part.